TODD KIM, Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

DEVON LEA FLANAGAN (DC Bar No. 1022195)
STEFAN J. BACHMAN (SC Bar No. 102182)
Trial Attorneys
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 305-0201
Fax: (202) 616-2427
Email: devon.flanagan@usdoj.gov
       stefan.bachman@usdoj.gov

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>CITY OF SAN DIEGO,<br><br>*Defendant.* | Case No. **'23CV0541 JLS  BGS**<br><br>**COMPLAINT** |

Plaintiff the United States of America ("United States"), by the authority of the Attorney General and at the request and on behalf of the Department of the Navy ("the Navy") acting under the authority of the President of the United States, alleges as follows:

**STATEMENT OF THE CASE**

1. This is a civil action against the City of San Diego ("the City" or "Defendant") pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, ("CERCLA"), 42 U.S.C.

1

§ 9607, for the recovery of response costs incurred by the Navy, acting under delegated CERCLA authority from the President of the United States, in connection with Installation Restoration ("IR") Site 12, the Boat Channel Sediments, at the former Naval Training Center in San Diego, California (the "Site" or "Boat Channel").

2. The United States also seeks a declaratory judgment pursuant to Section 113(g) of CERCLA, 42 U.S.C. § 9613(g), as to Defendant's liability to be binding in any subsequent action for the recovery of response costs not inconsistent with the National Contingency Plan ("NCP"), 40 C.F.R. § 300.

## JURISDICTION, AUTHORITY, AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 9613(b).

4. Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c) and 42 U.S.C. § 9613(b) because the events or omissions, including the release of hazardous substances, that gave rise to the claims alleged herein occurred in this District and Defendant resides, may be found, and has its principal place of business in this District.

## DEFENDANT

5. The City is a municipality in the State of California, located within San Diego County. The City is a "person" within the meaning of 42 U.S.C. § 9601(21) because it is a "municipality."

6. The City is the current "owner" and "operator," as those terms are defined in 42 U.S.C. § 9601(20), of a municipal separate storm sewer system ("MS4") and owned and operated the MS4 at the time of disposal of hazardous substances.

7. The City was the "owner" and/or "operator," as those terms are defined in 42 U.S.C. § 9601(20), of the property containing the airport formerly known as Lindbergh Field and now known as the San Diego International Airport ("Airport Property") from roughly the 1920s to 1963. The City owned and/or operated the

Airport Property at the time of the disposal of hazardous substances at and from that property.

### STATUTORY BACKGROUND

1. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

   Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section

   (1) the owner and operator of a . . . facility, [and]
   (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

   * * *

   from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for

   (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan; . . .

2. Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), provides that the term "facility" means:

   (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or

   (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located….

3. Section 101(29) of CERCLA provides that the term "disposal" has "the meaning provided in section 1004 of the Solid Waste Disposal Act [42 U.S.C. § 6903]." 42 U.S.C. § 9601(29).  Section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), defines "disposal" as:

   the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

4. The definition of "release" in CERCLA Section 101(22), 42 U.S.C. § 9601(22), includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ."

5. Copper, lead, zinc, total chlordane, and total dichlorodiphenyltrichloroethane ("DDT") are listed as "hazardous substances" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); *see* 40 C.F.R. § 302.4.

6. Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides that in an action for cost recovery of removal or remedial costs, a "court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

## GENERAL ALLEGATIONS

### The Site

7. The Naval Training Center ("NTC") was a training facility run by the United States Department of the Navy in San Diego, California. The NTC was commissioned in June 1923 and operated until April 30, 1997. The NTC was used primarily for training purposes.

8. The former NTC is located about 2.5 miles northwest of downtown San Diego adjacent to the San Diego Bay.

9. The Boat Channel runs north-northeast from the San Diego Bay and divides the former NTC property into two sections.

10. The Boat Channel was formed in the 1930s and early 1940s and is a remnant from the historical location of the San Diego River delta. The Boat Channel is roughly 5,000 feet long and approximately 500 feet wide, except at the northern end where it is approximately 800 feet wide.

11. The former NTC property, the Airport Property (labeled "Lindbergh Field"), the Boat Channel, and the Site boundaries are shown on the map below:



12. Between 1998 and 2001, after the NTC was decommissioned and closed, former NTC parcels were transferred to several other entities, including the City. The Boat Channel is the only portion of the former NTC property that has not been transferred.

