TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

DEVON LEA FLANAGAN (DC Bar No. 1022195)
STEFAN J. BACHMAN (SC Bar No. 102182)
Environmental Enforcement Section
MARK A. RIGAU (CA Bar Number 223610)
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 305-0201
Fax: (202) 616-2427
Email: devon.flanagan@usdoj.gov
        stefan.bachman@usdoj.gov
        mark.rigau@usdoj.gov

*Attorneys for Plaintiff/Counter-Defendant*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>CITY OF SAN DIEGO, SAN DIEGO UNIFIED PORT DISTRICT, SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY,<br><br>*Defendants.*<br><br>AND RELATED CROSS-ACTIONS | Civil No. 3:23-CV-00541-LL-BGS<br><br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff the United States of America ("United States"), by the authority of the Attorney General and at the request and on behalf of the Department of the Navy ("the Navy") acting under the authority of the President of the United States, alleges as follows:

1

**STATEMENT OF THE CASE**

1. This is a civil action against the City of San Diego ("the City"), the San Diego Unified Port District ("the Port District"), and the San Diego County Regional Airport Authority ("the Airport Authority") (collectively, "Defendants") pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, ("CERCLA"), 42 U.S.C. § 9607, for the recovery of response costs incurred by the Navy, acting under delegated CERCLA authority from the President of the United States, in connection with Installation Restoration ("IR") Site 12, the Boat Channel Sediments Site, at the former Naval Training Center in San Diego, California (the "Site").

2. The United States also seeks a declaratory judgment pursuant to Section 113(g) of CERCLA, 42 U.S.C. § 9613(g), as to Defendants' liability to be binding in any subsequent action for the recovery of response costs not inconsistent with the National Contingency Plan ("NCP"), 40 C.F.R. § 300.

**JURISDICTION, AUTHORITY, AND VENUE**

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 9613(b).

4. Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c) and 42 U.S.C. § 9613(b) because the events or omissions, including the release of hazardous substances, that gave rise to the claims alleged herein occurred in this District and Defendants reside, may be found, and have their principal places of business in this District.

**DEFENDANTS**

5. The City is a municipality in the State of California, located within San Diego County. The City is a "person" within the meaning of 42 U.S.C. § 9601(21) because it is a "municipality."

6. The City is the current "owner" and "operator," as those terms are defined in 42 U.S.C. § 9601(20), of a municipal separate storm sewer system ("MS4") and owned and

2

operated the MS4 at the time of disposal of hazardous substances.  For purposes of this complaint, "MS4" includes any stormwater conveyances owned or operated by the City, even if they predate the use of the MS4 terminology.  The City has also arranged for the disposal of hazardous substances from its MS4 to the Site, as described in 42 U.S.C. § 9607(a)(3), and accepted hazardous substances for transport to disposal facilities or sites selected by the City from which there was a release or threatened release to the Site, as described in 42 U.S.C. § 9607(a)(4).

7. The City was the "owner" and/or "operator," as those terms are defined in 42 U.S.C. § 9601(20), of the property containing the airport formerly known as Lindbergh Field and now known as the San Diego International Airport ("Airport Property") from roughly the 1920s to 1963.  The City owned and/or operated the Airport Property at the time of the disposal of hazardous substances at and from that property.

8. The Port District is a regional public agency created by the California State Legislature on December 18, 1962.  The Port District manages the San Diego Bay and surrounding waterfront land.  The Port District is governed by a Board of Port Commissioners.  Commissioners are appointed by the city councils of San Diego, Chula Vista, Coronado, Imperial Beach, and National City.  The Port District is a "person" within the meaning of 42 U.S.C. § 9601(21) because it is a corporation and a political subdivision of the State.

9. Upon information and belief, the Port District is the current "owner," as that term is defined in 42 U.S.C. § 9607(20), of the Airport Property and has been since roughly 1963.  Additionally, the Port District was the "operator," as that term is defined in 42 U.S.C. § 9601(20), of the Airport Property from about 1963 until at least 2003.  The Port District owned and/or operated the Airport Property at the time of the disposal of hazardous substances at and from that property.  The Port District has also arranged for the disposal of hazardous substances from the Airport Property to the Site, as described in 42 U.S.C. § 9607(a)(3), and accepted hazardous substances for transport to disposal

facilities or sites it selected from which there was a release or threatened release to the Site, as described in 42 U.S.C. § 9607(a)(4).

