1   Thomas F. Vandenburg (State Bar No. 163446)
2   tvandenburg@wshblaw.com
    Alice Charkhchyan (State Bar No. 332670)
3   acharkhchyan@wshblaw.com
    **WOOD, SMITH, HENNING & BERMAN LLP**
4   505 North Brand Boulevard, Suite 1100
5   Glendale, California 91203
    Phone: 818 551-6000 ♦ Fax: 818 551-6050
6
7   Attorneys for Defendant/Counter-Claimant/Third-Party Plaintiff
    CITY OF SAN DIEGO
8
9                  **UNITED STATES DISTRICT COURT**
10               **SOUTHERN DISTRICT OF CALIFORNIA**
11

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO<br><br>                          Defendant. | **Civil No. 3:23-CV-00541-LL-BGS**<br><br>**CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT; COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL**<br><br>Action Filed:  3/7/23<br><br>Trial Date:     None Set |

20   / / /
21   / / /
22   / / /
23   / / /
24
25
26
27
28

29748891.1:10874-0001

# I.

## ANSWER TO FIRST AMENDED COMPLAINT

CITY OF SAN DIEGO (hereinafter, "Defendant"), by and through its counsel of record, hereby responds to the first amended complaint (hereinafter, "FAC") filed by plaintiff, UNITED STATES OF AMERICA (hereinafter, "Plaintiff"), and each enumerated Paragraph therein, as follows:

### STATEMENT OF THE CASE

1.    The allegations in Paragraph 1 of the FAC constitute a statement of Plaintiff's case, and therefore, no response is required to said allegations.

2.    The allegations in Paragraph 2 of the FAC constitute a statement of Plaintiff's case, and therefore, no response is required to said allegations.

### JURISDICTION, AUTHORITY, AND VENUE

3.    Defendant admits the allegations set forth in Paragraph 3 of the FAC.

4.    Defendant admits the allegations set forth in Paragraph 4 of the FAC.

### DEFENDANTS

5.    Defendant admits that it is a municipality in the State of California, located within San Diego County.  The remaining allegations in Paragraph 5 of the FAC constitute a legal conclusion, and therefore, no response is required to said allegations.   To the extent Paragraph 5 of the FAC contains factual allegations pertaining to Defendant, and except as specifically admitted herein, Defendant denies said allegations.

6.    The allegations in Paragraph 6 of the FAC constitute a legal conclusion, and therefore, no response is required to said allegations.  To the extent Paragraph 6 of the FAC contains factual allegations pertaining to Defendant, Defendant denies each and every allegation set forth in Paragraph 6 of the FAC.

7.    The allegations in Paragraph 7 of the FAC constitute a legal conclusion, and therefore, no response is required to said allegations.  To the extent Paragraph 7 of the FAC contains factual allegations pertaining to Defendant, Defendant denies

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1 each and every allegation set forth in Paragraph 7 of the FAC.

2        8.    The allegations in Paragraph 8 of the FAC do not pertain to Defendant,
3 and therefore, no response is required to said allegations.  To the extent Paragraph 8
4 of the FAC contains factual allegations and require a response from Defendant,
5 Defendant admits the allegations set forth in Paragraph 8 of the FAC.

6        9.    The allegations in Paragraph 9 of the FAC do not pertain to Defendant,
7 and therefore, no response is required to said allegations.  To the extent Paragraph 8
8 of the FAC contains factual allegations and require a response from Defendant,
9 Defendant admits the allegations set forth in Paragraph 9 of the FAC.

10      10.   The allegations in Paragraph 10 of the FAC do not pertain to Defendant,
11 and therefore, no response is required to said allegations.  To the extent Paragraph 8
12 of the FAC contains factual allegations and require a response from Defendant,
13 Defendant admits the allegations set forth in Paragraph 10 of the FAC.

14      11.   The allegations in Paragraph 11 of the FAC do not pertain to Defendant,
15 and therefore, no response is required to said allegations.  To the extent Paragraph 8
16 of the FAC contains factual allegations and require a response from Defendant,
17 Defendant admits the allegations set forth in Paragraph 8 of the FAC.

18 **STATUTORY BACKGROUND**

19      12.   Defendant admits that Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)
20 is a statutory code provision and speaks for itself.  Except as specifically admitted
21 herein, Defendant denies the allegations in Paragraph 12 of the FAC.

22      13.   Defendant admits that Section 101(9) of CERCLA, 42 U.S.C. § 9601(9)
23 is a statutory code provision and speaks for itself.  Except as specifically admitted
24 herein, Defendant denies the allegations in Paragraph 13 of the FAC.

25      14.   Defendant admits that Section 101(29) of CERCLA, 42 U.S.C. §
26 9601(29) and Section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903(3) are
27 statutory code provisions and speak for themselves.  Except as specifically admitted
28 herein, Defendant denies the allegations in Paragraph 14 of the FAC.

15.   Defendant admits that Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) is a statutory code provision and speaks for itself.  Except as specifically admitted herein, Defendant denies the allegations in Paragraph 15 of the FAC.

16.   Defendant admits that Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) is a statutory code provision and speaks for itself.  Except as specifically admitted herein, Defendant denies the allegations in Paragraph 16.

17.   Defendant admits that Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2) is a statutory code provision and speaks for itself.  Except as specifically admitted herein, Defendant denies the allegations in Paragraph 17 of the FAC.

## GENERAL ALLEGATIONS

### The Site

18.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the FAC, and on that basis denies said allegations.

19.   Defendant admits the former Naval Training Center San Diego (hereinafter, "NTC") was located near San Diego Bay.  Except as specifically admitted herein, Defendant denies the allegations in Paragraph 19 of the FAC.

20.   Defendant admits the allegations in Paragraph 20 of the FAC.

21.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the FAC, and on that basis denies said allegations.

22.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the FAC, and on that basis denies said allegations.

23.   Defendant admits the allegations in Paragraph 23 of the FAC, on that basis denies said allegations.

24.   Defendant admits that certain NTC parcels were conveyed to the City between 2000 and 2001 as well as to the Port District.  Except as specifically admitted

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1   herein, Defendant denies the allegations in Paragraph 24 of the FAC.

2       25.   Defendant lacks knowledge or information sufficient to form a belief as
3   to the truth of the allegations in Paragraph 25 of the FAC, and on that basis denies
4   said allegations.

5       26.   Defendant lacks knowledge or information sufficient to form a belief as
6   to the truth of the allegations in Paragraph 26 of the FAC, and on that basis denies
7   said allegations.

8       27.   Defendant lacks knowledge or information sufficient to form a belief as
9   to the truth of the allegations in Paragraph 27 of the FAC, and on that basis denies
10  said allegations.

11      28.   Defendant admits that 42 U.S.C. § 9601(29) and 42 U.S.C. § 6903(3) are
12  each a statutory code provision and speaks for themselves.  Except as specifically
13  admitted herein, Defendant denies the allegations in Paragraph 28 of the FAC.

14      29.   Defendant denies the allegations in Paragraph 29 of the FAC as the
15  allegations pertain to it.  As to the allegations in Paragraph 29 of the FAC pertaining
16  to "other entities,"  Defendant lacks knowledge or information sufficient to form a
17  belief as to the truth of the allegations, and on that basis, denies said allegations.

18      30.   Defendant denies the allegations in Paragraph 30 of the FAC.

19      31.   Defendant denies the allegations in Paragraph 31 of the FAC.

20      32.   Defendant denies that Defendant owned and/or operated the Airport
21  Property from the 1920s to 1963.  As to the remaining allegations in Paragraph 32 of
22  the FAC, Defendant lacks knowledge or information sufficient to form a belief as to
23  the truth of the allegations, and on that basis denies said allegations.

24      33.   Defendant admits the allegations in Paragraph 33 of the FAC.

25      34.   Defendant admits the allegations in Paragraph 34 of the FAC.

26      35.   Defendant lacks knowledge or information sufficient to form a belief as
27  to the truth of the allegations, and on that basis, denies the allegations in Paragraph
28  35 of the FAC.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

36.   Defendant denies the allegations in Paragraph 36 of the FAC.

37.   Defendant admits the allegations in Paragraph 37 of the FAC.

38.   Defendant admits the allegations in Paragraph 38 of the FAC.

### **Response Action and Enforcement History**

39.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 of the FAC, and on that basis denies said allegations.

40.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the FAC, and on that basis denies said allegations.

41.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the FAC, and on that basis denies said allegations.

42.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the FAC, and on that basis denies said allegations.

43.   Defendant admits that in 2003, the Navy completed a Remedial Investigation Report.  Defendant alleges that the Remedial Investigation Report speaks for itself, and on that basis, no admission or denial to the remaining allegations in Paragraph 43 of the FAC are required.

44.   Defendant admits that in May 2012, the Navy completed a Draft Feasibility Study Report and that the Navy released a final Feasibility Study Report in 2016.  Defendant alleges that said reports speak for themselves, and on that basis, no admission or denial to the remaining allegations in Paragraph 44 of the FAC are required.

45.   Defendant admits the allegations in Paragraph 45 of the FAC.

46.   Defendant alleges that the Navy's Record of Decision and Remedial Action Plan speak for themselves, and on that basis, no admission or denial of the

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1   allegations in Paragraph 46 of the FAC are required.

2       47.    Defendant denies the allegations in Paragraph 47 of the FAC.

3       48.    Defendant denies the allegations in Paragraph 48 of the FAC.

4       49.    Defendant admits the allegations in Paragraph 49 of the FAC.

5       50.    Defendant denies the allegations in Paragraph 50 of the FAC.

6       51.    Defendant denies the allegations in Paragraph 51 of the FAC.

7   **FIRST CLAIM FOR RELIEF**

8   (Cost Recovery under Section 107 of CERCLA)

9       52.    Defendant incorporates by reference its responses to the preceding
10  paragraphs as though fully set forth herein.

11      53.    Defendant admits that Section 101(9) of CERCLA, 42 U.S.C. § 9601(9)
12  is a statutory code provision and speaks for itself.  Except as specifically admitted
13  herein, Defendant denies the allegations in Paragraph 53 of the FAC.

14      54.    Defendant admits that Section 101(9) of CERCLA, 42 U.S.C. § 9601(9)
15  is a statutory code provision and speaks for itself.  Except as specifically admitted
16  herein, Defendant denies the allegations in Paragraph 54 of the FAC.

17      55.    Defendant denies the allegations in Paragraph 55 of the FAC.

18      56.    Defendant denies the allegations in Paragraph 56 of the FAC.

19      57.    Defendant denies the allegations in Paragraph 57 of the FAC.

20      58.    Defendant denies the allegations in Paragraph 58 of the FAC.

21      59.    Defendant denies the allegations in Paragraph 56 of the FAC.

22      60.    Defendant admits that Section 101(29) of CERCLA, 42 U.S.C. §
23  9601(29) is a statutory code provision and speaks for itself.  Except as specifically
24  admitted herein, Defendant denies the allegations in Paragraph 60 of the FAC.

25      61.    Defendant admits that Section 101(14) of CERCLA, 42 U.S.C. §
26  9601(14) is a statutory code provision and speaks for itself.  Except as specifically
27  admitted herein, Defendant denies the allegations in Paragraph 61 of the FAC.

28      62.    Defendant denies the allegations in Paragraph 62 of the FAC.

63.     Defendant denies the allegations in Paragraph 63 of the FAC.

64.     Defendant denies the allegations in Paragraph 64 of the FAC.

65.     Defendant denies the allegations in Paragraph 65 of the FAC.

66.     Defendant admits that Section 101(9) of CERCLA, 42 U.S.C. § 9601(9) is a statutory code provision and speaks for itself.  Except as specifically admitted herein, Defendant denies the allegations in Paragraph 66 of the FAC.

67.     Defendant denies the allegations in Paragraph 67 of the FAC.

68.     Defendant denies the allegations in Paragraph 68 of the FAC.

69.     Defendant admits the allegations in Paragraph 69 of the FAC.

70.     Defendant admits the allegations in Paragraph 70 of the FAC.

71.     Defendant denies the allegations in Paragraph 71 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 71 of the FAC pertaining to the Port District and Airport, Defendant admits the allegations therein.

72.     Defendant denies the allegations in Paragraph 72 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 72 of the FAC pertaining to the Port District, Airport, and "another entity or person," Defendant admits the allegations therein.

73.     Defendant denies the allegations in Paragraph 73 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 73 of the FAC pertaining to the Port District and Airport, Defendant admits the allegations therein.

74.     Defendant denies the allegations in Paragraph 74 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 74 of the FAC pertaining to the Port District and Airport, Defendant admits the allegations therein.

75.     Defendant denies the allegations in Paragraph 75 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 75 of the FAC pertaining to the Port District and Airport, Defendant admits the allegations therein.

76.     Defendant denies the allegations in Paragraph 76 of the FAC.

77.     Defendant denies the allegations in Paragraph 77 of the FAC.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

78.     Defendant denies the allegations in Paragraph 78 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 78 of the FAC pertaining to the Port District and Airport, Defendant admits the allegations therein.

79.     Defendant denies the allegations in Paragraph 79 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 79 of the FAC pertaining to the Port District and Airport, Defendant admits the allegations therein.

80.     Defendant denies the allegations in Paragraph 80 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 80 of the FAC pertaining to the Port District and Airport, Defendant admits the allegations therein.

81.     Defendant denies the allegations in Paragraph 81 of the FAC as the allegations pertain to it.  As to the allegations in Paragraph 81 of the FAC pertaining to the Port District and Airport, Defendant admits the allegations therein.

### SECOND CLAIM FOR RELIEF

(CERCLA Declaratory Judgment)

82.     Defendant incorporates by reference its responses to the preceding paragraphs as though fully set forth herein.

### PRAYER FOR RELIEF

Defendant denies that Plaintiff is entitled to any relief as set forth in the FAC as against Defendant.

### II.

### AFFIRMATIVE DEFENSES

Further answering Plaintiff's FAC and by way of affirmative defense, Defendant alleges as follows.  By asserting the affirmative defenses below, Defendant intends no alteration of the burden of proof or any other evidentiary burden which otherwise exists as to any particular issue at law or in equity.  Such issues of burden are not waived and, to the contrary, are expressly reserved.

/ / /

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

## FIRST AFFIRMATIVE DEFENSE

### (Statute(s) of Limitation)

1.      Plaintiff's FAC and each and every claim for relief alleged therein, is barred by any and all applicable statutes of limitations, including but not limited to 42 U.S.C. § 9613(g)(2) and California *Code of Civil Procedure* §§ 338 and 339, and California *Probate Code* § 550, *et seq*.

## SECOND AFFIRMATIVE DEFENSE

### (Act of God or War)

2.      The damages and/or losses alleged in the FAC, if any, were or may have been proximately caused or contributed to by some natural cause, act of God, or act of war.

## THIRD AFFIRMATIVE DEFENSE

### (Act or Omission of Third Party)

3.      Based on information and belief, Defendant alleges that Plaintiff's FAC, and each and every claim for relief alleged therein, is barred in whole or in part because any alleged release of hazardous substances and any damages resulting therefrom were caused solely by the acts or omissions of a third party.

## FOURTH AFFIRMATIVE DEFENSE

### (Superseding or Intervening Independent Cause)

4.      Based on information and belief, Defendant alleges that the acts, injuries, and/or damages alleged by Plaintiff were the result of superseding or intervening causes arising from acts or omissions of Plaintiff, and/or individuals and/or other entities which Defendant neither controlled nor had the legal right to control. Accordingly, each act, injury, and/or damages alleged were not proximately caused by Defendant.

/ / /

/ / /

29748891.1:10874-0001

- 9 -

CIVIL NO. 3:23-CV-00541-LL-BGS

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT; COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

1

## FIFTH AFFIRMATIVE DEFENSE

2

### (Cause in Fact)

3      5.      Based on information and belief, Plaintiff cannot prove any facts

4   showing that Defendant's conduct or omissions were the cause in fact of the damages

5   or losses alleged in the FAC.

6

## SIXTH AFFIRMATIVE DEFENSE

7

### (Proximate Cause of Harm)

8      6.      Based on information and belief, Plaintiff cannot prove any facts

9   showing that Defendant's alleged conduct or omissions were the proximate cause of

10  the damages or losses alleged in the FAC.

11

## SEVENTH AFFIRMATIVE DEFENSE

12

### (Any Releases Authorized or Permitted Pursuant to Federal or State Law)

13     7.      To the extent that Defendant is determined to be responsible for any

14  releases or threatened releases (which responsibility it denies), any such releases or

15  threatened releases were authorized by applicable federal or state law and/or valid

16  permits.

17

## EIGHTH AFFIRMATIVE DEFENSE

18

### (Divisibility)

19     8.      If the damages alleged by Plaintiff are found to have been caused by

20  Defendant, which Defendant denies, such damages are distinct, divisible, and

21  separate, and the costs and harm in relation to which they were incurred are capable

22  of reasonable apportionment and are divisible; therefore, Defendant cannot be held

23  jointly and severally liable.

24

## NINTH AFFIRMATIVE DEFENSE

25

### (Joint and Several Liability Improper)

26     9.      On information and belief, Plaintiff is a responsible party under

27  CERCLA § 107(a), 42 U.S.C. § 9607(a), as an "owner" or "operator" of properties

28  referenced in the Crossclaims at which releases of the Contamination have occurred.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

1  Defendant therefore is barred from bringing a claim for joint and several cost recovery
2  under CERCLA § 107(a), 42 U.S.C. 9607(a), and Defendant's liability to Plaintiff, if
3  any, is limited to its equitable share, if any, of the necessary costs of response incurred
4  by Plaintiff consistent with the NCP.

5                            **TENTH AFFIRMATIVE DEFENSE**
6                            **(Right to Assert Additional Defenses)**

7            10.    Defendant reserves the right to offer additional defenses which cannot
8  now be set forth due to Plaintiff's failure to particularize their claims and/or to
9  Defendant's lack of knowledge of the circumstances surrounding Plaintiff's claims.
10 Upon further particularization of the claims by Plaintiff or upon discovery of further
11 information concerning Plaintiff's claims, Defendant reserves the right to assert
12 additional defenses.

13                         **DEFENDANT'S PRAYER FOR RELIEF**
14          WHEREFORE, Defendant prays as follows:
15          1.   That Plaintiff take nothing by its FAC, and that the FAC be dismissed
16               with prejudice;
17          2.   That Defendant be awarded costs of suit incurred in defense of this
18               action; and
19          3.   For such other relief as the Court deems just and proper.

20                                        **III.**
21                                 **COUNTERCLAIMS**

22          Defendant/Counter-Claimant CITY OF SAN DIEGO ("Counter-Claimant")
23 incorporates by reference all allegations in its Answer and also alleges the following
24 as Counterclaims against Plaintiff/Counter-Defendant, UNITED STATES OF
25 AMERICA, DEPARTMENT OF THE NAVY ("Counter-Defendant") and Roes 1-
26 10, inclusive:
27 / / /
28 / / /

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

## STATEMENT OF THE ACTION

1.     On or about March 27, 2023, Counter-Defendant filed, in the United States District Court for the Southern District of California, Case No. 3:23-CV-541-LL-BGS ("Action") against Counter-Claimant concerning the clean-up of contaminated sediments at Installation Restoration Site 12 ("IR Site 12") located within the former Naval Training Center San Diego ("NTC") Boat Channel. The "NTC Boat Channel," as used herein, consists of Parcels III-B and VII as described in the 2000 Memorandum of Agreement between Counter-Defendant and Counter-Claimant for Economic Benefit Conveyance and Public Benefit Conveyances at the former NTC ("MOA").[1] The Action seeks recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607 (the "FAC") for clean-up costs Counter-Defendant allegedly incurred at IR Site 12, which includes only the submerged sediments of NTC Boat Channel property boundaries.

2.     In response to the environmental contamination claims made against it by Plaintiff/Counter-Defendant, and in order to avoid or minimize its alleged liability in connection with such claims, in order to recover its own CERCLA-related costs, and in order to protect itself from harm caused by Plaintiff/Counter-Defendant's acts/omissions in violation of the MOA, Counter-Claimant brings this Counterclaim against Counter-Defendant for Contribution and Cost Recovery under CERCLA, Declaratory Relief under CERCLA, Breach of Contract, Equitable Indemnity, and Declaratory Relief.

3.     Without admitting any of the allegations except those set forth in Counter-Claimant's Answer to the FAC, Counter-Claimant incorporates for purposes of reference herein the FAC filed in this Action for the sole purpose of setting forth

---

[1] In its Complaint, Plaintiff uses the term "Site," which it defines as IR Site 12 only, interchangeably with the term "Boat Channel." However, IR Site 12 covers only the submerged sediments in the Boat Channel. It is not co-extensive with the property boundaries of the NTC Boat Channel at issue here. Counter-Claimant is also using the similar phrase "NTC Boat Channel" in its Counterclaim to refer to the entirety of Parcels III-B and VII as described in the MOA.

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1   Counter-Defendant's allegations to which this Counterclaim relates.

2   4.   Counter-Claimant denies that it is liable to Counter-Defendant and

3   denies that Counter-Defendant is entitled to any relief against it.

4   ## JURISDICTION AND VENUE

5   5.   This Court has jurisdiction over the subject matter of this Counterclaim

6   pursuant to (a) 28 U.S.C. §§ 1331 and 1346; (b) 28 U.S.C. § 1367; (c) Federal Rule

7   of Civil Procedure, Rule 14; and (d) Section 113(b) of CERCLA, 42 U.S.C. § 9613(b).

8   This Court also has subject matter jurisdiction over the claim for declaratory relief by

9   virtue of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the

10   Federal Rules of Civil Procedure.

11   6.   Counter-Claimant's claims for relief arise in this District.   Venue is

12   therefore proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. §

13   1391(b).

14   ## PARTIES

15   7.   Defendant/Counter-Claimant CITY OF SAN DIEGO is a municipal

16   corporation located in the County of San Diego and is named as a defendant by

17   Plaintiff/Counter-Defendant, UNITED STATES OF AMERICA in the Action.

18   8.   Counter-Claimant is informed and believes, and based thereon alleges

19   that ROES 1 through 10, inclusive, whether individual, corporate, associate, or

20   otherwise, are unknown to Counter-Claimant, which will, upon proper identification,

21   seek leave to amend this pleading when such true names are ascertained.  Each of the

22   Counter-Defendants designated as a Roe is responsible in some manner for the events

23   and happenings alleged herein.

24   9.   Whenever it is alleged herein that any act or omission was also done or

25   committed by a specifically named Counter-Defendant, Counter-Claimant intends to

26   allege, and alleges, that the same act or omission was also committed by each and

27   every Counter-Defendant named herein, including the Roe Counter-Defendants, both

28   separately and in concert or conspiracy with the other Counter-Defendants and Cross-

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1    Defendants.  Counter-Claimant prays for leave of this Court to amend this pleading

2    when those names and capacities are ascertained.

3                                    **GENERAL ALLEGATIONS**

4         10.    The United States claims in this lawsuit that the NTC Boat Channel

5    qualifies as a "facility" pursuant to 42 USC 9601."

6         11.    Each of the Counter-Defendants is a "person" within the meaning of 42

7    U.S.C. § 9601(21) and *California Health & Safety Code* § 25319.

8         12.    Based on information and belief, beginning around 1916, Counter-

9    Claimant conveyed various parcels of land to Plaintiff/Counter-Defendant for

10   purposes of constructing and operating what came to be known as NTC. Based on

11   information and belief, Plaintiff/Counter-Defendant created and has owned the NTC

12   Boat Channel since its creation around the 1930s – 1940s. NTC was closed around

13   1997 under the federal Base Realignment and Closure process ("BRAC") and the

14   property was offered for redevelopment.

15        13.    Counter-Claimant is informed and believes, and based thereon alleges

16   that Plaintiff/Counter-Defendant owned, constructed, operated, controlled, directed,

17   managed, and conducted affairs at the NTC from 1916 until on or about 2000-2001

18   when NTC parcels, except for the NTC Boat Channel parcels, were conveyed to the

19   City and other entities. Counter-Claimant is informed and believes, and based thereon

20   alleges that Plaintiff/Counter-Defendant owned, constructed, operated, controlled,

21   directed, managed, and conducted affairs at the Marine Corps Recruit Depot

22   ("MCRD"), adjacent to both NTC and the NTC Boat Channel, from around 1919 to

23   the present.  Counter-Claimant is informed and believes, and based thereon alleges

24   that Plaintiff/Counter-Defendant owned, constructed, operated, controlled, directed,

25   managed, and conducted affairs at other properties within the watershed draining to

26   the NTC Boat Channel from the time of its creation to the present.  As such, Counter-

27   Defendant is a "person" and "operator" as defined by CERCLA, 42 U.S.C. § 9601.

28

*(left margin, vertical text)* WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

**DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL**

14.     In 2000, Counter-Claimant and Plaintiff/Counter-Defendant entered into the MOA setting forth the terms under which Counter-Claimant agreed to accept Plaintiff/Counter-Defendant's conveyance of certain NTC parcels, including the NTC Boat Channel, to Counter-Claimant for redevelopment.   With regard to the NTC Boat Channel parcels, the MOA states in relevant part:

> 2.(c) . . .
>
> "Parcel IIIB is believed to contain sediments impacted with various contaminants.  Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel IIIB, as described in the NTC San Diego Reuse Plan dated August 1998."
>
> 4.(b) . . .
>
> "Parcel VII is believed to contain sediments impacted by various contaminants.  Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel VII, as described in the NTC San Diego Reuse Plan dated August 1998."

The remedial action taken by Plaintiff/Counter-Defendant pursuant to the MOA was flawed, including but not limited to by being developed and implemented without adequate understanding or analysis of the sources, nature, types, and extent of contamination at the NTC Boat Channel.

15.     Based on information and belief, each of the Counter-Defendant's operations, including Plaintiff's, resulted in the generation, storage, use, discharge, release, and disposal of hazardous substances at the NTC Boat Channel.

16.     Based on information and belief, at various times between approximately 1916 to the present, Counter-Defendants, including Plaintiff, caused or contributed to the past or present handling, storage, treatment, transportation, generation, release, or disposal of Chemicals of Concern in the environment in, at, and around the NTC Boat

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ◆ FAX 818 551-6050

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

Channel, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the state of California, because each Counter-Defendant released or otherwise discarded Chemicals of Concern, and/or controlled and/or operated the NTC, MCRD, or other property or engaged in a business or other activity from which Chemicals of Concern were released or otherwise discarded, and/or failed to prevent or abate the contamination caused by Chemicals of Concern.

17. Based on information and belief, at various times between 1916 to the present, Counter-Defendants, including Plaintiff, negligently, suddenly, and accidentally caused or contributed to the presence of Chemicals of Concern in the environment, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the state of California, at the NTC Boat Channel.

18. Based on information and belief, Counter-Defendants, including Plaintiff, without the consent or knowledge of Defendant/Counter-Claimant, released and/or failed to remediate hazardous substances, hazardous waste, and/or solid waste in the environment at or around the NTC Boat Channel, and knew or should have known that any such release would contaminate the soil and water in, at, beneath, and around the NTC Boat Channel.

19. Based on information and belief, each of the Counter-Defendant's releases of, disposals of, and/or failures to remediate hazardous substances into the environment at or around the NTC Boat Channel has resulted or may result in the migration of contamination to the NTC Boat Channel and/or to real property that is not the subject of this lawsuit, owned by individuals or entities which are not parties to this lawsuit.

20. As compared to Counter-Defendants, who discharged, disposed of, caused the releases of, or failed to remediate hazardous substances and hazardous waste into the environment in, at or around the NTC Boat Channel, Defendant/Counter-Claimant is without fault.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

# FIRST COUNTERCLAIM

## (Contribution Pursuant to CERCLA §113(f)(1))

## (Against All Counter-Defendants)

21.   Defendant/Counter-Claimant incorporates by reference its allegations in Paragraphs 1 through 20 above as though fully set forth herein.

22.   Each of the Counter-Defendants is a liable or potentially liable person under section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

23.   Counter-Defendants are each a "person" as defined in CERCLA § 101(21), 42 U.S.C. § 9601(21).

24.   Plaintiff/Counter-Defendant has alleged that a "release" or threatened release of a "hazardous substance," as those terms are defined by CERCLA §§101(22), 42 U.S.C. § 9601(22), (14), has occurred at the NTC Boat Channel.

25.   The United States claims in this lawsuit that the NTC Boat Channel qualifies as a "facility" pursuant to 42 USC 9601."

26.   Counter-Claimant denies any liability to Counter-Defendant; but if Counter-Claimant's CERCLA liability for Counter-Defendant's alleged response costs is established, then pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1), the Court should allocate the response costs sought in Counter-Defendant's claim among liable or potentially liable parties, including each of the Counter-Defendants and each of any Cross-Defendants, using such equitable factors as the Court determines are appropriate.

27.   Counter-Claimant is informed and believes, and based thereon alleges, that each of the Counter-Defendants either:

(a)   "released" or threatened to "release" hazardous substances to/at the NTC Boat Channel within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) during their ownership and/or occupation of the NTC and/or MCRD and/or other properties; and/or

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ◆ FAX 818 551-6050

(b) owned or operated NTC and/or MCRD and/or other properties and had a duty, authority, obligation, and/or right to manage, control, oversee, monitor, regulate and/or supervise the acts or omissions of their various lessees and/or sub-lessees to prevent the "release" or threatened "release" of hazardous substances, and to remediate any such "release" within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) to/at the NTC Boat Channel; and/or

(c) is vicariously liable for a "release" or threatened "release" of hazardous substances to/at the NTC Boat Channel within the meaning Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) during their ownership, operation, and/or occupation of the NTC and/or MCRD and/or other properties, under applicable alter-ego, corporate successor, corporate parent, and/or other theories of vicarious liability; and/or

(d) is the current owner and/or operator of the NTC Boat Channel.

28.    Therefore, each of the Counter-Defendants is potentially liable under § 107(a) of CERCLA, 42 U.S.C. § 9607(a) for any costs of response incurred or that will be incurred by Counter-Claimant for the investigation and remediation of any and all disposals and/or releases of hazardous substances at the NTC Boat Channel.

29.    Counter-Claimant is entitled to contribution, pursuant to CERCLA § 113(f), 42 U.S.C. § 9613(f) for any and all costs, from any person who is liable or potentially liable under CERCLA, including but not limited to, assessment, investigation, evaluation, monitoring, mitigation, removal, and/or remedial action costs and/or enforcement costs, attorney's fees, consultant fees, and related costs, together with interest and court costs, incurred by Counter-Claimant in excess of Counter-Claimant's proportionate liability.

30.    WHEREFORE, Defendant/Counter-Claimant prays for judgment as set forth below.

## SECOND COUNTERCLAIM

## Cost Recovery under CERCLA, 42 U.S.C. § 9607(a)

31.     Counter-Claimant incorporates by reference its allegations in Paragraphs 1 through 30 above as though fully set forth herein.

32.     Counter-Defendant's potential liability in this action arises from its allegations in the FAC that there has been a release of hazardous substances into the environment that have allegedly contaminated the NTC Boat Channel.

33.     The United States claims in this lawsuit that the NTC Boat Channel qualifies as a "facility" pursuant to 42 U.S.C. § 9601.

34.     Counter-Claimant is informed and believes, and based thereon alleges, that each of the Counter-Defendants either:

a.  "released" or threatened to "release" hazardous substances to/at the NTC Boat Channel within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) during their ownership, operation, and/or occupation of said location; and/or

b.  owned or leased the NTC Boat Channel and had a duty, authority, obligation, and/or right to manage, control, oversee, monitor, regulate and/or supervise the acts or omissions of their various lessees and/or sub-lessees to prevent the "release" or threatened "release" of hazardous substance, and to remediate any such "release" within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) to/at said location; and/or

c.  is vicariously liable for a "release" or threatened "release" of hazardous substances at the NTC Boat Channel within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), under applicable alter-ego, corporate successor, corporate parent, and/or other theories of vicarious liability; and/or is the current owner and/or operator of the NTC Boat Channel.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
HAMMER & JACOBS, SUITE 100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

35.     Thus, each of the Counter-Defendants is an "owner or operator" at the time when hazardous materials were allegedly released or threatened to be released to/at the NTC Boat Channel and is vicariously liable for a release or threatened release to/at the NTC Boat Channel or is the current "owner or operator" of the NTC Boat Channel and therefore each of the Counter-Defendants is a "responsible," "liable" and/or "covered" party pursuant to 42 U.S.C. § 9607.

36.     Counter-Claimant has incurred, and will continue to incur, response costs in relation to the investigation, mitigation, and/or remediation of any and all disposals and/or releases of hazardous substances at the NTC Boat Channel including the response costs related to potential migration of hazardous substances to the NTC Boat Channel from  surrounding properties that are not part of the NTC Boat Channel. These response costs are both necessary and consistent with the National Contingency Plan and were incurred in accordance with the applicable CERCLA requirements. These response costs include, but are not limited to, assessment, investigation, evaluation, monitoring, mitigation, removal, and/or remedial action costs and/or enforcement costs, attorney's fees, consultant fees, and related costs, all of which are and will continue to be necessary costs of response consistent with the National Contingency Plan.

37.     Based on the above, Counter-Claimant is entitled to reimbursement for any and all such past, present, and/or future response costs incurred prior to trial, together with interest thereon, with each of the Counter-Defendants being strictly liable to Counter-Claimant for all such amounts under CERCLA.

### THIRD COUNTERCLAIM

### (Breach of Contract)

38.     Counter-Claimant incorporates by reference its allegations in Paragraphs 1 through 37 above as though fully set forth herein.

39.     As alleged above, Paragraphs 2(c) and 4(b) of the MOA (a copy of which is attached hereto as **Exhibit A**) obligated Counter-Defendant to "take all remedial

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE  818 551-6000 ♦ FAX 818 551-6050

1 action necessary to protect human health and the environment and [to] obtain site

2 closure from appropriate regulatory authorities based on the projected use of [Parcels

3 IIIB and VII.]"  Parcels IIIB and VII comprise that portion of the NTC Boat Channel

4 at issue here. A small section at the upper northeast end of the Boat Channel lies

5 outside of NTC in MCRD. The MOA anticipated that parcels IIIB and VII would be

6 conveyed to Counter-Plaintiff in 2002.  The Record of Survey referenced in MOA

7 Exhibit A is attached hereto as **Exhibit B**.

8     40.    Counter-Defendant and Roes 1-10 have breached, and continue to

9 breach, their obligations under the MOA, including but not limited to failing to take

10 all remedial action necessary to protect human health and the environment and  failing

11 to obtain site closure from appropriate regulatory authorities based on the projected

12 uses of Parcels IIIB and VII, as described in the NTC San Diego Reuse Plan dated

13 August 1998.

14     41.    Plaintiff/Counter-Defendant developed and implemented a remediation

15 plan with an inadequate understanding and analysis of the sources, nature, types, and

16 extent of contamination in/at the NTC Boat Channel, so that their remediation

17 obligations have not been satisfied.  Further, Plaintiff/Counter-Defendant has failed

18 and refused to perform any further investigation and remediation of the NTC Boat

19 Channel.

20     42.    Plaintiff/Counter-Defendant's response action breached the provisions

21 and requirements of the MOA because: (1) Plaintiff/Counter-Defendant's

22 investigation was inadequate; (2) the site characterization relied on stale, flawed, and

23 incomplete data; and (3) Plaintiff/Counter-Defendant's remediation was incomplete

24 since the remediation plan itself was deficient, did not encompass the entirety of NTC

25 Boat Channel parcels IIIB and VII, and did not comply with current regulatory

26 standards.  Moreover, Plaintiff/Counter-Defendant ignored the Counter-Claimant's

27 repeated warnings,  over a number of years, about the flaws in its investigation and

28 remediation.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

43.    Plaintiff/Counter-Defendant breached the provisions and requirements of the MOA  because its remedial investigation was inadequate.  Counter-Claimant has previously informed Plaintiff/Counter-Defendant that Plaintiff/Counter-Defendant's remedial investigation was inadequate for the following reasons: (1) Counter-Defendant failed to accurately identify the current and historic sources of discharges to the NTC Boat Channel, and further, failed to assess their relative contributions to the contamination; (2) Counter-Defendant's remedial investigation improperly relied upon 20-year old data; (3) Counter-Defendant did not test for all likely pollutants; (4) the scope and methodology of the investigation were insufficient to accurately characterize the NTC Boat Channel by current standards; and (5) many other variables could have affected the NTC Boat Channel over the roughly twenty-year timeframe between investigation and remediation, potentially requiring a different remedial strategy to ensure a second cleanup action would not be necessary to remove any remaining contamination.

44.    Counter-Defendant also breached the provisions and requirements of the MOA  because the remediation was deficient and incomplete.  As Counter-Claimant previously advised Counter-Defendant on several occasions, Counter-Defendant's remediation was deficient because: (1) Counter-Defendant's remediation proposed cleanup to Alternative Cleanup Levels ("ACLs") that do not meet current sediment remediation standards; (2) Counter-Defendant's remediation failed to address all existing contamination throughout the entirety of the NTC Boat Channel including the banks, slopes, rip rap, shorelines, and shallower areas, which make up a significant portion of the NTC Boat Channel; (3) Counter-Defendant's  remediation fails to control the potential migration of legacy contaminants from the banks, slopes, rip rap, shoreline, and shallow areas onto the NTC Boat Channel; and (4) Counter-Defendant's remedial plan proposed no remediation of Parcel IIIB, even though the parties acknowledged in the MOA that Parcel IIIB was impacted by contaminated sediments.  Further, as a result of the chosen remedial plan, Counter-Defendant will

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1    not provide 5-year monitoring of the site, eliminating a protection that could have

2    been required if a different, more comprehensive, response action had been selected.

3        45.    Counter-Defendant also breached the provisions and requirements of the

4    MOA because its remedial plan did not meet current sediment remediation standards,

5    i.e., the 2009 Sediment Quality Objectives (SQOs), nor the 2018 SQOs.   Under

6    Plaintiff/Counter-Defendant's clean-up analysis, the 2009 SQOs were not considered

7    "Applicable or Relevant and Appropriate Requirements" (ARARs) under CERCLA.

8    However, Counter-Defendant failed to provide any explanation or analysis as to why

9    it concluded the 2009 SQOs are not an applicable or relevant and appropriate

10   requirement. Nor, to Counter-Claimant's knowledge, did Counter-Defendant formally

11   waive those requirements in accordance with CERCLA.   Unlike Plaintiff/Counter-

12   Defendant, future, non-federal owners of the NTC Boat Channel will not be shielded

13   from San Diego Regional Water Quality Control Board ("Water Board") efforts to

14   require further investigation and remediation to current State standards.  An April 6,

15   2022 letter from the Water Board to Counter-Defendant confirms as much.

16       46.    Counter-Defendant also breached the provisions and requirements of the

17   MOA because Counter-Defendant's remedial plan failed to address all existing

18   contamination throughout the entirety of the NTC Boat Channel, including the banks,

19   slopes, rip rap, shorelines, and shallower areas, which make up a significant portion

20   of the site.  Counter-Claimant understands that these areas, which extend to the top of

21   the bank of the NTC Boat Channel parcels, were not included in Counter-Defendant's

22   testing protocol during its remedial investigation.  Counter-Defendant's exclusion of

23   these areas in its remedial investigation and cleanup raises serious concerns because

24   both surface runoff and storm drain discharges, which Counter-Defendant claims is

25   the primary source of contaminants, would have flowed across and down those areas.

26       47.    Plaintiff/Counter-Defendant's remedial action is in breach of the MOA

27   because there are inconsistencies between the areas Counter-Defendant identified as

28   impacted versus the areas that Counter-Defendant cleaned up.  For example, dredging

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE  818 551-6000 ♦ FAX 818 551-6050

1    depths were modified during cleanup and certain sloped areas were avoided.

2        48.    Plaintiff/Counter-Defendant's remedial action is in breach of the MOA

3    because it has failed, and continues to fail, to control the potential migration of legacy

4    contaminants to/at the NTC Boat Channel from the banks, slopes, rip rap, shoreline,

5    and shallow areas of the site. Counter-Defendant's remedial efforts only consisted of

6    dredging. Dredging alone is not sufficient to assure long-term protection of the

7    environment from recontamination threats to the NTC Boat Channel sediments.

8    Thus, by limiting remedial measures to dredging only, and by failing to include source

9    control measures, the sediments remain susceptible to recontamination from legacy

10   pollutants.

11       49.    Plaintiff/Counter-Defendant also has breached the provisions and

12   requirements of the MOA because it proposed no remediation of Parcel IIIB, and none

13   was performed, even though the parties acknowledged in the MOA that Parcel IIIB

14   was impacted by contaminated sediments.

15       50.    Counter-Defendant also has breached the MOA because NTC Boat

16   Channel parcels IIIB and VII are not suitable for transfer, and yet Plaintiff/Counter-

17   Defendant has found that NTC Boat Channel parcels IIIB and VII are suitable for

18   transfer and has, in fact, attempted to transfer those parcels to Counter-Defendant in

19   violation of the MOA.

20       51.    The Water Board was the lead State agency overseeing

21   Plaintiff/Counter-Defendant's remedial investigation and clean-up of the NTC Boat

22   Channel.  Unlike other sites, where the Water Board issues a "No Further Action"

23   ("NFA") letter for the property as a whole, here the Water Board only issued a

24   qualified approval of Counter-Defendant's limited clean-up. Instead of an NFA letter,

25   the Water Board issued a "No Further Comment" Letter, which leaves the door open

26   for further investigative and clean-up orders by the Water Board once the NTC Boat

27   Channel is transferred to a non-federal party. Moreover, the Water Board's various

28   letters do not state that the cleanup is protective of human health as required by the

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1    MOA. Further, any statement that the cleanup is protective of the environment is

2    limited to the sediments in IR Site12 because the investigation and remediation failed

3    to include the banks, slopes, rip rap, shoreline, and shallow areas of the NTC Boat

4    Channel.  So, at most, the Water Board letters close the case on IR site 12, but do not

5    constitute the site closure on Parcels IIIB and VII that Counter-Defendant promised

6    it would provide in the MOA.

7        52.    The Water Board's letters create a reasonable expectation that further

8    investigation and clean-up will be required at the NTC Boat Channel. Indeed, the

9    Water Board's San Diego Bay strategic plan and recently issued Investigative Orders

10   to Counter-Claimant and other parties for nearby areas of the San Diego Bay clearly

11   demonstrate what is in store for the NTC Boat Channel should it be transferred to the

12   City.[2]

13       53.    Given the above, Counter-Claimant has no written confirmation from the

14   Water Board that it will not seek further investigation and remediation of legacy

15   pollutants at the NTC Boat Channel.

16       54.    In fact, on April 16, 2019, the Water Board sent a letter to Counter-

17   Defendant entitled "Final Remedial Action Completion Report, Installation

18   Restoration Site 12, Boat Channel Sediments, Former Naval Training Center, San

19   Diego, California, March 2019" ("Final RACR").  This letter was not a "No Further

20   Action" letter typically submitted by regional boards for site closure, but was instead

21   a communication that the Water Board had "no further comments on the Final RACR

22   that had been submitted by the Department of the Navy in March 2019.  In reliance

23   on this correspondence, Counter-Defendant submitted its Draft Finding of Suitability

24   to Transfer (FOST) document to the Water Board on August 24, 2020, which

25   commenced a 30-day comment period for the same.  In response, Counter-Claimant

26

27   _____

     [2] California Regional Water Quality Control Board San Diego Region Resolution No. R9-2015-0086 in Support of
     Implementation of the Strategy for a Healthy San Diego Bay; Investigative Order No. R9-2019-0040 for Laurel

28   Hawthorne Embayment; Investigative Order No. R9-2017-0081 for Tenth Avenue Marine Terminal; Investigative
     Order No. R9-2017-0082 for Continental Marine San Diego.

submitted comments on the Draft FOST that outlined Counter-Defendant's investigatory and remedial failures at the NTC Boat Channel and highlighted the fact that the Water Board had never issued a "No Further Action" letter regarding the NTC Boat Channel or IR Site 12. Then, on December 16, 2020, despite the fact that no additional investigation or remedial activities had been undertaken at the NTC Boat Channel, the Water Board issued an NFA letter. Counter-Claimant then filed a Petition with the State Water Resources Board challenging the issuance of the NFA letter. The Water Board later unilaterally rescinded the NFA letter.

55. Further, Counter-Defendant has refused, and continues to refuse, to provide the City with the CERCLA covenant for the NTC Boat Channel parcels, which is a material term of the MOA. Pursuant to CERCLA section 120(h) at 42 USC section 9620, if the grantee of land might be a potentially responsible party, subsection (h)(3)(B) lifts the requirement for a CERCLA covenant without expressly prohibiting these covenants. Counter-Defendant now asserts it will not provide the CERCLA covenant, without which the City will be exposed to significant liability if historical contamination is discovered at the NTC Boat Channel after the parcels are transferred.

56. Plaintiff/Counter-Defendant has attempted to transfer the NTC Boat Channel parcels to Counter-Plaintiff to force their acceptance in their present condition in violation of the MOA.

57. Given the above, Counter-Claimant has sustained and/or will sustain harm as a result of Counter-Defendants' failure to fulfill their obligations under the MOA, including by losing use of the NTC Boat Channel free of contamination to which it was entitled under the MOA, and/or by facing exposure to future investigative and clean-up orders if the NTC Boat Channel is transferred in its present condition to Counter-Plaintiff, and/or by facing future CERCLA and other liability related to the NTC Boat Channel.

58. Section 9. Performance of the MOA states: " . . . [F]ailure of either party to perform or observe any other term or condition of this Agreement prior to

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT; COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1  conveyance of the Property, after written notice and thirty days to cure, shall be

2  deemed to be a breach of this Agreement, and the other party may exercise any of the

3  remedies for breach or default set forth in this Agreement or otherwise available,

4  including the right to terminate this Agreement."

5      59.    On May 16th, 2022, Counter-Defendant tendered transfer documents for

6  the NTC Boat Channel Parcel IIIB to Counter-Plaintiff.  On June 3rd, 2022, Counter-

7  Plaintiff advised Counter-Defendant in writing that with regard to Parcel IIIB

8  Counter-Defendant had not taken all remedial action necessary to protect human

9  health and the environment nor obtained site closure from appropriate regulatory

10  authorities, as required by the MOA.  Counter-Plaintiff further advised Counter-

11  Defendant in writing that Parcel IIIB was not suitable for transfer, and noted that

12  Counter-Defendant's proposed quitclaim deed for Parcel IIIB failed to include the

13  promised CERCLA covenant.  Counter-Plaintiff further advised Counter-Defendant

14  in writing that for all these reasons, Counter-Plaintiff was not willing to accept

15  transfer of Parcel IIIB in its present condition.  On June 10th, 2022, Counter-

16  Defendant acknowledged receipt of Counter-Plaintiff's June 3rd, 2022 written

17  communication.

18      60.    On May 16th, 2022, Counter-Defendant tendered transfer documents for

19  NTC Boat Channel Parcel VII to the National Park Service for subsequent transfer to

20  Counter-Plaintiff as a public benefit conveyance.  On May 19th, 2022, Counter-

21  Plaintiff advised the National Park Service and Counter-Defendant in writing that

22  Counter-Plaintiff disputed Counter-Defendant's claim that Parcel VII was suitable for

23  transfer, and that Counter-Plaintiff objected to such transfer.  On May 23rd, 2022, the

24  National Park Service acknowledged receipt of Counter-Plaintiff's May 19th, 2022

25  written communication.  On June 7th, 2022, Counter-Plaintiff further advised the

26  National Park Service and Counter-Defendant in writing that Counter-Plaintiff would

27  not accept transfer of Parcel VII in its present state.

28

61.     On February 1st, 2023, with regard to both Parcel IIIB and Parcel VII, Counter-Defendant advised Counter-Plaintiff in writing that (1) Counter-Defendant has fulfilled all of its obligations under the MOA and (2) Counter-Defendant does not intend to undertake any further cleanup efforts at the NTC Boat Channel Parcels.

62.     The absence of accurate and current data regarding the environmental condition of the NTC Boat Channel renders it impossible for Plaintiff/Counter-Defendant, or any other party, to determine additional remedial actions necessary to remediate all existing contamination, and further, makes it impossible to conclude that the Plaintiff/Counter-Defendant's investigative and remedial efforts are sufficient.

63.     As one example, the Navy failed to account for all legacy contamination at IR Site 12, including, but not limited to, potential contamination from the landfill formerly located on the Naval Training Center/Camp Nimitz site which is located adjacent to the NTC Boat Channel.  Reports issued by the Navy identified a shallow aquifer under the old landfill where groundwater in likely contact with the waste generally flows toward the NTC Boat Channel.  The Navy failed to account for this potentially significant source of contamination.

64.     Given the above, Counter-Claimant is under no obligation under the MOA to accept the transfer of NTC Boat Channel parcels IIIB and VII in their present condition.

65.     WHEREFORE Defendant/Counter-Claimant prays for judgment as set forth below.

## **FOURTH COUNTERCLAIM**

### **(Equitable Indemnity Under Common Law)**

### **(Against All Counter-Defendants)**

66.     Counter-Claimant incorporates by reference its allegations in Paragraphs 1 through 65 above as though fully set forth herein.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE  818 551-6000 ♦ FAX 818 551-6050

67.     Based on information and belief, any liability that Counter-Claimant may have to any other person, government or regulatory agency, under any law, regulation, or common law principle, relating to the alleged contamination at the NTC Boat Channel, was proximately caused, in whole or in part, by the acts and/or omissions of Counter-Defendants, and each of them.

68.     Counter-Claimant denies any liability to Counter-Defendants; but if Counter-Claimant's liability for Counter-Defendants' alleged damages is established, then that liability would be a direct and proximate result of the acts and/or omissions of each of the Counter-Defendants, as alleged in detail above.  Counter-Claimant would therefore be entitled to recover indemnity, whether total or partial, equitable, implied and/or expressed, from Counter-Defendants, and each of them.

69.     In the event that Counter-Claimant is determined to be legally liable for removal or remedial action costs, expenses, or other damages as a result of the claims asserted by Counter-Defendant or others relating to soil and/or water contamination in, to or at the NTC Boat Channel, then Counter-Claimant would be entitled to indemnification from Counter-Defendants, and each of them, for the damages, including attorneys' fees and litigation costs, caused by the acts and/or omissions of each of the Counter-Defendants.

70.     WHEREFORE, Defendant/Counter-Claimant prays for judgment as set forth below.

## **FIFTH COUNTERCLAIM**

### **(Declaratory Relief Pursuant to CERCLA § 113(g)(2) and Other Federal and State Laws)**

### **(Against All Counter-Defendants)**

71.     Counter-Claimant incorporates by reference its allegations in Paragraphs 1 through 70 above as though fully set forth herein.

72.     An actual and substantial legal controversy exists between Counter-Claimant and the Counter-Defendants regarding their respective rights and

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

obligations for response costs that allegedly have been incurred and will be incurred in connection with contamination found at the NTC Boat Channel. Counter-Claimant contends that it is entitled to a declaration that each of the Counter-Defendants is liable for all past, present, and future response costs and other damages incurred by Counter-Claimant in connection with the NTC Boat Channel. Based on information and belief, Counter-Defendants contend otherwise.

73.     Counter-Claimant is authorized to seek declaratory relief in this action against each of the Counter-Defendants pursuant to CERCLA section 113(g)(2), 42 U.S.C. § 9613(g)(2); 28 U.S.C. § 2201.

74.     No adequate or speedy remedy exists for Counter-Claimant in the absence of a judicial declaration pursuant to applicable law. Based on information and belief, if Counter-Claimant's liability is established, then it will incur substantial costs over time and after conclusion of this action; and unless declaratory relief is granted, Counter-Claimant will need to commence successive actions against Counter-Defendants , and each of them, to secure compensation for the costs incurred and damages sustained, thus requiring a multiplicity of suits. Counter-Claimant therefore requests a declaration from the Court setting forth its and Counter-Defendants' liability for past, present and future response, removal and remediation costs, and other penalties and/or damages imposed on Counter-Claimant in connection with the NTC Boat Channel.

75.     WHEREFORE, Defendant/Counter-Claimant prays for judgment as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant/Counter-Claimant prays for judgment against all Counter-Defendants as follows:

1.     For an Order of this Court prohibiting Counter-Defendant from transferring NTC Boat Channel Parcels VII and III-B to Counter-Claimant unless and until Counter-Defendant can fully demonstrate to this Court that (1) it has taken all

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1   remedial action necessary to protect human health and the environment and (2) it has

2   obtained site closure from appropriate regulatory authorities based on the projected

3   uses of Parcels VII and III-B, as described in the NTC San Diego Reuse Plan dated

4   August 1998; and

5       2.      For an Order of this Court compelling Counter-Defendant (1) to take all

6   remedial action necessary to protect human health and the environment and (2) to

7   obtain site closure from appropriate regulatory authorities based on the projected uses

8   of Parcels VII and III-B, as described in the NTC San Diego Reuse Plan dated August

9   1998; and

10      3.      For an Order of this Court prohibiting Counter-Defendant from

11  transferring NTC Boat Channel Parcels VII and III-B to Counter-Claimant unless

12  Counter-Defendant provides Counter-Claimant with the CERCLA covenant for each

13  parcel which Counter-Claimant is entitled to under the terms of the MOA;  or

14      4.      For an Order of this Court declaring that Counter-Claimant has no legal

15  duty to accept transfer of NTC Boat Channel Parcels VII and III-B  to Counter-

16  Claimant due to the Counter-Defendant's breach of the requirements and provisions

17  of the MOA; and

18      5.      For an Order of this Court which rescinds the MOA provisions

19  concerning transfer of NTC Boat Channel Parcels VII and III-B to Counter-Claimant

20  due to Counter-Defendant's breach of the requirements and provisions of the MOA;

21  and

22      6.      For contribution from Counter-Defendants, and each of them, pursuant

23  to 42 U.S.C. § 9613(f)(1), for all or part of the past and future response costs that the

24  Counter-Claimant is or may be liable for with respect to the NTC Boat Channel; and

25      7.      For contribution from Counter-Defendants, and each of them, pursuant

26  to 42 U.S.C. § 9613(f)(1), for all or part of the past and future response costs that the

27  Counter-Claimant has incurred or will incur with respect to the NTC Boat Channel;

28  and

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

8.      For a declaration, pursuant to 42 U.S.C. § 9613(g)(2), 28 U.S.C. § 2201, that Counter-Claimant is entitled to contribution from each of the Counter-Defendants for all or part of the response costs, expenses, and other damages that Counter-Claimant is or may be liable for in any subsequent action or actions to recover further response costs incurred in response to the releases or threatened release of hazardous substances at the NTC Boat Channel; and

9.      For indemnity, whether total or partial, equitable, implied and/or expressed from the Counter-Defendants, and each of them, in an amount for which Counter-Claimant is held liable as a result of the claims asserted by Counter-Defendant or others relating to contamination in, to or at the NTC Boat Channel; and

10.     For costs of suit; and

11.     For such other relief that the Court deems just and proper.

## IV.

## CROSS-CLAIMS

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant/Cross-Complainant, CITY OF SAN DIEGO (hereinafter, "City"), hereby asserts the following Cross-Claims against Cross-Defendants, SAN DIEGO UNIFIED PORT DISTRICT (hereinafter, "Port District"); SAN DIEGO AIRPORT AUTHORITY (hereinafter, "Airport Authority"); and ROES 1 through 10, inclusive (hereinafter collectively, "Cross-Defendants"):

## PARTIES

1.      SAN DIEGO UNIFIED PORT DISTRICT is a public corporation located in the County of San Diego.

2.      SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY is a local governmental entity of regional government located in the County of San Diego.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of these Cross-Claims pursuant to (a) 28 U.S.C. §§ 1331 and 1346; (b) 28 U.S.C. § 1367; (c) Federal Rule

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1  of Civil Procedure, Rule 14; and (d) § 113(b) of CERCLA, 42 U.S.C. § 9613(b).  This
2  Court also has subject matter jurisdiction over the claim for declaratory relief by virtue
3  of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the
4  Federal Rules of Civil Procedure.

5       4.     The City's claims for relief arise in this District.  Venue is therefore
6  proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. and 28 U.S.C. §
7  1391(b).

8                          **GENERAL ALLEGATIONS**

9       5.     On or about March 27, 2023, the UNITED STATES OF AMERICA
10 ("United States") filed, in the United States District Court for the Southern District of
11 California, Civil No. 3:23-CV-541-LL-BGS ("Action") against the City concerning
12 the clean-up of contaminated sediments at Installation Restoration Site 12 ("IR Site
13 12") located within the former Naval Training Center San Diego ("NTC") Boat
14 Channel.  The "NTC Boat Channel," as used herein, consists of Parcels III-B and VII
15 as described in the 2000 Memorandum of Agreement between the City and the United
16 States for Economic Benefit Conveyance and Public Benefit Conveyances at the
17 former NTC ("MOA").[3]   The Action seeks recovery under the Comprehensive
18 Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.
19 § 9607 in the first amended complaint filed by the United States (the "FAC") for
20 clean-up costs the United States (through the Department of the Navy) allegedly
21 incurred at IR Site 12.

22      6.     In response to the environmental contamination claims made against it
23 by the United States, and in order to avoid or minimize its alleged liability in
24 connection with such claims, in order to recover its own CERCLA-related costs, and
25 in order to protect itself from harm caused by Cross-Defendants' acts/omissions that
26

27 [3] In its Complaint, the USA uses the term "Site," which it defines as IR Site 12 only, interchangeably with the term "Boat Channel." However, IR Site 12 covers only the submerged sediments in the Boat Channel. It is not co-extensive
28 with the property boundaries of the NTC Boat Channel at issue here.  The City is also using the similar phrase "NTC Boat Channel" in its Crossclaims to refer to the entirety of Parcels III-B and VII as described in the MOA.

caused or contributed to the alleged contamination at issue in the First Amended Complaint, the City brings these Cross-Claims against Cross-Defendants for Contribution and Cost Recovery under CERCLA, Declaratory Relief under CERCLA, Equitable Indemnity, and Declaratory Relief.

7.     Without admitting any of the allegations except those set forth in the City's Answer to the FAC, the City incorporates for purposes of reference herein the FAC filed in this Action for the sole purpose of setting forth the City's allegations to which these Cross-Claims relate.

8.     Based upon information and belief, the City alleges that the Port District previously owned, operated, controlled and/or used the NTC Boat Channel and/or the areas around it at various times between 1916 to the present.

9.     Based upon information and belief, the City alleges that the Airport Authority previously owned, operated, controlled and/or used the NTC Boat Channel and/or the areas around it at various times between 1916 to the present.

10.     The City is informed and believes, and based thereon alleges that ROES 1 through 10, inclusive, whether individual, corporate, associate, or otherwise, are unknown to the City, which will, upon proper identification, seek leave to amend this pleading when such true names are ascertained.  The City is informed and believes, and thereon alleges that each of the Cross-Defendants designated as a Roe is responsible in some manner for the events and happenings alleged herein.

11.     The United States claims in the Action the NTC Boat Channel qualifies as a "facility" pursuant to 42 U.S.C. § 9601(9).

12.     Each of the Cross-Defendants is a "person" within the meaning of 42 U.S.C. § 9601(21).

13.     Based on information and belief, beginning around 1916, the City conveyed various parcels of land to the United States for purposes of constructing and operating what came to be known as NTC.  Based on information and belief, the United States created and has owned the NTC Boat Channel since its creation around

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ◆ FAX 818 551-6050

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT; COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

1   the 1930s – 1940s. NTC was closed around 1997 under the federal Base Realignment

2   and Closure Act ("BRAC") and the property was offered for redevelopment.

3       14.  In its FAC, the United States alleges that hazardous substances and other

4   pollutants were discharged to the NTC Boat Channel from storm drains and surface

5   runoff from nearby property including the San Diego International Airport, formerly

6   known as Lindbergh Field ("Airport Property").

7       15.  The City is informed and believes, and based thereon alleges that the Port

8   District owned, constructed, operated, controlled, directed, managed, and conducted

9   affairs at the Airport Property beginning on or about 1962.  The City is informed and

10  believes, and based thereon alleges that the Airport Authority owned, constructed,

11  operated, controlled, directed, managed, and conducted affairs at the Airport Property

12  beginning on or about 2001.    As such, Cross-Defendants and each of them is a

13  "person" and "operator" as defined by CERCLA, 42 U.S.C. § 9601.

14      16.  Based upon information and belief, the City alleges that each of the

15  Cross-Defendants' operations resulted in the generation, storage, use, discharge,

16  release, and disposal of hazardous substances in, at or around the NTC Boat Channel.

17      17.  Based on information and belief, at various times between approximately

18  1962 to the present, Cross-Defendants caused or contributed to the past or present

19  handling, storage, treatment, transportation, generation, release, or disposal of

20  Chemicals of Concern in the environment in, at, and around the NTC Boat Channel,

21  including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the

22  waters of the state of California, because each Cross-Defendant released or otherwise

23  discarded Chemicals of Concern, and/or controlled and/or operated the Airport

24  Property or engaged in a business or other activity from which Chemicals of Concern

25  were released or otherwise discarded, and/or failed to prevent or abate the

26  contamination caused by Chemicals of Concern.

27      18.  Based on information and belief, at various times between approximately

28  1962 to the present, Cross-Defendants negligently, suddenly, and accidentally caused

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE  818 551-6000 ♦ FAX 818 551-6050

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

or contributed to the presence of Chemicals of Concern in the environment, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the state of California, in, at or around the NTC Boat Channel.

19.    Based on information and belief, Cross-Defendants, without the consent or knowledge of the City, released and/or failed to remediate hazardous substances, hazardous waste, and/or solid waste in the environment in, at or around the NTC Boat Channel, and knew or should have known that any such release would contaminate the soil and water in, at, beneath, and around the NTC Boat Channel.

20.    Based on information and belief, each of the Cross-Defendant's releases of, disposals of, and/or failures to remediate hazardous substances into the environment in, at or around the NTC Boat Channel has resulted or may result in the migration of contamination to the NTC Boat Channel and/or to real property that is not the subject of this lawsuit, owned by individuals or entities which are not parties to this lawsuit.

21.    Based upon information and belief, the City alleges that Cross-Defendants, and each of them, caused or contributed to the presence of hazardous substances in the soils, soil vapor, groundwater, surface water, and the waters of the State of California, in, at or around the NTC Boat Channel.  Based upon information and belief, the City alleges that said hazardous substances have continued to spread and migrate, and each of the Cross-Defendants have failed to abate said contamination.

22.    Based upon information and belief, the City alleges that each of the Cross-Defendants' releases or disposals of hazardous substances into the environment in, at or around the NTC Boat Channel has resulted or may result in the migration of said contamination to real property that is not the subject of this law suit, owned by individuals or entities which are not parties to this lawsuit.

///

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

23.    As compared to Cross-Defendants, who discharged, disposed of, caused the releases of, or failed to remediate hazardous substances and hazardous waste into the environment in, at or around the NTC Boat Channel, the City is without fault.

## FIRST CAUSE OF ACTION

### Contribution under CERCLA, 42 U.S.C. § 9613(f)

### (Against All Cross-Defendants and ROES 1-10)

24.    The City incorporates by reference its allegations in Paragraphs 1 through 23 above as though fully set forth herein.

25.    The City's potential liability in this action arises from the United States' allegations in the FAC against the City under CERCLA § 107(a), 42 U.S.C. § 9607(a); and as such, the City is authorized to seek contribution in this action pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1).

26.    The City is afforded the right under § 113(f) of CERCLA, 42 U.S.C. § 9613(f), to seek contribution from "any other person who is liable or potentially liable" under § 107(a) of CERCLA, 42 U.S.C. § 9607(a) for any amounts the City paid or incurred in excess of its equitable share of liability related to the investigation and remediation of any and all disposals and/or releases of hazardous substances in, at or around the NTC Boat Channel, including the potential migration of hazardous substances from the NTC Boat Channel to other surrounding properties that are not part of the NTC Boat Channel.

27.    On that basis, the City asserts its right of contribution against each and every Cross-Defendant in connection with the contamination alleged in the First Amended Complaint.

28.    The United States claims in this lawsuit that the NTC Boat Channel qualifies as a "facility" pursuant to 42 U.S.C. 9601."

29.    Each of the Cross-Defendants is a liable or potentially liable person under § 107(a) of CERCLA, 42 U.S.C. § 9607(a).

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

30.     Cross-Defendants are each a "person" as defined in CERCLA § 101(21), 42 U.S.C. § 9601(21).

31.     The City is informed and believes, and based thereon alleges that each of the Cross-Defendants either:

a.  "released" or threatened to "release" hazardous substances in, at or around the NTC Boat Channel within the meaning of § 101(22) of CERCLA, 42 U.S.C. § 9601(22) during their ownership, operation, and/or occupation of the Airport Property and/or other properties within the watershed draining to the NTC Boat Channel; and/or

b.  owned, operated, and/or occupied the Airport Property and/or other properties within the watershed draining to the NTC Boat Channel and had a duty, authority, obligation, and/or right to manage, control, oversee, monitor, regulate and/or supervise the acts or omissions of their various lessees and/or sub-lessees to prevent the "release" or threatened "release" of hazardous substances, and to remediate any such "release" within the meaning of § 101(22) of CERCLA, 42 U.S.C. § 9601(22) in, at, and around the NTC Boat Channel; and/or

c.  is vicariously liable for a "release" or threatened "release" of hazardous substances in, at or around the NTC Boat Channel within the meaning § 101(22) of CERCLA, 42 U.S.C. § 9601(22) during their ownership, operation, and/or occupation of the Airport Property and/or other properties within the watershed draining to the NTC Boat Channel, under applicable alter-ego, corporate successor, corporate parent, and/or other theories of vicarious liability; and/or

d.  is the current owner and/or operator of the Airport Property and/or other properties within the watershed draining to the NTC Boat Channel.

32.     Therefore, each of the Cross-Defendants is potentially liable under § 107(a) of CERCLA, 42 U.S.C. § 9607(a) for any costs of response incurred or that will

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

be incurred by the City for the investigation and remediation of any and all disposals and/or releases of hazardous substances in, at or around the NTC Boat Channel.

33. The City denies any liability to the United States; but if the City's CERCLA liability for the United States' alleged response costs is established, then pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), the Court should allocate the response costs sought in the United States' claim among liable or potentially liable parties, including each of the Cross-Defendants, using such equitable factors as the Court determines are appropriate.

34. The City is entitled to contribution, pursuant to CERCLA § 113(f), 42 U.S.C. § 9613(f) for any and all costs, from any person who is liable or potentially liable under CERCLA, including but not limited to, assessment, investigation, evaluation, monitoring, mitigation, removal, and/or remedial action costs and/or enforcement costs, attorney's fees, consultant fees, and related costs, together with interest and court costs, incurred by the City in excess of the City's proportionate liability.

35. WHEREFORE, the City prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

### Cost Recovery under CERCLA, 42 U.S.C. § 9607(a)

### (Against all Cross-Defendants and ROES 1-10)

36. The City incorporates by reference its allegations in Paragraphs 1 through 35 above as though fully set forth herein.

37. The City's potential liability in this action arises from the United States' FAC against the City under CERCLA § 107(a), 42 U.S.C. § 9607(a); and as such, the City is authorized to seek contribution in this action pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1).

38. The City is afforded the right under § 113(f) of CERCLA, 42 U.S.C. § 9613(f), to seek contribution from "any other person who is liable or potentially liable" under § 107(a) of CERCLA, 42 U.S.C. § 9607(a) for any amounts the City

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1  paid or incurred in excess of its equitable share of liability related to the investigation

2  and remediation of any and all disposals and/or releases of hazardous substances in,

3  at or around the NTC Boat Channel, including the potential migration of hazardous

4  substances from the NTC Boat Channel to other surrounding properties that are not

5  part of the NTC Boat Channel.

6       39.    On that basis, the City asserts its right of contribution against each and

7  every Cross-Defendant in connection with the contamination alleged in the

8  Complaint.

9       40.    The United States claims in this lawsuit that the NTC Boat Channel

10 qualifies as a "facility" pursuant to 42 U.S.C. § 9601.

11      41.    Each of the Cross-Defendants is a liable or potentially liable person

12 under § 107(a) of CERCLA, 42 U.S.C. § 9607(a).

13      42.    The City is informed and believes, and based thereon alleges, that each

14 of the Cross-Defendants either:

15        a.   "released" or threatened to "release" hazardous substances in, at or

16           around the NTC Boat Channel within the meaning of § 101(22) of

17           CERCLA, 42 U.S.C. § 9601(22) during their ownership, operation,

18           and/or occupation of the Airport Property and/or other properties within

19           the watershed draining to the NTC Boat Channel; and/or

20        b.   owned, operated, and/or leased the Airport Property and/or other

21           properties within the watershed draining to the NTC Boat Channel and

22           had a duty, authority, obligation, and/or right to manage, control,

23           oversee, monitor, regulate and/or supervise the acts or omissions of their

24           various lessees and/or sub-lessees to prevent the "release" or threatened

25           "release" of hazardous substance, and to remediate any such "release"

26           within the meaning of § 101(22) of CERCLA, 42 U.S.C. § 9601(22) in,

27           at, and around the NTC Boat Channel; and/or

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

    c.  is vicariously liable for a "release" or threatened "release" of hazardous substances at the NTC Boat Channel within the meaning of § 101(22) of CERCLA, 42 U.S.C. § 9601(22), during their ownership, operation, and/or occupation of the Airport Property and/or other properties within the watershed draining to the NTC Boat Channel, under applicable alter-ego, corporate successor, corporate parent, and/or other theories of vicarious liability; and/or

    d.  is the current owner and/or operator of the Airport Property and/or other properties withing the watershed draining to the NTC Boat Channel.

43.    Thus, each of the Cross-Defendants is an "owner or operator" at the time when hazardous materials were allegedly released or threatened to be released in, at or around some or all of the NTC Boat Channel or is vicariously liable for a release or threatened release in, at or around some or all of the NTC Boat Channel or is the current "owner or operator" of the Airport Property and/or other properties within the watershed draining to the NTC Boat Channel and therefore each of the Cross-Defendants is a "responsible," "liable" and/or "covered" party pursuant to 42 U.S.C. § 9607.

44.    The City has incurred, and will continue to incur, response costs in relation to the investigation, mitigation, and/or remediation of any and all disposals and/or releases of hazardous substances in, at, and around the NTC Boat Channel including the response costs related to potential migration of hazardous substances in, at or around the NTC Boat Channel from surrounding properties that are not part of the NTC Boat Channel. These response costs are both necessary and consistent with the National Contingency Plan and were incurred in accordance with the applicable CERCLA requirements. These response costs include, but are not limited to, assessment, investigation, evaluation, monitoring, mitigation, removal, and/or remedial action costs and/or enforcement costs, attorney's fees, consultant fees, and related costs, all of which are and will continue to be necessary costs of response

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

1    consistent with the National Contingency Plan.

2        45.    Based on the above, the City is entitled to reimbursement for any and all

3    such past, present, and/or future response costs incurred prior to trial, together with

4    interest thereon, with each of the Cross-Defendants being strictly liable to the City for

5    all such amounts under CERCLA.

6        46.    WHEREFORE, the City prays for judgment as set forth below.

7                              **THIRD CAUSE OF ACTION**

8    **Declaratory Relief under CERCLA, 42 U.S.C. § 9613 and Other Federal Laws**

9                      **(Against all Cross-Defendants and ROES 1-10)**

10       47.    The City incorporates by reference its allegations in Paragraphs 1

11   through 46 above as though fully set forth herein.

12       48.    The City prays for a declaratory judgment, pursuant to 28 U.S.C. § 2201

13   and 42 U.S.C. §§ 9607 and 9613, for the purpose of determining a question of actual

14   controversy between and among the parties, as appears above and as hereinafter more

15   fully appears.

16       49.    An actual and substantial legal controversy exists between the City on

17   the one hand and each of the Cross-Defendants on the other hand, regarding their

18   respective rights and obligations for response costs that allegedly have been incurred

19   and will be incurred in connection with contamination found in, to or at the NTC Boat

20   Channel.  The City  contends that it is entitled to a declaration that each of the Cross-

21   Defendants is liable for some or all past, present, and future response costs and other

22   damages incurred by the City in connection with the NTC Boat Channel.  Based on

23   information and belief, Cross-Defendants contend otherwise.

24       50.    The City is authorized to seek declaratory relief in this action against

25   each of Cross-Defendants pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2);

26   28 U.S.C. § 2201.

27       51.    No adequate or speedy remedy exists for the City in the absence of a

28   judicial declaration pursuant to applicable law.  Based on information and belief, if

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE  818 551-6000 ♦ FAX 818 551-6050

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE  818 551-6000 ♦ FAX 818 551-6050

1   the City's liability is established, then it will incur substantial costs over time and after

2   conclusion of this action; and unless declaratory relief is granted, the City will need

3   to commence successive actions against Cross-Defendants, and each of them, to

4   secure compensation for the costs incurred and damages sustained, thus requiring a

5   multiplicity of suits.  The City therefore requests a declaration from the Court setting

6   forth its and Cross-Defendants' liability for past, present and future response, removal

7   and remediation costs, and other penalties and/or damages imposed on the City in

8   connection with the NTC Boat Channel.

9       52.    WHEREFORE, the City prays for judgment as set forth below.

10                    **FOURTH CAUSE OF ACTION**

11                 **Equitable Indemnity Under Common Law**

12            **(Against all Cross-Defendants, and ROES 1-10)**

13      53.    The City incorporates by reference its allegations in Paragraphs 1

14  through 52 above as though fully set forth herein.

15      54.    Based on information and belief, any liability that the City may have to

16  any other person, government or regulatory agency, under any law, regulation, or

17  common law principle, relating to the alleged contamination in, to or at the NTC Boat

18  Channel, was proximately caused, in whole or in part, by the acts and/or omissions of

19  Cross-Defendants, and each of them.

20      55.    The City denies any liability to Plaintiff; but if the City's liability for

21  Plaintiff's alleged damages is established, then the City alleges said liability is a direct

22  and proximate result of the acts and/or omissions of each of the Cross-Defendants

23  and/or Plaintiff, as alleged in detail above. The City is therefore entitled to recover

24  indemnity, whether total or partial, equitable, implied and/or expressed, from Cross-

25  Defendants and each of them.

26      56.    The City denies any liability to Cross-Defendants, but if the City's

27  liability for Cross-Defendants' alleged damages is established, then that liability

28  would be a direct and proximate result of the acts and/or omissions of each of the

1    Cross-Defendants and/or Plaintiff, as alleged in detail above. The City would

2    therefore be entitled to recover indemnity, whether total or partial, equitable, implied

3    and/or expressed, from Cross-Defendants, and each of them.

4        57.    In the event that the City is determined to be legally liable for removal

5    or remedial action costs, expenses, or other damages as a result of the claims asserted

6    by Cross-Defendant or others relating to soil and/or water contamination in, to or at

7    the NTC Boat Channel, then the City would be entitled to indemnification from Cross-

8    Defendants, and each of them, for the damages, including attorneys' fees and litigation

9    costs, caused by the acts and/or omissions of each of the Cross-Defendants.

10       58.    WHEREFORE, the City prays for judgment as set forth below.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief Pursuant to CERCLA § 113(g)(2) and

### Other Federal and State Laws)

### (Against all Cross-Defendants, and ROES 1-10)

15       59.    The City incorporates by reference its allegations in Paragraphs 1

16   through 58 above as though fully set forth herein.

17       60.    An actual and substantial legal controversy exists between the City and

18   Cross-Defendants regarding their respective rights and obligations for response costs

19   that allegedly have been incurred and will be incurred in connection with

20   contamination found in, to or at the NTC Boat Channel. The City contends that it is

21   entitled to a declaration that each of the Cross-Defendants is liable for some or all

22   past, present, and future response costs and other damages incurred by Plaintiff in

23   connection with the NTC Boat Channel. Based on information and belief, the City

24   alleges that Cross-Defendants contend otherwise.

25       61.    The City is authorized to seek declaratory relief in this action against

26   each of the Cross-Defendants pursuant to CERCLA § 113(g)(2), 42 U.S.C. §

27   9613(g)(2); 28 U.S.C. § 2201.

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE  818 551-6000 ♦ FAX 818 551-6050

62.    No adequate or speedy remedy exists for the City in the absence of a judicial declaration pursuant to applicable law.  Based on information and belief, the City alleges that if its liability is established, then the City will incur substantial costs over time and after conclusion of this action; and unless declaratory relief is granted, it will be necessary for the City to commence many successive actions against Cross-Defendants, and each of them, to secure compensation for the costs incurred and damages sustained, thus requiring a multiplicity of suits.  The City therefore requests a declaration from the Court setting forth the City's and Cross-Defendants' liability for past, present and future response, removal and remediation costs, and other penalties and/or damages imposed on the City in connection with the NTC Boat Channel.

## **PRAYER FOR RELIEF**

WHEREFORE, the City prays for judgment against all Cross-Defendants as follows:

1.    For contribution from Cross-Defendants, and each of them, pursuant to 42 U.S.C. § 9613(f)(1), for all or part of the past and future response costs, expenses, and other damages the City has incurred or will incur with respect to the NTC Boat Channel;

2.    For a declaration, pursuant to 42 U.S.C. § 9613(g)(2), 28 U.S.C. § 2201,  that the City is entitled to contribution from each of the Cross-Defendants for all or part of the response costs, expenses, and other damages that the City is or may be liable for in any subsequent action or actions to recover further response costs incurred in response to the releases or threatened release of hazardous substances in, at or around the NTC Boat Channel; and

3.    For indemnity, whether total or partial, equitable, implied and/or expressed from the Cross-Defendants, and each of them, in an amount for which the City is held liable as a result of the claims asserted by

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE  818 551-6000 ♦ FAX 818 551-6050

1        Plaintiff, Cross-Defendants or others relating to contamination in, to or

2        at the NTC Boat Channel; and

3   4.   For costs of suit; and

4   5.   For such other relief that the Court deems just and proper.

5

6   DATED:  September 29, 2023          WOOD, SMITH, HENNING & BERMAN LLP

7

8                                       By: _____
                                             THOMAS F. VANDENBURG
9                                            NICHOLAS GEDO
                                             ALICE CHARKHCHYAN
10                                      Attorneys for Defendant, CITY OF SAN
                                        DIEGO

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

1

## **DEMAND FOR JURY TRIAL**

2       Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and United

3   States District Court for the Southern District of California Local Civil Rule 38.1,

4   City of San Diego hereby demands a jury trial on all issues so triable.

5

6   DATED:  September 29 , 2023          WOOD. SMITH. HENNING & BERMAN LLP

7

8                                       By: _____

9                                           THOMAS F. VANDENBURG
                                            NICHOLAS GEDO
10                                          ALICE CHARKHCHYAN
                                        Attorneys for Defendant, CITY OF SAN
11                                      DIEGO

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

29748891.1:10874-0001

CIVIL NO. 3:23-CV-00541-LL-BGS

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

COPY

MEMORANDUM OF AGREEMENT

BY AND BETWEEN

THE UNITED STATES OF AMERICA AND THE CITY OF SAN DIEGO

FOR ECONOMIC DEVELOPMENT CONVEYANCE AND PUBLIC BENEFIT

CONVEYANCES AT THE FORMER NAVAL TRAINING CENTER, SAN DIEGO

DOCUMENT NO. RR293512-1

FILED          MAY 3 0 2000

OFFICE OF THE CITY CLERK

SAN DIEGO, CALIFORNIA

MEMORANDUM OF AGREEMENT
BY AND BETWEEN
THE UNITED STATES OF AMERICA AND THE CITY OF SAN DIEGO
FOR ECONOMIC DEVELOPMENT CONVEYANCE AND PUBLIC BENEFIT
CONVEYANCES AT THE FORMER NAVAL TRAINING CENTER SAN DIEGO


THIS AGREEMENT is made between the United States of America, acting by and through the Department of the Navy, hereinafter referred to as the "Navy," and the City of San Diego, a municipal corporation and charter city organized and existing under the laws of the State of California, hereinafter referred to as the "City." The Navy and the City may sometimes be referred to jointly as the "Parties."


## RECITALS

A.    The Navy is the owner of certain real property, improvements and associated personal property, located in San Diego, California and commonly referred to as the former Naval Training Center ("NTC"), which was used as a military installation, and closed pursuant to the Defense Base Closure and Realignment Act of 1990, as amended (hereinafter referred to as "DBCRA").

B.    That part of NTC which was subject to reuse planning by the City and is subject to disposal by the Navy consists of approximately 429 acres of land, together with buildings, structures, facilities and personal property thereon, as shown on the site map attached hereto as Exhibit "A."

C.    By application dated September 23, 1999, City has applied for an economic development conveyance pursuant to DBCRA § 2905(b)(4), as amended by the National Defense Authorization Act for Fiscal Year 2000.  The application encompasses approximately 279 acres.  For purposes of this Agreement, this acreage has been divided into four parcels: (1) Parcel II/IIIA, a parcel of approximately 258 acres which is available for immediate transfer; (2) Parcel VIII, a parcel of approximately 6 acres adjacent to Rosecrans Avenue; (3) Parcel X, a parcel of approximately 1 acre adjacent to Cushing Road; and (4) Parcel IIIB, a parcel of approximately 13 acres within the southern part of the boat channel.   The legal descriptions of these four parcels are a part of the quitclaim deed referred to in paragraph 3.  The parcels are also identified on Exhibit "A."  For purposes of this Agreement, Parcels II/IIIA, IIIB, VIII and X are referred to collectively as the "Property."

D.    It is anticipated that the remainder of NTC subject to reuse planning by the City will be conveyed through several public benefit conveyances to the City and other public entities. The parcels proposed for public benefit conveyances are appropriately marked as such on Exhibit "A."

<u>AGREEMENTS</u>

NOW, THEREFORE, the Parties hereby covenant and agree as follows:

1.    <u>Conveyance and Acceptance of the Property.</u>  Subject to the terms and conditions hereinafter set forth, the Navy agrees to convey to the City, and the City agrees to accept from the Navy, in consideration of the covenants, conditions and restrictions contained in the Deed and other valuable consideration, all of the Navy's right, title and interest in the Property, except for such rights as are reserved therein.

2.    <u>Sequence of Conveyances.</u>  The Parties anticipate that the conveyance of the Property will be accomplished in four separate transactions, as follows:

(a)  The anticipated date of conveyance for Parcel II/IIIA is June, 2000; and

(b)  The anticipated date of conveyance for Parcel VIII is May, 2001. Parcel VIII is known to be impacted with elevated levels of tetrachloroethene (PCE) in soil and groundwater.  Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel VIII, as described in the NTC San Diego Reuse Plan dated August 1998; and

(c)  The anticipated date of conveyance for Parcel IIIB is March, 2002. Parcel IIIB is believed to contain sediments impacted with various contaminants.  Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel IIIB, as described in the NTC San Diego Reuse Plan dated August 1998.  The City agrees that until such time as site closure is obtained by the Navy, the City shall take all steps necessary to ensure that no activity is conducted within 15 feet of the top of the bank of the Boat Channel which may result in the sloughing of soil or other materials from the bank or the Esplanade into the Boat Channel shown on Exhibit "D."  It shall be assumed for purposes of this Agreement that any development, as that term is defined in California Public Resources Code Section 30106, is such an activity; and

(d)  The anticipated date of conveyance for Parcel X is March 2001. Parcel X may contain petroleum-based residues.  Navy shall take all remedial action necessary, if any, to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel X, as described in the NTC San Diego Reuse Plan dated August 1998.

The Parties recognize that although the Navy will utilize its best efforts to achieve conveyance by the dates set forth above, the dates for (b), (c) and (d) are based on the present best estimate of work required to complete Navy's remedial actions, the full

extent and nature of which are not presently known.  The Parties also recognize that the anticipated dates for conveyance may be impacted by regulator and public review.

   3.   <u>Form of Conveyance.</u>  All conveyances shall be by quitclaim deed ("Deed") in substantially the form attached hereto as Exhibit "B" provided, however, that changes may be required in connection with execution of the Findings of Suitability to Transfer discussed in paragraph 5.

   4.   <u>Application for Public Benefit Conveyances.</u>  City agrees to apply for and take all necessary steps to expeditiously perfect its applications for the following public benefit conveyances:

       (a)  Parcel VI (approximately 40 acres).  Sponsoring agency is the Department of the Interior.  Authority for the disposal is 40 U.S.C. § 484(k)(2) for public park or recreation purposes.  The projected date for assignment to the sponsoring agency is November, 2000

       (b)  Parcel VII (approximately 51 acres).  Sponsoring agency is the Department of the Interior.  Authority for the disposal is 40 U.S.C. § 484(k)(2) for public park or recreation purposes.  The projected date for assignment to the sponsoring agency is March 2002.  Parcel VII is believed to contain sediments impacted by various contaminants.  Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel VII, as described in the NTC San Diego Reuse Plan dated August 1988.  The City agrees that until such time as site closure is obtained by the Navy, the City shall take all steps necessary to ensure that no activity is conducted within 15 feet of the top of the bank of the Boat Channel which may result in the sloughing of soil or other materials from the bank or the Esplanade into the Boat Channel shown on Exhibit "D."  It shall be assumed for purposes of this Agreement that any development, as that term is defined in California Public Resources Code Section 30106, is such an activity.

       (c)  Parcel IX (approximately 9 acres).  Sponsoring agency is the Department of Health and Human Services.  Authority for the disposal is 40 U.S.C. § 484(k)(1) for the protection of public health, including research.  This parcel is to be used by the Metropolitan Wastewater Department for the construction and operation of a laboratory.  The projected date for assignment is six months from the date the sponsoring agency accepts the City's application for public benefit conveyance.

Provided that the City has obtained the necessary approvals for its applications, and upon request of the sponsoring agencies, Navy will assign the parcels described above to the sponsoring agencies for conveyance, subject to the sponsoring agencies' normal terms and conditions and subject to such additional terms and conditions as the Navy may determine are required for the protection of human health and the environment, and subject further to such easements and reservations as may be required for ongoing

federal activities in and about NTC.  City shall take all necessary actions to accept the deeds as they are proffered by the sponsoring agencies.

     5.    <u>Findings of Suitability to Transfer.</u>  The Parties recognize that it will be necessary for Navy to prepare Findings of Suitability to Transfer ("FOST") prior to conveyance of any of the parcels of the Property and prior to the assignment of the properties described above as public benefit conveyances, and that said FOSTs will have to be reviewed, approved and disseminated in a manner consistent with applicable Department of Defense guidance on the subject.  The Parties anticipate that it will be necessary to prepare five separate FOSTs for the following parcels:

        (a)  Parcels II/IIIA and IX; and

        (b)  Parcel VI; and

        (c)  Parcel VIII; and

        (d)  Parcels IIIB and VII; and

        (e)  Parcel X.

While the completion of these documents has been considered in connection with the dates of disposal described in paragraph 2 above, the Parties understand that regulator and public comment may delay the completion of the documents and, therefore, the dates of disposal or assignment.

     6.    <u>Personal Property.</u>  In addition to conveyance of the Property, Navy agrees to transfer to City and City agrees to accept from Navy all that personal property described in the bill of sale attached hereto as Exhibit "C."  Said transfer shall be in accordance with the terms and conditions contained in Exhibit "C" and shall occur concurrently with the conveyance of the Property.

     7.    <u>Description of Property.</u>  The descriptions of the Property are based on the best information presently available to the Navy and the City and are believed to be correct.  In the event of an error, however, the Parties, their successors and assigns, will cooperate, at no expense to the Navy, in executing and delivering instruments required to correct the error.

     8.    <u>Title Insurance and Escrow.</u>  Any title insurance which may be desired by the City shall be procured at its sole cost and expense.  The Navy will, however, cooperate with the City or its authorized agent, and will permit reasonable examination and inspection of any documents relating to the title of the Property as it may have available.  It is understood that the Navy will not be obligated to pay for any expense incurred in connection with title matters, survey of the Property or escrow.

9.    Performance.  Failure of the City to accept delivery of a Deed, or failure of either party to perform or observe any other term or condition of this Agreement prior to conveyance of the Property, after written notice and thirty days to cure, shall be deemed to be a breach of this Agreement, and the other party may exercise any of the remedies for breach or default set forth in this Agreement or otherwise available, including the right to terminate this Agreement.

10.    Condition of Property.  The City acknowledges that it has inspected the Property as well as those parcels which are contemplated to be transferred pursuant to public benefit conveyances, and that, except as otherwise specifically provided in this Agreement, and in the exhibits hereto, the Property and said parcels will be conveyed "as is" and "where is" without any representation, promise, agreement or warranty on the part of Navy regarding such condition and state of repair, or regarding the making of any alterations, improvements, repairs or additions, except to the extent required by applicable law.

11.    Additional Action Required.

(a)  Prior to conveyance of the parcel(s) on which the following building(s) are located, the Navy will abate hazards associated with friable, accessible and damaged asbestos and asbestos-containing materials in Buildings 5, 9, 15, 16, 17, 18, 19, 25, 35, 202, 430, 479, 480 and 557 through removal or encapsulation.

(b)  Prior to conveyance of the parcel(s) on which such wells exist, the Navy will close all monitoring and extraction wells on the Property, with the exception of monitoring wells ES-14S  and ES-14D.  The permits for these two wells will be assigned to the San Diego Unified Port District ("District").  City shall grant the District a license to sample and maintain these wells for purposes related to the District's remediation of Parcels IV and V.  The license will be conditioned upon timely closure of the wells by the District at no cost to City.

(c)  The Navy is in the process of establishing a new telecommunications hub to serve continuing operations of the Navy and the Department of Justice adjacent to the Property.  In the course of installing that hub, it will be necessary to modify connections at existing Navy hubs and the Pacific Bell point of connection on the Property.  City agrees to allow Navy access and exclusive control within those areas of buildings 38 and 9 where the hub connections are situated as necessary to accomplish this work.  In accomplishing this work, the Navy will minimize service interruptions to facilities and buildings presently served through these hubs and the point of connection, regardless of whether said buildings and facilities are presently being used by the City or its tenants.  This obligation shall not extend to the following building numbers 55, 56, 57, 58, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 90, 91, 92, 93, 209, 214, 226, 227, 228, 241, 242, 251, 262, 286, 287, 293, 355, 356, 368, 378, 379, 383, 408, 412, 443, 496, and 583.

(d) City acknowledges that there are fire protection indicator panels in building 303 which the Navy intends to retain.  City agrees to grant Navy right of entry and access until September 30, 2000 in order to remove these fire protection indicator panels.

12.    Lease Termination.  It is acknowledged that the City currently leases a substantial portion of the Property pursuant to Navy Contract N68711-96-RP0607, originally executed on March 12, 1996, as amended.  Upon conveyance of the Property hereunder, the City's leasehold interest shall be extinguished in accordance with the terms of lease, but only insofar as said lease covers portions of the Property conveyed. The lease shall continue in full force and effect with respect to portions of the premises described therein which are not a part of the Property conveyed.

13.    Use of Proceeds From Sale or Lease.

(a)  Any proceeds from a sale, lease, or equivalent use of the Property (i.e., any mechanism that serves to accomplish the same purposes of a sale or lease such as licenses, permits, concession agreements, etc.) received by the City for the Property or the personal property transferred by the bill of sale ("Proceeds"), during the first seven years after the recordation of each Deed for a part of the Property, shall be used to support long-term job creation and the economic redevelopment of, or related to, NTC.  Proceeds shall be expended for such purposes as quickly as practicable, but in no event later than 180 days following the end of said seven year period.  For purposes of this paragraph, the definition of "Property" shall include the personal property transferred pursuant to the bill of sale.

(b)  Allowable uses of Proceeds pursuant to subparagraph (a) include payment for, or offsetting the costs of public investment, for the following purposes:

- Road construction
- Transportation management facilities
- Storm and sanitary sewer construction
- Police and fire protection facilities and other public facilities
- Utility construction
- Building rehabilitation
- Historic property preservation
- Pollution prevention equipment or facilities
- Demolition
- Disposal of hazardous materials generated by demolition
- Landscaping, grading, and other site or public improvements
- Planning for or the marketing of the redevelopment and reuse of NTC

Other activities on NTC related to those listed above (for example, new construction related to job creation and economic redevelopment, capital improvements, and

operation and maintenance of NTC required to market its redevelopment and reuse) will also be considered an allowable use of Proceeds.

(c) Proceeds may also be expended for the allowable uses enumerated in subparagraph (b) off of NTC; provided, however, in order for expenditures made off of NTC to be considered allowable uses of Proceeds, the City shall first submit appropriate documentation to the Navy for its approval which demonstrates that such investments are related to those listed in subparagraph (b) and directly benefit the City's economic redevelopment and long term job generation efforts on NTC.

(d) Consistent with generally accepted accounting practices, City shall maintain adequate records and books of account for income and expenses related to the redevelopment of NTC detailing transactions described in subparagraphs (a), (b) and (c). City shall provide Navy with access to such records and books of account and proper facilities for inspection thereof at all reasonable times.

(e) City shall submit to the Navy an annual financial statement certified by an independent certified public accountant. The statement shall cover the City's use of Proceeds it receives from the sale, lease, or equivalent use of the Property. The first such statement shall cover the 12-month period beginning on the date of recordation of the first Deed and shall be delivered to Navy within 60 days of the end of that period and annually thereafter. Once statements have been submitted for the first seven annual periods after the recordation of each deed, this requirement shall be fully satisfied.

(f) In the event that the DBCRA is amended to permit it, the provisions of subparagraphs (a) and (e) regarding the several periods of seven years beginning upon the recordation of each deed for a part of the Property shall be changed to reflect a single period of seven years beginning upon recordation of the first deed for a part of the Property. Said change shall be effective without further action of either party upon the effective date of the amendment.

14.    Recoupment of Proceeds.  Navy may recoup all Proceeds described in paragraph 13(a) which have not been reinvested in allowable uses described in paragraphs 13(b) and 13(c). If recoupment is desired, Navy shall notify City in writing that it intends to recoup Proceeds in a specific amount, describing why it believes that those Proceeds have not been reinvested as required by paragraph 13. Within 30 days of receipt of such notification, City shall submit its response to Navy. Within 30 days of receipt of City's response or within 30 days of the date City's response was due under this paragraph, Navy shall issue its decision on the matter which shall be final and binding on the City. The amount of the recoupment described in the decision shall be paid by the City.

15.    Submission of Notices.  Notice and correspondence under or related to this Agreement shall be in writing and shall be addressed to the addressees set out below or to such addressees as may from time to time be identified by the Parties.

Such notice and correspondence may be delivered by hand, express delivery, overnight courier, or by prepaid registered or certified mail, return receipt requested.

If to Navy:

> BRAC Operations Office
> Attention:  BCM Hunters Point/San Diego
> Southwest Division, Naval Facilities Engineering Command
> 1220 Pacific Highway
> San Diego, CA 92132-5190

If to City:

> NTC Reuse Project Manager
> City of San Diego
> City Administration Building
> 202 C Street
> San Diego, CA 92101-3863

And to:

> Office of City Attorney
> Attention:  Richard A. Duvernay
> City Administration Building
> 202 C Street
> San Diego, CA 92101-3863

16.   Agreement:  This Agreement shall not be modified unless in writing and signed by both Parties.  No oral statements or representations made by, or on behalf of either Party shall be a part of this Agreement.  This Agreement, together with all exhibits hereto, constitute the entire agreement between the Parties.  All prior discussions and understandings on this matter are superceded by said documents.

17.   Dispute Regarding Tidelands.  Navy has been advised by City that a dispute exists between the City and the California State Lands Commission ("CSLC") with respect to whether portions of the Property and public benefit conveyance parcels are subject to the jurisdiction of the CSLC as tidelands trust property.  Without cost to the Navy, and to the extent that it has the legal authority to do so, Navy will cooperate with City  to obtain from the CSLC such approvals as may be necessary for the City to adjust tidelands trust encumbrances claimed to exist in a manner consistent with the City's NTC Reuse Plan, provided, however, that such cooperation is not inconsistent with the position of the United States of America regarding tidelands trust issues in general.

18.   Determination of No Hazard to Air Navigation.  Based on coordination between the General Services Administration and the Federal Aviation Administration,

as recommended in House Report 95-1053, entitled "FAA Determination of 'No Hazard' for Structures Near Airports," it has been determined that the only public airport within six nautical air miles of the Property is the San Diego International Airport at Lindbergh Field.  FAA has been apprised of the proposed disposal of the Property, and the Navy's conveyance document will contain a provision that the grantee, its successors and assigns, must prohibit any construction or alteration on the Property unless a determination of no hazard to air navigation is issued by FAA under 14 CFR part 77, "Objects Affecting Navigable Airspace," or under the authority of the Federal Aviation Act of 1958, as amended.

19.    <u>Lease and Rental to Department of Justice and Navy.</u>  Immediately following conveyance of any part of the Property containing all or part of the leasehold described therein, the City shall enter into the lease agreements attached hereto as Exhibit "E."   As soon as practicable, and within 60 days of conveyance, the City and the Department of Justice shall enter into a mutually acceptable, no-cost lease, for a term acceptable to the United States of America for Parcel 9 depicted on Record of Survey Map No. 16556 filed on April 25, 2000 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.  Said lease to be for parking purposes of the Department of Justice, Immigration and Naturalization Service, in connection with the operation and maintenance of the adjacent small arms range.

20.    <u>Failure To Insist On Compliance.</u>  The failure of either Party to insist, in any one or more instances, upon strict performance of any of the terms of this Agreement shall not be construed as a waiver or relinquishment of such Party's right to future performance of this Agreement, but the obligations of the other Party with respect to such future performance shall continue in full force and effect.  Whenever the terms of this Agreement call for one Party to approve an action or make a determination before the other Party may undertake or perform such action, said approval or determination shall not be unreasonably denied or delayed.

21.    <u>Risk of Loss.</u>  From the effective date of this Agreement, City shall bear all risks of loss and damage due to casualty that may be suffered by the Property or associated personal property.  Notwithstanding any such loss or damage, each and all of the provisions of this Agreement shall remain unimpaired and in full force and effect.

22.    <u>Counterparts.</u>  This Agreement is executed in three counterparts, each of which is deemed to be an original.

23.    <u>Availability of Funds.</u>  Navy's obligations under this Agreement are subject to the availability of funds appropriated for such purpose.

<u>IN WITNESS WHEREOF,</u> the Parties have caused this Agreement to be executed by their duly authorized representatives on the respective dates set forth beneath each of their signatures and hereby deem this Agreement to be effective as of the latest such date, which date shall be considered the date of this Agreement for all purposes.

THE UNITED STATES OF AMERICA

By: _~Karen P. Ringel~_____

Title: Real Estate Contracting Officer, Southwest Division,
Naval Facilities Engineering Command

Printed Name: _Karen P. Ringel_

Date: _24 May 00_


CITY OF SAN DIEGO

By: _S. Gail Goldberg_____

Title: City Manager, City of San Diego

Printed Name: _S. Gail Goldberg_

Date: _5/30/00_

ATTEST: _Charles G. Abdelnour_

Charles G. Abdelnour, City Clerk

DATE: _5/30/00_

R-293512

10

LIST OF EXHIBITS

Exhibit A          Parcel Map

Exhibit B          Form of Quitclaim Deed

Exhibit C          Form of Bill of Sale

Exhibit D          Cross section of Boat Channel

Exhibit E          Form of Lease to COMNAVREGSW



## EXHIBIT A

| Exhibit A Parcel ID | Parcel Number as shown on Record of Survey Map No. 16556 filed on April 25, 2000 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego | Acres |
|---|---|---|
| II/IIIA | 8 | 6.990 |
| | 10 | 39.635 |
| | 14 | 180.050 |
| | 9 | 0.202 |
| | 12 | 21.230 |
| | 16 | 8.899 |
| IIIB | 11 | 10.847 |
| | 15 | 2.031 |
| VI | 1 | 1.551 |
| | 2 | 1.203 |
| | 5 | 6.922 |
| | 6 | 39.380 |
| VII | 4 | 43.625 |
| VIII | 13 | 6.288 |
| IX | 3 | 7.545 |
| | 7 | 0.313 |
| X | 18 | 0.878 |

Exhibit A, Page 2 of 2

EXHIBIT B

RECORDING REQUESTED BY:
The City of San Diego

WHEN RECORDED MAIL TO:
NTC Project Manager
Redevelopment Agency of the City
of San Diego
City Administration Building
202 C Street
San Diego, CA 92101-3863

---

Space Above This Line Reserved for Recorder's Use

## QUITCLAIM DEED AND ENVIRONMENTAL
## RESTRICTION PURSUANT TO CIVIL CODE SECTION 1471

This Deed is made this ___ day of _____ 2000, by the UNITED STATES OF AMERICA, acting by and through the Department of the Navy, (herein called "Grantor") in favor of the CITY OF SAN DIEGO, a municipal corporation of the State of California ("Grantee"),

### RECITALS

A.   The Defense Base Closure and Realignment Commission's recommendations for 1993 included the closure of the former Naval Training Center San Diego (the "Installation") consisting of approximately 429 acres. The Installation is depicted on Exhibit "A," attached hereto and made a part hereof.  The property was declared to be surplus to the needs of the federal government and available for disposal. In accordance with the Defense Base Closure and Realignment Act of 1990, and the Department of Defense regulations adopted pursuant thereto, the City of San Diego prepared a redevelopment plan for the Installation.  A Final Environmental Impact Statement was prepared to analyze the impact of disposal of the Property and a Record of Decision has been signed by the Deputy Assistant Secretary of the Navy (Conversion & Redevelopment).

B.   Pursuant to said redevelopment plan, and in accordance with the provisions of section 2905(b)(4) of the Defense Base Closure and Realignment Act of 1990, as amended by the Defense Authorization Act for Fiscal Year 2000, Grantee submitted an application for an economic development conveyance of approximately 279 acres of the Installation. Included within that acreage are three parcels of property, consisting of approximately 20 acres, which cannot be conveyed until Grantor completes certain remedial action thereon.  The legal description for that portion of the acreage presently suitable for transfer (the "Property") is contained in Exhibit "B" which is attached hereto.  The legal descriptions for those three parcels not suitable for transfer at this time are  set forth in Exhibits "C," "D" and "E"  respectively, all of which are attached hereto and made a part hereof as if set out at length.

1

C.      Grantor and Grantee have entered into a Memorandum of Agreement pursuant to which this deed has been executed, delivered and accepted.  Said Memorandum of Agreement contains certain restrictions on the use of the proceeds derived from the sale or lease of the Property, provisions for the recoupment of proceeds not used for those purposes set forth in the Memorandum of Agreement, together with other conditions and requirements contained in section 2905(b)(4) mentioned above.  Said Memorandum of Agreement also commits the Grantor to convey to Grantee the three parcels described in Paragraph B above following the completion of the remedial action.

D.      In accordance with the provisions of the Community Environmental Response Facilitation Act, the Navy prepared an Environmental Baseline Survey (EBS) for the Installation dated November 1994, and a Finding of Suitability to Transfer (FOST) regarding the Property dated April, 2000.  The FOST sets forth the basis for Grantor's determination that the Property is suitable for transfer.

E.      Pursuant to California Civil Code section 1471, Grantor has determined that it is reasonably necessary to impose certain restrictions on the use of the Property to protect present and future human health or safety or the environment as a result of the presence of hazardous materials on portions of the Property described hereinafter with particularity.

## AGREEMENT

1.      Grantor, in consideration of the foregoing, the performance by Grantee of its covenants, conditions and restrictions hereinafter contained and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby remise, release and forever quitclaim to Grantee any and all right, title and interest in and to the Property described in Exhibit " B", together with all improvements and appurtenances thereon, reserving only such rights as may arise from the operation of the easements, restrictions and covenants of this deed, which the UNITED STATES OF AMERICA has in and to the Property.

2.      Grantee acknowledges that it has received copies of the EBS and FOST, together with all documents referenced therein.

3.      (a)  Grantee is hereby informed and does hereby acknowledge that hazardous materials in the form of asbestos or asbestos-containing materials ("ACM") have been found and are otherwise presumed to exist in buildings and structures on the Property. Grantee acknowledges receipt of the EBS and the FOST disclosing the presence of known asbestos or ACM hazards in the buildings and structures on the Property.

(b)  Grantee covenants, on behalf of itself, its successors and assigns, as a covenant running with the land, that it will prohibit occupancy and use of buildings and structures, or portions thereof, containing known asbestos or ACM hazards prior to abatement of such hazards.  In connection with its use and occupancy of the Property, including, but not limited to, demolition of buildings and structures containing asbestos

2

or ACM, it will comply with all applicable Federal, State and local laws relating to asbestos and ACM.

4. (a) In accordance with the provisions of 42 U.S.C. section 9620(h)(3)(A), Grantor hereby gives notice that hazardous substances were stored for one year or more, released or disposed of on the Property. **The information contained in this notice is required by regulations promulgated under section 120(h) of the Comprehensive Environmental Response, Liability, and Compensation Act (CERCLA or "Superfund"), 42 U.S.C. section 9620(h).** Grantor has made a complete search of its files and records concerning the Property. Based on that search, the type and quantity of these substances, the time at which such storage, release or disposal took place, to the extent such information is available, and a description of the remedial action taken, if any, is contained in Exhibit "F" attached hereto and made a part hereof.

(b) Grantor warrants for the benefit of Grantee, its successors and assigns, that all remedial action necessary to protect human health and the environment with respect to any hazardous substances remaining on the Property has been taken before the date of this deed.

(c) Grantor covenants for the benefit of Grantee, its successors and assigns, as a covenant running with the land, that any additional remedial action found to be necessary after the date of this deed shall be conducted by the United States; provided, however, that the foregoing covenant shall not apply with respect to any release or threat of release caused by Grantee or its successors or assigns.

(d) In connection with Grantor's covenant made in subparagraph (c), Grantee agrees on behalf of itself, its successors and assigns, as a covenant running with the land, that the United States, and the State of California, their agencies, officers, agents, employees, contractors and subcontractors shall have the right, upon reasonable notice to Grantee, its successors and assigns, to enter upon the Property in any case in which remedial or corrective action is found to be necessary at such Property after the date of this deed, or such access is necessary to carry out remedial action or corrective action on adjoining property. In exercising these rights of access, except in case of imminent endangerment to human health or the environment, Grantor or the State of California shall give to Grantee, its successors and assigns, reasonable notice of actions to be taken related to such remedial action or corrective action necessary at the Property or on adjoining property and shall make every reasonable effort to minimize interference with the use of the Property by Grantee, its successors or assigns. Neither Grantee nor its successors and assigns shall have any claim solely on account of the exercise of any reserved right of entry against the United States or the State of California, or any of their agencies, officers, agents, employees, contractors or subcontractors.

(e) The right to enter described in subparagraph (d) shall include the right to conduct tests, investigations and surveys, including, where necessary, drilling, testpitting, boring and other similar activities. Such right shall also include the right to construct, operate, maintain or undertake any other necessary remedial or corrective action including, but not limited to, monitoring wells, extraction wells and treatment facilities.

(f) In connection with Grantor's remedial actions described in subparagraph (d), Grantee agrees on behalf of itself, its successors and assigns, as a covenant running with the land, to comply with the provisions of any health or safety plan approved by appropriate regulatory authorities and in effect during the course of any such action.

(g) In accordance with, and to the extent required by, applicable federal, state and local laws, and to the extent that Grantee or its successors and assigns have not caused or contributed to any release or threat of release, Grantor will timely:

(i) Assess, inspect, investigate, study and remove or remediate, as appropriate, the release or threat of release of a hazardous substance, pollutant or contaminant from or on the Property caused by Department of Defense activities at the Property; and

(ii) Settle or defend any claim, demand, or order made by federal, state or local regulators or third parties in connection with any release or threat of release of a hazardous substance, pollutant or contaminant from or on the Property caused by Department of Defense activities at the Property.

(h) Grantee agrees, on behalf of itself and its successors and assigns, as a covenant running with the land, that it shall:

(i) Notify Grantor in writing within ninety (90) days after learning of any previously unidentified condition of the Property that suggests a response action is necessary, or, within ninety (90) days after receiving notice of a claim by federal, state or local regulators, or other third parties, of the existence of any condition on the Property that suggests a response action is necessary. If Grantee, or its successors and assigns is served with a complaint or written notice of a claim by federal, state or local regulators, the served party shall provide Grantor with a copy of such document not later than fifteen (15) days following service of such document; and

(ii) Furnish Grantor copies of pertinent papers Grantee, or any successor or assigns, receives; and

(iii) Provide, upon written request of Grantor, reasonable access to the records and personnel of Grantee, or any successor or assigns, for the purposes of defending or resolving the need for additional response action.

5.   (a) In accordance with and to the extent required by applicable federal, state and local laws, Grantor will timely:

(i) assess, inspect, investigate, study, and remove or remediate, as appropriate, the release or threat of release of petroleum or a petroleum derivative from or on the Property caused by Department of Defense activities at the Property; and

(ii) settle or defend any claim, demand, or order made by federal, state or local regulators or third parties in connection with a release or threat of release

4

of petroleum or a petroleum derivative, from or on the Property caused by Department of Defense activities at the Property.

(b)  Grantee agrees, on behalf of itself and its successors and assigns, as a covenant running with the land, that upon learning of any previously unidentified release or threat of release of petroleum or a petroleum derivative from or on the Property, that may have been caused by Department of Defense activities at the Property, will notify Grantor by following the notification procedures set forth in subparagraph 4(h) above.

6.    (a)  Pursuant to Section 330 of P.L. 102-484, as amended, and subject to the provisions of this Paragraph 6, Grantor shall hold harmless, defend and indemnify in full Grantee, any other person or entity that acquires ownership or control of the Property and any successor, assignee, transferee, lender or lessee of Grantee or of any other person or entity that acquires ownership or control of the Property (collectively and individually "Indemnitee(s)") from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threat of release of any hazardous substance, pollutant, contaminant, petroleum or petroleum derivative from or on the Property as a result of Department of Defense activities at the Property.

(b)  Grantor will not indemnify an Indemnitee to the extent said Indemnitee caused or contributed to any release or threat of release of any hazardous substance, pollutant, contaminant, petroleum or petroleum derivative at the Property.  Grantor shall be entitled to contribution from Indemnitees to the extent Grantor shows that such Indemnitees caused or contributed to any release.  However, the availability of contribution shall not affect the requirement of Grantor to defend Indemnitees, unless such Indemnitees are solely responsible for the release or threat of release giving rise to the claim for indemnity, in which case Grantor shall have no duty to defend as to said claim.

(c)  In any case in which Grantor determines that Grantor may be required to indemnify an Indemnitee for any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage, Grantor may settle or defend, on behalf of Indemnitee, the claim for personal injury or property damage.  Prior to taking any action or reaching any final settlement under this paragraph that could adversely impact any Indemnitee,  Grantor shall consult with such Indemnitee  to minimize any such impact.

(d)  If any Indemnitee refuses to allow Grantor to settle or defend any claim, then Indemnitee shall not be afforded indemnification with respect to such claim.

(e)  Indemnification shall not be afforded by Grantor to an Indemnitee unless:

(i)  Such Indemnitee notifies Grantor in writing within 90 days after such an indemnification claim accrues.  If an Indemnitee is served with a complaint or written notice of a claim by a private party or by Federal, State or local regulators,

Indemnitee will provide Grantor with a copy of such document not later than fifteen (15) days following service of such complaint or written notice.  A claim for indemnification accrues when the Indemnitee receives written notice of any suit, claim, demand or action, liability, judgment, cost or other fee, which relates to personal injury or property damage, that the Indemnitee knows, or reasonably should have known, may have been caused or contributed to by Department of Defense activities.  The right of an Indemnitee to indemnification shall not expire due to late notice on the part of Indemnitee unless Grantor's ability to defend or to settle is materially and adversely affected;

(ii) Such Indemnitee provides to Grantor copies of pertinent papers Indemnitee receives;

(iii) Such Indemnitee provides to Grantor, to the extent such is in the possession or control of such Indemnitee, evidence or proof of any claim, loss or damage covered by this indemnity obligation; and

(iv) Such Indemnitee provides, upon the request of Grantor, reasonable access to the records and personnel of such Indemnitee for purposes of defending or settling the claim or action.

(f) Any Indemnitee may implement or enforce the terms of this Paragraph in its own right at its own discretion without obtaining permission from, or joining, any of the other Indemnitees.

(g) Nothing in this Paragraph creates rights of any kind in any person or entity other than Grantor and Indemnitees.

7.    For purposes of Paragraphs 4, 5 and 6, the following terms have the meanings indicated below:

(a) "Release," "threat of release," "remedial action," "remove," "response," "hazardous substance," "pollutant" and "contaminant" have the meanings given such terms under CERCLA and U.S. Environmental Protection Agency Regulations implementing CERCLA.

(b) "Department of Defense activities" means the construction, installation, placement, operation, maintenance, misuse, abandonment, or failure to maintain the buildings, equipment and land at the Property or the failure to satisfy any otherwise legally applicable obligation to investigate or remediate any Environmental Conditions existing at the Property.  "Department of Defense activities" does not mean the release or threat of release of a hazardous substance, pollutant, contaminant, petroleum or petroleum derivative, to the extent Grantor shows that the release or threat of release is caused or contributed to by the Indemnitee(s).

(c) "Demand or action . . . arising out of any claim for . . . property damage" includes, but is not limited to, any judicial, administrative or private cost recovery proceedings brought against an Indemnitee (i) for response costs arising under CERCLA, (ii) for costs incurred to enjoin or abate the presence or migration of contamination from or on the Property under RCRA, or (iii) for costs incurred to comply

with the requirements of other federal or state laws or regulations (or the laws of any political subdivision of the state) which arise from the environmental conditions at the Property.

(d) "Environmental Conditions" means any hazardous substance, pollutant or contaminant, including hazardous waste or hazardous constituent, petroleum or petroleum derivative, disposed of, released or existing in environmental media such as surface soil, subsurface soil, air, groundwater, surface water or subsurface geological formations at levels above background.

8.   Grantor agrees that for purposes of 42 U.S.C. section 9620(h)(3), the acquisition of ownership or control of the Property by the Grantee or its successors or assigns will not make such person a potentially responsible party or relieve Grantor of its obligations herein unless their activities cause a release or a threat of release resulting in response costs to the Grantor.

9.   Nothing in this Deed shall diminish or waive any rights which parties might otherwise have under common law or any Federal or State law or regulation, except that the provisions of this Deed shall be deemed to fully set forth the parties' statutory rights under section 330 of P.L. 102-484 and under 42 U.S.C. section 9620(h)(3).

10.   (a)  This Deed is subject to all outstanding easements and rights of way of record.

(b)  Grantor has constructed and installed structures, facilities, pipelines and conduits on the Property, including those used for water, gas, electricity, steam, communications, heating and cooling, to serve and support Grantor's continuing activities off of the Property.  Grantor hereby reserves the easements described in Exhibits "G" through "P" for the purposes enumerated therein.  Said easements shall be non-exclusive and Grantee may make use of the underlying property burdened by such easements, provided it does so in a manner not inconsistent with Grantor's rights under the easements.

(c)  With the exception of the easement for ingress and egress to and from the United States Border Patrol small arms range and the Department of the Navy medical/dental clinic, all said easements shall include the right, upon reasonable advance notice except in the case of an emergency, to enter upon, above, below or through the surface to construct, operate, maintain, repair, replace or modify Grantor's improvements, provided that the surface shall be restored to the condition previously existing and provided that interference with Grantee's use of the Property is minimized to the extent practicable.

(d)  Grantee, agrees, on behalf of itself and its successors and assigns, as a covenant running with the land, that it shall protect or relocate Grantor's improvements in a manner satisfactory to Grantor should such protection or relocation be required as a result of Grantee's, its successors' and assigns' use of the Property.

(e)  In the event that the proposed use of the Property by Grantee, its successors and assigns, will require the protection or relocation of Grantor's improvements, or restrict or interfere in any way with Grantor's use of the easements

reserved herein, such proposed use shall not begin or proceed until and unless the written consent of the Grantor is obtained and all reasonable requirements and conditions imposed as a condition of the grant of consent are complied with. Grantor's consent shall not be unreasonably withheld or delayed.

11.     Grantee covenants for itself, its successors and assigns, that in connection with any construction or alteration on the Property, it will obtain a determination of no hazard to air navigation from the Federal Aviation Administration in accordance with Title 14 Code of Federal Regulations, part 77, entitled "Objects Affecting Navigable Airspace," or under the authority of the Federal Aviation Act of 1958, as amended.

12.     Grantee covenants for itself, its successors and assigns, that it will not discriminate  upon the basis of race, color, religion, sex, marital status, national origin, ancestry, age, sexual orientation, disability or handicap in the use, occupancy, sale or lease of the Property.

13.     The conditions, restrictions, reservations and covenants set forth herein are a binding servitude on the Property, shall inure to the benefit of Grantor and Grantee and their respective successors and assigns, and will be deemed to run with the land in perpetuity, pursuant to California Civil Code sections 1462 and 1471 and other applicable authority.

14.     No waiver by Grantor or Grantee of any of the terms or conditions of this Deed or any of their respective rights under this Deed shall be effective unless such waiver is in writing and signed by the party charged with the waiver.

15.     Time is of the essence of this Deed.

16.     Notice under or related to this Deed shall be in writing and shall be addressed to the addressees set out below or to such addresses as may from time to time be identified by the parties. Such notice may be delivered by hand, express delivery, overnight courier or pre-paid registered or certified mail, return receipt requested.

If to Grantor:

    BRAC Operations Office
    Attn:  BCM Hunters Point/NTC
    Southwest Division
    Naval Facilities Engineering Command
    1220 Pacific Highway
    San Diego, CA 92132-5190

If to Grantee:

    NTC Project Manager
    Redevelopment Agency of the City of San Diego
    City Administration Building
    202 "C" Street
    San Diego, CA 92101-3863

    And to:

    Office of City Attorney
    Attn:  Richard A. Duvernay
    City Administration Building
    202 "C" Street
    San Diego, CA 92101-3863

**GRANTOR'S SIGNATURE**

UNITED STATES OF AMERICA

By: _____

Print Name: _____

Date: _____

Title:  Real Estate Contracting Officer, Southwest
Division Naval Facilities Engineering Command

**GRANTEE'S COVENANTS AND SIGNATURE**

TO INDICATE ACCEPTANCE of its covenants and agreements contained in this
deed, and receipt of the documents described in Paragraphs 2 and 3 above, Grantee
has executed this document on the date written below.

CITY OF SAN DIEGO

By: _____

Print Name: _____

Date: _____

Title:  City Manager, City of San Diego

# LIST OF EXHIBITS

| Deed Exhibit | Description |
|:---:|:---|
| A | Parcel Map |
| B | EDC Parcel II/IIIA Legal Description |
| C | EDC Parcel IIIB Legal Description |
| D | EDC Parcel VIII Legal Description |
| E | EDC Parcel X Legal Description |
| F | Hazardous Substances Notification |
| G | Finding of Suitability to Transfer Parcels II/IIIA and IX of the Former Naval Training Center San Diego, California, May 2000 |
| H | Easement for Telecommunications Distribution System |
| I | Easement for 69kV Electric Distribution Line |
| J | Easement for Steam Distribution Line |
| K | Easement for 12 kV Electric Distribution System |
| L | Easement for Fuel Line |
| M | Easement for Electric Service to CATS Microwave Tower |
| N | Storm Drain Easement |
| O | Easement for Cable Television Distribution System |
| P | Easement for Pedestrian Bridge |
| Q | Easement for Access to Retained Facilities |



# EXHIBIT A

| Exhibit A Parcel ID | Parcel Number as shown on Record of Survey Map No. 16556 filed on April 25, 2000 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego | Acres |
|---|---|---|
| II/IIIA | 8 | 6.990 |
| | 10 | 39.635 |
| | 14 | 180.060 |
| | 9 | 0.202 |
| | 12 | 21.230 |
| | 16 | 8.899 |
| IIIB | 11 | 10.847 |
| | 15 | 2.031 |
| VI | 1 | 1.551 |
| | 2 | 1.203 |
| | 5 | 6.922 |
| | 6 | 39.380 |
| VII | 4 | 43.625 |
| VIII | 13 | 6.288 |
| IX | 3 | 7.545 |
| | 7 | 0.313 |
| X | 18 | 0.878 |

Exhibit A, Page 2 of 2

## EDC PARCEL II/IIIA LEGAL DESCRIPTION

Being portions of the Naval Training Center in the City of San Diego, County of San Diego, State of California, said portions more particularly described as follows:

Parcels 8, 9, 10, 12, 14, and 16 as depicted on Record of Survey Map No. 16556 filed on April 25, 2000 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

**EXHIBIT B**

## EDC PARCEL IIIB LEGAL DESCRIPTION

Being portions of the Naval Training Center in the City of San Diego, County of San Diego, State of California, said portions more particularly described as follows:

Parcels 11 and 15 as depicted on Record of Survey Map No. 16556 filed on April 25, 2000 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

**EXHIBIT C**

## EDC PARCEL VIII LEGAL DESCRIPTION

Being portions of the Naval Training Center in the City of San Diego, County of San Diego, State of California, said portions more particularly described as follows:

Parcel 13 as depicted on Record of Survey Map No. 16556 filed on April 25, 2000 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

EXHIBIT D

## EDC PARCEL X LEGAL DESCRIPTOPN

Being a portion of the Naval Training Center in the City of San Diego, County of San Diego, State of California, said portion more particularly described as follows:

Parcel 18 as depicted on Record of Survey Map No. 16556 filed on April 25, 2000 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

EXHIBIT E

**EXHIBIT F – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX**

| Site Name | Hazardous Substances[1] | CAS No.[2] | Regulatory Synonym[3] | RCRA Waste No[5] | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S) or Released (R) or Disposed (D) of | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| IR Site 2 (Building 227 UST) | Petroleum Hydrocarbons | N/A | N/A | N/A | N/A | Unknown | 1942-1991 | S, R | J, 3-3 |
| IR Site 4 | Paper ash | N/A | N/A | N/A | N/A | Unknown | Approx. 1942-late 1960's | Burned on site | G |
| IR Site 4 (PCB Spill Area) | Polychlorinated biphenyls | 1336363 | PCBs, Aroclors | N/A | 10 | Unknown | 8 July 1999 | R | G, 7-1 |
| IR Site 6 | 1,1,2-trichloroethane | 79005 | 1,1,2-TCA | U228 | 1,000 | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | 4,4'-DDE | 72559 | DDE | N/A | 1 | Unknown | 1970-1997 | S,R | E, 6-2 |
| IR Site 6 | 4,4'-DDT | 50293 | Benzene, 1,1'-(trichloroethylidene)bis[4-chloro DDT | U061 | 1 | Unknown | | S,R | E, 6-2 |
| IR Site 6 | Acetone | 67641 | 2-Propanone | U002 | 1 | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Anti-seize compound | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Calcium arsenate | 7778441 | N/A | N/A | 1,000 | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Cement solvent | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Chlorinated diphenyl oxide | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | DDT | 50293 | Benzene, 1,1'-(trichloroethylidene)bis[4-chloro, 4,4'DDT | U061 | 1 | Unknown | 1970-1997 | S,R | E, 2-5 |
| IR Site 6 | Degreaser | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Heptane | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Hexamethylmelamine | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Iprodione | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Liquid w. solder seal | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Milorganic fertilizer | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Mineral spirits | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Motor oil | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S,R | E, 2-5 |
| IR Site 6 | Pentachlorophenol | 87865 | Phenol, pentachloro | U242 | 10 | Unknown | 1970-1997 | S | E, 2-5 |

**EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX**

| Site Name | Hazardous Substances[1] | CAS No.[2] | Regulatory Synonym | RCRA[3] Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S) Released (R), or Disposed (D) of | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| IR Site 6 | Pesticides | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | G, 4-11; J, 3-4 |
| IR Site 6 | Pramitol | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Real tuff | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Resmirithin | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | G, 4-11 |
| IR Site 6 | Teflon post, sealant | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 2-5 |
| IR Site 6 | Unitrac hydraulic oil | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S,R | E, 2-5 |
| IR Site 6 | Waste oil | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S,R | J, 3-4 |
| IR Site 6 | 4,4'-DDD | 72548 | Benzene, 1,1'-(2,2-dichloroethylidene)bis[4-chloro DDD, TDE | N/A | 1 | Unknown | 1970-1997 | S,R | E, 6-2 |
| IR Site 6 | Heptachlor Epoxide | 1024573 | N/A | N/A | 1 | Unknown | 1970-1997 | S | E, 6-2 |
| IR Site 6 | Petroleum hydrocarbons | N/A | N/A | N/A | N/A | Unknown | 1970-1997 | S,R | E, 6-2 |
| IR Site 6 | Arsenic | 7440382 | N/A | N/A | 1 | Unknown | 1970-1997 | ** | B, App M; E, 6-6 |
| IR Site 6 | Barium | N/A | N/A | D005 | 1 | Unknown | 1970-1997 | S | E, 6-6 |
| IR Site 6 | Cadmium | 7440439 | N/A | N/A | 1 | Unknown | 1970-1997 | S | E, 6-6 |
| IR Site 6 | Chromium | 7440473 | N/A | N/A | 1 | Unknown | 1970-1997 | S | E, 6-6 |
| IR Site 6 | Copper | 7440508 | N/A | N/A | 1 | Unknown | 1970-1997 | S | E, 6-6 |
| IR Site 6 | Lead | 7439921 | N/A | N/A | 1 | Unknown | 1970-1997 | S | E, 6-6 |
| IR Site 6 | Mercury | 7439976 | N/A | U151 | 1 | Unknown | 1970-1997 | S | E, 6-6 |
| IR Site 6 | Zinc | 7440666 | N/A | N/A | N/A | Unknown | 1970-1997 | S | E, 6-6 |
| IR Site 7 | Total Petroleum Hydrocarbons – diesel | N/A | N/A | N/A | N/A | Unknown | 1942-1988 | S, R | F, Table 5-1 |
| IR Site 7 | Total Petroleum Hydrocarbons – gasoline | N/A | N/A | N/A | N/A | Unknown | 1942-1988 | S, R | F, Table 5-1 |
| IR Site 7 | 4,4'-DDE | 72559 | DDE | N/A | 1 | Unknown | 1942-1988 | S, R | F, Table 5-1 |
| IR Site 7 | 4,4'-DDD | 72548 | Benzene, 1,1'-(2,2-dichloroethylidene)bis[4-chloro DDD, TDE | U060 | 1 | Unknown | 1942-1988 | S, R | F, Table 5-1 |
| IR Site 7 | 4,4'-DDT | 50293 | Benzene, 1,1'-(trichloroethylidene)bis[4-chloro, 4,4'DDT | U061 | 1 | Unknown | 1942-1988 | S | F, Table 5-1 |

EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX

| Site Name[1] | Hazardous Substances[1] | CAS No.[2] | Regulatory/Synonym[1] | RGRA[4] Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[1] | Stored (S) Released (R) or Disposed (D) of | Reference/Page No. |
|---|---|---|---|---|---|---|---|---|---|
| IR Site 7 | 2-Methylnaphthalene | 91576* | N/A | N/A | N/A | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | 1,1-Dichloroethene | 75354 | 1,1-DCE; Ethene, 1,1-dichloro-Vinlyidene chloride | U078 | 5,000 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | 1,1,1-Trichloroethane | 71556 | 1,1,1-TCA; Ethane, 1,1,1-trichloro-; Methyl chloroform | U226 | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Beryllium | 7440417* | Beryllium compounds | N/A | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | trans-1,2-Dichloroethene | 156605 | 1,2-DCE; Ethene, 1,2-dichloro (E) | U079 | 1,000 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Ethylbenzene | 100414 | N/A | N/A | 1,000 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Trichloroethene | 79016 | TCE, Ethene, trichloro | U228 | 1,000 | Unknown | 1942-1988 | S, R | F, Table 5-1 |
| IR Site 7 | Xylenes | 1330207 | Benzene, dimethyl-Xylene | U239 | 1,000 | Unknown | 1942-1988 | S, R | F, Table 5-1 |
| IR Site 7 | Acenaphthene | 83329 | N/A | N/A | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Benzo(a)anthracene | 56553 | Benz[a]anthracene; 1,2-Benzanthracene | U018 | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Benzo(b)fluoranthene | 205992 | N/A | N/A | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Benzo(a)pyrene | 50328 | 3,4-Benzopyrene | U022 | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | bis(2-Ethylhexyl) phthalate | 117817 | Diethylhexyl phthalate; 1,2-Benzenedicarboxylic acid; [bis(2-ethylhexyl)]ester | U028 | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Chrysene | 218019 | 1,2-Benzphenanthrene | U050 | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Fluoranthene | 206440 | Benzo[j,k]fluorene | U120 | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Fluorene | 86737 | N/A | N/A | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Phenanthrene | 85018 | N/A | N/A | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |

EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX

| Site Name | Hazardous Substances[3] | CAS No.[2] | Regulatory Synonym | RCRA[3] Waste No. | Reportable Quantity[4] (Pounds) | Quantity[5] | Date(s) of Storage and/or Operation[5] | Stored (S), Released (R), or Disposed (D) of[5] | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| IR Site 7 | Pyrene | 129000 | N/A | N/A | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | tert-Butylbenzene | N/A | N/A | N/A | N/A | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | cis-1,2-Dichloroethene | 156605 | cis-1,2-DCE; Ethene, 1,2-dichloro- | U079 | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | trans-1,2-Dichloroethene | 156605 | trans-1,2-DCE; Ethene, 1,2-dichloro- | U079 | 1 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Ethylbenzene | 100414 | N/A | N/A | 1,000 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Naphthalene | 91203 | N/A | U165 | 5,000 | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | Propylbenzene | N/A | N/A | N/A | N/A | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 7 | 1,2,4-Trimethylbenzene | 95636 | Asymetrical trimethyl-benzene | N/A | N/A | Unknown | 1942-1988 | R | F, Table 5-1 |
| IR Site 8 (POI 34) | Gasoline | N/A | N/A | N/A | N/A | Unknown | Approx. 1942-1994 | S, R | J, 3-4 |
| IR Site 8 (POI 34) | Benzene | 71432 | N/A | U109 | 1,000 | Unknown | Approx. 1942-1994 | S, R | A, 4-7 |
| IR Site 8 (POI 34) | Toluene | 108883 | Benzene, methyl | U220 | 1,000 | Unknown | Approx. 1942-1994 | S, R | A, 4-7 |
| IR Site 8 (POI 34) | Ethylbenzene | 100414 | N/A | N/A | 1,000 | Unknown | Approx. 1942-1994 | S,R | A, 4-7 |
| IR Site 8 (POI 34) | Xylenes | 1330207 | Benzene, dimethyl-xylene | U239 | 1,000 | Unknown | Approx. 1942-1994 | S,R | A, 4-7 |
| IR Site 8 (POI 34) | 1,2-dichloroethane | 107062 | 1,2-DCA, Ethylene dichloride | U077 | 5,000 | Unknown | Approx. 1942-1994 | S,4R | A, 4-7 |
| IR Site 9 (POI 31) | JP-5 | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S, R | H, 5 |
| IR Site 9 (POI 31) | Petroleum | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S, R | J, 3-4 |
| IR Site 9 (POI 31) | TPH-diesel | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S, R | H, 9 |
| IR Site 9 (POI 31) | Benzene | 71432 | N/A | U109 | 1,000 | Unknown | 1942-1994 | S, R | H, 9 |
| IR Site 9 (POI 31) | Toluene | 108883 | Benzene, methyl | U220 | 1,000 | Unknown | 1942-1994 | S, R | H, 9 |

EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX

| Site Name | Hazardous Substances[1] | CAS No.[2] | Regulatory Synonym | RCRA[3] Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S) Released (R) or Disposed (D) of | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| IR Site 9 (POI 31) | Ethylbenzene | 100414 | N/A | N/A | 1,000 | Unknown | 1942-1994 | S, R | H, 9 |
| IR Site 9 (POI 31) | Xylene | 1330207 | Benzene, dimethyl-xylene | U239 | 1,000 | Unknown | 1942-1994 | S, R | H, 9 |
| IR Site 10 (UST 189) | Benzene | 71432 | N/A | U109 | 1,000 | Unknown | 1942-1994 | S, R | I, 15 |
| IR Site 10 (UST 189) | Toluene | 108883 | Benzene, methyl | U220 | 1,000 | Unknown | 1942-1994 | S, R | I, 3 |
| IR Site 10 (UST 189) | Tetrachloroethene | 127184 | PCE; Tetrachloroethylene | U210 | 1 | Unknown | 1942-1994 | S, R | I, 15 |
| IR Site 10 (UST 189) | Ethylbenzene | 100414 | N/A | N/A | 1,000 | Unknown | 1942-1994 | S, R | I, 15 |
| IR Site 10 (UST 189) | Xylenes | 1330207 | Benzene, dimethyl-xylene | U239 | 1,000 | Unknown | 1942-1994 | S, R | I, 15 |
| IR Site 10 (UST 189) | Barium | N/A | N/A | D005 | 1 | Unknown | 1942-1994 | R | I, 15 |
| IR Site 10 (UST 189) | Chromium | 7440473 | N/A | N/A | 1 | Unknown | 1942-1994 | R | I, 15 |
| IR Site 10 (UST 189) | Copper | 7440508 | N/A | N/A | 1 | Unknown | 1942-1994 | R | I, 15 |
| IR Site 10 (UST 189) | Lead | 7439921 | N/A | N/A | 1 | Unknown | 1942-1994 | R | I, 15 |
| IR Site 10 (UST 189) | Soluble Lead | 7439921 | N/A | N/A | 1 | Unknown | 1942-1994 | S, R | I, 15 |
| IR Site 10 (UST 189) | Nickel | 7440020 | N/A | N/A | 1 | Unknown | 1942-1994 | R | I, 15 |
| IR Site 10 (UST 189) | Vanadium | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | R | I, 15 |
| IR Site 10 (UST 189) | Zinc | 7440666 | N/A | N/A | 1 | Unknown | 1942-1994 | R | I, 15 |
| IR Site 10 (UST 189) | Waste oil | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | R | I, 3; J, 3-4 |
| IT Site 10 (UST 189) | Total Recoverable Petroleum Hydrocarbons | N/A | TRPH | N/A | N/A | Unknown | 1942-1994 | S, R | I, 3; J, 3-4 |
| IR Site 11 (POI 16) | cis-1,2-Dichloroethene | 156605 | cis-1,2-DCE; Ethene, 1,2-dichloro- | U079 | 1 | Unknown | 1942-1995 | S, R | I, 17 |
| IR Site 11 (POI 16) | Toluene | 108883 | Benzene, methyl | U220 | 1,000 | Unknown | 1942-1995 | S, R | I, 17 |

EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX

| Site Name | Hazardous Substances[1] | CAS No.[2] | Regulatory Synonym | RCRA Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S) Released (R) or Disposed (D) of | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| IR Site 11 (POI 16) | Tetrachloroethene | 127184 | PCE, Tetrachloroethylene | U210 | 1 | Unknown | 1942-1995 | S, R | I, 17 |
| IR Site 11 (POI 16) | Ethylbenzene | 100414 | N/A | N/A | 1,000 | Unknown | 1942-1995 | S, R | I, 17 |
| IR Site 11 (POI 16) | Toluene | 108883 | Benzene, methyl | U220 | 1,000 | Unknown | 1942-1995 | S, R | I, Table 3 |
| IR Site 11 (POI 16) | Xylene | 1330207 | Benzene, dimethyl-xylene | U239 | 1,000 | Unknown | 1942-1995 | S, R | I, Table 3 |
| IR Site 11 (POI 16) | TPH-diesel | N/A | N/A | N/A | N/A | Unknown | 1942-1995 | S, R | I, Table 2 |
| IR Site 11 (POI 16) | Tetrachloroethylene | 127184 | Perchloroethene; PCE | U210 | 100 | Unknown | 1942-1995 | R | A, 4-7 |
| IR Site 11 (POI 16) | Trichloroethylene | 79016 | TCE | U228 | 100 | Unknown | 1942-1995 | R | A, 4-7 |
| IR Site 11 (POI 16) | 1,2-dichloroethylene | 156605 | 1,2-DCE; Ethene, 1,2-dichloro (E) | U079 | 1,000 | Unknown | 1942-1995 | R | A, 4-7 |
| IR Site 11 (POI 16) | Stoddard solvent | 8052413* | N/A | N/A | N/A | Unknown | 1942-1995 | S, R | A, 4-7; I, 4 |
| POI 1 | JP-5 | N/A | Jet fuel | N/A | N/A | Unknown; operational pipeline adjacent to Rosecrans Street | 1954 – Present | S | D, A-1 |
| POI 7 | Sodium bisulfate | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-3 |
| POI 7 | Sodium metasilicate pentahydrate | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-3 |
| POI 7 | "So-Sure" all-purpose detergent | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-3 |
| POI 7 | Lubricating oil | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-3 |
| POI 7 | Hydraulic fluid | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-3 |
| POI 7 | Grease | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-3 |
| POI 7 | Solvents | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-3 |
| POI 7 | Paint | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-3 |
| POI 7 | Benzene | 71432 | N/A | U109 | 1,000 | Unknown | 1942-1994 | S,R | D, D4-6 |
| POI 7 | Toluene | 108883 | Benzene, methyl | U220 | 1,000 | Unknown | 1942-1994 | S,R | D, D4-6 |
| POI 7 | Ethylbenzene | 100414 | N/A | N/A | 1,000 | Unknown | 1942-1994 | S,R | D, D4-6 |
| POI 7 | Total xylenes | 1330207 | Dimethylbenzene | U239 | 1,000 | Unknown | 1942-1994 | S,R | D, D4-6 |
| POI 7 | Tetrachloroethene | 127184 | PCE, Tetrachloroethylene | U210 | 1 | Unknown | 1942-1994 | S,R | D, D4-6 |

**EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX**

| Site Name | Hazardous Substances[1] | Regulatory Synonym | CAS No.[2] | RCRA[3] Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(S) of Storage and/or Operation[5] | Stored (S), Released (R), or Disposed (D) of[5] | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| POI 7 | Arsenic | N/A | 7440382 | N/A | 1 | Unknown | 1942-1994 | ** | B, App M; D, D4-15 |
| POI 7 | Barium | N/A | N/A | D005 | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Beryllium | Beryllium compounds | N/A | N/A | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Chromium | N/A | 7440473 | N/A | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Copper | N/A | 7440508 | N/A | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Lead | N/A | 7439921 | N/A | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Molybdenum | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Nickel | N/A | 7440020 | N/A | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Selenium | N/A | 7782492 | N/A | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Silver | N/A | 7440224 | N/A | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Thallium | N/A | 7440280 | N/A | 1 | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Vanadium | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Petroleum hydrocarbons | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S,R | D, D4-15 |
| POI 7 | Trichloro-Fluoromethane | | | | | Unknown | 1942-1994 | S,R | D, D4-11 |
| POI 10 | Fuel | N/A | N/A | N/A | N/A | Unknown | 1943-1995 | S | D, A-7 |
| POI 10 | Oils | N/A | N/A | N/A | N/A | Unknown | 1943-1995 | S | D, A-7 |
| POI 10 | Paints | N/A | N/A | N/A | N/A | Unknown | 1943-1995 | S | D, A-7 |
| POI 10 | Primer | N/A | N/A | N/A | N/A | Unknown | 1943-1995 | S | D, A-7 |
| POI 10 | Solvents | N/A | N/A | N/A | N/A | Unknown | 1943-1995 | S | D, A-7 |
| POI 11 | Chlorine | N/A | 7782505 | N/A | 10 | Unknown | 1942-1995 | S | D, A-10 |
| POI 11 | Cleaning Fluids | N/A | N/A | N/A | N/A | Unknown | 1942-1995 | S | D, A-10 |
| POI 11 | Nitrogen | N/A | 7727379* | N/A | N/A | Unknown | 1942-1995 | S | D, A-10 |
| POI 11 | Oxygen | N/A | 7782447* | N/A | N/A | Unknown | 1942-1995 | S | D, A-10 |
| POI 11 | Potassium super oxide | N/A | N/A | N/A | N/A | Unknown | 1942-1995 | S | D, A-9 |
| POI 12 | Film-developing chemicals | N/A | N/A | N/A | N/A | Unknown | 1978-1993 | S, R | D, A-12 |
| POI 12 | Silver | N/A | 7440224 | N/A | 1,000 | Unknown | 1978-1993 | S, R | D, A-12 |
| POI 14 | Hydraulic fluid | N/A | N/A | N/A | N/A | Unknown | 1942-1996 | S | D, C-2 |
| POI 14 | Lubricating oil | N/A | N/A | N/A | N/A | Unknown | 1942-1996 | S | D, C-2 |
| POI 14 | Solvents | N/A | N/A | N/A | N/A | Unknown | 1942-1996 | S | D, C-2 |
| POI 14 | Plating solutions (i.e., acids, bases) | N/A | N/A | N/A | N/A | Unknown | 1942-1996 | S | D, C-2 |
| POI 14 | Copper | N/A | 7440508 | N/A | 1 | Unknown | 1942-1996 | S | D, C-2 |
| POI 14 | Tin | N/A | N/A | N/A | N/A | Unknown | 1942-1996 | S | D, C-2 |

**EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX**

| Site Name | Hazardous Substances[3] | CAS No.[2] | Regulatory/Synonym | RCRA Waste No.[2] | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S), Released (R), or Disposed (D) of[5] | Reference/Page No. |
|---|---|---|---|---|---|---|---|---|---|
| POI 14 | Paint | N/A | N/A | N/A | N/A | Unknown | 1942-1996 | S | D, C-2 |
| POI 14 | Cutting fluid | N/A | Cimcool Qual Star ® | N/A | N/A | Unknown | 1942-1996 | S | D, C-2 |
| POI 15 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1922-1975 | S | D, B-4 |
| POI 15 | Silver | 7440224 | N/A | U015 | 1 | Unknown | 1922-1975 | S | D, B-4 |
| POI 17 | Oils | N/A | N/A | N/A | N/A | Unknown | 1937-1995 | S | D, B-6 |
| POI 17 | Paints | N/A | N/A | N/A | N/A | Unknown | 1937-1995 | S | D, B-6 |
| POI 18 | Adhesives | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Cleaning solvents | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Diesel fuel | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Fuel oil | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-19 |
| POI 18 | Hydraulic fluid | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Isopropyl alcohol | 67630* | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Paint | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Pep set binding | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Plating acid | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Wood putty | N/A | N/A | N/A | N/A | Unknown | 1952-1984 | S | D, A-20 |
| POI 18 | Lye | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-8 |
| POI 19 | Paints | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S, R | D, B-8 |
| POI 19 | Acetylene | 74862* | N/A | N/A | N/A | Unknown | 1940-1995 | S, R | D, B-9 |
| POI 19 | Argon | 7440371* | N/A | N/A | N/A | Unknown | 1940-1995 | S, R | D, B-9 |
| POI 19 | Pesticides | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Round-up® | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Diazon® | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Orthene® | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Di Quat® | 85007 | N/A | N/A | 1,000 | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Tri-Mec® | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Malathion | 121755 | N/A | N/A | 10 | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Fusiland | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Waste oil | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Hydraulic fluid | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 19 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1940-1995 | S | D, B-9 |
| POI 20 | Cutting fluids | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | S | D, D4-16 |
| POI 20 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | S | D, D4-16 |
| POI 20 | Solvents | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | S | D, D4-16 |
| POI 20 | Paints | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | S | D, D4-16 |
| POI 20 | Waste oil | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | S | D, D4-16 |
| POI 20 | Waste aerosols | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | S | D, D4-16 |

**EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX**

| Site/Name | Hazardous Substances[1] | CAS No.[2] | Regulatory/Synonym | RCRA[3] Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S), Released (R), or Disposed (D) of[5] | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| POI 20 | Liquid adhesives | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | S | D, D4-16 |
| POI 20 | Asbestos-containing floor tile | 1332214 | N/A | P036 | 1 | Unknown | 1990-1997 | S | D, D4-16 |
| POI 20 | Polychlorinated biphenyls | 1336363 | PCB, Aroclors | N/A | 10 | Unknown | 1990-1997 | S | D, D4-16 |
| POI 20 | Petroleum Hydrocarbons | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | R | D, D4-21 |
| POI 20 | Trichloro-fluoromethane | 75694 | Trichloromonofluoro-methane | U121 | 1 | Unknown | 1990-1997 | R | D, D4-21 |
| POI 20 | Alpha-benzene hexachloride | 118741 | Alpha-BHC, Hexachlorobenzene | U127 | 1 | Unknown | 1990-1997 | R | D, D4-21 |
| POI 20 | 4,4'-DDT | 50293 | Benzene, 1,1'-(trichloroethylidene)bis[4 | U061 | 1 | Unknown | 1990-1997 | R | D, D4-21 |
| POI 20 | 4,4'-DDE | 72559 | DDE | N/A | 1 | Unknown | 1990-1997 | R | D, D4-21 |
| POI 20 | Arsenic | 7440382 | N/A | N/A | 1 | Unknown | 1990-1997 | ** | B, App M; D, D4-24 |
| POI 20 | Beryllium | N/A | Beryllium compounds | N/A | 1 | Unknown | 1990-1997 | R | D, D4-24 |
| POI 20 | Chromium | 7440473 | N/A | N/A | 1 | Unknown | 1990-1997 | R | D, D4-24 |
| POI 20 | Lead | 7439921 | N/A | N/A | 1 | Unknown | 1990-1997 | R | D, D4-24 |
| POI 20 | Nickel | 7440020 | N/A | N/A | 1 | Unknown | 1990-1997 | R | D, D4-24 |
| POI 20 | Silver | 7440224 | N/A | N/A | 1 | Unknown | 1990-1997 | R | D, D4-24 |
| POI 20 | Vanadium | N/A | N/A | N/A | N/A | Unknown | 1990-1997 | R | D, D4-24 |
| POI 21 | Freon® | N/A | N/A | N/A | N/A | Unknown | 1941-1997 | S | D, B-12 |
| POI 21 | Lube oil | N/A | N/A | N/A | N/A | Unknown | 1941-1997 | S | D, B-12 |
| POI 21 | Waste oil | N/A | N/A | N/A | N/A | Unknown | 1941-1997 | S | D, B-12 |
| POI 21 | Acetylene | 74862 | N/A | N/A | N/A | Unknown | 1941-1997 | S | D, B-12 |
| POI 22 | Paints | N/A | N/A | N/A | N/A | Unknown | 1960-1997 | S | D, B-13 |
| POI 22 | Resins | N/A | N/A | N/A | N/A | Unknown | 1960-1997 | S | D, B-13 |
| POI 22 | Solvents | N/A | N/A | N/A | N/A | Unknown | 1960-1997 | S | D, B-13 |
| POI 22 | Waste Oils | N/A | N/A | N/A | N/A | Unknown | 1960-1997 | S | D, B-13 |
| POI 22 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1960-1997 | S | D, B-13 |
| POI 22 | Engine oil | N/A | N/A | N/A | N/A | Unknown | 1960-1997 | S | D, B-13 |
| POI 23 | "CS" gas pellets | N/A | N/A | N/A | N/A | Unknown | 1992-1997 | S, R | D, A-23 |
| POI 23 | Liquid carbon dioxide | N/A | N/A | N/A | N/A | Unknown | 1992-1997 | S, R | D, A-23 |
| POI 23 | Liquid propane | 108601 | Dichloisopropyl ether | U027 | 1 | Unknown | 1992-1997 | S, R | D, A-23 |
| POI 23 | Sodium bicarbonate | N/A | N/A | N/A | N/A | Unknown | 1992-1997 | S, R | D, A-23 |
| POI 23 | Sodium dodecylbenzene sulfate | 25155300 | Surrogate aqueous film forming foam (AFFF) | N/A | 1,000 | Unknown | 1992-1997 | S, R | D, A-23 |

EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX

| Site Name | Hazardous Substances[3] | Regulatory Synonym[2] | CAS No.[2] | RCRA[3] Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S), Released (R), or Disposed (D) of | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| POI 23 | Synthetic hydraulic fuel | Fyre Quel | N/A | N/A | N/A | Unknown | 1992-1997 | S, R | D, A-23 |
| POI 25 | Photo-developing chemicals | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S | D, C-6 |
| POI 25 | Paint | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S | D, C-6 |
| POI 26 | Paint | N/A | N/A | N/A | N/A | Unknown | 1937-1979 | S | D, D4-25 |
| POI 26 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1937-1979 | S | D, D4-25 |
| POI 26 | Diesel fuel | N/A | N/A | N/A | N/A | Unknown | 1937-1979 | S | D, D4-25 |
| POI 26 | Grease | N/A | N/A | N/A | N/A | Unknown | 1937-1979 | S | D, D4-25 |
| POI 26 | Petroleum hydrocarbons | N/A | N/A | N/A | N/A | Unknown | 1937-1979 | R | D, D4-31 |
| POI 26 | Arsenic | N/A | 7440382 | N/A | 1 | Unknown | 1937-1979 | ** | B, App M; D, D4-35 |
| POI 26 | Beryllium | Beryllium compounds | N/A | N/A | 1 | Unknown | 1937-1979 | R | D, D4-35 |
| POI 26 | Chromium | N/A | 7440473 | N/A | 1 | Unknown | 1937-1979 | R | D, D4-35 |
| POI 26 | Lead | N/A | 7439921 | N/A | 1 | Unknown | 1937-1979 | R | D, D4-35 |
| POI 26 | Nickel | N/A | 7440020 | N/A | 1 | Unknown | 1937-1979 | R | D, D4-35 |
| POI 26 | Silver | N/A | 7440224 | N/A | 1 | Unknown | 1937-1979 | R | D, D4-35 |
| POI 26 | Thallium | N/A | 7440280 | N/A | 1 | Unknown | 1937-1979 | R | D, D4-35 |
| POI 26 | Vanadium | N/A | N/A | N/A | N/A | Unknown | 1937-1979 | R | D, D4-35 |
| POI 28 | Polychlorinated biphenyls | PCB, Aroclors | 1336363 | N/A | 10 | Unknown | 1988 | R | D, D4-36 |
| POI 28 | Heptachlor | 4,7-Methano-1H-indene, 1,4,5,6,7,8,8-heptachloro-3a,4,7,7a-tetrahydro | 76448 | P059 | N/A | Unknown | 1988 | R | D, D4-39 |
| POI 28 | 4,4'-DDE | DDE | 72559 | N/A | 1 | Unknown | 1988 | R | D, D4-39 |
| POI 28 | 4,4'-DDT | Benzene, 1,1'(2,2,2-trichloroethylidene) | 50293 | U061 | 1 | Unknown | 1988 | R | D, D4-39 |
| POI 32 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1942-1994 | S | D, 3-3 |
| POI 35 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1970-1994 | S | D, 3-3 |
| POI 38 | Copper | N/A | 7440508 | N/A | 1 | Unknown | 1947-1997 | R | C, p3-2 |
| POI 38 | Lead | N/A | 7439921 | N/A | 1 | Unknown | 1947-1997 | R | C, p3-2 |
| POI 39 | Polychlorinated Biphenyls | PCB, Aroclors | N/A | N/A | 10 | Unknown | Unknown | S | D, B-17 |
| POI 49 | Paint | N/A | N/A | N/A | N/A | Unknown | 1932-1997 | S | D, C-10 |
| POI 49 | Oil | N/A | N/A | N/A | N/A | Unknown | 1932-1997 | S | D, C-10 |
| POI 50 | Fiberglass resin | N/A | N/A | N/A | N/A | Unknown | 1941-1997 | S | D, B-29 |
| POI 50 | Methyl ethyl ketone | MEK, | 78933 | U159 | 1 | Unknown | 1941-1997 | S | D, B-29 |

EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION¹ – PARCELS II/IIIA AND IX

| Site Name | Hazardous Substances¹ | CAS No.² | Regulatory/Synonym | RCRA³ Waste No. | Reportable Quantity⁴ (Pounds) | Quantity | Date(s) of Storage and/or Operation⁵ | Stored (S), Released (R), or Disposed (D) of | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| | | | 2 butanone | | | | | | |
| POI 50 | Engine oil | N/A | N/A | N/A | N/A | Unknown | 1941-1997 | S | D, B-29 |
| POI 50 | Peroxide | N/A | N/A | N/A | N/A | Unknown | 1941-1997 | S | D, B-29 |
| POI 51 | Tear gas | N/A | N/A | N/A | N/A | Unknown | 1942-1970 | S, R | D, A-28 |
| | | | | | | | | | |
| POI 53 | Photo-developing chemicals | N/A | N/A | N/A | N/A | Unknown | 1960-1964 | S | D, C-12 |
| POI 54 | Oil | N/A | N/A | N/A | N/A | Unknown | 1943-1970 | S | D, C-14 |
| POI 54 | Alcohol (isopropyl) | 67630* | N/A | N/A | N/A | Unknown | 1943-1970 | S | D, C-14 |
| POI 57 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1926-1938 | S | D, D4-56 |
| POI 57 | Petroleum Hydrocarbons | N/A | N/A | N/A | N/A | Unknown | 1926-1938 | R | D, D4-60 |
| POI 60 | Boat fuel | N/A | N/A | N/A | N/A | Unknown | 1943-1965 | S | D, D4-69 |
| POI 66 | Paint | N/A | N/A | N/A | N/A | Unknown | 1923-1939 | S | D, C-18 |
| POI 66 | Oil | N/A | N/A | N/A | N/A | Unknown | 1923-1939 | S | D, C-18 |
| POI 67 | Photo-developing chemicals | N/A | N/A | N/A | N/A | Unknown | 1923-1924 | S | D, C-21 |
| POI 68 | Fertilizers | N/A | N/A | N/A | N/A | Unknown | 1949-1960 | S | D, C-22 |
| POI 69 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1926-1942 | S | D, D4-81 |
| POI 70 | Distillate fuel | N/A | N/A | N/A | N/A | Unknown | 1922-Unknown | S | D, D4-84 |
| POI 71 | Oils | N/A | N/A | N/A | N/A | Unknown | 1949-1960 | S | D, C-24 |
| POI 71 | Waste oils | N/A | N/A | N/A | N/A | Unknown | 1942-1970 | S | D, C-24 |
| POI 71 | Greases | N/A | N/A | N/A | N/A | Unknown | 1942-1970 | S | D, C-24 |
| POI 71 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1942-1970 | S | D, C-24 |
| POI 71 | Stoddard solvent | N/A | Mineral spirits | N/A | N/A | Unknown | 1942-1970 | S | D, C-24 |
| POI 72 | Gasoline | N/A | N/A | N/A | N/A | Unknown | 1942-1997 | S | D, C-27 |
| POI 72 | Paint | N/A | N/A | N/A | N/A | Unknown | 1942-1997 | S | D, C-27 |
| POI 72 | Engine oil | N/A | N/A | N/A | N/A | Unknown | 1942-1997 | S | D, C-27 |
| POI 75 | Acetylene | 74862* | N/A | N/A | N/A | Unknown | 1941-1966 | S | D, C-31 |
| POI 75 | Oils | N/A | N/A | N/A | N/A | Unknown | 1941-1966 | S | D, C-31 |
| POI 75 | Compressed oxygen | 7782447* | N/A | N/A | N/A | Unknown | 1941-1966 | S | D, C-31 |
| POI 75 | Compressed nitrogen | 77277379* | N/A | N/A | N/A | Unknown | 1941-1966 | S | D, C-31 |
| POI 75 | Refrigerant | N/A | R-134 | N/A | N/A | Unknown | 1941-1966 | S | D, C-31 |
| POI 75 | Grease | N/A | N/A | N/A | N/A | Unknown | 1941-1966 | S | D, C-31 |
| POI 75 | Mineral oil | N/A | N/A | N/A | N/A | Unknown | 1941-1966 | S | D, C-31 |
| POI 78 | Chlorine gas | 7782505* | N/A | N/A | N/A | Unknown | 1953-1983 | S, R | D, A-35 |

**EXHIBIT F, continued – HAZARDOUS SUBSTANCES NOTIFICATION[1] – PARCELS II/IIIA AND IX**

| Site Name | Hazardous Substances[3] | CAS No.[2] | Regulatory Synonym | RCRA[3] Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S) Released (R), or Disposed (D) of | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| POI 80 | Chlorine gas | 7782505* | N/A | N/A | N/A | Unknown | 1945-1983 | S, R | D, A-37 |
| POI 81 | Chlorine gas | 7782505* | N/A | N/A | N/A | Unknown | 1945-1983 | S, R | D, A-39 |
| POI 82 | Chlorine gas | 7782505* | N/A | N/A | N/A | Unknown | 1945-1983 | S, R | D, A-41 |
| POI 83 | Chlorine gas | 7782505* | N/A | N/A | N/A | Unknown | 1945-1983 | S, R | D, A-43 |
| POI 84 | Paint | N/A | N/A | N/A | N/A | Unknown | 1944-1997 | S | D, B-27 |
| POI 85 | Photo-developing chemicals | N/A | N/A | N/A | N/A | Unknown | 1940s-1980s | S | |
| POI 85 | Printing chemicals | N/A | N/A | N/A | N/A | Unknown | 1940s-1980s | S | D, C-36 |
| POI 85 | Mineral spirits | N/A | N/A | N/A | N/A | Unknown | 1940s-1980s | S | D, C-36 |
| POI 85 | Mimeograph fluids | N/A | N/A | N/A | N/A | Unknown | 1940s-1980s | S | D, C-36 |
| POI 87 | Pesticides | N/A | N/A | N/A | N/A | Unknown | 1942-1997 | S, R | D, 3-5 |
| POI 93 | 4,4'-DDE | 72559 | DDE | N/A | 1 | Unknown | Unknown | S | B, 4-168 |
| POI 93 | 4,4'-DDD | 72548 | Benzene, 1,1'(2,2-dichloroethylidene)bis[4-chloro | N/A | 1 | Unknown | Unknown | S | B, 4-168 |
| POI 93 | 4,4'-DDT | 50293 | Benzene, 1,1'- (trichloroethylidene)bis[4-chloro DDT | U061 | 1 | Unknown | Unknown | S | B, 4-168 |
| Facilitywide | Asbestos | 1332214 | N/A | P036 | 1 | Unknown | Approx. 1922-present | Used | |
| Facilitywide | Lead-based paint | N/A | N/A | N/A | N/A | Unknown | Approx. 1922 -present | Used | |

[1] – This table was prepared in accordance with 40 CFR 373 and 40 CFR 302.4 and contains the required categories (a "Reference" column has been added to the format). None of the materials listed are known to meet reportable quantities.

[2] – CAS – Chemical Abstracts Services

[3] – RCRA – Resource Conservation and Recovery Act

[4] – N/A – The reported substance is not listed on the 40 CFR 302.4 table and therefore has no corresponding reportable quantity

**EXHIBIT F, continued -- HAZARDOUS SUBSTANCES NOTIFICATION[1] -- PARCELS II/IIIA AND IX**

| Site Name | Hazardous Substances[3] | CAS No.[2] | Regulatory Synonym | RCRA[3] Waste No. | Reportable Quantity[4] (Pounds) | Quantity | Date(s) of Storage and/or Operation[5] | Stored (S), Released (R), or Disposed (D) of | Reference/ Page No. |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |

[5] -- For USTs/substances associated with buildings, the date of storage and/or operation corresponds to the start of base operations or the building construction date (start date); and tank removal date (when known), building demolition, or base closure date (end date).

\* -- Data from NIOSH website http://www.siri.uvm.edu.niosh

\*\* -- Reported levels of arsenic are attributable to natural (background) levels of arsenic in the soil.

**References:**

A_ Final Technical Memorandum, Basewide Groundwater Evaluation, dated June 1999.

B_ Final Site Assessment/Extended Site Assessment (SA/ESA) for 18 Points of Interest (POIs), dated May 1998.

C_ Final Comprehensive Report on the Site Assessment for the Steam Tunnels (POI 38), NTC, dated May 1997.

D_ Final Comprehensive Site Assessment Report for Points of Interest, dated July 1996.

E_ Focused Site Inspection Report, Naval Training Center Site 6, dated June 1996.

F_ Final Closure Report, Site 7 Naval Training Center, dated September 26, 1996 (OHM).

G_ Final Preliminary Assessment Report, Naval Training Center Sites 4, 5, and 6, dated 11 November 1994 (BNI).

H_ Final Report, Remediation and Site Assessment Activities, Site 9, Tank 196 Site, Naval Training Center, dated August 1995 (OHM)

I_ Final Environmental Soil and Ground-Water Study Site 10 (Building 189) and Site 11 (Building 226), Naval Training Center, dated 26 March 1996 (Geoservices).

J_ Base Realignment and Closure Cleanup Plan (BCP) for Naval Training Center, dated March 1997 (DON).

<u>EXHIBIT G</u>

FINDING OF SUITABILITY TO TRANSFER
PARCELS II/IIA AND IX
FORMER NAVAL TRAINING CENTER
SAN DEIGO, CALIFORNIA

**Finding of Suitability to Transfer
Parcels II/IIIA and IX
Former Naval Training Center
San Diego, California**

**May 2000**

**Prepared By:**

**Southwest Division
Naval Facilities Engineering Command
1220 Pacific Highway
San Diego, California 92132-5187**

**TABLE OF CONTENTS**

**FINDING OF SUITABILITY TO TRANSFER**
**PARCELS II/IIIA and IX, FORMER NTC**

1.0  PURPOSE

2.0  BIBLIOGRAPHY

3.0  PARCEL DESCRIPTION
    3.1  Property Boundaries
    3.2  Past, Current, and Future Land Use

4.0  REGULATORY COORDINATION

5.0  NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) COMPLIANCE

6.0  ENVIRONMENTAL BASELINE SURVEY (EBS) HISTORY AND FINDINGS
    6.1  Comprehensive and CERFA (Community Environmental Response Facilitation Act) EBS
    6.2  Site-Specific EBS for Parcels C,D,H,N,O,P and the Morale, Welfare and Recreation Marina
    6.3  Basewide Groundwater Evaluation

7.0  ENVIRONMENTAL FINDINGS
    7.1  IR/UST Sites
    7.2  Points of Interest
        7.2.1    Basewide POIs
        7.2.2    Parcel-Specific POIs
    7.3  Adjacent IR/UST Sites, POIs, and Off-Property Sites

8.0  ENVIRONMENTAL FACTORS
    8.1  Environmental Factors That Do Not Pose Constraints or Require Notification
    8.2  Environmental Factors That May Pose Constraints or Require Notification
        8.2.1    Storage Tanks
        8.2.2    Groundwater Use
        8.2.3    Indoor Air Quality
        8.2.4    Polychlorinated Biphenyls (PCBs)

9.0  OTHER RELATED ENVIRONMENTAL FACTORS
    9.1  Other Environmental Factors That Do Not Pose Constraints or Require Notification
    9.2  Other Environmental Factors That May Pose Constraints or Require Notification
        9.2.1    Asbestos-Containing Material (ACM)
        9.2.2    Lead-Based Paint (LBP)
        9.2.3    Wetlands/Sensitive Habitat
        9.2.4    Threatened and Endangered Species
        9.2.5    Historic Properties
        9.2.6    Coastal Zones

10.0  DEED CONTENTS REGARDING THE PRESENCE OF HAZARDOUS SUBSTANCES OR PETROLEUM PRODUCTS

11.0  CONCLUSION

# TABLE OF CONTENTS

## FINDING OF SUITABILITY TO TRANSFER
## PARCELS II/IIIA and IX, FORMER NTC

TABLE 1     Points of Interest Identified in the SSEBS Within Parcels II/IIIA and IX
TABLE 2     Department of Defense Environmental Condition of Property Area Types
TABLE 3     Environmental Factors Considered – Parcels II/IIIA and IX
TABLE 4     Results of Asbestos Survey Phases I-IV and Revalidation Survey, Parcels
            II/IIIA and IX
TABLE 5     Results of Lead-Based Paint Survey, Parcels II/IIIA and IX – Buildings Assumed
            to Have LBP Based on Year of Construction (Through 1980)

FIGURE 1    Location of Former NTC San Diego
FIGURE 2    Map of Disposal Parcels
FIGURE 3    Map of IR/UST Sites on or Adjacent to Parcels II/IIIA and IX
FIGURE 4    Map of Parcels C,D,H,N,O and P
FIGURE 5    Map of Points of Interest on or Adjacent to Parcels II/IIIA and IX
FIGURE 6    National Register-Eligible Historic Areas and Areas of Special Mention

APPENDIX A  Responsiveness Summary

# FINDING OF SUITABILITY TO TRANSFER
# PARCELS II/IIIA AND IX
# FORMER NAVAL TRAINING CENTER SAN DIEGO

## 1.0    Purpose

The purpose of this Finding of Suitability to Transfer (FOST) is to document the conclusion that real property made available through the Base Realignment and Closure (BRAC) process is environmentally suitable to transfer by deed under Section 120(h) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). Such transfer is in accordance with the National Environmental Policy Act (NEPA) Record of Decision (ROD) for the Disposal and Reuse of Naval Training Center San Diego, California, March 10, 1999.

This finding supports the conclusion that Parcels II/IIIA and IX may be transferred if conveyed subject to terms of the deed and with notifications presented in this document. This finding is based on the conclusion that all remedial actions necessary to protect human health and the environment with respect to any hazardous substances remaining on Parcels II/IIIA and IX have been taken prior to transfer.

## 2.0    Bibliography

This FOST has been prepared in accordance with Department of Defense (DoD) Guidance on the Environmental Review Process to Reach a FOST for Property Where Release or Disposal Has Occurred, and is based on a review of the information contained in the following documents produced for NTC:

- Final Technical Memorandum, Basewide Groundwater Evaluation, dated June 1999

- Base Realignment and Closure (BRAC) Cleanup Plan (BCP) for Former NTC San Diego, Update 5, dated March 1999

- NEPA Record of Decision (ROD) for NTC, dated March 1999

- NTC San Diego Reuse Plan, dated August 1998

- Final Environmental Impact Statement/Environmental Impact Report (EIS/EIR), dated July 1998

- Final Site Assessment/Extended Site Assessment (SA/ESA) for 18 Points of Interest (POIs), dated May 1998

- Base Realignment and Closure (BRAC) Cleanup Plan (BCP) for Former NTC San Diego, Update 4, dated March 1998

- Final Comprehensive Report on the Site Assessment for the Steam Tunnels (POI 38), NTC, dated May 1997
- Finding of Suitability to Lease (FOSL) for West End Property (Parcels C, D, H, N, O, and P) at NTC San Diego, dated March 1997
- Base Realignment and Closure (BRAC) Cleanup Plan (BCP) for Former NTC San Diego, Update 3, dated March 1997
- Final Site-Specific Environmental Baseline Survey (SSEBS) for Parcels C, D, H, N, O, P, and the Morale, Welfare, and Recreation (MWR) Marina at NTC San Diego, dated August 1996
- Final Comprehensive Site Assessment Report for Points of Interest, dated July 1996
- Focused Site Inspection Report, Naval Training Center Site 6, dated June 1996
- Base Realignment and Closure (BRAC) Cleanup Plan (BCP) for Former NTC San Diego, Update 2, dated March 1996
- Base Realignment and Closure (BRAC) Cleanup Plan (BCP) for Former NTC San Diego, Update 1, dated March 1995
- Final Comprehensive and Community Environmental Response Facilitation Act (CERFA) Environmental Baseline Survey (EBS) for NTC San Diego, dated November 1994

These documents can be found at the Information Repository located at the Science and Industry Desk of the San Diego Public Library, 820 "E" Street, San Diego, California, (619) 236-5800.

The following documents are available upon request through the Navy by contacting Ms. Andrea Muckerman at (619) 532-0911:

- Joint DoD/USEPA Interim Final: Lead-Based Paint Guidelines for Disposal of Department of Defense Residential Real Property – A Field Guide, dated December 1999
- Memorandum of Agreement Among the Department of the Navy, California State Historic Preservation Officer, and the Advisory Council on Historic Preservation Regarding the Interim Leasing and Disposal of the Naval Training Center San Diego, dated July 1998
- Summary of Asbestos-Containing Material in Various Buildings at the Former Naval Training Center, San Diego, dated May 1998.
- Fax from Navy Public Works Center to NTC BRAC Coordinator re: Clean Steam Tunnels and Vaults, dated March 1997
- Fax from Navy Public Works Center to G. Sheffer, NTC re: Suggestions for Content of TF-1 for Cleaning of Steam Tunnel at NTC, dated March 1997

- Four-volume NTC PWC Lead Report: Lead Activity Summary; Lead Management Plan, NTC 1 Housing; Lead Management Plan, NTC 2 Housing; and Lead and Asbestos at NTC San Diego Housing; dated November 1997

- Asbestos Survey and Assessment – Phase IV, Naval Training Center, San Diego, CA, Assessment and Abatement Division, dated February 1996

- NTC San Diego Environmental Office Memorandum:  Update to Steam Lines Concerns, dated January 1996

- Memorandum from PWC to NTC Environmental Officer re: Utility Baseline Study, dated October 1995

- Memorandum from NTC to Linda Geldner re: Navy Storm Drain Illicit Connection Survey, dated October 1995

- National Archaeological Data Base (NADB) Information Sheet, Final Historic Properties Phase II Eligibility Study of Naval Training Center, dated July 1995

- Memorandum from the Office of the Under Secretary of Defense: Asbestos, Lead-Based Paint and Radon Policies at BRAC Properties, dated October 1994

- Memorandum from the Deputy Secretary of Defense: FOST for BRAC Property with the following attachment:  Department of Defense (DoD) Guidance on the Environmental Review Process to Reach a FOST for Property Where Release or Disposal Has Occurred, dated June 1994

- Department of the Navy, Naval Sea Systems Command Detachment, Radiological Affairs Support Office (RASO: Response to Comments form California Department of Services (review of references and a historical search of radioactive material at NTC San Diego), dated June 1994

- Asbestos Survey and Assessment Report, NTC – Phase III, dated November 1992

- Asbestos Survey and Assessment, NTC – Phase II, dated August 1990

- Asbestos Survey Inventory, NTC – Phase I, dated January 1989

## 3.0  Parcel Description

Former NTC is located near downtown San Diego, adjacent to Lindbergh Field (San Diego airport) and San Diego Bay (see Figure 1). Parcel II/IIIA comprises about 257 acres consisting of a 2,250-foot-long section of Harbor Drive (Parcel II), and the main NTC base west of the Boat Channel and Camp Nimitz east of the Boat Channel (Parcel IIIA) (see Figure 2). For purposes of transfer (via economic development conveyance), these two parcels are treated as one and are called "Parcel II/IIIA". Parcel IX comprises about 8.0 acres within Parcel II/IIIA on Camp Nimitz (east of the

Boat Channel). Parcel IX will be transferred via public benefit conveyance, hence it is separate from Parcel II/IIIA.

## 3.1    Property Boundaries

The boundaries of Parcel II/IIIA are shown in Figure 3. Parcel II consists of a section along Harbor Drive from Nimitz Boulevard south to McCain Road (on former NTC).  West of the Boat Channel, Parcel IIIA comprises the NTC "main base area" and is bounded by Lytton Street to the north, Rosecrans Street to the west, Cushing Road to the southeast, and Chauncey Road to the southwest.  The southern boundary runs through Bainbridge Court, jogs east along Farragut Road, turns south along Sampson Road, and joins Parcel II at Gearing Road.  That portion of Parcel IIIA east of the Boat Channel is called the "Camp Nimitz area".  It is bounded by the Boat Channel to the west, McCain Road to the east, and joins Parcel II at Halsey Road to the southwest.

Parcel IX (see Figure 3) is bounded by the Boat Channel on the west, Spruance Road on the north, Kincaid Road on the east, and an east-west line just north of buildings 56, 62, and 64 on the south.  It includes the Camp Nimitz Drill Field.

## 3.2    Past, Current, and Future Land Use

NTC was commissioned in 1923.  Throughout its history, the mission of NTC was to provide primary, advanced, and/or specialized training for members of the regular U.S. Navy and Naval Reserve.  NTC was closed in accordance with the Defense Base Closure and Realignment Act of 1990.  Formal closure occurred on 30 April 1997.

Parcel II is the Navy-owned segment of Harbor Drive, a public thoroughfare.  Parcel IIIA west of the Boat Channel (the main base area) consists mainly of several hundred buildings and structures, most of which were used for administrative/office, training/educational, residential, and recreational purposes while NTC was active. Some of the buildings now comprise the NTC Historic District, which has been accepted to the National Register of Historic Places (see 9.2.5). Structures on Parcel IIIA include the commanding officer's headquarters, various training and maintenance facilities and schools (including the mock ship *U.S.S. Recruit*), medical/dental facilities, bachelor enlisted quarters (BEQs), officers quarters, commissaries, and a golf course. Parcel IIIA east of the Boat Channel (the Camp Nimitz area) primarily consists of a drill field, BEQs, and training and maintenance buildings. Parcel IX, in the Camp Nimitz area, consists of a drill field, BEQs, and a medical clinic office building.

According to the approved NTC San Diego Reuse Plan (1998), the proposed future land use for Parcel II remains as a transportation corridor

for public use. Various areas of Parcel IIIA in the main base area are proposed for residential, educational, and mixed commercial/civic uses (the historic core area). The Camp Nimitz area of Parcel II/IIIA is proposed for a hotel and a public safety training institute. Parcel IX is proposed for a Metropolitan Wastewater Department marine sciences laboratory.

## 4.0   Regulatory Coordination

The California Regional Water Quality Control Board (CRWQCB), San Diego Region, and the U.S. EPA participated with the Navy in preparation of the 1999 BCP Update #5. These agencies, along with the Cal-EPA Department of Toxic Substances Control (DTSC), which was the lead state agency prior to 1999, reviewed and commented on most of the documents listed in Section 2.0. Since NTC has no National Priorities List (NPL) sites, the Department of the Navy is the lead federal agency regarding environmental restoration at NTC and the RWQCB is the lead state agency.

## 5.0   National Environmental Policy Act (NEPA) Compliance

Potential environmental impacts pertaining to the disposal and reuse of NTC were addressed in the Final EIS/EIR and were disclosed to agencies and the public for comment and review in compliance with the requirements of NEPA and the California Environmental Quality Act. The EIS/EIR was prepared through joint effort by the Navy (EIS) and the City of San Diego (EIR), and the final EIS/EIR was certified by the San Diego City Council on 20 October 1998. The NEPA Record of Decision (ROD) for NTC was signed in March 1999 by the Deputy Assistant Secretary of the Navy (Conversion & Redevelopment).

## 6.0   Environmental Baseline Survey (EBS) History and Findings

Two environmental baseline surveys have been prepared to date for NTC and these are discussed below. In addition, a basewide groundwater study was recently completed to evaluate groundwater conditions for NTC as a whole.

### 6.1   Comprehensive and CERFA (Community Environmental Response Facilitation Act) EBS

A basewide EBS for NTC was prepared by the Navy and finalized in 1994. It was used as the basis for compliance with the Community Environmental Response Facilitation Act (CERFA) of 1992, which calls for early identification of uncontaminated property at Department of Defense installations that are closing under BRAC.

After publication of the final Comprehensive and CERFA EBS, the then lead state agency, California DTSC, issued a letter, dated 23 February 1995, stating that it was unable to concur with the identification of parts of the property as uncontaminated. This was because the areas with "no suspected environmental concerns" were located adjacent to areas with "known environmental concerns" or areas "requiring further study". DTSC also stated that the potential for migration of contaminated groundwater from these areas to surrounding areas existed primarily due to the very shallow depth to groundwater and the fact that the groundwater is tidally influenced. Because no information was available at the time to confirm that the groundwater was not contaminated underneath the proposed CERFA-eligible parcels, and such contamination was a possibility, DTSC could not concur with the identification of those parcels as uncontaminated.

## 6.2    Site-Specific EBS for Parcels C,D,H,N,O,P and the Morale, Welfare and Recreation Marina

A site-specific EBS (SSEBS) was prepared in 1996 to update information presented in the 1994 basewide EBS. It included a more detailed evaluation of specific parcels slated for lease or transfer. Parcels addressed in the site-specific EBS were C, D, H, N, O, P, and the Morale, Welfare and Recreation (MWR) Marina.

Parcels C, D, H, N, and O fall within the current boundaries of Parcel II/IIIA. However, a segment of Parcel II/IIIA to the southwest, between Farragut Road, Chauncey Road, and Gearing Drive, was not part of the parcels studied for the SSEBS, nor was the Camp Nimitz area (see Figure 4 for the parcels studied as part of the 1996 SSEBS).

Seven IR/UST sites, seven "basewide" Points of Interest (POIs) (spanning more than a single parcel), and 39 parcel-specific POIs were identified in Parcels C, D, H, N, and O in the SSEBS (see Figures 3 and 5 for sites and parcel-specific POIs). The IR sites and basewide POIs are discussed in detail in Section 7.0 and are as follows:

- Site 2  - Building 227 Underground Storage Tanks (USTs)
- Site 6  - Golf Course Maintenance Shop
- Site 7 - Building 49/50A UST
- Site 8 - Building 368 UST (former POI 34)
- Site 9 - Building 196 Removed UST (former POI 31)
- Site 10 - Building 188/189 USTs
- Site 11 - Former Navy Exchange Dry Cleaner USTs (former POI 16)
- POI 2 - Buildings Constructed Before 1980
- POI 3 - Buildings Not Surveyed for Asbestos-Containing Materials (ACM)
- POI 4 - Buildings With ACM

- POI 38 - Basewide Steam Tunnel System
- POI 40 - Transformers Not Sampled for PCBs (Polychlorinated Biphenyls)
- POI 64 - Storm Drain System

The IR sites require no further action and POIs 3, 38, 40, and 64 require no further investigation.   POIs 2 and 4 require disclosure and are addressed in this FOST in Section 9.0.

Table 1 presents the parcel-specific POIs identified within parcels C D, H, N, and O in the SSEBS.  With the exception of POI 8, none of the POIs required further investigation. They were identified as Environmental Condition of Property (ECP) Area Types 1 and 2 and therefore suitable for transfer (see Table 2 for a presentation of ECP Area Types).  POI 8 was later designated as IR Site 15.  It has subsequently been placed in a separate parcel, referred to as Parcel VIII.  It will be addressed in a later FOST. In addition, a former UST at Building 361 (POI 36) has also been placed into a separate parcel, Parcel X, and will be addressed in a later FOST.

### 6.3    Basewide Groundwater Evaluation

To resolve the issue of groundwater quality that was raised by the regulators regarding the CERFA EBS, a basewide groundwater study was undertaken. A Final Technical Memorandum, Basewide Groundwater Evaluation, was completed in June 1999. This report evaluated available basewide geological, hydrogeological, and analytical groundwater data. The evaluation was performed to determine whether there was any evidence of groundwater contamination that had not been addressed by prior or current investigations at IR or UST sites on NTC.

Based upon a review of existing information (no additional field investigations or activities were performed), no additional areas of groundwater contamination by organic chemicals or metals appeared to exist, beyond those that had been identified in previous or current investigations. The report concluded that no additional investigation regarding basewide groundwater was necessary.  Regulators concurred with this recommendation in 1999.

### 7.0    Environmental Findings

NTC is not on the NPL and is neither the subject of a Federal Facilities Agreement nor a Corrective Action Order.  Environmental investigations have been conducted at NTC to evaluate potential contamination from hazardous substances and petroleum or petroleum derivatives used at NTC.  This section discusses the results of those investigations. Sites in

Parcel II/IIIA are shown on Figure 3 and POIs are shown on Figure 5. No IR/UST sites, and only basewide POIs, occur on Parcel IX.

IR Site 4, Former Classified Document Incinerator, is located within Parcel II/IIIA but was not part of the SSEBS because it fell outside the parcels under study at that time. It is addressed in subsection 7.1, below. In addition, POIs 10, 11, 28, 43, 55, 60, 82, 83, and 91 in the main base area of Parcel IIIA, and POIs 12, 23, and 78 in the Camp Nimitz area of Parcel IIIA, were not part of any of the SSEBS parcels. These POIs therefore are addressed in subsection 7.2, below.

## 7.1 IR/UST Sites

Site 2: Building 227 USTs. Site 2 is located on the main base portion of NTC near Farragut Road. During a subsurface soil investigation for a construction project in February 1985, soil borings indicated contamination in the vicinity of Building 227. Six USTs located at the building, and inactive since 1976, were removed in 1991. Analytical results of sampling indicated the presence of petroleum contamination in soil and groundwater at the site. A removal action was begun in November 1994. Cleanup was completed and regulators concurred with no further action in 1996. Site 2 is identified in the BCP as ECP Area Type 2.

Site 4: Former Document Incinerator, Building 40. Site 4 is located in Parcel IIIA but was not studied as part of any of the SSEBS parcels. It is located on the main base between Evans Road and Chauncey Road, near the southern boundary of NTC. Base maps dating from 1945 showed the presence of a classified document incinerator, designated as Building 40. The building was removed in 1982 but had not been used since the late 1960s. A preliminary assessment report was issued in 1994 and regulators concurred with no further action in February 1995. Site 4 is identified in the BCP as ECP Area Type 1.

Site 6: Golf Course Maintenance Shop (Building 516). Site 6 is located on the west side of the Sail Ho Golf Course. Due to the nature of operations at the golf course, there was a concern about potential pesticide contamination in this area due to rinsing of pesticide containers and a potential for the release of motor oil due to maintenance activities. A preliminary assessment was conducted at this site in 1994, and results indicated that further evaluation was required for pesticides and waste oil. A focused site inspection was performed, did not find evidence of a release, and the report recommended no further action for this site. Concurrence was received from regulators in July 1996. Site 6 is identified in the BCP as ECP Area Type 3.

Site 7: Building 49/50A Removed UST. Site 7 is located on the main base, between Farragut Road and Worden Road. A 3,200-gallon UST

adjacent to former Building 50A (now part of Building 49) was removed in January 1988 in conjunction with the demolition and reconstruction of the building.  Soil samples indicated petroleum contamination. Cleanup efforts began in October 1994, but were discontinued in favor of further site assessment. After reassessing the situation, the cleanup action was considered feasible and was implemented.  Cleanup was completed in March 1996, and regulatory concurrence with a no-further-action recommendation was received in January 1997.  Site 7 is identified in the BCP as ECP Area Type 2.

Site 8: Building 368 Removed UST (former POI 34).  Site 8 is located on the Sail Ho Golf Course. Building 368 operated as a pump house using a 550-gallon UST that stored gasoline.  Contamination was found near the tank when it was removed in January 1994.  A report issued in April 1995 noted that further action was warranted; hence a site assessment was initiated and completed in 1996.  A corrective action plan proposing quarterly groundwater monitoring was implemented in 1997.  Quarterly monitoring was performed throughout 1998. Regulators concurred with no further action in September 1999.  Site 8 is identified in the BCP as ECP Area Type 2.

Site 9: Former Building 196 Removed UST (former POI 31).  Site 9 is located on the main base, at the corner of Woodworth Way and Dewey Road.  A 50-gallon UST, which contained petroleum, was previously located near Building 196. The tank was removed in April 1994 and soil samples taken indicated petroleum contamination.  In 1995, contaminated soil was excavated and a report was issued.  Concurrence on a no-further-action recommendation was received from regulators in March 1996. Site 9 is identified in the BCP as ECP Area Type 2.

Site 10: Buildings 188/189 USTs. Site 10 is located in the southern part of Parcel IIIA, near the corner of Cushing Road and Chauncey Road. A 100-gallon waste oil UST was removed from the former Auto Hobby Shop #2 in August 1994.  Contamination was found in the vicinity of the tank upon its removal.  A site assessment report was issued in December 1995.  Excavation of the contaminated soil was completed in October 1996 and a closure report was finalized in 1997.  Confirmatory groundwater sampling was completed and the site was closed with regulatory concurrence in December 1998. Site 10 is identified in the BCP as ECP Area Type 2.

Site 11: Former NEX Dry Cleaning Facility USTs (Building 226) (former POI 16).  Two 2,000-gallon USTs, located under the building and used for Stoddard solvent, were closed in place in 1995.  During closure, soil samples taken beneath the building and tanks indicated petroleum contamination with small amounts of trichloroethylene (TCE).  A site assessment report was issued in December 1995.  Remediation consisting of soil vapor extraction and free-product removal was

implemented in June 1996. The vapor extraction system operated through August 1998, and the site was closed with regulatory concurrence in December 1998. Site 11 is identified as ECP Area Type 4 following the remedial action, although it is incorrectly identified in the BCP as Area Type 3.

## 7.2   Points of Interest

Point of Interest (POI) was the term used at NTC for sites that were identified as areas requiring further investigation. The majority of POIs at NTC did not require any response action. Six POIs at NTC, however, did eventually become IR or UST sites, and three of those POIs are on Parcel II/IIIA.

Sixty POIs are identified in Parcels II/IIIA and IX: 39 parcel-specific POIs are addressed in subsection 6.2 (SSEBS) and on Table 1; and 7 basewide POIs were addressed in the SSEBS and are discussed in detail in 7.2.1. The remaining 14 POIs were not part of the SSEBS parcels studied and are discussed in 7.2.2, below.

### 7.2.1   Basewide POIs

POI 1: Aviation Fuel Line.  A pipeline used by the Navy for transferring JP-5 jet fuel from the Fleet Industrial Supply Center (FISC) to former Naval Air Station Miramar is located on NTC property parallel to Rosecrans Street.   The pipeline, which is used daily, was installed in 1954 and is constructed of schedule-40 steel.   The pipe outer diameter is 8 inches. The pipe is buried 4 feet below ground surface.  An investigation of this pipeline was conducted as part of FISC maintenance activities in 1994. Some pipeline imperfections were identified and repaired, however no leaks were detected.  Confirmation soil sampling indicated no presence of contamination.     No-further-action  concurrence  was  received  from regulators in December 1996. POI 1 is identified in the BCP as ECP Area Type 1.

POI 2: Buildings Constructed Before 1980. This POI was identified in the SSEBS as requiring further investigation due to the age of the buildings and structures at NTC.  A baseline year of 1980 was set to determine whether or not a building contains LBP at NTC because NTC had a stored surplus of paint that may have been used beyond 1978. A survey was done to determine the age of buildings and structures. LBP is a disclosure item and is discussed further in subsection 9.2.2, Lead-Based Paint.

POI 3: Buildings Not Surveyed for ACM.  POI 3 was identified before all buildings at NTC were surveyed for ACM. Because all buildings have since been surveyed for ACM and a revalidation survey of previously surveyed buildings was done in 1998, this POI is no longer applicable. POI 3 is identified in the BCP as ECP Area Type 1.

FOST for Parcels II/IIIA and IX, NTC San Diego
04/28/00 9:40 AM I:\cleanII\cto\ntc\cto168\fost\II-IIIA.doc
page 12

POI 4: Buildings with ACM. This POI was identified in the SSEBS as requiring further investigation. A four-phase asbestos survey was conducted at NTC; friable, accessible, and damaged (FAD) ACM identified was abated; and a revalidation survey was completed in mid-1998. ACM is a disclosure item and is discussed further in subsection 9.2.1, Asbestos-Containing Material.

POI 38: NTC Steam Tunnels. POI 38 was identified because of the potential for metals contamination in sediments that may have accumulated in the steam tunnels. A three-phase site assessment was conducted for POI 38 in 1996 and sediment removal was recommended. Regulatory concurrence on POI closure was received in late 1997, pending sediment removal from the steam tunnels, which was completed in January 1998. POI 38 is identified in the BCP as Area Type 4.

POI 40: Transformers Not Sampled for PCBs. The transformers that were included in POI 40 were determined to be non-PCB-containing transformers and thus did not require further study. Concurrence was received from the regulators in 1996 for no additional action. POI 40 is identified in the BCP as ECP Area Type 1.

POI 64: Basewide Storm Drainage System. An illicit storm drain connection study was undertaken in 1994-1995 and 12 illicit connections were identified within the boundaries of the SSEBS parcels (a total of 32 such connections were identified overall from the study). The illicit connections were recommended either for repair or disconnection. Each recommendation was prioritized for action, as appropriate. Regulatory concurrence on a recommendation for further action where illicit connections were identified was received from regulators in December 1996. All repair work or disconnections were completed. POI 64 is identified in the BCP as ECP Area Type 1.

### 7.2.2 Parcel-Specific POIs

The remaining 14 POIs in Parcels II/IIIA and IX not addressed in subsection 6.2 as part of the SSEBS are summarized in the table below. None require any additional action (all received regulatory concurrence for no further action in 1996 or, in the case of POI 93, 1998) and all are ECP area types suitable for transfer. POI 28 (Former PCB Spill Area) is discussed in further in subsection 8.2.3.

**POIs Located Within Parcels II/IIIA and IX***
**Not Addressed in the SSEBS**

| POI[1] Number | Name/Building | ECP[2] Area Type (1999) |
|---|---|---|
| 10 | Hazardous Materials Bunker (Bldg 393/394) | 1 |
| 11 | Former Naval Health Research Unit (Bldg 287) | 1 |
| 12 | Former Recruit In-Processing Facility (Bldg 557) | 1 |
| 23 | Existing Firefighter School (Bldgs 608-611, 614) | 1 |
| 28 | Former PCB Spill Area (near Site 4) | 4 |
| 43 | Former Mattress Sterilizer Shop ( Bldg 288) | 1 |
| 51 | Former Gas Instruction Chamber (former Bldg 283) | 1 |
| 55 | Former 2-MK-3 Trainer (Bldg 412) | 1 |
| 60 | Former pumping Dock #2 (former Bldg 448) | 1 |
| 78 | Former Chlorination Building (Bldg 81) | 1 |
| 82 | Former Chlorination Building C-2 (Bldg 531) | 1 |
| 83 | Former Chlorination Building C-4 (Bldg 533) | 1 |
| 91 | UST at Former Gate House (Bldg 384) | 1 |
| 93 | Former Vertical Steel Structure (near Bldg 49) | 3 |

\* – There are no site-specific POIs located within Parcel IX; all are located within Parcel II/IIIA
[1] – Point of Interest
[2] – Environmental Condition of Property; area types 1 through 4 are suitable for transfer

## 7.3    Adjacent IR/UST Sites, POIs, and Off-Property Sites

Adjacent IR/UST sites, POIs, and off-property sites may affect, or be affected by, the redevelopment of NTC. This subsection discusses IR/UST sites and POIs adjacent to Parcels II/IIIA and IX, and two off-property sites with USTs undergoing investigation. They are shown on Figures 3 and 5.

IR Site 1, Inactive Landfill.  Site 1 is located to the east of Parcel II/IIIA and west of the NTC boundary with Lindbergh Field.  It comprises 51 acres and is included in Parcels IV and V (see Figure 2).  The Inactive Landfill was a disposal site for municipal and "dumpster" waste generated by NTC and Marine Corps Recruit Depot between approximately 1950 and 1971. A variety of hazardous wastes are believed to have been disposed of in the Landfill. Several environmental investigations have been conducted at Site 1 since 1986.   The Landfill is currently subject to ongoing groundwater  monitoring and soil cover maintenance activities.

Transfer of Parcels IV and V to the San Diego Unified Port District for airport uses is being pursued under an "early transfer" process permitted under CERCLA section 120(h)(3)(C).  This allows the transfer of property with deferral of the warranty that all necessary remedial action has been completed.  The transferee will take the appropriate CERCLA response action.  Transfer of Parcels IV and V is anticipated in 2000.

Monitoring wells will be left in place for future landfill monitoring.  The Navy will transfer its monitoring well permits to the Port District.

IR Site 12: Boat Channel. Sediments in the Boat Channel immediately bordering parts of Parcel II/IIIA were identified as IR Site 12 (former POI 41). Based on levels of metals, PCBs, and pesticides reported in sediment samples, the 1996 Boat Channel Sediment Characterization Report recommended further action. A remedial investigation was begun at Site 12 in 1998 and is ongoing.  Completion is expected in 2000.

IR Site 15: Building 443, Former Dry Cleaner Trainer (former POI 8). Field investigation focused on the potential for release of spent dry cleaning solvents during past operations. A Site Assessment/Extended Site Assessment was conducted in 1997 to determine the presence of tetrachloroethene (PCE) in groundwater. Limited risk assessment and soil-gas evaluation were completed in 1999.  No further action is proposed for groundwater. Removal of contaminated soil is proposed to coincide with demolition of the building. Site 15 is located in Parcel VIII, a 6.3-acre parcel surrounded on three sides by Parcel II/IIIA (see Figure 2).

Building 361 UST.  The former 10,000-gallon UST at Building 361 was removed in November 1999.  This UST location was identified for further assessment by the county of San Diego.  The Building 361 UST is located in Parcel X, a .85-acre parcel surrounded on four sides by Parcel II/IIIA (see Figure 2).

Adjacent POIs are summarized below.  None require any further action (all received regulatory concurrence for no additional action in 1996 or 1997) and all are ECP Area Types suitable for transfer.

### POIs Located Adjacent to Parcels II/IIIA and IX

| POI[1] Number | Name/Building | ECP[2] Area Type (1999) |
|---|---|---|
| 1 | Aviation Fuel Line | 1 |
| 5 | Cogeneration Facility | 1 |
| 37 | Building 365 Removed UST | 1 |
| 44 | Former Torpedo Equipment Storage ( fmr Bldg 276) | 1 |
| 62 | Former Small Arms Range #1 | 1 |

[1] – Point of Interest
[2] – Environmental Condition of Property; area types 1 through 4 are suitable for transfer

Off-Property Sites. North of and adjacent to NTC are two UST locations undergoing investigation by the County of San Diego, located at 2844 and 2940 Lytton Street (auto body/paint and car wash, and service station, respectively).

## 8.0   Environmental Factors

Environmental factors related to Restoration/Hazardous Substances/ Petroleum products, some of which potentially pose constraints to transfer of the FOST parcels, are discussed in this section. See Table 3 for environmental factors considered and whether they pose constraints or require notification.

## 8.1   Environmental Factors That Do Not Pose Constraints or Require Notification

Based on a review of pertinent documents in Section 2.0, the following environmental factors have been determined to pose no known threat or unacceptable risk to human health and the environment, and therefore require no specific restriction or notification in the proposed transfer.

- Medical/bio-hazardous waste
- Oil/water separators
- Unexploded ordnance
- Pesticides
- Radioactive and mixed wastes

## 8.2   Environmental Factors That May Pose Constraints or Require Notification

Factors related to hazardous substances and petroleum products and which require notification are discussed in this section. These include storage tanks, groundwater, indoor air quality, and PCBs.

### 8.2.1   Storage Tanks

There are no active storage tanks on Parcels II/IIIA or IX. All but two of the underground storage tanks (USTs) have been removed. These USTs are located at IR Site 11 (Building 226), were closed in place in 1994, and received no-further-action concurrence from regulators in 1998. An aboveground storage tank is located at the Former Auto Hobby Shop #2 (Building 189), but it is inactive.

The transferee is hereby notified of the former presence and the status of remaining underground and aboveground storage tanks on Parcel II/IIIA. Should future land use change on Parcels II/IIIA and IX, the transferee is required to promptly notify the appropriate oversight regulatory agency (CRWQCB or County of San Diego Department of Environmental Health).

### 8.2.2  Groundwater Use

Groundwater occurs beneath NTC from approximately 7 to 55 feet below ground surface at different areas of the base.  Recharge to the water table through infiltration of surface water is limited because most of NTC is paved or covered by buildings.

Groundwater has been investigated in association with IR sites and POIs at NTC, as well as in the basewide groundwater report (see 6.3, above). No further action has been recommended for groundwater associated with IR sites and POIs within Parcels II/IIIA and IX.

Groundwater in the subarea which includes NTC is classified by the California Regional Water Quality Control Board (RWQCB) in the 1994 Water Control Plan for the San Diego Basin (Region 9) as exempt from the municipal use designation.  The groundwater is not a source of water suitable for municipal, industrial, or agricultural purposes, because the groundwater in this area is brackish and the values of the hydrogeochemical parameters used to determine water quality are above state levels for classification as beneficial use. However, because federal drinking water guidelines are different from the state guidelines, the groundwater could be classified as a potential source of drinking water under federal guidelines.

As per the RWQCB, two monitoring wells will remain on Parcel II/IIIA, under permit to the San Diego Unified Port District, for the purpose of monitoring the adjacent inactive landfill on Parcels IV and V.

### 8.2.3  Indoor Air Quality

None of the documents reviewed suggest a problem with indoor air quality in any of the NTC buildings. However, no documentation has been found suggesting that indoor air sampling was conducted.

The transferee is hereby notified that indoor air quality may present a concern in the buildings containing FAD ACM (see subsection 9.2.1).

### 8.2.4  Polychlorinated Biphenyls (PCBs)

The Former PCB Spill Area (POI 28) is located immediately northeast of the intersection of Stockton Road and Evans Road in Parcel II/IIIA. In July 1988, approximately 14 gallons of PCB-contaminated liquid were spilled there.  The contaminated asphalt and soil were excavated and removed. Regulator concurrence for no additional action was received in December 1996. POI 28 is identified in the BCP as ECP Area Type 4.

---

A PCB abatement program was initiated in 1988. The last PCB-containing transformer was retrofilled in 1996 and the transformer was subsequently classified as a non-PCB transformer, according to both federal (concentrations less than 50 parts per million [ppm]) and state (concentrations less than 5 ppm) standards.

Based upon the age of some of the buildings on Parcels II/IIIA and IX, some light ballasts may contain PCBs.

## 9.0   Other Related Environmental Factors

Environmental factors (Disclosure Factors/Resources) other than those related to hazardous substances and petroleum products are discussed in this section (see Table 3 for environmental factors considered).

### 9.1   Other Related Environmental Factors That Do Not Pose Constraints or Require Notification

Based on information provided in pertinent documents in 2.0, the following environmental factors have been determined to pose no known threat or unacceptable risk to human health and the environment, and therefore require no specific restriction or notification in the proposed transfer. These are shown on Table 3 and include:

- Drinking water quality
- Radon
- Air conformity/air permits
- Energy/utilities
- Floodplains
- OSHA (Occupational Safety & Health)
- Outdoor air quality
- Prime/unique farmlands
- Sewer systems/septic systems
- Solid waste
- Transportation

### 9.2   Other Environmental Factors That May Pose Constraints or Require Notification

Other environmental factors that require notification are presented here. They include ACM, LBP, wetlands/sensitive habitats, threatened and endangered species, historic properties, and coastal zones.

#### 9.2.1   Asbestos-Containing Material (ACM)

Between 1988 and 1995, a four-phase asbestos survey of NTC was completed. Any structures that were found to contain friable, accessible, and damaged (FAD) asbestos were repaired or abated, according to

Department of Defense (DoD) policy. The asbestos abatement program was completed in February 1998.

An asbestos revalidation survey focusing on the structures inspected in the first three phases of the original survey was completed in mid-1998. The results of that survey as it affects buildings in Parcels II/IIIA and IX are shown in Table 4. The results of the revalidation survey indicated that FAD ACM in Parcels II/IIIA and IX is reported in 14 buildings that are identified in the NTC San Diego Reuse Plan for rehabilitation. The FAD ACM hazard in the 14 buildings slated for rehabilitation has been abated as of March 2000.

The results of the revalidation survey (Table 4) also show that 24 buildings containing FAD ACM in Parcels II/IIIA and IX are identified in the NTC San Diego Reuse Plan for demolition. It is DoD policy that remediation of ACM is not required when buildings are scheduled for demolition by the transferee; however, the transferee cannot occupy the building prior to demolition.

In addition, steam tunnels occur on Parcels II/IIIA and IX. Friable and damaged ACM was found in the steam tunnels in the form of pipe lagging. However, because the steam tunnels are not publicly accessible, the Navy determined no additional action was necessary for the steam tunnel ACM.

The transferee will be notified of the presence, location, and types of asbestos and ACM on Parcels II/IIIA and IX. To ensure full disclosure of all ACM on the FOST parcels, a copy of the four-phase survey report and the revalidation survey will be included in the transfer documentation, as well as information known about ACM in the steam tunnels. The transferee is prohibited from occupying any FAD ACM-containing buildings prior to demolition or rehabilitation.

### 9.2.2   Lead-Based Paint (LBP)

The Navy's obligation to respond to LBP hazards is on residential real property. Approximately 183 non-residential buildings or structures are located within Parcels II/IIIA and IX that were constructed prior to 1980 and these are presented in Table 5. Those buildings constructed prior to 1980 may contain LBP.

In accordance with the 1999 Joint USEPA/DoD Lead-Based Paint Guidelines for Disposal of Department of Defense Residential Real Property, the Navy has determined that Quarters A-D are the only residential properties on Parcels II/IIIA and IX. The following reports document information gathered on LBP at Quarters A-D: the four-volume NTC PWC Lead Report: Lead Activity Summary; Lead Management Plan, NTC 1 Housing; Lead Management Plan, NTC 2 Housing; and Lead and Asbestos at NTC San Diego Housing, dated November 1997. These reports contain sampling data for Quarters A-D. Six soil samples were taken from bare-soil areas in the front, back, and side yard areas that are

accessible to children. The results ranged from 12 parts per billion (ppb) to 433 ppb. The average of these samples is 214 ppb, which is significantly below the 400-ppb criterion for children's play areas as described in the 1999 Joint DoD/USEPA Lead-Based Paint Guidelines for Disposal of Defense Residential Real Property. Therefore, control measures were taken at all bare-soil locations surrounding Quarters A-D, including application of groundcover and/or mulch.

### 9.2.3  Wetlands/Sensitive Habitats

The Boat Channel, although not part of the transfer parcels, divides NTC and Parcel II/IIIA and is adjacent to Parcel IX. The Boat Channel is considered a subtidal estuarine open wetland habitat. These wetlands are classified as Estuarine, Subtidal, and Unconsolidated Bottom (EU1BL). EU1BL wetlands consist of deep-water tidal habitats that can be semienclosed by land but have open, partly obstructed, or sporadic access to the ocean.

Eelgrass beds cover much of the subtidal zones of the Boat Channel, except for the steep inclines and deeper waters in the northern portion of the channel. These beds provide important breeding, nursery, and cover habitat for a number of fish species. Waterfowl and wading birds have been observed using the intertidal and subtidal areas of the Boat Channel. Species observed included gull, cormorant, coot, scaup, eared grebe, western grebe, bufflehead, golden eye, mallard, snowy egret, great blue heron, night heron, brown pelican, and various shorebirds.

### 9.2.4  Threatened and Endangered Species

A number of threatened and endangered animal and plant species have been identified as occurring, or possibly occurring, in the vicinity of NTC. Until the spring of 1999 one endangered species, the California least tern, had a protected nesting colony on a 10-acre portion of NTC. This protected nesting area, located east of Parcels II/IIIA and IX on Parcel V, adjacent to the airport, was moved off of NTC in 1999. The relocation was the result of an agreement reached between the US Fish & Wildlife Service and the San Diego Unified Port District as part of the early transfer of Parcels IV and V from the Navy to the Port District. However, least terns may still frequent the Boat Channel area and adjacent shorelines (Parcels II/IIIA and IX), as the Boat Channel is the source of food for the least tern and other sea/shore birds.

### 9.2.5  Historic Properties

Fifty-two buildings were identified by the Navy, and concurred with by the California State Historic Preservation Officer (SHPO), as eligible for inclusion on the National Register of Historic Places (NRHP) as contributors to the NTC Historic District. The NTC Historic District is located within Parcel II/IIIA, comprising most of the older buildings on the

main base area including the commanding officer's headquarters, officers' housing, the *U.S.S. Recruit* (the mock training ship, designated Building 430), concrete gun platforms, and flagpoles (see Figure 6).

A Memorandum of Agreement (MOA) among the Navy, the State Historic Preservation Officer, and the Advisory Council on Historic Preservation, was signed in July 1998. This MOA addresses the interim leasing and disposal of NTC as these actions affect historic properties, and ensures that a determination of eligibility for the NRHP is performed. The Navy nominated the NTC Historic District to the NRHP and forwarded the National Register Nomination form to the Keeper of the NRHP in accordance with 36 Code of Federal Regulations (C.F.R.) Section 60.9. The NTC Historic District was initially accepted to the NRHP in 1999. Eligibility paperwork was forwarded on 13 January 2000 and final acceptance to the National Register is expected in 2000.

In addition to the NTC Historic District, several areas of special mention exist within Parcel II/IIIA. A California historical landmark is located at the northwest corner of Farragut Road and Truxton Road, commemorating the site of *El Desembarcadero* (Old Landing). In addition, a trash deposit dating to World War II was found adjacent to Building 227 during monitoring of a UST removal. In March 1999, the Navy received SHPO concurrence on a recommendation of no cultural significance. The golf course gravesite of Edwin Burke Woodworth, the first NTC executive officer, and his wife Nell Doig Woodworth, is an area of special mention.

### 9.2.6  Coastal Zones

All NTC property is within the coastal zone.

## 10.0  Deed Contents Regarding the Presence of Hazardous Substances or Petroleum Products

In accordance with CERCLA Section 120 (h), the deed will contain a covenant warranting that all remedial actions necessary to protect human health and the environment with respect to any hazardous substances remaining on Parcels II/IIIA and IX have been taken before the date of transfer. The deed will also contain a covenant warranting that any additional remedial action found to be necessary after the date of transfer shall be conducted by the United States provided that this covenant will not apply to any response action required on the property as a result of an act or omission of the grantee which results in a new release or threat of release of hazardous substances. Further, the deed will contain a clause granting the United States access to the property in any case in which a response action or corrective action is found to be necessary after the date of transfer.

## 11.0   Conclusion

Based on the foregoing information and analysis, I have concluded that the requirements of CERCLA Section 120(h)(3) have been met and I find that Parcels II/IIIA and IX are suitable for transfer by deed for the purposes intended, subject to the conditions, notifications, and restrictions set forth in Sections 8.0 and 9.0 above.  The parcels can be used with acceptable risk to human health and the environment, and without interference with the environmental restoration process.


Date  4 MAY 00

R. L. PHILLIPS
Captain, CEC, U.S. Navy
Commander

## TABLE 1

### POIs Identified in the SSEBS Within Parcels II/IIIA and IX*

| POI[1] Number | Name/Building | FA/NFA[2] | ECP[3] Area Type (1999) |
|---|---|---|---|
| 7 | Former Auto Hobby Shop #2 (Bldgs 187/188/189) | NFA | 1 |
| 14 | Machinery Repairman School (Bldg 49) | NFA | 2 |
| 15 | Former Medical/Dental Complex (Bldgs 6,7 and 160) | NFA | 2 |
| 16 | Former NEX Dry Cleaning Facility (Bldg 226) | NFA as POI; see Site 11 | 3 |
| 17 | Former NEX Maintenance Storage Area (Building 32) | NFA | 1 |
| 18 | Patternmaker and Molder Schools (Bldg 51) | NFA | 2 |
| 19 | PWC' Aztec Landscape Storage Area (Bldg 34) | NFA | 2 |
| 20 | PWC Hazardous Waste Storage Area (near Bldg 180) | NFA | 2 |
| 21 | Air Conditioning and Refrigeration School (Bldg 36) | NFA | 1 |
| 22 | Boat Ramp Work Area (Bldg 464) | NFA | 1 |
| 25 | NEX Audio/Visual Office (Bldg 231) | NFA | 1 |
| 26 | PWC Workshop (Bldg 31) | NFA | 2 |
| 32 | Bldgs 200/202 Removed UST | NFA | 1 |
| 35 | Building 529 Removed UST | NFA | 1 |
| 39 | Transformer with Known PCB Contamination (Bldg 83) | NFA | 1 |
| 42 | Former Glass House (former Bldg 129) | NFA | 1 |
| 45 | Former Torpedo School (former Bldg 353) | NFA | 1 |
| 49 | Former Paint & Oil Storage #2 (Bldg 42) | NFA | 1 |
| 50 | Boat & Rigging Shop (Bldg 179) | NFA | 1 |
| 53 | Former Welfare Photo Shop (former Bldg 367) | NFA | 1 |
| 54 | Former Oil & Alcohol Storage (former Bldg 385) | NFA | 1 |
| 56 | Former Ejector House (former Bldg 13) | NFA | 1 |
| 57 | Former Electric School & Garage (former Bldg. 100) | NFA | 2 |

# TABLE 1

## POIs Identified in the SSEBS Within Parcels II/IIIA and IX

| POI[1] Number | Name/Building | FA/NFA[2] | ECP[3] Area Type (1999) |
|---|---|---|---|
| 58 | Former 1,000-Gallon Gasoline Tank near P-179 (Decatur & Sims Roads) | NFA | 2 |
| 65 | Former Sterilizer Building (former Bldg 107 at corner of Decatur & Dewey) | NFA | 1 |
| 66 | Former Paint & Oil Storage #1 (former Bldg 108, near Bldgs 202 & 177) | NFA | 1 |
| 67 | Former Canteen & Paint Studio (former Bldg 109, near P-141 | NFA | 1 |
| 68 | Former Lath & Glass House (former Bldg 110, near current Bldg 178) | NFA | 1 |
| 69 | 550-, 1,000- and 2,000-Gallon Former Gasoline Storage Tanks (former Bldg 119, near current Bldg 195) | NFA | 2 |
| 70 | 1,000-Gallon Former Distillate Tank (near Bldg 1) | NFA | 1 |
| 71 | Former Auto Hobby Shop #1 (former Bldg 224) | NFA | 2 |
| 72 | Marina Building #358 | NFA | 1 |
| 75 | Welding Shop School & Acetylene Generator (Bldgs. 37 and 433) | NFA | 1 |
| 76 | Former Generator (Bldg 77) | NFA | 2 |
| 77 | Former Generator (Bldg. 78) | NFA | 1 |
| 80 | Former Chlorination Building C-1 (Bldg 530) | NFA | 1 |
| 81 | Former Chlorination Building C-2 (Bldg 531) | NFA | 1 |
| 84 | Paint Storage Vault (Bldg. 75) | NFA | 1 |
| 85 | Former Printing Facility (Bldg. 11) | NFA | 1 |
| 87 | Former Golf Course Maintenance Storage Areas (Bldgs. 364 and 519) | NFA | 1 |

\* There are no POIs within Parcel IX
[1] Point of Interest
[2] Further Action/No Further Action
[3] Environmental Condition of Property
[4] Underground Storage Tank
[5] Navy Exchange

# TABLE 2

## DEPARTMENT OF DEFENSE
## ENVIRONMENTAL CONDITION OF PROPERTY AREA TYPES[1]

- Area Type 1 – Areas where no release or disposal of hazardous substances or petroleum products has occurred (including no migration of these substances from adjacent areas)

- Area Type 2 – Areas where only release or disposal of petroleum products has occurred

- Area Type 3 – Areas where release of hazardous substances has occurred, but at concentrations that do not require a removal or remedial action

- Area Type 4 – Areas where release, disposal, and/or migration of hazardous substances has occurred, and all remedial actions necessary to protect human health and the environment have been taken

- Area Type 5 – Areas where release, disposal, and/or migration of hazardous substances has occurred, and removal or remedial actions are under way, but all required remedial actions have not yet been taken

- Area Type 6 – Areas where release, disposal, and/or migration of hazardous substances has occurred, but required response actions have not yet been implemented

- Area Type 7 – Areas that have not been evaluated or require additional evaluation

---

[1] According to the Department of Defense BRAC Cleanup Plan Guidebook, properties classified as Area Types 1 through 4 may be considered suitable for transfer, and properties classified as Area Types 5 through 7 are considered unsuitable for transfer

## TABLE 3

| Environmental Factors that May Pose Constraints or Require Notification | | Environmental Factors Considered Parcels II/IIIA and IX |
|---|---|---|
| No | Yes | |
| | | **Environmental Restoration/Hazardous Substances/Petroleum** |
| | X | Hazardous Substances (Notification) |
| | X | Installation Restoration Program/Point of Interest (POI) |
| X | | Medical/Bio-hazardous Wastes |
| X | | Oil/Water Separators |
| X | | Unexploded Ordnance |
| | X | Petroleum Products and Derivatives |
| X | | Pesticides |
| X | | Radioactive & Mixed Wastes |
| | X | Storage Tanks (USTs/ASTs) |
| | | **Disclosure Factors/Resources** |
| | X | Asbestos |
| X | | Drinking Water Quality |
| | X | Indoor Air Quality |
| | X | Lead-Based Paint |
| | X | PCBs |
| X | | Radon |
| | | **Other Factors** |
| X | | Air Conformity/Air Permits |
| | X | Coastal Zones |
| X | | Energy (Utilities) |
| X | | Flood Plains |
| | X | Groundwater Use/Subsurface Excavation |
| | X | Historic Property (Archeological/Native American, Paleontological) |
| X | | OSHA (Occupational Safety & Health Administration) |
| X | | Outdoor Air Quality |
| X | | Prime/Unique Farmlands |
| X | | Sanitary Sewer Systems (Wastewater) |
| | X | Sensitive Habitat |
| X | | Septic Tanks (Wastewater) |
| X | | Solid Waste |
| | X | Threatened and Endangered Species |
| X | | Transportation |
| | X | Wetlands |

## TABLE 4

### Results of Asbestos Surveys Phases I-IV and Revalidation Survey, Parcels II/IIIA and IX

| Buildings With No ACM Reported; Building Plans Unknown | Buildings Reported With ACM; Building Plans Unknown | Buildings Without ACM or ACM Abated; Buildings Eligible for Demolition[1] | Buildings With FAD ACM; Buildings Eligible for Demolition | Buildings Without ACM or ACM Abated; Buildings Designated for Rehabilitation[1] | Buildings Not Reported in Asbestos Surveys or Reuse Plan |
|---|---|---|---|---|---|
| 48, 75, 77, 81, 159, 346, 373, 562 | 42, 158, 180, 288, 386, 444, 527, 530 | 37, 38, 39, 41, 43, 44, 45, 52, 58, 67, 87, 89*, 90, 91, 92, 93, 186, 187, 188, 189, 190, 191, 214, 226, 228, 231, 232, 234, 235, 236, 238, 241, 242, 251, 262, 286, 287, 293, 355, 364, 368, 378, 379, 383, 388, 393, 394, 408, 412, 428, 443, 490, 491, 492, 493, 494, 496, 500, 501, 502, 503, 504, 505, 523, 524, 525, 526, 531, 533, 542, 543, 583, 584, 585, 586, 587, 588, 589, 590, 591, 593, 594, 595, 596, 597, 598, 599 | 54, 56, 57, 59, 60, 61, 62, 63, 64, 65, 66, 68, 69, 70, 71, 72, 73, 88, 207, 227, 237, 239, 495, 499 | 1, 2, 3, 4, **5**, 6, 7, 8, **9**, 10, 11, 12, 14, **15, 16, 17, 18, 19**, 20, 21, **22***, 23, 24, **25**, 26, 27, 28, 29, 30, 31, 32, 33, 34, **35**, 36, 49, 51, 83, 84, 94, 153, 174, 175, 176, 177, 178, 185, 193, 194, 195, 198, 200, 201, **202**, 208, 209, 210, 271, 303, 366, **430**, 464, **479, 480**, **557**, 558, 623, Quarters A,B,C,D | 203** |

[1] Demolition or rehabilitation according to 1998 NTC San Diego Reuse Plan.

* Building 89 is listed in the Reuse Plan both as eligible for demolition and as designated for rehabilitation; plans for rehabilitation of Building 22 (Pump House/Heating System) are uncertain at this time.

Buildings in **bold italic type** will have FAD ACM hazardous abated prior to transfer.

**Structure 203 is a reviewing stand located just west of Preble Field.

# TABLE 5

**Results of Lead-Based Paint Survey, Parcels II/IIIA and IX
Buildings Assumed to Have LBP Based on Year of Construction
(Through 1980)**

| Number/Name of Building | Year of Construction |
|---|---|
| A - Officer's Quarters A | 1923 |
| B – Captain's Quarters B | 1923 |
| C – Captain's Quarters | 1923 |
| D – Officer's Quarters | 1923 |
| 1 – Community Facilities Building | 1922 |
| 2 – Enlisted Barracks | 1922 |
| 3 – Enlisted Barracks | 1922 |
| 4 – Enlisted Barracks | 1922 |
| 5 – Enlisted Barracks | 1922 |
| 6 – Medical Administration | 1922 |
| 7 – Dispensary/Eye Clinic | 1942 |
| 8 – Office Storage | 1922 |
| 9 – Consolidated Area Telephone System | 1922 |
| 10 – Golf Clubhouse | 1922 |
| 11 – Old Child Care Center | 1922 |
| 12 – Navy Relief | 1922 |
| 14 – Enlisted Barracks | 1923 |
| 15 – Enlisted Barracks | 1923 |
| 16 – Enlisted Barracks | 1923 |
| 17 – Enlisted Barracks | 1923 |
| 18 – Enlisted Barracks | 1923 |
| 19 – Enlisted Barracks | 1923 |
| 20 – Gate House #[1] | 1923 |
| 21 – Pass/Decal Office | 1922 |
| 22 – Pump House/Heating System | 1924 |
| 23 – Naval Investigative Service | 1924 |
| 24 – Morale, Welfare & Recreation Club | 1923 |
| 25 – Enlisted Barracks | 1924 |
| 26 – Enlisted Barracks | 1924 |
| 27 – Enlisted Barracks | 1932 |
| 28 – Recruit Barracks | 1932 |
| 29 – Recruit Barracks | 1932 |
| 30 – Community services Mall | 1932 |
| 31 – Utilities Shop | 1937 |
| 32 – Exchange Warehouse | 1937 |
| 33 – Self-Help Weld Shop | 1940 |
| 34 – Paint Shop | 1940 |
| 35 – Auditorium 1 | 1941 |
| 36 – Air Conditioning School | 1941 |
| 37 – Welding School | 1941 |
| 38 – Compressed Air Plant | 1941 |

FOST for Parcels II/IIIA and IX, NTC San Diego
04/28/00 9:34 AM I:\cleanii\cto\ntc\cto168\fost\II-IIIA.doc
page 28

## TABLE 5 (continued)

### Results of Lead-Based Paint Survey, Parcels II/IIIA and IX Buildings Assumed to Have LBP Based on Year of Construction (Through 1980)

| | |
|---|---|
| 39 – Switch House | 1941 |
| 41 – Kennel | 1941 |
| 42 – Paint-Oil Storehouse | 1942 |
| 43 – General Warehouse | 1942 |
| 44 – Warehouse | 1942 |
| 45 – Warehouse | 1942 |
| 48 – Film Storage | 1942 |
| 49 – Machinery Repair School | 1942 |
| 51 – Pattern Maker Bolder Training Building | 1952 |
| 52 – Gate #11A | 1953 |
| 54 – Exchange Retail Store | 1955 |
| 55 – Recruit Barracks | 1954 |
| 56 – Recruit Barracks | 1954 |
| 57 – Recruit Barracks | 1956 |
| 58 – Enlisted Barracks | 1956 |
| 59 – Medical Clinic Office | 1955 |
| 60 – Recruit Barracks | 1956 |
| 61 – Recruit Barracks | 1954 |
| 62 – Recruit Barracks | 1954 |
| 63 – Recruit Barracks | 1954 |
| 64 – Food Service Galley #18 | 1955 |
| 65 – Regimental Headquarters | 1954 |
| 66 – Recruit Barracks | 1954 |
| 67 – Recruit Barracks | 1954 |
| 68 – Recruit Barracks | 1956 |
| 69 – Recruit Barracks | 1956 |
| 70 – Recruit Barracks | 1956 |
| 71 – Recruit Barracks | 1956 |
| 72 – Recruit Barracks | 1954 |
| 73 – Recruit Barracks | 1954 |
| 75 – Storage | 1944 |
| 77 – Storage Vault | 1953 |
| 81 – Chlorinator Building | 1953 |
| 83 – Communications School | 1962 |
| 84 – Air Conditioning Building for Bldg. 83 | 1962 |
| 87 – Mess Hall | 1967 |
| 88 – Recruit Barracks | 1967 |
| 89 – Recruit Barracks | 1967 |
| 90 – Enlisted Barracks | 1967 |
| 91 – Enlisted Barracks | 1967 |
| 92 – Recruit Barracks | 1968 |
| 93 – Recruit Barracks | 1968 |
| 94 – School | 1969 |
| 153 – Carpenter Shop | 1938 |

## TABLE 5 (continued)

### Results of Lead-Based Paint Survey, Parcels II/IIIA and IX Buildings Assumed to Have LBP Based on Year of Construction (Through 1980)

| | |
|---|---|
| 158 – Storage | 1941 |
| 174 – Pest Control/Paint Storage | 1940 |
| 175 – School Building | 1941 |
| 176 – School Building | 1941 |
| 177 – Library | 1941 |
| 178 – Navy Exchange | 1942 |
| 180 – Chief Petty Officer Club Storage | 1941 |
| 185 – Public Works Shop Building | 1942 |
| 186 – Security Office Building | 1942 |
| 187 – Storage | 1942 |
| 188 –Public Works Center Material Storage | 1942 |
| 189 – Automotive Hobby Shop | 1942 |
| 190 – Transportation Office | 1942 |
| 191 – Recreation Building | 1942 |
| 193 – Enlisted Personnel Club | 1942 |
| 194 – Administrative Office Building | 1942 |
| 195 – Hospital Dispensary/Navy Band | 1942 |
| 198 – Gate House #3 | 1942 |
| 200 – Former NTC Headquarters Building | 1942 |
| 201 – Personnel/Staff Civil Engineer Offices | 1942 |
| 202 – Personnel Supp. Detachment Offices | 1942 |
| 203 – Reviewing Stand | 1942 |
| 207 – Laundry | 1942 |
| 208 – North Chapel | 1942 |
| 209 – Office Building | 1942 |
| 210 – Administration, Gym, Pool | 1942 |
| 214 – Navy Campus Counseling | 1941 |
| 226 – Dry Clean,Tailor,Plant Shop,Del Taco | 1942 |
| 227 – Exchange Warehouse | 1942 |
| 228 – Cold Store Building | 1942 |
| 231 – Exchange/School | 1942 |
| 232 – Uniform Outlet Store | 1942 |
| 234 – Storehouse #5 (Dry Store) | 1942 |
| 235 – Storehouse #6 (Dry Store) | 1942 |
| 236 – Storehouse #9 (Food Service) | 1942 |
| 237 – Central Bedding Warehouse | 1942 |
| 238 – Office Storehouse | 1942 |
| 239 – Storage | 1942 |
| 241 – School Building #5 | 1942 |
| 242 – School Building | 1942 |
| 251 – School Building | 1942 |
| 262 – Classroom Building | 1942 |
| 271 – Swimming Pool/Gym | 1942 |

## TABLE 5 (continued)

### Results of Lead-Based Paint Survey, Parcels II/IIIA and IX
### Buildings Assumed to Have LBP Based on Year of Construction
### (Through 1980)

| Building | Year |
|---|---|
| 286 – Enlisted Barracks now Admin. Office | 1942 |
| 287 – Administration Office Building | 1942 |
| 288 – Special Service Laundry | 1942 |
| 293 – Office/Self Help | 1942 |
| 303 – Central Fire Station | 1942 |
| 346 – North Reservoir | 1942 |
| 355 – Office | ?? |
| 364 – Gardener Tool Shed | 1942 |
| 366 – Office Building | 1942 |
| 368 – Pump House | 1942 |
| 373 – Garage | 1942 |
| 378 – Training Aids Building | 1944 |
| 379 – School Building | 1944 |
| 383 – School Building and Offices | 1942 |
| 386 – Chief Petty Officer Club Storage | 1943 |
| 388 – Lumber Shed | 1943 |
| 393 – Storehouse (Paint Locker) | ?? |
| 394 – Storehouse (Paint Locker) | ?? |
| 408 – Damage Control Instructor Building | 1944 |
| 412 – Storage | 1943 |
| 417 – Boathouse | 1944 |
| 428 – Public Toilet | 1945 |
| 430 – *USS Recruit* Mock-up | 1949 |
| 443 – Classroom Building | 1956 |
| 444 – Steam Valve House | 1955 |
| 464 – Boat House | 1955 |
| 479 – Recruit Barracks | 1969 |
| 480 – Recruit Barracks | 1969 |
| 485 – Classroom/Admin. Office Building | 1970 |
| 490 – Enlisted Barracks | 1970 |
| 491 – Enlisted Barracks | 1970 |
| 492 – Enlisted Barracks | 1970 |
| 493 – Enlisted Barracks | 1970 |
| 494 – Enlisted Barracks | 1970 |
| 495 – Barracks Lobby for B40 to B494 | 1970 |
| 496 – Self-Service Car Wash | 1971 |
| 500 – Enlisted Barracks | 1972 |
| 501 – Enlisted Barracks | 1972 |
| 502 – Enlisted Barracks | 1972 |
| 503 – Enlisted Barracks | 1972 |
| 504 – Enlisted Barracks | 1972 |
| 505 – Barracks Central Core for 500-504 | 1972 |
| 516 – Golf Maintenance Shop | 1970 |
| 523 – Enlisted Barracks | 1973 |

## TABLE 5 (continued)

### Results of Lead-Based Paint Survey, Parcels II/IIIA and IX
### Buildings Assumed to Have LBP Based on Year of Construction
### (Through 1980)

| | |
|---|---|
| 524 – Enlisted Barracks Staff | 1973 |
| 525 – Enlisted Barracks | 1973 |
| 526 – Enlisted Barracks | 1973 |
| 527 – Applied Instruction Building | 1970 |
| 530 – Chlorinator Station | 1945 |
| 531 – Chlorinator Station | 1945 |
| 532 – Chlorinator Station | 1945 |
| 533 – Chlorinator Staiton | 1945 |
| 542 – Enlisted Barracks | 1975 |
| 543 – Enlisted Barracks | 1975 |
| 544 – Enlisted Barracks | 1975 |
| 557 – Recruit In-Processing Facility | 1978 |
| 558 – Storage/Training Materials | 1970 |
| 562 – Sentry House Gate #3 | 1980 |
| 43A – Warehouse | 1951 |
| 44A – Warehouse | 1951 |



INDEX MAP

FORMER NAVAL
TRAINING CENTER

Lindbergh Field

Boat Channel

HARBOR DR.

West Basin

Harbor Island

FLEET ANTISUBMARINE WARFARE
TRAINING CENTER (FLEASWTRACEN)

Commercial Basin

| Southwest Division |
| Naval Facilities Engineering Command |
| Former Naval Training Center, San Diego, CA |
| Location of |
| Former NTC San Diego |

| File No. | Figure 1 | Date |
|---|---|---|
| 168R3773 | | 11/30/98 |



LEGEND

AREA OF SPECIAL MENTION

NATIONAL REGISTER - ELIGIBLE
HISTORICAL AREA

NTC BOUNDARY

MILITARY HOUSING BOUNDARY

Southwest Division
Naval Facilities Engineering Command

Former Naval Training Center, San Diego, CA

National Register - Eligible Historic Areas and
Areas of Special Mention

Figure 6

| File No. | Date |
|---|---|
| 16BL6076 | 2/23/00 |





Finding of Suitability to Lease (FOSL)
Figure 4
Map of Parcels C, D, H, N, O and P

Naval Training Center, San Diego, California

Bechtel National, Inc.
CLEAN II Program

| Date: | 2/23/00 |
| File No: | 16BL5074 |
| Job No: | 22214-168 |
| Rev: | B |

LEGEND

NTC SAN DIEGO BOUNDARY

PARCEL BOUNDARY

PARCEL DESIGNATION



LEGEND

PARCELS 1, IIIB, IV, V, VI, VII, VIII, AND X

PARCELS II/IIIA AND IX

IR OR UST SITE REFERRED TO IN POST

PARCEL BOUNDARY

✕ APPROXIMATE LOCATIONS OF OFF-BASE PROPERTY

Southwest Division
Naval Facilities Engineering Command

Former Naval Training Center, San Diego, CA

Map of IR/UST Sites
on or Adjacent to Parcels II/IIIA and IX

Figure 3

| File No. | Date |
|---|---|
| 168L4700 | 2/2/00 |



**APPENDIX A**


**Responsiveness Summary**

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
05/04/00

| Originator: Richard Cooper NTC San Diego Restoration Advisory Board | Dated: 7 March, 2000 |
|---|---|
| *COMMENTS* | *RESPONSES* |
| I have no suggestion for improvement on subject document. | Comment acknowledged. |

Page 1

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
05/04/00

| Originator:   Charles Bishop<br>NTC San Diego Restoration Advisory Board | Dated: 5 March, 2000 |
|---|---|
| *COMMENTS*<br><br>I have reviewed the draft FOST for Parcels II/IIIA and IX of NTC and find it to be well-organized and thorough in coverage as I understand it.<br><br>I note that Section 3.0 describes Parcel II as a "2250-foot-long section of Harbor Drive" and explains that Parcels II and IIIA are combined for purposes of transfer. Section 3.2 states that the "proposed future land use for Parcel II remains as a transportation corridor for public use." Figure 2, however, does not show the location of Parcel II. Since it is an entity, and with unique properties, it would be useful to the reader to be able to locate it in Figure 2.<br><br>I concur in the conclusion stated in Section 11. | *RESPONSES*<br><br>Comment acknowledged.<br><br>Parcel II and IIIA were combined for purposes of transfer and there is no longer a boundary between Parcel II and IIIA.  Originally, Parcel II was Harbor Drive.  This former Parcel is now shown as part of Parcel II/IIIA on Figure 2.<br><br><br><br>Comment acknowledged. |

Page 2

**DRAFT RESPONSE TO COMMENTS**
**DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX**
**for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA**
**05/04/00**

| Originator:   Cheryl Lester<br>City of San Diego, Hazardous Materials Program Supervisor | Dated: 27 March, 2000 |
|---|---|
| **COMMENTS**<br><br>A) In response to my comments on the Preliminary Draft FOST dated November 1999, the City received a detailed spreadsheet, dated February 8, 2000, which noted many important details pertaining to each site and point of interest (POI) including restrictions and residual contamination. This spreadsheet is an excellent way to clearly summarize the existing conditions at these sites and POIs. My understanding was this document would be included in the FOST as part of the disclosure. I recommend that this spreadsheet be included in the FOST so the existing site conditions are clear to those who will reuse the property without their need to locate the multitude of reports to compile this information. | **RESPONSES**<br><br>The spreadsheet, or Table, being referred to was provided for the convenience of the city of San Diego. However, it would be appropriate for any future re-user of the property to review the complete reports and documents for each site or POI. |
| B) On page 14, the Table identifies POI 93 as a Type 1 for the Environmental Condition of Property (ECP). The spreadsheet noted above listed POI 93 as a Type 3. Confirmation is needed on which is the appropriate ECP Type for POI 93. | POI 93 is ECP area type 3 and the table on page 14 of the FOST will be amended as such. |
| C) The spreadsheet mentioned above noted that arsenic and antimony were found above project threshold concentrations at 15 POI locations. The State in their "no further action" notice made note that the risks associated with these 15 POIs was due specifically to the remaining levels of arsenic and antimony. The reports allege that these concentrations found are due to a high background level of these two metals. Since the risk to human health was considered acceptable, but heavy metals, concentrations remain, I recommend that those POIs with arsenic and antimony levels above the project threshold be noted as a Type 3 for ECP to disclose this existing condition. | The reports concluded that the concentrations of arsenic and antimony are the result of background concentrations and are not the result of a release of arsenic or antimony from Navy operations. Therefore, it would be incorrect to re-categorize these POI's as ECP area type 3, where "....release of hazardous substances has occurred..." |

Page 3

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
05/04/00

| Originator:   Cheryl Lester<br>City of San Diego, Hazardous Materials Program Supervisor | Dated: 27 March, 2000 |
|---|---|
| **COMMENTS**<br><br>D) When concentrations of hazardous constituents are noted to exist at a POI or site, yet the risk to human health is at an acceptable level due to the low concentrations, I recommend these POIs and sites be denoted as a Type 2 or Type 3 ECP.  This denotation gives those reusing the property a reference point that some level of contamination exists.  Examples of changes to Table 1 – ECP Type are:<br><br>• POI 57 is listed as a Type 1 for ECP, however small concentrations of petroleum hydrocarbons exist in the soil and ground water which would indicate that some release occurred.  This POI should be designated as a Type 2 for ECP.<br><br>• Since the ground water samples were noted in POI 76 as having detectable levels of xylenes and toluene, the ECP designation should be changed from a Type 1 to a Type 2.  This redesignation for POI 76 is consistent with the logic used to designate POI 71 as a Type 2 for ECP.  Both POIs show groundwater samples with a detectable level of contaminants and the soil samples not showing the same contaminants. | **RESPONSES**<br><br>Concur.  The previous document incorrectly stated ECP area type 1 for POI 57 and 76.  The FOST will be revised to show ECP area type 2 for these two POI's.  Upon further review of the FOST, there were no other incorrect POI ECP area type designations noted. |

Page 4

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
*05/04/00*

| **Originator:  Corey Walsh** | **Dated: 30 March, 2000** |
|---|---|
| Regional Water Quality Control Board | |
| *COMMENTS* | *RESPONSES* |
| 1) The document has been substantially changed with the deletion of Section 11.0 entitled *Environmental Notification/Transfer Conditions* and with the reformatting of other notification sections previously agreed upon.  The RWQCB disagrees with the removal of notification previously contained in Section 11.0 (i.e. Groundwater condition/use restriction; and Boat Channel sediment/water use restriction) and suggest including them in the Final FOST. | 1) The Basewide Groundwater Evaluation concluded that the concentrations of groundwater contaminants were at levels that required no response actions, including restrictions.  The RWQCB concurred with this conclusion in 1999.

Section 11.0 of the working draft FOST that you are referring to inaccurately contained a notification/restriction.

The FOST provides the Transferee with all information gathered by the Navy disclosing the condition of groundwater at NTC.  Please refer to sections 6.3 and 8.2.2 of the FOST.

The language in the former section 11.0 of the working draft FOST regarding the boat channel was deleted because it was inaccurate and is not part of the property associated with Parcel II/IIIA or IX.

The boat channel is discussed in section 7.3 of the FOST as an adjacent IR site. |
| 2) Comments provided by RWQCB, dated December 2, 1999 on the Preliminary Draft FOST have not been completely addressed.  Please include the requested notification clauses (see comment number 7, RWQCB December 2, 1999) in the relevant sections of the revised Final FOST (i.e. Please notify the RWQCB and/or appropriate agency of any change in site use or the initiation of subsurface excavation work for closed UST, IR or other sites where residual contamination has been left in place). | 2) Notification requirements were associated solely with regulatory closure of former UST sites.  A notification requirement is contained in section 8.2.1 of the FOST.

For additional clarification, section 8.2.1 paragraph 2 will be changed as follows, "The Transferee is hereby notified of the <u>former</u> presence. . . ." |

Page 5

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
*05/04/00*

| Originator:  Corey Walsh | Dated: 30 March, 2000 |
|---|---|
| Regional Water Quality Control Board | |
| *COMMENTS* | *RESPONSES* |
| 3) Please include appropriate notification for all items checked "Yes" in Table 3 entitled Environmental Factors That May Pose Constraints or Require Notification. Notifications of the possible presence of residual contamination were not made for the following items referenced in the table: Hazardous Substances, Installation restoration Program/Points of Interest, Petroleum Products and Derivatives, Storage Tanks, or Groundwater Use/Subsurface Excavation. Please consider including the residual contamination table that was prepared as an attachment to the Response to Preliminary Draft FOST comments. | 3) Sections 6, 7, and 8 contain a complete discussion/notification os hazardous substances, IR Sites, POI's, petroleum products, storage tanks, and groundwater.<br><br>The spreadsheet, or Table, being referred to was provided for the convenience of the city of San Diego. However, it would be appropriate for any future re-user of the property to review the complete reports and documents for each site or POI. |

Page 6

**DRAFT RESPONSE TO COMMENTS**
**DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX**
**for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA**
05/04/00

| Originator: Steven W. Anderson | Dated: 27 March, 2000 |
|---|---|
| **USEPA** | |
| *COMMENTS* | *RESPONSES* |
| 1) <u>Section 8.1 Storage Tanks</u>  In the previous draft the aboveground storage tank at the Former Auto Hobby Shop#2 (Building 189) was described as "closed"; in the current draft it is described as "inactive." Is there more detailed information available on the status of this tank and whether it poses any environmental problems? | 1) This 200-gallon aboveground storage tank is present but inactive at Buildings 189 (Former Auto Hobby Shop #2).  Formerly, the tank contained alkali solution used as part of auto hobby shop activities.  The tank sits on concrete.  There is no evidence that the tank ever leaked or that it poses any environmental problems. |
| 2) <u>Section 8.2.2 Groundwater Use (third paragraph)</u>  The text notes that the groundwater at the Naval Training Center is classified by the Regional Water Quality Control Board as exempt from the municipal use designation.  While the State of California considers groundwater not to be a potential source of drinking water if, among other reasons, it contains in excess of 3,000 mg/l total dissolved solids, EPA guidelines may classify an aquifer as a potential source of drinking water if it contains less than 10,000 mg/l total dissolved solids and is capable of yielding 150 gallons per day.  The text should state whether groundwater would be classified as a potential source of drinking water under the federal guidelines. | 2) The groundwater has not been tested for daily production yield; therefore, it is unknown whether the groundwater would be classified as a potential source of drinking water under federal guidelines. |
| 3) <u>Section 10.0 Deed Covenants Regarding the Presence of Hazardous Substances or Petroleum Products</u>  With reference to CERCLA Section 120(h), the text states that "[t]he deed will also contain a covenant warranting that any additional remedial action found to be necessary after the date of transfer <u>as a result of former activities conducted by the United States</u> will be conducted by the United States." (emphasis added) Section 120(h)(3)(A)(ii)(II) of CERCLA does not contain the underlined language.  I recommend that the underlined limitation be deleted, or that it be qualified by noting that EPA reserves all of its response authorities under CERCLA. | 3) Although CERCLA section 120(h)(3)(A)(ii)(II) does not contain any limitation, it is the Department of the Navy's position that this warranty is read in conjunction with the warranty at CERCLA section 120(h)(3)(A)(ii)(I) requiring the DoN to take any additional remedial action for hazardous substances remaining on the property at the time of transfer.  Without such limitation the DoN would be responsible for the release or threat of release of hazardous substances brought to the property by the transferee and caused by the transferee's activities on the property after the date of transfer.  The limitation is not intended to limit US EPA's response authority under CERCLA. |

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
*05/04/00*

| Originator: John Hammil<br>USEPA | Dated: 17 March, 2000 |
|---|---|
| *COMMENTS*<br><br>1) I am confused with the ECP categories for the Basewide POIs in pages 12-13. How can these generic issues like LBP, ACM, steam tunnels, PCBs, and Storm Drainage System fall under an ECP category? ECP category identification is only for the specific parcels to be transferred, not for issues.<br><br>2) POI 2: Buildings Constructed Before 1980 on Page 12. Here it is stated that "this POI was identified in the SSEBS as requiring further investigation due to the age of the buildings." However, I have not seen anywhere in the FOST where there is a discussion of any further investigations. Was any sampling done? Where are the results?<br><br>3) Page 16. Pesticides are not listed anywhere on the FOST. Should they also be listed under Section 8.1 – Environmental Factors That Do Not Pose Constraints or Require Notification?<br><br>4) Page 18. At the bottom of the page it states "The FAD ACM Hazard in the 14 buildings slated for rehabilitation will be abated prior to transfer in accordance with DoD policy." If this is required, this must be completed and documented prior to finalizing this FOST. | *RESPONSES*<br><br>1) The Navy's intent in assigning ECP area type categories for the base wide POI's was to categorize the property associated with the base wide POI's for suitability to transfer. The decision to assign ECP area types to these POI's was a BRAC Clean-up Team (BCT) decision as reflected in earlier BRAC Clean-up Plans (BCP's).<br><br>2) The SSEBS was completed prior to the publication of the Joint USEPA/DoD Lead-Based Paint Guidelines for Disposal of Residential Real Property. In accordance with these guidelines, investigation was only necessary for Quarters A through D. The investigation reports are referenced in section 2.0 of the FOST.<br><br>3) Pesticides should not be listed in section 8.1. The Navy has no evidence that the use of pesticides was other than in the course of normal and routine application. Therefore, the Navy did not consider pesticide application in evaluating the suitability of this parcel for transfer.<br><br>4) The asbestos hazard abatement and documentation has been completed. Section 9.2.1, paragraph 2 and section 2.0 will be revised accordingly. |

Page 8

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/III/A and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
05/04/00

| Originator:  John Hammil<br>USEPA | Dated: 17 March, 2000 |
|---|---|
| *COMMENTS* | *RESPONSES* |
| 5) LBP. It is stated that "Quarters A-D are the only residential properties that are subject to the LBP guidelines." If that is the case, where are the sampling results required by DoD's LBP Field Guide? Table 5 only lists the year of construction of the structures. This does not list what the reuse for each structure is and what, if any, sampling and abatement has been done for each structure.  For the non-residential reuse structures, if no LBP sampling has been done, a deed restriction prohibiting residential reuse is needed. | 5) The sample results are contained in the following document as referenced in section 2.0 of the FOST: Four-volume NTC PWC Lead Report: Lead Activity Summary; Lead Management Plan, NTC 1 Housing; Lead Management Plan, NTC 2 Housing; and Lead and Asbestos at NTC San Diego Housing; dated November 1997.  Table 5 is intended to notify the Transferee that, based on the age of the buildings, lead-based paint may be present. The USEPA/DoD Field Guide, Lead Based-Paint requirements are only applicable to circumstances involving the transfer of DoD residential real property. None of the structures listed in Table 5 (with the sole exception of Quarters A through D) are residential real property. |

Page 9

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
05/04/00

| Originator: Corey Walsh<br>Regional Water Quality Control Board | Dated: 17 April, 2000 |
|---|---|
| *COMMENTS*<br>1) No objections to the proposed FOST and subsequent response to regulatory comments. | *RESPONSES*<br>1) Comment acknowledged. |

Page 10

| Originator: **Steven W. Anderson** | Dated: 13 April, 2000 |
|---|---|
| **USEPA** | |
| *COMMENTS* | *RESPONSES* |
| 1) Section 8.1 Storage Tanks The Navy's draft response addresses my comment satisfactorily. | 1) Comment acknowledged. |
| 2) Section 8.2.2 Groundwater Use (Third paragraph) While the draft response states that it is not known whether the groundwater at the Naval Training Center would be classified as a potential source of drinking water under federal guidelines, I understand that the groundwater has tested at 15,000 to 25,000 mg/l total dissolved solids, well in excess of federal guidelines. If this is the case, the text should state that the groundwater would not be classified as a potential source of drinking water under the federal guidelines. | 2) Groundwater on the portion of Parcels II/IIIA and IX east of the boat channel has total dissolved solids (TDS) of 15,000 to 25,000 mg/l. Groundwater on the portion of Parcel II/IIIA west of the boat channel has TDS of less than 10,000 mg/l. The Navy has no information regarding the yield capabilities of this groundwater to summarize in this FOST. Consequently, the Navy does not know whether the groundwater would be classified as a potential source of drinking water under the federal guidelines for the entire FOST Parcels.

Therefore, section 8.2.2 of the FOST will be amended to state that the groundwater could be classified as a potential source of drinking water under the federal guidelines. |
| 3) Section 10.0 Deed Covenants Regarding the Presence of Hazardous Substances or Petroleum Products With reference to CERCLA Section 120(h), the text states that "(t)he deed will also contain a covenant warranting that any additional remedial action found to be necessary after the date of transfer as a result of former activities conducted by the United States will be conducted by the United States."

Since Section 120(h)(3)(A)(ii)(II) of CERCLA does not contain the underlined language, I recommend that the text quote Section 120(h)(3)(A)(ii)(II) exactly, rather than paraphrasing it. | 3) Concur. Section 10.0 of the FOST will be amended to include the following language: "The deed will also contain a covenant warranting that any additional remedial action found to be necessary after the date of transfer shall be conducted by the United States provided that this covenant will not apply to any response action required on the property as a result of an act or omission of the grantee which results in a new release or threat of release of hazardous substances." |

DRAFT RESPONSE TO COMMENTS
DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS I/II/IA and IX
for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA
05/04/00

| Originator:  Steven W. Anderson<br><br>USEPA | Dated:  13 April, 2000 |
|---|---|
| *COMMENTS* | *RESPONSES* |
| 3) continued...<br><br>In the alternative, the underlined text should be reworded to be less broad.  For example, "(t)he deed will also contain a covenant warranting that any additional remedial action found to be necessary after the date of transfer will be conducted by the United States; the foregoing covenant shall not apply to any response action required on the property as a result of an act or omission of the grantee which results in a new release of hazardous substances." (emphasis added) I understand that this language has been used by the Air Force in FOSTs at closing bases in Guam and Hawaii. | |

Page 12

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
*05/04/00*

| Originator: John Hammil | Dated: 13 April, 2000 |
|---|---|
| **USEPA** | |
| *COMMENTS* | *RESPONSES* |
| 1) Basewide POI ECP categories. –The Navy clarified the purpose of assigning ECP categories to basewide POIs. | 1) Comment acknowledged. |
| 2) POI 2: Buildings Constructed Before 1980 on Page 12. –This section only states that "a survey was done to determine the age of the building and structures." Was any sampling done? If so, state the report that documents the results. The FOST should state if the results indicate elevated levels of lead in soil (above 400 ppm) that might be a concern for residential areas. | 2) In accordance with the Joint USEPA/DoD Lead-Based Paint Guidelines for Disposal of Residential Real Properties sampling is not required for any of the buildings and structures with the sole exception of Quarters A-D.<br><br>Section 9.2.2 of the FOST will be amended to reference the Four-volume NTC PWC Lead Report: Lead Activity Summary; Lead Management Plan, NTC 1 Housing; Lead Management Plan, NTC 2 Housing; and Lead and Asbestos at NTC San Diego Housing; dated November 1997. These reports contain the sampling data for quarters A-D. Six soil samples were taken from bare soil areas in the front, back, and side yard areas all of which are accessible to children. The results ranged from 12 ppb to 433 ppb. Only one sample location, in the front yard of quarters D, exceeded the 400 ppb criteria. The average of these samples is 214 ppb, which is significantly below the 400 ppb a criterion for children's play areas. Please see the response to your question number 5 dated 13 April, 2000. |
| 3)Page 16. Pesticides. If pesticides are not a concern the FOST should state so. That is why I believe an appropriate place to document this would be under section 8.1 – Environmental Factors that do not pose Constraints or Require Notification. | 3) Section 8.1 and Table 3 of the FOST will be revised to include pesticides in the list of Environmental Factors that do not pose constraints or require notification. |
| 4)Page 18. Asbestos Hazard Abatement. – The Navy response is satisfactory. | 4) Comment acknowledged. |

DRAFT RESPONSE TO COMMENTS
DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX
for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA
05/04/00

| Originator:  John Hammil<br>USEPA | Dated: 13 April, 2000 |
|---|---|
| *COMMENTS* | *RESPONSES* |
| 5)Page 19. LBP – The Navy response is not complete.  The FOST should state if the sampling results indicate elevated levels of lead in soil (above 400 ppm) that might be a concern for residential areas. Quarters A–D are residential properties that are subject to the LBP guidelines.  Is any abatement required for these properties?  For the non-residential reuse structures, if no LBP sampling has been done a deed restriction in the FOST prohibiting residential reuse is needed. | 5) Please see the response to your question number 2 regarding sample results for quarters A–D.  The average of these soil samples is 214 ppb, which is significantly below the 400 ppb a criterion for children's play areas.  Therefore, abatement is not required.  However, control measures were taken at all bare soil locations surrounding quarters A–D via application of groundcover and/or mulch.<br><br>Section 9.2.2 will be revised as follows.  The following reports documents information gathered on lead-based paint at quarters A–D: Four-volume NTC PWC Lead Report: Lead Activity Summary; Lead Management Plan, NTC 1 Housing; Lead Management Plan, NTC 2 Housing; and Lead and Asbestos at NTC San Diego Housing; dated November 1997.<br><br>These reports contain sampling data for quarters A–D.  Six soil samples were taken from bare soil areas in the front, back, and side yard areas that are accessible to children.  The results ranged from 12 ppb to 433 ppb. The average of these samples is 214 ppb, which is significantly below the 400 ppb criterion for children's play areas as described in the 1999 Joint DoD/USEPA Lead-Based Paint Guidelines for Disposal of Defense Residential Real Property. Therefore, control measures were taken at all bare soil locations surrounding quarters A–D including application of groundcover and/or mulch. |

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
*05/04/00*

| Originator:   John Hammil USEPA | Dated: 13 April, 2000 |
|---|---|
| _COMMENTS_ | _RESPONSES_ |
| | 5) continued… |
| | The US EPA has requested deed restrictions prohibiting the residential use of the non-residential structures presently located on NTC based on the fact that the DoN did no LBP sampling in the non-residential areas. |
| | The DoN finds that the requirements for addressing lead-based paint hazards at real property owned by the United States are established in Title X (Residential Lead-Based Paint Hazard Reduction Act) of the Housing and Community Development Act of 1992, section 403 of the Toxic Substances Control Act (TSCA) and the Comprehensive Environmental Response Compensation and Liability Act (CERCLA). The DoN has concluded that although the release of lead-based paint to soil can be considered a release of a hazardous substance under CERCLA, Title X and TSCA 403 provide the nationally applicable requirements and standards for addressing lead-based paint hazards at Base Realignment and Closure properties.  Title X and TSCA 403 are applicable to residential real property only and do not require LBP sampling at non-residential areas.  Therefore, the DoN does not consider deed restrictions prohibiting residential use of non-residential structures appropriate for parcels II/IIIA and IX. |

Page 15

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
05/04/00

| Originator:   Cheryl Lester<br>City of San Diego, Hazardous Materials Program Supervisor | Dated: 20 April, 2000 |
|---|---|
| *COMMENTS*<br><br>1) Many City staff did not receive the Draft Response to Comments on the Draft FOST for Parcels II/IIIA & IX until April 18, 2000.  After internal review and discussion, the City would like to submit comments on this Draft Response.  These comments are in line with those that I made at our meeting on April 12, 2000 and also reiterate similar comments from the RWQCB staff member during that meeting.<br><br>2) The City feels strongly that the spreadsheet which summarizes the existing condition of the POIs and site within those Parcels should be included in the FOST.  The City does not believe that this request requires the FOST to go out for an additional public review time since it is only summarizing existing information which is contained in the reference documents mentioned in the FOST.<br><br>This summary information is very important to those re-using the property, as you also noted during our meeting. If it is not included in the FOST, it will be extremely difficult to ensure that this information continues to pass on with the FOST. | *RESPONSES*<br><br>1) Comment acknowledged.<br><br><br><br><br><br><br>2) Please see the response to your comment (A) of March 27, 2000. This spreadsheet was corrected to include POI 43 which is on Parcel II/IIIA and to show the ECP area types for POI's 57 and 76 as ECP area type 2 .  The spreadsheet is attached to these responses to comments, which by incorporation will be included in the final FOST. |

Page 16

*DRAFT RESPONSE TO COMMENTS*
*DRAFT FINDING OF SUITABILITY TO TRANSFER (FOST) FOR PARCELS II/IIIA and IX*
*for FORMER NAVAL TRAINING CENTER, SAN DIEGO, CA*
*05/04/00*

| Originator:   Glenn R. Kistner<br>Acting Section Chief, USEPA | Dated: 3 May, 2000 |
|---|---|
| *COMMENTS*<br><br>1) The United States Environmental Protection Agency (USEPA) has received and reviewed the Draft Finding of Suitability to Transfer (FOST) and Response to Comments for Parcels II/IIIA and IX at the Former Naval Training Center San Diego in San Diego, California, dated February 25, 2000. Our review of the document finds that the majority of our comments have been addressed to our satisfaction. As you are aware, we differ on the issue of lead-based paint which has left one unresolved comment in the document but we have no objections to the finalization of the FOST. | *RESPONSES*<br><br>1) Comment acknowledged. |

Page 17

**ATTACHMENT**

**Table 1**
**FOST Site and POI Overview**
**Parcels II/IIIA and IX**

Table 1
Findings of Suitability to Transfer (FOST)
Site and POI Overview
Parcels II/IIIA and IX*

| Site/POI | Documents Completed to Date | Status/Date/Agency | ECP Area Type | Regulatory Closure Restrictions/Notifications | Residual Contamination |
|---|---|---|---|---|---|
| **SITES:** | | | | | |
| Site 2 (UST): Former UST (Bldg. 227) | Final Report on Remediation and Site Assessment Activities, Site 2, NTC (OHM, 1995). | Site closed, NFA, County DEH, 7-1-96 | 2 | If change in land use is proposed, owner must promptly notify CO DEH | Minor amounts of TPH-diesel (120-970 mg/kg) in soil remain in the vicinity of the excavation. Monitoring well data show no residual contamination in groundwater. |
| Site 4 (IR): Former Document Incinerator (Bldg. 40) | Final Preliminary Assessment Report: Sites 4, 5, and 6, NTC, San Diego (BNI, 1994). | NFA, DTSC, 2-2-95 | 1 | None cited in NFA letter of 2-2-95 | None |
| Site 6 (former POI 87): Golf Course Maintenance Shop (Bldg. 319) | Final Preliminary Assessment Report: Sites 4, 5, and 6, NTC San Diego (BNI, 1994). Final Focused Site Inspection Report for the Golf Course Maintenance Shop, Site 6, NTC (BNI, 1996). | NFA, DTSC and RWQCB, 7-12-96 | 3 | None cited in NFA letter of 7-12-96 | Concentrations of pesticides (4,4'-DDD at 0.10 mg/kg; 4,4'-DDE at 0.87 mg/kg; and 4,4'-DDT at 0.32 mg/kg); petroleum hydrocarbons (TPH as gasoline at 0.22 mg/kg), and arsenic (9.7 mg/kg) are present in shallow soil samples (less than 2.5 feet bgs) at levels well below the project-specific threshold limits. These levels dropped to non-detect or reduced levels at depths greater than 2.5 feet bgs. TPH as other extractable hydrocarbons reported at 11.2 mg/kg in soil at 3 feet bgs. |
| Site 7 (UST): Former UST (Bldg. 049) | Final Site Assessment Report, 9 December (Jacobs, 1991). Building 49 UST Studies, Site Assessment Report, November (Jacobs, 1992). Final Report Site Assessment Activities, Site 7, August (OHM, 1995). Final Closure Report, Site 7, NTC (OHM, 1996). | Site closed, NFA, RWQCB, 1-8-97 | 2 | If change in land use is proposed, owner must promptly notify RWQCB | Approximately 2 cubic yards of soil contaminated with 4,900 mg/kg of TPH as diesel at 8 feet and 6,700 mg/kg of TPH as diesel at 9 feet were left in place due to the adverse effects that removing this contaminated soil would have on surrounding structures. In addition, TPH as diesel-impacted groundwater appears to be limited to the area of the former UST location. |
| Site 8 (POI 34): Bldg. 368 Removed UST | Final Report Remediation and Site Assessment Activities, Site 8, August, (OHM, 1995). Final Site Assessment Report for Underground Storage Tanks: Preliminary Site Assessments at Building 368 (Site 8), NTC San Diego (SOTA, 1997). 1st and 2nd Quarterly Groundwater Monitoring Reports for Sites 1, 3, and 8, dated 5/97 and 7/97 (BNI, 1997) 1997 Annual Groundwater Monitoring Report for Sites 1, 3, and 8, NTC San Diego, (BNI, 1998). 1st Quarter 1998 Groundwater Monitoring Report for Site 8, NTC (SOTA 1998). | Site closed, NFA, RWQCB, 9-22-99 | 2 | If change in land use is proposed, owner must promptly notify RWQCB | Petroleum hydrocarbons as gasoline (51,000 µg/L) and BTEX (all at concentrations < 1,500 µg/L) are present in groundwater. |
| Site 9 (POI 31): Former Building 196 Removed UST | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Report, Remediation and Site Assessment Activities, Site 9, NTC (OHM, 1995). | Site closed, NFA, County DEH, 3-8-96 | 2 | If change in land use is proposed, owner must promptly notify CO DEH | Very low levels of benzene (0.00157 ppm) and toluene (0.00162 ppm) in groundwater. Very low level of xylene (0.006 ppm) in soil. |
| Site 10 (POI 7): Former Auto Hobby Shop #2 UST (Bldgs. 187/188/189) | Final Environmental Soil and Groundwater Study, Site 10 (Bldg. 189) and Site 11 (Bldg. 226), NTC, March (Geoservices, 1996). Interim Remedial Action Plan for Sites 10 and 11, NTC (OHM, 1996). Final Site Closure Report, Site 10, NTC (OHM 1998). | Site closed, NFA, RWQCB, 12-10-98 | 2 | If change in land use is proposed, owner must promptly notify RWQCB | TRPH is 743 mg/kg maximum in soil. 1,2 DCA at 11 µg/L in groundwater. 600-1300 cubic yards of soil still in place. |
| Site 11 (UST): Former UST (Bldg. 226) | Installation of 4 groundwater monitoring wells in April 1991 by IT Corporation. Final Environmental Soil and Groundwater Study, Site 10 (Bldg. 189) and Site 11 (Bldg. 226), NTC (Geoservices, 1996). Interim Remedial Action Plan for Sites 10 and 11, NTC (OHM, 1996). Site 11 Remediation: Progress Monitoring Reports – August 1996 through July 1997, and August 1997 through November 1997, NTC (OHM 1997). Final Site Closure Report, Site 11, NTC (OHM 1998). | Site closed, NFA, RWQCB, 12-21-98 | 4 | If change in land use is proposed, owner must promptly notify RWQCB | Standard solvent plume underwent active remediation with a vapor extraction system. Current soil concentration reported at 41,000 mg/kg. Xylenes (5.1 µg/L), TCE (1.5 µg/L), and trimethylbenzene (TMB; 6.5 µg/L) reported in groundwater. TMB also reported in soil (7,000 mg/kg). Risk assessment found that residual concentrations were determined to not present an adverse risk to human health or the environment. |

\* All the IR/UST sites and location-specific POIs are located on Parcel II/IIIA.  There are no IR/UST sites or location-specific POIs on Parcel IX; only basewide POIs are found on Parcel IX.

Table 1
Findings of Suitability to Transfer (FOST)
Site and POI Overview
Parcels II/IIIA and IX*

| Site/POI | Documents Completed to Date | Status/Date/ Agency | ECP Area Type | Regulatory Closure Restrictions/ Notifications | Residual Contamination |
|---|---|---|---|---|---|
| **BASEWIDE POIs** | | | | | |
| POI 1: Aviation Fuel Line | Original Identified Points of Interest (POIs) at NTC were investigated by Bechtel National in 1995. A Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996) was completed in July 1996. This report recommended each individual POI for further action (FFA) or no further action (NFA) based on investigations of historic and current site operations and practices. | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None; pipeline currently in operation. |
| POI 2: Bldgs Constructed before 1980 | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Four-Volume NTC Public Works Center Lead Report: Lead Activity Summary, Lead Management Plan, NTC 1 Housing; Lead Management Plan, NTC 2 Housing; and Lead and Asbestos at NTC-San Diego Housing (PWC 1997). | NFA, DTSC, 12-27-96 | LBP in bldgs not a CERCLA issue; not assigned an ECP Area Type | None cited in NFA concurrence letter | This POI was created as part of the base closure activities to disclose which buildings at NTC might contain lead-based paint. POI 2 includes all buildings constructed, repaired, and/or maintained prior to 1980. Only Quarters A-D are residential real property, as defined in the joint USEPA/DOD Lead-Based Paint Guidelines for Disposal of Department of Defense Residential Real Property – A Field Guide; Interim Final (December 1999). The Navy has determined that the response taken at Quarters A-D meet these latest guidelines. |
| POI 3: Bldgs not surveyed for ACM | Asbestos Survey and Assessment – Phase IV (Navy PWC, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | All existing buildings at NTC have been surveyed for asbestos containing materials. |
| POI 4: Buildings with ACM | Asbestos Survey and Assessment – Phase IV (Navy PWC, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | FAD ACM hazard in buildings to be rehabilitated will be completed prior to transfer | ACM not a CERCLA issue; not assigned an ECP Area Type | NA | FAD ACM remains in 13 buildings slated for rehabilitation by the city of San Diego. FAD ACM also found in the steam tunnels. But, because the steam tunnels are not publicly accessible, no additional action was determined to be necessary. Transferee will be notified of the presence, location, and types of asbestos and ACM remaining on NTC. |
| POI 38: Steam Tunnels | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Memo from NTC Environmental Office re: Update to Steam Lines Concerns (1996). Final Comprehensive Report on the Site Assessment for the Steam Tunnels (POI 38) at NTC (BNI, 1997). Fax from Navy PWC to NTC BRAC Coordinator re: Clean Steam Tunnels and Vaults (PWC, 1997). Fax from Navy PWC to G. Sheffer, NTC re: Suggestions for Content of TT-1 for Cleaning of Steam Tunnels at NTC (PWC, 1997). | NFA, USEPA 5-28-97; NFA pending sediment removal, DTSC 6-2-97; 7-22-97 | 4 | DTSC requested that for closure of POI 38, sludge in the tunnels must be removed and properly disposed of. Completed by PWC 1-98. | None. |
| POI 40: Transformers not sampled for PCBs | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC August, 1996 (BNI, 1996). | NFA, DTSC, 12-27-96 | 4 | None cited in NFA concurrence letter | The last PCB-containing transformer at NTC was retrofitted in 1996 and was subsequently classified as a non-PCB-containing transformer, according to both USEPA (concentrations <50 ppm) and state (concentrations <5 ppm) standards. |
| POI 64: Storm Drainage System | Storm Drain Illicit Connection Survey/Non-Storm Discharge Elimination and Prevention Program for NTC (CDM Federal Services, 1995). Memo from NTC to Linda Geldner re: Navy Storm Drain Illicit Connection Survey (1995). Final Site-Specific Environmental Baseline Survey, Parcels C,D,H,N,O,P and MWR Marina, NTC, (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None identified; storm drainage system currently in operation. All illicit connections for Parcels II/IIIA and IX have been addressed. |

2

Table 1
Findings of Suitability to Transfer (FOST)
Site and POI Overview
Parcels II/IIIA and IX*

| Site/POI | Documents Completed to Date | Status/Date/Agency | ECP Area Type | Regulatory Closure Restrictions/Notifications | Residual Contamination |
|---|---|---|---|---|---|
| **SITE-SPECIFIC POIs** | | | | | |
| POI 7: Former Auto Hobby Shop #2 (Bldgs. 187/188/189) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC, August, 1996 (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 [DTSC concurred with NFA recommendations based on approval of Final Extended Site Assessment at NTC for 18 POIs at NTC, 1998] | 1 | None cited in NFA concurrence letter | None. POI 7 was the hydraulic lifts at the Former Auto Hobby Shop #2. The UST's outside Bldgs. 187/188/189 comprise Site 10. Lab results from sampling at POI 7 were reported to be below analytical laboratory detection limits. There is no indication that a release occurred at POI 7.  NOTE: for POIs 7, 14, 15, 16, 18, 19, 20, 26, 58, 69, 71, 72, 85, 87, and 93 (the NFA POIs in Parcel II/IIIA addressed in the Final SA/ESA (1998)), DTSC noted that, although human health risks at individual NFA POIs are within acceptable levels for a residential scenario, most of the risks associated with potentially naturally occurring metals (arsenic and antimony). |
| POI 10: Hazardous Materials Bunker (Bldg. 593/594) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 [DTSC & RWQCB concurred with NFA recommendation based on approval of Final Comprehensive Site Assessment Report (1996)] | 1 | None cited in NFA concurrence letter | None |
| POI 11: Naval Health Research Unit (Bldg. 287) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 12: Former Recruit In-Processing Facility (Bldg. 557) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 14: Machinery Repairman School (Bldg. 49) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Arsenic was reported in soil at concentrations of 2.1 and 1.2 mg/kg from borings P14-B1 (13-25 feet bgs) and P14-B2 (4-5 feet bgs), respectively. These arsenic results are above project-specific threshold level of 1.0 mg/kg, but are below site and regional background levels. |
| POI 15: Former Medical/Dental Complex Bldg. (Bldgs. 6, 7, and 160) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | TPH in soil reported above the project-specific threshold level of 1,000 mg/kg in two borings (18,600 mg/kg and 12,900 mg/kg). This POI was addressed together with POI 69. See results for POI 69. |

3

## Table 1
## Findings of Suitability to Transfer (FOST)
## Site and POI Overview
## Parcels II/IIIA and IX*

| Site/POI | Documents Completed to Date | Status/Date/ Agency | ECP Area Type | Regulatory Closure Restrictions/ Notifications | Residual Contamination |
|---|---|---|---|---|---|
| POI 16: Former NEX Dry Cleaning Facility (Bldg. 226) (see Site 11) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Site-Specific Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 3 | None cited in NFA concurrence letter | POI 16 and IRP Site 11 overlap physically and operationally. POI 16 consists of the footprint of Bldg. 226. Site 11 consists of the two 2,000-gallon Stoddard solvent USTs and associated groundwater contamination plume. Reported levels of carbon disulfide (0.6 ppb), 1,2-dichloroethene (0.2 ppb), tetrachloroethene (0.1 ppb), 1,2,4-trimethylbenzene (2.1 ppb), 1,3,5-trimethylbenzene (0.6 ppb), benzene (0.08 ppb), and xylene (0.2 ppb) were detected below project-specific threshold levels in the groundwater samples collected from the three POI 16 investigation borings. The NFA recommendation for POI 16 is independent of investigation and remediation work conducted for IRP Site 11. |
| POI 17: Former NEX Maintenance Storage Area (Bldg. 32) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 18: Patternmaker and Molder Schools (Bldg. 31) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Small amounts of residual petroleum hydrocarbons are present in the vicinity of a 50,000-gallon petroleum UST that was removed in 1987. TPH was reported at 722 μg/L in groundwater, slightly above the project-specific threshold level of 500 μg/L. This is within the range of expected variability of laboratory analysis. Based on the results of the SA/ESA investigation and DTSC concurrence, the current use of the site, the interpreted extent of petroleum hydrocarbons in groundwater, and the non-beneficial use designation of the groundwater, there are no potential pathways for contact with petroleum hydrocarbons at POI 18. |
| POI 19: PWC Aztec Landscape Storage Area (Bldg. 34) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Arsenic reported above project-specific threshold levels (1.2 mg/kg) at 1-2 feet bgs in boring P19-B2. This arsenic level is below naturally occurring NTC and regional background levels. Petroleum hydrocarbons in soil (13.9 mg/kg) below project-specific threshold levels (1,000 mg/kg) are reported from boring P19-B1 at a depth of 5-6 feet bgs. Based on comparison of soil and groundwater sample concentrations with project-specific threshold levels, contaminants at POI 19 do not present an excess risk and the extent of reported contamination is limited. |
| POI 20: PWC Hazardous Waste Storage Area (Bldg. 180) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) for 18 Points of Interest (POIs) at NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Maximum reported metals concentrations were silver (5.5 μg/L), beryllium (3.4 μg/L), chromium (203 μg/L), nickel (65.9 μg/L), lead (177 μg/L), and vanadium (535 μg/L). TPH was reported at 4,700 μg/L. All exceed the project-specific threshold levels. |
| POI 21: Air Conditioning and Refrigeration School (Bldg. 36) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 22: Boat Ramp work Area (Bldg. 464) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 23: Existing Fire-Fighter School (Bldgs. 608/609/610/611/614) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |

L:\team\Trans\co-16RStoe\FOI-subL.doc 02/17/2000;45 PM

4

## Table 1
## Findings of Suitability to Transfer (FOST)
## Site and POI Overview
## Parcels II/IIIA and IX*

| Site/POI | Documents Completed to Date | Status/Date/Agency | ECP Area Type | Regulatory Closure Restrictions/Notifications | Residual Contamination |
|---|---|---|---|---|---|
| POI 25: NEX Audio/Visual Office (Bldg. 31) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 26: PWC Workshop (Bldg. 31) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC  (BNI, 1996).  Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Base Realignment and Closure Cleanup Plan (BCP) for NTC (SWDIV, 1998).  Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). Summary of Results of the RRSEM Data Collection Effort at NTC (BNI, 1996). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Based on the SA/ESA and previous investigations, the extent of petroleum hydrocarbon in soil and groundwater appears limited to the area immediately around the vehicle lift, underneath the building. Maximum concentrations reported in soil are 13,000 mg/kg at 7 feet bgs and 14,000 µg/L in groundwater at 14 feet bgs. The petroleum hydrocarbons consist of heavier hydrocarbons which are less mobile; therefore, future downgradient migration of dissolved petroleum hydrocarbons above threshold levels in considered unlikely. |
| POI 28: Former PCB Spill Area (near Site 4) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-17-96 | 4 | In July 1998, approximately 14 gal. of PCB-contaminated liquid spilled at POI 28. Contaminated soil & asphalt were excavated and removed. | None |
| POI 32: Bldg. 200/202 Removed UST | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  San Diego County Department of Environmental Health Services (DEH) Underground Storage Tank System Closure Report for Establishment H80123 at NTC, dated 8 August (DEH, 1994). | NFA, DEH, 8-8-94 | 1 | None cited in DEH closure report | None |
| POI 35: Bldg. 529 Removed UST | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-17-96 | 1 | None cited in NFA concurrence letter | None |
| POI 39: Transformer with known PCB Contamination (Bldg. 83) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-17-96 | 1 | None cited in NFA concurrence letter | None |
| POI 42: Former Glass House (former Bldg. 129) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-17-96 | 1 | None cited in NFA concurrence letter | None |
| POI 45: Former Mattress Sterilizer (Bldg. 288) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-17-96 | 1 | None cited in NFA concurrence letter | None |
| POI 45: Former Torpedo Classroom (former Bldg. 353) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-17-96 | 1 | None cited in NFA concurrence letter | None |
| POI 49: Former Paint and Oil Storage #2 (Bldg. 42) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-17-96 | 1 | None cited in NFA concurrence letter | None |
| POI 50: Boat and Rigging Shop (Bldg. 179) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996).  Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |

5

L:\4ten\fl\tocts-158\fost\POI-tab1.doc 05/01/00 12:57 PM

**Table 1**
**Findings of Suitability to Transfer (FOST)**
**Site and POI Overview**
**Parcels II/IIIA and IX***

| Site/POI | Documents Completed to Date | Status/Date/ Agency | ECP Area Type | Regulatory Closure Restrictions/ Notifications | Residual Contamination |
|---|---|---|---|---|---|
| POI 51: Former Gas Instruction Chamber (former Bldg. 283) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 53: Former Welfare Photo Shop (former Bldg. 369) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 54: Former Oil and Alcohol Storage (former Bldg. 385) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 55: Former 2-MK-3 Trainer (Bldg. 412) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 56: Former Ejector House (former Bldg. 13) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 57: Former Electric School and Garage (former Bldg. 100) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996), Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Geophysical investigation as part of Comprehensive SA. | NFA, DTSC and RWQCB, 2-27-97 | 2 | None cited in NFA concurrence letter | Minor amounts of residual petroleum hydrocarbons are present in soils and groundwater in the immediate vicinity of the historical USTs at POI 57. The reported TPH concentrations (4.5 and 6.9 mg/kg for soil and 1.2 mg/L for groundwater) were below project-specific threshold levels. |
| POI 58: Former 1,000-gallon Gasoline Tank near P-179 (Decatur and Sims Roads) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996), Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Concentrations of TPH (67 mg/kg) and BTEX (2.17 mg/kg for xylenes and 1.1 mg/kg for ethylbenzene) reported in soil samples were below project-specific threshold levels. One TPH concentration (742 μg/L) above the project-specific threshold level was present in the groundwater sample collected from one downgradient boring (PZ8-B5); however, it was only slightly above the project-specific threshold level (500 μg/L) and within the range of expected variability in laboratory analyses. |
| POI 60: Former Pumping Deck #2 (former Bldg. 448) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996), Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Geophysical investigation as part of Comprehensive SA. | NFA, DTSC, 12-27-96 | 1 | None cited in NAF concurrence letter | None |
| POI 65: Former Sterilizer Bldg. (former Bldg. 107, corner of Decatur and Dewey) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA | 1 | None cited in NFA concurrence letter | None |
| POI 66: Former Paint and Oil Storage #1 (former Bldg. 108, Near Bldgs 202 and 177) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA | 1 | None cited in NFA concurrence letter | None |
| POI 67: Former Canteen and Paint Studio (Bldg. 109 near P-141) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996), Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA | 1 | None cited in NFA concurrence letter | None |

L:\4team\fost\n-168\fost\POI- task.doc 05/01/001-04 PM

Table 1
Findings of Suitability to Transfer (FOST)
Site and POI Overview
Parcels II/IIIA and IX*

| Site/POI | Documents Completed to Date | Status/Date/ Agency | ECP Area Type | Regulatory Closure Restrictions/ Notifications | Residual Contamination |
|---|---|---|---|---|---|
| POI 68: Former Lath and Glass House (former Bldg. 110, near current Bldg. 178) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 69: 500, 1,000, and 2,000-gallon former gasoline tanks (former Bldg. 119 near Bldg. 195) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). Geophysical investigation as part of Comprehensive SA. | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Minor amounts of petroleum hydrocarbons exist in soil and groundwater in a small area southeast of Building 195. NFA was approved by the DTSC due to the relatively thin zone of residual petroleum hydrocarbons located between 14 and 16 feet bgs in soil at the water table. In addition, petroleum hydrocarbons concentrations in groundwater decrease significantly in the downgradient sample points (12,500 µg/L to 108 µg/L) to concentrations below project-specific threshold levels (500 µg/L). Future downgradient migration of petroleum hydrocarbons is considered unlikely due to attenuation, the likely age of the release (pre-1942), and downgradient hydrogeology. |
| POI 70: 1,000-gallon Former Distillate Tank (near Bldg. 1) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Geophysical investigation as part of Comprehensive SA. | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 71: Former Auto Hobby Shop #1 (former Building 224) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Soil and groundwater results suggest that activities conducted at former Bldg. 226 have not adversely impacted soil or groundwater at POI 71, based on the lack of a consistent relationship between typical auto shop operations and the metals detected, the lack of other indications of a release, and the general lack of analytes in soil above project-specific threshold levels. Analytical results for soil indicate that only arsenic (3.3 mg/kg) and beryllium (0.21 mg/kg) exceeded the threshold levels. In groundwater, aluminum (324 µg/L), beryllium (5.6 µg/L), copper (43.2 µg/L), nickel (31.2 µg/L), silver (34.3 µg/L), and zinc (145 µg/L) exceeded threshold levels. Localized natural subsurface conditions are likely the cause. |
| POI 72: Marina Bldg. (Bldg. 358) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Small amount of petroleum hydrocarbons (17 mg/kg) in soil at 4-5 feet bgs in boring P72-B2. This reported TPH concentration was below the project-specific threshold level. |
| POI 75: Welding Shop School and Acetylene Generator (Bldgs 37/433) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 76: Former Generator (Bldg. 77) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC, August, 1996 (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1996). Geophysical investigation as part of Comprehensive SA. | NFA, DTSC, 5-21-98 | 2 | None cited in NFA concurrence letter | Low levels of xylenes and toluene (6.78 and 7.59 µg/L, respectively) were reported in the groundwater sample collected from 11.3 to 16 feet bgs in boring P76-B1. These reported groundwater concentrations were well below their project-specific threshold levels. Due to the absence of TPH reported in both soil and groundwater and very low concentrations of xylenes and toluene reported in groundwater, there is no indication that a release of petroleum hydrocarbons has occurred in the vicinity of the geophysical anomaly at POI 76. |

Table 1
Findings of Suitability to Transfer (FOST)
Site and POI Overview
Parcels II/IIIA and IX*

| Site/POI | Documents Completed to Date | Status/Date/Agency | ECP Area Type | Regulatory Closure Restrictions/Notifications | Residual Contamination |
|---|---|---|---|---|---|
| POI 77: Former Generator (Bldg. 78) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Base Realignment and Closure Cleanup Plan (SWDIV, 1993). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 78: Chlorination Bldg. (Bldg. 81) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 80: Chlorination Bldg. C-1 (Bldg. 530) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 81: Chlorination Bldg. C-2 (Bldg. 531) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 82: Chlorination Bldg. C-3 (Bldg. 532) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 83: Chlorination Bldg. C-4 (Bldg. 533) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 84: Paint Storage Vault (Bldg. 75) | Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |
| POI 85: Former Printing Facility (Bldg. 11) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 1 | None cited in NFA concurrence letter | Arsenic was reported slightly above the project-specific threshold level of 1.0 mg/kg in six of the nine soil samples. Aluminum (245 µg/L), copper (22.2 µg/L), and silver (23 µg/L) were reported above project-specific threshold levels (67 µg/L, 2.9 µg/L, and 2.3 µg/L, respectively) in a groundwater sample at POI 85. However, these metals are not anticipated to be a result of previous activities and would not be anticipated to be a result of previous activities at POI 85. In addition, these reported metals concentrations are interpreted to be in the range of concentrations found in groundwater at NTC in general. |
| POI 87: Former Golf Course Maintenance Storage Area (Bldgs. 364 and 519) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 1 | None cited in NFA concurrence letter | Arsenic was reported above the project-specific threshold level of 1.0 mg/kg in 14 of 15 soil samples; however, the arsenic concentrations are similar to those concentrations found at other POIs, and the concentrations are within the range generally considered to be naturally occurring arsenic levels at NTC. The pesticide alpha-chlordane was reported above the detection limit in the shallowest soil sample from boring B4. The reported concentration of 0.00291 mg/kg was significantly below the threshold level of 0.54 mg/kg; further, no other pesticides were reported above detection limits. |
| POI 91: Former Gatehouse 10, UST (Bldg. 384) | Final Site-Specific Environmental Baseline Survey Parcels C, D, H, N, O, P, and MWR Marina, NTC (BNI, 1996). Final Comprehensive Site Assessment Report for Points of Interest at Naval Training Center (BNI, 1996). Geophysical Investigation as part of Comprehensive SA. | NFA, DTSC, 12-27-96 | 1 | None cited in NFA concurrence letter | None |

8

Table 1
Findings of Suitability to Transfer (FOST)
Site and POI Overview
Parcels II/IIIA and IX*

| Site/POI | Documents Completed to Date | Status/Date/ Agency | ECP Area Type | Regulatory Closure Restrictions/ Notifications | Residual Contamination |
|---|---|---|---|---|---|
| POI 93: Former Vertical Steel Structure (near Bldg. 49) | Final Closure Report, Site 7, NTC, September (OHM, 1996).   Final Site Assessment/Extended Site Assessment (SA/ESA) Report for 18 Points of Interest (POIs), NTC (BNI, 1998). | NFA, DTSC, 5-21-98 | 3 | None cited in NFA concurrence letter | Very low levels of the pesticides 4,4'-DDD (0.098 mg/kg), 4,4'-DDE (0.076 mg/kg), 4,4'-DDT (0.011 mg/kg), and Endrin aldehyde (0.028 mg/kg) were reported at 2.9 feet bgs from a subsurface abandoned sewer pipe; ), In addition, very low levels of 4,4'-DDD (0.00743 mg/kg) and 4,4'-DDE (0.00898 mg/kg) were reported in the 10.8 to 11.3 feet bgs soil sample from boring P93-B1. The reported concentrations for these pesticides were well below the project-specific threshold levels (1.9 mg/kg, 1.3 mg/kg, 1.9 mg/kg, and not established, respectively). The 1996 OHM report concluded that pesticide-impacted soil appeared to have been limited to within the steel structure, and that the impacted soil was removed.  The report also concluded that pesticide-impacted groundwater appeared to be limited to the area of the former UST investigation (Site 7). |

9

## EASEMENT FOR TELECOMMUNICATIONS DISTRIBUTION SYSTEM

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement, approximately twelve (12) feet in width, for purposes of construction, installation, operation, maintenance, repair, modification or replacement of conduits for a telecommunications distribution system or systems, together with ancillary improvements, such easement being on, in and under the Property described in paragraph B of the deed.  Said easement is described in Attachment (1)* and is depicted on Record of Survey Map No. 15840 filed on June 12, 1998 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

Modifications or replacements shall not be limited to the number, size or capacity of the conduit or conduits in place on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America.  In the event, and at such time as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

*Note that the legal description contained in Attachment (1) extends beyond the Property and to that extent is not relevant to this easement.

EXHIBIT H

PARCEL 1

A 628.00 foot by 47.20 foot rectangular parcel on the westerly extension of Halsey Road, being the bridge and appurtenances thereto crossing the boat channel, the horizontal limits of said parcel being described as follows:

Commencing at the northerly end of that certain course shown on sheet 4 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego, County, California, as having a bearing and distance of N 13°53'35" W, 132.20 feet; thence southerly along said course  S 13°53'35" E, 4.43 feet to the **True Point of Beginning**; thence N 78°07'25"E, a distance of 627.81 feet; thence  S 11°52'35" E, a distance of 47.20 feet; thence S 78°07'25' W, a distance of 628.00 feet; thence  N 11°52'35" W, a distance of 47.20 feet; thence  N 78°07'25" E, a distance of 0.19 feet to the **True Point of Beginning.**

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains <u>0.68</u> acres, more or less.


PARCEL 2

A strip of land 12.00 feet in width, the centerline of which is described as follows:  Beginning at a point in that certain course shown on sheet 6 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego County, California, as having a bearing and distance of N 12° 25'55" W, 36.79 feet, said point being  N 12° 25'55" W, 26.84 feet along said line from the southerly terminus of said line, thence  S 82° 41'08"W, a distance of 67.09 feet; thence  S 84° 05' 08" W, a distance of 97.59 feet to a point in that certain course shown on sheet 1 of 1 sheet of Record of Survey Map No. 15710 on file in the office of the County Recorder of San Diego County, California, as having a bearing and distance of N 07° 17' 01" E, 338.80 feet;, said point being  N 07°17'01" E 26.57 feet along said last mentioned certain course from the southerly terminus of said course; thence continuing S 84° 05' 08" W, a distance of 2.05 feet; thence  S 79° 11' 44" W, a distance of 44.86 feet; thence  S 83° 42' 03" W, a distance of 66.84 feet to a point in that certain course shown on said Record of Survey Map No. 15710 as having a bearing and distance of  N 82° 17' 51" W, 275.39 feet, said point being N 82° 17' 51" W,

92.10 feet along said course from the easterly terminus of said course; thence continuing  S 83° 42' 03" W, a distance of 36.98 feet; thence S 87° 44'07" W, a distance of 77.71 feet to a point hereinafter referred to as point "G", thence S 83° 14'10" W, a distance of 29.71 feet; thence  S 76° 03' 43" W, a distance of 36.40 feet to a point hereinafter referred to as point "H", thence  S 16° 50' 02" W, a distance of 11.75 feet; thence  S 07° 46' 16" W, a distance of 76.48 feet; thence  S 08° 01' 19" W, a distance of 124.82 feet; thence  S 33° 08'48" W, a distance of 4.38 feet to a point in that certain course shown on sheet 13 of 13 sheets of said Record of Survey Map No. 15213 as having a bearing and distance of  N 81° 55' 00" W, 25.85 feet, said point being  N 81° 55' 00" W, 5.65 feet along said line from the easterly terminus of said line.

The sidelines of said strip are to be prolonged or shortened to meet at angle points and to terminate easterly in said certain course having a bearing and distance of N 12° 25' 55" W, 36.79 feet, and to terminate southerly in said certain course having a bearing and distance of N 81° 55' 00" W, 25.85 feet and the easterly prolongation thereof.

Subject to conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains <u>0.19</u> acres, more or less.

## PARCEL 3

**A strip of land 12.00 feet in width, the centerline of which is described as follows:**

**Beginning** at point "G" as described in aforedescribed parcel 2; thence N 37°20'34" W, a distance of 31.70 feet to a point on that certain course shown on Record of Survey Map No. 15789 on file in the office of the County Recorder of San Diego County, California as having a bearing and distance of N 82°17'51" W, 275.39 feet, said point being 48.43 feet easterly along said course from the westerly terminus of said course; thence N 09°23'28" W, a distance of 21.56 feet; thence N 07°01'00" W, a distance of 29.62 feet; thence N 00°42'38" W, a distance of 17.58 feet; thence N 04°15'18" E, a distance of 28.46 feet; thence N 07°30'55" E, a distance of 90.23 feet; thence N 07°15'53"E, a distance of 63.63 feet; thence N 05°35'06" E, a distance of 39.23 feet to a point on that certain course shown on said Record of Survey Map No. 15789 as having a bearing and distance of N 82°35'20" W, 291.54 feet, said point being 28.81 feet easterly along said last mentioned course from the westerly terminus of said course; thence continuing N 05°35'06" E, a distance of 10.53 feet; thence N 06° 47'17"

E, a distance of 44.49 feet; thence N 07°50'40" E, a distance of 71.53 feet; thence N 09°39'54" E, a distance of 67.17 feet; thence N 08°45'28" E, a distance of 39.21 feet; thence N 11°47'32"E, a distance of 32.13 feet; thence N 09°45'53" E, a distance of 145.46 feet; thence N 01°35'52" E, a distance of 117.13 feet; thence N 05°58'24" E, a distance of 136.22 feet; thence N 12°22'40" E, a distance of 70.79 feet; thence N 05°06'15" E, a distance of 22.69 feet; thence N 08°09'30" E, a distance of 128.11 feet; thence N 08°03'25" E, a distance of 230.55 feet; thence N 10°15'04" E, a distance of 123.50 feet; thence N 07°56'49" E, a distance of 99.64 feet; thence N 10°08'01" E, a distance of 50.28 feet; thence    N 20°10'29" E, a distance of 73.11 feet; thence N 14°29'01" E, a distance of 18.52 feet; thence N 11°17'05" E, a distance of 27.56 feet to a point on that certain course shown on sheet 6 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego County, California as having a bearing and distance of N 82°29'30"W, 355.45 feet, said point being 31.37 feet westerly along said last mentioned course from the easterly terminus of said course.

The sidelines of said strip to be prolonged or shortened to meet at angle points and at the crossing lines cited above and to terminate northerly in that certain course shown on sheet 6 of 13 sheets of said Record of Survey Map No. 15213 as having a bearing and distance of N 82°29'30" W, 355.45 feet and southeasterly in the northerly line of aforedescribed parcel 2.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record Of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains **0.50** acres, more or less.


PARCEL 4

**A strip of land 12.00 feet in width, the centerline of which is described as follows:**

**Beginning** at point "H" as described in aforedescribed parcel 2,; thence N 05°07'13" E, a distance of 3.91 feet; thence N 84°33'15" W, a distance of 118.05 feet; thence N 82°43'22" W, a distance of 68.03 feet to a point hereinafter referred to as point "I"; thence continuing N 82°43'22" W, a distance of 13.07 feet to the POINT OF TERMINUS.

The sidelines of said strip to be prolonged or shortened to meet at angle points and to terminate southerly in the westerly and northwesterly line of aforedescribed parcel 2.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record , if any.

EXHIBIT H, ATTACHMENT (1)
Page 3 of 6

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains <u>0.05</u> acres, more or less.

## PARCEL 5

**A strip of land 12.00 feet wide, the centerline of which is described as follows:**

**Beginning** at point "I" as described in aforedescribed parcel 4; thence N 06°20'39" E, a distance of 7.51 feet; thence N 82°46'11" W, a distance of 174.78 feet; thence N 87°42'00" W, a distance of 27.44 feet; thence S 55°44'02" W, a distance of 14.20 feet thence S 00°48'49" W, a distance of 16.00 feet; thence S 18°37'26" E, a distance of 25.03 feet; thence S 06°45'10" W, a distance of 77.47 feet; thence S 18°22'10" W, a distance of 42.97 feet; thence S 11°25'51" W, a distance of 96.10 feet; thence S 74°43'55" W, a distance of 25.65 feet; thence S 83°54'53" W, a distance of 401.22 feet; thence S 85°44'14" W, a distance of 174.18 feet; thence N 86°06'15" W, a distance of 32.02 feet; thence S 82°35'25" W, a distance of 44.91 feet; thence N 88°48'33" W, a distance of 50.91 feet; thence S 66°29'32" W, a distance of 27.18 feet; thence N 89°43'28" W, a distance of 61.50 feet; thence S 78°03'35" W a distance of 173.44 feet; thence N 11°52'35" W, a distance of 11.94 feet to a point in the southerly line of aforedescribed parcel 1, said point being S 78°07'25" W, 27.14 feet along said southerly line from the southeast corner of said parcel 1.

The sidelines of said strip to be prolonged or shortened to meet at angle points and to terminate in the southerly line of aforedescribed parcel 1 and in the northerly line of aforedescribed parcel 4.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains <u>0.41</u> acres, more or less.

## PARCEL 6

**A strip of land 12.00 feet in width, the centerline of which is described as follows:**

**Beginning** at a point in that certain course shown on sheet 4 of 13 sheets of

**EXHIBIT H, ATTACHMENT (1)**
Page 4 of 6

Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego County, California as having a bearing and distance of N 36°18'40" E, 1080.03 feet, said point being 84.65 feet southwesterly along said line from the northeasterly terminus of said line; thence S 53°36'16" E, a distance of 104.72 feet; thence N 37°20'23" E, a distance of 64.75 feet; thence S 53°19'54" E, a distance of 58.32 feet; thence S 53°32'11" E, a distance of 211.62 feet to a point on that certain course shown on Record of Survey Map No. 15709 on file in the office of the County Recorder of San Diego County, California as having a bearing and distance of N 36°16'00" E, 1307.97 feet, said point being 21.23 feet southwesterly along said line from the northeasterly terminus of said line; thence continuing S 53°32'11" E, a distance of 322.57 feet; thence S 41°22'08" E, a distance of 10.78 feet; thence S 56°35'44" E, a distance of 33.53 feet; thence S 13°15'54" W, a distance of 653.35 feet; thence S 14°19'16" W, a distance of 83.81 feet; thence S 15°35'34" W a distance of 83.79 feet; thence S 16°44'15" W, a distance of 91.40 feet; thence S 13°00'21" W, a distance of 18.71 feet; thence S 03°45'50" W, a distance of 46.10 feet to a point hereinafter referred to as point "J"; thence S 06°00'29" E, a distance of 28.56 feet; thence S 11°04'38" E, a distance of 47.21 feet; thence S 15°37'23" E, a distance of 96.81 feet; thence S 01°26'10" E, a distance of 35.89 feet, to a point in the southerly R/W line of Harbor Drive (200' wide) as shown on sheet 12 of 13 sheets of said Record of Survey Map No. 15213, said point being S 16°49'46" W, 237.60 feet along said line from the southerly terminus of that certain course shown on sheet 4 of 13 sheets of said Record Of Survey Map No. 15213 as having a bearing and distance of N 13°53'35" W, 132.20 feet.

The sidelines of said strip to be prolonged or shortened to meet at angle points and at the line crossing cited above and to terminate southerly in said southerly R/W line of Harbor Drive (200' wide) and northwesterly in that certain course cited above as having a bearing and distance of N 36°18'40" E, 1080.03 feet.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains <u>0.55</u> acres, more or less.


PARCEL 7

A strip of land 12.00 feet in width, the centerline of which is described as follows.

Beginning at a point in the westerly line of aforedescribed parcel 1, said point being N 11°52'35" W, 6.25 feet along said westerly line from the southwest corner of said parcel 1; thence S 61°11'57" W, a distance 5.29 feet; thence S 17° 25'53" E, a distance of 17.99 feet; thence S 09° 43'22" E, a distance of 25.30 feet; thence S 25°30'15" E, a distance of 15.77 feet; thence S 70°37'40" W, a

distance of 20.75 feet; thence S 55°46'16" W, a distance of 70.45 feet; thence S 83°49'42" W, a distance of 19.49 feet to point "J" as described in aforedescribed parcel 6.

The sidelines of said strip to be prolonged or shortened to meet at angle points and to terminate easterly in the westerly line of aforedescribed parcel 1 and westerly in the easterly line of aforedescribed parcel 6.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains **0.05** acres, more or less.

EXHIBIT H, ATTACHMENT (1)
Page 6 of 6

## <u>EASEMENT FOR 69 KV ELECTRIC DISTRIBUTION LINE</u>

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement, approximately twenty-four (24) feet in width, for purposes of construction, installation, operation, maintenance, repair, modification or replacement of a 69 kilovolt electric distribution line or lines, together with ancillary improvements, such easement being on, in, and under the Property described in paragraph B of the deed.  Said easement is described in Attachment (2)* and is depicted on Record of Survey Map No. 15840 filed on June 12, 1998 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

Modifications or replacements shall not be limited to the size, number or capacity of the line or lines in place on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America.  In the event, and at such time, as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

*Note that the legal description contained in Attachment (2) extends beyond the Property and to that extent is not relevant to this easement.

EXHIBIT I

A STRIP OF LAND 24.00 FEET WIDE FOR 69 KV ELECTRICAL UTILITY PURPOSES WITHIN THE BOUNDARIES OF THE UNITED STATES NAVAL TRAINING CENTER, SAN DIEGO COUNTY, CALIFORNIA AS SAID NAVAL TRAINING CENTER EXISTED AS OF JANUARY O1, 1997, SAID STRIP OF LAND RUNS BETWEEN THE NORTHWESTERLY BOUNDARY LINE OF THE U. S. NAVAL TRAINING CENTER TO THE CO-GENERATION PLANT ADJACENT TO THE U.S. MARINE CORPS BASE, THE CENTERLINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

**Beginning** at a point in the northwesterly boundary line of the United States Naval Training Center as said boundary line is shown on sheets 4 and 10 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego County, California, said point being, N 36°16'06" E, 271.35 feet along said northwesterly boundary line from an angle point in said boundary, said angle point being marked with a ¾" diameter iron pipe with plastic plug stamped "LS 6929", said angle point also being at the easterly corner of Nimitz Boulevard and Rosecrans Street, all as shown on said Record of Survey; thence from said **Point of Beginning**; S 55°06'51"E, 17.58 feet to the beginning of a curve concave northerly having a radius of 27.00 feet; thence se'ly, e'ly and ne'ly along said curve through a central angle of 84°51'11", an arc length of 39.99 feet; thence the following courses; N 40°01'58" E, 26.80 feet; N 32°13'05" E, 38.77 feet; N 08° 53'30" E, 16.48 feet and, N 36°13'07"E, 1238.58 feet to the intersection with that certain course shown on sheet 4 of 13 sheets of said Record of Survey as having a bearing and distance of, "N 53°43'54" W, 1427.91 feet", said point being, S 53°43'54" E, 34.23 feet along said course from the northwesterly terminus of said course; thence continuing, N 36°13'07"E, 295.08 feet; thence, N 21°58'00 E, 31.72 feet; S 70°26'03" E, 11.89 feet; N 37°05'09" E, 267.00 feet and, N 36°05'23" E, 383.21 feet to the beginning of a tangent curve concave southerly having a radius of 65.00 feet, thence ne'ly, e'ly, and se'ly along said curve through a central angle of 90°10'18", an arc length of 102.30 feet; thence, S 53°44'19" E, 756.17 feet; S, 69°20'00" E, 82.58 feet; S 37°14'32" E, 18.38 feet; S 74°53'21" E, 16.46 feet and, S 53°31'47" E, 454.89 feet, to an intersection with that certain course shown on sheet 4 of 13 sheets of said Record of Survey Map No. 15213 as having a bearing and distance of, N 36°18'40" E, 1080.03 feet; said point being, S 36°18'40" W, 13.99 feet along said course from the northeasterly terminus of said course; thence continuing, S 53°31'47" E, 39.36 feet; thence, S 53°41'14" E, 336.46 feet to that certain course shown on Record of Survey Map No. 15709 on file in the office of the County Recorder of San Diego, County, California as having a bearing and distance of N 36° 16' 00" E, 1307.97 feet, said point being, S 36°16'00' W, 14.35 feet along said course from the northeasterly terminus of said course; thence continuing, S 53°41'14" E, 175.96 feet; thence, N 74°10'16" E, 18.33 feet to an intersection with that certain course shown on sheet 4 of 13 sheets of said Record of Survey Map No. 15213 as having a bearing and distance of, N 53°43'30" W, 780.00 feet, said point being, N 53°43'30" W, 216.97 feet along said course from the southeasterly terminus of said course; thence, continuing,

N 74°10'16" E, 12.58 feet; N 58°58'41" E, 15.88 feet;  N 05°31'56" E, 13.54 feet;  N 45°07'02" E, 350.53 feet; N 41°52'02" E, 383.36 feet;  N 48°01'37" E, 37.06 feet;  N 22°38'57" E, 13.36 feet; N 41°56'24" E, 1207.57 feet;  S 70°26'30" E, 14.83 feet; thence, over, across and through the boat channel,  S 70°26'30" E, 599.37 feet;  thence,  S 81°25'27" E, 242.78 feet;  thence, N 44°57'07" E, 38.27 feet  more or less to that certain course shown on said Record of Survey Map No. 15213 as having a bearing and distance of, N 82°29'30" W, 355.45 feet, said point being,  N 82°29'30" W, 101.24 feet along said last mentioned course from the easterly terminus of said course.

The sidelines of said strip to be prolonged or shortened to meet at angle points and at the crossing courses cited above and to terminate northerly in that certain course shown on sheet 6 of 13 sheets of said Record of Survey Map No. 15213 as having a bearing and distance of, "N 82°29'30" W, 355.45 feet  and westerly in the northwesterly boundary line of the U.S. Naval Training Center as shown on sheets 4 and 10 of 13 sheets of said Record of Survey Map No. 15213 as having a bearing and distance of,  N 36°16'06" E, 6903.50 feet.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego, County, California and by this reference, made a part hereof.

The above described parcel contains **4.01** acres, more or less.

EXHIBIT I, ATTACHMENT (2)
Page 2 of 2

## EASEMENT FOR STEAM DISTRIBUTION LINE

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement, approximately forty-two (42) feet in width, for purposes of construction, installation, operation, maintenance, repair, modification or replacement of a steam distribution and other utility distribution systems, together with ancillary improvements, such easement being on, in, over and under the Property described in paragraph B of the deed.  Said easement is described in Attachment (3)* and parcels 1 through 9 are depicted on Record of Survey Map No. 15840 filed on June 12, 1998 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.  Parcel 10 is described and depicted in Attachment (3)*, pages 6 through 8.

Modifications or replacements shall not be limited to the size or capacity of the line or lines in place on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America.  In the event, and at such time, as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

*Note that the legal description contained in Attachment (3) extends beyond the Property and to that extent is not relevant to this easement.

**EXHIBIT J**

## Parcel 1

A 628.00 FOOT BY 47.20 FOOT RECTANGULAR PARCEL ON THE WESTERLY EXTENSION OF HALSEY ROAD BEING THE BRIDGE AND APPURTENANCES THERETO CROSSING THE BOAT CHANNEL, THE HORIZONTAL LIMITS OF SAID PARCEL BEING DESCRIBED AS FOLLOWS:

**Commencing** at the northerly end of that certain course shown on sheet 4 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego County, California, as having a bearing and distance of N 13°53'35", W, 132.20 feet; thence southerly along said course,  S 13°53'35" E, 4.43 feet to the **True Point of Beginning**; thence  N 78°07'25" E, 627.81 feet; thence,  S 11°52'35" E, 47.20 feet; thence S 78°07'25" W, 628.00 feet; thence  N 11°52'35" W, 47.20 feet; thence N 78°07'25" E, 0.19 feet to the **True Point of Beginning.**

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains  0.68  acres, more or less.

## Parcel 2

**A 50.00 foot By 26.00 foot rectangular parcel of land described as follows:**

**Commencing** at the northeast corner of aforedescribed parcel 1; thence, along the easterly prolongation of the northerly line of said parcel 1, N 78°07'25" E, 105.58 feet to the **True Point of Beginning**; thence S 21°21'43" E, 18.80 feet; thence N 68°38'17" E, 50.00 feet; thence N 21°21'43" W, 26.00 feet; thence S 68°38'17" W, 50.00 feet; thence S 21°21'43" E, 7.20 feet to the **True Point of Beginning.**

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains 0.03 acres, more or less.

Parcel 3

A strip of land 42.00 feet in width, the northeasterly and easterly line of said strip being described as follows:

Beginning at a point in the northerly line of aforedescribed parcel 2, said point being 33.84 feet easterly along said northerly line from the westerly terminus of said northerly line; thence, N 54°50'01" W, 106.49 feet; thence N 16°13'52" E, 687.38 feet; thence N 41°35'39" E, 353.22 feet to a point hereinafter referred to as point "A"; thence continuing N 41°35'39" E, a distance of 119.42 feet; thence, N 41°23'49" E, 279.11 feet; thence, N 41°16'00" E, 280.87 feet; thence N 42°40'50" E, 766.76 feet to a point in that certain course shown on sheet 6 of 13 sheets of Record of Survey Map No. 15213 as having a bearing and distance of N 82°29'30"W, 355.45 feet, said point being S 82°29'30" E, 72.28 feet along said course from the westerly terminus of said course.

The northwesterly and northerly line of said strip to be prolonged or shortened to meet at angle points and to terminate southerly in the boundary of aforedescribed parcel 2 and to terminate easterly in said course shown on Record of Survey Map No. 15213 as having a bearing and distance of N 82°29'30" W, 355.45 feet.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains **2.52** acres, more or less.


Parcel 4

A strip of land 20.00 feet in width, the centerline of which is described as follows:

Beginning at point "A" as described in aforedescribed parcel 3, thence S 49°00'37" E, 36.58 feet to a point hereinafter referred to as point "B"; thence N 36°38'11" E, 58.49 feet; thence S 81°11'27" E, 136.29 feet to the **Point of Terminus.**

The side lines of said strip to be prolonged or shortened to meet at angle points and to terminate northwesterly in the southeasterly line of said parcel 3.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this

reference, made a part hereof.

The above described parcel contains **0.11** acres, more or less.

## Parcel 5

**A strip of land 20.00 feet in width, the centerline of which is described as follows:**

**Beginning** at point "B" as described in aforedescribed parcel 4; thence S 36°38'11" W, 36.51 feet to the **Point of Terminus**.

The side lines of said strip to be prolonged or shortened to terminate northeasterly in the southwesterly side line of aforedescribed parcel 4.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains **0.01** acres, more or less.

## Parcel 6

**A strip of land 46.00 feet in width, the southerly line of which is described as follows:**

**Beginning** at a point in the northerly line of aforedescribed parcel 1, said point being  S 78°07'25" W, 53.46 feet along said northerly line from the easterly terminus of said northerly line; thence, N 84°18'00" E, 162.92 feet to a point in the westerly line of aforedescribed parcel 2 said point being N 21°21'43"W, 1.03 feet along said westerly line from the southerly terminus of said westerly line.

Excepting therefrom, that portion of said strip lying within aforedescribed parcels 1, 2 and 3.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains **0.14** acres, more or less.

Parcel 7

**A 30.00 foot wide strip of land, the northerly line of which is described as follows:**

**Beginning** at the southwesterly corner of aforedescribed parcel 1; thence along the southerly line of said parcel 1,  N 78°07'25" E, 40.00 feet to the **Point of Terminus.**

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains <u>**0.03**</u> acres, more or less.


Parcel 8

**A strip of land 35.00 feet in width, the westerly line of said strip being described as follows:**

**Commencing** at the southwesterly corner of aforedescribed parcel 1; thence along the prolongation of the southerly line of said parcel 1,  S 78°07'25" W, 26.65 feet to the **True Point of Beginning**, said **True Point of Beginning** being hereinafter referred to as point "C"; thence from said **True Point of Beginning,** S 12°11'38"W, 321.27 feet to a point in the southerly right of way of Harbor Drive (200' wide) as said right of way line is shown on sheet 12 of 13 sheets of Record ofSurvey Map No. 15213 on file in the office of the County Recorder of San Diego County, California, said point being located  S 25°27'46" W, 267.70 feet from the southerly terminus of that certain course shown on sheet 4 of 13 sheets of said Record of Survey Map No. 15213 as having a bearing and distance of  N 13°53'35" W, 132.20 feet.

The easterly side line of said strip to be prolonged or shortened to terminate southerly in said southerly right of way line of Harbor Drive.

Also excepting therefrom, that portion of said strip lying within aforedescribed parcel 7.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this

reference, made a part hereof.

The above described parcel contains <u>0.25</u> acres, more or less.


<u>Parcel 9</u>

**A strip of land 35.00 feet in width, the westerly line of which is described as follows:**

**Beginning** at point "C" as described in aforedescribed parcel 8; thence N 12°11'38" E, 45.17 feet; thence N 21°21'01" W, 52.99 feet; thence N 13°19'52" E, 803.39 feet to a point in that certain course shown on sheet 4 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego County, California as having a bearing and distance of N 53°43'30" W, 780.00 feet, said point being N 53°43'30" W, 42.81 feet along said course from the southeasterly terminus of said course; thence continuing N 13°19'52" E, 13.25 feet to the point of terminus.

Excepting therefrom that portion lying within aforedescribed parcels 1, 7 and 8.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains <u>0.73</u> acres, more or less.

## Parcel 10

All that portion of the U.S. Naval Training Center as shown on Record of Survey Map No. 15213, filed in the Office of the County Recorder of San Diego County, June 14, 1996, and being a portion of the Tidelands of the Bay of San Diego, as described in document recorded June 6, 1921 in Book 853, Page 126 of Deeds and a portion of the Tidelands of the Bay of San Diego as described in document recorded October 25, 1933 in Book 239, Page 408 of Official Records, all in the City of San Diego, County of San Diego, State of California, described as follows:

COMMENCING at the most Westerly corner of the U.S. Naval Training Center, being the intersection of Northeasterly line of Nimitz Boulevard (formerly Lowell Street) and the Southeasterly line of Rosecrans Street (formerly Main Street), said Southeasterly line being the Southeasterly line of the Northwesterly 10.50 feet of the Southeasterly 20.00 feet of Rosecrans Street as closed and vacated to public use by Resolution No. 25281 by the Council of the City of San Diego, February 18, 1920 and described in deed to the City of San Diego recorded March 16, 1942 in Book 1312, Page 396 of Official Records; thence along said Southeasterly line of Rosecrans Street, North 36°16'06" East, 1615.62 feet; thence leaving said Southeasterly line, South 53°43'54" East, 1427.91 feet; thence North 36°18'40" East, 1080.03 feet; thence South 53°43'30" East, 148.65 feet to the TRUE POINT OF BEGINNING; thence North 36°16'30" East, 25.84 feet; thence South 53°43'30" East, 615.61 feet to the northeast corner of that certain steam line easement shown as Parcel 9 on sheet 7 of Record of Survey Map No. 15840, filed in the Office of the County Recorder of San Diego County, June 12, 1998; thence along the northerly and westerly line of said steam line easement, the following two (2) courses: North 76°40'08" West, 35.00 feet; thence South 13°19'52" West, 21.93 feet; thence leaving said westerly line, North 53°43'30" West, 364.77 feet to that certain course shown on Record of Survey Map No. 15709, filed in the Office of the County Recorder of San Diego County, January 9, 1998, as having a bearing and distance of "N 36°16'00" E, 1307.97 feet"; thence along said certain course, North 36°16'00" East, 8.00 feet to that certain course shown on Record of Survey Map No. 15213, filed in the Office of the County Recorder of San Diego County, June 14, 1996, as having a bearing and distance of "N 53°43'30" W, 780.00 feet"; thence along said certain course, North 53°43'30" West, 227.16 feet to the TRUE POINT OF BEGINNING.

CONTAINS: 0.419 Acres, more or less.

EXHIBIT J, ATTACHMENT (3)
Page 6 of 8



EXHIBIT J, ATTACHMENT (3)                    PAGE 7 OF 8



U.S. NAVAL TRAINING CENTER

T.P.O.B.

DATA TABLE

| NO. | BEARING | LENGTH |
| --- | --- | --- |
| C1 | N36°16'30"E | 25.84' |
| C2 | N76°40'08"W | 35.00' |
| C3 | S13°19'52"W | 21.93' |
| C4 | N36°16'00"E | 8.00' |

LEGEND

INDICATES UTILITY EASEMENT

R. O. S. NO. 15709

STEAM LINE EASEMENT
(PARCEL 9) AS SHOWN
ON SHEET 7 OF
R.O.S. MAP NO. 15840

SCALE: 1"=100'

EXHIBIT J, ATTACHMENT (3)          PAGE 8 OF 8

## EASEMENT FOR 12 KV ELECTRIC DISTRIBUTION LINE

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement, approximately twenty-four (24) feet in width, for purposes of construction, installation, operation, maintenance, repair, modification or replacement of a 12 kilovolt electric distribution line or lines, together with ancillary improvements, such easement being on, in, and under the Property described in paragraph B of the deed. Said easement is described and depicted in Attachment (4).

Modifications or replacements shall not be limited to the size, number or capacity of the line or lines in place on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America. In the event, and at such time, as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

Note that the legal description and depiction contained in Attachment (4) extends beyond the Property and to that extent is not relevant to this easement.

EXHIBIT K

## 12KV TO COGENERATION PLANT

All that portion of the U.S. Naval Training Center as shown on Record of Survey Map No. 15213, filed in the Office of the County Recorder of San Diego County, June 14, 1996, and being a portion of the Tidelands of the Bay of San Diego granted to the UNITED STATES OF AMERICA in document recorded September 5, 1917 in Book 739, Page 307 of Deeds, in the City of San Diego, County of San Diego, State of California, described as follows:

COMMENCING at the Northwest corner of the U.S. Marine Corps Recruit Depot as shown on Record of Survey No. 9050; thence along the Jurisdictional Boundary between U.S. Marine Corps Recruit Depot and the U.S. Naval Training Center, South 15°38'02" East, 1934.29 feet (North 16°08'40" West, 1935.28 feet per Record of Survey No. 9050); thence continuing along said Jurisdictional Boundary, South 07°30'30" West, 811.78 feet (North 07°00'00" East, 810.94 feet per Record of Survey No. 9050); thence North 82°29'30" West, 126.00 feet to the TRUE POINT OF BEGINNING; thence North 82°29'30" West, 150.70 feet; thence South 07°30'30" West, 13.96 feet to the northerly line of that certain 24 foot wide 69KV electrical utility easement as shown on sheet 17 of Record of Survey Map No. 15840, filed in the Office of the County Recorder of San Diego County, June 12, 1998; thence along said northerly line of said electrical utility easement, South 81°25'27" East, 150.72 feet; thence leaving said northerly line, North 07°30'30" East, 16.77 feet to the TRUE POINT OF BEGINNING.

CONTAINS: 0.053 Acres, more or less.

EXHIBIT K, ATTACHMENT (4)
Page 1 of 6



EXHIBIT K, ATTACHMENT (4)          PAGE 2 OF 6



SHEET 2 OF 2 SHEETS

SCALE: 1"=50'

LEGEND

INDICATES UTILITY EASEMENT

(A) INDICATES 12KV ELECTRICAL UTILITY EASEMENT (PARCEL 2) AS SHOWN ON SHEET 17 OF R.O.S. MAP NO. 15840

(B) INDICATES 69KV ELECTRICAL UTILITY EASEMENT AS SHOWN ON SHEET 17 OF R.O.S. MAP NO. 15840

R. O. S, NO. 15213

R. O. S, NO. 15840

U.S. NAVAL TRAINING CENTER

COGENERATION PLANT

U.S. MARINE CORPS RECRUIT DEPOT

S07°30'30"W 811.78'

S07°30'30"W 13.96'

N07°30'30"E 16.77'

T.P.O.B.

6.25'

N82°29'30"W 270.45'

276.70'

150.70'

N81°25'27"W 150.72'

126.00'

24'

(B)

24'

(A)

24'

EXHIBIT K, ATTACHMENT (4)          PAGE 3 OF 6

## 12KV TO FLEET ANTI-SUBMARINE WARFARE TRAINING CENTER

All that portion of the U.S. Naval Training Center as shown on Record of Survey Map No. 15213, filed in the Office of the County Recorder of San Diego County, June 14, 1996, and being a portion of the Tidelands of the Bay of San Diego granted to the UNITED STATES OF AMERICA in document recorded October 25, 1933 in Book 239, Page 408 of Official Records, in the City of San Diego, County of San Diego, State of California, being a strip of land 24.00 feet in width, the centerline of which is described as follows:

COMMENCING at the most Westerly corner of the U.S. Naval Training Center, being the intersection of northeasterly line of Nimitz Boulevard (formerly Lowell Street) and the southeasterly line of Rosecrans Street (formerly Main Street), said southeasterly line being the southeasterly line of the northwesterly 10.50 feet of the southeasterly 20.00 feet of Rosecrans Street as closed and vacated to public use by Resolution No. 25281 by the Council of the City of San Diego, February 18, 1920 and described in deed to the City of San Diego recorded March 16, 1942 in Book 1312, Page 396 of Official Records; thence along said northeasterly line of Nimitz Boulevard and the southerly prolongation of said northeasterly line, South 53°45'35" East, 1877.52 feet to the southeasterly line of Harbor Drive (200 feet wide), said point being on the arc of a non-tangent 1000.00 foot radius curve, concave to the northwest, a radial to said point bears South 26°17'10" East; thence along said southeasterly line of Harbor Drive, the following three (3) courses: northeasterly, along said curve, through a central angle of 04°10'57" an arc distance of 73.00 feet; thence North 59°31'53" East, 827.72 feet to the beginning of a tangent 3900.00 foot radius curve, concave to the southeast; thence northeasterly, along said curve, through a central angle of 13°20'54" an arc distance of 908.59 feet to the TRUE POINT OF BEGINNING, said point being on the centerline of that certain 24 foot wide 12KV electrical utility easement (Parcel 4) as shown on sheet 9 of Record of Survey Map No. 15840, filed in the Office of the County Recorder of San Diego County, June 12, 1998; thence along said easement centerline the following four (4) courses: non-tangent to said curve, North 15°17'00" East, 19.04 feet; thence North 01°43'12" West, 13.27 feet; thence North 14°03'56" West, 185.54 feet; thence North 13°09'15" East, 71.44 feet; thence leaving said easement centerline, North 71°23'22" East, 108.15 feet.

The sidelines of said strip are to be prolonged or shortened so as to terminate southerly in said southeasterly line of Harbor Drive.

CONTAINS: 0.219 Acres, more or less.



SHEET 1 OF 2 SHEETS

R. O. S, NO. 15840

U.S. NAVAL TRAINING CENTER

15213

P.O.B.

INTERSECTION OF
NE'LY LINE OF NIMITZ BLVD. &
SE'LY LINE OF ROSECRANS ST.

NIMITZ BOULEVARD

S53°45'35"E   1877.52'

S26°17'10"E
(R)

U.S. NAVAL FLEET
ANTI-SUBMARINE
WARFARE
TRAINING CENTER

UTILITY EASEMENT
SEE SHEET 2

**EXHIBIT K, ATTACHMENT (4)**          **PAGE 5 OF 6**



SCALE 1"=50'

12KV ELECTRICAL UTILITY
EASEMENT (PARCEL 4)
AS SHOWN ON SHEET 9 OF
R.O.S. MAP NO. 15840

HARBOR DRIVE

U.S. NAVAL
TRAINING CENTER

12KV ELECTRICAL UTILITY
EASEMENT (PARCEL 4)
AS SHOWN ON SHEET 9 OF
R.O.S. MAP NO. 15840

N16°48'03"W
(R)

200'

24'

12'

LEGEND

INDICATES UTILITY
EASEMENT

C2

C1

T.P.O.B.

N17°07'13"W
(R)

Δ=13°20'54"
R=3900.00'
L=908.59'

U.S. NAVAL FLEET
ANTI-SUBMARINE
WARFARE
TRAINING CENTER

### DATA TABLE

| NO. | BEARING | LENGTH |
|-----|---------|--------|
| C1 | N15°17'00"E | 19.04' |
| C2 | N01°43'12"W | 13.27' |

EXHIBIT K, ATTACHMENT (4)

PAGE 6 OF 6

## EASEMENT FOR FUEL LINE

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement, approximately twenty-five (25) feet in width, for purposes of construction, installation, operation, maintenance, repair, modification or replacement of a fuel distribution line or lines, together with ancillary improvements, such easement being on, in and under the Property described in paragraph B of the deed. Said easement is described and depicted in Attachment (5)*.

Modifications or replacements shall not be limited to the size or capacity of the line or lines in place on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America. In the event, and at such time, as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

*Note that the legal description and depiction contained in Attachment (5) extends beyond the Property and to that extent is not relevant to this easement.

EXHIBIT L

All that portion of the U.S. Naval Training Center as shown on Record of Survey Map No. 15213, filed in the Office of the County Recorder of San Diego County, June 14, 1996, and being a portion of Blocks 156, 158, 170, 171, 184, 186, 217, 224, 237, and 246 of ROSEVILLE, according to Map thereof No. 165, dated January, 1869, a copy of which was filed in the Office of the County Recorder, August 14, 1914, a portion of Blocks 199 and 204 of REMONDINO'S SUBDIVISION, according to Map thereof No. 443, filed in the Office of the County Recorder of San Diego County, October 7, 1880, and a portion of Blocks 256, 265, 272, 281, 288, 297, 304 and 311 of SUBDIVISION OF PUEBLO LOT NO. 209 FOR MANNASSE AND SCHILLER, according to Map thereof No. 275, filed in the Office of the County Recorder of San Diego County, September 25, 1869, all in the City of San Diego, County of San Diego, State of California, together with the streets and alleys vacated and closed to public use per City of San Diego Council Resolution No's 25105 and 25281, described as follows:

COMMENCING at the most westerly corner of the U.S. Naval Training Center, being the intersection of northeasterly line of Nimitz Boulevard (formerly Lowell Street) and the southeasterly line of Rosecrans Street (formerly Main Street), said southeasterly line being the southeasterly line of the northwesterly 10.50 feet of the southeasterly 20.00 feet of Rosecrans Street as closed and vacated to public use by Resolution No. 25281 by the Council of the City of San Diego, February 18, 1920 and described in deed to the City of San Diego recorded March 16, 1942 in Book 1312, Page 396 of Official Records; thence along said southeasterly line of Rosecrans Street, North 36°16'06" East, 1615.62 feet to the westerly terminus of that certain course shown on said Record of Survey Map No. 15213, as having a bearing and distance of "North 53°43'54" West, 1427.91 feet" and being the TRUE POINT OF BEGINNING; thence continuing along said southeasterly line of Rosecrans Street, the following two (2) courses: North 36°16'06" East, 5287.88 feet to the beginning of a tangent 37.00 foot radius curve, concave to the south; thence easterly, along said curve, through a central angle of 64°22'40" an arc distance of 41.57 feet to a line parallel with and 21.00 feet southeasterly from said southeasterly line of Rosecrans Street; thence non-tangent to said curve, along said parallel line, South 36°16'06" West, 5244.78 feet; thence leaving said parallel line, South 03°58'38" West, 35.57 feet; thence South 36°16'06" West, 46.40 feet to that certain course shown on said Record of Survey Map No. 15213, as having a bearing and distance of "North 53°43'54" West, 1427.91 feet"; thence along said certain course, North 53°43'54" West, 40.00 feet to the TRUE POINT OF BEGINNING.

CONTAINS: 2.588 Acres, more or less.



SEE SHEET 2

BLK  156

R. O. S.  NO.  15840

SHEET 1 OF 4 SHEETS

RUSSELL STREET

T.P.O.B.

N53°43'54"W  1427.91'

QUIMBY STREET

ROSECRANS STREET

POE STREET

OLIPHANT STREET

NEWELL STREET

MACAULAY STREET

N36°16'06"E  1615.62'

BLK  40

MAP  165

BLK  124

BLK  113

BLK  108

R. O. S.  NO.  15213

U. S. NAVAL TRAINING CENTER

LEGEND

INDICATES UTILITY EASEMENT

SCALE: 1"=200'

NIMITZ BOULEVARD

P.O.B.

INTERSECTION OF
NE'LY LINE OF NIMITZ BLVD. &
SE'LY LINE OF ROSECRANS ST.

EXHIBIT L, ATTACHMENT (5)     PAGE 2 OF 5

MATCH LINE — SEE SHEET 3

XENOPHON STREET

WHITTIER STREET

VOLTAIRE STREET

UDALL STREET

TENNYSON STREET

STERNE STREET

RUSSELL STREET

T.P.O.B.

U.S. NAVAL TRAINING CENTER

R. O. S. NO. 15213

LEGEND

INDICATES UTILITY EASEMENT

5287.88'  N36°16'06"E

5244.78'  S36°16'06"W

21'

DATA TABLE

| NO. | BEARING | LENGTH |
|-----|---------|--------|
| C1 | S03°58'38"W | 35.57' |
| C2 | S36°16'06"W | 46.40' |
| C3 | N36°16'06"E | 1615.62' |

C1
C2
C3

N53°43'54"W    1427.91'

40.00'

SCALE: 1"=200'

SEE SHEET 1

EXHIBIT L, ATTACHMENT (5)    PAGE 3 OF 5



MATCH LINE – SEE SHEET 4

SHEET 3 OF 4 SHEETS

ELLIOTT STREET

DUMAS STREET

CURTIS STREET

BROWNING STREET

ALCOTT STREET

ZOLA STREET

YONGE STREET

STREET

ROSECRANS

U. S. NAVAL TRAINING CENTER

R. O. S. NO. 15213

21'

5287.88'

5244.78'

N36°16'06"E

S36°16'06"W

BLK 224

MAP 165

BLK 217

BLK 218

LEGEND

INDICATES UTILITY EASEMENT

SCALE: 1" = 200'

EXHIBIT L, ATTACHMENT (5)   PAGE 4 OF 5

MATCH LINE – SEE SHEET 2



LEGEND

INDICATES UTILITY EASEMENT

MATCH LINE - SEE SHEET 3

EXHIBIT L, ATTACHMENT (5)  PAGE 5 OF 5

## EASEMENT FOR ELECTRIC SERVICE TO CATS MICROWAVE TOWER

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement, approximately ten (10) feet in width for purposes of construction, installation, operation, maintenance, repair, modification or replacement of an underground electrical service, together with ancillary improvements, such easement being on, in, and under the Property described in paragraph B of the deed. Said easement is described in Attachment (6) and is depicted on Record of Survey Map No. 15840 filed on June 12, 1998 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

Modifications or replacements shall not be limited to the size, number or capacity of the line or lines in place on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America.  In the event, and at such time, as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

EXHIBIT M

A 10.00' WIDE EASEMENT FOR ELECTRICAL UTILITY PURPOSES WITHIN THE U.S. NAVAL TRAINING CENTER, SAN DIEGO COUNTY, CALIFORNIA AS SAID NAVAL TRAINING CENTER EXISTED AS OF JANUARY 01, 1998, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS:

Beginning at a point in that certain course shown on sheet 13 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego County, California as having a bearing and distance of, N 07° 30'30" E, 32.25 feet, said point being S 07° 30' 30" W, 6.11 feet from the northerly terminus of said course; thence S 68° 10' 17" E, 13.17 feet; thence S 22° 04' 31" E, 10.91 feet, thence S 71° 32' 16" E, 20.90 feet to the northerly R/W line of Harbor Drive (200' wide) as shown on said Record of Survey Map, said point being N 83° 48' 36" E, 39.80 feet along said R/W line from the southerly terminus of aforesaid course having a bearing and distance of N 07° 30' 30" E, 32.25 feet.

The sidelines of said strip are to be prolonged or shortened to meet at angle points and to terminate southerly in said northerly R/W line of Harbor Drive and northwesterly in said course having a bearing and distance of N 07° 30' 30" E, 32.25 feet.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Exhibit "B" attached hereto and by this reference, made a part hereof.

Also as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego county, California and by this reference, made a part hereof.

The above described parcel contains 0.01 acres, more or less.

EXHIBIT M, ATTACHMENT (6)
Page 1 of 1

## STORM DRAIN EASEMENT

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement, approximately twenty-seven (27) feet wide for purposes of construction, installation, operation, maintenance, repair, modification or replacement of an underground storm drain or drains, together with ancillary improvements, such easement being on, in, and under the Property described in paragraph B of the deed. Said easement is described in Attachment (7) and is depicted on Record of Survey Map No. 15840 filed on June 12, 1998 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

Modifications or replacements shall not be limited to the size, number or capacity of the line or lines in place on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America. In the event, and at such time, as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

EXHIBIT N

A STRIP OF LAND 27.00' WIDE FOR STORM DRAIN UTILITY PURPOSES IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, CROSSING NORTH HARBOR DRIVE, BETWEEN THE U.S. NAVAL TRAINING CENTER AND THE FLEET ANTI-SUBMARINE WARFARE TRAINING CENTER, THE CENTERLINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

**Commencing** at the intersection of those certain courses shown on sheet 4 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of San Diego County, said courses being shown on said Record of Survey Map as having bearings and distances of N 59° 31' 53" E, 827.72 feet and  N 53° 45' 35 W", 624.77 feet, said intersection being in the northwesterly right of way line of North Harbor Drive (200 feet wide) as shown on said map; thence northeasterly along said northwesterly right of way line, N 59° 31' 53" E, 11.75 feet to the **True Point of Beginning**; thence S 53° 43'52"E, 217.70 feet to the southeasterly right of way line of said North Harbor Drive as shown on said Record of Survey Map.

The sidelines of said strip to be prolonged or shortened to terminate southeasterly in said southeasterly right of way line and northwesterly in said northwesterly right of way line.

Subject to covenants, conditions, reservations, restrictions, rights of way and easements of record
if any.

All as more particularly shown on Exhibit "B" attached hereto and by this reference, made a part hereof.

Also as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

Said strip of land contains **0.135** acres, more or less.

## EASEMENT FOR CABLE TELEVISION DISTRIBUTION SYSTEM

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves a ten (10) foot wide easement for purposes of construction, installation, operation, maintenance, repair, modification or replacement of conduits for a cable television distribution system and ancillary improvements, such easement being on, in and under the Property described in paragraph B of the deed. Said easement is described and depicted in Attachment (8)*.

Modifications or replacements shall not be limited to the number, size or capacity of the conduit or conduits in place on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America. In the event, and at such time as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

*Note that the legal description and depiction contained in Attachment (8) extends beyond the Property and to that extent is not relevant to this easement.

EXHIBIT O

All that portion of the U.S. Naval Training Center as shown on Record of Survey Map No. 15213, filed in the Office of the County Recorder of San Diego County, June 14, 1996, in the City of San Diego, County of San Diego, State of California, being a strip of land 10.00 feet in width, the centerline of which is described as follows:

COMMENCING at the Northwest corner of the U.S. Marine Corps Recruit Depot as shown on Record of Survey No. 9050; thence along the Jurisdictional Boundary between U.S. Marine Corps Recruit Depot and the U.S. Naval Training Center, South 15°38'02" East, 88.00 feet to the TRUE POINT OF BEGINNING; thence leaving said Jurisdictional Boundary, South 82°13'15" West, 34.22 feet; thence South 68°14'08" West, 48.53 feet; thence South 41°04'56" West, 182.06 feet; thence South 33°18'58" West, 51.67 feet; thence South 05°38'57" West, 90.73 feet; thence South 85°13'22" East, 14.54 feet; thence South 05°48'10" West, 128.68 feet; thence South 13°16'49" West, 51.53 feet; thence South 02°53'14" West, 84.98 feet; thence South 42°12'52" West, 122.07 feet; thence South 40°07'50" East, 15.50 feet; thence South 38°22'37" West, 47.56 feet; thence North 85°39'34" West, 17.00 feet; thence South 42°02'09" West, 229.71 feet; thence South 02°09'41" West, 55.75 feet; thence South 43°40'43" West, 263.08 feet; thence South 41°52'57" West, 271.29 feet; thence South 56°08'30" West, 50.50 feet; thence South 42°27'06" West, 68.77 feet; thence South 00°35'30" East, 15.00 feet; thence South 38°16'19" West, 118.28 feet; thence North 79°30'39" West, 20.09 feet; thence South 69°59'56" West, 20.17 feet; thence South 40°17'33" West, 241.27 feet; thence South 45°59'35" West, 155.93 feet; thence South 20°53'10" West, 31.34 feet; thence South 30°36'36" East, 12.20 feet; thence South 44°51'45" West, 209.37 feet; thence South 60°42'21" West, 21.00 feet; thence South 35°26'00" West, 22.00 feet; thence South 17°45'34" West, 29.37 feet; thence South 41°40'20" West, 174.57 feet; thence South 51°19'20" West, 42.50 feet; thence South 25°10'00" West, 16.57 feet; thence South 41°48'44" West, 425.05 feet; thence South 61°09'24" West, 16.34 feet; thence South 43°30'00" West, 22.50 feet; thence South 11°05'00" West, 13.70 feet; thence South 40°51'00" West, 59.91 feet to POINT "A"; thence South 36°20'25" East, 33.04 feet; thence South 49°20'00" East, 275.00 feet; thence South 50°42'22" East, 59.89 feet; thence South 47°58'42" East, 218.00 feet; thence South 49°15'43" West, 56.08 feet; thence North 47°27'35" West, 135.00 feet; thence North 75°52'00" West, 15.00 feet; thence South 53°19'07" West, 40.27 feet; thence South 41°33'30" West, 490.00 feet; thence South 37°06'40" West, 214.00 feet; thence South 10°34'20" West, 24.50 feet; thence South 20°29'00" East, 25.00 feet; thence South 39°38'25" West, 66.60 feet; thence South 53°00'00" East, 174.35 feet; thence South 55°40'40" East, 431.00 feet; thence South 35°59'00" East, 25.75 feet; thence North 40°26'20" East, 40.72 feet; thence South 51°00'34" East, 74.13 feet; thence South 13°27'08" West, 731.14 feet; thence South 15°56'45" West, 198.75 feet; thence South 02°18'53" West, 42.43 feet; thence North 73°42'22" East, 29.91 feet; thence North 52°14'00" East, 76.00 feet; thence South 37°46'00" East, 10.00 feet; thence South 52°14'00"

West, 26.01 feet; thence South 11°57'20" West, 53.29 feet; thence South 23°08'08" West, 51.04 feet; thence South 08°51'00" East, 118.00 feet; thence South 24°50'00" West, 16.13 feet to the southerly line of Harbor Drive, said point being on the arc of a 3900.00 foot radius curve, concave to the south, a radial to said point bears North 16°13'57" West; thence South 24°50'00" West, 53.87 feet thence South 44°28'20" West, 24.15 feet.

The side lines of said 10 foot wide easement to be extended or shortened so as to terminate northeasterly in said Jurisdictional boundary between the Marine Corps Recruit Depot and the Naval Training Center.

TOGETHER with a strip of land 10.00 feet in width, the centerline of which is described as follows:

BEGINNING at the hereinabove described POINT "A"; thence North 54°18'00" West, 17.00 feet.

CONTAINS: 1.679 Acres, more or less.



EXHIBIT O, ATTACHMENT (8)          PAGE 3 OF 10



SHEET 2 OF 8 SHEETS

BARNETT AVENUE

LYTTON STREET

P.O.B.
NORTHWEST CORNER
OF M.C.R.D. PER
R.O.S. NO. 9050

88.00'

T.P.O.B.

S82°13'15"W  34.22'

S68°14'08"W  48.53'

U.S.  MARINE  CORPS
RECRUIT  DEPOT

N15°38'02"W  1934.29'

S41°04'56"W  182.06'

R. O. S,   NO.   15213
R. O. S,   NO.   15840

S33°18'58"W  51.67'

10'

5'

S85°13'22"E  14.54'

S05°38'57"W  90.73'

LEGEND
INDICATES UTILITY
EASEMENT

S05°48'10"W  128.68'

U.S.  NAVAL                  TRAINING CENTER

S13°16'49"W  51.53'

S02°53'14"W  84.98'

S42°12'52"W  122.07'

SCALE: 1"=100'

S40°07'50"E  15.50'
S38°22'37"W  47.56'
N85°39'34"W  17.00'

MATCH LINE
SEE SHEET 3

EXHIBIT O, ATTACHMENT (8)  PAGE 4 OF 10



SHEET 3 OF 8 SHEETS

MATCH LINE
SEE SHEET 2

R. O. S,        NO.    15213
R. O. S,        NO.    15840

S42°02'09"W  229.71'

10'
5'

S02°09'41"W  55.75'

U.S.   NAVAL        TRAINING CENTER

263.08'
S43°40'43"W

LEGEND

INDICATES UTILITY
EASEMENT

271.29'
S41°52'57"W

SCALE: 1"=100'

S56°08'30"W  50.50'

S42°27'06"W  68.77'

MATCH LINE
SEE SHEET 4

S00°35'30"E  15.00'

EXHIBIT O, ATTACHMENT (8)   PAGE 5 OF 10



EXHIBIT O, ATTACHMENT (8)          PAGE 6 OF 10



SHEET 5 OF 8 SHEETS

SCALE: 1" = 100'

MATCH LINE
SEE SHEET 4

S41°40'20"W
174.57'

S51°19'20"W   42.50'

S25°10'00"W   16.57'

U.S.   NAVAL                    TRAINING CENTER

S41°48'44"W
425.05'

R. O. S,              NO.    15213
R. O. S,              NO.    15840

10'

5'

LEGEND

INDICATES UTILITY
EASEMENT

S61°09'24"W   16.34'

S43°30'00"W   22.50'

S11°05'00"W   13.70'

S40°51'00"W   59.91'

S36°20'25"E   33.04'

S49°20'00"E   275.00'

MATCH LINE
SEE SHEET 6

N54°18'00"W   17.00'

POINT "A"

EXHIBIT O, ATTACHMENT (8)              PAGE 7 OF 10



SHEET 6 OF 8 SHEETS

MATCH LINE
SEE SHEET 5

S47°58'42"E
218.00'

N47°27'35"W
135.00'

S49°15'43"W  56.08'

S50°42'22"E  59.89'

N75°52'00"W  15.00'
S53°19'07"W  40.27'

490.00'
S41°33'30"W

10'
5'

LEGEND

INDICATES UTILITY
EASEMENT

U.S.   NAVAL   TRAINING CENTER
R. O. S,   NO.   15213
R. O. S,   NO.   15840

N10°34'20"E
24.50'

21.08'

N20°29'00"W
25.00'

5'

10'

780.00'
N53°43'30"W

66.60'
N39°38'25"E

39.30'

10' WIDE
UTILITY
EASEMENT

DETAIL
SCALE: 1"=50'

SEE DETAIL
AT RIGHT

S37°06'40"W  214.00'

S10°34'20"W  24.50'
S20°29'00"E  25.00'
S39°38'25"W  66.60'

N53°43'30"W

N36°16'00"E
1307.97'

MATCH LINE
SEE SHEET 7

780.00'

404.19'

375.81'

S53°00'00"E
174.35'

65.29'

162.91'

S55°40'40"E   431.00'

R. O. S,   NO. 15709

EXHIBIT O, ATTACHMENT (8), PAGE 8 OF 10





SHEET 8 OF 8 SHEETS

R. O. S, NO. 15213
R. O. S, NO. 15840

MATCH LINE
SEE SHEET 7

R. O. S, NO. 15709

LEGEND

INDICATES UTILITY EASEMENT

| DATA TABLE | | |
|---|---|---|
| NO. | BEARING | LENGTH |
| C1 | S02°18'53"W | 42.43' |
| C2 | N73°42'22"E | 29.91' |
| C3 | N52°14'00"E | 76.00' |
| C4 | S37°46'00"E | 10.00' |
| C5 | S52°14'00"W | 26.01' |
| C6 | S11°57'20"W | 53.29' |
| C7 | S23°08'08"W | 51.04' |
| C8 | S08°51'00"E | 118.00' |
| C9 | S24°50'00"W | 70.00' |
| C10 | S44°28'20"W | 24.15' |

U.S. NAVAL FLEET
ANTI-SUBMARINE
WARFARE TRAINING CENTER

EXHIBIT O. ATTACHMENT (8)            PAGE 10 OF 10

## EASEMENT FOR PEDESTRIAN BRIDGE

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement, approximately thirteen (13) feet in width for purposes of construction, installation, operation, maintenance, repair, modification or replacement of a pedestrian bridge over North Harbor Drive, together with ancillary improvements, such easement being on, in, under and over the Property described in paragraph B of the deed. Said easement is described in Attachment (9)* and is depicted on Record of Survey Map No. 15840 filed on June 12, 1998 in the Book of Record of Survey Maps in the office of the County Recorder for the County of San Diego.

Modifications or replacements shall not be limited to the size or capacity of the bridge on the date of the reservation, provided that the burden on the Property is not unreasonably increased.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America. In the event, and at such time, as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

The United States of America shall not have any obligation to remove any of its improvements or restore the land subject to the easement unless such removal or restoration is required by applicable law.

5-18-00

*Note that the legal description contained in Attachment (9) extends beyond the Property and to that extent is not relevant to this easement.

EXHIBIT P

Commencing at the intersection of those certain courses shown on sheet 4 of 13 sheets of Record of Survey Map No. 15213 on file in the office of the County Recorder of said San Diego County, said courses being shown on said Record of Survey Map as having bearings and distances of N 59° 31' 53" E, 827.72 feet and N 53° 45' 35" W, 624.77 feet, said intersection being in the northwesterly right-of-way line of North Harbor Drive (200' wide) as shown on said map; thence southwesterly along said northwesterly right-of-way line, S 59° 31' 53" W, 25.66 feet to the <u>True Point of Beginning;</u> thence S 30° 29'09" E, 10.37 feet to a line parallel with and 10.37 feet southeasterly (measured at right angles) from said northwesterly right-of-way line; thence along said parallel line S 59° 31'53" W, 16.48 feet; thence  S 30° 29' 09" E, 179.08 feet to a line parallel with and 10.55 feet northwesterly (measured at right angles) from the southeasterly right-of-way line of said North Harbor Drive as shown on said Record of Survey Map; thence along said last mentioned parallel line  N 59°31'53" E, 16.33 feet; thence  S 30° 29' 09" E, 10.55 feet to the southeasterly right-of-way line of said North Harbor Drive; thence southwesterly along said right of way line,  S 59° 31' 53" W, 34.42 feet; thence parallel with aforesaid course of  (S 30° 29' 09" E, 10.55 feet),  N 30° 29' 09" W, 10.55 feet to aforesaid parallel line which lies 10.55 feet northwesterly of said southeasterly right of way line; thence along said last mentioned parallel line,  N 59° 31' 53" E, 5.09 feet to a line parallel with and 13.00 feet southwesterly (measured at right angles) from aforesaid course of (S 30° 29' 09" E, 179.08 feet); thence along said last mentioned parallel line, N 30° 29'09" W, 179.08 feet to aforesaid parallel line which lies 10.37 feet southeasterly of said northwesterly right of way line; thence along said last mentioned parallel line, S 59° 31' 53" W, 5.48 feet to a line parallel with aforesaid course of  (S 30° 29'09" E, 10.37 feet); thence along said parallel line, N 30° 29' 09" W, 10.37 feet to said northwesterly right-of-way line of North Harbor Drive; thence northeasterly along said right of way line, N 59° 31' 53" E, 34.96 feet to the <u>True Point of Beginning.</u>

Subject to covenants,conditions, reservations, restrictions, rights of way and easements of record, if any.

All as more particularly shown on Exhibit "B" attached hereto and by this reference, made a part hereof.

Also as more particularly shown on Record of Survey Map No. 15840 on file in the office of the County Recorder of San Diego County, California and by this reference, made a part hereof.

The above described parcel contains <u>0.070</u> acres, more or less.

EXHIBIT P, ATTACHMENT (9)
Page 1 of 1

## EASEMENT FOR ACCESS TO RETAINED FACILITIES

In accordance with the reservation contained in paragraph 10 of the deed to which this exhibit is attached, the United States of America reserves an easement for ingress and egress, including but not limited to vehicular access to the United States Border Patrol small arms range, the cogeneration plant and the Department of the Navy medical/dental clinic shown on Exhibit "H" by users, employees, contractors, delivery services, vendors, maintenance and ancillary service providers for the activities and improvements now or hereafter located thereon. Said easement shall be on, across and over McCain Road for the United States Border Patrol small arms range; and on, across and over Farragut Road and Cushing Road for the Department of the Navy medical/dental clinic, and thence over such other improved roads that may exist on the Property described in paragraph B of the deed on the date of conveyance which connect to North Harbor Drive, Rosecrans Street or other, equally convenient public streets.

This easement is subject to the express condition subsequent that it shall remain in effect for so long as it is required by the United States of America. In the event, and at such time, as the Department of the Navy shall determine in writing that such easement is no longer so required, the easement shall thereupon terminate.

EXHIBIT Q

BILL OF SALE
FOR
MISCELLANEOUS PERSONAL PROPERTY LOCATED
AT NAVAL TRAINING CENTER, SAN DIEGO

This Bill of Sale is made by the United States of America, acting by and through Department of the Navy, hereinafter referred to as "Navy," for the benefit of the City of San Diego, hereinafter referred to as "City."

RECITALS

A.      Navy is the owner of certain real property, improvements and associated personal property, located in San Diego, California and commonly referred to as the former Naval Training Center ("NTC"), which was used as a military installation, and closed pursuant to the Defense Base Closure and Realignment Act of 1990, as amended (hereinafter referred to as "DBCRA").

B.      That part of NTC which was subject to reuse planning by the City and is subject to disposal by the Navy consists of approximately 429 acres of land, together with buildings, structures, facilities and personal property thereon.

C.      By application dated September 23, 1999, City applied for an economic development conveyance pursuant to DBCRA § 2905(b)(4), as amended by the National Defense Authorization Act for Fiscal Year 2000, Public Law 106-65.  The application encompasses approximately 279 acres of land and improvements and requests the transfer of all personal property situated thereon.  Pursuant to said section the Secretary of the Navy has the authority to dispose of real and personal property without consideration for purposes of job creation and economic redevelopment related to a closed military installation.

AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing recitals and other considerations set forth herein, it is mutually agreed as follows:

1.      Navy hereby grants, transfers, releases and quitclaims title and ownership of all personal property located on the real property which Navy is conveying to City contemporaneously with the execution of this bill of sale, with the exception of that property located on the premises to be leased pursuant to Exhibit "E."

2.      The proceeds of the sale of any of the personal property included in this bill of sale shall be subject to the same restrictions and provisions for recoupment as are set

EXHIBIT C

forth in paragraphs 13 and 14 of the Memorandum of Agreement between Navy and City dated _____, 2000.

3.      The property is delivered to the City "as is" and "where is," and Navy makes no warranty of any kind, or as to its usability generally or as to its fitness for any particular purpose.

4.      This bill of sale shall be effective on the last date written below.

IN WITNESS WHEREOF, the parties hereto have, on the respective dates set forth below, duly executed this instrument.

THE UNITED STATES OF AMERICA

Real Estate Contracting Officer

Date: 24 May 00

CITY OF SAN DIEGO

City Manager

Date: 5/30/00

EXHIBIT C                                   R 293512



Section A-A: Looking Northerly

Timing of Coastal Development Permits (CDP)
On and Adjacent to the Boat Channel
NTC Precise Plan

EXHIBIT D

Not To Scale
Rick Planning Group   3-8-00



EXHIBIT E

| STANDARD FORM 2<br>FEBRUARY 1965 EDITION<br>GENERAL SERVICES<br>ADMINISTRATION<br>FPR (41 CFR) 1-16.601 | U.S. GOVERNMENT<br>LEASE FOR REAL PROPERTY |
| --- | --- |

| DATE OF LEASE | LEASE NO.   N68711-00-RP00A47 |
| --- | --- |

THIS LEASE, made and entered into this date by and between the City of San Diego, a municipal corporation, and whose interest in the property hereinafter described is that of   OWNER, and hereinafter called the Lessor, and the UNITED STATES OF AMERICA, hereinafter called the Government:

   WITNESSETH: The parties hereto for the considerations hereinafter mentioned, covenant and agree as follows:

1.  The Lessor hereby leases to the Government, all of that certain real property situated in the City of San Diego, County of San Diego, State of California, described in Exhibit "A", attached hereto and by this reference made a part of this agreement.  Said real property is hereinafter called the "premises" or "leased premises" and is described as follows:

Housing Unit A

2.  To be used for housing and other related and incidental purposes.

3.  TO HAVE AND TO HOLD the said premises with their appurtenances on a month to month basis, beginning on May 16, 2000 subject to termination requirements and rights as may be hereinafter set forth.

4.  The Government shall pay to the Lessor rent at the rate of $312.50, payable monthly and in advance, exclusive of utility charges which are specifically set forth in paragraph 2 of the Special Provisions included herein.  Rent checks shall be annotated as follows, "For NTC Quarters A", and made payable to:

City Treasurer

And mailed to the following address:

Office of the City Treasurer
City of San Diego
PO Box 2289
San Diego, CA 92112-4165

5.  The Government may terminate this lease, at any time, for any reason and by giving at least thirty (30) days' notice in writing to the Lessor and no consideration shall accrue after the effective date of termination.

6. The Lessor may terminate this lease by giving at least six (6) months' notice in writing to the Government except in the event that a regulatory agency having jurisdiction over the matter determines that the premises are unsafe or otherwise uninhabitable.  In that event, the Lessor may terminate by giving at least thirty (30) day's notice in writing to the Government.

7.  It is understood and agreed that the Government will assign the demised premises to military personnel in accordance with Executive Order No. 11063, dated November 20, 1962 which provides that housing and related facilities shall be available without discrimination because of race, color, creed, or national origin.

AA 17  00007035  2506  0252  15811  0  068711  2A  470442  AA000RP00A47  = $1,875.00

8.  Lessor expressly covenants that the consideration stipulated in paragraph 4 above and paragraph 2 of the Special Provisions of this lease constitutes the entire consideration for the lease and that the Lessor has not and will not enter into any separate agreement with the occupant of the leased premises for any financial obligation of one to the other arising out of occupancy of the premises hereunder.

9.  The total maximum annual expenditure by the Government hereunder, including rental and the cost of utilities, maintenance, services and operation, whether obtained by the Government through this lease or independent of this lease may not exceed the statutory ceiling established for each year of this lease or any renewal thereof, by the Congress of the United States.

10.  The following are attached and made a part hereof:

> General  Provisions, Certification and Instructions (Standard Form 2-A, May 1970 edition) paragraphs 1 through 16, and Additional Paragraphs 17 through 19;
> Special  Provisions 1 through 25,
> Exhibit  A, Description of Premises

11.  The following changes were made in this lease prior to its execution: Paragraphs 2, 5, and 14 of the General Provisions, Certification and Instructions have been deleted.

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first above written.

LESSOR

BY  _A. Neil Goldberg_____      _City  Planner_____
(Signature/Title)                                  (Signature/Title)

UNITED STATES OF AMERICA

BY  _Karen P. Ringel_____      **KAREN P. RINGEL**
(Signature)                                        **Real Estate Contracting Officer**
                                                   (Official Title)

# GENERAL PROVISIONS, CERTIFICATION AND INSTRUCTIONS

## U.S. Government Lease for Real Property

## GENERAL PROVISIONS

### 1. SUBLETTING THE PREMISES.

The Government may sublet any part of the premises but shall not be relieved from any obligations under this lease by reason of any such subletting.

### 2. MAINTENANCE OF PREMISES.

The Lessor shall maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, furnished by the Lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees. For the purpose of so maintaining said premises and property, the Lessor may at reasonable times, and with the approval of the authorized Government representative in charge, enter and inspect the same and make any necessary repairs thereto.

### 3. DAMAGE BY FIRE OR OTHER CASUALTY.

If the said premises be destroyed by fire or other casualty this lease shall immediately terminate. In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease by giving written notice to the Lessor within fifteen (15) days thereafter; if so terminated no rent shall accrue to the Lessor after such partial destruction or damage; and if not so terminated the rent shall be reduced proportionately by supplemental agreement hereto effective from the date of such partial destruction or damage.

### 4. ALTERATIONS.

The Government shall have the right during the existence of this lease to make alterations, attach fixtures and erect additions, structures or signs in or upon the premises hereby leased, which fixtures, additions or structures so placed in, upon or attached to the said premises shall be and remain the property of the Government and may be removed or otherwise disposed of by the Government.

### 5. CONDITION REPORT.

A joint physical survey and inspection report of the demised premises shall be made as of the effective date of this lease, reflecting the then present condition, and will be signed on behalf of the parties hereto.

### 6. COVENANT AGAINST CONTINGENT FEES.

The Lessor warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessor for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul this lease without liability or in its discretion to deduct from the rental price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee. (Licensed real estate agents or brokers having listings on property for rent, in accordance with general business practice, and who have not obtained such licenses for the sole purpose of effecting this lease, may be considered as bona fide employees or agencies within the exception contained in this clause.)

### 7. OFFICIALS NOT TO BENEFIT.

No Member or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this lease contract, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this lease contract if made with a corporation for its general benefit.

### 8. ASSIGNMENT OF CLAIMS.

Pursuant to the provisions of the Assignment of Claims Act of 1940, as amended (31 U.S.C. 203, 41 U.S.C. 15), if more, claims for payments aggregating $1,000 or more, claims for monies due or to become due the Lessor from the Government under this contract may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency, and may thereafter be further assigned or reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this contract and not already paid, and shall not be made to more than one party, except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. Notwithstanding any provisions of this contract, payments to an assignee of any monies due or to become due under this contract shall not, to the extent provided in said Act, as amended, be subject to reduction or set-off.

### 9. EQUAL OPPORTUNITY CLAUSE.

(The following clause is applicable unless this contract is exempt under the rules, regulations, and relevant orders of the Secretary of Labor (41 CFR, ch. 60).)

During the performance of this contract, the Contractor agrees as follows:

(a) The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this Equal Opportunity clause.

(b) The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(c) The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency Contracting Officer, advising the labor union or workers' representative of the Contractor's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d) The Contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(e) The Contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting

1

agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(f) In the event of the Contractor's noncompliance with the Equal Opportunity clause of this contract or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended, in whole or in part, and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(g) The Contractor will include the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for noncompliance: *Provided, however,* That in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

10. FACILITIES NONDISCRIMINATION.

(a) As used in this section, the term "facility" means stores, shops, restaurants, cafeterias, restrooms, and any other facility of a public nature in the building in which the space covered by this lease is located.

(b) The Lessor agrees that he will not discriminate by segregation or otherwise against any person or persons because of race, color, religion, sex, or national origin in furnishing, or by refusing to furnish, to such person or persons the use of any facility, including any and all services, privileges, accommodations, and activities provided thereby. Nothing herein shall require the furnishing to the general public of the use of any facility customarily furnished by the Lessor solely to tenants, their employees, customers, patients, clients, guests and invitees.

(c) It is agreed that the Lessor's noncompliance with the provisions of this section shall constitute a material breach of this lease. In the event of such noncompliance, the Government may take appropriate action to enforce compliance, may terminate this lease, or may pursue such other remedies as may be provided by law. In the event of termination, the Lessor shall be liable for all excess costs of the Government in acquiring substitute space, including but not limited to the cost of moving to such space. Substitute space shall be obtained in as close proximity to the Lessor's building as is feasible and moving costs will be limited to the actual expenses thereof as incurred.

(d) It is further agreed that from and after the date hereof the Lessor will, at such time as any agreement is to be entered into or a concession is to be permitted to operate, include or require the inclusion of the foregoing provisions of this section in every such agreement or concession pursuant to which any person other than the Lessor operates or has the right to operate any facility. Nothing herein contained, however, shall be deemed to require the Lessor to include or require the inclusion of the foregoing provisions of

this section in any existing agreement or concession arrangement or one in which the contracting party other than the Lessor has the unilateral right to renew or extend the agreement or arrangement, until the expiration of the existing agreement or arrangement and the unilateral right to renew or extend. The Lessor also agrees that it will take any and all lawful actions as expeditiously as possible, with respect to any such agreement as the contracting agency may direct, as a means of enforcing the intent of this section, including, but not limited to, termination of the agreement or concession and institution of court action.

11. EXAMINATION OF RECORDS.

(NOTE.—This provision is applicable if this lease was negotiated without advertising.)

(a) The Lessor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under this lease, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Lessor involving transactions related to this lease.

(b) The Lessor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Comptroller General of the United States or his representatives shall, until the expiration of 3 years after final payment under this lease with the Government, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor involving transactions related to the subcontract.

12. APPLICABLE CODES AND ORDINANCES

The Lessor, as part of the rental consideration, agrees to comply with all codes and ordinances applicable to the ownership and operation of the building in which the leased space is situated and, at his own expense, to obtain all necessary permits and related items.

13. INSPECTION.

At all times after receipt of Bids, prior to or after acceptance of any Bid or during any construction, remodeling or renovation work, the premises and the building or any parts thereof, upon reasonable and proper notice, shall be accessible for inspection by the Contracting Officer, or by architects, engineers, or other technicians representing him, to determine whether the essential requirements of the solicitation or the lease requirements are met.

14. ECONOMY ACT LIMITATION.

If the rental specified in this lease exceeds $2,000 per annum, the limitation of Section 322 of the Economy Act of 1932, as amended (40 U.S.C. 278a), shall apply.

15. FAILURE IN PERFORMANCE.

In the event of failure by the Lessor to provide any service, utility, maintenance or repairs required under this lease, the Government shall have the right to secure said services, utilities, maintenance or repairs and to deduct the cost thereof from rental payments.

16. LESSOR'S SUCCESSORS.

The terms and provisions of this lease and the conditions herein shall bind the Lessor, and the Lessor's heirs, executors, administrators, successors, and assigns.

# CERTIFICATION

1. CERTIFICATION OF NONSEGREGATED FACILITIES.

(Applicable to (1) contracts, (2) subcontracts, and (3) agreements with applicants who are themselves performing federally assisted construction contracts, exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause.)

By the submission of this bid, the bidder, offeror, applicant, or subcontractor certifies that he does not maintain or provide for his employees any segregated facilities at any of his establishments, and that he does not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. He certifies fur-

Standard Form 2-A
May 1970 Edition

ther that he will not maintain or provide for his employees any segregated facilities at any of his establishments, and that he will not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. The bidder, offeror, applicant, or subcontractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. He further agrees that (except where he has obtained identical certifications from proposed subcontractors for specific time periods) he will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that he will retain such certifications in his files; and that he will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.

A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

*NOTE.—The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.*

## INSTRUCTIONS

1. Whenever the lease is executed by an attorney, agent, or trustee on behalf of the Lessor, two authenticated copies of his power of attorney, or other evidence to act on behalf of the Lessor, shall accompany the lease.

2. When the Lessor is a partnership, the names of the partners composing the firm shall be stated in the body of the lease. The lease shall be signed with the partnership name, followed by the name of the partner signing the same.

3. Where the Lessor is a corporation, the lease shall be signed with the corporate name, followed by the signature and title of the officer or other person signing the lease on its behalf, duly attested, and, if requested by the Government evidence of this authority so to act shall be furnished.

4. When deletions or other alterations are made specific notation thereof shall be entered under clause 8 of the lease before signing.

5. If the property leased is located in a State requiring the recording of leases, the Lessor shall comply with all such statutory requirements at Lessor's expense.

3

Standard Form 1—A
May 1970 Edition

GENERAL PROVISIONS, CERTIFICATIONS, AND INSTRUCTIONS (...continued)

17. Gratuities Clause:

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative - 

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) the facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under paragraph (a) above, the Government is entitled -

(1) To pursue the same remedies as in breach of the contract; and

(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.


18. FEDERAL TORT CLAIMS ACT CLAUSE:

If the death of or injury to any person, or the loss of or damage to any property, is caused by the Government in the course of its use of the facilities described herein, the liability, if any, of the Government therefor shall be determined in accordance with the applicable provisions of the Federal Tort Claims Act (28 U.S.C. 2671-2680).


19. DISPUTES

19.1    This lease is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613) (the Act).

19.2    Except as provided in the Act, all disputes arising under or relating to this lease shall be resolved under this clause.

19.3    "Claim", as used in this clause, means a written demand or written assertion by the Lessor or the Government seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of lease terms, or other relief arising under or relating to this lease. A claim arising under this lease, unlike a claim relating to this lease, is a claim that can be resolved under a lease clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Lessor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph 1.4(2) below. a voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

19.4(1)   A claim by the Lessor shall be made in writing and submitted to the  Commander, Southwest Division Naval Facilities Engineering Command, for a written decision.  A claim by the Government against the Lessor shall be subject to a written decision by the Commander, Southwest Division, Naval Facilities Engineering Command.

19.4(2)(a)   The Lessor shall provide the certification specified in subparagraph 1.4(2)(c) of this clause when submitting any claim--

(A)  Exceeding $100,000; or
(B)  Regardless of the amount claimed, when using--

(1)  Arbitration conducted pursuant to 5 U.S.C. 575-580; or
(2)  Any other alternative means of dispute resolution (ADR) technique that the agency elects to handle in accordance with the Administrative Dispute Resolution Act (ADRA).

19.4(2)(b)   The certification requirement does not apply to issues in controversy that have not been submitted as all or part of a claim.

19.4(2)(c)   The certification shall state as follows:  "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Lessor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Lessor."

19.4(3)   The certification may be executed by any person duly authorized to bind the Lessor with respect to the claim.

19.5   For Lessor claims of $100,000 or less, the Commander, Southwest Division, Naval Facilities Engineering Command, must, if requested in writing by the Lessor, render a decision within 60 days of the request.  For Lessor-certified claims over $100,000, the Commander, Southwest Division Naval Facilities Engineering Command, must, within 60 days, decide the claim or notify the Lessor of the date by which the decision will be made.

19.6   The Commander, Southwest Division  Naval Facilities Engineering Command, decision shall be final unless the Lessor appeals or files a suit as provided in the Act.

19.7   At the time a claim by the Lessor is submitted to the Commander, Southwest Division Naval Facilities Engineering Command or a claim by the Government is presented to the Lessor, the parties, by mutual consent, may agree to use ADR.  When using arbitration conducted pursuant to 5 U.S.C. 575-580, or when using any other ADR technique that the agency elects to handle in accordance with the ADRA, any claim, regardless of amount, shall be accompanied by the certification described in paragraph 19.4(2)(c) of this clause, and executed in accordance with paragraph 19.4(3) of this clause.

19.8   The Government shall pay interest on the amount found due and unpaid by the Government from (1) the date the Commander, Southwest Division Naval Facilities Engineering Command receives the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment.  With regard to claims having defective certifications, as defined in FAR 33.201, interest shall be paid from the date that the Commander, Southwest Division Naval Facilities Engineering Command initially receives the claim.  Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury, as provided in the Act, which is applicable to the period during which the Commander, Southwest Division Naval Facilities Engineering Command receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

19.9   The Lessor shall proceed diligently with the performance of the lease, pending final resolution of any request for relief, claim, appeal, or action arising under the lease, and comply with any decision of the Commander, Southwest Division Naval Facilities Engineering Command.

SPECIAL PROVISIONS

1. Assignment or transfer.  The Government is aware that the Lessor may assign its interests in accordance with Paragraph 16 of the General Provisions of this lease. The Government may not assign or transfer the lease to another party without the written approval of the Lessor.

2. Utilities.  Procurement of electricity, gas, steam, telephone and trash removal will be the responsibility of the Government.  Government agrees to obtain needed utility services from any private or municipal supplier who should, during the term of the lease, become able to deliver such services to the leased premises. Lessor shall provide water and sewerage service.  Government agrees to be responsible for the payment of all utility and service charges as billed by the City or utility provider including electricity, gas, water, steam, sewerage and boiler expenses associated with the premises.  If facilities are metered for water, sewerage, gas, steam or electricity, Government shall pay its utility bill as established by the appropriate meter.  For facilities or utilities that are not individually metered, Government shall pay based on the City's prorated engineering estimates of the monthly utility costs. Due to the ongoing utility conversion process, Government has the option to install a utility meter at its sole expense.

3. Ingress/Egress.  Government will be granted appropriate ingress and egress to leased premises.

4. Maintenance. The Government shall maintain the demised premises furnished by the Lessor under this lease in good repair and tenantable condition, except in the case of damage arising from the act or negligence of the Lessor.

5. Improvements/Alternations.  No improvements, structures, or installations shall be constructed on the leased premises, and the leased premises may not be altered by the Government without prior written approval by the City Manager.

6. Related Council Actions.  By the granting of this lease, neither Lessor nor the Council of the City of San Diego  is obligating itself to any other governmental agent, board, commission, or agency with regard to any other discretionary action relating to development or operation of the premises.  Discretionary action includes but is not limited to rezonings, variances, environmental clearances, or any other governmental agency approvals which may be required for the development and operation of the leased premises.

7. Quiet Possession.  The Government, paying the consideration and performing the covenants and agreements herein, shall at all times during the term peaceably and quietly have, hold, and enjoy the premises.  If Lessor for any reason cannot deliver possession of the premises to Government at the commencement of the term, or if during the lease term Government is temporarily dispossessed through action or claim of a title superior to Lessor's, then and in either of such events, this lease shall not be voidable nor shall Lessor be liable to the Government for any loss or damage resulting therefrom, but there shall be determined and stated in writing by the City Manager of San Diego a proportionate reduction of the consideration for this lease for the period or periods during which Government is prevented from having the quiet possession of all or a portion of the premises.

8. Surrender of Premises. At termination of this lease for any reason, Government shall execute, acknowledge, and deliver to Lessor, within five (5) days after written Lessor demand, a valid and recordable quitclaim deed covering all of the premises. The premises shall be delivered free and clear of all liens and encumbrances and in a decent, safe, and sanitary condition. If Government fails or refuses to deliver the required deed, Lessor may prepare and record a notice reciting Government's failure to execute this lease provision, and the notice will be conclusive evidence of the termination of this lease and all Government's rights to the premises.

9. Defaults and Remedies.
   a. Default. In the event that:

   (1) Government shall default in the performance of any covenant or condition required by this lease to be performed by Government and shall fail to cure said default within thirty (30) days following written notice thereof from Lessor; or if any such default is not curable within thirty (30) days, and Government shall fail to commence to cure the default(s) within said thirty-day period and diligently pursue such cure to completion; then Lessor may, at its option, without further notice or demand upon Government or upon any person claiming rights through Government, immediately terminate this lease and all rights of Government and of all persons claiming rights through Government to the premises or to possession thereof; and Lessor may enter and take possession of the premises.

   b. Abandonment by Government. Even though Government has breached the lease and abandoned the property, this lease shall continue in effect for so long as Lessor does not terminate this lease, and Lessor may enforce all its rights and remedies hereunder, including but not limited to the right to recover the rent as it becomes due, plus damages.

   c. Waiver. Any waiver of a default is not a waiver of any other default. Any waiver of a default must be in writing and be executed by the City Manager in order to constitute a valid and binding waiver. The Lessor's delay or failure to exercise a remedy or right is not a waiver of that or any other remedy or right under this lease. The use of one remedy or right for any default does not waive the use of another remedy or right for the same default or for another or later default. The Lessor's acceptance of any rents is not a waiver of any default preceding the rent payment. Lessor and Government specifically agree that the property constituting the premises is City-owned and held in trust for the benefit of the citizens of the City of San Diego and that any failure by the City Manager or City staff to discover a default or take prompt action to require the cure of any default shall not result in an equitable estoppel, but the Lessor shall at all times, have the legal right to require the cure of any default when and as such defaults are discovered or when and as the City Council directs the City Manager to take action or require the cure of any default after such default is brought to the attention of the City Council by the City Manager or by any concerned citizen.

10. Easements and Reservations.

-2-

a. Lessor hereby reserves all rights, title, and interest in any and all subsurface natural gas, oil, minerals, and water on or within the premises.

b. Lessor reserves the right to grant and use easements or to establish and use rights-of-way over, under, along, and across the leased premises for utilities, thoroughfares, or access as it deems advisable for the public good.

c. Lessor has the right to enter the premises for the purpose of making repairs to or developing municipal resources and services. However, Lessor shall not unreasonably or substantially interfere with the Government's use of the premises and will reimburse the Government for physical damages, if any, to the permanent improvements located on the leased premises resulting from the Lessor exercising the rights reserved in this section. Such reimbursement may include a reduction in the rent proportionate to the amount of physical damage as determined by the Lessor. Lessor will pay the costs of maintenance and repair of all Lessor installations made pursuant to these reserved rights.

d. Entry/Inspection. City shall reserve the right to enter the leased premises, but only after obtaining express permission from the Government, not to be unreasonably withheld, for the purpose of viewing and ascertaining the condition of the same, or to protect its interests in the leased premises as necessary to implement reuse of the leased premises in accordance with the City of San Diego's Naval Training Center San Diego Reuse Plan, dated October 1998.

11. Acceptance of Premises. By signing this lease, the Government represents and warrants that it has independently inspected the premises and made all tests, investigations, and observations necessary to satisfy itself of the condition of the premises. The Government agrees it is relying solely on such independent inspection, tests, investigations, and observations in making this lease. The Government further acknowledges that the premises are in the condition called for by this lease, that the Lessor has performed all work with respect to the premises, and that the Government does not hold the Lessor responsible for any defects whether apparent or latent, in the premises, including the presence of any hazardous wastes.

12. Unavoidable Delay. If the performance of any act required of the Lessor or the Government is directly prevented or delayed by reason of strikes, lockouts, labor disputes, unusual governmental delays, acts of God, fire, floods, epidemics, freight embargoes, or other causes beyond the reasonable control of the party required to perform an act, said party shall be excused from performing that act for the period equal to the period of the prevention or delay. In the event Government or Lessor claims the existence of such a delay, the party claiming the delay shall notify the other party in writing of such fact within ten (10) days after the beginning of any such claimed delay.

13. Hazardous/Toxic Waste. The Government will not allow the installation of additional underground storage tanks or release of hazardous substances in, on, under, or from the premises. For the purposes of this provision, a release shall include but not be limited to any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leeching, dumping, or otherwise disposing of hazardous substances. "Hazardous substances" shall have the same meaning as in 42 U.S.C. Section 9601 (14).

14. Asbestos Disclosure. Lessor discloses to Government that portions of the structural components of the leased premises may contain asbestos. Government acknowledges having received notice from Lessor of the presence of such asbestos in accordance with California Health and Safety Code Section 25915.

15. If Government knows or has reasonable cause to believe that any hazardous substance has been released on or beneath the premises, Government shall give written notice to the Lessor Manager within ten (10) days of receipt of such knowledge or cause for belief. Provided, however, if Government knows or has reasonable cause to believe that such substance is an imminent and substantial danger to public health and safety, Government shall notify the Lessor Manager immediately upon receipt of this knowledge or belief and shall take all actions necessary to alleviate such danger. Government will notify the Lessor Manager immediately of any notice of violation received or initiation of environmental actions or private suits relative to the premises. In addition, Government and Government's sublessees shall not utilize or sell any hazardous substance on the property without the prior written consent of Lessor.

16. Notices. Any notice required or permitted to be given hereunder shall be in writing and may be served personally or by United States mail, postage prepaid and addressed in writing to the Government or to Lessor as follows:

    If to the Government:
    Southwest Division Naval Facilities Engineering Command
    Real Estate Contracting Officer
    1220 Pacific Highway
    San Diego, CA 92132-5190

    If to the Lessor:
    City Manager
    Attention Real Estate Assets Director
    City Administration Building
    202 "C" Street, M.S. 9B
    San Diego, CA 92101-4155

or to any mortgagee, trustee, or beneficiary, as applicable, at such appropriate address designated in writing by the respective party. Any party entitled or required to receive notice under this lease may by like notice designate a different address to which notices shall be sent.

17. Lessor Approval. The approval or consent of Lessor, wherever required in this lease, shall mean the written approval or consent of the City Manager unless otherwise specified, without need for further resolution by the City Council.

18. Nondiscrimination. Government agrees not to discriminate in any manner against any person or persons on account of race, color, religion, gender, sexual orientation, medical status, national origin, age, marital status, or physical disability in Government's use of the premises.

19. Partial Invalidity.  If any term, covenant, condition, or provision of this lease is found invalid, void, or unenforceable by a court of competent jurisdiction, the remaining provisions will remain in full force and effect.

20. Number and Gender.  Words of any gender used in this lease shall include any other gender, and words in the singular number shall include the plural, when the tense requires.

21. Captions.  The Lease Outline, section headings, and captions for various articles and paragraphs shall not be held to define, limit, augment, or describe the scope, content, or intent of any or all parts of this lease.  The numbers of the paragraphs and pages of this lease may not be consecutive.  Such lack of consecutive numbers is intentional and shall have no effect on the enforceability of this lease.

22. Entire Understanding.  This lease contains the entire understanding of the parties.  Government, by signing this agreement, agrees that there is no other written or oral understanding between the parties with respect to the leased premises.  Each party has relied on its own examination of the premises, advice from its own attorneys, and the warranties, representations, and covenants of the lease itself.  Each of the parties in this lease agrees that no other party, agent, or attorney of any other party has made any promise, representation, or warranty whatsoever which is not contained in this lease.  The failure or refusal of any party to read the lease or other documents, inspect the premises, and obtain legal or other advice relevant to this transaction constitutes a waiver of any objection, contention, or claim that might have been based on these actions.  No modification, amendment, or alteration of this lease will be valid unless it is in writing and signed by all parties.

23. City Employee Participation Policy.  It is the policy of Lessor that all Lessor contracts, agreements, or leases with consultants, vendors, or Governments shall include a condition that the contract, agreement, or lease may, at the sole option of Lessor, be unilaterally and immediately terminated by Lessor if the contractor or Government employs an individual who, within the twelve months immediately preceding such employment, did in his/her capacity as a City officer or employee participate in negotiations with or otherwise have an influence on the recommendation made to the City Council in connection with the selection of the contractor or Government.  It is not the intent of this policy that these provisions apply to members of the City Council.

24. Standard of Employees.  Government and its employees shall at all times conduct themselves and the operations on the leased premises in a creditable manner.

25. Relocation Payments.  Government understands and agrees that it shall not be entitled to any relocation payment whatsoever upon termination of this lease.



Detail Map

Vicinity Map

| | |
|---|---|
| Southwest Division | |
| Naval Facilities Engineering Command | |
| Former Naval Training Center, San Diego, CA | |
| EXHIBIT "A" | |
| | Page 1 of 1 |

| STANDARD FORM 2<br>FEBRUARY 1965 EDITION<br>GENERAL SERVICES<br>ADMINISTRATION<br>FPR (41 CFR) 1-16.601 | U.S. GOVERNMENT<br>LEASE FOR REAL PROPERTY |
|---|---|

| DATE OF LEASE | LEASE NO.  N68711-00-RP00A48 |
|---|---|

THIS LEASE, made and entered into this date by and between the City of San Diego, a municipal corporation, and whose interest in the property hereinafter described is that of  OWNER, and  hereinafter called the Lessor, and the UNITED STATES OF AMERICA, hereinafter called the Government:

WITNESSETH: The parties hereto for the considerations hereinafter mentioned, covenant and agree as follows:

1.  The Lessor hereby leases to the Government, all of that certain real property situated in the City of San Diego, County of San Diego, State of California, described in Exhibit "A", attached hereto and by this reference made a part of this agreement.  Said real property is hereinafter called the "premises" or "leased premises" and is described as follows:

Housing Unit B

2.  To be used for housing and other related and incidental purposes.

3.  TO HAVE AND TO HOLD the said premises with their appurtenances on a month to month basis, beginning on May 16, 2000 subject to termination requirements and rights as may be hereinafter set forth.

4.  The Government shall pay to the Lessor rent at the rate of $312.50, payable monthly and in advance, exclusive of utility charges which are specifically set forth in paragraph 2 of the Special Provisions included herein.  Rent checks shall be annotated as follows, "For NTC Quarters B", and made payable to:

City Treasurer

And mailed to the following address:

Office of the City Treasurer<br>City of San Diego<br>PO Box 2289<br>San Diego, CA 92112-4165

5.  The Government may terminate this lease, at any time, for any reason and by giving at least thirty (30) days' notice in writing to the Lessor and no consideration shall accrue after the effective date of termination.

6. The Lessor may terminate this lease by giving at least six (6) months' notice in writing to the Government except in the event that a regulatory agency having jurisdiction over the matter determines that the premises are unsafe or otherwise uninhabitable.  In that event, the Lessor may terminate by giving at least thirty (30) day's notice in writing to the Government.

7.  It is understood and agreed that the Government will assign the demised premises to military personnel in accordance with Executive Order No. 11063, dated November 20, 1962 which provides that housing and related facilities shall be available without discrimination because of race, color, creed, or national origin.

AA  17  00007035  2506  0252  15811  0  068711  2A  470444  AA000RP00A48  =  $1,875.00

8.  Lessor expressly covenants that the consideration stipulated in paragraph 4 above and paragraph 2 of the Special Provisions of this lease constitutes the entire consideration for the lease and that the Lessor has not and will not enter into any separate agreement with the occupant of the leased premises for any financial obligation of one to the other arising out of occupancy of the premises hereunder.

9.  The total maximum annual expenditure by the Government hereunder, including rental and the cost of utilities, maintenance, services and operation, whether obtained by the Government through this lease or independent of this lease may not exceed the statutory ceiling established for each year of this lease or any renewal thereof, by the Congress of the United States.

10.  The following are attached and made a part hereof:

   General  Provisions, Certification and Instructions (Standard Form 2-A, May 1970 edition) paragraphs 1 through 16, and Additional Paragraphs 17 through 19;
   Special  Provisions 1 through 25,
   Exhibit  A, Description of Premises

11.  The following changes were made in this lease prior to its execution: Paragraphs 2, 5, and 14 of the General Provisions, Certification and Instructions have been deleted.

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first above written.

LESSOR

BY _____        _____
   (Signature/Title)                          (Signature/Title)


UNITED STATES OF AMERICA

                                            **KAREN P. RINGEL**
                                            **Real Estate Contracting Officer**
   BY _____
   (Signature)                                _____
                                              (Official Title)

# GENERAL PROVISIONS, CERTIFICATION AND INSTRUCTIONS

## U.S. Government Lease for Real Property

### GENERAL PROVISIONS

**1. SUBLETTING THE PREMISES.**

The Government may sublet any part of the premises but shall not be relieved from any obligations under this lease by reason of any such subletting.

**2. MAINTENANCE OF PREMISES.**

The Lessor shall maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, furnished by the Lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees. For the purpose of so maintaining said premises and property, the Lessor may at reasonable times, and with the approval of the authorized Government representative in charge, enter and inspect the same and make any necessary repairs thereto.

**3. DAMAGE BY FIRE OR OTHER CASUALTY.**

If the said premises be destroyed by fire or other casualty this lease shall immediately terminate. In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease by giving written notice to the Lessor within fifteen (15) days thereafter; if so terminated no rent shall accrue to the Lessor after such partial destruction or damage; and if not so terminated the rent shall be reduced proportionately by supplemental agreement hereto effective from the date of such partial destruction or damage.

**4. ALTERATIONS.**

The Government shall have the right during the existence of this lease to make alterations, attach fixtures and erect additions, structures or signs in or upon the premises hereby leased, which fixtures, additions or structures so placed in, upon or attached to the said premises shall be and remain the property of the Government and may be removed or otherwise disposed of by the Government.

**5. CONDITION REPORT.**

A joint physical survey and inspection report of the demised premises shall be made as of the effective date of this lease, reflecting the then present condition, and will be signed on behalf of the parties hereto.

**6. COVENANT AGAINST CONTINGENT FEES.**

The Lessor warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessor for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul this lease without liability or in its discretion to deduct from the rental price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee. (Licensed real estate agents or brokers having listings on property for rent, in accordance with general business practice, and who have not obtained such licenses for the sole purpose of effecting this lease, may be considered as bona fide employees or agencies within the exception contained in this clause.)

**7. OFFICIALS NOT TO BENEFIT.**

No Member or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this lease contract, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this lease contract if made with a corporation for its general benefit.

**8. ASSIGNMENT OF CLAIMS.**

Pursuant to the provisions of the Assignment of Claims Act of 1940, as amended (31 U.S.C. 203, 41 U.S.C. 15), if this lease provides for payments aggregating $1,000 or more, claims for monies due or to become due the Lessor from the Government under this contract may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency, and may thereafter be further assigned or reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this contract and not already paid, and shall not be made to more than one party, except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. Notwithstanding any provisions of this contract, payments to an assignee of any monies due or to become due under this contract shall not, to the extent provided in said Act, as amended, be subject to reduction or set-off.

**9. EQUAL OPPORTUNITY CLAUSE.**

(The following clause is applicable unless this contract is exempt under the rules, regulations, and relevant orders of the Secretary of Labor (41 CFR, ch. 60).)

During the performance of this contract, the Contractor agrees as follows:

(a) The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this Equal Opportunity clause.

(b) The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(c) The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency Contracting Officer, advising the labor union or workers' representative of the Contractor's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d) The Contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(e) The Contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting

1

agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(f) In the event of the Contractor's noncompliance with the Equal Opportunity clause of this contract or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended, in whole or in part, and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(g) The Contractor will include the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for noncompliance: *Provided, however,* That in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

10. FACILITIES NONDISCRIMINATION.

(a) As used in this section, the term "facility" means stores, shops, restaurants, cafeterias, restrooms, and any other facility of a public nature in the building in which the space covered by this lease is located.

(b) The Lessor agrees that he will not discriminate by segregation or otherwise against any person or persons because of race, color, religion, sex, or national origin in furnishing, or by refusing to furnish, to such person or persons the use of any facility, including any and all services, privileges, accommodations, and activities provided thereby. Nothing herein shall require the furnishing to the general public of the use of any facility customarily furnished by the Lessor solely to tenants, their employees, customers, patients, clients, guests and invitees.

(c) It is agreed that the Lessor's noncompliance with the provisions of this section shall constitute a material breach of this lease. In the event of such noncompliance, the Government may take appropriate action to enforce compliance, may terminate this lease, or may pursue such other remedies as may be provided by law. In the event of termination, the Lessor shall be liable for all excess costs of the Government in acquiring substitute space, including but not limited to the cost of moving to such space. Substitute space shall be obtained in as close proximity to the Lessor's building as is feasible and moving costs will be limited to the actual expenses thereof as incurred.

(d) It is further agreed that from and after the date hereof the Lessor will, at such time as any agreement is to be entered into or a concession is to be permitted to operate, include or require the inclusion of the foregoing provisions of this section in every such agreement or concession pursuant to which any person other than the Lessor operates or has the right to operate any facility. Nothing herein contained, however, shall be deemed to require the Lessor to include or require the inclusion of the foregoing provisions of

this section in any existing agreement or concession arrangement or one in which the contracting party other than the Lessor has the unilateral right to renew or extend the agreement or arrangement, until the expiration of the existing agreement or arrangement and the unilateral right to renew or extend. The Lessor also agrees that it will take any and all lawful actions as expeditiously as possible, with respect to any such agreement as the contracting agency may direct, as a means of enforcing the intent of this section, including, but not limited to, termination of the agreement or concession and institution of court action.

11. EXAMINATION OF RECORDS.

(NOTE.—This provision is applicable if this lease was negotiated without advertising.)

(a) The Lessor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under this lease, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Lessor involving transactions related to this lease.

(b) The Lessor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Comptroller General of the United States or his representatives shall, until the expiration of 3 years after final payment under this lease with the Government, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor involving transactions related to the subcontract.

12. APPLICABLE CODES AND ORDINANCES.

The Lessor, as part of the rental consideration, agrees to comply with all codes and ordinances applicable to the ownership and operation of the building in which the leased space is situated and, at his own expense, to obtain all necessary permits and related items.

13. INSPECTION.

At all times after receipt of Bids, prior to or after acceptance of any Bid or during any construction, remodeling or renovation work, the premises and the building or any parts thereof, upon reasonable and proper notice, shall be accessible for inspection by the Contracting Officer, or by architects, engineers, or other technicians representing him, to determine whether the essential requirements of the solicitation or the lease requirements are met.

14. ECONOMY ACT LIMITATION.

If the rental specified in this lease exceeds $2,000 per annum, the limitation of Section 322 of the Economy Act of 1932, as amended (40 U.S.C. 278a), shall apply.

15. FAILURE IN PERFORMANCE.

In the event of failure by the Lessor to provide any service, utility, maintenance or repairs required under this lease, the Government shall have the right to secure said services, utilities, maintenance or repairs and to deduct the cost thereof from rental payments.

16. LESSOR'S SUCCESSORS.

The terms and provisions of this lease and the conditions herein shall bind the Lessor, and the Lessor's heirs, executors, administrators, successors, and assigns.

## CERTIFICATION

1. CERTIFICATION OF NONSEGREGATED FACILITIES.

(Applicable to (1) contracts, (2) subcontracts, and (3) agreements with applicants who are themselves performing federally assisted construction contracts, exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause.)

By the submission of this bid, the bidder, offeror, applicant, or subcontractor certifies that he does not maintain or provide for his employees any segregated facilities at any of his establishments, and that he does not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. He certifies fur-

Standard Form 2-A
May 1970 Edition

ther that he will not maintain or provide for his employees any segregated facilities at any of his establishments, and that he will not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. The bidder, offeror, applicant, or subcontractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. He further agrees that (except where he has obtained identical certifications from proposed subcontractors for specific time periods) he will obtain identical certifications from proposed subcontractors

prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that he will retain such certifications in his files; and that he will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.

A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

*NOTE.—The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.*

## INSTRUCTIONS

1. Whenever the lease is executed by an attorney, agent, or trustee on behalf of the Lessor, two authenticated copies of his power of attorney, or other evidence to act on behalf of the Lessor, shall accompany the lease.

2. When the Lessor is a partnership, the names of the partners composing the firm shall be stated in the body of the lease. The lease shall be signed with the partnership name, followed by the name of the partner signing the same.

3. Where the Lessor is a corporation, the lease shall be signed with the corporate name, followed by the signature

and title of the officer or other person signing the lease on its behalf, duly attested, and, if requested by the Government evidence of this authority so to act shall be furnished.

4. When deletions or other alterations are made specific notation thereof shall be entered under clause 8 of the lease before signing.

5. If the property leased is located in a State requiring the recording of leases, the Lessor shall comply with all such statutory requirements at Lessor's expense.

3

Standard Form 2-A
May 1970 Edition

GENERAL PROVISIONS, CERTIFICATIONS, AND INSTRUCTIONS (...continued)

17. Gratuities Clause:

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative -

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) the facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under paragraph (a) above, the Government is entitled -

(1) To pursue the same remedies as in breach of the contract; and

(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

18. FEDERAL TORT CLAIMS ACT CLAUSE:

If the death of or injury to any person, or the loss of or damage to any property, is caused by the Government in the course of its use of the facilities described herein, the liability, if any, of the Government therefor shall be determined in accordance with the applicable provisions of the Federal Tort Claims Act (28 U.S.C. 2671-2680).

19. DISPUTES

19.1    This lease is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613) (the Act).

19.2    Except as provided in the Act, all disputes arising under or relating to this lease shall be resolved under this clause.

19.3    "Claim", as used in this clause, means a written demand or written assertion by the Lessor or the Government seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of lease terms, or other relief arising under or relating to this lease. A claim arising under this lease, unlike a claim relating to this lease, is a claim that can be resolved under a lease clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Lessor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph 1.4(2) below. a voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

19.4(1)   A claim by the Lessor shall be made in writing and submitted to the  Commander, Southwest Division Naval Facilities Engineering Command, for a written decision.  A claim by the Government against the Lessor shall be subject to a written decision by the Commander, Southwest Division, Naval Facilities Engineering Command.

19.4(2)(a)   The Lessor shall provide the certification specified in subparagraph 1.4(2)(c) of this clause when submitting any claim--

(A)  Exceeding $100,000; or
(B)  Regardless of the amount claimed, when using--

(1)  Arbitration conducted pursuant to 5 U.S.C. 575-580; or
(2)  Any other alternative means of dispute resolution (ADR) technique that the agency elects to handle in accordance with the Administrative Dispute Resolution Act (ADRA).

19.4(2)(b)   The certification requirement does not apply to issues in controversy that have not been submitted as all or part of a claim.

19.4(2)(c)   The certification shall state as follows:  "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Lessor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Lessor."

19.4(3)   The certification may be executed by any person duly authorized to bind the Lessor with respect to the claim.

19.5   For Lessor claims of $100,000 or less, the Commander, Southwest Division, Naval Facilities Engineering Command, must, if requested in writing by the Lessor, render a decision within 60 days of the request.  For Lessor-certified claims over $100,000, the Commander, Southwest Division Naval Facilities Engineering Command, must, within 60 days, decide the claim or notify the Lessor of the date by which the decision will be made.

19.6   The Commander, Southwest Division  Naval Facilities Engineering Command, decision shall be final unless the Lessor appeals or files a suit as provided in the Act.

19.7   At the time a claim by the Lessor is submitted to the Commander, Southwest Division Naval Facilities Engineering Command or a claim by the Government is presented to the Lessor, the parties, by mutual consent, may agree to use ADR.  When using arbitration conducted pursuant to 5 U.S.C. 575-580, or when using any other ADR technique that the agency elects to handle in accordance with the ADRA, any claim, regardless of amount, shall be accompanied by the certification described in paragraph 19.4(2)(c) of this clause, and executed in accordance with paragraph 19.4(3) of this clause.

19.8   The Government shall pay interest on the amount found due and unpaid by the Government from (1) the date the Commander, Southwest Division Naval Facilities Engineering Command receives the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment.  With regard to claims having defective certifications, as defined in FAR 33.201, interest shall be paid from the date that the Commander, Southwest Division Naval Facilities Engineering Command initially receives the claim.  Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury, as provided in the Act, which is applicable to the period during which the Commander, Southwest Division Naval Facilities Engineering Command receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

19.9   The Lessor shall proceed diligently with the performance of the lease, pending final resolution of any request for relief, claim, appeal, or action arising under the lease, and comply with any decision of the Commander, Southwest Division Naval Facilities Engineering Command.

SPECIAL PROVISIONS

1.  Assignment or transfer.  The Government is aware that the Lessor may assign its interests in accordance with Paragraph 16 of the General Provisions of this lease. The Government may not assign or transfer the lease to another party without the written approval of the Lessor.

2.  Utilities.  Procurement of electricity, gas, steam, telephone and trash removal will be the responsibility of the Government.  Government agrees to obtain needed utility services from any private or municipal supplier who should, during the term of the lease, become able to deliver such services to the leased premises. Lessor shall provide water and sewerage service.  Government agrees to be responsible for the payment of all utility and service charges as billed by the City or utility provider including electricity, gas, water, steam, sewerage and boiler expenses associated with the premises.  If facilities are metered for water, sewerage, gas, steam or electricity, Government shall pay its utility bill as established by the appropriate meter.  For facilities or utilities that are not individually metered, Government shall pay based on the City's prorated engineering estimates of the monthly utility costs. Due to the ongoing utility conversion process, Government has the option to install a utility meter at its sole expense.

3.  Ingress/Egress.  Government will be granted appropriate ingress and egress to leased premises.

4.  Maintenance. The Government shall maintain the demised premises furnished by the Lessor under this lease in good repair and tenantable condition, except in the case of damage arising from the act or negligence of the Lessor.

5.  Improvements/Alternations.  No improvements, structures, or installations shall be constructed on the leased premises, and the leased premises may not be altered by the Government without prior written approval by the City Manager.

6.  Related Council Actions.  By the granting of this lease, neither Lessor nor the Council of the City of San Diego  is obligating itself to any other governmental agent, board, commission, or agency with regard to any other discretionary action relating to development or operation of the premises.  Discretionary action includes but is not limited to rezonings, variances, environmental clearances, or any other governmental agency approvals which may be required for the development and operation of the leased premises.

7.  Quiet Possession.  The Government, paying the consideration and performing the covenants and agreements herein, shall at all times during the term peaceably and quietly have, hold, and enjoy the premises.  If Lessor for any reason cannot deliver possession of the premises to Government at the commencement of the term, or if during the lease term Government is temporarily dispossessed through action or claim of a title superior to Lessor's, then and in either of such events, this lease shall not be voidable nor shall Lessor be liable to the Government for any loss or damage resulting therefrom, but there shall be determined and stated in writing by the City Manager of San Diego a proportionate reduction of the consideration for this lease for the period or periods during which Government is prevented from having the quiet possession of all or a portion of the premises.

8. Surrender of Premises.  At termination of this lease for any  reason, Government shall execute, acknowledge, and deliver to Lessor, within five (5) days after written Lessor demand, a valid and recordable quitclaim deed covering all of the premises. The premises shall be delivered free and clear of all liens and encumbrances and in a decent, safe, and sanitary condition.  If Government fails or refuses to deliver the required deed, Lessor may prepare and record a notice reciting Government's failure to execute this lease provision, and the notice will be conclusive evidence of the termination of this lease and all Government's rights to the premises.

9. Defaults and Remedies.
   a. Default.  In the event that:

   (1) Government shall default in the performance of any covenant or condition required by this lease to be performed by Government and shall.fail to cure said default within thirty (30) days following written notice thereof from Lessor; or if any such default is not curable within thirty (30) days, and Government shall fail to commence to cure the default(s) within said thirty-day period and diligently pursue such cure to completion; then Lessor may, at its option, without further notice or demand upon Government or upon any person claiming rights through Government, immediately terminate this lease and all rights of Government and of all persons claiming rights through Government to the premises or to possession thereof; and Lessor may enter and take possession of the premises.

   b. Abandonment by Government.  Even though Government has breached the lease and abandoned the property, this lease shall continue in effect for so long as Lessor does not terminate this lease, and Lessor may enforce all its rights and remedies hereunder, including but not limited to the right to recover the rent as it becomes due, plus damages.

   c. Waiver.  Any waiver of a default is not a waiver of any other default.  Any waiver of a default must be in writing and be executed by the City Manager in order to constitute a valid and binding waiver.  The Lessor's delay or failure to exercise a remedy or right is not a waiver of that or any other remedy or right under this lease. The use of one remedy or right for any default does not waive the use of another remedy or right for the same default or for another or later default.  The Lessor's acceptance of any rents is not a waiver of any default preceding the rent payment. Lessor and Government specifically agree that the property constituting the premises is City-owned and held in trust for the benefit of the citizens of the City of San Diego and that any failure by the City Manager or City staff to discover a default or take prompt action to require the cure of any default shall not result in an equitable estoppel, but the Lessor shall at all times, have the legal right to require the cure of any default when and as such defaults are discovered or when and as the City Council directs the City Manager to take action or require the cure of any default after such default is brought to the attention of the City Council by the City Manager or by any concerned citizen.

10. Easements and Reservations.

a.  Lessor hereby reserves all rights, title, and interest in any and all subsurface natural gas, oil, minerals, and water on or within the premises.

b.  Lessor reserves the right to grant and use easements or to establish and use rights-of-way over, under, along, and across the leased premises for utilities, thoroughfares, or access as it deems advisable for the public good.

c.  Lessor has the right to enter the premises for the purpose of making repairs to or developing municipal resources and services.  However, Lessor shall not unreasonably or substantially interfere with the Government's use of the premises and will reimburse the Government for physical damages, if any, to the permanent improvements located on the leased premises resulting from the Lessor exercising the rights reserved in this section.  Such reimbursement may include a reduction in the rent proportionate to the amount of physical damage as determined by the Lessor.  Lessor will pay the costs of maintenance and repair of all Lessor installations made pursuant to these reserved rights.

d.  Entry/Inspection.  City shall reserve the right to enter the leased premises, but only after obtaining express permission from the Government, not to be unreasonably withheld, for the purpose of viewing and ascertaining the condition of the same, or to protect its interests in the leased premises as necessary to implement reuse of the leased premises in accordance with the City of San Diego's Naval Training Center San Diego Reuse Plan, dated October 1998.

11.  Acceptance of Premises.  By signing this lease, the Government represents and warrants that it has independently inspected the premises and made all tests, investigations, and observations necessary to satisfy itself of the condition of the premises.  The Government agrees it is relying solely on such independent inspection, tests, investigations, and observations in making this lease.  The Government further acknowledges that the premises are in the condition called for by this lease, that the Lessor has performed all work with respect to the premises, and that the Government does not hold the Lessor responsible for any defects whether apparent or latent, in the premises, including the presence of any hazardous wastes.

12.  Unavoidable Delay.  If the performance of any act required of the Lessor or the Government is directly prevented or delayed by reason of strikes, lockouts, labor disputes, unusual governmental delays, acts of God, fire, floods, epidemics, freight embargoes, or other causes beyond the reasonable control of the party required to perform an act, said party shall be excused from performing that act for the period equal to the period of the prevention or delay.  In the event Government or Lessor claims the existence of such a delay, the party claiming the delay shall notify the other party in writing of such fact within ten (10) days after the beginning of any such claimed delay.

13.  Hazardous/Toxic Waste.  The Government will not allow the installation of additional underground storage tanks or release of hazardous substances in, on, under, or from the premises.  For the purposes of this provision, a release shall include but not be limited to any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leeching, dumping, or otherwise disposing of hazardous substances.  "Hazardous substances" shall have the same meaning as in 42 U.S.C. Section 9601 (14).

14. Asbestos Disclosure. Lessor discloses to Government that portions of the structural components of the leased premises may contain asbestos. Government acknowledges having received notice from Lessor of the presence of such asbestos in accordance with California Health and Safety Code Section 25915.

15. If Government knows or has reasonable cause to believe that any hazardous substance has been released on or beneath the premises, Government shall give written notice to the Lessor Manager within ten (10) days of receipt of such knowledge or cause for belief. Provided, however, if Government knows or has reasonable cause to believe that such substance is an imminent and substantial danger to public health and safety, Government shall notify the Lessor Manager immediately upon receipt of this knowledge or belief and shall take all actions necessary to alleviate such danger. Government will notify the Lessor Manager immediately of any notice of violation received or initiation of environmental actions or private suits relative to the premises. In addition, Government and Government's sublessees shall not utilize or sell any hazardous substance on the property without the prior written consent of Lessor.

16. Notices. Any notice required or permitted to be given hereunder shall be in writing and may be served personally or by United States mail, postage prepaid and addressed in writing to the Government or to Lessor as follows:

    If to the Government:
    Southwest Division Naval Facilities Engineering Command
    Real Estate Contracting Officer
    1220 Pacific Highway
    San Diego, CA 92132-5190

    If to the Lessor:
    City Manager
    Attention Real Estate Assets Director
    City Administration Building
    202 "C" Street, M.S. 9B
    San Diego, CA 92101-4155

or to any mortgagee, trustee, or beneficiary, as applicable, at such appropriate address designated in writing by the respective party. Any party entitled or required to receive notice under this lease may by like notice designate a different address to which notices shall be sent.

17. Lessor Approval. The approval or consent of Lessor, wherever required in this lease, shall mean the written approval or consent of the City Manager unless otherwise specified, without need for further resolution by the City Council.

18. Nondiscrimination. Government agrees not to discriminate in any manner against any person or persons on account of race, color, religion, gender, sexual orientation, medical status, national origin, age, marital status, or physical disability in Government's use of the premises.

19. Partial Invalidity.  If any term, covenant, condition, or provision of this lease is found invalid, void, or unenforceable by a court of competent jurisdiction, the remaining provisions will remain in full force and effect.

20. Number and Gender.  Words of any gender used in this lease shall include any other gender, and words in the singular number shall include the plural, when the tense requires.

21. Captions.  The Lease Outline, section headings, and captions for various articles and paragraphs shall not be held to define, limit, augment, or describe the scope, content, or intent of any or all parts of this lease.  The numbers of the paragraphs and pages of this lease may not be consecutive.  Such lack of consecutive numbers is intentional and shall have no effect on the enforceability of this lease.

22. Entire Understanding.  This lease contains the entire understanding of the parties.  Government, by signing this agreement, agrees that there is no other written or oral understanding between the parties with respect to the leased premises.  Each party has relied on its own examination of the premises, advice from its own attorneys, and the warranties, representations, and covenants of the lease itself.  Each of the parties in this lease agrees that no other party, agent, or attorney of any other party has made any promise, representation, or warranty whatsoever which is not contained in this lease.  The failure or refusal of any party to read the lease or other documents, inspect the premises, and obtain legal or other advice relevant to this transaction constitutes a waiver of any objection, contention, or claim that might have been based on these actions.  No modification, amendment, or alteration of this lease will be valid unless it is in writing and signed by all parties.

23. City Employee Participation Policy.  It is the policy of Lessor that all Lessor contracts, agreements, or leases with consultants, vendors, or Governments shall include a condition that the contract, agreement, or lease may, at the sole option of Lessor, be unilaterally and immediately terminated by Lessor if the contractor or Government employs an individual who, within the twelve months immediately preceding such employment, did in his/her capacity as a City officer or employee participate in negotiations with or otherwise have an influence on the recommendation made to the City Council in connection with the selection of the contractor or Government.  It is not the intent of this policy that these provisions apply to members of the City Council.

24. Standard of Employees.  Government and its employees shall at all times conduct themselves and the operations on the leased premises in a creditable manner.

25. Relocation Payments.  Government understands and agrees that it shall not be entitled to any relocation payment whatsoever upon termination of this lease.



Detail Map

Vicinity Map

| | |
|---|---|
| Southwest Division<br>Naval Facilities Engineering Command | |
| Former Naval Training Center, San Diego, CA | |
| EXHIBIT "A" | |
| | Page 1 of 1 |

| STANDARD FORM 2 FEBRUARY 1965 EDITION GENERAL SERVICES ADMINISTRATION FPR (41 CFR) 1-16.601 | U.S. GOVERNMENT LEASE FOR REAL PROPERTY |
|---|---|

| DATE OF LEASE | LEASE NO.  N68711-00-RP00A49 |
|---|---|

THIS LEASE, made and entered into this date by and between the City of San Diego, a municipal corporation, and whose interest in the property hereinafter described is that of  OWNER, and  hereinafter called the Lessor, and the UNITED STATES OF AMERICA, hereinafter called the Government:

   WITNESSETH: The parties hereto for the considerations hereinafter mentioned, covenant and agree as follows:

1.  The Lessor hereby leases to the Government, all of that certain real property situated in the City of San Diego, County of San Diego, State of California, described in Exhibit "A", attached hereto and by this reference made a part of this agreement.  Said real property is hereinafter called the "premises" or "leased premises" and is described as follows:

Housing Unit C

2.  To be used for housing and other related and incidental purposes.

3.  TO HAVE AND TO HOLD the said premises with their appurtenances on a month to month basis, beginning on May 16, 2000 subject to termination requirements and rights as may be hereinafter set forth.

4.  The Government shall pay to the Lessor rent at the rate of $312.50, payable monthly and in advance, exclusive of utility charges which are specifically set forth in paragraph 2 of the Special Provisions included herein.  Rent checks shall be annotated as follows, "For NTC Quarters C", and made payable to:

City Treasurer

And mailed to the following address:

Office of the City Treasurer
City of San Diego
PO Box 2289
San Diego, CA 92112-4165

5.  The Government may terminate this lease, at any time, for any reason and by giving at least thirty (30) days' notice in writing to the Lessor and no consideration shall accrue after the effective date of termination.

6. The Lessor may terminate this lease by giving at least six (6) months' notice in writing to the Government except in the event that a regulatory agency having jurisdiction over the matter determines that the premises are unsafe or otherwise uninhabitable.  In that event, the Lessor may terminate by giving at least thirty (30) day's notice in writing to the Government.

7.  It is understood and agreed that the Government will assign the demised premises to military personnel in accordance with Executive Order No. 11063, dated November 20, 1962 which provides that housing and related facilities shall be available without discrimination because of race, color, creed, or national origin.

AA  17  00007035  2506  0252  15811  0  068711  2A  470446  AA000RP00A49 = $1,875.00

8.  Lessor expressly covenants that the consideration stipulated in paragraph 4 above and paragraph 2 of the Special Provisions of this lease constitutes the entire consideration for the lease and that the Lessor has not and will not enter into any separate agreement with the occupant of the leased premises for any financial obligation of one to the other arising out of occupancy of the premises hereunder.

9.  The total maximum annual expenditure by the Government hereunder, including rental and the cost of utilities, maintenance, services and operation, whether obtained by the Government through this lease or independent of this lease may not exceed the statutory ceiling established for each year of this lease or any renewal thereof, by the Congress of the United States.

10.  The following are attached and made a part hereof:

General  Provisions, Certification and Instructions (Standard Form 2-A, May 1970 edition) paragraphs 1 through 16, and Additional Paragraphs 17 through 19;
Special  Provisions 1 through 25,
Exhibit  A, Description of Premises

11.  The following changes were made in this lease prior to its execution: Paragraphs 2, 5, and 14 of the General Provisions, Certification and Instructions have been deleted.

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first above written.

LESSOR

BY  _A. Neil Goldberg_                          _City Planner_
       (Signature/Title)                                (Signature/Title)

UNITED STATES OF AMERICA

BY  _Karen P. Ringel_                          KAREN P. RINGEL
       (Signature)                                      Real Estate Contracting Officer
                                                              (Official Title)

# GENERAL PROVISIONS, CERTIFICATION AND INSTRUCTIONS
## U.S. Government Lease for Real Property

## GENERAL PROVISIONS

### 1. SUBLETTING THE PREMISES.

The Government may sublet any part of the premises but shall not be relieved from any obligations under this lease by reason of any such subletting.

### 2. MAINTENANCE OF PREMISES.

The Lessor shall maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, furnished by the Lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees. For the purpose of so maintaining said premises and property, the Lessor may at reasonable times, and with the approval of the authorized Government representative in charge, enter and inspect the same and make any necessary repairs thereto.

### 3. DAMAGE BY FIRE OR OTHER CASUALTY.

If the said premises be destroyed by fire or other casualty this lease shall immediately terminate. In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease by giving written notice to the Lessor within fifteen (15) days thereafter; if so terminated no rent shall accrue to the Lessor after such partial destruction or damage; and if not so terminated the rent shall be reduced proportionately by supplemental agreement hereto effective from the date of such partial destruction or damage.

### 4. ALTERATIONS.

The Government shall have the right during the existence of this lease to make alterations, attach fixtures and erect additions, structures or signs in or upon the premises hereby leased, which fixtures, additions or structures so placed in, upon or attached to the said premises shall be and remain the property of the Government and may be removed or otherwise disposed of by the Government.

### 5. CONDITION REPORT.

A joint physical survey and inspection report of the demised premises shall be made as of the effective date of this lease, reflecting the then present condition, and will be signed on behalf of the parties hereto.

### 6. COVENANT AGAINST CONTINGENT FEES.

The Lessor warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessor for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul this lease without liability or in its discretion to deduct from the rental price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee. (Liberty for rent, in accordance with general business practice, and who have not obtained such licenses for the sole purpose of effecting this lease, may be considered as bona fide employees or agencies within the exception contained in this clause.)

### 7. OFFICIALS NOT TO BENEFIT.

No Member of or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this lease contract, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this lease contract if made with a corporation for its general benefit.

### 8. ASSIGNMENT OF CLAIMS.

Pursuant to the provisions of the Assignment of Claims Act of 1940, as amended (31 U.S.C. 203, 41 U.S.C. 15), if this lease provides for payments aggregating $1,000 or more, claims for monies due or to become due the Lessor from the Government under this contract may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency, and may thereafter be further assigned or reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this contract and not already paid, and shall not be made to more than one party, except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. Notwithstanding any provisions of this contract, payments to an assignee of any monies due or to become due under this contract shall not, to the extent provided in said Act, as amended, be subject to reduction or set-off.

### 9. EQUAL OPPORTUNITY CLAUSE.

(The following clause is applicable unless this contract is exempt under the rules, regulations, and relevant orders of the Secretary of Labor (41 CFR, ch. 60).)

During the performance of this contract, the Contractor agrees as follows:

(a) The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this Equal Opportunity clause.

(b) The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(c) The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency Contracting Officer, advising the labor union or workers' representative of the Contractor's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d) The Contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(e) The Contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting

1

agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(f) In the event of the Contractor's noncompliance with the Equal Opportunity clause of this contract or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended, in whole or in part, and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(g) The Contractor will include the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for noncompliance: *Provided, however,* That in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

10. FACILITIES NONDISCRIMINATION.

(a) As used in this section, the term "facility" means stores, shops, restaurants, cafeterias, restrooms, and any other facility of a public nature in the building in which the space covered by this lease is located.

(b) The Lessor agrees that he will not discriminate by segregation or otherwise against any person or persons because of race, color, religion, sex, or national origin in furnishing, or by refusing to furnish, to such person or persons the use of any facility, including any and all services, privileges, accommodations, and activities provided thereby. Nothing herein shall require the furnishing to the general public of the use of any facility customarily furnished by the Lessor solely to tenants, their employees, customers, patients, clients, guests and invitees.

(c) It is agreed that the Lessor's noncompliance with the provisions of this section shall constitute a material breach of this lease. In the event of such noncompliance, the Government may take appropriate action to enforce compliance, may terminate this lease, or may pursue such other remedies as may be provided by law. In the event of termination, the Lessor shall be liable for all excess costs of the Government in acquiring substitute space, including but not limited to the cost of moving to such space. Substitute space shall be obtained in as close proximity to the Lessor's building as is feasible and moving costs will be limited to the actual expenses thereof as incurred.

(d) It is further agreed that from and after the date hereof the Lessor will, at such time as any agreement is to be entered into or a concession is to be permitted to operate, include or require the inclusion of the foregoing provisions of this section in every such agreement or concession pursuant to which any person other than the Lessor operates or has the right to operate any facility. Nothing herein contained, however, shall be deemed to require the Lessor to include or require the inclusion of the foregoing provisions of

this section in any existing agreement or concession arrangement or one in which the contracting party other than the Lessor has the unilateral right to renew or extend the agreement or arrangement, until the expiration of the existing agreement or arrangement and the unilateral right to renew or extend. The Lessor also agrees that it will take any and all lawful actions as expeditiously as possible, with respect to any such agreement as the contracting agency may direct, as a means of enforcing the intent of this section, including, but not limited to, termination of the agreement or concession and institution of court action.

11. EXAMINATION OF RECORDS.

(NOTE.—This provision is applicable if this lease was negotiated without advertising.)

(a) The Lessor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under this lease, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Lessor involving transactions related to this lease.

(b) The Lessor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Comptroller General of the United States or his representatives shall, until the expiration of 3 years after final payment under this lease with the Government, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor involving transactions related to the subcontract.

12. APPLICABLE CODES AND ORDINANCES.

The Lessor, as part of the rental consideration, agrees to comply with all codes and ordinances applicable to the ownership and operation of the building in which the leased space is situated and, at his own expense, to obtain all necessary permits and related items.

13. INSPECTION.

At all times after receipt of Bids, prior to or after acceptance of any Bid or during any construction, remodeling or renovation work, the premises and the building or any parts thereof, upon reasonable and proper notice, shall be accessible for inspection by the Contracting Officer, or by architects, engineers, or other technicians representing him, to determine whether the essential requirements of the solicitation or the lease requirements are met.

14. ECONOMY ACT LIMITATION.

If the rental specified in this lease exceeds $2,000 per annum, the limitation of Section 322 of the Economy Act of 1932, as amended (40 U.S.C. 278a), shall apply.

15. FAILURE IN PERFORMANCE.

In the event of failure by the Lessor to provide any service, utility, maintenance or repairs required under this lease, the Government shall have the right to secure said services, utilities, maintenance or repairs and to deduct the cost thereof from rental payments.

16. LESSOR'S SUCCESSORS.

The terms and provisions of this lease and the conditions herein shall bind the Lessor, and the Lessor's heirs, executors, administrators, successors, and assigns.

## CERTIFICATION

1. CERTIFICATION OF NONSEGREGATED FACILITIES.

(Applicable to (1) contracts, (2) subcontracts, and (3) agreements with applicants who are themselves performing federally assisted construction contracts, exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause.)

By the submission of this bid, the bidder, offeror, applicant, or subcontractor certifies that he does not maintain or provide for his employees any segregated facilities at any of his establishments, and that he does not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. He certifies fur-

2

ther that he will not maintain or provide for his employees any segregated facilities at any of his establishments, and that he will not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. The bidder, offeror, applicant, or subcontractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. He further agrees that (except where he has obtained identical certifications from proposed subcontractors for specific time periods) he will obtain identical certifications from proposed subcontractors

prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that he will retain such certifications in his files; and that he will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.

A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

*NOTE.—The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.*

## INSTRUCTIONS

1. Whenever the lease is executed by an attorney, agent, or trustee on behalf of the Lessor, two authenticated copies of his power of attorney, or other evidence to act on behalf of the Lessor, shall accompany the lease.

2. When the Lessor is a partnership, the names of the partners composing the firm shall be stated in the body of the lease. The lease shall be signed with the partnership name, followed by the name of the partner signing the same.

3. Where the Lessor is a corporation, the lease shall be signed with the corporate name, followed by the signature

and title of the officer or other person signing the lease on its behalf, duly attested, and, if requested by the Government evidence of this authority so to act shall be furnished.

4. When deletions or other alterations are made specific notation thereof shall be entered under clause 8 of the lease before signing.

5. If the property leased is located in a State requiring the recording of leases, the Lessor shall comply with all such statutory requirements at Lessor's expense.

3

Standard Form 2–A
May 1970 Edition

## GENERAL PROVISIONS, CERTIFICATIONS, AND INSTRUCTIONS (...continued)

17. Gratuities Clause:

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative -

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) the facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under paragraph (a) above, the Government is entitled -

(1) To pursue the same remedies as in breach of the contract; and

(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee.  (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

18. FEDERAL TORT CLAIMS ACT CLAUSE:

If the death of or injury to any person, or the loss of or damage to any property, is caused by the Government in  the course of its use of the facilities described herein; the liability, if any, of the Government therefor shall be determined in accordance with the applicable provisions of the Federal Tort Claims Act (28 U.S.C. 2671-2680).

19.  DISPUTES

19.1    This lease is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613) (the Act).

19.2    Except as provided in the Act, all disputes arising under or relating to this lease shall be resolved under this clause.

19.3   "Claim", as used in this clause, means a written demand or written assertion by the Lessor or the Government seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of lease terms, or other relief arising under or relating to this lease.  A claim arising under this lease, unlike a claim relating to this lease, is a claim that can be resolved under a lease clause that provides for the relief sought by the claimant.  However, a written demand or written assertion by the Lessor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph 1.4(2) below.  a voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act.  The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

19.4(1)   A claim by the Lessor shall be made in writing and submitted to the  Commander, Southwest Division Naval Facilities Engineering Command, for a written decision.  A claim by the Government against the Lessor shall be subject to a written decision by the Commander, Southwest Division, Naval Facilities Engineering Command.

19.4(2)(a)   The Lessor shall provide the certification specified in subparagraph 1.4(2)(c) of this clause when submitting any claim--

   (A)  Exceeding $100,000; or
   (B)  Regardless of the amount claimed, when using--

      (1)  Arbitration conducted pursuant to 5 U.S.C. 575-580; or
      (2)  Any other alternative means of dispute resolution (ADR) technique
          that the agency elects to handle in accordance with the Administrative
          Dispute Resolution Act (ADRA).

19.4(2)(b)   The certification requirement does not apply to issues in controversy that have not been submitted as all or part of a claim.

19.4(2)(c)   The certification shall state as follows:  "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Lessor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Lessor."

19.4(3)   The certification may be executed by any person duly authorized to bind the Lessor with respect to the claim.

19.5   For Lessor claims of $100,000 or less, the Commander, Southwest Division, Naval Facilities Engineering Command, must, if requested in writing by the Lessor, render a decision within 60 days of the request.  For Lessor-certified claims over $100,000, the Commander, Southwest Division Naval Facilities Engineering Command, must, within 60 days, decide the claim or notify the Lessor of the date by which the decision will be made.

19.6   The Commander, Southwest Division  Naval Facilities Engineering Command, decision shall be final unless the Lessor appeals or files a suit as provided in the Act.

19.7   At the time a claim by the Lessor is submitted to the Commander, Southwest Division Naval Facilities Engineering Command or a claim by the Government is presented to the Lessor, the parties, by mutual consent, may agree to use ADR.  When using arbitration conducted pursuant to 5 U.S.C. 575-580, or when using any other ADR technique that the agency elects to handle in accordance with the ADRA, any claim, regardless of amount, shall be accompanied by the certification described in paragraph 19.4(2)(c) of this clause, and executed in accordance with paragraph 19.4(3) of this clause.

19.8   The Government shall pay interest on the amount found due and unpaid by the Government from (1) the date the Commander, Southwest Division Naval Facilities Engineering Command receives the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment.  With regard to claims having defective certifications, as defined in FAR 33.201, interest shall be paid from the date that the Commander, Southwest Division Naval Facilities Engineering Command initially receives the claim.  Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury, as provided in the Act, which is applicable to the period during which the Commander, Southwest Division Naval Facilities Engineering Command receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

19.9   The Lessor shall proceed diligently with the performance of the lease, pending final resolution of any request for relief, claim, appeal, or action arising under the lease, and comply with any decision of the Commander, Southwest Division Naval Facilities Engineering Command.

SPECIAL PROVISIONS

1.  Assignment or transfer.  The Government is aware that the Lessor may assign its interests in accordance with Paragraph 16 of the General Provisions of this lease. The Government may not assign or transfer the lease to another party without the written approval of the Lessor.

2.  Utilities.  Procurement of electricity, gas, steam, telephone and trash removal will be the responsibility of the Government.  Government agrees to obtain needed utility services from any private or municipal supplier who should, during the term of the lease, become able to deliver such services to the leased premises. Lessor shall provide water and sewerage service.  Government agrees to be responsible for the payment of all utility and service charges as billed by the City or utility provider including electricity, gas, water, steam, sewerage and boiler expenses associated with the premises.  If facilities are metered for water, sewerage, gas, steam or electricity, Government shall pay its utility bill as established by the appropriate meter.  For facilities or utilities that are not individually metered, Government shall pay based on the City's prorated engineering estimates of the monthly utility costs. Due to the ongoing utility conversion process, Government has the option to install a utility meter at its sole expense.

3.  Ingress/Egress.  Government will be granted appropriate ingress and egress to leased premises.

4.  Maintenance. The Government shall maintain the demised premises furnished by the Lessor under this lease in good repair and tenantable condition, except in the case of damage arising from the act or negligence of the Lessor.

5.  Improvements/Alternations.  No improvements, structures, or installations shall be constructed on the leased premises, and the leased premises may not be altered by the Government without prior written approval by the City Manager.

6.  Related Council Actions.  By the granting of this lease, neither Lessor nor the Council of the City of San Diego  is obligating itself to any other governmental agent, board, commission, or agency with regard to any other discretionary action relating to development or operation of the premises.  Discretionary action includes but is not limited to rezonings, variances, environmental clearances, or any other governmental agency approvals which may be required for the development and operation of the leased premises.

7.  Quiet Possession.  The Government, paying the consideration and performing the covenants and agreements herein, shall at all times during the term peaceably and quietly have, hold, and enjoy the premises.  If Lessor for any reason cannot deliver possession of the premises to Government at the commencement of the term, or if during the lease term Government is temporarily dispossessed through action or claim of a title superior to Lessor's, then and in either of such events, this lease shall not be voidable nor shall Lessor be liable to the Government for any loss or damage resulting therefrom, but there shall be determined and stated in writing by the City Manager of San Diego a proportionate reduction of the consideration for this lease for the period or periods during which Government is prevented from having the quiet possession of all or a portion of the premises.

8. Surrender of Premises. At termination of this lease for any reason, Government shall execute, acknowledge, and deliver to Lessor, within five (5) days after written Lessor demand, a valid and recordable quitclaim deed covering all of the premises. The premises shall be delivered free and clear of all liens and encumbrances and in a decent, safe, and sanitary condition. If Government fails or refuses to deliver the required deed, Lessor may prepare and record a notice reciting Government's failure to execute this lease provision, and the notice will be conclusive evidence of the termination of this lease and all Government's rights to the premises.

9. Defaults and Remedies.
   a. Default. In the event that:

   (1) Government shall default in the performance of any covenant or condition required by this lease to be performed by Government and shall fail to cure said default within thirty (30) days following written notice thereof from Lessor; or if any such default is not curable within thirty (30) days, and Government shall fail to commence to cure the default(s) within said thirty-day period and diligently pursue such cure to completion; then Lessor may, at its option, without further notice or demand upon Government or upon any person claiming rights through Government, immediately terminate this lease and all rights of Government and of all persons claiming rights through Government to the premises or to possession thereof; and Lessor may enter and take possession of the premises.

   b. Abandonment by Government. Even though Government has breached the lease and abandoned the property, this lease shall continue in effect for so long as Lessor does not terminate this lease, and Lessor may enforce all its rights and remedies hereunder, including but not limited to the right to recover the rent as it becomes due, plus damages.

   c. Waiver. Any waiver of a default is not a waiver of any other default. Any waiver of a default must be in writing and be executed by the City Manager in order to constitute a valid and binding waiver. The Lessor's delay or failure to exercise a remedy or right is not a waiver of that or any other remedy or right under this lease. The use of one remedy or right for any default does not waive the use of another remedy or right for the same default or for another or later default. The Lessor's acceptance of any rents is not a waiver of any default preceding the rent payment. Lessor and Government specifically agree that the property constituting the premises is City-owned and held in trust for the benefit of the citizens of the City of San Diego and that any failure by the City Manager or City staff to discover a default or take prompt action to require the cure of any default shall not result in an equitable estoppel, but the Lessor shall at all times, have the legal right to require the cure of any default when and as such defaults are discovered or when and as the City Council directs the City Manager to take action or require the cure of any default after such default is brought to the attention of the City Council by the City Manager or by any concerned citizen.

10. Easements and Reservations.

a. Lessor hereby reserves all rights, title, and interest in any and all subsurface natural gas, oil, minerals, and water on or within the premises.

b. Lessor reserves the right to grant and use easements or to establish and use rights-of-way over, under, along, and across the leased premises for utilities, thoroughfares, or access as it deems advisable for the public good.

c. Lessor has the right to enter the premises for the purpose of making repairs to or developing municipal resources and services. However, Lessor shall not unreasonably or substantially interfere with the Government's use of the premises and will reimburse the Government for physical damages, if any, to the permanent improvements located on the leased premises resulting from the Lessor exercising the rights reserved in this section. Such reimbursement may include a reduction in the rent proportionate to the amount of physical damage as determined by the Lessor. Lessor will pay the costs of maintenance and repair of all Lessor installations made pursuant to these reserved rights.

d. Entry/Inspection. City shall reserve the right to enter the leased premises, but only after obtaining express permission from the Government, not to be unreasonably withheld, for the purpose of viewing and ascertaining the condition of the same, or to protect its interests in the leased premises as necessary to implement reuse of the leased premises in accordance with the City of San Diego's Naval Training Center San Diego Reuse Plan, dated October 1998.

11. Acceptance of Premises. By signing this lease, the Government represents and warrants that it has independently inspected the premises and made all tests, investigations, and observations necessary to satisfy itself of the condition of the premises. The Government agrees it is relying solely on such independent inspection, tests, investigations, and observations in making this lease. The Government further acknowledges that the premises are in the condition called for by this lease, that the Lessor has performed all work with respect to the premises, and that the Government does not hold the Lessor responsible for any defects whether apparent or latent, in the premises, including the presence of any hazardous wastes.

12. Unavoidable Delay. If the performance of any act required of the Lessor or the Government is directly prevented or delayed by reason of strikes, lockouts, labor disputes, unusual governmental delays, acts of God, fire, floods, epidemics, freight embargos, or other causes beyond the reasonable control of the party required to perform an act, said party shall be excused from performing that act for the period equal to the period of the prevention or delay. In the event Government or Lessor claims the existence of such a delay, the party claiming the delay shall notify the other party in writing of such fact within ten (10) days after the beginning of any such claimed delay.

13. Hazardous/Toxic Waste. The Government will not allow the installation of additional underground storage tanks or release of hazardous substances in, on, under, or from the premises. For the purposes of this provision, a release shall include but not be limited to any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leeching, dumping, or otherwise disposing of hazardous substances. "Hazardous substances" shall have the same meaning as in 42 U.S.C. Section 9601 (14).

14. Asbestos Disclosure. Lessor discloses to Government that portions of the structural components of the leased premises may contain asbestos. Government acknowledges having received notice from Lessor of the presence of such asbestos in accordance with California Health and Safety Code Section 25915.

15. If Government knows or has reasonable cause to believe that any hazardous substance has been released on or beneath the premises, Government shall give written notice to the Lessor Manager within ten (10) days of receipt of such knowledge or cause for belief. Provided, however, if Government knows or has reasonable cause to believe that such substance is an imminent and substantial danger to public health and safety, Government shall notify the Lessor Manager immediately upon receipt of this knowledge or belief and shall take all actions necessary to alleviate such danger. Government will notify the Lessor Manager immediately of any notice of violation received or initiation of environmental actions or private suits relative to the premises. In addition, Government and Government's sublessees shall not utilize or sell any hazardous substance on the property without the prior written consent of Lessor.

16. Notices. Any notice required or permitted to be given hereunder shall be in writing and may be served personally or by United States mail, postage prepaid and addressed in writing to the Government or to Lessor as follows:

> If to the Government:
> Southwest Division Naval Facilities Engineering Command
> Real Estate Contracting Officer
> 1220 Pacific Highway
> San Diego, CA 92132-5190

> If to the Lessor:
> City Manager
> Attention Real Estate Assets Director
> City Administration Building
> 202 "C" Street, M.S. 9B
> San Diego, CA 92101-4155

or to any mortgagee, trustee, or beneficiary, as applicable, at such appropriate address designated in writing by the respective party. Any party entitled or required to receive notice under this lease may by like notice designate a different address to which notices shall be sent.

17. Lessor Approval. The approval or consent of Lessor, wherever required in this lease, shall mean the written approval or consent of the City Manager unless otherwise specified, without need for further resolution by the City Council.

18. Nondiscrimination. Government agrees not to discriminate in any manner against any person or persons on account of race, color, religion, gender, sexual orientation, medical status, national origin, age, marital status, or physical disability in Government's use of the premises.

19. Partial Invalidity.  If any term, covenant, condition, or provision of this lease is found invalid, void, or unenforceable by a court of competent jurisdiction, the remaining provisions will remain in full force and effect.

20. Number and Gender.  Words of any gender used in this lease shall include any other gender, and words in the singular number shall include the plural, when the tense requires.

21. Captions.  The Lease Outline, section headings, and captions for various articles and paragraphs shall not be held to define, limit, augment, or describe the scope, content, or intent of any or all parts of this lease.  The numbers of the paragraphs and pages of this lease may not be consecutive.  Such lack of consecutive numbers is intentional and shall have no effect on the enforceability of this lease.

22. Entire Understanding.  This lease contains the entire understanding of the parties. Government, by signing this agreement, agrees that there is no other written or oral understanding between the parties with respect to the leased premises.  Each party has relied on its own examination of the premises, advice from its own attorneys, and the warranties, representations, and covenants of the lease itself.  Each of the parties in this lease agrees that no other party, agent, or attorney of any other party has made any promise, representation, or warranty whatsoever which is not contained in this lease.  The failure or refusal of any party to read the lease or other documents, inspect the premises, and obtain legal or other advice relevant to this transaction constitutes a waiver of any objection, contention, or claim that might have been based on these actions.  No modification, amendment, or alteration of this lease will be valid unless it is in writing and signed by all parties.

23. City Employee Participation Policy.  It is the policy of Lessor that all Lessor contracts, agreements, or leases with consultants, vendors, or Governments shall include a condition that the contract, agreement, or lease may, at the sole option of Lessor, be unilaterally and immediately terminated by Lessor if the contractor or Government employs an individual who, within the twelve months immediately preceding such employment, did in his/her capacity as a City officer or employee participate in negotiations with or otherwise have an influence on the recommendation made to the City Council in connection with the selection of the contractor or Government.  It is not the intent of this policy that these provisions apply to members of the City Council.

24. Standard of Employees.  Government and its employees shall at all times conduct themselves and the operations on the leased premises in a creditable manner.

25. Relocation Payments.  Government understands and agrees that it shall not be entitled to any relocation payment whatsoever upon termination of this lease.



Detail Map

Vicinity Map

| Southwest Division |
| Naval Facilities Engineering Command |
| Former Naval Training Center, San Diego, CA |
| EXHIBIT "A" |
| Page 1 of 1 |

| STANDARD FORM 2<br>FEBRUARY 1965 EDITION<br>GENERAL SERVICES<br>ADMINISTRATION<br>FPR (41 CFR) 1-16.601 | U.S. GOVERNMENT<br>LEASE FOR REAL PROPERTY |
|---|---|

| DATE OF LEASE | LEASE NO.  N68711-00-RP00A50 |
|---|---|

THIS LEASE, made and entered into this date by and between the City of San Diego, a municipal corporation, and whose interest in the property hereinafter described is that of  OWNER, and  hereinafter called the Lessor, and the UNITED STATES OF AMERICA, hereinafter called the Government:

WITNESSETH: The parties hereto for the considerations hereinafter mentioned, covenant and agree as follows:

1. The Lessor hereby leases to the Government, all of that certain real property situated in the City of San Diego, County of San Diego, State of California, described in Exhibit "A", attached hereto and by this reference made a part of this agreement.  Said real property is hereinafter called the "premises" or "leased premises" and is described as follows:

Housing Unit D

2. To be used for housing and other related and incidental purposes.

3. TO HAVE AND TO HOLD the said premises with their appurtenances on a month to month basis, beginning on May 16, 2000 subject to termination requirements and rights as may be hereinafter set forth.

4. The Government shall pay to the Lessor rent at the rate of $312.50, payable monthly and in advance, exclusive of utility charges which are specifically set forth in paragraph 2 of the Special Provisions included herein.  Rent checks shall be annotated as follows, "For NTC Quarters D", and made payable to:

City Treasurer

And mailed to the following address:

Office of the City Treasurer
City of San Diego
PO Box 2289
San Diego, CA 92112-4165

5. The Government may terminate this lease, at any time, for any reason and by giving at least thirty (30) days' notice in writing to the Lessor and no consideration shall accrue after the effective date of termination.

6. The Lessor may terminate this lease by giving at least six (6) months' notice in writing to the Government except in the event that a regulatory agency having jurisdiction over the matter determines that the premises are unsafe or otherwise uninhabitable.  In that event, the Lessor may terminate by giving at least thirty (30) day's notice in writing to the Government.

7. It is understood and agreed that the Government will assign the demised premises to military personnel in accordance with Executive Order No. 11063, dated November 20, 1962 which provides that housing and related facilities shall be available without discrimination because of race, color, creed, or national origin.

AA  17  00007035  2506  0252  15811  0  068711  2A  470447  AA000RP00A50 = $3,750.00

8. Lessor expressly covenants that the consideration stipulated in paragraph 4 above and paragraph 2 of the Special Provisions of this lease constitutes the entire consideration for the lease and that the Lessor has not and will not enter into any separate agreement with the occupant of the leased premises for any financial obligation of one to the other arising out of occupancy of the premises hereunder.

9. The total maximum annual expenditure by the Government hereunder, including rental and the cost of utilities, maintenance, services and operation, whether obtained by the Government through this lease or independent of this lease may not exceed the statutory ceiling established for each year of this lease or any renewal thereof, by the Congress of the United States.

10. The following are attached and made a part hereof:

  General  Provisions, Certification and Instructions (Standard Form 2-A, May 1970 edition) paragraphs 1 through 16, and Additional Paragraphs 17 through 19;
  Special  Provisions 1 through 25,
  Exhibit  A, Description of Premises

11. The following changes were made in this lease prior to its execution: Paragraphs 2, 5, and 14 of the General Provisions, Certification and Instructions have been deleted.

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first above written.

LESSOR

BY    *A. Neil Goldberg*                    *City Planner*
      (Signature/Title)                      (Signature/Title)

UNITED STATES OF AMERICA

                                            KAREN P. RINGEL
                                            Real Estate Contracting Officer

BY    *Karen P. Ringel*
      (Signature)                            (Official Title)

R-293512

# GENERAL PROVISIONS, CERTIFICATION AND INSTRUCTIONS
## U.S. Government Lease for Real Property

## GENERAL PROVISIONS

**1. SUBLETTING THE PREMISES.**

The Government may sublet any part of the premises but shall not be relieved from any obligations under this lease by reason of any such subletting.

**2. MAINTENANCE OF PREMISES.**

The Lessor shall maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, furnished by the Lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees. For the purpose of so maintaining said premises and property, the Lessor may at reasonable times, and with the approval of the authorized Government representative in charge, enter and inspect the same and make any necessary repairs thereto.

**3. DAMAGE BY FIRE OR OTHER CASUALTY.**

If the said premises be destroyed by fire or other casualty this lease shall immediately terminate. In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease by giving written notice to the Lessor within fifteen (15) days thereafter; if so terminated no rent shall accrue to the Lessor after such partial destruction or damage; and if not so terminated the rent shall be reduced proportionately by supplemental agreement hereto effective from the date of such partial destruction or damage.

**4. ALTERATIONS.**

The Government shall have the right during the existence of this lease to make alterations, attach fixtures and erect additions, structures or signs in or upon the premises hereby leased, which fixtures, additions or structures so placed in, upon or attached to the said premises shall be and remain the property of the Government and may be removed or otherwise disposed of by the Government.

**5. CONDITION REPORT.**

A joint physical survey and inspection report of the demised premises shall be made as of the effective date of this lease, reflecting the then present condition, and will be signed on behalf of the parties hereto.

**6. COVENANT AGAINST CONTINGENT FEES.**

The Lessor warrants that no person or selling agency has been employed or retained to solicit or secure this lease upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Lessor for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul this lease without liability or in its discretion to deduct from the rental price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee. (Liberty for rent, in accordance with general business practice, and who have not obtained such licenses for the sole purpose of effecting this lease, may be considered as bona fide employees or agencies within the exception contained in this clause.)

**7. OFFICIALS NOT TO BENEFIT.**

No Member or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this lease contract, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this lease contract if made with a corporation for its general benefit.

**8. ASSIGNMENT OF CLAIMS.**

Pursuant to the provisions of the Assignment of Claims Act of 1940, as amended (31 U.S.C. 203, 41 U.S.C. 15), if this lease provides for payments aggregating $1,000 or more, claims for monies due or to become due the Lessor from the Government under this contract may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency, and may thereafter be further assigned or reassigned to any such institution. Any such assignment or reassignment shall cover all amounts payable under this contract and not already paid, and shall not be made to more than one party, except that any such assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in such financing. Notwithstanding any provisions of this contract, payments to an assignee of any monies due or to become due under this contract shall not, to the extent provided in said Act, as amended, be subject to reduction or set-off.

**9. EQUAL OPPORTUNITY CLAUSE.**

(The following clause is applicable unless this contract is exempt under the rules, regulations, and relevant orders of the Secretary of Labor (41 CFR, ch. 60).)

During the performance of this contract, the Contractor agrees as follows:

(a) The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this Equal Opportunity clause.

(b) The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(c) The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency Contracting Officer, advising the labor union or workers' representative of the Contractor's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d) The Contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(e) The Contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting

1

agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(f) In the event of the Contractor's noncompliance with the Equal Opportunity clause of this contract or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended, in whole or in part, and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(g) The Contractor will include the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for noncompliance: *Provided, however,* That in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

10. FACILITIES NONDISCRIMINATION.

(a) As used in this section, the term "facility" means stores, shops, restaurants, cafeterias, restrooms, and any other facility of a public nature in the building in which the space covered by this lease is located.

(b). The Lessor agrees that he will not discriminate by segregation or otherwise against any person or persons because of race, color, religion, sex, or national origin in furnishing, or by refusing to furnish, to such person or persons the use of any facility, including any and all services, privileges, accommodations, and activities provided thereby. Nothing herein shall require the furnishing to the general public of the use of any facility customarily furnished by the Lessor solely to tenants, their employees, customers, patients, clients, guests and invitees.

(c) It is agreed that the Lessor's noncompliance with the provisions of this section shall constitute a material breach of this lease. In the event of such noncompliance, the Government may take appropriate action to enforce compliance, may terminate this lease, or may pursue such other remedies as may be provided by law. In the event of termination, the Lessor shall be liable for all excess costs of the Government in acquiring substitute space, including but not limited to the cost of moving to such space. Substitute space shall be obtained in as close proximity to the Lessor's building as is feasible and moving costs will be limited to the actual expenses thereof as incurred.

(d) It is further agreed that from and after the date hereof the Lessor will, at such time as any agreement is to be entered into or a concession is to be permitted to operate, include or require the inclusion of the foregoing provisions of this section in every such agreement or concession pursuant to which any person other than the Lessor operates or has the right to operate any facility. Nothing herein contained, however, shall be deemed to require the Lessor to include or require the inclusion of the foregoing provisions of

this section in any existing agreement or concession arrangement or one in which the contracting party other than the Lessor has the unilateral right to renew or extend the agreement or arrangement, until the expiration of the existing agreement or arrangement and the unilateral right to renew or extend. The Lessor also agrees that it will take any and all lawful actions as expeditiously as possible, with respect to any such agreement as the contracting agency may direct, as a means of enforcing the intent of this section, including, but not limited to, termination of the agreement or concession and institution of court action.

11. EXAMINATION OF RECORDS.

(NOTE.—This provision is applicable if this lease was negotiated without advertising.)

(a) The Lessor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under this lease, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Lessor involving transactions related to this lease.

(b) The Lessor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Comptroller General of the United States or his representatives shall, until the expiration of 3 years after final payment under this lease with the Government, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor involving transactions related to the subcontract.

12. APPLICABLE CODES AND ORDINANCES

The Lessor, as part of the rental consideration, agrees to comply with all codes and ordinances applicable to the ownership and operation of the building in which the leased space is situated and, at his own expense, to obtain all necessary permits and related items.

13. INSPECTION.

At all times after receipt of Bids, prior to or after acceptance of any Bid or during any construction, remodeling or renovation work, the premises and the building or any parts thereof, upon reasonable and proper notice, shall be accessible for inspection by the Contracting Officer, or by architects, engineers, or other technicians representing him, to determine whether the essential requirements of the solicitation or the lease requirements are met.

14. ECONOMY ACT LIMITATION.

If the rental specified in this lease exceeds $2,000 per annum, the limitation of Section 322 of the Economy Act of 1932, as amended (40 U.S.C. 278a), shall apply.

15. FAILURE IN PERFORMANCE.

In the event of failure by the Lessor to provide any service, utility, maintenance or repairs required under this lease, the Government shall have the right to secure said services, utilities, maintenance or repairs and to deduct the cost thereof from rental payments.

16. LESSOR'S SUCCESSORS.

The terms and provisions of this lease and the conditions herein shall bind the Lessor, and the Lessor's heirs, executors, administrators, successors, and assigns.

# CERTIFICATION

1. CERTIFICATION OF NONSEGREGATED FACILITIES.

(Applicable to (1) contracts, (2) subcontracts, and (3) agreements with applicants who are themselves performing federally assisted construction contracts, exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause.)

By the submission of this bid, the bidder, offeror, applicant, or subcontractor certifies that he does not maintain or provide for his employees any segregated facilities at any of his establishments, and that he does not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. He certifies fur-

2

ther that he will not maintain or provide for his employees any segregated facilities at any of his establishments, and that he will not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. The bidder, offeror, applicant, or subcontractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. He further agrees that (except where he has obtained identical certifications from proposed subcontractors for specific time periods) he will obtain identical certifications from proposed subcontractors

prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that he will retain such certifications in his files; and that he will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.

A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

NOTE.—The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

## INSTRUCTIONS

1. Whenever the lease is executed by an attorney, agent, or trustee on behalf of the Lessor, two authenticated copies of his power of attorney, or other evidence to act on behalf of the Lessor, shall accompany the lease.

2. When the Lessor is a partnership, the names of the partners composing the firm shall be stated in the body of the lease. The lease shall be signed with the partnership name, followed by the name of the partner signing the same.

3. Where the Lessor is a corporation, the lease shall be signed with the corporate name, followed by the signature

and title of the officer or other person signing the lease on its behalf, duly attested, and, if requested by the Government, evidence of this authority so to act shall be furnished.

4. When deletions or other alterations are made specific notation thereof shall be entered under clause 8 of the lease before signing.

5. If the property leased is located in a State requiring the recording of leases, the Lessor shall comply with all such statutory requirements at Lessor's expense.

3

Standard Form 2-A
May 1970 Edition

GENERAL PROVISIONS, CERTIFICATIONS, AND INSTRUCTIONS (...continued)

17. Gratuities Clause:

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative -

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) the facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under paragraph (a) above, the Government is entitled -

(1) To pursue the same remedies as in breach of the contract; and

(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

18. FEDERAL TORT CLAIMS ACT CLAUSE:

If the death of or injury to any person, or the loss of or damage to any property, is caused by the Government in the course of its use of the facilities described herein, the liability, if any, of the Government therefor shall be determined in accordance with the applicable provisions of the Federal Tort Claims Act (28 U.S.C. 2671-2680).

19. DISPUTES

19.1   This lease is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613) (the Act).

19.2   Except as provided in the Act, all disputes arising under or relating to this lease shall be resolved under this clause.

19.3   "Claim", as used in this clause, means a written demand or written assertion by the Lessor or the Government seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of lease terms, or other relief arising under or relating to this lease.  A claim arising under this lease, unlike a claim relating to this lease, is a claim that can be resolved under a lease clause that provides for the relief sought by the claimant.  However, a written demand or written assertion by the Lessor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph 1.4(2) below.  a voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act.  The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

19.4(1)   A claim by the Lessor shall be made in writing and submitted to the  Commander, Southwest Division Naval Facilities Engineering Command, for a written decision.  A claim by the Government against the Lessor shall be subject to a written decision by the Commander, Southwest Division, Naval Facilities Engineering Command.

19.4(2)(a)   The Lessor shall provide the certification specified in subparagraph 1.4(2)(c) of this clause when submitting any claim--

(A)  Exceeding $100,000; or
(B)  Regardless of the amount claimed, when using--

(1)  Arbitration conducted pursuant to 5 U.S.C. 575-580; or
(2)  Any other alternative means of dispute resolution (ADR) technique that the agency elects to handle in accordance with the Administrative Dispute Resolution Act (ADRA).

19.4(2)(b)   The certification requirement does not apply to issues in controversy that have not been submitted as all or part of a claim.

19.4(2)(c)   The certification shall state as follows:  "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Lessor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Lessor."

19.4(3)   The certification may be executed by any person duly authorized to bind the Lessor with respect to the claim.

19.5   For Lessor claims of $100,000 or less, the Commander, Southwest Division, Naval Facilities Engineering Command, must, if requested in writing by the Lessor, render a decision within 60 days of the request.  For Lessor-certified claims over $100,000, the Commander, Southwest Division Naval Facilities Engineering Command, must, within 60 days, decide the claim or notify the Lessor of the date by which the decision will be made.

19.6   The Commander, Southwest Division  Naval Facilities Engineering Command, decision shall be final unless the Lessor appeals or files a suit as provided in the Act.

19.7   At the time a claim by the Lessor is submitted to the Commander, Southwest Division Naval Facilities Engineering Command or a claim by the Government is presented to the Lessor, the parties, by mutual consent, may agree to use ADR.  When using arbitration conducted pursuant to 5 U.S.C. 575-580, or when using any other ADR technique that the agency elects to handle in accordance with the ADRA, any claim, regardless of amount, shall be accompanied by the certification described in paragraph 19.4(2)(c) of this clause, and executed in accordance with paragraph 19.4(3) of this clause.

19.8   The Government shall pay interest on the amount found due and unpaid by the Government from (1) the date the Commander, Southwest Division Naval Facilities Engineering Command receives the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment.  With regard to claims having defective certifications, as defined in FAR 33.201, interest shall be paid from the date that the Commander, Southwest Division Naval Facilities Engineering Command initially receives the claim.  Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury, as provided in the Act, which is applicable to the period during which the Commander, Southwest Division Naval Facilities Engineering Command receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

19.9   The Lessor shall proceed diligently with the performance of the lease, pending final resolution of any request for relief, claim, appeal, or action arising under the lease, and comply with any decision of the Commander, Southwest Division Naval Facilities Engineering Command.

SPECIAL PROVISIONS

1. Assignment or transfer.  The Government is aware that the Lessor may assign its interests in accordance with Paragraph 16 of the General Provisions of this lease. The Government may not assign or transfer the lease to another party without the written approval of the Lessor.

2. Utilities.  Procurement of electricity, gas, steam, telephone and trash removal will be the responsibility of the Government.  Government agrees to obtain needed utility services from any private or municipal supplier who should, during the term of the lease, become able to deliver such services to the leased premises. Lessor shall provide water and sewerage service.  Government agrees to be responsible for the payment of all utility and service charges as billed by the City or utility provider including electricity, gas, water, steam, sewerage and boiler expenses associated with the premises.  If facilities are metered for water, sewerage, gas, steam or electricity, Government shall pay its utility bill as established by the appropriate meter.  For facilities or utilities that are not individually metered, Government shall pay based on the City's prorated engineering estimates of the monthly utility costs. Due to the ongoing utility conversion process, Government has the option to install a utility meter at its sole expense.

3. Ingress/Egress.  Government will be granted appropriate ingress and egress to leased premises.

4. Maintenance. The Government shall maintain the demised premises furnished by the Lessor under this lease in good repair and tenantable condition, except in the case of damage arising from the act or negligence of the Lessor.

5. Improvements/Alternations.  No improvements, structures, or installations shall be constructed on the leased premises, and the leased premises may not be altered by the Government without prior written approval by the City Manager.

6. Related Council Actions.  By the granting of this lease, neither Lessor nor the Council of the City of San Diego  is obligating itself to any other governmental agent, board, commission, or agency with regard to any other discretionary action relating to development or operation of the premises.  Discretionary action includes but is not limited to rezonings, variances, environmental clearances, or any other governmental agency approvals which may be required for the development and operation of the leased premises.

7. Quiet Possession.  The Government, paying the consideration and performing the covenants and agreements herein, shall at all times during the term peaceably and quietly have, hold, and enjoy the premises.  If Lessor for any reason cannot deliver possession of the premises to Government at the commencement of the term, or if during the lease term Government is temporarily dispossessed through action or claim of a title superior to Lessor's, then and in either of such events, this lease shall not be voidable nor shall Lessor be liable to the Government for any loss or damage resulting therefrom, but there shall be determined and stated in writing by the City Manager of San Diego a proportionate reduction of the consideration for this lease for the period or periods during which Government is prevented from having the quiet possession of all or a portion of the premises.

-1-

8. Surrender of Premises.  At termination of this lease for any reason, Government shall execute, acknowledge, and deliver to Lessor, within five (5) days after written Lessor demand, a valid and recordable quitclaim deed covering all of the premises. The premises shall be delivered free and clear of all liens and encumbrances and in a decent, safe, and sanitary condition.  If Government fails or refuses to deliver the required deed, Lessor may prepare and record a notice reciting Government's failure to execute this lease provision, and the notice will be conclusive evidence of the termination of this lease and all Government's rights to the premises.

9. Defaults and Remedies.
   a. Default.  In the event that:

   (1)  Government shall default in the performance of any covenant or condition required by this lease to be performed by Government and shall fail to cure said default within thirty (30) days following written notice thereof from Lessor; or if any such default is not curable within thirty (30) days, and Government shall fail to commence to cure the default(s) within said thirty-day period and diligently pursue such cure to completion; then Lessor may, at its option, without further notice or demand upon Government or upon any person claiming rights through Government, immediately terminate this lease and all rights of Government and of all persons claiming rights through Government to the premises or to possession thereof; and Lessor may enter and take possession of the premises.

   b. Abandonment by Government.  Even though Government has breached the lease and abandoned the property, this lease shall continue in effect for so long as Lessor does not terminate this lease, and Lessor may enforce all its rights and remedies hereunder, including but not limited to the right to recover the rent as it becomes due, plus damages.

   c. Waiver.  Any waiver of a default is not a waiver of any other default.  Any waiver of a default must be in writing and be executed by the City Manager in order to constitute a valid and binding waiver.  The Lessor's delay or failure to exercise a remedy or right is not a waiver of that or any other remedy or right under this lease. The use of one remedy or right for any default does not waive the use of another remedy or right for the same default or for another or later default.  The Lessor's acceptance of any rents is not a waiver of any default preceding the rent payment. Lessor and Government specifically agree that the property constituting the premises is City-owned and held in trust for the benefit of the citizens of the City of San Diego and that any failure by the City Manager or City staff to discover a default or take prompt action to require the cure of any default shall not result in an equitable estoppel, but the Lessor shall at all times, have the legal right to require the cure of any default when and as such defaults are discovered or when and as the City Council directs the City Manager to take action or require the cure of any default after such default is brought to the attention of the City Council by the City Manager or by any concerned citizen.

10. Easements and Reservations.

a.  Lessor hereby reserves all rights, title, and interest in any and all subsurface natural gas, oil, minerals, and water on or within the premises.

b.  Lessor reserves the right to grant and use easements or to establish and use rights-of-way over, under, along, and across the leased premises for utilities, thoroughfares, or access as it deems advisable for the public good.

c.  Lessor has the right to enter the premises for the purpose of making repairs to or developing municipal resources and services.  However, Lessor shall not unreasonably or substantially interfere with the Government's use of the premises and will reimburse the Government for physical damages, if any, to the permanent improvements located on the leased premises resulting from the Lessor exercising the rights reserved in this section.  Such reimbursement may include a reduction in the rent proportionate to the amount of physical damage as determined by the Lessor.  Lessor will pay the costs of maintenance and repair of all Lessor installations made pursuant to these reserved rights.

d.  Entry/Inspection.  City shall reserve the right to enter the leased premises, but only after obtaining express permission from the Government, not to be unreasonably withheld, for the purpose of viewing and ascertaining the condition of the same, or to protect its interests in the leased premises as necessary to implement reuse of the leased premises in accordance with the City of San Diego's Naval Training Center San Diego Reuse Plan, dated October 1998.

11.  Acceptance of Premises.  By signing this lease, the Government represents and warrants that it has independently inspected the premises and made all tests, investigations, and observations necessary to satisfy itself of the condition of the premises.  The Government agrees it is relying solely on such independent inspection, tests, investigations, and observations in making this lease.  The Government further acknowledges that the premises are in the condition called for by this lease, that the Lessor has performed all work with respect to the premises, and that the Government does not hold the Lessor responsible for any defects whether apparent or latent, in the premises, including the presence of any hazardous wastes.

12.  Unavoidable Delay. If the performance of any act required of the Lessor or the Government is directly prevented or delayed by reason of strikes, lockouts, labor disputes, unusual governmental delays, acts of God, fire, floods, epidemics, freight embargoes, or other causes beyond the reasonable control of the party required to perform an act, said party shall be excused from performing that act for the period equal to the period of the prevention or delay.  In the event Government or Lessor claims the existence of such a delay, the party claiming the delay shall notify the other party in writing of such fact within ten (10) days after the beginning of any such claimed delay.

13.  Hazardous/Toxic Waste.  The Government will not allow the installation of additional underground storage tanks or release of hazardous substances in, on, under, or from the premises.  For the purposes of this provision, a release shall include but not be limited to any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leeching, dumping, or otherwise disposing of hazardous substances.  "Hazardous substances" shall have the same meaning as in 42 U.S.C. Section 9601 (14).

14. Asbestos Disclosure. Lessor discloses to Government that portions of the structural components of the leased premises may contain asbestos. Government acknowledges having received notice from Lessor of the presence of such asbestos in accordance with California Health and Safety Code Section 25915.

15. If Government knows or has reasonable cause to believe that any hazardous substance has been released on or beneath the premises, Government shall give written notice to the Lessor Manager within ten (10) days of receipt of such knowledge or cause for belief. Provided, however, if Government knows or has reasonable cause to believe that such substance is an imminent and substantial danger to public health and safety, Government shall notify the Lessor Manager immediately upon receipt of this knowledge or belief and shall take all actions necessary to alleviate such danger. Government will notify the Lessor Manager immediately of any notice of violation received or initiation of environmental actions or private suits relative to the premises. In addition, Government and Government's sublessees shall not utilize or sell any hazardous substance on the property without the prior written consent of Lessor.

16. Notices. Any notice required or permitted to be given hereunder shall be in writing and may be served personally or by United States mail, postage prepaid and addressed in writing to the Government or to Lessor as follows:

    If to the Government:
    Southwest Division Naval Facilities Engineering Command
    Real Estate Contracting Officer
    1220 Pacific Highway
    San Diego, CA 92132-5190

    If to the Lessor:
    City Manager
    Attention Real Estate Assets Director
    City Administration Building
    202 "C" Street, M.S. 9B
    San Diego, CA 92101-4155

or to any mortgagee, trustee, or beneficiary, as applicable, at such appropriate address designated in writing by the respective party. Any party entitled or required to receive notice under this lease may by like notice designate a different address to which notices shall be sent.

17. Lessor Approval. The approval or consent of Lessor, wherever required in this lease, shall mean the written approval or consent of the City Manager unless otherwise specified, without need for further resolution by the City Council.

18. Nondiscrimination. Government agrees not to discriminate in any manner against any person or persons on account of race, color, religion, gender, sexual orientation, medical status, national origin, age, marital status, or physical disability in Government's use of the premises.

19. Partial Invalidity.  If any term, covenant, condition, or provision of this lease is found invalid, void, or unenforceable by a court of competent jurisdiction, the remaining provisions will remain in full force and effect.

20. Number and Gender.  Words of any gender used in this lease shall include any other gender, and words in the singular number shall include the plural, when the tense requires.

21. Captions.  The Lease Outline, section headings, and captions for various articles and paragraphs shall not be held to define, limit, augment, or describe the scope, content, or intent of any or all parts of this lease.  The numbers of the paragraphs and pages of this lease may not be consecutive.  Such lack of consecutive numbers is intentional and shall have no effect on the enforceability of this lease.

22. Entire Understanding.  This lease contains the entire understanding of the parties. Government, by signing this agreement, agrees that there is no other written or oral understanding between the parties with respect to the leased premises.  Each party has relied on its own examination of the premises, advice from its own attorneys, and the warranties, representations, and covenants of the lease itself.  Each of the parties in this lease agrees that no other party, agent, or attorney of any other party has made any promise, representation, or warranty whatsoever which is not contained in this lease.  The failure or refusal of any party to read the lease or other documents, inspect the premises, and obtain legal or other advice relevant to this transaction constitutes a waiver of any objection, contention, or claim that might have been based on these actions.  No modification, amendment, or alteration of this lease will be valid unless it is in writing and signed by all parties.

23. City Employee Participation Policy.  It is the policy of Lessor that all Lessor contracts, agreements, or leases with consultants, vendors, or Governments shall include a condition that the contract, agreement, or lease may, at the sole option of Lessor, be unilaterally and immediately terminated by Lessor if the contractor or Government employs an individual who, within the twelve months immediately preceding such employment, did in his/her capacity as a City officer or employee participate in negotiations with or otherwise have an influence on the recommendation made to the City Council in connection with the selection of the contractor or Government.  It is not the intent of this policy that these provisions apply to members of the City Council.

24. Standard of Employees.  Government and its employees shall at all times conduct themselves and the operations on the leased premises in a creditable manner.

25. Relocation Payments.  Government understands and agrees that it shall not be entitled to any relocation payment whatsoever upon termination of this lease.



Detail Map

Vicinity Map

| Southwest Division |
| :---: |
| Naval Facilities Engineering Command |
| Former Naval Training Center, San Diego, CA |
| EXHIBIT "A" |
| Page 1 of 1 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
505 NORTH BRAND BOULEVARD, SUITE 1100
GLENDALE, CALIFORNIA 91203
TELEPHONE 818 551-6000 ♦ FAX 818 551-6050

# Exhibit B

29748891.1:10874-0001

CIVIL NO. 3:23-CV-00541-LL-BGS

DEFENDANT CITY OF SAN DIEGO'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
COUNTERCLAIM; CROSSCLAIMS; AND DEMAND FOR JURY TRIAL

Case 3:23-cv-00541-LL-DTF   Document 31   Filed 09/29/23   PageID.720   Page 270 of 272



# R.O.S. NO. 16556

## SHEET 1 OF 3 SHEETS

**RECORD OF SURVEY**

ALL OF FRACTIONAL BLOCKS 241 AND 242 OF ROSEVILLE, ACCORDING TO MAP NO. 165, DATED JANUARY, 1869, A COPY OF WHICH WAS FILED IN THE OFFICE OF THE COUNTY RECORDER, AUGUST 14, 1914, A PORTION OF THE TIDELANDS OF THE BAY OF SAN DIEGO, AS DESCRIBED IN DOCUMENT RECORDED SEPTEMBER 5, 1917 IN BOOK 739, PAGE 307 OF DEEDS, A PORTION OF THE TIDELANDS OF THE BAY OF SAN DIEGO, AS DESCRIBED IN DOCUMENT RECORDED JUNE 6, 1921, IN BOOK 853, PAGE 185 OF DEEDS, A PORTION OF THE TIDELANDS OF THE BAY OF SAN DIEGO AS DESCRIBED IN DOCUMENT RECORDED OCTOBER 25, 1933 IN BOOK 239, PAGE 408 OF OFFICIAL RECORDS, ALL IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, TOGETHER WITH THE STREETS AND ALLEYS VACATED AND CLOSED TO PUBLIC USE PER CITY OF SAN DIEGO COUNCIL RESOLUTION NOS. 2505 AND 2528.

**BASIS OF BEARINGS**

THE BASIS OF BEARINGS FOR THIS RECORD OF SURVEY IS SOUTHEASTERLY RIGHT-OF-WAY OF ROSECRANS STREET AS SHOWN ON RECORD OF SURVEY NO. 1523, I.E. N 38°16'09" E.

SAID BEARING AND THE BEARINGS SHOWN HEREON ARE IN TERMS OF THE CALIFORNIA COORDINATE SYSTEM NAD83 ZONE 6. QUOTED BEARINGS FROM REFERENCE MAPS OR DEEDS MAY OR MAY NOT BE IN TERMS OF SAID SYSTEM

**SURVEYOR'S STATEMENT**

THIS MAP CORRECTLY REPRESENTS A SURVEY MADE BY ME OR UNDER MY DIRECTION IN CONFORMANCE WITH THE REQUIREMENTS OF THE LAND SURVEYORS ACT AT THE REQUEST OF THE CITY OF SAN DIEGO IN NOVEMBER OF 1999.

BY _____ 4-19-00
ROBERT G. SCHOETTMER, LS 4324
EXPIRES:6-30-2000

**COUNTY SURVEYOR'S STATEMENT**

THIS MAP HAS BEEN EXAMINED IN ACCORDANCE WITH SECTION 8766 OF THE LAND SURVEYORS ACT THIS 20TH DAY OF APRIL, 2000.

_____
PHILIP J. GURBINO, LS 4424
COUNTY SURVEYOR

**LEGEND**

▲ INDICATES FOUND LEAD PLUG & TACK (NO RECORD)

● INDICATES FOUND 3/4" IRON PIPE WITH PLUG STAMPED "LS 6929 PER RECORD OF SURVEY 1523, UNLESS OTHERWISE NOTED

■ INDICATES FOUND LEAD AND DISK STAMPED "LS 6929 PER RECORD OF SURVEY 1523, UNLESS OTHERWISE NOTED

○ INDICATES SET 3/4 x 18 IRON PIPE WITH PLASTIC PLUG STAMPED "LS 4324"

□ INDICATES SET LEAD AND DISK STAMPED "LS 4324", UNLESS OTHERWISE NOTED

2 INDICATES SHEET INDEX NUMBER

— INDICATES MAP SHEET LIMITS

Ⓐ INDICATES LETTER OF TRANSFER DATED 1-8-1954 FROM N.T.C. TO FLEET SONAR SCHOOL

NOTE: ALL BEARINGS AND DISTANCES SHOWN ON THIS MAP ARE RECORD PER RECORD OF SURVEY 1523 WHERE APPLICABLE

**RECORDER'S STATEMENT**

FILE NO. 2000-210625
FILED THIS 21ST DAY OF April, 2000 AT 9:42 A.M IN BOOK OF RECORD OF SURVEY MAPS AT PAGE 16556, AT THE REQUEST OF ROBERT G. SCHOETTMER.

GREGORY J. SMITH
COUNTY RECORDER        BY _____ DEPUTY

FEE $11.20

| PROJECT NUMBER | 12309-M | |
|---|---|---|
| APN | 450-790-04 | L.C. 202-1699 |

**NOTE:**
ALL PORTIONS OF THE PROPERTY DESIGNATED AS "PARCELS, EXCEPT PARCEL 17 AND PARCEL 19, ARE INTENDED FOR CONVEYANCE TO THE CITY OF SAN DIEGO PURSUANT TO A RECORD OF DECISION WITH THE DEPARTMENT OF THE NAVY. THE CITY OF SAN DIEGO AND THE UNITED STATES NAVY, BEING GOVERNMENTAL AGENCIES, ARE EXEMPT FROM HAVING TO FILE A PARCEL MAP UNDER SECTION 66428(a)(2) OF THE SUBDIVISION MAP ACT.

**COURSE TABLE**

| No. | DIRECTION | DISTANCE |
|---|---|---|
| L1 | N 7°30'30" E | 412.55 |
| L2 | N 41°37'23" E | 482.21 |
| L3 | N 82°29'30" W | 270.45 |
| L4 | N 35°45'46" E | 0.37 |
| L5 | N 82°35'20" W | 6.27 |
| L6 | N 7°33'09" E | 287.95 |
| L7 | N 82°17'51" W | 212.78 |
| L8 | N 82°17'51" E | 226.44 |
| L9 | N 83°48'36" W | 61.91 |
| L10 | N 7°30'41" E | 205.86 |
| L11 | N 83°48'36" E | 1292.59 |
| L12 | N 59°31'53" E | 145.32 |
| L13 | N 53°45'35" W | 503.19 |
| L14 | N 53°45'35" W | 60.40 |
| L15 | N 59°39'22" W | 245.73 |
| L16 | N 76°01'32" W | 75.00 |
| L17 | N 59°31'53" E | 111.84 |
| L18 | N 11°26'16" W | 48.41 |
| L19 | N 30°28'07" W | 4.25 |

**CURVE TABLE**

| No. | DELTA | RADIUS | ARC |
|---|---|---|---|
| C1 | 7°32'46" | 900.00 | 118.53 |
| C2 | 16°22'10" | 200.00 | 57.14 |
| C3 | 6°11'58" | 800.00 | 86.56 |
| C4 | 89°28'40" | 37.00 | 57.78 |
| C5 | 24°16'43" | 3900.00 | 1652.59 |
| C6 | 5°45'44" | 950.00 | 95.54 |
| C7 | 16°22'10" | 200.00 | 57.14 |
| C8 | 6°11'58" | 800.00 | 86.56 |
| C9 | 24°16'43" | 4100.00 | 1737.34 |
| C10 | 24°16'43" | 4000.00 | 1694.96 |

**DETAIL "A"**
NO SCALE
PARCEL 17
0.163 ACRES

**VICINITY MAP**
NO SCALE
N.T.C. SITE
NORTH HARBOR DRIVE

**RICK ENGINEERING COMPANY**
5620 Friars Road.
San Diego, California 92110-2596      (619) 291-0707

NOT A PART

SAN DIEGO BAY

GRAPHIC SCALE 1"= 500'
500 250 0 500 1000 1500

Case 3:23-cv-00541-LL-DTF   Document 31   Filed 09/29/23   PageID.721   Page 271 of 272



R.O.S. NO. 16556

SHEET 2 OF 3 SHEETS



R.O.S. NO. 16556

SHEET 3 OF 3 SHEETS