TODD KIM, Assistant Attorney General
U.S. Department of Justice
Environmental and Natural Resources Division

DEVON LEA FLANAGAN (DC Bar No. 1022195)
STEFAN J. BACHMAN (SC Bar No. 102182)
Environmental Enforcement Section
MARK A. RIGAU (CA Bar Number 223610)
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 305-0201
Fax: (202) 616-2427
Email: devon.flanagan@usdoj.gov
        stefan.bachman@usdoj.gov
        mark.rigau@usdoj.gov

BRIAN M. BOYNTON, Principal Deputy Assistant Attorney General
U.S. Department of Justice
Civil Division

KIRK MANHARDT
MARC S. SACKS
ALASTAIR M. GESMUNDO (CA Bar No. 36573)
SAMUEL F. HOBBS (AL Bar No. 9776O19E)
Commercial Litigation Branch
Corporate Financial Litigation Section
P.O. Box 875, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-4659
Email: alastair.m.gesmundo@usdoj.gov
        samuel.hobbs@usdoj.gov

*Attorneys for Plaintiff and Counterclaim Defendant United States of America*

1

# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    *Plaintiff and*

    *Counterclaim-Defendant,*

    v.

CITY OF SAN DIEGO,

    *Defendant and*

    *Counterclaim-Plaintiff.*

Case No. 3:23-cv-0541-LL-BGS

**UNITED STATES' ANSWER TO CITY OF SAN DIEGO'S COUNTERCLAIMS AND UNITED STATES' COUNTERCLAIM-IN-REPLY**

The United States, on behalf of the United States Department of the Navy (the "United States"), files its answer to the City of San Diego's (the "City") Counterclaims and asserts a Counterclaim-in-Reply.

## ANSWER TO COUNTERCLAIMS

Counterclaim Defendant the United States of America (the "United States") hereby answers counterclaimant City of San Diego (the "City") counterclaims as follows.

## STATEMENT OF THE ACTION

1. Admitted.

2. The United States admits that the City asserted the specified counterclaims. The United States lacks knowledge or information sufficient to form a belief as to the City's alleged purposes for asserting its counterclaims. Otherwise denied.

3. Paragraph 3 incorporates the United States' First Amended Complaint and does not contain allegations to which a response is required. To the extent a response is required, the United States admits the allegations in the First Amended Complaint.

4.   Denied.

JURISDICTION AND VENUE

5.   The United States admits that the court has subject-matter jurisdiction over the City's first and second counterclaims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b). The United States admits that the court has subject matter jurisdiction over the City's fifth counterclaim. The United States denies that the court has subject matter jurisdiction over the third and fourth counterclaims. Otherwise denied.

6.   Admitted.

THE PARTIES

7.   Admitted.

8.   The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 8.

9.   The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 9.

GENERAL ALLEGATIONS

10.   Denied.

11.   The United States admits that the United States is a "person" within the meaning of 42 U.S.C. § 9601(21). The United States lacks sufficient information to form a belief about the truth of whether the unnamed counter-defendants are a "person" under these provisions. Otherwise denied.

12.   Admitted.

13. The United States admits that it owned, constructed, operated, controlled, directed and managed the NTC from around 1916 until around 2000-2001, when the United States conveyed

3

the NTC parcels to the City and other entities. The United States further admits that it owned, constructed, operated, controlled, directed and managed the MCRD from around 1919 to present. The United States lacks sufficient information to form a belief about the truth of the allegations in the third sentence, which are vague and ambiguous.  The remaining allegations constitute legal conclusions to which no response is required, and to the extent a response is required, the allegations are denied.

14. The United States admits the allegations in the first sentence, except that not all of the NTC parcels were to be conveyed to the City under the MOA for redevelopment. The United States admits the MOA includes the quoted provisions from sections 2(c) and 4(b). To the extent the quoted provisions are inconsistent with the language of the MOA or are an incomplete characterization of the MOA, the United States denies these allegations. The United States denies the last sentence of Paragraph 14. Otherwise denied.

15. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 15 as they relate to the unnamed counter-defendants. The United States admits that products containing hazardous substances were used, handled, stored, or disposed of at locations within the former NTC and MCRD, other than the Boat Channel.  Otherwise denied.

16. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 16 as they relate to the unnamed counter-defendants. The United States admits that products containing hazardous substances were used, handled, stored, or disposed of at locations within the former NTC and MCRD, other than the Boat Channel.  The United States further admits that it conducted environmental response actions for contamination at several locations within the former NTC and MCRD.  Otherwise denied.

17. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 17 as they relate to the unnamed counter-defendants. Otherwise denied.

18. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 18 as they relate to the unnamed counter-defendants. Otherwise denied.

19. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 19 as they relate to the unnamed counter-defendants. Otherwise denied.

20. Denied.

FIRST COUNTERCLAIM
CONTRIBUTION PURSUANT TO CERCLA §311(f)

21. The United States incorporates its responses to the preceding paragraphs.

22. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 22 as they relate to the unnamed counter-defendants. The remaining allegations constitute legal conclusions to which no response is required, and to the extent a response is required, the allegations are denied.

23. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 23 as they relate to the unnamed counter-defendants. The remaining allegations constitute legal conclusions to which no response is required, and to the extent a response is required, the allegations are denied.

24. The United States admits that a "release" or threatened release of a "hazardous substance" under 42 U.S.C. § 9601(22), (14) has occurred at IR Site 12. Otherwise denied.

25. The United States admits that IR Site 12 is a "facility" under 42 U.S.C. § 9601(9). Otherwise denied.

26. The United States admits that the court should allocate the response costs under 42 U.S.C. §9613(f)(1) among the liable or potentially liable parties. Otherwise denied.

5

27. The United States admits that it owned or operated the NTC and the MCRD. The United States admits that it is the current owner and operator of the NTC Boat Channel. The United States otherwise lacks sufficient information to form a belief about the truth of the allegations in Paragraph 27.

28. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 28.

29. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 29.

30. Denied.

SECOND COUNTERCLAIM<br>COST RECOVERY UNDER CERCLA, 42 U.S.C. §9607(a)

31. The United States incorporates its responses to the preceding paragraphs.

32. Denied.

33. The United States admits that IR Site 12 is a "facility" under 42 U.S.C. § 9601(9). Otherwise denied.

34. The United States admits that it owned and is the current owner and operator of the NTC Boat Channel. The United States otherwise lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 34.

35. The United States admits that it is the current owner and operator of the NTC Boat Channel. The United States otherwise lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 35.

36. Denied.

37. Denied.

6

### THIRD COUNTERCLAIM
### BREACH OF CONTRACT

38. The United States incorporates its responses to the preceding paragraphs.

39.  The United States admits that the MOA includes the modified quotations referenced in Paragraph 39. To the extent the quotations are inconsistent with the language of the MOA or are an incomplete characterization of the MOA, the United States denies the allegation. The United States admits that Parcels IIIB and VII constitute the portion of the NTC Boat Channel at issue in the third counterclaim, and that a small section at the upper northeast end of the Boat Channel lies outside of the NTC in MCRD. The United States admits the MOA anticipated conveyance of Parcels IIIB and VII in 2002, but the MOA also acknowledged the time needed for remediation as well as for regulatory and public review could prolong the conveyance. Otherwise denied.

40. Denied.

41. Denied.

42. Denied.

43. The United States denies the first sentence of Paragraph 43. The United States admits the City has previously communicated certain reasons for objecting to the remedial investigation, but the United States denies the validity of the City's reasons. Otherwise denied.

44. The United States denies the first sentence of Paragraph 44. The United States admits the City previously communicated certain reasons for objecting to the remediation, but the United States denies the validity of the City's reasons. The United States admits the five-year monitoring period under CERCLA is not required for IR Site 12. Otherwise denied.

