Barry P. Steinberg (Admitted Pro Hac Vice)
barry.steinberg@kutakrock.com
**KUTAK ROCK LLP**
1133 Connecticut Avenue, N.W.
Suite 1200
Washington, DC 20036
Telephone: (202) 828-2400
Facsimile: (202) 828-2488

Thomas F. Vandenburg (State Bar No. 163446)
tvandenburg@wshblaw.com
Alice Charkhchyan (State Bar No. 332670)
acharkhchyan@wshblaw.com
**WOOD, SMITH, HENNING & BERMAN LLP**
505 North Brand Boulevard, Suite 1100
Glendale, California 91203
Telephone: (818) 551-6000
Facsimile: (818) 551-6050

Attorneys for Defendant/Cross Defendant/
Counter Claimant/Cross Claimant
CITY OF SAN DIEGO

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO,<br><br>Defendant.<br><br>*AND RELATED CROSS CLAIMS AND COUNTER CLAIMS* | Civil No. 3:23-CV-00541-LL-BJC<br><br>**CITY OF SAN DIEGO'S FIRST AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT; CITY OF SAN DIEGO'S FIRST AMENDED COUNTERCLAIM**<br><br>The Hon. Linda Lopez<br><br>Trial Date: None Set |

/ / /

/ / /

/ / /

/ / /

# I.

## ANSWER TO FIRST AMENDED COMPLAINT

Defendant City of San Diego ("the City") answers the first amended complaint ("FAC") filed by Plaintiff United States of America ("the United States") as follows:

### STATEMENT OF THE CASE

1.     The City admits that this is a civil action brought under CERCLA. The City denies all remaining allegations of paragraph 1, and denies that the United States is entitled to any recovery against the City.

2.     The City admits that the United States seeks declaratory judgment under CERCLA. The City denies that the United States is entitled to any recovery against the City and denies the allegation that the actions of the United States are not inconsistent with the NCP.

### JURISDICTION, AUTHORITY, AND VENUE

3.     The City admits the allegations of paragraph 3 of the FAC.

4.     The City admits the allegations of paragraph 4 of the FAC.

### DEFENDANTS

5.     The City admits that it is a municipality in the State of California, located within San Diego County. The remaining allegations of paragraph 5 constitute a legal conclusion to which no answer is required. To the extent an answer is required, the City denies the allegations of paragraph 5 of the FAC.

6.     The allegations of paragraph 6 of the FAC constitute legal conclusions

- 1 -

CIVIL NO. 3:23-CV-00541-LL-BJC
CITY OF SAN DIEGO'S FIRST AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT;
CITY OF SAN DIEGO'S FIRST AMENDED COUNTERCLAIM

to which no answer is required. To the extent an answer is required, the City denies the allegations of paragraph 6 of the FAC.

7.      The allegations of paragraph 7 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies the allegations of paragraph 7 of the FAC.

8.      The allegations of paragraph 8 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City lacks knowledge or information sufficient to form a belief about the truth of allegations of paragraph 8 and so denies them.

9.      The allegations of paragraph 9 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City lacks knowledge or information sufficient to form a belief about the truth of allegations of paragraph 9 and so denies them.

10.     The allegations of paragraph 10 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City lacks knowledge or information sufficient to form a belief about the truth of allegations of paragraph 10 and so denies them.

11.     The allegations of paragraph 11 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City lacks knowledge or information sufficient to form a belief about the truth of allegations of paragraph 11 and so denies them.

## STATUTORY BACKGROUND

12.     The allegations of paragraph 12 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

13.     The allegations of paragraph 13 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

14.     The allegations of paragraph 14 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

15.     The allegations of paragraph 15 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

16.     The allegations of paragraph 16 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

17.    The allegations of paragraph 17 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

## **GENERAL ALLEGATIONS**

### **The Site**

18.    The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 18 of the FAC, and so denies them.

19.    The City admits the former Naval Training Center San Diego ("NTC") was located near San Diego Bay. The City denies the remaining allegations of paragraph 19 of the FAC.

20.    The City admits the allegations in paragraph 20 of the FAC.

21.    The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 21 of the FAC, and so denies them.

22.    The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 22 of the FAC, and so denies them.

23.    The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 23 of the FAC, and so denies them.

24.    The City admits that certain NTC parcels were conveyed to the City between 2000 and 2001 as well as to the Port District. The City denies the remaining allegations of paragraph 24 of the FAC.

25.    The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 25 of the FAC, and so denies them.

26.    The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 26 of the FAC, and so denies them.

27.    The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 27 of the FAC, and so denies them.

28.    The allegations in paragraph 28 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

29.    The City denies the allegations of paragraph 29 of the FAC directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the allegations, and so denies them, with respect to the "other entities" referenced in paragraph 29.

30.    The City denies the allegations of paragraph 30 of the FAC.

31.    The City denies the allegations of paragraph 31 of the FAC.

32.    The City denies that it owned and/or operated the Airport Property from the 1920s to 1963. As to the remaining allegations in paragraph 32 of the FAC, the City lacks knowledge or information sufficient to form a belief about the truth of the allegations, and on that basis denies them.

33.    The City admits the allegations of paragraph 33 of the FAC.

34.     The City admits the allegations of paragraph 34 of the FAC.

35.     The City lacks knowledge or information sufficient to form a belief about the truth of the allegations, and so denies them.

36.     The City denies the allegations of paragraph 36 of the FAC.

37.     The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 37 of the FAC and so denies them.

38.     The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 38 of the FAC, and so denies them.

### <u>Response Action and Enforcement History</u>

39.     The allegations in paragraph 39 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 39 of the FAC, and so denies them.

40.     The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 40 of the FAC, and so denies them.

41.     The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 41 of the FAC, and so denies them.

42.     The City lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 42 of the FAC, and so denies them.

43.     The City admits that in 2003, the Navy completed a Remedial Investigation Report. The City alleges that the Remedial Investigation Report speaks

for itself, and denies any allegation of paragraph 43 of the FAC inconsistent with the Remedial Investigation Report.

44.    The City admits that in May 2012, the Navy completed a Draft Feasibility Study Report and that the Navy released a final Feasibility Study Report in 2016. Those documents speak for themselves, and the City denies any allegation of paragraph 44 of the FAC inconsistent with those documents.

45.    The City admits the allegations of paragraph 45 of the FAC.

46.    The Navy's Record of Decision and Remedial Action Plan speak for themselves, and the City denies any allegation of paragraph 46 of the FAC that is inconsistent with those documents.

