TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

STEFAN J. BACHMAN (SC Bar No. 102182)
BRIAN SCHAAP (DC Bar No. 1780655)
NICHOLAS MCDANIEL (MA Bar No. 682742)
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 616-6536

MARK ALBERT RIGAU (CA Bar No. 223610)
Environmental Defense Section
450 Golden Gate Avenue, Suite 07-6714
San Francisco, CA 94102
Phone: (415) 744-6487

ALASTAIR M. GESMUNDO (CABN 316573)
SAMUEL F. HOBBS (AL Bar No. 9776O19E)
Civil Division
Commercial Litigation Branch
Phone: (202) 305-4664

*Attorneys for Plaintiff and Counterclaim Defendant United States of America*

## IN THE UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO, et. al.<br><br>        Defendants.<br><br>*AND RELATED CROSS CLAIMS* | Case No. 3:23-cv-00541-LL-BJC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE CITY OF SAN DIEGO'S *PRIMA FACIE* LIABILITY UNDER CERCLA** |

Case No. 3:23-cv-00541-LL-BJC

# MEMORANDUM OF POINTS AND AUTHORITIES
## TABLE OF CONTENTS

**INTRODUCTION AND BACKGROUND**................................................................1

**SUMMARY OF ARGUMENT** ........................................................................4

**ARGUMENT** ...................................................................................5

I.  Legal Background......................................................................5

  A. Summary Judgment Standard.........................................................5

  B. Statutory Background and Standard of Review under CERCLA .................7

II. The City's *Prima Facie* Liability Under CERCLA.................................8

  A. The City's Storm Sewer System and the Airport are "Facilities".................9

  B. There Have Been "Releases" of "Hazardous Substances" From....................

  the Storm Sewer System and the Airport ...........................................11

     i.    The City's Storm Sewer System Discharges Are Releases of Hazardous Substances into the Boat Channel..............................................11

     ii.   Overland Stormwater Runoff from the Airport to the Boat Channel is a Release. ........................................................................14

  C. The Releases Have Caused the United States to Incur Response Costs .......15

  D. The City Falls Within One or More of the Classes of Liable .........................

  Parties Defined by CERCLA..........................................................16

  E. CERCLA Compels a Declaratory Judgment on the City's Joint .................

  and Several Liability for Response Costs.............................................19

III. The City's Asserted Affirmative Defenses are Legally and Factually Insufficient  ........................................................................19

**CONCLUSION**.................................................................................21

# TABLE OF AUTHORITIES

## Federal Cases

*3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355
(9th Cir. 1990) ................................................................................. 13

*Adobe Lumber, Inc. v. Hellman*, 658 F. Supp. 2d 1188
(E.D. Cal. 2009) ................................................................................ 14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242
(1986) ............................................................................................. 9, 10

*B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir. 1996) ....................... 15

*Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286
(11th Cir. 2002) ................................................................................ 23

*Burlington N. & Santa Fe Ry. Co. v. United States*,
556 U.S. 599 .................................................................................... 23

*Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562
(9th Cir. 1994) ................................................................................. 21

*California ex rel. Cal. Dep't of Toxic Servs. v. Neville Chem. Co.*,
213 F. Supp. 2d 1134 (C.D. Cal. 2002) ........................................... 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................... 9, 10

*Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*,
153 F.3d 344 (6th Cir. 1998) ........................................................... 23

*CMC Heartland Partners v. Union Pac. R.R.*,
78 F.3d 285 (7th Cir. 1996) ............................................................. 20

*Coeur D'Alene Tribe v. Asarco, Inc.*,
280 F. Supp. 2d 1094 (D. Idaho 2003) ............................................ 18

*Cose v. Getty Oil Co.*,
4 F.3d 700–09 (9th Cir. 1993) ......................................................... 13

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
889 F.2d 1146 (1st Cir. 1989) ......................................................... 14

*Kalamazoo River Study Group v. Menasha Corp.*,
228 F.3d 648 (6th Cir. 2000) ........................................................... 21

*Kelley v. E.I. DuPont de Nemours & Co.*
17 F.3d 836 ..................................................................................... 22

*Kelly v. Thomas Solvent Co.*,
714 F. Supp. 1439 (W.D. Mich. 1989) ............................................ 24

*Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*,
   14 F.3d 321 ........................................................................ 19
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .......................................................... 9, 10
*Mendoza v. Garland, No. 21-cv-01968-LL-MDD*,
   2023 WL 1805868 (S.D. Cal. Feb. 7, 2023) ...................... 8, 10
*Mission Linen Supply v. City of Visalia, No. 15-cv-0672-AWI-EPG*,
   2019 WL 446358 (E.D. Cal. Feb. 5, 2019) ....................... 14
*New York v. Green*,
   420 F.3d 99 (2d Cir. 2005) ................................................ 22
*Pakootas v. Teck Cominco Metals, Ltd.*,
   452 F.3d 1066 (9th Cir. 2006) .................................... 17, 21
*Redwing Carriers Inc. v. Saraland Apartments*,
   94 F.3d 1489 (11th Cir. 1996) .......................................... 21
*State of N.Y. v. Shore Realty Corp.*,
   759 F.2d 1032 (2d Cir. 1985) ........................................... 23
*Tosco Corp. v. Koch Indus. Inc.*,
   216 F.3d 886 (10th Cir. 2000) .......................................... 21
*United States v. Am. Cyanamid Co.*,
   786 F. Supp. 152 (D.R.I. 1992) ....................................... 11
*United States v. CDMG Realty Co.*,
   96 F.3d (3d Cir. 1996) ...................................................... 20
*United States v. Chapman*,
   146 F.3d 1166 ............................................................ 11,12
*United States v. Chromalloy Am. Corp.*,
   158 F.3d 345 (5th Cir. 1998) ........................................... 11
*United States v. Dico, Inc.*,
   266 F.3d 864 (8th Cir. 2001) ........................................... 11
*United States v. Findett Corp.*,
   220 F.3d 842 (8th Cir. 2000) ........................................... 11
*United States v. Hardage*,
   982 F.2d 1436 (10th Cir. 1992) ....................................... 11
*United States v. Hercules, Inc.*,
   247 F.3d 706 (8th Cir. 2001) ........................................... 19
*United States v. Kramer*,
   757 F. Supp. 397 (D.N.J. 1991) ...................................... 19
*United States v. Meyer*,

120 F. Supp. 2d 635 (W.D. Mich. 1999) .......................................... 14

*United States v. Northernaire Plating Co.*,
685 F. Supp. 1410 (W.D. Mich. 1988) ................................. 11

*United States v. Rohm & Haas Co.*,
939 F. Supp. 1142 (D.N.J. 1996) .......................................... 24

*United States v. Sterling Centrecorp Inc.*,
977 F.3d 750 (9th Cir. 2020) ................................................ 12

*United States v. TIC Inv. Corp.*,
68 F.3d 1082 (8th Cir. 1995) ................................................ 21

*United States v. Union Corp.*,
277 F. Supp. 2d 478–87 (E.D. Pa. 2003) ........................... 14

*United States v. USX Corp.*,
68 F.3d 811 (3d Cir. 1995) ................................................... 22

*Velsicol Chem. Corp. v. Enenco, Inc.*,
9 F.3d 524 (6th Cir. 1993) ................................................... 23

*Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*,
66 F.3d 669–80 (4th Cir.1995) ............................................ 14

**Federal Statutes**

42 U.S.C. § 9601 ......................................................... 13, 15, 19, 20
42 U.S.C. § 9601(23) ................................................................... 19
42 U.S.C. § 9601(25) ................................................................... 19
42 U.S.C. § 9601(29) ................................................................... 20
42 U.S.C. § 9607 ................................. 6, 7, 8, 10, 11, 18, 19, 20, 21, 22, 23, 24
42 U.S.C. § 9607(a) .............................. 7, 8, 9, 11, 18, 20, 21, 22, 23
42 U.S.C. § 9607(a)(4)(A) ............................................. 6, 7, 8, 11
42 U.S.C. § 9613 ............................................................ 11, 12, 22
42 U.S.C. §§ 9601-9675 ................................................................. 5

**Federal Regulations**

40 C.F.R. § 302.4 ......................................................................... 16

**Rules**

Fed. R. Civ. P. 56 ............................................................... 8, 9, 10
Fed. R. Civ. P. 56(a) .................................................................... 10
Fed. R. Civ. P. 56(c) ...................................................................... 9

Fed. R. Civ. P. 56(e) ............................................................................... 10

Fed. R. Civ. P. 56(g) ............................................................................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION AND BACKGROUND

In this case, the United States seeks recovery from the City of San Diego of over $17 million in unreimbursed costs that the Navy has incurred in addressing releases of hazardous substances at the Boat Channel. The City is liable for reimbursement of those costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, because the City discharged contamination to the Boat Channel from its storm sewer system and from overland runoff from the San Diego International Airport property ("Airport"), previously owned and operated by the City. This Memorandum supports a motion for partial summary judgment on the City's *prima facie* liability under CERCLA. A ruling in the United States' favor would fully resolve Claim 2 in the United States' Amended Complaint and significantly narrow the remaining issues in this case. *See* ECF No. 25.

The Boat Channel is a narrow body of water that was created in the late 1930s and early 1940s, as the result of fill activities in former tidelands of San Diego Bay. The Boat Channel and some surrounding property used to be owned and operated by the Navy for the Naval Training Center ("NTC"), which operated from roughly the 1920s before closing in 1997. The United States also operates a Marine Corps Recruit Depot ("MCRD") along a portion of the northern basin of the Boat Channel. Both the NTC and the MCRD properties contained athletic fields, classroom buildings, facility support buildings, training centers, and housing.

The Boat Channel became contaminated through several sources over the course of many decades. Over thirty stormwater outfalls discharge stormwater into the Boat Channel. The City's municipal separate storm sewer system ("Storm Sewer System") gathers runoff from hundreds of acres of residential, commercial,

-1-                          Case No. 3:23-cv-00541-LL-BJC

industrial, and other areas, and then discharges that runoff into the Boat Channel. Stormwater runoff from the Airport also drains to the Boat Channel. The City owned and operated the Airport from 1928 to 1962.[1]  Additionally, the City sometimes experiences overflows of raw sanitary sewage, which has contributed contamination to the Boat Channel through the Storm Sewer System.

