Barry P. Steinberg (admitted *Pro Hac Vice*)
barry.steinberg@kutakrock.com
**KUTAK ROCK LLP**
1133 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
Telephone: (202) 828-2400
Facsimile: (202) 828-2488

Dwyer Arce (admitted *Pro Hac Vice*)
dwyer.arce@kutakrock.com
**KUTAK ROCK LLP**
1650 Farnam Street
The Omaha Building
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148

Thomas F. Vandenburg (State Bar No. 163446)
tvandenburg@wshblaw.com
Alice Charkhchyan (State Bar No. 332670)
acharkhchyan@wshblaw.com
**WOOD, SMITH, HENNING & BERMAN LLP**
505 North Brand Boulevard, Suite 1100
Glendale, CA 91203
Telephone: (818) 551-6000
Facsimile: (818) 551-6050

Attorneys for Defendant/Counter-Claimant
CITY OF SAN DIEGO

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO,<br><br>Defendant.<br><br>*AND RELATED CROSS CLAIMS AND COUNTER CLAIMS* | Civil No. 3:23-CV-00541-LL-VET<br><br>**CITY OF SAN DIEGO OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>The Hon. Linda Lopez<br><br>Trial Date: None Set |

/ / /

1

TABLE OF CONTENTS

2

Page

3   I.      INTRODUCTION ...................................................................................... 1

4   II.     FACTUAL BACKGROUND ...................................................................... 2

5   III.    PROCEDURAL HISTORY ........................................................................ 5

6   IV.     RELEVANT LEGAL AUTHORITIES ..................................................... 6

7           A.      Procedural Standards Governing the Summary Judgment

8                   Motion ................................................................................................ 6

9   V.      ARGUMENT .............................................................................................. 7

10          A.      The United States fails to carry its burden of showing that the

11                  undisputed facts support summary judgment ...................................... 7

12          B.      The motion is premature and not ripe for resolution and should

13                  be denied pending further discovery ................................................... 8

14          C.      The costs the United States seeks from the City are inconsistent

15                  with the NCP ....................................................................................... 9

16                  1.      The United States failed to consider the actual or potential

17                          exposure required by the NCP ................................................ 12

18                  2.      The United States failed to evaluate the high levels of

19                          hazardous substances or pollutants in the Boat Channel .......... 12

20                  3.      The United States failed to eliminate the threat to public

21                          health or welfare or the environment ....................................... 13

22                  4.      The United States failed to conduct an investigation

23                          consistent with the requirements of the NCP ........................... 13

24                  5.      The United States restricted the sampling plan in a

25                          manner inconsistent with the NCP ........................................... 14

26                  6.      These failures to comply with the NCP constitute

27                          arbitrary and capricious action ................................................ 16

28

1

D.    The failures of the United States make cost recovery unlawful

and inequitable ...................................................................... 18

VI.    CONCLUSION ............................................................................ 20

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CITY OF SAN DIEGO OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*American Petroleum Institute v. E.P.A.*,

    661 F.2d 340 (5th Cir. 1981) ................................................................. 16

*Anderson Bros. v. St. Paul Fire & Marine Ins. Co.*,

    729 F.3d 923 (9th Cir. 2013) ................................................................. 19

*Matter of Bell Petroleum Servs., Inc.*,

    3 F.3d 889 (5th Cir. 1993) ............................................................... 10, 16

*Bowman Transp. Inc. v. Arkansas-Best Freight System*,

    371 U.S. 156 (1962) .............................................................................. 16

*California Dep't of Toxic Substances Control v. NL Indus., Inc.*,

    687 F. Supp. 3d 905 (C.D. Cal. 2023), reconsideration denied, 2024

    WL 3280904 (C.D. Cal. 2024) ......................................................... 9, 18

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,

    287 F. Supp. 2d 1118 (C.D. Cal. 2003), *aff'd sub nom. Carson*

    *Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006) ............... 10

*Celotex Corp. v. Catrett*,

    477 U.S. 317 (1986) ................................................................................ 7

*City of Moses Lake v. United States*,

    458 F. Supp. 2d 1198 (E.D. Wash. 2006) ............................................. 11

*Emhart Indus., Inc. v. New England Container Co., Inc.*,

    274 F. Supp. 3d 30 (D.R.I. 2017) .......................................................... 17

*Engel v. Siroky*,

    2014 WL 585769 (D. Nev. 2014) ............................................................ 7

*Estes v. State Farm Mut. Auto. Ins. Co.*,

    2016 WL 4595949 (S.D. Cal. 2016), aff'd, 713 F. App'x 717 (9th

    Cir. 2018) ................................................................................................ 6-7

*FCC v. Fox Television Stations, Inc.*,

    556 U.S. 502 (2009) .................................................................................. 17

*Georgia-P. v. Officemax Inc.*,

    2013 WL 5273007 (N.D. Cal. 2013) ........................................................ 18

*Insight Psychology & Addiction, Inc. v. City of Costa Mesa*,

    724 F. Supp. 3d 1067 (C.D. Cal. 2024) .................................................... 7

*Jackson v. Federal Express*,

    766 F3d 189 (2d Cir. 2014) ...................................................................... 6

*Loper Bright Enterprises v. Raimondo*,

    603 U.S. 369 (2024) .................................................................................. 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

