UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 3:23-cv-00541-LL-VET |
|---|---|
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO COMPEL THE UNITED STATES OF AMERICA TO PERMIT ENTRY AND SAMPLING AT THE BOAT CHANNEL** |
| CITY OF SAN DIEGO, | |
| Defendant. | |
| | **[Doc. Nos. 117 & 138]** |
| AND RELATED CROSS CLAIMS | |

Before the Court is Defendant City of San Diego's ("City") Amended Motion to Compel the United States of America to Permit Entry and Sampling at the Boat Channel.[1] Doc. No. 138 ("Motion"). The United States of America timely opposed the Motion. Doc. No. 125 ("Opposition"). The Court heard oral argument on February 4, 2025. Doc. No. 140. For the reasons discussed below, the Motion is **DENIED**.

---

[1] The City's original motion to compel required amendment to address the use of certain exhibits subsequently identified as confidential by the United States. *See* Doc. Nos. 117, 145. The original and amended motions to compel seek the same relief and are virtually identical in substance. This Order disposes of both motions.

I.    BACKGROUND

A.    Land and Remedial Action at Issue

The Department of the Navy operated the former Naval Training Center ("NTC") in San Diego, California as a training facility from June 1923 until April 30, 1997. Doc. No. 1 at 4.[2] Between 1998 and 2001, after it closed and decommissioned the NTC, the Navy transferred parcels of land within the NTC to other entities, including the City. *Id*. at 5. Specifically, pursuant to a Memorandum of Agreement ("MOA") signed in May 2000, the Navy conveyed to the City seven parcels of land, including two parcels (IIIB and VII) that comprise a narrow body of water referred to as the "Boat Channel." Doc. No. 117-5 at 4–5, 14 (parcel map). The Navy agreed to convey, and the City agreed to accept the Navy's right, title, and interest in the land via quitclaim deed pursuant to a sequence of conveyances laid out in the MOA. *Id*. at 4–5. Because the Boat Channel was "believed to contain sediments impacted by various contaminants," the Navy agreed to "take all remedial action necessary to protect human health and the environment" and "obtain site closure from appropriate regulatory authorities based on the projected use" of the Boat Channel. *Id.*

The Navy investigated contamination at the Boat Channel, and in 2003, completed a Remedial Investigation Report. Doc. No. 73 at 17 (¶ 19). The contamination at the Boat Channel was "primarily the result of accumulation of fine sediments, organic matter, and contaminants in its northern section," *see* Doc. No. 98-2 at 227, and the primary chemicals of concern were copper, lead, zinc, total chlordane and total DDT, *see* Doc. No. 73 at 17 (¶ 19). The Navy completed a Draft Feasibility Study Report analyzing remedial alternatives for the Boat Channel sediments and released a final Feasibility Study Report in 2016. *Id*. at 17 (¶ 22). On March 28, 2017, the Navy issued the final Record of Decision and Remedial Action Plan, concluding that the preferred remedial alternative (dredging

---

[2]    Page numbers for docketed materials refer to those imprinted by the Court's electronic case filing system.

chemically impacted sediments and removing them to an off-site landfill) met the threshold criteria for protecting human health. *Id.* at 17–18 (¶¶ 23–24). The San Diego Regional Water Quality Control Board (the "Water Board") concurred with the Navy's selected remedy. *Id.* at 18 (¶ 25).

Between late 2017 and early 2019, the Navy conducted the selected remedial action and incurred over $16 million in costs to remediate the Boat Channel. *Id*. at 18–19 (¶¶ 26, 33). The Water Board subsequently reviewed the Navy's final Remedial Action Completion Report (issued in March 2019) and concluded that it had no further comments. *Id.* at 18 (¶¶ 27–28). Following preparation of a Final Finding of Suitability to Transfer for the Boat Channel parcels, which the Water Board found "acceptable," the United States attempted to transfer the Boat Channel to the City in May 2022. Doc. No. 73 at 18–19 (¶¶ 29–34). The City refused to accept the transfer. *Id.* at 19 (¶ 35).