13. The Boat Channel does not have any natural surface water inputs. The only freshwater inputs into the Boat Channel come from storm drains and runoff from nearby properties.

14. More than thirty storm drains discharge into the Boat Channel from drainage areas that include properties within the City of San Diego and served by the MS4, the former NTC, a current Marine Corps Recruitment Depot, and the Airport Property.

15. Hazardous substances, including copper, lead, zinc, total chlordane, and DDT, have entered the Site from these storm drain outfalls and surface runoff.

16. Some of the storm drains that discharge to the Site are part of the City's MS4.

17. The MS4 conveys runoff and storm water from properties within the City of San Diego, including properties owned or operated by the City, to storm drain outfalls, including the ones that discharge to the Site.
18. Hazardous substances have been released from the City's MS4 to the Site.
19. The Airport Property is located to the east of the Boat Channel. Upon information and belief, the City owned and/or operated the Airport Property from the 1920s to 1963. The City passed a bond issue in 1928 for the construction of a two-runway municipal airport on the property. This airport, originally named Lindbergh Field, was dedicated on August 16, 1928.
20. Hazardous substances have been released from the Airport Property to the Site through storm drain outfalls. Upon information and belief, hazardous substances also have been released from the Airport Property to the Site through direct surface runoff.
21. During the period of the City's ownership and/or operation of the Airport Property, there was a disposal of hazardous substances from the Airport Property to the Site.

**Response Action and Enforcement History**

22. Department of Defense policy requires the Navy to identify, evaluate, and respond to the release or threat of release of hazardous substances, pollutants, or other contaminants into the environment from Navy facilities. DOD Instruction 4715.07, Defense Environmental Restoration Program (DERP) at 2 (August 31, 2018). When the Navy takes such response actions, it is acting under delegated authority from the President of the United States granted in Section 104 of CERCLA, 42 U.S.C. § 9604.
23. The Boat Channel sediments were identified as a point of interest in a 1995 Base Realignment and Closure Cleanup Plan, due to possible impacts by discharges from stormwater outfalls along the Boat Channel.
24. In 1996, the Boat Channel sediments were designated as IR Site 12 as part of the Navy's Installation and Restoration Program.
25. The Navy conducted a sediment characterization study of the Boat Channel in 1996.

Sediment samples indicated elevated levels of metals and pesticides in some locations.

26. In 2003, the Navy completed a Remedial Investigation Report to assess whether Boat Channel sediments posed an unacceptable risk to human health and/or the environment. The primary chemicals of concern identified in the Boat Channel sediments were copper, lead, zinc, total chlordane, and total DDT, concentrated in two areas of ecological concern and five potential areas of ecological concern.

27. In May 2012, the Navy completed a Draft Feasibility Study Report analyzing remedial alternatives for the Boat Channel sediments. The Navy released a final Feasibility Study Report in 2016. The Feasibility Study considered eight alternatives and determined that the preferred alternative was removing the contaminated Boat Channel sediments and disposing of them in a landfill. The Navy held a public meeting on October 6, 2016, and solicited public comments on the proposed plan.

28. On March 28, 2017, the Navy issued the final Record of Decision and Remedial Action Plan ("ROD").

29. In the ROD, the Navy selected the preferred remedial alternative: dredging the chemically impacted sediments from the Site and removing them to an off-site landfill. The ROD concluded that this alternative met the threshold criteria of overall protection of human health and the environment and compliance with applicable or relevant and appropriate requirements from federal and state statutes and regulations.

30. The San Diego Regional Water Quality Control Board ("the Water Board"), acting under delegated authority from the California Environmental Protection Agency, Department of Toxic Substances Control, concurred in the Navy's selected remedy.

31. The Navy conducted the selected remedial action between late 2017 and early 2019.

32. On March 14, 2019, the Navy issued a final Remedial Action Completion Report for IR Site 12.

33. To date, the Navy has incurred over $16 million in response costs to remediate the Boat Channel sediments and continues to incur response costs, including enforcement costs.

34. The United States Department of Justice has incurred response costs at the Site, including enforcement costs, and continues to incur such costs.