10. The Airport Authority is an independent agency that manages the operations of the San Diego International Airport.  The Airport Authority also serves as the region's Airport Land Use Commission, and in that capacity is responsible for protecting public health and safety surrounding airports in San Diego County.  The Airport Authority was created on January 1, 2003.  The Airport Authority is a "person" within the meaning of 42 U.S.C. § 9601(21) because it is a corporation, commercial entity, and/or political subdivision of a State.

11. The Airport Authority is the current "operator," as that term is defined in 42 U.S.C. § 9601(20), of the Airport Property and current owner and operator of the Airport Property Stormwater System.  Additionally, the Airport Authority may be the current owner of the Airport Property, or portions thereof, pursuant to a 2003 lease agreement with the Port District.  The Airport Authority became the owner and/or operator of the Airport Property or portions thereof in or around 2003.  The Airport Authority owned and/or operated the Airport Property and Airport Property Stormwater System at the time of the disposal of hazardous substances at and from those facilities.  The Airport Authority has also arranged for the disposal of hazardous substances from the Airport Property to the Site, as described in 42 U.S.C. § 9607(a)(3), and accepted hazardous substances for transport to disposal facilities or sites it selected from which there was a release or threatened release to the Site, as described in 42 U.S.C. § 9607(a)(4).

## **STATUTORY BACKGROUND**

12. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section

(1) the owner and operator of a . . . facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

4

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for --

(A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan; . . .

13. Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), provides that the term "facility" means:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or

(B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located….

14. Section 101(29) of CERCLA provides that the term "disposal" has "the meaning provided in section 1004 of the Solid Waste Disposal Act [42 U.S.C. § 6903]." 42 U.S.C. § 9601(29). Section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), defines "disposal" as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

15. The definition of "release" in CERCLA Section 101(22), 42 U.S.C. § 9601(22), includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ."

5

16. Copper, lead, zinc, total chlordane, and total dichlorodiphenyltrichloroethane ("DDT") are listed as "hazardous substances" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); *see* 40 C.F.R. § 302.4.

17. Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides that in an action for cost recovery of removal or remedial costs, a "court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

## **GENERAL ALLEGATIONS**

### **The Site**

18. The Naval Training Center ("NTC") was a training facility run by the United States Department of the Navy in San Diego, California.  The NTC was commissioned in June 1923 and operated until April 30, 1997.  The NTC was used primarily for training purposes.

19. The former NTC is located about 2.5 miles northwest of downtown San Diego adjacent to the San Diego Bay.

20. A narrow body of water runs north-northeast from the San Diego Bay and divides the former NTC property into two sections.  This body of water, along with its banks, are known as the "Boat Channel."

21. The Boat Channel was formed in the 1930s and early 1940s and is a remnant from the historical location of the San Diego River delta.  The Boat Channel is roughly 5,000 feet long and approximately 500 feet wide, except at the northern end where it is approximately 800 feet wide.

22. Most of the Boat Channel falls within the former NTC boundaries and a portion of the Boat Channel at the northern end falls within the property boundary of the Marine Corps Recruit Depot, which still exists today.

23. The map below shows the former NTC property, the airport (labeled "Lindbergh Field") as defined prior to the transfer of the former NTC lands, the Boat Channel, and the Site boundaries:

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28




**FIGURE 1.2**

**Site Features**

Installation Restoration Site 12
Former Naval Training Center
San Diego, California

24. Between 1998 and 2001, after the NTC was decommissioned and closed, former NTC parcels were transferred to several other entities, including the Port District for San Diego International Airport expansion and the City. All of the former NTC property has been transferred, except for the parcels containing the Boat Channel.

25. The Boat Channel does not have any natural surface water inputs. The only freshwater inputs into the Boat Channel come from storm drain lines or other stormwater conveyances ("storm drains") and runoff from nearby properties.

26. More than thirty storm drains discharge into the Boat Channel from drainage areas that include properties within the City of San Diego and served by its MS4, the former NTC, a current Marine Corps Recruit Depot, and the Airport Property served by the Airport Property stormwater system.

27. Hazardous substances, including copper, lead, zinc, total chlordane, and DDT, have entered the Site from these storm drains and surface runoff.

28. The discharge of stormwater and other materials containing hazardous substances from storm drains into the Boat Channel is a "disposal," pursuant to 42 U.S.C. § 9601(29) and 42 U.S.C. § 6903(3), because it is a discharge, dumping, spilling, or placing of hazardous waste into or on land or water such that the hazardous substances, or any constituent thereof, may enter the environment or be discharged into water.