45. The United States admits that it did not treat the 2009 or 2018 SQOs as ARARs, because IR Site 12 was exempt from the 2009 and 2018 SQOs. Otherwise denied.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. The United States admits that the United States, as well as the appropriate regulatory authorities, have found that Parcels IIIB and VII are suitable for transfer, and that the United States has attempted to transfer those parcels to the City. Otherwise denied.

51. The United States admits that the Water Board was the lead state agency overseeing the Navy's remedial investigation and clean up. Otherwise denied.

52. The United States denies the first sentence in Paragraph 52. The United States lacks sufficient information to form a belief about the truth of the allegations in the second sentence in Paragraph 52.

53. The United States lacks sufficient information to form a belief about the truth of the allegations in Paragraph 53.

54. The United States admits that the Water Board sent a letter to the United Sates on April 16, 2019 regarding the United States' Final RACR, which letter concluded the Navy's selected remedy for IR Site 12 "is protective of the environment, complies with federal and state statutes and appropriate requirements, and is cost-effective"; that the United States submitted its Draft FOST to the Water Board on August 24, 2020; that the City submitted comments on the Draft FOST to the Water Board; that the Water Board issued a No Further Action ("NFA") letter on December 16, 2020; that the City filed a petition with the State Water Resources Board challenging the Water Board's NFA letter; that the Water Board withdrew the NFA letter because the NFA letter was not necessary or required to effect closure of IR Site 12. The United States otherwise denies the allegations in Paragraph 54.

55. The United States admits that it has declined to provide a CERCLA covenant to the City because relevant law prohibits the United States from providing the covenant to a potentially responsible party, which includes the City. Otherwise denied.

56. The United States admits that it attempted to transfer the NTC Boat Channel parcels to the City.  Otherwise denied.

57.  Denied.

58. The United States admits the MOA includes the quoted language as modified. To the extent the quoted language is inconsistent with the language of the MOA or are an incomplete characterization of the MOA, the United States denies this allegation.

59. The United States admits that it tendered the transfer documents for Parcel IIIB to the City on May 16, 2022. The United States admits the City responded that it was not willing to accept transfer of Parcel IIIB. Otherwise denied.

60. The United States admits that it tendered assignment documents for Parcel VII to the National Park Service for subsequent transfer to the City as a public benefit conveyance. The United States admits the City advised the United States and the National Park Service that it would not accept transfer of Parcel VII. Otherwise denied.

61. Admitted.

62. Denied.

63. Denied.

64. Denied.

65. Denied.

## FOURTH COUNTERCLAIM
## EQUITABLE INDEMNITY

66. The United States incorporations its responses to the preceding paragraphs.

67. The United States lacks information sufficient to form a belief about the truth of the allegations in Paragraph 67 regarding the unnamed counter-defendants. Otherwise denied.

68. The United States lacks information sufficient to form a belief about the truth of the allegations in Paragraph 68 regarding the unnamed counter-defendants. Otherwise denied.

69. The United States lacks information sufficient to form a belief about the truth of the allegations in Paragraph 69 regarding the unnamed counter-defendants. Otherwise denied.

70. Denied.

FIFTH COUNTERCLAIM
DECLARATORY RELIEF PURSUANT TO CERCLA § 113(g)(2)

71. The United States incorporations its responses to the preceding paragraphs.

72. The United States lacks information sufficient to form a belief about the truth of the allegations in Paragraph 72 regarding the unnamed counter-defendants. Otherwise admitted.

73. Admitted.

74. The United States lacks information sufficient to form a belief about the truth of the allegations in Paragraph 74 regarding the unnamed counter-defendants. Otherwise denied.

75. Denied.

AFFIRMATIVE DEFENSES

In further response to the City's Counterclaims, the United States asserts the following affirmative defenses. By raising the affirmative defenses below, the United States intends no alteration of the burden of proof or any evidentiary burden which otherwise exists as to any particular issue at law or in equity. Such issues are expressly reserved.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

Each claim alleged in City's Counterclaims fails to state facts sufficient to state a claim against the United States.