47.    The City denies the allegations of paragraph 47 of the FAC.

48.    The City denies the allegations of paragraph 48 of the FAC.

49.    The City admits the allegations of paragraph 49 of the FAC.

50.    The City denies the allegations of paragraph 50 of the FAC.

51.    The City denies the allegations of paragraph 51 of the FAC.

**FIRST CLAIM FOR RELIEF**
**(Cost Recovery under Section 107 of CERCLA)**

52.    The City incorporates by reference its answers to the preceding paragraphs as though fully set forth herein.

53.    The allegations in paragraph 53 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies

any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

54.    The allegations of paragraph 54 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

55.    The City denies the allegations of Paragraph 55 of the FAC.

56.    The City denies the allegations of Paragraph 56 of the FAC.

57.    The City denies the allegations of Paragraph 57 of the FAC.

58.    The City denies the allegations of Paragraph 58 of the FAC.

59.    The City denies the allegations of Paragraph 56 of the FAC.

60.    The allegations of paragraph 60 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

61.    The allegations of paragraph 61 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

62.    The City denies the allegations of paragraph 62 of the FAC.

63.    The City denies the allegations of paragraph 63 of the FAC.

64.     The City denies the allegations of paragraph 64 of the FAC.

65.     The City denies the allegations of paragraph 65 of the FAC.

66.     The allegations of paragraph 66 of the FAC constitute legal conclusions, to which no answer is required. To the extent an answer is required, the City denies any allegation that is inconsistent with CERCLA and denies that the United States may recover against the City under CERCLA or any other provision of law.

67.     The City denies the allegations of paragraph 67 of the FAC.

68.     The City denies the allegations of paragraph 68 of the FAC.

69.     The City admits the allegations of paragraph 69 of the FAC.

70.     The City admits the allegations of paragraph 70 of the FAC.

71.     The City denies the allegations of paragraph 71 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 71 of the FAC.

72.     The City denies the allegations of paragraph 72 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 72 of the FAC.

73.     The City denies the allegations of paragraph 73 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph

73 of the FAC.

74.     The City denies the allegations of paragraph 74 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 74 of the FAC.

75.     The City denies the allegations of paragraph 75 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 75 of the FAC.

76.     The City denies the allegations of paragraph 76 of the FAC.

77.     The City denies the allegations of paragraph 77 of the FAC.

78.     The City denies the allegations of paragraph 78 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 78 of the FAC.

79.     The City denies the allegations of paragraph 79 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 79 of the FAC.

80.     The City denies the allegations of paragraph 80 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information

sufficient to form a belief about the truth of the remaining allegations of paragraph 80 of the FAC.

81.    The City denies the allegations of paragraph 81 of the FAC to the extent those allegations are directed to the City. The City lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 81 of the FAC.

**SECOND CLAIM FOR RELIEF**
**(CERCLA Declaratory Judgment)**

82.    The City incorporates by reference its answers to the preceding paragraphs as though fully set forth herein.

83.    The City denies the allegations of paragraph 83 of the FAC and denies that the United States is entitled to any form of relief against the City.

**PRAYER FOR RELIEF**

The City prays that the Court dismiss the First Amended Complaint of the United States with prejudice in its entirety and grant relief to the City consistent with the City's affirmative defenses and counterclaims.

**II.**

**AFFIRMATIVE DEFENSES**

Further answering the FAC and by way of affirmative defense, the City alleges as follows. By asserting the affirmative defenses below, the City intends no alteration of the burden of proof or any other evidentiary burden which otherwise exists as to

any particular issue at law or in equity. Such issues of burden are not waived and, to the contrary, are expressly reserved.

## FIRST AFFIRMATIVE DEFENSE
### (Statute(s) of Limitation)

1.      The FAC and each and every claim for relief alleged therein, is barred by any and all applicable statutes of limitations, including but not limited to 42 U.S.C. § 9613(g)(2).

## SECOND AFFIRMATIVE DEFENSE
### (Act of God or War)

2.      The damages and/or losses alleged in the FAC, if any, were or may have been proximately caused or contributed to by some natural cause, act of God, or act of war.

## THIRD AFFIRMATIVE DEFENSE
### (Act or Omission of Third Party)

3.      Based on information and belief, the City alleges that the FAC, and each and every claim for relief alleged therein, is barred in whole or in part because any alleged release of hazardous substances and any damages resulting therefrom were caused solely by the acts or omissions of a third party.

## FOURTH AFFIRMATIVE DEFENSE
### (Superseding or Intervening Independent Cause)

4.      Based on information and belief, the City alleges that the acts, injuries, and/or damages alleged by the United States were the result of superseding or intervening causes arising from acts or omissions of the United States, and/or

individuals and/or other entities which the City neither controlled nor had the legal right to control. Accordingly, each act, injury, and/or damages alleged were not proximately caused by the City.

## FIFTH AFFIRMATIVE DEFENSE
### (Cause in Fact)

5.    Based on information and belief, the United States cannot prove any facts showing that the City's conduct or omissions were the cause in fact of the damages or losses alleged in the FAC.

## SIXTH AFFIRMATIVE DEFENSE
### (Proximate Cause of Harm)

6.    Based on information and belief, the United States cannot prove any facts showing that the City's alleged conduct or omissions were the proximate cause of the damages or losses alleged in the FAC.

## SEVENTH AFFIRMATIVE DEFENSE
### (Any Releases Authorized or Permitted Pursuant to Federal or State Law)

7.    To the extent that the City is determined to be responsible for any releases or threatened releases (which responsibility it denies), any such releases or threatened releases were authorized by applicable federal or state law and/or valid permits.

## EIGHTH AFFIRMATIVE DEFENSE
### (Divisibility)

8.    If the damages alleged by the United States are found to have been caused by the City, which the City denies, such damages are distinct, divisible, and

separate, and the costs and harm in relation to which they were incurred are capable of reasonable apportionment and are divisible; therefore, the City cannot be held jointly and severally liable.

## NINTH AFFIRMATIVE DEFENSE
### (Joint and Several Liability Improper)

9.    On information and belief, the United States is a responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), as an "owner" or "operator" of properties at which releases of hazardous substances and Pollutants and Contamination have occurred.

The United States therefore is barred from bringing a claim for joint and several cost recovery under CERCLA § 107(a), 42 U.S.C. 9607(a), and the City's liability to the United States, if any, is limited to its equitable share, if any, of the necessary costs of response incurred by the United States that are not inconsistent with the NCP.