The decades of stormwater runoff and sanitary sewage discharges led to the accumulation of metals (copper, lead, and zinc) and pesticides (dichlorodiphenyltrichloroethane or "DDT" and chlordane) in the Boat Channel. These contaminants are ubiquitous in stormwater runoff.

As the Navy prepared to close the NTC, it found copper, lead, zinc, DDT, and chlordane contamination in sediment at the bottom of the Boat Channel. After carrying out the investigation and cleanup process outlined in CERCLA, in 2017-2018 the Navy dredged the contaminated Boat Channel sediments and disposed of approximately 30,000 cubic yards of material at an off-site landfill. The Navy incurred over $16.2 million in remediation costs and continues to incur enforcement and litigation costs for this case.

The United States seeks reimbursement of these cleanup and enforcement costs under CERCLA. CERCLA Section 107(a)(4) provides that liable parties must pay "*all costs* of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan." 42 U.S.C.

---

[1] There is some dispute over whether the United States took control of the Airport for a short period of time during World War II. The United States contends that it did not take control of the Airport. Regardless, this dispute is not material to the United States' summary judgment motion because the City indisputably owned the Airport for the majority of the relevant time period and contributed contamination to the Boat Channel during that period.

§ 9607(a)(4)(A) (emphasis added).  This brief supports the United States' motion for partial summary judgment on the City's *prima facie* CERCLA liability.[2]

The City's liability under CERCLA can be summarized as follows:

**Sewer System Discharges:**  The City's Storm Sewer System discharged contaminated stormwater runoff to the Boat Channel.  The City also sometimes discharged sanitary sewage that contained hazardous substances.  The Navy incurred costs in cleaning up this contamination in the Boat Channel.

**Airport Runoff:**  During the period of City ownership, overland stormwater runoff containing hazardous substances drained to the Boat Channel.  The Navy incurred costs in cleaning up this contamination in the Boat Channel.

The parties' expert designations and initial expert disclosures make clear that the City cannot dispute the facts establishing both theories of liability.  The City has not offered – and cannot offer – any expert testimony to dispute that its stormwater runoff contributed contamination to the Boat Channel.  In fact, the City's own expert concludes that "a reasonable overall allocation of contaminant contribution to the environmental response costs for the Boat Channel is 12.5% for the City of San Diego."  *See* ECF. No. 119-44 at 4-5.  The United States' motion is therefore ripe for decision.  A ruling on the City's liability and the recoverability of

---

[2] The United States expects that it will also move for summary judgment on the actual *amount* of costs recoverable in this case, at the close of expert discovery. The City is not able to contest those costs.  But because the City has disclosed an expert that may discuss the amount of the United States' response costs, the United States is only moving for partial summary judgment on liability at this time.

the United States' costs would significantly narrow the scope of any remaining issues that may need to be addressed at trial.[3]

## **SUMMARY OF ARGUMENT**

In the argument presented below, Section I summarizes the standard for entry of partial summary judgment and provides legal background on the elements of liability and the standard for recovery of cleanup costs under CERCLA. Pursuant to Fed. R. Civ. P. 56, the Court shall grant summary judgment on each claim or defense for which the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Mendoza v. Garland*, 2023 WL 1805868, *2-3 (S.D. Cal. 2023). Under CERCLA Section 107(a), the United States must demonstrate that response costs were incurred in connection with the release or threatened release of hazardous substances from a facility, as those terms are defined in the statute. In turn, CERCLA Section 107(a)(4)(A) provides that liable parties must pay "*all costs* of removal or remedial action incurred by the United States Government . . . not inconsistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(A) (emphasis added).

Section II demonstrates the *prima facie* liability of the City based on the undisputed material facts bearing on each element of liability. The City's Storm Sewer System and the Airport are facilities under CERCLA. Releases of

---

[3] At a basic level, this case involves three primary issues: (1) the City's CERCLA liability for the United States' cleanup costs; (2) the allocation of response costs among all the potentially responsible parties, including the United States; and (3) whether the United States' cleanup of the Boat Channel complied with the relevant standard under CERCLA and a 2000 Memorandum of Agreement between the City and the Navy. A ruling in the United States' favor on this current motion for partial summary judgment would resolve the first issue and narrow the remaining issues.

hazardous substances (including heavy metals and pesticides) from those facilities caused the United States to incur response costs in cleaning up the Boat Channel. The City is therefore liable under CERCLA as a current and/or past owner of these facilities.

Section III demonstrates that the City's asserted affirmative defenses are legally and factually insufficient.

Pursuant to this Court's Chamber Rules, attached to this motion is a separate Statement of Undisputed Material Facts with numbered paragraphs for each undisputed material fact, as well as citations to the evidentiary record. The argument below cites to these numbered paragraphs as "SOF ¶ [number]" when referencing a relevant material fact.

## ARGUMENT

### I.    Legal Background

#### A.    Summary Judgment Standard

The Court is well acquainted with the general standards governing consideration of a motion for summary judgment, as summarized here:

> Under Federal Rules of Civil Procedure Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Substantive law determines "which facts are critical and which facts are irrelevant." *Id.* Further, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). When ruling on a summary judgment motion, the court must view "the inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Further, once the moving party satisfies this initial burden, the nonmoving party must identify "specific facts showing that there is a genuine dispute for trial". *Celotex*, 477 U.S. at 324. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (citations omitted). Thus, "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 256.