    *Co.*,

    463 U.S. 29 (1983) .................................................................................... 16

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,

    210 F.3d 1099 (9th Cir. 2000) .................................................................. 7

*Reardon v. United States*,

    947 F.2d 1509 (1st Cir. 1991) .................................................................. 8

*State of Minn. v. Kalman W. Abrams Metals, Inc.*,

    155 F.3d 1019 (8th Cir. 1998) .................................................................. 17

*Union Carbide Corp. v. Thiokol Corp.*,

    890 F. Supp. 1035 (D. Ga. 1994) ............................................................ 8

*United States v. Chapman*,

    146 F.3d 1166 (9th Cir. 1998) .................................................................. 10

*United States v. Iron Mountain Mines*,

    724 F. Supp. 2d 1086 (E.D. Cal. 2010) ................................................... 16

*United States v. Olin Corp.*,
　107 F.3d 1506 (11th Cir. 1997) ................................................................ 18-19
*United States v. Puerto Rico Indus. Dev. Co.*,
　368 F. Supp. 3d 326 (D.P.R. 2019), *aff'd*, 18 F.4th 370 (1st Cir.
　2021) ............................................................................................................... 10
*Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*,
　622 F. Supp. 2d 918 (N.D. Cal. 2009) .............................................................. 6
*Washington State Dep't of Transp. v. Washington Nat. Gas Co.,*
　*Pacificorp*,
　59 F.3d 793 (9th Cir. 1995) ..................................................................... 16-17

**FEDERAL STATUTES**

42 U.S.C. § 9601(33) ......................................................................................... 12
42 U.S.C. § 9607(a)(4)(A) .................................................................................... 1
42 U.S.C. §§ 9607 *et seq.* .................................................................................... 1
42 U.S.C. § 9620(h)(3)(A)(ii) ............................................................................ 19
Administrative Procedure Act ............................................................................... 6
CERCLA § 107(a) ................................................................................................. 5
CERCLA § 113(f)(1) ............................................................................................. 6
CERCLA § 113(g)(2) ............................................................................................ 6
Safe Drinking Water Act ..................................................................................... 12

**OTHER AUTHORITIES**

40 C.F.R. § 300.415(b)(2)(i) .............................................................................. 12
40 C.F.R. § 300.415(b)(2)(iv) ............................................................................ 12
40 C.F.R. § 300.415(b)(3) .................................................................................. 13
40 C.F.R. § 300.415(b)(4) .................................................................................. 13
40 C.F.R. § 300.430(b) ....................................................................................... 14

1

40 C.F.R. § 300.430(d)(1) ........................................................................ 15

2

40 C.F.R. §§ 300 *et seq.* ............................................................................ 1

3

*Consistency with the National Contingency Plan*, 1 RCRA and

4

    Superfund: A Practice Guide, 3d § 9:117 (2024) ................................. 10

5

Fed. R. Civ. P. 56(c)(1) ............................................................................ 7

6

Fed. R. Civ. Proc. 56 ...........................................................................2, 6-8

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

# OPPOSITION TO THE UNITED STATES' MOTION
# FOR PARTIAL SUMMARY JUDGMENT

3

4    ## I.    **INTRODUCTION**

5        Defendant City of San Diego (the "City") files this opposition to the motion

6    for partial summary judgment filed by Plaintiff United States of America ("the United

7    States"). The motion must fail for several reasons, not the least of which is the attempt

8    to ignore the obligations of CERCLA, *see* 42 U.S.C. §§ 9607 *et seq.*, and the National

9    Contingency Plan (NCP), *see* 40 C.F.R. §§ 300 *et seq.*

10        It is fundamental procedural law that summary judgment is not appropriate in

11    matters involving factual disputes. Although the United States mentions the

12    requirements for asserting liability for response costs attributable to potentially

13    responsible parties ("PRP"), it ignores the legal requirement that liability for such

14    costs is predicated upon the mandate that such costs incurred by the United States not

15    be inconsistent with the NCP.

16        The language of the statute, 42 U.S.C. § 9607(a)(4)(A), does not eliminate the

17    requirement that such costs be consistent with the NCP. Rather, the language of the

18    statute effectively shifts the burden of proof to establish inconsistency to the party

19    against whom PRP liability is asserted. The attempt to bifurcate the determination of

20    PRP status from the element essential for an award of such costs to the United States

21    removes from the Court's determination an essential element for recovery by the

22    United States. The burden of proof with respect to this essential element does not

23    alter the controversy pertaining to consistency with the NCP. Suggesting that the

24    court determine PRP status without a determination of NCP consistency ignores the

25    evidentiary issue essential for recovery by the United States and it does so in a

26    piecemeal fashion without justification based on judicial efficiency, legal

27    implications, or complexity. The effort of the United States to prematurely eliminate

28

the issue of PRP status independent of the evidence to be presented with respect to NCP consistency ignores the requirement that there be no disputed factual matters affecting this motion pursuant to Federal Rule of Civil Procedure 56. This is demonstrated by the fact that the statement of undisputed material facts submitted by the United States fails to properly support its factual claims, fails to cite to evidence that actually supports the factual assertion, and makes broad claims wholly unsupported by its evidence and often unrelated to the Boat Channel or the Boat Channel drainage basin.

The standard for granting summary judgment is clear: the movant must show that there is no genuine dispute as to any material fact. The consistency issue, regardless of the burden of proof, is material and inextricably bound to the recovery of costs. Further, in the context of this litigation, the PRP determination is limited to cost recovery and is irrelevant to the contractual obligations of the United States arising from the Memorandum of Agreement between the parties.