### B.     Parties' Claims

On March 27, 2023, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the United States initiated this suit, asserting two claims. Doc. No. 1 at 1–2.[3] First, pursuant to Section 107, the United States seeks to recover from the City response costs incurred by the Navy in remediating the Boat Channel. Doc. No. 25 at ¶¶ 1, 52–81; *see also* 42 U.S.C. § 9607. Second, pursuant to Section 113(g)(2), the United States seeks a declaratory judgment for liability to be binding in any subsequent action seeking to recover further response costs. *Id*. at ¶¶ 2, 82–83; *see also* 42 U.S.C. § 9613(g).[4]

In response, the City initially asserted five counterclaims against the United States for: (1) contribution pursuant to Section 113(f)(1) of CERCLA; (2) cost recovery under

---

[3]    The United States filed a First Amended Complaint ("FAC") on September 15, 2023. The bases for their claims, *i.e.*, CERCLA, did not change in the FAC.

[4]    The United States also asserted claims against the San Diego Unified Port Authority and the San Diego County Regional Airport Authority, which were subsequently settled. Doc. Nos. 65, 67–69.

3

3:23-cv-00541-LL-VET

1 | Section 107(a) of CERCLA; (3) breach of contract; (4) equitable indemnity; and

2 | (5) declaratory relief pursuant Section 113(g)(2) of CERCLA. Doc. No. 31. The United

3 | States filed a counterclaim-in-reply against the City for breach of contract. Doc. No. 73.

4 | The Court granted, with leave to amend, the United States' motion to dismiss the

5 | City's Second, Third, and Fourth Counterclaims. Doc. No. 89. The City then filed four

6 | amended counterclaims against the United States for: (1) contribution pursuant to Section

7 | 113(f)(1) of CERCLA; (2) recoupment; (3) declaratory and injunctive relief under the

8 | Administrative Procedure Act ("APA");[5] and (4) declaratory relief pursuant to Section

9 | 113(g)(2) of CERCLA. Doc. No. 96. On July 17, 2025, the Court dismissed, with prejudice,

10 | the City's Second and Third Counterclaim for lack of subject matter jurisdiction.[6] Doc. No.

11 | 180.

### C.   Sampling at Issue

On September 12, 2024, pursuant to Federal Rule of Civil Procedure 34(a)(2), the City served the United States with a request for entry on to land to conduct sampling ("Sampling Request"). Doc. No. 117-3 at 2–4. Therein, the City requested access to the Boat Channel for "the purpose of inspecting, observing, measuring, surveying, photographing, testing, and sampling the soils, sediments, and water on and leading to the Boat Channel." *Id*. at 3. The City requested entry beginning on October 15, 2024 and ending November 7, 2024 (one day after the close of fact discovery). *Id*.; *see also* Doc. No. 87 (setting November 6, 2024 deadline for the close of fact discovery). Any samples collected would be analyzed "for the presence of hazardous substances, pollutants and contaminants, and unregulated contaminants as those terms are defined in 42 U.S.C. 9601(14) and (33) and 42 U.S.C. 300g-1(b)." *Id.* The City identified sampling locations by

---

[5]   Although styled as an APA claim, this counterclaim stems from the alleged breach of the MOA. *See* Doc. No. 96 at 43–45 (¶¶ 75–82).

[6]   In response to the dismissal, the City filed a Motion for Reconsideration, which is currently pending. *See* Doc. No. 182.

3:23-cv-00541-LL-VET

1    referring to and attaching the "scope of work" prepared by AtkinsRealis. *Id.* at 2, 7–29.

2    The scope of work, titled "Naval Training Center (NTC) Boat Channel Environmental

3    Assessment," is dated March 2024 and outlines a 10-month schedule to accomplish the

4    sampling and analyses proposed therein (hereinafter the "Scope of Work"). *Id.* at 28.

5          On October 9, 2024, the United States formally objected to the Sampling Request,

6    contending that any sampling results would constitute post-decisional, extra-record

7    material. Doc. No. 117-4 at 3. As such, the information would be irrelevant as any

8    challenges to the adequacy of the Navy's cleanup is limited to information in the

9    administrative record, pursuant to Section 113(j)(1) of CERCLA. *Id.* at 2–9.