## FIRST CLAIM FOR RELIEF
(Cost Recovery under Section 107 of CERCLA)

35. Paragraphs 1 through 34 are re-alleged and incorporated by reference.

36. The Site, as well as associated contamination, is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

37. The City's MS4 is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), because it is a structure and a site where hazardous substances have been deposited, disposed of, placed, or otherwise come to be located.

38. The City is the owner and operator of the MS4 and has been for all times relevant to this Complaint.

39. The City has managed the operations of the MS4, including the collection and transport of stormwater from the City of San Diego that contains hazardous substances, including lead, zinc, copper, and pesticides or insecticides. Through its operation and ownership of the MS4, the City had the power to direct, contain, or treat stormwater.

40. During the time that the City was the owner or operator of the MS4, the "disposal" of hazardous substances within the meaning of Section 101(29) of CERCLA, 42 U.S.C. § 9601(29), occurred at and from the MS4.

41. There have been releases and threatened releases of "hazardous substances," including zinc, copper, lead, total chlordane and/or DDT, within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), from the City's MS4 to the Site.

42. The Airport Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), because it is a site or area where hazardous substances have been deposited, stored, disposed of, or placed.
43. Upon information and belief, the City was the owner and/or operator of the Airport Property from the 1920s until 1963.
44. During the time that the City was the owner and/or operator of the Airport Property, the "disposal" of hazardous substances within the meaning of Section 101(29) of CERCLA, 42 U.S.C. § 9601(29), occurred at and from the Airport Property because hazardous substances were discharged, deposited, spilled, leaked, or placed on the land and, through stormwater runoff that traveled through storm drains or by other means, these hazardous substances were discharged into the Boat Channel, where they entered the environment.
45. There have been releases and threatened releases of "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), from the Airport Property to the Site.
46. The releases and threatened releases of hazardous substances at and from the Site have caused and continue to cause the United States to incur costs to conduct response actions related to the Site, including, but not limited to, studies, investigations, remediation, oversight, enforcement, and indirect costs. The costs are not inconsistent with the NCP.
47. As the current owner and operator of the MS4 and as the owner and operator of the MS4 at the time of the disposal of hazardous substances, from which facility there has been a release or threatened release of a hazardous substance that led to the incurrence of response costs, the City is liable for all such costs under Sections 107(a)(1) and (2) of CERCLA, 42 U.S.C. § 9607(a)(1), (2).
48. As the owner and/or operator of the Airport Property at the time of the disposal of hazardous substances, from which facility there has been a release or threatened release of a hazardous substance that led to the incurrence of response costs, the

9

City is liable for all such costs under Sections 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

## SECOND CLAIM FOR RELIEF
(CERCLA Declaratory Judgment)

49. Paragraphs 1 through 48 are re-alleged and incorporated by reference.

50. Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), a declaratory judgment should be entered against the City declaring that it is liable and that the declaration of liability will be binding in any subsequent action for the recovery of response costs not inconsistent with the NCP incurred by the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States prays that the Court:

1. Enter judgment against the Defendant and in favor of the United States, for all costs incurred in response to the release or threat of release of hazardous substances at and to the Site, plus interest;

2. Enter a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2) that the Defendant is liable that will be binding in a subsequent action for future response costs to be incurred by the United States in connection with the Site not inconsistent with the National Contingency Plan;

3. Award court costs to the United States; and

4. Grant such other relief as this Court deems just and proper.

Dated: March 27, 2023        Respectfully submitted,

        TODD KIM
        Assistant Attorney General
        Environment and Natural Resources Division
        United States Department of Justice

        */s/ Devon Lea Flanagan*
        DEVON LEA FLANAGAN (DC Bar No. 1022195)

| | |
|---|---|
| 1 | STEFAN J. BACHMAN (SC Bar No. 102182) |
| 2 | Trial Attorneys |
|   | Environmental Enforcement Section |
| 3 | P.O. Box 7611 |
|   | Washington, DC 20044 |
| 4 | Phone: (202) 305-0201 |
| 5 | Fax: (202) 616-2427 |
|   | Email: devon.flanagan@usdoj.gov |
| 6 |        stefan.bachman@usdoj.gov |
| 7 | Attorneys for Plaintiff |
| 8 | UNITED STATES OF AMERICA |