29. The MS4 conveys runoff, stormwater, and other materials collected by the system from properties within the City of San Diego, including properties owned or operated by the City, to storm drain outfalls, including the ones that discharge to the Boat Channel, or to stormwater conveyance systems owned and operated by other entities, including systems that discharge to the Boat Channel.

30. In the past, the City may have conveyed treated or untreated sewage to the Boat Channel or to stormwater systems that discharge to the Boat Channel through other City owned or operated wastewater conveyance systems.

31. Hazardous substances have been disposed of at and released from the City's MS4. Hazardous substances disposed of at and released from the MS4 traveled to and accumulated at the Site.

32. The Airport Property is located to the east of the Boat Channel.  Upon information and belief, the City owned and/or operated the Airport Property from the 1920s to 1963. The City passed a bond issue in 1928 for the construction of a two-runway municipal airport on the property.  This airport, originally named Lindbergh Field, was dedicated on August 16, 1928.

33. The Port District has owned and/or operated the Airport Property at various times from roughly 1963 until the present.

34. The Airport Authority has owned and/or operated the Airport Property at various times from roughly 2003 to the present.

8

35. Hazardous substances have been released from the Airport Property through the storm drain system on the Airport Property and caused contamination at the Site.  Upon information and belief, hazardous substances also have been released from the Airport Property or adjacent land leased and operated by the Port District and Airport Authority during their respective time periods of airport ownership or operation to the Site through direct surface runoff.

36. During the period of the City's ownership and/or operation of the Airport Property, there was a disposal of hazardous substances at and from the Airport Property from which there was a release or threatened release to the Site.

37. During the period of the Port District's ownership and/or operation of the Airport Property, there was a disposal of hazardous substances at and from the Airport Property from which there was a release or threatened release to the Site.

38. During the period of the Airport Authority's ownership and/or operation of the Airport Property, there was a disposal of hazardous substances at and from the Airport Property from which there was a release or threatened release to the Site.

**<u>Response Action and Enforcement History</u>**

39. Department of Defense policy requires the Navy to identify, evaluate, and respond to the release or threat of release of hazardous substances, pollutants, or other contaminants into the environment from Navy facilities. DOD Instruction 4715.07, Defense Environmental Restoration Program (DERP) at 2 (August 31, 2018).  When the Navy takes such response actions, it is acting under delegated authority from the President of the United States granted in Section 104 of CERCLA, 42 U.S.C. § 9604.

40. The Boat Channel sediments were identified as a point of interest in a 1995 Base Realignment and Closure Cleanup Plan, due to possible impacts by discharges from stormwater outfalls along the Boat Channel.

41. In 1996, the Boat Channel sediments were designated as IR Site 12 as part of the Navy's Installation and Restoration Program.

9

42. The Navy conducted a sediment characterization study of the Boat Channel in 1996. Sediment samples indicated elevated levels of metals and pesticides in some locations.

43. In 2003, the Navy completed a Remedial Investigation Report to assess whether Boat Channel sediments posed an unacceptable risk to human health and/or the environment. The primary chemicals of concern identified in the Boat Channel sediments were copper, lead, zinc, total chlordane, and total DDT, concentrated in two areas of ecological concern and five potential areas of ecological concern.

44. In May 2012, the Navy completed a Draft Feasibility Study Report analyzing remedial alternatives for the Boat Channel sediments. The Navy released a final Feasibility Study Report in 2016. The Feasibility Study considered eight alternatives and determined that the preferred alternative was removing the contaminated Boat Channel sediments and disposing of them in a landfill. The Navy held a public meeting on October 6, 2016, and solicited public comments on the proposed plan.

45. On March 28, 2017, the Navy issued the final Record of Decision and Remedial Action Plan ("ROD").

46. In the ROD, the Navy selected the preferred remedial alternative: dredging the chemically impacted sediments from the Site and removing them to an off-site landfill. The ROD concluded that this alternative met the threshold criteria of overall protection of human health and the environment and compliance with applicable or relevant and appropriate requirements from federal and state statutes and regulations.

47. The San Diego Regional Water Quality Control Board, acting under delegated authority from the California Environmental Protection Agency, Department of Toxic Substances Control, concurred in the Navy's selected remedy.

48. The Navy conducted the selected remedial action between late 2017 and early 2019.

49. On March 14, 2019, the Navy issued a final Remedial Action Completion Report for the Site.

50. To date, the Navy has incurred over $16 million in response costs to remediate the Boat Channel sediments and continues to incur response costs, including enforcement costs.