## SECOND AFFIRMATIVE DEFENSE
### (Statute(s) of Limitations)

Each claim alleged in City's Counterclaims for the recovery of any costs or damages it alleges to have incurred are barred by any and all applicable statute(s) of limitation, including but not limited to 42 U.S.C. § 9613(g)(2).

## THIRD AFFIRMATIVE COUNTERCLAIM
### (Act or Omission of Third Party)

Each claim for relief alleged in City's Counterclaims is barred in whole or in part because any alleged release of hazardous substances and any damages resulting therefrom were caused solely by the acts or omissions of a third party.

## FOURTH AFFIRMATIVE DEFENSE
### (Costs Unnecessary or Incurred Inconsistent with the National Contingency Plan)

Any cost alleged to have been incurred by the City was not a necessary cost of response or was not incurred in a manner consistent with the National Contingency Plan.

## FIFTH AFFIRMATIVE DEFENSE
### (Estoppel)

The City is equitably estopped from refusing to accept transfer of Parcels IIIB and VII.

## SIXTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

Granting the relief sought pursuant to the City's third counterclaim for breach of contract and fourth counterclaim for equitable indemnity would cause the City to be unjustly enriched, since the City has already received the benefit of the MOA.

11

### SEVENTH AFFIRMATIVE DEFENSE
#### (Prior Material Breach)

The City's prior material breach of the MOA excuses the United States' alleged failure to perform.

### EIGHTH AFFIRMATIVE DEFENSE
#### (Anticipatory Repudiation)

The City anticipatorily repudiated the MOA when it refused to accept transfer of the Parcels IIIB and VII, which excused the United States' further performance.

### NINTH AFFIRMATIVE DEFENSE
#### (Contract Void as Against Public Policy)

To the extent the MOA requires the United States to include certain CERCLA covenants in the deeds transferring Parcels IIIB and VII to the City, such requirement is void as against public policy.

### TENTH AFFIRMATIVE DEFENSE
#### (Subject Matter Jurisdiction)

The court lacks subject matter jurisdiction over the City's breach of contract and equitable indemnity claims.

### ELEVENTH AFFIRMATIVE DEFENSE
#### (Sovereign Immunity)

The United States is immune from the City's breach of contract and equitable indemnity claims.

### RESERVATION OF ADDITIONAL DEFENSES

The United States reserves the right to offer additional defenses which cannot now be set forth due to the City's failure to particularize its Counterclaims or to the United States' lack of knowledge of the circumstances surrounding the City's claims. Upon further particularization of

12

the claims by the City or upon discovery of further information concerning the City's claims, the United States reserves the right to assert additional defenses.

## UNITED STATES' COUNTERCLAIM-IN-REPLY

The United States, by the authority of the Attorney General and at the request and on behalf of the Department of the Navy (the "Navy") acting under the authority of the President of the United States, asserts this Counterclaim-in-Reply against the City and alleges as follows:

### STATEMENT OF THE CASE

1.      Under the May 30, 2000 Memorandum of Agreement (the "MOA") between the United States and the City, the Navy agreed to transfer seven parcels of land totaling around 379 acres to the City at no cost. The City agreed to accept title to the parcels after the Navy complied with certain conditions in the MOA. All but two parcels have been transferred to the City, and the City has redeveloped some of the transferred parcels into the thriving mixed-use commercial hub known as Liberty Station. The remaining parcels are Parcels IIIB and VII (the "Boat Channel Parcels"), which are part of the boat channel that bisects the former Naval Training Center San Diego (the "Naval Training Center"). Pursuant to its obligations under the MOA, the Navy spent over $16 million to remediate the contaminated portion of the Boat Channel Parcels referred to as Installation Restoration Site 12 ("Site 12"), and the Navy obtained approval from the appropriate regulatory authority that the Boat Channel Parcels were suitable for transfer. But the City has refused to accept title to the Boat Channel Parcels in violation of the MOA. The United States seeks specific performance under the MOA for the City's breach of its contractual obligations.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. § 1345 because the United States is the plaintiff.

3.      Venue is proper in this district because a substantial part of the events giving rise to the claims occurred in the district.