## TENTH AFFIRMATIVE DEFENSE
### (Recoupment)

10.    The recovery of the United States, if any, against the City is subject to recoupment diminishing or defeating the recovery of the United States.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Action Inconsistent with the National Contingency Plan)

11.    Any costs sought by the United States were not or are not necessary, or were not incurred or will not be incurred in a manner consistent with the National

Contingency Plan, and the United States acted in an arbitrary and capricious manner in choosing a particular response action

### TWELFTH AFFIRMATIVE DEFENSE
### (Right to Assert Additional Defenses)

12.    The City reserves the right to offer additional defenses which cannot now be set forth due to the failure of the United States to particularize their claims and/or to the City's lack of knowledge of the circumstances surrounding the claims of the United States. Upon further particularization of the claims by the United States or upon discovery of further information concerning its claims, the City reserves the right to assert additional defenses.

### DEFENDANT'S PRAYER FOR RELIEF

WHEREFORE, the City prays as follows:

1.  That the United States take nothing by its FAC, and that the FAC be dismissed with prejudice;

2.  That the City be awarded costs of suit incurred in defense of this action; and

3.  For such other relief as the Court deems just and proper.

### III.

### FIRST AMENDED COUNTERCLAIM

Defendant/Counter-Claimant City of San Diego ("the City") incorporates by reference all allegations in its first amended answer and also alleges the following as

CIVIL NO. 3:23-CV-00541-LL-BJC

counterclaims against Plaintiff/Counter-Defendant United States of America ("the United States"), and Roes 1- 10, inclusive:

## STATEMENT OF THE ACTION

1.      On or about March 27, 2023, the United States filed Case No. 3:23-CV-541-LL-BGS in the United States District Court for the Southern District of California against the City concerning the clean-up of contaminated sediments at Installation Restoration Site 12 ("IR Site 12") located within the former Naval Training Center San Diego ("NTC") Boat Channel. The "NTC Boat Channel" includes Parcels III-B and VII as described in the 2000 Memorandum of Agreement ("MOA") between the City and the United States for Economic Benefit Conveyance and Public Benefit Conveyances at the former NTC together with an unlabeled portion of the channel that is part of the adjacent Marine Corps Recruit Depot.[1] The action seeks recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607 (the "FAC") for clean-up costs the United States allegedly incurred at IR Site 12, which includes only the submerged sediments of the NTC Boat Channel and is not co-extensive with the NTC Boat Channel property boundaries.

2.      In response to the environmental contamination claims made against it

---

[1] In its Complaint, Plaintiff uses the term "Site," which it defines as IR Site 12 only, interchangeably with the term "Boat Channel." However, IR Site 12 covers only the submerged sediments in the Boat Channel. It is not co-extensive with the property boundaries of the NTC Boat Channel at issue here. The City is also using the similar phrase "NTC Boat Channel" in its counterclaim to refer to the entirety of Parcels III-B and VII as described in the MOA.

by the United States, and in order to avoid or minimize its alleged liability in connection with such claims, in order to recover its own CERCLA-related costs, and in order to protect itself from harm caused by the acts/omissions of the United States in violation of the MOA, the City brings this counterclaim against the United States for Contribution and Cost Recovery under CERCLA, Recoupment, relief under the Administrative Procedure Act ("APA"), and Declaratory Relief under CERCLA.

3.      Without admitting any of the allegations except those set forth in the City's answer to the FAC, the City incorporates for purposes of reference herein the FAC filed in this action for the sole purpose of setting forth the allegations of the United States to which this counterclaim relates.

4.      The City denies that it is liable to the United States and denies that the United States is entitled to any relief against it.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this counterclaim pursuant to 28 U.S.C. § 1331 and CERCLA § 113(b), 42 U.S.C. § 9613(b).

6.      The City's claims for relief arise in this District. Venue is therefore proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b).

## PARTIES

7.      The City is a municipal corporation located in the County of San Diego and is named as a defendant by the United States in the FAC.

8.      The United States is the "owner" and "operator" of the NTC Boat

Channel, including IR Site 12, throughout all times relevant to this litigation, and has remained so to the present.

9.     The City is informed and believes, and based thereon alleges that ROEs 1 through 10, inclusive, whether individual, corporate, associate, or otherwise, are unknown to the City, which will, upon proper identification, seek leave to amend this pleading when such true names are ascertained. Each of the counter-defendants designated as a "Roe" defendant is responsible in some manner, in whole or in part, for the events and happenings alleged herein.

10.     Whenever it is alleged herein that any act or omission was also done or committed by a specifically named counter-defendant, the City intends to allege, and alleges, that the same act or omission was also committed by each and every counter-defendant named herein, including the "Roe" counter-defendants, both separately and in concert or conspiracy with the others. The City prays for leave of this Court to amend this pleading when those names and capacities are ascertained.

## GENERAL ALLEGATIONS

11.     The United States claims in this lawsuit that the NTC Boat Channel qualifies as a "facility" pursuant to 42 U.S.C. § 9601.

12.     Each of the counter-defendants is a "person" within the meaning of 42 U.S.C. § 9601(21).

13.     Based on information and belief, beginning around 1916, the City conveyed various parcels of land to the United States at no cost for purposes of

constructing and operating what came to be known as NTC. Based on information and belief, the United States created and has owned the NTC Boat Channel since its creation around the 1930s and 1940s, and around 1922 it had created and owned a predecessor estuary in roughly the same location.

14.    Based on information and belief, around 1993, NTC was scheduled for closure. Subsequently, the Navy and the City as well as other stakeholders entered into a several-year, public land use planning process in anticipation of the eventual closure of NTC and the transfer of NTC parcels to the City. NTC was closed around 1997 under the federal Base Realignment and Closure process ("BRAC") and the property was offered for redevelopment.

15.    The City is informed and believes, and based thereon alleges that the United States owned, constructed, operated, controlled, directed, managed, and conducted affairs at the NTC from 1916 until on or about 2000 or 2001 when NTC parcels, except for the NTC Boat Channel parcels, were conveyed to the City and other entities. The City is informed and believes, and based thereon alleges that the United States owned, constructed, operated, controlled, directed, managed, and conducted affairs at the Marine Corps Recruit Depot ("MCRD"), adjacent to both NTC and the NTC Boat Channel, from around 1919 to the present.  The City is informed and believes, and based thereon alleges that the United States owned, constructed, operated, controlled, directed, managed, and conducted affairs at other properties within the watershed draining to the NTC Boat Channel from the time of

its creation to the present. As such, the United States is a "person" and "operator" as defined by CERCLA, 42 U.S.C. § 9601.