*Mendoza v. Garland*, No. 21-cv-01968-LL-MDD, 2023 WL 1805868, *2-3 (S.D. Cal. Feb. 7, 2023).

These general standards apply to this motion for partial summary judgment. Partial summary judgment is explicitly authorized by Rule 56, which provides that a party "may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a).  Even if the Court finds that it cannot grant all relief requested by a summary judgment motion, the Court may enter an order identifying "any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed R. Civ. P. 56(g).

**B.    Statutory Background and Standard of Review under CERCLA**

Congress enacted CERCLA in response to widespread concern over the environmental and public health effects resulting from improper disposal of hazardous industrial wastes and other hazardous substances.  Under CERCLA Section 107(a)(4)(A), liable parties must pay "*all costs* of removal or remedial action incurred by the United States Government . . . not inconsistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(A) (emphasis added).  CERCLA also provides that the Court "*shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2) (emphasis added).

Because CERCLA imposes strict liability and recognizes only limited defenses, the courts have routinely granted the United States partial summary judgment establishing a defendant's liability under CERCLA Section 107(a), as well as liability for uncontested costs.  *See, e.g.*, *United States v. Dico, Inc.*, 266 F.3d 864, 878-79 (8th Cir. 2001) (affirming district court's grant of summary judgment awarding government a recovery of its costs incurred in cleanup of site as well as enforcement costs); *California ex rel. Cal. Dep't of Toxic Servs. v. Neville Chem. Co.,* 213 F. Supp. 2d 1134, 1142 (C.D. Cal. 2002); *United States v. Findett Corp.,* 220 F.3d 842, 849-50 (8th Cir. 2000); *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 347-48 (5th Cir. 1998); *United States v. Hardage*, 982 F.2d 1436, 1448 (10th Cir. 1992); *United States v. Northernaire Plating Co.,* 685 F. Supp. 1410, 1414-15 (W.D. Mich. 1988)*, aff'd sub nom., United States v. R.W. Meyer, Inc.,* 889 F.2d 1497 (6th Cir. 1989).

Once a government plaintiff establishes a *prima facie* case that its response costs were incurred in connection with the release or threatened release of hazardous substances from a site, the costs are presumed consistent with the NCP,

and the burden shifts to defendants to prove otherwise.  *See, e.g., United States v. Chapman*, 146 F.3d 1166, 1170; *United States v. Am. Cyanamid Co.*, 786 F. Supp. 152, 161 (D.R.I. 1992).

## II.    The City's *Prima Facie* Liability Under CERCLA

Fact discovery is complete and the parties have identified the expert testimony they expect to use at trial.  The City's expert designations and initial expert disclosures make clear that it cannot raise any colorable challenge to its CERCLA liability.  Importantly, the City has not disclosed any expert testimony that could challenge any of the elements of *prima facie* liability discussed below. To the contrary, the City's own expert acknowledges that the City contributed contamination to the Boat Channel.  *See* ECF No. 119-44.  And the City has not challenged whether the Navy incurred cleanup costs in connection with the Site.[4] Summary judgment on the City's liability is therefore appropriate.

To establish a *prima facie* case to recover its response costs under CERCLA, the United States must prove: (1) the site is a "facility"; (2) a "release" or "threatened release" of a hazardous substance occurred; (3) the government

--------------------------------------------

[4] The City has offered expert testimony criticizing the sufficiency of Navy's investigation and cleanup of Boat Channel.  This expert testimony is irrelevant for purposes of this partial summary judgment motion for three reasons.  First, even if the City attempts to challenge the consistency of response costs with the NCP, that issue is not relevant to the City's *prima facie* liability, which is the subject of this motion.  Second, any expert testimony on the sufficiency of the cleanup is irrelevant generally, because judicial review of response actions is explicitly limited to the administrative record under CERCLA.  42 U.S.C. § 9613(j)(1). Third, the City has argued that Navy *did not do enough* in its cleanup of the Boat Channel.  Clearly, the City's argument that Navy should have performed additional response actions (and presumably spent more money) at the Site cannot somehow create a material dispute about whether the response actions Navy *did perform* are consistent with the NCP.

incurred costs in responding to the release or threatened release; and (4) the defendant falls within one of four categories of "covered persons" subject to liability. *United States v. Sterling Centrecorp Inc.*, 977 F.3d 750, 756 (9th Cir. 2020); *Chapman*, 146 F.3d at 1169.

The subsections below explain how the basic, undisputed material facts demonstrate the City's *prima facie* liability under CERCLA. In order to find liability, the Court need only conclude that the City discharged *any* amount of hazardous substances into the Boat Channel, no matter how small. *See Cose v. Getty Oil Co.,* 4 F.3d 700, 708–09 (9th Cir. 1993).

### A.    The City's Storm Sewer System and the Airport are "Facilities"

CERCLA incorporates a two-faceted definition of the term "facility":

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). "[T]he term facility has been broadly construed by the courts, such that in order to show that an area is a facility, the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there." *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1360 n.10 (9th Cir. 1990).