The sole legal issue related to the motion of the United States pertains to cost recovery, which recovery is not permitted unless such costs are consistent with the NCP. The NCP evidence to be offered by the City in this regard pertains to material facts which are clearly in genuine dispute.

## II. FACTUAL BACKGROUND

Beginning around 1916, the City donated various parcels of land to the United States for purposes of constructing and operating what came to be known as the Naval Training Center ("NTC"). The City alleges in its counterclaim that the United States created and has owned the NTC Boat Channel since its creation in the 1930s to 1940s. NTC was closed around 1997 under the federal Base Realignment and Closure process ("BRAC") and the property was offered for redevelopment. The City alleges that the United States conducted limited sampling of the Boat Channel and only once, in 1998, shortly after NTC's closure. (ECF No. 109 ¶¶ 23-24).

The City further alleges that the United States owned, constructed, operated,

controlled, directed, managed, and conducted affairs at the NTC from 1916 until on or about 2000-2001 when NTC parcels, except for the NTC Boat Channel parcels, were conveyed to the City and other entities. The City alleges that the United States owned, constructed, operated, controlled, directed, managed, and conducted affairs at the Marine Corps Recruit Depot ("MCRD"), immediately adjacent to both NTC and the NTC Boat Channel, from around 1919 to the present. Together, the NTC and MCRD properties completely surrounded the Boat Channel from its creation until around 2000-2001, when certain NTC parcels were transferred to the City and other entities. The City alleges that the operations of the United States resulted in the generation, storage, use, discharge, release, and disposal of hazardous substances at the NTC Boat Channel.

The City's counterclaims depend, in part, on the decision of the United States to enter into an agreement with the City in 2000, otherwise known as the MOA. The counterclaim allegations make reference to the MOA, which sets forth the terms under which the City agreed to accept the United States' conveyance of certain NTC parcels, including the NTC Boat Channel, to the City for redevelopment.

The counterclaim cites to relevant portions of the MOA, with regard to the NTC Boat Channel parcels, which state:

> 2.(c) . . .
>
> "Parcel IIIB is believed to contain sediments impacted with various contaminants. Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel IIIB, as described in the NTC San Diego Reuse Plan dated August 1998."
>
> 4.(b) . . .
>
> "Parcel VII is believed to contain sediments impacted by various contaminants. Navy shall take all remedial action necessary to protect

human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel VII, as described in the NTC San Diego Reuse Plan dated August 1998."

The City alleges that the remedial action taken by the United States was flawed, including but not limited to by being developed and implemented without an adequate understanding or analysis of the sources, nature, types, and extent of contamination at the NTC Boat Channel. (ECF No. 96). If the City were forced to accept the transfer without proper remedial action taken by the United States, the City would incur costs of its own to undertake the required remedial action. The counterclaim alleges that the San Diego Regional Water Quality Control Board ("Water Board") issued only a qualified approval of the limited clean-up of IR Site 12 (which covers only part of Parcels IIIB and VII) by the United States, which ultimately leaves the door open for further investigative and clean-up orders by the Water Board if NTC Boat Channel Parcels IIIB and VII are transferred to a non-federal party. This deficient Water Board acceptance of the final cleanup report made no comment on IR Site 12 or the NTC Boat Channel, preventing the United States from satisfying the conditions precedent of the MOA. (ECF No. 96 at 32 ¶ 46). The counterclaim alleges that the Water Board's letters create a reasonable expectation that further investigation and clean-up will be required at the NTC Boat Channel. (*Id.*). The counterclaim states that the Water Board's San Diego Bay strategic plan and recently issued Investigative Orders to the City and other parties for nearby areas of the San Diego Bay clearly demonstrate what is in store for the NTC Boat Channel should it be transferred to the City. (*Id.*).

Notably, the Counterclaim alleges that the United States has refused, and continues to refuse, to provide the City with a representation that all action necessary has been taken for the NTC Boat Channel, without which the City will be exposed to significant liability if historical contamination is discovered at the NTC Boat Channel

after the parcels are transferred. (ECF No. 96 at 36 ¶ 52). This refusal is predicated on a misstatement of the law pertaining to the applicable statutory authority.

In spite of the failures of the United States, and the City's pending affirmative defenses and counterclaims, the United States tries to saddle the City with the costs of its own failure in its motion for summary judgment. (ECF No. 118).

## III.    PROCEDURAL HISTORY

On March 27, 2023, the United States initially filed this action against the City to recover costs of the clean-up of contaminated sediments at Installation Restoration Site 12 ("IR Site 12") located within the former NTC Boat Channel. The "NTC Boat Channel," as used herein, consists of Parcels III-B and VII as described in the 2000 Memorandum of Agreement between the United States and the City for Economic Benefit Conveyance and Public Benefit Conveyances at the former NTC (the "MOA").

The City filed a counterclaim against the United States for Contribution and Cost Recovery under CERCLA, Declaratory Relief under CERCLA, Breach of Contract, Equitable Indemnity, and Declaratory Relief. (ECF No. 8). The United States, thereafter, brought a motion to dismiss the City's second through fifth counterclaims. (ECF No. 20). The City filed an opposition to said motion in response thereto. (ECF No. 27). The United States filed a reply (ECF No. 28) submitting the motion was moot given the filing of the first amended complaint by the United States.

The United States filed the first amended complaint on September 15, 2023. (ECF No. 25). In response, the City filed an answer, along with the counterclaim against the United States and crossclaims against the San Diego Unified Port District and San Diego County Regional Airport Authority. (ECF No. 31). The United States then filed a motion to dismiss the counterclaim. (ECF No. 38).