10          On December 20, 2024, following three status conferences with Magistrate Judge

11    Benjamin J. Cheeks to discuss ongoing discovery issues, the City filed the instant Motion,

12    seeking to compel the requested entry and sampling. Doc. Nos. 92, 113, 114, 117. Therein,

13    the City asserts that "serious and legitimate deficiencies in the United States' remediation

14    efforts are apparent," and lists the various ways in which the United States' cleanup is

15    purportedly inadequate. Motion at 5. Accordingly, the City seeks sampling so it has "the

16    opportunity to conduct its own investigation." *Id.* at 7.

17    **II.    LEGAL STANDARD**

18          Federal Rule of Civil Procedure 34 provides that a party may serve on any other

19    party a request within the scope of Rule 26 to permit entry onto land possessed or controlled

20    by the responding party so the requesting party may, among other things, sample the

21    property.[7] Fed. R. Civ. P. 34(a)(2). In turn, Rule 26 permits "discovery regarding any

22    nonprivileged matter that is relevant to any party's claim or defense and proportional to the

23    needs of the case." Fed. R. Civ. P. 26(b)(1). The court considers proportionality based on

24    the following factors: (1) "importance of the issues at stake in the action," (2) "the amount

25    in controversy," (3) "the parties' relative access to relevant information," (4) "the parties'

26

27

28    [7]    Unless otherwise indicated, all references to a "Rule" are to the Federal Rules of Civil
Procedure.

3:23-cv-00541-LL-VET

resources," (5) "the importance of the discovery in resolving the issues," and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*. "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id*.

The Court may also "limit the frequency or extent of discovery" if it determines that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). The "Court must consider both relevance and proportionality in determining whether the scope of discovery that a party seeks is appropriate." *BlackBerry Ltd. v. Facebook, Inc.*, Case No. CV 18-1844-GW (KSx), 2019 U.S. Dist. LEXIS 165849, at *19 (C.D. Cal. Aug. 19, 2019). The party resisting discovery "has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Weinstein v. Katapult Grp., Inc.*, No. 21-CV-05175-PJH, 2022 U.S. Dist. LEXIS 181635, at *2 (N.D. Cal. Sept. 29, 2022) (quoting *Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D. Cal. 1998)). On a motion to compel, the moving party bears the burden of demonstrating relevance, proportionality, and other Rule 26 requirements. *Shared P'ship v. Meta Platforms, Inc.*, No. 22-cv-02366-RS (RMI), 2023 U.S. Dist. LEXIS 43851, at *9 (N.D. Cal. Mar. 14, 2023) (citing *Rodriguez v. Barrita, Inc.*, No. 09-04057 RS-PSG, 2011 U.S. Dist. LEXIS 134079, at *4 (N.D. Cal. Nov. 21, 2011)).

## III.   DISCUSSION

### A.   Judicial Review under CERCLA

In 1980, Congress enacted CERCLA as a "response to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). "As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). Courts construe CERCLA liberally to effectuate its two primary goals: "(1) to ensure the prompt and effective cleanup of waste disposal sites, and (2) to assure that parties responsible for

1  hazardous substances [bear] the cost of remedying the conditions they created." *Carson*

2  *Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001).

3         "Section 113 of CERCLA, entitled 'Civil Proceedings,' sets forth the jurisdictional

4  basis and limits of federal courts to adjudicate actions arising out of CERCLA." *Fairchild*

5  *Semiconductor Corp. v. United States EPA*, 984 F.2d 283, 286 (9th Cir. 1993); *see also*

6  *generally* 42 U.S.C. § 9613. In relevant part, subsection (j)(1) provides that "[i]n *any*

7  *judicial action under this chapter*, judicial review of any issues concerning the adequacy

8  of any response action taken or ordered by the President shall be limited to the

9  administrative record." 42 U.S.C. § 9613(j)(1) (emphasis added). At issue here is whether

10  Section 113(j)(1) precludes the sampling requested by the City. For the reasons discussed

11  below, the Court finds that it does.

12       **B.      Relevance of Sampling to CERCLA Claims**

13         At the outset, the Court first addresses the City's contention that "the United States'

14  initiation of this litigation is predicated upon the contractual obligations of the parties,

15  which establishes conditions to be satisfied by both parties." Motion at 3. The record

16  confirms that is not the case.