51. The United States Department of Justice has incurred response costs at the Site, including enforcement costs, and continues to incur such costs.

**FIRST CLAIM FOR RELIEF**
(Cost Recovery under Section 107 of CERCLA)

52. Paragraphs 1 through 51 are re-alleged and incorporated by reference.

53. The Site, as well as associated contamination, is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

**The City's Liability Associated with Its MS4 and Other Discharges**

54. The City's MS4 is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), because it is a structure and a site where hazardous substances have been deposited, disposed of, placed, or otherwise come to be located.

55. The City is the owner and operator of the MS4 and has been for all times relevant to this Complaint.

56. The City has managed the operations of the MS4, including the collection and transport of stormwater from the City of San Diego that contains hazardous substances, including lead, zinc, copper, and pesticides or insecticides.  Through its operation and ownership of the MS4, the City had the power to direct, contain, or treat stormwater.

57. The City has also arranged for the disposal or transport of stormwater or wastewater containing hazardous substances to the Site via intentional steps, including contracts, agreements, or other actions.  The City exercised control over the disposal process.  The Site is a facility that is not owned or operated by the City and which contained such hazardous substances.

58. Stormwater in the MS4 or wastewater in other City conveyance systems, and the hazardous substances within that stormwater or wastewater, are owned or possessed by the City.  In the alternative, hazardous substances within that stormwater or wastewater are owned or possessed by another entity or person.

59. The City has accepted hazardous substances for transportation through the MS4 to disposal facilities or sites selected by the City (i.e. the Boat Channel).  There were

11

releases or threatened releases from those facilities and/or sites which caused the Navy to incur response costs to remediate contamination at the Site.

60. During the time that the City was the owner or operator of the MS4, the "disposal" of hazardous substances within the meaning of Section 101(29) of CERCLA, 42 U.S.C. § 9601(29), occurred at and from the MS4.

61. There have been releases and threatened releases of "hazardous substances," including zinc, copper, lead, total chlordane and/or DDT, within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), from the City's MS4 directly or indirectly to the Site.

62. The releases and threatened releases of hazardous substances from the MS4 have caused and continue to cause the United States to incur costs to conduct response actions related to the Site, including, but not limited to, studies, investigations, remediation, oversight, enforcement, and indirect costs. These costs are not inconsistent with the NCP.

63. As the current owner and operator of the MS4 and as the owner and operator of the MS4 at the time of the disposal of hazardous substances, from which facility there has been a release or threatened release of a hazardous substance that caused the incurrence of response costs, the City is liable for all such costs under Sections 107(a)(1) and (2) of CERCLA, 42 U.S.C. § 9607(a)(1), (2).

64. The City is also liable as a person who by contract, agreement, or otherwise arranged for disposal, or arranged with a transporter for transport for disposal, of hazardous substances owned or possessed by the City, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, from which facility there has been a release or threatened release of a hazardous substance that caused the incurrence of response costs, pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

65. The City is also liable as a person who accepts or accepted hazardous substances for transport to disposal facilities or sites selected by the City, from which there has been a

release or threatened release of a hazardous substance that caused the incurrence of response costs, pursuant to Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

**Defendants' Liability Associated with the Airport Property and Its Stormwater System**

66. The Airport Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), because it is a site or area where hazardous substances have been deposited, stored, disposed of, or placed.

67. The Airport Property Stormwater System is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), because it is a structure and a site where hazardous substances have been deposited, disposed of, placed, or otherwise come to be located.

68. Upon information and belief, the City was the owner and/or operator of the Airport Property from the 1920s until 1963.  Upon information and belief, the City also owned and/or operated the Airport Property Stormwater System during that period.

69. The Port District was the owner and/or operator of the Airport Property and the Airport Property Stormwater System from roughly 1963 to at least 2003 and upon information and belief is the current owner of the Airport Property.

70. The Airport Authority is the current owner and/or operator of the Airport Property, or portions thereof, and the current owner and operator of the Airport Property Stormwater System.  The Airport Authority has owned and/or operated the Airport Property and the Airport Property Stormwater System since roughly 2003.

71. Each Defendant has also arranged for the disposal or transport of stormwater and other materials containing hazardous substances to the Site via intentional steps, including contracts, agreements, or other actions.  The Defendants exercised control over the disposal process.  The Site is a facility that is not owned or operated by the Defendants and which contained such hazardous substances.