PARTIES

4.      The plaintiff is the United States. The United States brings this action on behalf of the United States Department of the Navy.

5.      The defendant is the City, which is a municipality in the State of California located within San Diego County.

GENERAL ALLEGATIONS

6.      The Defense Base Closure and Realignment Act of 1990 (P.L. 101-510, as amended, 10 U.S.C. § 2687 note) and the Department of Defense regulations (32 C.F.R. Part 174) provide a framework for the transfer of ownership and disposal of military installations.  These regulations provide multiple mechanisms for conveying surplus Base Realignment and Closure ("BRAC") property for redevelopment purposes, including economic development conveyances ("EDCs") pursuant to the Base Closure Act, as amended by the National Defense Authorization Act for Fiscal Year 2000, and public benefit conveyances ("PBCs") pursuant to the Federal Property and Administrative Services Act of 1949 at 40 U.S.C. § 484(k)(2).

7.      For EDCs, a local redevelopment authority agrees to certain conditions meant to generate employment at the property. For PBCs, a transferee agrees to use the property for a specific public purpose. In exchange, under both EDCs and PBCs, the military transfers the property at up to a 100 percent discount.

8.      The Defense Base Closure and Realignment Commission of 1993 recommended the Naval Training Center for closure, and the base was closed in April 1997. In September 1999,

14

the City applied for an EDC to redevelop about 279 acres of the Naval Training Center. The Navy determined to convey approximately 100 additional acres to the City as PBCs.

### The MOA

9.      On May 30, 2000, the United States and the City entered into the MOA, under which the City would receive—at no cost—four parcels approximating 279 acres through EDCs and three parcels approximating 100 acres through PBCs.

10.      For the EDC parcels, "subject to the terms and conditions" in the MOA, "the Navy agree[d] to convey to the City, and the City agree[d] to accept from the Navy," "all of the Navy's right, title and interest in the" EDC parcels. The City promised to use the proceeds from any sale or lease of the EDC parcels within seven years of the transfer date for economic redevelopment, which the City estimated would generate approximately 5,300 jobs.

11.      For the PBC parcels, the City agreed "to apply for and take all necessary steps to expeditiously perfect is applications for" the PBCs. After the City obtained the necessary approvals, the Navy agreed to assign the PBC parcels to the sponsoring agencies for conveyance to the City, subject to the sponsoring agencies' and the Navy's terms and conditions. The City agreed to "take all necessary actions to accept the deeds" for the PBC parcels "as they are proffered by the sponsoring agencies."

12.      The property to be transferred under the MOA includes the two Boat Channel Parcels. Parcel IIIB is approximately 13 acres and is to be transferred by an EDC, and Parcel VII is approximately 43 acres and is to be transferred by a PBC.

13.      The MOA notes that the Boat Channel Parcels are "believed to contain sediments impacted by various contaminants." Before transferring the Boat Channel Parcels, the Navy agreed

to "take all remedial action necessary to protect human health and the environment and [to] obtain site closure from appropriate regulatory authorities based on the projected use of" the parcels.

14.     The MOA required the Navy to complete these same steps—taking remedial action and obtaining regulatory site closure—for Parcels VIII and X. The City accepted transfer of those parcels.

15.     The MOA recognizes that the Navy must prepare Findings of Suitability to Transfer ("FOST") prior to conveyance of the EDC parcels and prior to assignment of the PBC parcels. FOSTs are prepared in accordance with the Department of Defense BRAC Manual (DoD 2006) and the Navy BRAC Program Management Office Policy for Processing FOSTs or Leases (Navy 2008c).

16.     The MOA anticipated that Parcel IIIB would be conveyed and that Parcel VII would be assigned in March 2002. But the parties recognized that the full extent and nature of the remedial work required, as well as regulator and public comment, could delay the projected dates of conveyance and assignment.

17.     The MOA provides that all conveyances "shall be by quitclaim deed in substantially the form attached" to the MOA as Exhibit B, provided "that changes may be required in connection with execution of the [FOST]."