16.    In 2000, after the approval of a variety of land use planning documents including, but not limited to, the NTC San Diego Reuse Plan dated August 1998, the City and the United States entered into the MOA setting forth the terms under which the City agreed to accept the conveyance of certain NTC parcels from the United States, including the NTC Boat Channel, to the City for redevelopment. With regard to the NTC Boat Channel parcels, the MOA states in relevant part:

> 2.(c) . . .
>
> "Parcel IIIB is believed to contain sediments impacted with various contaminants. Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel IIIB, as described in the NTC San Diego Reuse Plan dated August 1998."
>
> 4.(b) . . .
>
> "Parcel VII is believed to contain sediments impacted by various contaminants. Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel VII, as described in the NTC San Diego Reuse Plan dated August 1998."

The investigation and remedial action taken by the United States pursuant to

the MOA was flawed, including but not limited to by being developed and implemented without adequate understanding or analysis of the sources, nature, types, and extent of contamination at the NTC Boat Channel.

17.    Based on information and belief, each of the operations of the United States, resulted in the generation, storage, use, discharge, release, and disposal of hazardous substances at the NTC Boat Channel.

18.    Based on information and belief, at various times between approximately 1916 to the present, the United States caused or contributed to the past or present handling, storage, treatment, transportation, generation, release, or disposal of hazardous substances as defined in CERCLA § 9601, 42 U.S.C. § 9601(14), and of Pollutants or Contaminants as defined in CERCLA 42 U.S.C. § 9601(33) in the environment in, at, and around the NTC Boat Channel, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the State of California, because the United States released or otherwise discarded hazardous substances as defined in CERCLA § 9601, 42 U.S.C. § 9601(14), and Pollutants or Contaminants as defined in CERCLA 42 U.S.C. § 9601(33), and/or controlled and/or operated the NTC, MCRD, or other property or engaged in a business or other activity from which hazardous substances as defined in CERCLA § 9601, 42 U.S.C. § 9601(14), and Pollutants or Contaminants as defined in CERCLA 42 U.S.C. § 9601(33) were released or otherwise discarded, and/or failed to prevent or abate the resulting contamination.

19.     Based on information and belief, at various times between 1916 to the present, the United States negligently, suddenly, and accidentally caused or contributed to the presence of hazardous substances as defined in CERCLA § 9601, 42 U.S.C. § 9601(14), and of Pollutants or Contaminants as defined in CERCLA 42 U.S.C. § 9601(33) in the environment, including soil, land, subsurface strata, air, vapor, groundwater, surface water, and the waters of the state of California, at the NTC Boat Channel.

20.     Based on information and belief, the United States, without the consent or knowledge of the City, released and/or failed to remediate hazardous substances, hazardous waste, and/or solid waste in the environment at or around the NTC Boat Channel, and knew or should have known that any such release would contaminate the soil and water in, at, beneath, and around the NTC Boat Channel.

21.     Based on information and belief, the releases of, disposals of, and/or failures to remediate hazardous substances by the United States into the environment at or around the NTC Boat Channel has resulted or may result in the migration of contamination to the NTC Boat Channel and/or to real property that is not the subject of this lawsuit, owned by individuals or entities which are not parties to this lawsuit.

22.     The operations of the United States at the NTC, the NTC Boat Channel, and the adjacent MCRD, for at least 50 years resulted in waste discharges into the NTC Boat Channel from activities conducted on these sites. Wastes generated from operations and activities were disposed of in storm drains which discharge to the

NTC Boat Channel, disposed of in sanitary sewers which discharged to the NTC Boat Channel, dumped on the ground, buried in the ground, placed in dumpsters, prepared for off-site removal, or directly discharged to the NTC Boat Channel.

23.     In 1998, the United States conducted sampling for a remedial investigation to determine the nature and extent of hazardous waste in the NTC Boat Channel sediments and collect information to assess whether the NTC Boat Channel sediments posed a potential risk to humans or the environment.

24.     Based on this 1998 sampling data, and without any further investigation or analysis, the United States submitted a Remedial Investigation Report to the San Diego Regional Water Quality Control Board ("Water Board") in 2003 and subsequently presented its feasibility study and subsequent remediation alternatives in 2016, identifying 7 out of 26 areas of the submerged sediments as impacted. These seven areas underwent cleanup of the chemically impacted sediments in 2018—20 years after the United States completed its remedial investigation.

25.     Upon information and belief, sampling data collected in 1998 did not accurately represent the conditions of chemical contamination of the NTC Boat Channel sediment. The failure to determine the extent and magnitude of all potential contamination of the NTC Boat Channel leaves the City liable for such investigation and remediation upon transfer of ownership. Plus, the entirety of the NTC Boat Channel has been subject to deposition, resuspension, and potential loading of additional contaminants over the last two decades. As a result, the cleanup effort

performed by the United States based on 20-year-old data was insufficient.

26.    Upon information and belief, chemicals discharged into the NTC Boat Channel from NTC and MCRD activities included per- and polyfluoroalkyl substances ("PFAS"), including the specific PFAS compounds perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"), for which the United States did no testing. They also included total petroleum hydrocarbons, dichlorodiphenyltrichloroethane ("DDT") isomers and PCB congeners, and polychlorinated dibenzo-p-dioxins polychlorinated dibenzofurans ("PCDD/Fs"). Documents produced by the United States in this litigation also discloses that 5,000 pounds of chromium were released into the NTC Boat Channel sediment. The United States has failed to disclose where this chromium is located within the NTC Boat Channel, or whether any efforts were made to test or remove this substantial chromium contamination. Regulatory changes since 1998 designate these chemicals as hazardous substances that must be tested and remediated.

27.    The 1998 remedial investigation sampling program performed by the United States did not test for PFAS, PFOS, PFOA, or other likely pollutants, and the presence of such chemicals was not taken into account in the 1998 sampling program, the 2003 Remedial Investigation Report, the 2016 Final Feasibility Study Report, or the 2017 Record of Decision and Remedial Action Plan.

28.    The data relied upon by the United States are insufficient to account for the sediment contamination in the NTC Boat Channel in preparation for remediation

nearly two decades later. Natural processes of wind, water, and wave action move contamination within the defined underwater polygons, with additional perturbations from personal watercraft docked at MCRD. Moreover, the Navy failed to implement measures to prevent recontamination of remediated areas from nearby sources of potential contamination, such as the outfalls.

29.     The sediments under the riprap, adjacent to the outfalls, along the banks, shoreline, and seawall areas were not sampled or tested during the remedial investigation, leaving another data gap that should have been addressed to properly evaluate potential environmental and human health risks. This insufficient sampling resulted in an ineffective and insufficient remediation by the United States. The lack of follow-up to determine the extent and magnitude of all potential contamination of the NTC Boat Channel potentially leaves the City liable for such investigation and remediation upon transfer of ownership.