The City's Storm Sewer System is a "facility" under both (A) and (B). The exact configuration and components of the Storm Sewer System have changed over time, but at a basic level it consists of drains, pipes, box culverts, and other conveyances designed to collect stormwater runoff and transport it to discharge

points known as outfalls.  SOF ¶ 16.  Over 30 outfalls discharge directly to the Boat Channel, at least some of which are City Storm Sewer System outfalls.  SOF ¶¶ 21-23.  Courts examining the issue have consistently concluded that sewer systems are a "facility" under CERCLA because the system is a "structure, installation, equipment, pipe or pipeline."  *See Mission Linen Supply v. City of Visalia*, No. 15-cv-0672-AWI-EPG,  2019 WL 446358, at *15 (E.D. Cal. Feb. 5, 2019), *aff'd*,817 F. App'x 336 (9th Cir. June 3, 2020); *Adobe Lumber, Inc. v. Hellman*, 658 F. Supp. 2d 1188, 1194 (E.D. Cal. 2009); *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n,* 66 F.3d 669, 678–80 (4th Cir.1995); *United States v. Union Corp.,* 277 F. Supp. 2d 478, 486–87 (E.D. Pa. 2003); *United States v. Meyer,* 120 F. Supp. 2d 635, 639 (W.D. Mich. 1999).

Under subpart (B), the Storm Sewer System is also a "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  SOF ¶¶ 24-25, 30, 36-37.  Courts have interpreted subpart (B) to include "every conceivable place where hazardous substances come to be located." *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1151 (1st Cir. 1989).  As explained further below in Section II.B, it is undisputed that hazardous substances in stormwater runoff came to be located in the City's Storm Sewer System.  SOF ¶¶ 24-25, 30, 36-37.  The Storm Sewer System therefore qualifies as a CERCLA "facility" under subpart (B) as well.  *See Meyer*, 120 F. Supp.2d at 638-639 (finding private sewer lines to be facilities).

In addition to the Storm Sewer System, the Airport is also a "facility" under both CERCLA subparts.  While its configuration and components have also changed over time, the Airport has always included buildings, structures, installations, equipment, and aircraft.  SOF ¶¶ 10-13.  During the general period of City ownership, the Airport consisted of a runway, aircraft taxiways, terminals, and

airport-related buildings and infrastructure. *Id*. And the Airport also qualifies under subpart (B) because heavy metals (lead, copper, and zinc) from lead-fueled aircraft, aircraft and vehicle tires, and other airport activities came to be located there. SOF ¶¶ 49-52.

## B. There Have Been "Releases" of "Hazardous Substances" From the Storm Sewer System and the Airport

CERCLA Section 101(22) broadly defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment . . . ." 42 U.S.C. § 9601(22). Again, for purposes of establishing liability, even a small amount of hazardous substances is sufficient; "[q]uantity or concentration is not a factor." *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 515 (2d Cir. 1996)

This brief highlights the basic, undisputed facts demonstrating liability. At least two categories of events qualify as releases under the second element of CERCLA liability. First, discharges of stormwater containing hazardous substances into the Boat Channel qualify as a "release" from the "facility" of the City's Storm Sewer System. Second, overland stormwater runoff containing hazardous substances draining into the Boat Channel qualifies as a "release" from the "facility" of the Airport.

### i. The City's Storm Sewer System Discharges Are Releases of Hazardous Substances into the Boat Channel.

It is indisputable that the City's stormwater runoff contains CERCLA hazardous substances and that, in turn, those hazardous substances are discharged into the Boat Channel via the City's stormwater outfalls. SOF ¶¶ 22-23, 25, 30, 36-37. When it rains, various contaminants on the ground are picked up by the stormwater runoff and conveyed into the storm swales, gutters, and storm sewers,

eventually reaching the City's outfalls in the Boat Channel. SOF ¶ 24. A direct discharge of hazardous substances from an outfall clearly falls within CERCLA's definition of a "release."

The City's discharge of hazardous substances can be established from its own monitoring and reporting. The City operates its Storm Sewer System pursuant to a municipal separate storm sewer system ("MS4") permit.[5] SOF ¶¶ 19-20. The MS4 permit requires the City to monitor and report concentrations of contaminants, including heavy metals. SOF ¶ 31. The City has sampled stormwater from manholes upstream of outfalls that discharge directly into the Boat Channel, and the City's sampling demonstrates the presence of copper, zinc, and lead in the stormwater. SOF ¶ 30. In fact, the City uses its stormwater monitoring to create event mean concentrations or "EMCs." SOF ¶ 31. EMCs are expected concentrations of contaminants in stormwater, averaged over the course of a storm event – in other words, EMCs are a way to estimate and measure the contamination in stormwater. *Id*. The City's own EMCs demonstrate without a doubt that its stormwater contains lead, copper, and zinc. SOF ¶ 32.