The Court ultimately granted the motion to dismiss in part. The Court held that the City's claim for cost recovery under CERCLA § 107(a) failed because "the City here alleges no facts from which the Court can plausibly conclude it already incurred

- 5 -

CIVIL NO. 3:23-CV-00541-LL-VET
CITY OF SAN DIEGO OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

costs related to an actual containment or cleanup response that is necessary and consistent with the NCP." (ECF No. 89 at 8). The Court further dismissed the City's counterclaims for breach of contract under the MOA and equitable indemnity. In doing so, the Court held that the City failed to properly plead that the United States had waived sovereign immunity. (ECF No. 89 at 12).

The Court granted the City leave to file a first amended counterclaim, which the City did on October 17, 2024. (ECF No. 96). In the first amended counterclaim, the City alleged causes of action for: (1) contribution under CERCLA § 113(f)(1); (2) recoupment; (3) relief under the Administrative Procedure Act ("APA"); and (4) relief under CERCLA § 113(g)(2). (ECF No. 96 at 38-45). The United States moved to dismiss the first amended counterclaim in part. (ECF No. 111). Despite this, the motion remains pending and the City's amended counterclaim remains part of this case.

## IV.   RELEVANT LEGAL AUTHORITIES

### A.   Procedural Standards Governing the Summary Judgment Motion

The standards of Federal Rule of Civil Procedure 56 are familiar to the parties and the Court. The Court cannot enter summary judgment when there are genuine issues of material fact that must be resolved at trial. "Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material." *Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*, 622 F. Supp. 2d 918, 924 (N.D. Cal. 2009).

"A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact." *Estes v. State Farm Mut. Auto. Ins. Co.*, 2016 WL 4595949, at *2 (S.D. Cal. 2016), aff'd, 713 F. App'x 717 (9th Cir. 2018). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed."

*Jackson v. Federal Express*, 766 F3d 189, 194 (2d Cir. 2014). "If the moving party fails to discharge its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence." *Estes v. State Farm Mut. Auto. Ins. Co.*, 2016 WL 4595949, at \*2 (S.D. Cal. 2016), aff'd, 713 F. App'x 717 (9th Cir. 2018). In deciding summary judgment, the "court must view the facts and draw inferences in the manner most favorable to the non-moving party." *Insight Psychology & Addiction, Inc. v. City of Costa Mesa*, 724 F. Supp. 3d 1067, 1080 (C.D. Cal. 2024). Even if a fact is not disputed, if reasonable minds can differ on the inferences to be drawn from that fact, summary judgment should be denied. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fresno Motors LLC v. Mercedes Benz USA, LLC*, 771 F3d 1119, 1125 (9th Cir. 2014); *Estate of Pepper ex rel. Deeble v. Whitehead*, 686 F3d 658, 667-68 (8th Cir. 2012).

The City's opposition presents multiple genuine issues of material fact under CERCLA and the NCP precluding summary judgment to the United States. The Court should deny the motion of the United States.

## V.  ARGUMENT

### A.  The United States fails to carry its burden of showing that the undisputed facts support summary judgment.

"Parties moving for summary judgment must satisfy Rule 56 of the Federal Rules of Civil Procedure." *Engel v. Siroky*, 2014 WL 585769, at \*1 (D. Nev. 2014). To do so, the United States "must support the assertion[s] [of undisputed facts] by [] citing to particular parts of materials in the record." *Engel v. Siroky*, 2014 WL 585769, at \*1 (D. Nev. 2014) (quoting Fed. R. Civ. P. 56(c)(1)). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

The United States has failed to meet its initial burden here. Its statement of

- 7 -

undisputed material facts makes numerous broad statements regarding asserted material facts that are not supported by the evidence cited, outside the relevant time period, inapplicable to the Boat Channel and the Boat Channel watershed, fail to bridge the inference gap, or are unsupported for other reasons.

For example, the United States claims that: "[d]omestic sources of copper, lead, and zinc in sanitary sewage include plumbing, laundry detergents, tap water, and food;" that "[e]arly sanitary sewage disposal relied on gravity-driven systems that discharged into San Diego Bay without treatment;" and that "During the period of City ownership, hundreds of thousands of aircraft using lead-containing fuel took off and landed on the Airport runway." (ECF No. 123 ¶¶ 39, 44, 49). But the supporting evidence for both statements, declarations of Wayne F. Lorenz and Jason H. Gart, cite no authority, and the authorities cited in these expert reports is either outside the relevant timeframe of 1942 to 1998 or outside the Boat Channel drainage area. (City's SOF ¶ 39). Likewise, the United States claims "[p]esticides such as DDT and chlordane would also have been present in sanitary sewage prior to being banned." (ECF No. 123 ¶ 40). But the supporting evidence does not discuss the Boat Channel. Instead, the cited evidence addresses discharge to the sewage treatment plant.

These expert materials should be excluded from consideration on summary judgment because there is "too great an analytical gap" between the data relied on and the opinions proffered, as demonstrated above. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). As a result, the expert's opinion is clearly unreliable, and the court may disregard the expert's opinion when determining whether a genuine issue of material fact exists. *See Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

The extent to which the United States has failed to meet its burden of establishing the existence of its asserted facts is set forth in detail in the City's response to the USA's statement of facts filed concurrently herewith. Because the

United States fails to support its statements of undisputed fact with proper citations to supporting evidence, the United States fails to meet its burden under Federal Rule of Civil Procedure 56. The Court should deny the motion for partial summary judgment on that ground alone.