17         The genesis of this suit is two claims asserted by the United States—both pursuant

18  to CERCLA. The first is a cost recovery claim under Section 107 and the second is a

19  declaratory judgment claim under Section 113(g)(2). *See generally* Doc. Nos. 1, 25.

20  Pursuant to CERCLA, both claims are available to the United States irrespective of any

21  contract. Thus, any suggestion that this litigation originally stems from the parties'

22  "contractual obligations" in the MOA is inaccurate.

23         Further, since the filing of this action, the City has also asserted CERCLA claims in

24  the form of counterclaims. *See* Doc. Nos. 31, 96. Presently, the City asserts a contribution

25  action under Section 113(f)(1) and seeks a declaratory judgment under Section 113(g)(2).

26  Doc. No. 96 at 38–41, 45–46. Hence, at this juncture, both the United States and the City

27  assert causes of action pursuant to CERCLA.

28

3:23-cv-00541-LL-VET

1    As to the parties' causes of action arising directly under CERCLA, there can be no

2  dispute that Section 113(j)(1) applies. As such, with respect to the parties' CERCLA causes

3  of action, judicial review of any issues concerning the adequacy of the Navy's cleanup of

4  the Boat Channel is limited to the administrative record.[8] *See, e.g.*, *United States v. Iron*

5  *Mt. Mines*, 987 F. Supp. 1250, 1253 (E.D. Cal. 1997) (limiting review of response actions

6  selected by the EPA under CERCLA to the administrative record); *United States v. Wash.*

7  *DOT*, 450 F. Supp. 2d 1207, 1214 (W.D. Wash. 2006) (same). Thus, because it seeks

8  information to challenge the adequacy of the Boat Channel cleanup, the Sampling Request

9  seeks discovery that is irrelevant to the parties' CERCLA claims.

10    **C.    Relevance of Sampling to Remaining Allegations**

11    On July 17, 2025, the Court dismissed for lack of jurisdiction, and without leave to

12  amend, the City's third counterclaim, finding "the rights and remedies underlying the

13  City's APA counterclaim to be contractually based." *See* Doc. No. 180 at 5–8.[9] Following

14  this dismissal, the City's only remaining counterclaims are its CERCLA counterclaims

15  based on contribution and declaratory relief. At this juncture, it is not clear if or how the

16  City intends to rely on the United States' alleged breach of the MOA to support its

17  remaining claims or defenses. To the extent the City will continue to characterize any of

18  its remaining allegations as stemming from a breach of the MOA, the Court next addresses

19  the Sampling Request in that context.

20    **1.    Section 113(j)(1) and Challenges to CERCLA**

21    The United States contends that Section 113(j)(1) prohibits the Sampling Request

22  because judicial review in this action is limited to the administrative record. Opposition at

23  6. The City contends that contract law, and not CERCLA, governs the instant dispute

---

[8]  The Court notes that since the filing of the instant Motion, the City moved to supplement
the administrative record. *See* Doc. No. 153. In denying the requested sampling, the
Court makes no finding as to the merits of that motion.

[9]  The Court also dismissed the City's second counterclaim for recoupment. Doc. No. 180
at 3–5.

1    because the sampling requested relates to its contract-based assertions, specifically breach

2    of the MOA. Motion at 3–5. Moreover, the MOA does not reference CERCLA in the

3    context of describing the United States' obligation to "take all remedial action necessary

4    to protect human health and the environment." Motion at 3; *see also* Doc. 117-5 at 4.

5    Therefore, it is the City's position that Section 113(j)(1) does not apply to limit this action

6    to the administrative record or otherwise preclude the Sampling Request.

7          The City's arguments suggest that the Court can ignore CERCLA and the limitations

8    set forth in Section 113(j)(1). However, as the record demonstrates, both parties plead

9    CERCLA claims and the City repeatedly asserts that the United States failed to conduct an

10   adequate cleanup, in purported breach of the MOA. And at the time of the hearing, the City

11   could not articulate how it would or even could limit use of any sampling data to just its

12   allegations that the United States breached the MOA. *See* Doc. No. 145 at 51:22–54:2. As

13   such, the delineation the City wishes to draw between its CERCLA and breach of contract

14   allegations is not as clear as it suggests. Hence, whether Section 113(j)(1) applies to the