72. Stormwater in the Airport Property Stormwater System and the hazardous substances within that stormwater are owned or possessed by the Defendant owning and/or

13

operating the Airport Property Stormwater System during its respective time period of ownership and/or operation.  In the alternative, hazardous substances within the stormwater are owned or possessed by another entity or person.

73. Each Defendant has accepted hazardous substances for transportation through the Airport Stormwater System to disposal facilities or sites selected by the Defendants. There were releases or threatened releases from those facilities and/or sites which caused the Navy to incur response costs to remediate contamination at the Site.

74. During the respective time periods listed in paragraphs 68 through 70, each Defendant managed the operations of the Airport Property and its Stormwater System, including the collection and transport of stormwater from the Airport Property that contains hazardous substances, including lead, zinc, copper, and pesticides or insecticides. Through their operation and ownership of the Airport Property Stormwater System, each Defendant had the power to direct, contain, or treat stormwater.

75. During the time that each Defendant was the owner and/or operator of the Airport Property and/or the Airport Property Stormwater System, the "disposal" of hazardous substances within the meaning of Section 101(29) of CERCLA, 42 U.S.C. § 9601(29), occurred at and from the Airport Property and the Airport Property Stormwater System because hazardous substances were discharged, deposited, spilled, leaked, or placed on the land or into water and, through stormwater runoff that traveled through storm drains or by other means, these hazardous substances were ultimately discharged to the Boat Channel, where they entered the environment.

76. There have been releases and threatened releases of "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), from the Airport Property and the Airport Property Stormwater System directly or indirectly to the Site.

77. The releases and threatened releases of hazardous substances at and from the Airport Property and Airport Property Stormwater System have caused and continue to cause the United States to incur costs to conduct response actions related to the Site,

14

including, but not limited to, studies, investigations, remediation, oversight, enforcement, and indirect costs.  These costs are not inconsistent with the NCP.

78. As the owner and/or operator of the Airport Property and/or the Airport Property Stormwater System at the time of the disposal of hazardous substances, from which facilities there has been a release or threatened release of a hazardous substance that caused the incurrence of response costs, each Defendant is jointly and severally liable for all such costs under Sections 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

79. As the current owner and/or operator of the Airport Property and the Airport Property Stormwater System, from which facilities there has been a release or threatened release of a hazardous substance that caused the incurrence of response costs, the Port District and Airport Authority are jointly and severally liable for all such costs under Sections 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

80. Each Defendant is jointly and severally liable as a person who by contract, agreement, or otherwise arranged for disposal, or arranged with a transporter for transport for disposal, of hazardous substances owned or possessed by that Defendant, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, from which there was a release or threatened released that caused the incurrence of response costs, pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

81. Each Defendant is jointly and severally liable as a person who accepts or accepted any hazardous substances for transport to disposal facilities or sites selected by such persons, from which there was a release or threatened release that caused the incurrence of response costs, pursuant to Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

## SECOND CLAIM FOR RELIEF
### (CERCLA Declaratory Judgment)

82. Paragraphs 1 through 81 are re-alleged and incorporated by reference.

83. Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), a declaratory judgment should be entered against each Defendant declaring that it is jointly and

severally liable and that the declaration of liability will be binding in any subsequent action for the recovery of response costs not inconsistent with the NCP incurred by the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the United States prays that the Court:

1. Enter judgment against each Defendant in favor of the United States, holding each Defendant jointly and severally liable for all costs of response actions incurred by the United States at the Site, plus interest;

2. Enter a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), that each Defendant is jointly and severally liable that will be binding in a subsequent action for future response costs to be incurred by the United States in connection with the Site not inconsistent with the NCP;

3. Award court costs to the United States; and

4. Grant such other relief as this Court deems just and proper.

Dated: September 15, 2023          Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Devon Lea Flanagan*
DEVON LEA FLANAGAN (DC Bar No. 1022195)
STEFAN J. BACHMAN (SC Bar No. 102182)
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 305-0201
Fax: (202) 616-2427
Email: devon.flanagan@usdoj.gov
       stefan.bachman@usdoj.gov

MARK A. RIGAU (CA Bar Number 223610)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Environmental Defense Section
450 Golden Gate Avenue, Suite 07-6714
San Francisco, California 94102
Tel: 415-744-6487
Fax: 415-552-7005
Email: mark.rigau@usdoj.gov

Attorneys for Plaintiff/Counter-Defendant
UNITED STATES OF AMERICA