18.     Under the MOA, "[f]ailure of the City to accept delivery of a Deed, or failure of either party to perform or observe any other term or condition of this Agreement prior to conveyance of the Property, after written notice and thirty days to cure, shall be deemed to be a breach of this Agreement, and the other party may exercise any of the remedies for breach or default set forth in this Agreement or otherwise available."

16

<u>The Navy Performed Its Obligations Under the MOA</u>

19.     In 2003, the Navy completed a Remedial Investigation Report to assess whether the Boat Channel sediments posed an unacceptable risk to human health or the environment. The primary chemicals of concern identified in the Boat Channel sediments were copper, lead, zinc, total chlordane, and total DDT, concentrated in two identified areas of ecological concern and five potential areas of ecological concern, all of which were in Parcel VII.

20.     As to Parcel IIIB specifically, the Remedial Investigation Report concluded that there was no risk to human health or the environment.

21.     The Navy submitted its Remedial Investigation Report to the San Diego Regional Water Quality Control Board (the "Water Board") on November 14, 2003, and the Water Board accepted the report as the equivalent of a site assessment.

22.     In May 2012, the Navy completed a Draft Feasibility Study Report analyzing remedial alternatives for the Boat Channel sediments. The Navy released a final Feasibility Study Report in 2016. The Feasibility Study considered eight alternatives and determined that the preferred alternative was removing the contaminated Boat Channel sediments and disposing of them in a landfill. The Navy held a public meeting on October 6, 2016, and solicited public comments on the proposed plan.

23.     On March 28, 2017, the Navy issued the final Record of Decision and Remedial Action Plan ("ROD").

24.     In the ROD, the Navy selected the preferred remedial alternative: dredging the chemically impacted sediments from the Site and removing them to an off-site landfill. The ROD concluded that this alternative met the threshold criteria of protecting human health and the

17

environment and complying with relevant obligations under federal and state statutes and regulations.

25.     The Water Board concurred in the Navy's selected remedy.

26.     The Navy conducted the selected remedial action between late 2017 and early 2019.

27.     On March 14, 2019, the Navy issued a final Remedial Action Completion Report ("RACR") documenting that the Navy's remediation of Site 12 was complete, protected the environment, and complied with federal and state law.

28.     On April 16, 2019, the Water Board published a letter to the Navy stating that it had reviewed the final RACR and had no further comments. The Water Board concurred with the report's conclusion that the Navy's selected remedy "is protective of the environment, complies with federal and state statutes and appropriate requirements, and is cost-effective."

29.     After approval of the final RACR, the Navy prepared and submitted a Final Finding of Suitability to Transfer for Parcels IIIB and VII (the "Final FOST") to document that the Boat Channel Parcels were environmentally suitable for transfer by deed under CERCLA and Department of Defense FOST guidance.

30.     The Final FOST recognized that stormwater discharge from the City was a "primary source[] of the contaminants in IR Site 12," and identified the City as a potentially responsible party ("PRP") under CERCLA.

31.     By letter dated April 29, 2021, the Water Board found "the Final FOST acceptable with respect to the sediment remediation in the Boat Channel (IR Site 12) and ha[d] no further comments."

32.     The Navy thus obtained site closure from the appropriate regulatory authorities, who confirmed that the Navy's remedial action protected human health and the environment.

33.     The United States spent over $16 million to remediate Site 12 in the Boat Channel Parcels.

### The City Breached the MOA

34.     On May 16, 2022, the Navy tendered a deed to the City for Parcel IIIB, and the Navy assigned Parcel VII to the sponsoring agency, the National Park Service, for conveyance to the City.

35.     The City refused to accept title to either Parcels IIIB or VII.

36.     The Navy engaged in settlement discussions with the City to resolve the dispute, but the negotiations were not successful.

37.     On November 3, 2022, the Navy transmitted written notice of default and opportunity to cure to the City, which gave the City thirty days to accept transfer of Parcels IIIB and VII or otherwise be deemed in breach of the MOA.

38.     On December 2, 2022, the City rejected the notice of default and asserted that it did not have to accept the transfer.