30.     The United States continues to own and operate the Boat Channel and the responsibilities and obligations to investigate and remediate are continuous. As a consequence, the duty of the United States to investigate and remediate are now an additional six years tardy.

31.     Because the United States did not test for these chemicals and conducted its remediation efforts based on outdated, 20-year-old data, the United States has failed to take all remedial action necessary to protect human health and the environment before the transfer of the property to the City. The United States failed to

satisfy this condition precedent of the MOA, and so the City never became obligated to accept ownership.

32.   The United States discharged, disposed of, caused the releases of, or failed to remediate hazardous substances and hazardous waste into the environment in, at, or around the NTC Boat Channel. As a result, the City's potential liability, if any, is reduced, diminished, or defeated.

33.   The failure of the United States to conduct an updated remedial investigation in the intervening 20 years is also inconsistent with the National Contingency Plan ("NCP"). The actions of the United States are inconsistent with the NCP because, among other reasons:

33.1   The United States failed to include relevant documents in the administrative record ("AR") pertaining to the environmental history of the site including but not limited to the location of and action required to address large quantities of hazardous substances in the NTC Boat Channel;

33.2   The United States included irrelevant documents in the AR pertaining to other Navy facilities, indicating an inattention to detail in assembling the AR;

33.3   The AR failed to address the investigation, location, and environmental implications of substances recently designated as hazardous substances by the Environmental Protection Agency

("EPA");

33.4 The effort of the United States to rely upon 20-year-old data collected in 1998 for the selected remedy, ignoring the transient nature of the location and concentration of the hazardous substances and Pollutants and Contaminants in the NTC Boat Channel;

33.5 The failure of the United States to investigate the soils in the NTC Boat Channel outside of IR Site 12;

33.6 The failure of the United States to include in the AR documents bearing upon the remedy selected due to their off-site location and disposal;

33.7 The failure of the United States to investigate contamination below an arbitrarily determined depth and to ignore historical deposits of hazardous substances dating back at least 80 years;

33.8 The failure of the United States to report releases as required by 40 C.F.R. § 300.405(b);

33.9 The failure of the United States to assess the actual or potential exposure to humas, animals, or the food chain to perfluorinated compounds listed by EPA as hazardous substances. The United States is the owner of the property in question and the appropriate action is to address these matters with an amendment to the Record of Decision. Instead, the AR is frozen in time with no consideration

of what has transpired in the physical and regulatory world since 1998, when the investigation of the NTC Boat Channel was completed. The environmental obligations of a property owner, including the United States, are continuing, not frozen in time. 40 C.F.R. § 300.415(b); and

33.10 The failure of the United States to develop sampling and analysis plans of sufficient quality and quantity to satisfy data needs. 40 C.F.R. §§ 300.420(c)(4), 430(b)(8), and 430(d)(1).

These failures, individually and cumulatively, demonstrate that the AR is inadequate, the costs of removal or remedial action incurred by the United States were not incurred consistent with the NCP, and the contractual conditions precedent to the attempted conveyance have not been satisfied.

34. This failure is also a breach of the MOA. Paragraphs 2(c) and 4(b) of the MOA obligated the United States to take all remedial action necessary to protect human health and the environment and to obtain site closure from appropriate regulatory authorities based on the projected use of Parcels IIIB and VII. Parcels IIIB and VII comprise that portion of the NTC Boat Channel at issue here. A small section at the upper northeast end of the Boat Channel lies outside of NTC in MCRD. The MOA anticipated that parcels IIIB and VII would be conveyed to the City in 2002.

35. The United States has breached, and continues to breach, its obligations under the MOA, including but not limited to failing to take all remedial action

necessary to protect human health and the environment and failing to obtain site closure from appropriate regulatory authorities based on the projected uses of Parcels IIIB and VII, as described in the NTC San Diego Reuse Plan dated August 1998.

36.    The United States developed and implemented a remediation plan with an inadequate understanding and analysis of the sources, nature, types, and extent of contamination in/at the NTC Boat Channel, so that their remediation obligations have not been satisfied. Further, the United States has failed and refused to perform any further investigation and remediation of the NTC Boat Channel.

37.    The response action of the United States breached the provisions and requirements of the MOA because: (1) the investigation of the United States was, and continues to be, inadequate; (2) the site characterization relied on stale, flawed, and incomplete data; and (3) the remediation by the United States was incomplete since the remediation plan itself was deficient, did not encompass the entirety of NTC Boat Channel parcels IIIB and VII, and did not comply with current regulatory standards. Moreover, the United States ignored the City's repeated warnings, over years, about the flaws in its investigation and remediation.

38.    The United States breached the provisions and requirements of the MOA because its remedial investigation was inadequate. The City has previously informed the United States that its remedial investigation was inadequate for the following reasons: (1) the United States failed to accurately identify the current and historic sources of discharges to the NTC Boat Channel, and further, failed to assess

their relative contributions to the contamination; (2) the remedial investigation of the United States improperly relied upon 20-year old data; (3) the United States did not test for all likely pollutants; (4) the scope and methodology of the investigation were insufficient to accurately characterize the NTC Boat Channel by current standards; and (5) many other variables could have affected the NTC Boat Channel over the roughly 20-year timeframe between investigation and remediation, potentially requiring a different remedial strategy to ensure a second cleanup action would not be necessary to remove any remaining contamination.

39.    The United States also breached the provisions and requirements of the MOA because the remediation was deficient and incomplete. As the City previously advised the United States on several occasions, the remediation was deficient because: (1) the remediation proposed cleanup to Alternative Cleanup Levels ("ACLs") that do not meet current sediment remediation standards; (2) the remediation failed to address all existing contamination throughout the entirety of the NTC Boat Channel including the banks, slopes, rip rap, shorelines, and shallower areas, which make up a significant portion of the NTC Boat Channel; (3) the remediation fails to control the potential migration of legacy contaminants from the banks, slopes, rip rap, shoreline, and shallow areas onto the NTC Boat Channel; and (4) the remedial plan proposed no remediation of Parcel IIIB, even though the parties acknowledged in the MOA that Parcel IIIB was impacted by contaminated sediments. Further, as a result of the chosen remedial plan, the United States will not provide 5-year monitoring of the site,

eliminating a protection that could have been required if a different, more comprehensive, response action had been selected.

40.    The United States also breached the provisions and requirements of the MOA because its remedial plan did not meet current sediment remediation standards, i.e., the 2009 Sediment Quality Objectives (SQOs), or the 2018 SQOs. Under the clean-up analysis, the 2009 SQOs were not considered "Applicable or Relevant and Appropriate Requirements" ("ARARs") under CERCLA. However, the United States failed to provide any explanation or analysis as to why it concluded the 2009 SQOs are not an applicable or relevant and appropriate requirement. Nor, upon information and belief, did the United States formally waive those requirements in accordance with CERCLA. Unlike the United States, future, non-federal owners of the NTC Boat Channel will not be shielded from San Diego Regional Water Quality Control Board ("Water Board") efforts to require further investigation and remediation to current State standards. An April 6, 2022 letter from the Water Board to the City confirms as much.