The Navy's CERCLA cleanup of the Boat Channel addressed five "contaminants of concern": copper, lead, zinc, chlordane, and DDT. SOF ¶ 6. All five of these contaminants are "hazardous substances" listed in CERCLA's NCP regulations, *see* 40 C.F.R. § 302.4, and all five substances were discharged to the Boat Channel via the City's Storm Sewer System. SOF ¶¶ 25, 37. The following

---

[5] Since 1991, the City has operated under several different MS4 permits, SOF ¶¶ 19-20, the specifics of which are not relevant to this summary judgment motion on the City's CERCLA liability. Prior to 1991, the City's Storm Sewer System and stormwater discharges were entirely unregulated. SOF ¶ 19.

briefly summarizes the undisputed facts supporting the presence of these substances in the City's stormwater runoff:

**Copper, Lead, and Zinc:**  Various components of cars, such as tires and brakes, will shed copper and zinc into the environment due to normal wear and tear.  SOF ¶ 26.  The historical use of leaded gasoline in automobiles, prior to reduction standards, resulted in lead emissions into the environment.  SOF ¶ 27.  Lead paint and lead-contaminated dust can be released into the environment from old buildings.  SOF ¶ 28.  The City's streets, parking lots, and buildings are sources for these heavy metals.  SOF ¶ 29.[6]  The contaminants are picked up by stormwater runoff and carried through the City's Storm Sewer System and discharged at the Boat Channel.  SOF ¶¶ 22, 24.  The City's own monitoring results show that these heavy metal contaminants are ubiquitous in the City's stormwater.  SOF ¶ 30.  Copper, lead, and zinc are also present in untreated sanitary sewage.  SOF ¶¶ 38-39.  From 1941 until 1943, the City discharged sanitary sewage directly to the Boat Channel without any treatment.  SOF ¶ 46.  On other occasions, the City experiences sanitary sewer overflows that result in sanitary sewage discharges to the Boat Channel via the Storm Sewer System, including a 1962 sanitary sewage discharge.  SOF ¶¶ 47-48.

**Chlordane and DDT:**  Pesticides containing DDT and chlordane were widely used in the City prior to being banned in 1972 and 1988, respectively.  SOF ¶ 33.  The City itself sprayed DDT to control mosquitoes and other pests, including spraying outdoor trash cans.  SOF ¶ 34.  The City also used chlordane as a

---

[6] *See also* City's Expert Report of Adam Love, ECF No. 119-44 at 39 ("There were light industrial facilities in both the City of San Diego and the US Government stormwater basin that are the most likely source of the metal COCs in stormwater.").

pesticide, including directly spraying sewer manholes as part of a city-wide roach control initiative in the 1960s.  SOF ¶ 35.  City residents commonly used these pesticides prior to their being banned.  SOF ¶ 33.  DDT and chlordane are picked up by stormwater runoff and carried through the City's Storm Sewer System and discharged to the Boat Channel.  SOF ¶ 22, 24.  DDT and chlordane would also have been present in sanitary sewage prior to being banned.  SOF ¶ 40.[7]

### ii.    Overland Stormwater Runoff from the Airport to the Boat Channel is a Release.

The Ninth Circuit has held that "the passive migration of hazardous substances into the environment from where hazardous substances have come to be located is a release under CERCLA."  *Pakootas v. Teck Cominco Metals, Ltd*., 452 F.3d 1066, 1075 (9th Cir. 2006) (holding that the leaching of hazardous substances from slag at a site is a release).  The movement of the hazardous substances into the environment can be entirely passive, and the release can happen without the assistance of any pipes or other man-made conveyances.  *See Coeur D'Alene Tribe v. Asarco, Inc.,* 280 F. Supp. 2d 1094, 1113 (D. Idaho 2003) ("Th[e] passive movement and migration of hazardous substances by mother nature (no human action assisting in the movement) is still a 'release' for purposes of CERCLA.").  *Id.* at 1113.

As with the Storm Sewer System, stormwater runoff from Airport surfaces and structures indisputably contains hazardous substances like copper, lead, and zinc.  SOF ¶¶ 49-52.  During the period of City ownership, hundreds of thousands of lead-fueled aircraft took off and landed at the Airport, including using the runway nearest to the Boat Channel.  SOF ¶¶ 49-50.  Copper and zinc would have

---

[7] These summaries highlight some of the basic, undisputed facts demonstrating liability; they do not represent the full breadth of the evidence supporting the City's releases.

been released from the wear and tear of aircraft and other vehicle brakes and tires on the runway. SOF ¶ 51. As with all paved surfaces, these contaminants were picked up and carried by rainfall. SOF ¶ 53.

Rather than travel through the Storm Sewer System pipes and outfalls, at least some stormwater runoff from the Airport (runoff containing hazardous substances) travels over land and drains into the Boat Channel. SOF ¶ 54. Between 1944 and 1962, the Airport's runway was located only 1,500 feet from the Boat Channel, on relatively flat terrain. SOF ¶ 13. Hazardous substances from aircrafts or runway paint would be mobilized by stormwater runoff and drain that relatively short distance to the Boat Channel. SOF ¶ 54. This surface flow of stormwater runoff qualifies as a release under CERCLA.