### B. The motion is premature and not ripe for resolution and should be denied pending further discovery.

"Because the NCP is a complex set of requirements, it is necessary for the Court to have a full factual record before it in order to determine which remedial actions are consistent with the NCP." *Union Carbide Corp. v. Thiokol Corp.*, 890 F. Supp. 1035, 1045 (D. Ga. 1994); *see also Reardon v. United States*, 947 F.2d 1509, 1518 (1st Cir. 1991) ("Whether response costs were incurred consistently with the national contingency plan is an issue which may be highly factual.").

No "full factual record" exists here. Discovery is ongoing. The City's motion to compel further discovery in the form of a site inspection remains pending. (ECF No. 117). And regardless of the outcome of that motion, further critical discovery has yet to be conducted in the form of expert depositions that will not commence until January 29, 2025. This discovery implicates genuine issues in this case going to the heart of the motion for summary judgment. This includes the failure of the United States to address substantial contamination existing in the Boat Channel in the form of areas that were never tested at all, cleanup efforts that completely ignored the presence of numerous CERCLA hazardous substances, and the attempt of the United States to improperly pass along the substantial costs of addressing those issues to the City. (The City's SOF ¶ 5).

The Court should deny the motion for partial summary judgment on this basis and permit the parties to complete this critical discovery. If the Court were to grant the motion now, without giving the City the benefit of completing this discovery, it would grant substantial and unwarranted relief to the United States while the City stands with one hand tied behind its back.

**C.    The costs the United States seeks from the City are inconsistent with the NCP.**

"To establish a prima facie right to recovery under § 9607(a), a plaintiff must demonstrate that: (1) the site on which the hazardous substances are contained is a 'facility' as defined in CERCLA; (2) a 'release' or 'threatened release' of a 'hazardous substance' from the facility has occurred; (3) the 'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan;' and (4) defendants are within one of four classes of persons subject to liability under § 9607(a)." *California Dep't of Toxic Substances Control v. NL Indus., Inc.*, 687 F. Supp. 3d 905, 934 (C.D. Cal. 2023), reconsideration denied, 2024 WL 3280904 (C.D. Cal. 2024) (quoting *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1152 (C.D. Cal. 2003), *aff'd sub nom. Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006)).

The motion for partial summary judgment suggests that resolution of the City as a responsible party is addressed in its presentation. Omitted from its discussion and identification of elements and materiality is the requirement that the only costs allowable for recovery are those that are not inconsistent with the NCP. The statutory wording of this requirement is crafted in such a way as to shift the burden of proof for this element of recovery to the City. In essence, it is a rebuttable presumption. *See United States v. Chapman*, 146 F.3d 1166, 1170 (9th Cir. 1998) (holding defendant had the burden to "create a genuine issue of material fact on the question whether the [government's] response action was inconsistent with the [NCP]"); *Consistency with the National Contingency Plan*, 1 RCRA and Superfund: A Practice Guide, 3d § 9:117 (2024) ("A party failing to comply with NCP cannot recover for cleanup costs already incurred.").

The position of the United States mentions this but does not recognize that cost recovery is dependent upon either a lack of challenge by the nonmoving party on the basis of inconsistency or a determination by the Court that the burden on the

nonmoving party to demonstrate inconsistency has not been met. Costs incurred that are not consistent with the NCP are not recoverable. *See Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 908 (5th Cir. 1993) ("Although the [government's] powers under CERCLA are indeed broad, Congress has not provided that private parties must pay for the consequences of arbitrary and capricious agency action."); *see also United States v. Puerto Rico Indus. Dev. Co.*, 368 F. Supp. 3d 326, 337 (D.P.R. 2019), *aff'd*, 18 F.4th 370 (1st Cir. 2021) ("Costs attributed to removal and remedial actions that are inconsistent with the NCP are not recoverable.").

This issue is as integral to the issue of cost recovery as the issue of responsible party status. Further, contrary to the government's suggestion, it is irrelevant to a determination that the United States has met its contractual obligations under the MOA. The issue of inconsistency, regardless of the burden of proof, is a material fact in dispute.

The motion ignores that the work performed by the United States fails to address contamination in the Boat Channel. While it may be prima facie that the work performed was proper and responsive to the contamination, the City's evidence demonstrates a genuine issue of material fact regarding whether the work performed was inconsistent with the NCP precluding cost recovery. The United States should not be allowed to pass the costs of a deficient cleanup on to the City. Any suggestion that the appropriated funds can be recovered when those funds were expended to perform work that does not meet and is thereby inconsistent with the regulatory standards expressed in the NCP is illogical and would provide the United States with a free pass for its failure to meet the NCP requirements. The NCP establishes a baseline for performance that was not satisfied. The attached Declaration from Dr. J. Michael Trapp establishes these failures to satisfy the requirements of the NCP and the resulting inconsistency.

This inconsistency with the NCP is material. It is not limited to minor costs like the price per cubic yard for disposal. The failures go to the heart of the remedial

work and the satisfaction of applicable requirements as demonstrated by the declarations of Dr. Trapp and Mr. Stephen Johnson, two experts retained by the City to evaluate the performance of the United States.