15   instant dispute depends on what "judicial action under this chapter" means for purposes of

16   Section 113(j)(1).

17         No court seems to have directly addressed this question and the United States could

18   not identify such a case at the time of hearing. Still, the Ninth Circuit's interpretation of

19   CERCLA's exclusive jurisdiction provision, found in Section 113(b), is instructive. *See* 42

20   U.S.C. 9613(b). Specifically, in *Fort Ord Toxics Project v. Cal. EPA*, the Ninth Circuit

21   analyzed Section 113(h), which subject to certain exceptions, provides that "[n]o *Federal*

22   *court* shall have jurisdiction under Federal law . . . to review any challenges to removal or

23   remedial action selected under section 9604 of this title. . . ." 189 F.3d 828, 832 (9th Cir.

24   1999) (emphasis added); *see also* 42 U.S.C. § 9613(h). Based on the jurisdictional bar in

25   Section 113(h), the district court dismissed for lack of jurisdiction plaintiffs' state law

26   challenge to a CERCLA cleanup at Fort Ord. *Fort Ord Toxics Project*, 189 F.3d at 830.

27   Plaintiffs appealed, arguing in part that even if Section 113(h) precluded federal court

28   jurisdiction over their lawsuit, it did not remove jurisdiction from state courts and remand

of their case to state court was appropriate. *Id.* at 832. The *Fort Ord* court rejected such an interpretation, reasoning that "Congress only removed *federal* court jurisdiction from 'challenges' to CERCLA cleanups because only federal courts shall have jurisdiction to adjudicate a 'challenge' to a CERCLA cleanup in the first place." *Id.* (emphasis in original).

In reaching this conclusion, the court analyzed the "interplay" between Sections 113(b) and 113(h). *Id.* Under Section 113(b), federal district courts "have exclusive original jurisdiction over *all controversies arising under this chapter* . . . ." 42 U.S.C. § 9613(b) (emphasis added). The plaintiffs conceded that their state lawsuit challenged a CERCLA cleanup, but argued it was not a "controversy arising under CERCLA" and therefore federal courts did not have exclusive jurisdiction over their lawsuit. *Fort Ord Toxics Project, Inc.,* 189 F.3d at 832. The Ninth Circuit rejected this "cramped interpretation" of Section 113(b). *Id.* Guided by the "primary tenet of statutory construction" that courts should look at the statute as a whole and its object and policy, the *Fort Ord* court concluded that Section 113(b)'s exclusive jurisdiction provision covers "any 'challenge' to a CERCLA cleanup." *Id.* Thus, pursuant to *Fort Ord*, state law claims can constitute controversies arising under the act if they challenge a CERCLA cleanup. *Id.*; *see also Lehman Bros., Inc. v. City of Lodi*, 333 F. Supp. 2d 895, 901 (E.D. Cal. 2004) ("Section 113(b)'s jurisdictional grant is not limited to claims created by CERCLA, but can extend to purely state law claims.").

The Ninth Circuit again examined the scope of Section 113(b) in *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality*, 213 F.3d 1108, 1115 (9th Cir. 2000). The issue in *ARCO* was whether ARCO's state law claims seeking access to documents about a CERCLA cleanup constituted a "challenge to a CERCLA cleanup" and therefore federal claims subject to Section 113(b). *Id.* First, the *ARCO* court confirmed "that jurisdiction under § 113(b) is more expansive than . . . those claims created by CERCLA, and covers any challenge to a CERCLA cleanup." *Id.* (internal quotation marks omitted) (quoting *Fort Ord Toxics Project, Inc.*, 189 F.3d at 832). The court next explained that "[a]n action constitutes a challenge to a CERCLA cleanup if it is related to the goals

of the cleanup." *Id.* (internal quotation marks omitted) (quoting *Razore v. Tulalip Tribes of Washington*, 66 F.3d 236, 239 (9th Cir. 1995)). Based on these parameters, the court held that ARCO's state law claims did not relate to the goals of the cleanup because, for example, ARCO did not seek to alter cleanup requirements or environmental standards or alter or delay the cleanup. *Id.* Instead, the suit involved "only the public's right of access to information about that cleanup." *Id.*