39.     The City's breach of the MOA harms the United States. The City's refusal to accept transfer frustrates BRAC's statutory mission to close and transfer surplus military installations. The Navy incurs maintenance costs to own and manage the Boat Channel Parcels, for which the Navy's caretaker site office budgets approximately $15,000 annually, including for buoys and navigational lighting. In addition, the Navy is subject to ongoing potential liability associated with the public's access to and use of parts of the Boat Channel Parcels for recreation.

### FIRST COUNTERCLAIM-IN-REPLY
### (Breach of Contract)

40.     The United States re-alleges and incorporates the preceding paragraphs of this counterclaim-in-reply.

19

41.     The MOA is a valid and binding contract. The United States and the City mutually agreed to the terms of the MOA for valid consideration and manifested their assent by executing the agreement on May 30, 2000.

42.     The Navy performed its obligations under the MOA.

43.     The Navy remediated the Boat Channel Parcels to protect human health and the environment—at a cost of over $16 million—and the Navy obtained site closure from the appropriate regulatory authority.

44.     The Water Board confirmed that the Navy's remediation protected human health and the environment and complied with state and federal law.

45.     The Navy prepared the Final FOST for the Boat Channel Parcels.

46.     The Navy attempted to tender deeds to the City for the Boat Channel Parcels in substantially the form attached to the MOA, subject to changes required by the Final FOST.

47.     In violation of its obligations under the MOA, the City refused to accept transfer of the Boat Channel Parcels.

48.     On November 3, 2022, the Navy sent a written notice of default to the City and gave the City thirty days to cure its breach, which the City failed to do.

49.     The City's breach injures the United States because the Navy incurs maintenance costs to own and manage the Boat Channel Parcels, and the Navy is responsible for ongoing potential liability associated with the public's use of the Boat Channel Parcels for recreational purposes. The City's breach also injures the United States by impairing BRAC's statutory mission to close and transfer surplus military installations.

50.     Damages are inadequate to remedy the City's breach.

20

51.     Under the MOA, the Navy was transferring the Boat Channel Parcels to the City at no cost. The primary benefit to the Navy was the transfer of surplus property to provide savings to the Navy and the federal taxpayer. The Navy did not realize that benefit because the City took the valuable parts of the property from the former Naval Training Center but refused to honor its contractual obligation to accept the transfer of the Boat Channel Parcels.

52.     The Boat Channel Parcels have little if any extrinsic value to the Navy. The Boat Channel Parcels are submerged, surrounded by upland property that is owned by the Marine Corps Recruit Depot, the City, and the Airport. There is no ingress or egress to Parcels IIIB and VII without securing an easement from the surrounding upland property owners. Because the City took the valuable parts of the property from the former Naval Training Center, it is unlikely the Navy could find a substitute transferee.

53.     The United States seeks specific performance of precisely what the City agreed to do under the MOA: to accept transfer of and title to the Boat Channel Parcels.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the United States prays that the Court:

1.     Enter judgment that orders specific performance by the City of the MOA, requiring the City to accept title to Parcels IIIB and VII;

2.     Award court costs to the United States; and

3.     Grant such other relief as this Court deems just and proper.

21

Dated: June 17, 2024

Respectfully submitted,


*s/ Samuel Hobbs*
SAMUEL F. HOBBS (AL Bar No. 9776O19E)
ALASTAIR M. GESMUNDO (CA Bar No. 316573)
KIRK T. MANHARDT
MARC S. SACKS
Commercial Litigation Branch
Corporate Financial Litigation Section
P.O. Box 875, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-4659
Email: Alastair.M.Gesmundo@usdoj.gov
       Samuel.Hobbs@usdoj.gov


DEVON LEA FLANAGAN (DC Bar No. 1022195)
STEFAN J. BACHMAN (SC Bar No. 102182)
Environmental Enforcement Section
MARK ALBERT RIGAU (CA Bar No. 223610)
Environmental Defense Section

*Attorneys for Plaintiff and Counterclaim-Defendant United States of America*

22