41.    The United States also breached the provisions and requirements of the MOA because the remedial plan failed to address all existing contamination throughout the entirety of the NTC Boat Channel, including the banks, slopes, rip rap, shorelines, and shallower areas, which make up a significant portion of the site. The City understands that these areas, which extend to the top of the bank of the NTC Boat Channel parcels, were not included in the testing protocol during the remedial

investigation of the United States. The exclusion of these areas in its remedial investigation and cleanup raises serious concerns because both surface runoff and storm drain discharges, which the United States claims is the primary source of contaminants, would have flowed across and down those areas.

42.     The remedial action is in breach of the MOA because there are inconsistencies between the areas the United States identified as impacted versus the areas that the United States cleaned up. For example, dredging depths were limited and then modified during cleanup and certain sloped areas were avoided.

43.     The remedial action is in breach of the MOA because it has failed, and continues to fail, to control the potential migration of legacy contaminants to/at the NTC Boat Channel from the banks, slopes, rip rap, shoreline, and shallow areas of the site. The remedial efforts only consisted of dredging. Dredging alone is not sufficient to assure long-term protection of the environment from recontamination threats to the NTC Boat Channel sediments. Thus, by limiting remedial measures to dredging only, and by failing to include source control measures, the sediments remain susceptible to recontamination from legacy pollutants.

44.     The United States also has breached the provisions and requirements of the MOA because it proposed no remediation of Parcel IIIB, and none was performed, even though the parties acknowledged in the MOA that Parcel IIIB was impacted by contaminated sediments.

45.     The United States also has breached the MOA because NTC Boat

Channel parcels IIIB and VII are not suitable for transfer, and yet the United States has found that NTC Boat Channel parcels IIIB and VII are suitable for transfer and has, in fact, attempted to transfer those parcels to the City in violation of the MOA.

46.    The Water Board was the lead State agency overseeing the remedial investigation and clean-up of the NTC Boat Channel. Unlike other sites, where the Water Board issues a "No Further Action" ("NFA") letter for the property as a whole, here the Water Board only issued a qualified approval of the limited clean-up. Instead of an NFA letter, the Water Board issued a "No Further Comment" Letter, which leaves the door open for further investigative and clean-up orders by the Water Board once the NTC Boat Channel is transferred to a non-federal party. Moreover, the Water Board's various letters do not state that the cleanup is protective of human health as required by the MOA. Further, any statement that the cleanup is protective of the environment is limited to the sediments in IR Site 12 because the investigation and remediation failed to include the banks, slopes, rip rap, shoreline, and shallow areas of the NTC Boat Channel. So, at most, the Water Board letters close the case on IR site 12, but do not constitute the site closure on Parcels IIIB and VII that the United States promised it would provide in the MOA.

47.    The Water Board's letters create a reasonable expectation that further investigation and clean-up will be required at the NTC Boat Channel. Indeed, the Water Board's San Diego Bay strategic plan and recently issued Investigative Orders to the City and other parties for nearby areas of the San Diego Bay clearly

demonstrate what is in store for the NTC Boat Channel should it be transferred to the City.[2]

48. Given the above, the City has no written confirmation from the Water Board that it will not seek further investigation and remediation of legacy pollutants at the NTC Boat Channel.

49. In fact, on April 16, 2019, the Water Board sent a letter to the United States. This letter was not a "No Further Action" letter typically submitted by regional boards for site closure, but was instead a communication that the Water Board had "no further comments on the Final RACR that had been submitted by the Department of the Navy in March 2019." In reliance on this correspondence, the United States submitted its Draft Finding of Suitability to Transfer (FOST) document to the Water Board on August 24, 2020, which commenced a 30-day comment period for the same. In response, the City submitted comments on the Draft FOST that outlined the investigatory and remedial failures at the NTC Boat Channel and highlighted the fact that the Water Board had never issued a "No Further Action" letter regarding the NTC Boat Channel or IR Site 12. Then, on December 16, 2020, despite the fact that no additional investigation or remedial activities had been undertaken at the NTC Boat Channel, the Water Board issued an NFA letter. The

---

[2] California Regional Water Quality Control Board San Diego Region Resolution No. R9-2015-0086 in Support of Implementation of the Strategy for a Healthy San Diego Bay; Investigative Order No. R9-2019-0040 for Laurel Hawthorne Embayment; Investigative Order No. R9-2017-0081 for Tenth Avenue Marine Terminal; Investigative Order No. R9-2017-0082 for Continental Marine San Diego.

City then filed a petition with the State Water Resources Board challenging the issuance of the NFA letter. The Water Board later unilaterally rescinded the NFA letter.

50.    Further, the United States has refused, and continues to refuse, to provide the City with the CERCLA covenant for the NTC Boat Channel parcels, which is a material term of the MOA. Pursuant to CERCLA § 120(h) at 42 U.S.C. § 9620, if the grantee of land might be a potentially responsible party, subsection (h)(3)(B) lifts the requirement for a CERCLA covenant without expressly prohibiting these covenants. The United States now asserts it will not provide the CERCLA covenant, without which the City will be exposed to significant liability if historical contamination is discovered at the NTC Boat Channel after the parcels are transferred.

51.    The United States has attempted to transfer the NTC Boat Channel parcels to the City to force their acceptance in their present condition in violation of the MOA.

52.    Given the above, the City has sustained and/or will sustain harm as a result of the failure of the United States to fulfill its obligations under the MOA, including by losing use of the NTC Boat Channel free of contamination to which it was entitled under the MOA, and/or by facing exposure to future investigative and clean-up orders if the NTC Boat Channel is transferred in its present condition to the City, and/or by facing future CERCLA and other liability related to the NTC Boat Channel.

53.    Section 9. Performance of the MOA states: "[F]ailure of either party to perform or observe any other term or condition of this Agreement prior to conveyance of the Property, after written notice and thirty days to cure, shall be deemed to be a breach of this Agreement, and the other party may exercise any of the remedies for breach or default set forth in this Agreement or otherwise available, including the right to terminate this Agreement."