## C. The Releases Have Caused the United States to Incur Response Costs.

The third element of CERCLA Section 107(a) liability is whether a release of hazardous substances "cause[d] the incurrence of response costs" at the Site. 42 U.S.C. § 9607(a)(4). CERCLA defines "response" to encompass any "removal" activities, including "enforcement activities relating thereto." 42 U.S.C. § 9601(25). CERCLA in turn defines "removal" activities as including "the cleanup or removal of released hazardous substances from the environment, . . . such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," and "such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." *Id.* at § 9601(23).

This element is satisfied merely by showing that *some* amount of response costs has been incurred. *See Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325; *United States v. Kramer*, 757 F. Supp. 397, 420 (D.N.J.

-15-                    Case No. 3:23-cv-00541-LL-BJC

1991).  It does not require proof that a particular defendant caused the release leading to the incurrence of response costs.  *United States v. Hercules, Inc.*, 247 F.3d 706, 716 n.8 (8th Cir. 2001) ("The argument that the government must prove a direct causal link between the incurrence of response costs and an actual release caused by a particular defendant has been rejected by 'virtually every court,' that has directly considered the issue.") (citation omitted).

The City cannot contest that the Navy incurred costs in responding to the releases of copper, lead, zinc, chlordane, and DDT in the Boat Channel.  The United States' costs include the remedial investigation, a feasibility study identifying eight remedial alternatives, the cleanup itself (dredging and disposal of contaminated sediments), and the costs associated with enforcement.  SOF ¶¶ 5-9.

### D.  The City Falls Within One or More of the Classes of Liable Parties Defined by CERCLA.

CERCLA Section 107(a) defines four categories of covered persons.  The first category – "the owner and operator of a . . . facility" – applies to all current owners or operators of facilities that have released hazardous substances.  42 U.S.C. § 9607(a)(1); *see CMC Heartland Partners v. Union Pac. R.R.*, 78 F.3d 285, 289-90 (7th Cir. 1996) (CERCLA "unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation.") (citation omitted).  The City is a covered person because it currently owns and operates its Storm Sewer System.  SOF ¶ 15.

CERCLA Section 107(a)(2) encompasses certain past owners and operators – i.e. "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).  "Disposal" is defined as "discharge, deposit, injection, dumping, spilling, leaking, or placing . . . ."  42 U.S.C. § 9601(29) (incorporating

"disposal" definition at 42 U.S.C. § 6903(3)). For past owner/operator liability, "the dispersal of contaminants need not reach a particular threshold level in order to constitute 'disposal.'" *United States v. CDMG Realty Co.*, 96 F.3d, 706, 719 (3d Cir. 1996).

The City is liable as a past owner and operator of both the Storm Sewer System and the Airport. The City has owned and operated its Storm Sewer System for decades, and some amount of hazardous substances were disposed of during that time period. SOF ¶ 18. Similarly, the City owned and operated the Airport from 1928 to 1962. SOF ¶¶ 11, 14. During that time period, it is indisputable that hazardous substances were spilled or leaked at the Airport and entered the environment. SOF ¶ 49-52. The most obvious example of disposals at the Airport is the leaking of leaded gasoline from aircraft. SOF ¶ 49. In 1959, for example, the Airport reported over 100,000 annual flight take-offs and landings, the vast majority of which would have used leaded fuel. SOF ¶ 50. Deposits of metals, including copper and zinc, from aircraft brake and tire wear also constitute disposals. SOF ¶ 52. Other Airport activities like the use of lead-containing paint to mark the runways would qualify as disposals. SOF ¶ 51. Lead from leaking aircraft or runway paint would be mobilized by stormwater runoff and drain that relatively short distance to the Boat Channel. SOF ¶¶ 53-54.

The third category at issue here covers those who "by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person . . . at any facility . . . owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3). To establish arranger liability, a plaintiff need not prove that the specific hazardous substances found, released, or cleaned up at the site came from a particular party, *i.e.* there is no need to "fingerprint" the wastes. Rather, a plaintiff must only prove

that the arranger's wastes were destined for the site and that "like substances" were found there. *See Tosco Corp. v. Koch Indus. Inc.*, 216 F.3d 886, 892 (10th Cir. 2000); *United States v. TIC Inv. Corp.*, 68 F.3d 1082, 1088 (8th Cir. 1995), *cert denied*, 519 U.S. 808 (1996); *Redwing Carriers Inc. v. Saraland Apartments*, 94 F.3d 1489, 1512 (11th Cir. 1996).

The City is a covered person under (a)(3) because it arranged for the disposal or treatment of hazardous substances like copper, lead, and zinc through its Storm Sewer System. The Ninth Circuit has interpreted arranger liability under Section 107(a)(3) broadly. *Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562, 565 (9th Cir. 1994) (explaining that arranger liability extends to anyone who arranges for disposal, regardless of whether they own the substances or actually dispose of or treat the substances); *See Pakootas*, 452 F.3d at 1080-82 (interpreting Section 107(a)(3) broadly to find arranger liability for a smelter operator that disposed of its own slag itself). *See also Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 659 (6th Cir. 2000) (finding possible arranger liability if a defendant discharged hazardous substances into a river).