Consequently, summary judgment is inappropriate. Similarly, declaratory judgment, a discretionary prerogative of the Court, should not be used to mask disputed factual matters. The City's evidence creates a genuine issue of material fact regarding whether that the United States acted "arbitrarily and capriciously in choosing a particular response action to respond to a hazardous waste site." *Consistency with the National Contingency Plan*, 1 RCRA and Superfund: A Practice Guide, 3d § 9:117 (2024); *see also City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1236 (E.D. Wash. 2006) ("NCP compliance is a liability issue, or a hybrid issue.").

These issues can be resolved only at trial.

### 1. *The United States failed to consider the actual or potential exposure required by the NCP.*

The NCP requires that the United States consider the "[a]ctual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants." 40 C.F.R. § 300.415(b)(2)(i). The inclusion of pollutants and contaminants in the NCP is not new or novel. Perfluorinated Compounds (PFAS) have long been known to satisfy the CERCLA definition of pollutants and contaminants. *See* 42 U.S.C. § 9601(33). They were identified as emerging contaminants pursuant to the Safe Drinking Water Act as early as November 2017, before being designated as CERCLA hazardous substances, yet the United States failed or refused to investigate their presence notwithstanding their known nearby presence and the potential for migration to the Boat Channel. (The City's SOF ¶ 6; ECF No. 117-16 at ¶ 3).

1
2

### 2. *The United States failed to evaluate the high levels of hazardous substances or pollutants in the Boat Channel.*

3   The United States is also required to evaluate "[h]igh levels of hazardous

4  substances or pollutants or contaminants in soils largely at or near the surface, that

5  may migrate." 40 C.F.R. § 300.415(b)(2)(iv). The failure or refusal of the United

6  States to evaluate contaminants and hazardous substances in the area of the rip rap, a

7  known and expected recreational area, demonstrates a deliberate attempt to ignore an

8  obvious environmental risk associated with the presence of hazardous substances that

9  would have migrated under that debris. The United States also failed to investigate

10  areas immediately around the storm water outfalls which the United States claims are

11  the primary contributors of contamination to the Boat Channel. The migration from

12  surface water run-off and outfalls are an identified source of contamination. (The

13  City's SOF ¶ 24; ECF No. 117-16 at ¶ 3).

14
15

### 3. *The United States failed to eliminate the threat to public health or welfare or the environment.*

16   "If the lead agency determines that a removal action is appropriate, actions

17  shall, as appropriate, begin as soon as possible to abate, prevent, minimize, stabilize,

18  mitigate, or eliminate the threat to public health or welfare of the United States or the

19  environment." 40 C.F.R. § 300.415(b)(3). The United States made no effort to

20  comply with this provision of the NCP. This is evident in any of the documentation

21  produced by the United States. As one example, a frustrated Water Board

22  documented a 5-year period where there was essentially no action from submittal of

23  the Remedial Investigation in 2003 through at least 2008. The lengthy period between

24  sampling in 1998 and completion of remediation in 2018 should have resulted in

25  measures to ensure that further migration to the Boat Channel was abated. However,

26  none were implemented. (The City's SOF ¶ 5).

27
28

**4.    *The United States failed to conduct an investigation consistent with the requirements of the NCP.***

The investigation of the United States failed to adhere to the requirements of 40 C.F.R. § 300.415(b)(4), which prescribes sufficient data collection quality and quantity. The sampling and analysis of the Boat Channel was constrained geographically and temporally. The effort to limit the depth of analysis in IR Site 12, the lack of statistical validity for the sampling plan, the failure to sample the soils adjacent to IR Site 12, the limited number of samples for the spatial area at issue, and the failure to sample soils across which migrating contaminants were known or suspected to migrate represents a failure of significant proportions with respect to this provision of the NCP. The non-static nature of the Boat Channel sediment and the run-off from soils exacerbates the risk of continuing contamination long after the IR Site 12 removal action. The failure of United States to perform post-remediation sampling after these issues were identified defies explanation. The refusal to allow the City to perform this post-remediation sampling at its own expense can best be explained as an attempt to preclude discovery of the failure of the United States. (The City's SOF ¶ 5).

The United States also failed to investigate and remediate the entirety of the Boat Channel. (City SOF ¶ 8; Johnson Expert Rebuttal Report at Section 5.2). Instead, the United States only investigated and remediated IR Site 12. The United States took no action to address 5.5 acres of the Boat Channel outside of IR Site 12. (City SOF ¶ 5; Johnson Expert Rebuttal Report at pp. 3-4). The United States took no action with respect to the areas between the low-tide waterline and the top of the Boat Channel banks. (City SOF ¶ 8; Johnson Expert Rebuttal Report at pp. 3-4). This failure was inconsistent with the NCP because it ignored the potential for any past and continuing contribution of potential contaminants in this surrounding area to the IR Site 12 sediments. (City SOF ¶ 6; Declaration of Stephen Johnson at ¶ 13). Because of this, the remedial action of the United States did not extend to the

1  Unaddressed Area, the Unaddressed Area also falls outside the scope of the letters

2  issued by the California Regional Water Quality Control Board, San Diego Region.

3  (City SOF ¶ 8; Declaration of Stephen Johnson at ¶ 20). This constitutes a failure by

4  the United States to fulfill its obligation to "take all remedial action necessary to

5  protect human health and the environment and ... obtain site closure from appropriate

6  regulatory authorities based on the projected use" of the Boat Channel. (City SOF ¶

7  8; Declaration of Stephen Johnson at ¶ 21).