In interpreting Section 113(j)(1), the Court sees no reason to deviate from the Ninth Circuit's broad interpretation of Section 113(b). Both subsections (b) and (j)(1) govern civil proceedings pertaining to CERCLA and use similar language to describe the claims subject to each provision. *Compare* 42 U.S.C. § 9613(b) ("all controversies arising under this chapter") *with* 42 U.S.C. § 9613(j)(1) ("any judicial action under this chapter"). If "controversies arising under this chapter" captures any challenge to a CERCLA cleanup, it makes no sense that "any judicial action under this chapter" has a narrower meaning or is limited, for example, to only claims expressly created by CERCLA. Such an interpretation risks creating an inconsistency between subsections (b) and (j)(1). *See Feder v. Frank (In re HP Inkjet Printer Litig.)*, 716 F.3d 1173, 1184 (9th Cir. 2013) ("Under accepted canons of statutory interpretation, we must make every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (internal alterations omitted). It also risks creating different levels of judicial review based on artful pleading and can lead to conflicting findings concerning the same CERCLA cleanup. Such a result is contrary to the purpose of Section 113(j), which was designed to streamline, expedite and reduce of the cost of CERCLA litigation. *See* H.R. Rep. No. 99-253, 99th Cong., 2d Sess., reprinted in 1986 U.S. CODE CONG. & ADMIN. NEWS 2863 ("Limiting judicial review of response actions to the administrative record expedites the process for review, avoids the need for time-consuming and burdensome discovery, reduces litigation costs, and ensures that the reviewing court's attention is focused on the criteria used in selecting the response.").

3:23-cv-00541-LL-VET

Therefore, in accordance with the Ninth Circuit's interpretation of "all controversies arising under this chapter" in Section 113(b), the Court interprets "any judicial action under this chapter" to mean any challenge to a CERCLA cleanup. *See Fort Ord Toxics Project*, 189 F.3d 832 (noting that "by granting district courts exclusive jurisdiction over 'all controversies arising under' CERCLA, Congress used language more expansive than would be necessary if it intended to limit exclusive jurisdiction solely to 'those claims created by CERCLA'"). And like Section 113(b), the Court finds that Section 113(j)(1) applies to any challenge to a CERCLA cleanup.

**2.    Application to Any Remaining Allegations for Breach of the MOA**

Having concluded that Section 113(j)(1) applies to any challenge to a CERCLA cleanup, the Court next determines whether the City's allegations of breach of the MOA present a challenge to the CERCLA cleanup of the Boat Channel.

Here, the City is clear that it intends to support its allegations of breach of the MOA by challenging the Navy's cleanup of the Boat Channel, a remedial action taken pursuant to CERCLA. Doc. No. 96 at 43–45. Specifically, the MOA required that the Navy "take all remedial action necessary to protect human health and the environment." Doc. No. 117-5 at 5.[10] The City argues that the Navy failed to take all such remedial action, Doc. No. 96 at 44, and as part of those allegation, seeks sampling at the Boat Channel to show that the cleanup was inadequate. Motion at 5–7. One way the City proposes to challenge the cleanup is by sampling for polyfluorinated compounds (specifically PFAS and PFOA),

---

[10]    The United States argues that the language from the MOA regarding protecting human health and the environment comes directly from CERCLA and invites the Court to find that this language is identical to obligations under CERCLA. Opposition at 22. Given the Court's finding that Section 113(j)(1) applies to the City's breach allegations, the Court declines to reach this question as it is unnecessary to the Court's ruling. *See Gonzalez-Veliz v. Garland*, 996 F.3d 942, 949 (9th Cir. 2021) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

which the Environmental Protection Agency designated as CERCLA hazardous substances in July 2024 (*after* the Navy completed the Boat Channel cleanup).

Moreover, the City's expert confirms that the City intends to use the sampling to challenge the CERCLA cleanup, explaining that "[t]he purpose of the [sampling] investigation would be to demonstrate that the Navy is not entitled to recovery under its CERCLA claim because it has ***failed to perform a CERCLA-quality clean-up***." Doc. No. 117-3 at 8 (emphasis added). Even as its own expert admits that the sampling investigation will be used to challenge the adequacy of a CERCLA cleanup, the City argues that "this action is governed by contract, not CERCLA." Motion at 3.