54.    On June 3, 2022, the City advised the United States in writing that with regard to Parcel IIIB, the United States had not taken all remedial action necessary to protect human health and the environment nor obtained site closure from appropriate regulatory authorities, as required by the MOA. The City further advised the United States in writing that Parcel IIIB was not suitable for transfer, and noted that the suggested quitclaim deed for Parcel IIIB failed to include the CERCLA covenant. The City further advised the United States in writing that for all these reasons, the City was not willing to accept transfer of Parcel IIIB in its present condition. On June 10, 2022, the United States acknowledged receipt of the City's June 3, 2022 written communication.

55.    On May 16, 2022, the City was informed of the contents requested by the United States to be included in the transfer documents for Parcel VII. On May 19, 2022, the City advised the National Park Service and the United States in writing that the City disputed the claim that Parcel VII was suitable for transfer, and that the City objected to such transfer. On May 23, 2022, the National Park Service

acknowledged receipt of the May 19, 2022 written communication. On June 7, 2022, the City further advised the National Park Service and the United States in writing that the City would not accept transfer of Parcel VII in its present state.

56.     On February 1, 2023, with regard to both Parcel IIIB and Parcel VII, the United States advised the City in writing that (1) the United States had fulfilled all of its obligations under the MOA and (2) the United States does not intend to undertake any further cleanup efforts at the NTC Boat Channel Parcels.

57.     The absence of accurate and current data regarding the environmental condition of the NTC Boat Channel renders it impossible for the United States, or any other party, to determine what additional remedial actions are necessary to remediate all existing contamination, and further, makes it impossible to conclude that the investigative and remedial efforts are sufficient.

58.     As one example, the Navy failed to account for all legacy contamination at IR Site 12, including, but not limited to, potential contamination from the landfill formerly located on the Naval Training Center/Camp Nimitz site which is located adjacent to the NTC Boat Channel. Reports issued by the Navy identified a shallow aquifer under the old landfill where groundwater in likely contact with the waste generally flows toward the NTC Boat Channel. The Navy failed to account for this potentially significant source of contamination.

59.     Given the above, the City is under no obligation under the MOA to accept the transfer of NTC Boat Channel parcels IIIB and VII in their present

condition.

# FIRST COUNTERCLAIM
## (Contribution Pursuant to CERCLA § 113(f)(1))

60.     The City incorporates by reference all allegations of this first amended counterclaim and the answer to the FAC as though fully set forth herein.

61.     The United States is a liable person under section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

62.     The United States is a "person" as defined in CERCLA § 101(21), 42 U.S.C. § 9601(21).

63.     The United States has alleged that a "release" or threatened release of a "hazardous substance," as those terms are defined by CERCLA §§101(22), 42 U.S.C. § 9601(22), (14), has occurred at the NTC Boat Channel.

64.     The United States claims in this lawsuit that the NTC Boat Channel qualifies as a "facility" pursuant to 42 USC 9601."

65.     The City denies any liability to the United States for costs incurred inconsistent with the NCP; but if the City's CERCLA liability for alleged response costs is established by the United States, then pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), the Court should allocate the response costs sought in the claim of the United States among liable or potentially liable parties, using such equitable factors as the Court determines are appropriate, with consideration for contribution by other parties who have settled with the United States.

66.     The City is informed and believes, and based thereon alleges, that the United States either:

    66.1  "released" or threatened to "release" hazardous substances to/at the NTC Boat Channel within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) during ownership and/or occupation of the NTC and/or MCRD and/or other properties which ownership by the United States continues to this day; and/or

    66.2  owned or operated NTC and/or MCRD and/or other properties and had a duty, authority, obligation, and/or right to manage, control, oversee, monitor, regulate and/or supervise the acts or omissions of their various lessees and/or sub-lessees to prevent the "release" or threatened "release" of hazardous substances, and to remediate any such "release" within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) to/at the NTC Boat Channel; and/or

    66.3  is vicariously liable for a "release" or threatened "release" of hazardous substances to/at the NTC Boat Channel within the meaning Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) during their ownership, operation, and/or occupation of the NTC and/or MCRD and/or other properties, under applicable alter-ego, corporate successor, corporate parent, and/or other theories of vicarious liability; and/or

66.4    is the current owner and/or operator of the NTC Boat Channel.

67.    Therefore, the United States is liable under CERCLA § 107(a), 42 U.S.C. § 9607(a) for any costs of response incurred or that will be incurred by the City for the investigation and remediation of any and all disposals and/or releases of hazardous substances at the NTC Boat Channel.

68.    The City is entitled to contribution, pursuant to CERCLA § 113(f), 42 U.S.C. § 9613(f) for any and all costs, from any person who is liable or potentially liable under CERCLA, including but not limited to, assessment, investigation, evaluation, monitoring, mitigation, removal, and/or remedial action costs and/or enforcement costs, attorney's fees, consultant fees, and related costs, together with interest and court costs, incurred by the City in excess of the City's proportionate liability.

69.    WHEREFORE, the City prays for judgment as set forth below.

## SECOND COUNTERCLAIM
### (Recoupment)

70.    The City incorporates by reference all allegations of this first amended counterclaim and the answer to the FAC as though fully set forth herein.

71.    The City is informed and believes, and based thereon alleges, that the United States:

71.1    "released" or threatened to "release" hazardous substances to/at the NTC Boat Channel within the meaning of Section 101(22) of

CERCLA, 42 U.S.C. § 9601(22) during ownership, operation, and/or occupation of said location; and/or

71.2   owned or leased the NTC Boat Channel and had a duty, authority, obligation, and/or right to manage, control, oversee, monitor, regulate and/or supervise the acts or omissions of their various lessees and/or sublessees to prevent the "release" or threatened "release" of hazardous substance, and to remediate any such "release" within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22) to/at said location; and/or

71.3   is vicariously liable for a "release" or threatened "release" of hazardous substances at the NTC Boat Channel within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), under applicable alter-ego, corporate successor, corporate parent, and/or other theories of vicarious liability; and is the current owner and operator of the NTC Boat Channel.

71.4   Thus, the United States is an "owner or operator" at the time when hazardous materials were allegedly released or threatened to be released to/at the NTC Boat Channel and is vicariously liable for a release or threatened release to/at the NTC Boat Channel or is the current "owner or operator" of the NTC Boat Channel and therefore the United States is a "responsible," "liable" and/or "covered" party

pursuant to 42 U.S.C. § 9607.

72.     Based on the above, the City is entitled to recoupment diminishing or defeating the recovery of the United States.

73.     Sovereign immunity does not prevent or preclude a recoupment claim arising out of the same transaction or occurrence which is the subject matter of the suit of the United States and which seeks relief only to the extent of diminishing or defeating the recovery of the United States. *See United States v. Lockheed L-188 Aircraft*, 656 F.2d 390, 395 n.11 (9th Cir. 1979) ("counterclaims[] [for setoff or recoupment] arising from the same transaction as the matter sued upon[] are allowed when the government waives its sovereign immunity in suing a person").