Here, via the Storm Sewer System, the City disposed of its own hazardous substances (in stormwater runoff from City roads and other properties within the drainage basin) and other persons' hazardous substances (in stormwater runoff from non-City properties). SOF ¶¶ 22, 24. The City is therefore liable as an arranger under Section 107(a)(3).[8]

---

[8] The City is also liable as an arranger for disposal of hazardous substances through its sanitary sewer system, which, as explained above, sometimes overflows and discharges to the Boat Channel through the Storm Sewer System outfalls. SOF ¶¶ 42, 46, 48.

### E.    CERCLA Compels a Declaratory Judgment on the City's Joint and Several Liability for Response Costs.

CERCLA provides that, in a case for response costs brought under 42 U.S.C. § 9607, the Court "*shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2) (emphasis added).  This provision ensures that "a responsible party's liability, once established, would not have to be relitigated . . . ." *See Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844 (citing 42 U.S.C. § 9613(g)(2)); *see also New York v. Green*, 420 F.3d 99, 111 (2d Cir. 2005); *United States v. USX Corp.*, 68 F.3d 811, 819 n.17 (3d Cir. 1995).

The United States requests that this Court enter a declaratory judgment on the City's joint and several liability for response costs not inconsistent with the National Contingency Plan.

### III.    The City's Asserted Affirmative Defenses are Legally and Factually Insufficient

In its Answer to the Complaint, the City asserts a number of affirmative defenses which are not legally sufficient defenses to liability in a CERCLA Section 107(a) case (and, to the extent they might somehow be legally sufficient, the City has offered no facts to support them).  The clear language of Section 107(a) and (b) of CERCLA manifests the congressional intent to foreclose any defenses to liability that are not specifically enumerated in the statute.  *See Velsicol Chem. Corp. v. Enenco, Inc.*, 9 F.3d 524, 530 (6th Cir. 1993).  "Recognizing non-enumerated defenses to CERCLA liability would frustrate Congress's intent by giving responsible parties an incentive to delay cleaning up a polluted site, in the hopes of escaping liability and passing the buck to someone else."  *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1304 (11th Cir. 2002).

1    For example, the City asserts an affirmative defense that it was not the cause

2    in fact or the proximate cause of the contamination.  As discussed above, liability

3    for cost recovery actions brought under Section 107(a) is strict.  *Burlington N. &*

4    *Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 608; *Centerior Serv. Co. v. Acme*

5    *Scrap Iron & Metal Corp.*, 153 F.3d 344, 348 (6th Cir. 1998).  Courts have

6    specifically rejected defendants' arguments based on causation. *See, e.g., State of*

7    *N.Y. v. Shore Realty Corp.*, 759 F.2d 1032,1044 (2d Cir. 1985) (finding the

8    owner's attempt to impose a causation requirement into Section 107(a)(1) "at odds

9    with the structure of the statute").

10    The City has also sought to bar the United States' Section 107(a) claims on

11    the grounds that the release or threat of release of a hazardous substance and the

12    damages resulting therefrom were caused solely by the acts or omissions of a third

13    party.  Although CERCLA specifically allows a "third party defense" under

14    Section 107(b)(3), the defense as asserted by the City does not comport with the

15    language of Section 107(b)(3), which requires the City to allege that they acted

16    with due care, taking precautions against the foreseeable acts or omissions of an

17    unrelated third party who was not an employee or agent of the City.  For that

18    reason alone, courts have struck the defense*. See e.g. Kelly v. Thomas Solvent Co.,*

19    714 F. Supp. 1439, 1446 (W.D. Mich. 1989); *United States v. Rohm & Haas Co.,*

20    939 F. Supp. 1142, 1152 (D.N.J. 1996).  And the City certainly has not alleged any

21    facts that would support the elements of this defense. The City also cannot point to

22    any facts supporting an act of God or act of war defense.

23    The rest of the City's asserted affirmative defenses can be summarily

24    rejected for the same reasons:  They are legally insufficient because they are not

25    allowed under CERCLA and factually insufficient because the City cannot allege

26    any facts that would support a finding that the defense applies.

27

28

## **<u>CONCLUSION</u>**

For these reasons, the Court should enter partial summary judgment that (1) establishes the City's *prima facie* liability under CERCLA; (2) declares the City jointly and severally liable to the United States for response costs not inconsistent with the NCP; and (3) rejects the City's asserted affirmative defenses as legally and factually insufficient to defend against liability in the United States' Section 107(a) cost recovery action.

Dated: December 30, 2024

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

s/ *Nicholas McDaniel*
STEFAN J. BACHMAN (SC Bar No. 102182)
BRIAN SCHAAP (DC Bar No. 1780655)
NICHOLAS MCDANIEL (MA Bar No. 682742)
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 305-1167 (Schaap)
Brian.Schaap@usdoj.gov
Stefan.Bachman@usdoj.gov
MARK ALBERT RIGAU (CA Bar No. 223610)
Environmental Defense Section
Environment and Natural Resources Division
450 Golden Gate Avenue, Suite 07-6714
San Francisco, CA 94102
Phone: (415) 744-6487

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ALASTAIR M. GESMUNDO (CABN 316573)
SAMUEL F. HOBBS (AL Bar No. 9776O19E)
Civil Division
Commercial Litigation Branch
Alastair.M.Gesmundo@usdoj.gov
Samuel.Hobbs@usdoj.gov

*Attorneys for Plaintiff and Counterclaim-*
*Defendant United States of America*