8          **5.    *The United States restricted the sampling plan in a manner***

9                  ***inconsistent with the NCP.***

10         The NCP also requires that "[i]n implementing this section, the lead agency

11  should consider the program goal, program management principles, and expectations

12  contained in this rule. The investigative and analytical studies should be tailored to

13  site circumstances so that the scope and detail of the analysis is appropriate to the

14  complexity of site problems being addressed." 40 C.F.R. § 300.430(b). The

15  constraints imposed in the sampling plan included a failure to investigate to a

16  sufficient depth to determine the effects on deep benthic organisms, essential

17  components of the food chain. Their presence is not limited to the sediment surface

18  and near surface, yet the action of the United States did not proceed to the depth of

19  their presence. Essentially the United States plan ignored representative sampling in

20  all three dimensions. (The City's SOF ¶ 8).

21         Under the NCP, "[t]he purpose of the remedial investigation (RI) is to collect

22  data necessary to adequately characterize the site for the purpose of developing and

23  evaluating effective remedial alternatives. To characterize the site, the lead agency

24  shall, as appropriate, conduct field investigations, including treatability studies, and

25  conduct a baseline risk assessment." 40 C.F.R. § 300.430(d)(1).

26         The United States acted inconsistently with this requirement. Both the City

27  and the Water Board repeatedly raised concerns to the United States relating to site

28  characterization, the representativeness of the sampling plan, the staleness of the data

relied upon in the execution of its removal action , the limitation of chemicals of concern by eliminating a broader area of investigation, and the failure to perform any sampling of soils or water for perfluorinated compounds (PFAS) before or after their designation as CERCLA hazardous substances. In addition, the City raised the issue of the failure by the United States to adhere to State of California Sediment Quality Objectives.

In spite of these obvious failures, the United States would have the Court determine that the City is a PRP when the only reason for such designation is to collect from the City costs that the United States incurred in performing environmental remediation that was not and is not consistent with the requirements of the NCP. Suggesting that the City reimburse the United States for poorly performed and regulatorily inconsistent work is an illogical and bizarre interpretation of the CERCLA condition for such reimbursement. This would put the United States in the position of getting paid to do bad work. Whatever the limits of strict liability may be, such an interpretation is beyond such limits. This is not a challenge to the costs incurred; rather it is a challenge to reimbursement for work poorly performed that was not consistent with the NCP.

### 6. *These failures to comply with the NCP constitute arbitrary and capricious action.*

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n of*

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 371 U.S. 156, 168 (1962). "Judicial review 'must be based on something more than trust and faith in [the government's] experience.'" *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 905 (5th Cir. 1993) (quoting *American Petroleum Institute v. E.P.A.*, 661 F.2d 340, 349 (5th Cir. 1981)). Despite the ostensibly "narrow" scope of review, "[t]his inquiry must be searching and careful." *United States v. Iron Mountain Mines*, 724 F. Supp. 2d 1086, 1090 (E.D. Cal. 2010).

The actions of the United States here fail this standard. As the Ninth Circuit has previously held, the NCP "require[s] a remedial investigation 'to determine the nature and extent of the threat presented by the release.'" *Washington State Dep't of Transp. v. Washington Nat. Gas Co., Pacificorp*, 59 F.3d 793, 803 (9th Cir. 1995). "This includes sampling, monitoring, as necessary, and includes the gathering of sufficient information to determine the necessity for and proposed extent of remedial action." *Washington State Dep't of Transp. v. Washington Nat. Gas Co., Pacificorp*, 59 F.3d 793, 803 (9th Cir. 1995). Where the "remedial investigation utterly failed to determine the nature or the extent of the threat posed" by hazardous substances, the government's "actions were inconsistent with the NCP" and no cost recovery was warranted. *Washington State Dep't of Transp. v. Washington Nat. Gas Co., Pacificorp*, 59 F.3d 793, 803 (9th Cir. 1995).

In a similar case, the court held that a government cleanup was arbitrary and capricious where the government "failed to undertake a feasibility study" and "relied on EPA's May 1986 Site Assessment" despite warnings that the results of the site assessment was questionable. *State of Minn. v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1024 (8th Cir. 1998); *see also Emhart Indus., Inc. v. New England Container Co., Inc.*, 274 F. Supp. 3d 30, 49 (D.R.I. 2017) ("decisions made within [CERCLA and the NCP] will qualify as 'arbitrary and capricious' if [the government] fails to 'examine the relevant data and articulate a satisfactory explanation for its

1  action.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14

2  (2009))).

3      Notably, in making this determination the Court may not provide any

4  deference to the legal conclusions or positions advanced by the United States.

5  Instead, "[c]ourts must exercise their independent judgment in deciding whether an

6  agency has acted within its statutory authority." *Loper Bright Enterprises v.*

7  *Raimondo*, 603 U.S. 369, 412 (2024). The determination of the law, and the

8  underlying facts of the actions of the United States, are the exclusive province of the

9  Court to determine through trial of this action. The facts as demonstrated by the

10  City's evidence, at the very least, creates genuine issues of material fact regarding

11  inconsistency with the NCP. As in the cases cited above, the United States has

12  "utterly failed to determine the nature or the extent of the threat posed," and failed to

13  "gather[] sufficient information to determine the necessity for and proposed extent

14  of remedial action," among the numerous other deficiencies outlined above.