But this desire to limit the applicability of Section 113(j)(1) is also belied by the fact that the City could not articulate how it would use the sampling. Specifically, when the Court asked whether the City would use the sampling results to litigate both their breach of contract and CERCLA claims, the City did not provide a clear answer and did not commit to using the results to support only their breach allegations. Doc. No. 145 at 51:2–54:2. In short, the City is challenging the adequacy of a CERCLA cleanup in arguing that the United States breached the MOA, and wishes to conduct sampling, including testing for PFAS levels, to support that assertion. *See Hanford Downwinders Coalition, Inc. v. Dowdle*, 71 F.3d 1469, 1482 (9th Cir. 1995) (held it was a challenge to a CERCLA cleanup where plaintiff sought to dictate remedial actions); *Fort Ord Toxics Project*, 189 F.3d at 831 (held it was a challenge to a CERCLA cleanup where plaintiffs sought to postpone CERCLA cleanup based on state law); *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 330 (9th Cir. 1995) (held it was a challenge to a CERCLA cleanup where plaintiff wanted to impose additional reporting requirements on the cleanup); *Razore*, 66 F.3d at 239 (held it was a challenge to a CERCLA cleanup where plaintiff sought to alter the method and order of the cleanup); *Lehman Bros., Inc.*, 333 F. Supp. 2d at 901 (held that breach of contract claim was a challenge to a CERCLA cleanup when based on alleged failure to make priority of payments disallowed by CERCLA).

3:23-cv-00541-LL-VET

1    Because the City is challenging the adequacy of the CERCLA cleanup at the Boat

2    Channel as part of its allegations that the United States breached the MOA, Section

3    113(j)(1) applies, and judicial review of those issues is presently limited to the

4    administrative record. Accordingly, the Sampling Request seeks discovery that is

5    irrelevant.

6    **D.    Timeliness of Sampling Request**

7    The United States also objects that the Sampling Request is untimely. Opposition at

8    10–13. The Court agrees.

9    The Court originally set fact discovery to close on August 7, 2024. Doc. No. 61. At

10   the City's request, the Court continued discovery deadlines twice to September 6, 2024 and

11   November 6, 2024, respectively. *See* Doc. Nos. 78 & 87. In the Second Amended

12   Scheduling Order, Magistrate Judge Cheeks specified that all guidelines, deadlines, and

13   requirements from the original scheduling order remained in effect. Doc. No. 87. That

14   original scheduling order expressly informed the parties that all discovery "must be

15   initiated a sufficient period of time in advance of the cut-off date, **so that it may be**

16   **completed** by the cut-off date." Doc. No. 61 at 2 (emphasis in original). That did not occur

17   here.

18   The Scope of Work, which outlines the City's proposed sampling at the Boat

19   Channel and forms the basis for its request, was available in March 2024. Doc. No. 117-3

20   at 23–27. However, the City did not serve the Sampling Request until September 12, 2024

21   and requested to sample from October 15, 2024 to November 7, 2024. Thus, the City

22   proposed completing sampling *after* the close of fact discovery and on the same day that

23   initial expert designations and reports were due. Doc. No. 117-3 at 3; *see also* Doc. No. 87

24   (setting November 7, 2024 deadline for expert witness designations and disclosures). And

25   as reflected in the Scope of Work, sampling analysis would take months, so it is unclear

26   how the City proposed conducting the associated sampling analysis and still meeting

27   remaining case deadlines.

28

14

3:23-cv-00541-LL-VET

The City fails to explain why it waited over six months to serve this discovery. Nor could the City provide a clear response regarding the delay at the time of hearing. *See generally* Doc. No. 145. Furthermore, the Court agrees with the United States that permitting the proposed sampling would reopen major portions of fact and expert discovery and cause significant delays. Opposition at 11. Therefore, because the City failed to timely propounded and seek the requested sampling, the Court denies the Motion.

## IV.    CONCLUSION

For the reasons set forth above, the City's Motion to Compel is **DENIED**.

**IT IS SO ORDERED**.

Dated:  August 15, 2025

_____
Hon. Valerie E. Torres
United States Magistrate Judge

3:23-cv-00541-LL-VET