74.     WHEREFORE the City prays for judgment as set forth below.

## THIRD COUNTERCLAIM
### (Declaratory Judgment and Injunctive Relief under the Administrative Procedure Act)

75.     The City incorporates by reference all allegations of this first amended counterclaim and the answer to the FAC as though fully set forth herein.

76.     The Record of Decision, Remedial Action Plan, and Remedial Action Completion Report are agency actions subject to review under the Administrative Procedure Act ("APA"). The City is affected or aggrieved by this agency action and is entitled to judicial review thereof.

77.     The APA provides that "[t]he United States may be named as a defendant in any such action, and a judgment or decree may be entered against the

United States." 5 U.S.C. § 702. The United States has waived sovereign immunity for this claim under the APA because the City does not seek money damages, an adequate remedy for the City's claims is not available elsewhere, and the City's claims do not seek relief expressly or impliedly forbidden by another statute, including CERCLA, now that the United States alleges that it has completed all remedial measures it intends to perform under CERCLA and the MOA.

78.    The actions of the United States through the Remedial Action Completion Report are unlawful and should be set aside as arbitrary, capricious, an abuse of discretion and without observance of procedure required by law. The Remedial Action Completion Report fails to comply with the requirements of CERCLA because it is based on 20-year-old data that fails to take into account regulatory changes in the intervening years and fails to account for other hazardous substances that the United States admits exist in the NTC Boat Channel, such as PFAS, PFOS, PFOA, total petroleum hydrocarbons, DDT isomers, PCB congeners, PCDD/Fs, and 5,000 pounds of chromium. The United States admits these hazardous substances were released into the NTC Boat Channel during the time the United States was the "owner" and "operator" of the NTC Boat Channel, yet have not been tested or remediated.

79.    The Remedial Action Completion Report is also inconsistent with the obligations of the United States under the MOA. The Remedial Action Completion Report is arbitrary and capricious because it is inconsistent with the requirement of

the MOA that the United States take all remedial action necessary to protect human health and the environment. The unexplained inconsistency between the MOA and the Remedial Action Completion Report demonstrates the United States acted in an arbitrary and capricious manner in unilaterally changing its obligations to the City through later agency action. In doing so, the United States ignored or countermanded its earlier factual findings underlying the MOA without reasoned explanation for doing so.

80.    The Record of Decision, Remedial Action Plan, and Remedial Action Completion Report should also be set aside under the APA because they are inconsistent with the NCP as alleged above.

81.    To remedy these arbitrary and capricious actions in violation of the APA, MOA, NCP, and CERCLA, the City is entitled to declaratory judgment and injunctive relief preventing the United States from relying upon the flawed and inaccurate Record of Decision and the consequent Remedial Action Completion Report in a manner that violates the obligations and conditions precedent it agreed to in the MOA.

82.    WHEREFORE, the City prays for judgment as set forth below.

## FOURTH COUNTERCLAIM
### (Declaratory Relief Pursuant to CERCLA § 113(g)(2) and Other Federal and State Laws)

83.    The City incorporates by reference all allegations of this first amended counterclaim and the answer to the FAC as though fully set forth herein.

84.    An actual and substantial legal controversy exists between the City and

the United States regarding their respective rights and obligations for response costs that allegedly have been incurred and will be incurred in connection with contamination found at the NTC Boat Channel. The City contends that it is entitled to a declaration that the United States is liable for all past, present, and future response costs and other damages incurred by the City in connection with the NTC Boat Channel. Based on information and belief, the United States contends otherwise.

85.    The City is authorized to seek declaratory relief in this action against the United States pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

86.    No adequate or speedy remedy exists for the City in the absence of a judicial declaration pursuant to applicable law. Based on information and belief, if the City's liability is established, then it will incur substantial costs over time and after conclusion of this action; and unless declaratory relief is granted, the City will need to commence successive actions against the United States, and each of them, to secure compensation for the costs incurred and damages sustained, thus requiring a multiplicity of suits. The City therefore requests a declaration from the Court setting forth its liability, if any, and that of the United States for past, present, and future response, removal and remediation costs, and other penalties and/or damages imposed on the City in connection with the NTC Boat Channel.

87.    WHEREFORE, the City prays for judgment as set forth below.

# PRAYER FOR RELIEF

WHEREFORE, the City prays for judgment against the United States as follows:

1.     For an Order of this Court finding that the United States has failed to fully and completely investigate the Boat Channel and has acted in a manner inconsistent with the NCP.

2.     For an Order of this Court prohibiting the United States from transferring NTC Boat Channel Parcels VII and III-B to the City unless and until the United States can fully demonstrate to this Court that (1) it has taken all remedial action necessary to protect human health and the environment and (2) it has obtained site closure from appropriate regulatory authorities based on the projected uses of Parcels VII and III-B, as described in the NTC San Diego Reuse Plan dated August 1998; and

3.     For an Order of this Court compelling the United States (1) to take all remedial action necessary to protect human health and the environment and (2) to obtain site closure from appropriate regulatory authorities based on the projected uses of Parcels VII and III-B, as described in the NTC San Diego Reuse Plan dated August 1998; and

4.     For an Order of this Court declaring that the City has no legal duty to accept transfer of NTC Boat Channel Parcels VII and III-B to the City due to the breach of the requirements and provisions of the MOA by the United States; and

5.      For an Order of this Court granting the City recoupment against the United States diminishing or defeating the recovery, if any, to the United States; and

6.      For an Order of this Court granting declaratory judgment and injunctive relief under the APA; and

7.      For contribution from the United States, pursuant to 42 U.S.C. § 9613(f)(1), for all or part of the past and future response costs that the City is or may be liable for with respect to the NTC Boat Channel; and

8.      For a declaration, pursuant to 42 U.S.C. § 9613(g)(2) that the City is entitled to contribution from the United States for all or part of the response costs, expenses, and other damages that the City is or may be liable for in any subsequent action or actions to recover further response costs incurred in response to the releases or threatened release of hazardous substances at the NTC Boat Channel; and

9.      For costs of suit; and

10.     For such other relief that the Court deems just and proper.


DATED:  November 21, 2024            Respectfully submitted,

                                    KUTAK ROCK LLP


                                    By:  */s/ Barry P. Steinberg*
                                         Barry P. Steinberg
                                         barry.steinberg@kutakrock.com

                                    Attorney for Defendant/Cross Defendant/
                                    Counter Claimant/Cross Claimant
                                    City of San Diego