15      **D.**    **The failures of the United States make cost recovery unlawful and**

16          **inequitable.**

17      As a result of the deficient cleanup by the United States, the City is faced with

18  the unenviable circumstance of being forced to accept contaminated property

19  following a cleanup based on a 25-year-old investigation resulting in a flawed

20  remediation 18 years later. This investigation failed to address the designation of

21  chemicals in the federal list of hazardous substances (Perfluorinated Compounds

22  PFAS), a persistent and bio-accumulating chemical for which the United States is

23  obligated to address in its evaluation of the condition of the property and has failed

24  to do so. The United States now asks the Court to force the City to accept the

25  conveyance of property still contaminated with hazardous substances, and to pass off

26  the cost of future cleanup to the City.

27      These costs only exist because the United States did not perform pursuant to

28  the NCP. The United States asserts in its most recent filing that it "was not obligated

to remediate substances that were not considered hazardous at the time." (ECF No. 125 at 18). But courts have routinely recognized that CERCLA's obligations to investigate and remediate hazardous substances are retroactive. Those courts have held that CERCLA represented a "clear congressional intent favoring retroactive application of CERCLA's cleanup liability provisions." *United States v. Olin Corp.*, 107 F.3d 1506 (11th Cir. 1997). This analysis has been adopted by California federal courts as well. See, e.g., *Georgia-P. v. Officemax Inc.*, 2013 WL 5273007 (N.D. Cal. 2013) (discussing the Ninth Circuit's discussion of CERCLA as a "retroactive [ ] regime"); *California Dept. of Toxic Substances Control v. NL Industries, Inc.*, 687 F. Supp. 3d 905 (C.D. Cal. 2023), reconsideration denied, 2024 WL 3280904 (C.D. Cal. 2024).

The argument of the United States that the addition of a new substance as a CERCLA hazardous substance does not apply retroactively directly undermines the well-established intent of CERCLA liability. The addition of PFAS as a CERCLA hazardous substance must apply retroactively because "assigning responsibility to culpable parties can be achieved only through retroactive application of CERCLA's response cost liability provisions." *United States v. Olin Corp.*, 107 F.3d 1506 (11th Cir. 1997).

The United States asserts here that it is unnecessary to investigate for PFAS contamination because it was not a CERCLA hazardous substance at the time the remediation began. But the United States has an obligation to investigate for all CERCLA hazardous substances prior to transferring the property. Because the United States would have liability as a responsible party under CERCLA as a result of any PFAS contamination, the United States cannot transfer the property prior to collecting the data necessary to determine the level of PFAS contamination. By transferring to the City property with unknown PFAS contamination levels, the United States would saddle the City with additional costs, including obligating the City to take on burdensome future costs related to investigation and remediation.

In short, the United States cannot be permitted to grandfather in its deficient cleanup by relying on its 25-year-old investigation. *See Anderson Bros. v. St. Paul Fire & Marine Ins. Co.*, 729 F.3d 923, 926 (9th Cir. 2013) (CERCLA "establishes a retroactive strict liability regime that imposes joint and several liability upon past and current landowners or operators of properties or facilities from which hazardous substances have been released or disposed into the environment").

Aside from the plain absurdity of the position of the United States, it is also unsupported by the law. This position would absolve the United States from the CERCLA warranty mandated in some circumstances by the plain language of 42 U.S.C. § 9620(h)(3)(A)(ii) and allow the United States to refuse to address PFAS because they were not a hazardous substance 25 years ago. This flies in the face of the requirements of CERCLA and the NCP. The United States is in the unique position of controlling access to the property, the United States controls the content of the administrative record, and the United States performed all the investigation and remediation involved in the Boat Channel. It now asserts that the book is closed and no evidence, changed circumstance, or incompleteness will permit of any further consideration. The only concern of the United States is that of a bill collector. The protection of human health and the environment is frozen in time with all of its imperfections and notwithstanding the non-static nature of the Boat Channel contamination and the first-time ever addition to the hazardous substance inventory, the United States seeks payment for incomplete work and a forced transfer of the contaminated property to the City.

The repeated refusal by the United States to address the substantive issues in this case is consistent, stark, and an abdication of the underlying purposes of CERCLA. The United States seeks an order from this court that would mandate that the City accept title to realty without an opportunity to determine the current condition of that realty. The United States has rolled out every procedural device to ensure that neither the Court nor the City have such information. The obvious intent,

1   as best evidenced by the repudiation of any obligation to assess PFAS at the Boat

2   Channel, is to shroud the property in history without regard for changes, legal and

3   factual, that are not merely speculative.

4        The City does not ask for much—it seeks to kick the tires and lift the hood on

5   the efforts of the United States before the Court declares the City liable for yet-to-be-

6   determined costs resulting from unacceptable work that is inconsistent with the NCP.

7   The legal implications of the pending motion extend far beyond a responsible party's

8   share of financial responsibility. And if the United States intends to rely on its lawless

9   failure to properly address perfluorinated compounds (PFAS), that is a material fact

10  in dispute preventing summary judgment.

11  **VI.**   <u>**CONCLUSION**</u>

12       For the reasons set forth above, the City respectfully requests that the motion

13  for partial summary judgment of the United States (ECF No. 118) be denied in its

14  entirety.

15

16  DATED: January 31, 2025        Respectfully submitted,

16  **KUTAK ROCK LLP**

17

18

19  By: <u>*s/ Barry P. Steinberg*</u>
     Barry P. Steinberg

20       barry.steinberg@kutakrock.com

21  Attorney for Defendant/Cross
     Defendant/ Counter Claimant/Cross

22       Claimant
     City of San Diego

23

24

25

26

27

28