Barry P. Steinberg (admitted *Pro Hac Vice*)
barry.steinberg@kutakrock.com
**KUTAK ROCK LLP**
1133 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
Telephone: (202) 828-2400
Facsimile: (202) 828-2488

Dwyer Arce (admitted *Pro Hac Vice*)
dwyer.arce@kutakrock.com
**KUTAK ROCK LLP**
1650 Farnam Street
The Omaha Building
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148

Thomas F. Vandenburg (State Bar No. 163446)
tvandenburg@wshblaw.com
Alice Charkhchyan (State Bar No. 332670)
acharkhchyan@wshblaw.com
**WOOD, SMITH, HENNING & BERMAN LLP**
505 North Brand Boulevard, Suite 1100
Glendale, CA 91203
Telephone: (818) 551-6000
Facsimile: (818) 551-6050

Attorneys for Defendant/Counter-Claimant
CITY OF SAN DIEGO

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant.<br><br>*AND RELATED CROSS CLAIMS AND COUNTER CLAIMS* | Civil No. 3:23-CV-00541-LL-BJC<br><br>**CITY OF SAN DIEGO POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTERCLAIM-IN-REPLY OF UNITED STATES**<br><br>The Hon. Linda Lopez<br><br>Trial Date: None Set |

/ / /

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................ 2

    A.    The City conveys property to the Navy for the NTC ........................... 2

    B.    Knowing the Boat Channel is contaminated, the Navy starts
        planning to give it back to the City ...................................................... 2

    C.    The NTC closes and the Boat Channel is slated for
        redevelopment ....................................................................................... 3

    D.    The Navy insists the City execute an MOA obligating the
        United States to "take all remedial action necessary to protect
        human health and the environment" ..................................................... 4

    E.    The Navy ignores the City's ongoing concerns as it spends
        decades in remediation efforts based on the 1998 sampling of IR
        Site 12 ................................................................................................... 5

    F.    The State Board fails to act on the City's challenge to the
        Navy's deficient cleanup and the Water Board's inconsistent
        actions .................................................................................................. 7

    G.    The United States refuses to conduct any further investigation or
        cleanup, yet claims it has met the requirements of the MOA ............... 9

III.  STANDARD OF REVIEW ........................................................................... 9

    A.    Standards Governing Summary Judgment ........................................... 9

    B.    Elements Required to Prevail on Claim of Breach of Contract .......... 11

IV.   ARGUMENT .............................................................................................. 11

    A.    This motion should be granted regardless of whether federal law
        or California state law applies to the MOA ........................................ 11

B.  The United States failed to perform the unambiguous
    requirements of the MOA with regard to Parcels IIIB and VII .......... 12

    1.  The United States failed to take all actions necessary to
        protect human health and the environment ............................. 12

    2.  The United States refused to investigate the entirety of
        Parcels IIIB and VII ..................................................... 15

    3.  The United States Failed to Obtain Site Closure for
        Parcels IIIB and VII ..................................................... 16

    4.  The Actions of the United States Were Not Based on the
        Projected Uses of Parcels IIIB and VII as Described in the
        NTC San Diego Reuse Plan Dated August 1998 ..................... 17

C.  The Attempt by the United States to Claim the MOA Only
    Requires it to Comply with CERCLA Has No Support in the
    MOA ................................................................................... 18

D.  The failure of the United States to perform under the MOA is a
    breach of its material terms, excusing the City's performance .......... 20

E.  This breach and failure to satisfy conditions precedent to the
    City's duty to accept Parcels IIIB and VII precludes specific
    performance.......................................................................... 23

V.  CONCLUSION ............................................................................. 25

1

# TABLE OF AUTHORITIES

2

Page

3

## FEDERAL CASES

4   *Burlington N. & Santa Fe Ry. Co. v. United States,*

5       556 U.S. 599 (2009) ........................................................................ 19

6   *Caltex Plastics, Inc. v. Raytheon Co.,*

7       No. CV 14-504 PA (EX), 2014 WL 12687419 (C.D. Cal. Apr. 24, 2014)........ 12

8   *Chaly-Garcia v. United States,*

9       508 F.3d 1201 (9th Cir. 2007)............................................................ 11

10  *Church Mut. Ins. Co. v. Clay Ctr. Christian Church,*

11      746 F.3d 375 (8th Cir. 2014) ............................................................. 13

12  *City of Tacoma, Dep't of Pub. Utils. v. United States,*

13      31 F.3d 1130 (Fed. Cir. 1994) ........................................................... 10

14  *Conservation Cong. v. Finley,*

15      774 F.3d 611 (9th Cir. 2014)............................................................... 9

16  *Facebook, Inc. v. Pac. Nw. Software, Inc.,*

17      640 F.3d 1034 (9th Cir. 2011)........................................................20-21

18  *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank,*

19      *Nat'l Ass'n,*

20      671 F.3d 1027 (9th Cir. 2012) ........................................................... 12

21  *Gilbert v. Dep't of Just.,*

22      334 F.3d 1065 (Fed. Cir. 2003) ....................................................20, 22

23  *Ginett v. Computer Task Grp., Inc.,*

24      962 F.2d 1085 (2d Cir. 1992) ............................................................ 24

25  *Giordano v. Solvay Specialty Polymers USA, LLC,*

26      522 F. Supp. 3d 26 (D.N.J. 2021)....................................................... 14

27  *Grand Famous Shipping Ltd. v. Port of Houston Auth.,*

28      572 F. Supp. 3d 307 (S.D. Tex. 2021)................................................. 12

*Hernandez v. Wonderful Co. LLC*,

    No. 23-CV-1242 (ER), 2024 WL 4882180 (S.D.N.Y. Nov. 25, 2024) ............. 14

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,

    957 F.3d 1038 (9th Cir. 2020) .................................................................11, 23-24

*Israel v. Chabra*,

    537 F.3d 86 (2d Cir. 2008) ................................................................................ 24

*James River Ins. Co. v. Medolac Lab'ys*,

    290 F. Supp. 3d 956 (C.D. Cal. 2018)............................................................... 21

*Las Vegas Sands, LLC v. Nehme*,

    632 F.3d 526 (9th Cir. 2011) ...................................................................... 11, 21

*Lurline Gardens Ltd. Hous. P'ship v. United States*,

    37 Fed. Cl. 415 (1997).......................................................................................19

*Nat'l Foam, Inc. v. Zurich Am. Ins. Co.*,

    No. 23-CV-03873-LB, 2025 WL 699361 (N.D. Cal. Feb. 26, 2025)................ 14

*New Castle Cnty. v. Hartford Acc. & Indem. Co.*,

    970 F.2d 1267 (3d Cir. 1992) ........................................................................... 10

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,

    210 F.3d 1099 (9th Cir. 2000) .......................................................................... 10

*Oh v. Resol. Tr. Corp.*,

    26 F.3d 131, 1994 WL 249988 (9th Cir. 1994)........................................... 11, 23

*Rampp v. Ocwen Fin. Corp.*,

    No. 11-CV-3017-BTM-NLS, 2014 WL 4912930 (S.D. Cal. Sept. 29,

    2014)...................................................................................................................23

*Saavedra v. Donovan*,

    700 F.2d 496 (9th Cir. 1983) ............................................................................ 12

*Saedi v. Coterie Baby, Inc.*,

    No. 24CV3893 (DLC), 2024 WL 4388401 (S.D.N.Y. Oct. 3, 2024) .......... 14, 22

*San Carlos Irr. & Drainage Dist. v. United States*,

    877 F.2d 957 (Fed. Cir. 1989) ...................................................................10-11

*Schaap v. United States*,

    No. 24-1300C, 2025 WL 929227 (Fed. Cl. Mar. 26, 2025).............................. 14

*Sonner v. Schwabe N. Am., Inc.*,

    911 F.3d 989 (9th Cir. 2018) .............................................................................. 10

*United States v. Bedford Assocs.*,

    618 F.2d 904 (2d Cir. 1980) ............................................................................... 23

*United States v. Contra Costa Cnty. Water Dist.*,

    678 F.2d 90 (9th Cir. 1982) ................................................................................ 10

*United States v. Seckinger*,

    397 U.S. 203 (1970) ........................................................................................11-12

*Varilease Tech. Grp., Inc. v. United States*,

    289 F.3d 795 (Fed. Cir. 2002) ........................................................................... 10

*Williams v. Emps. Mut. Cas. Co.*,

    845 F.3d 891 (8th Cir. 2017) .............................................................................. 14

*Zurich Am. Ins. Co. of Illinois v. VForce Inc.*,

    No. 2:18-CV-02066-DAD-CKD, 2024 WL 4452721 (E.D. Cal. Oct. 8,

    2024) ................................................................................................................... 10

### STATE CASES

*300 DeHaro St. Invs. v. Dep't of Hous. & Cmty. Dev.*,

    161 Cal. App. 4th 1240, 75 Cal. Rptr. 3d 98 (2008) .......................................... 19

*Consolidated World Investments, Inc. v. Lido Preferred Ltd.*,

    9 Cal. App. 4th 373 (1992) ................................................................................. 24

*Karpinski v. Smitty's Bar, Inc.*,

    246 Cal. App. 4th 456 (2016) ............................................................................. 24

*PlattPacific, Inc. v. Andelson*,

    6 Cal. 4th 307 (1993) .......................................................................................... 23

*Smith v. State Farm Mut. Auto. Ins. Co.*,

    399 P.3d 771 (Colo. App. 2017).............................................................19

**FEDERAL STATUTES**

Comprehensive Environmental Response, Compensation, and

    Liability Act..............................................................................4, 6, 18-20

Defense Base Closure and Realignment Act of 1990 ...............................2-3

**STATE STATUTES**

Cal. Civ. Code § 1436..............................................................................24

Cal. Civ. Code § 3392 (1994)...........................................................11, 23

Cal. Water Code § 13391.5(d).....................................................................5

**OTHER AUTHORITIES**

11 Williston on Contracts § 30:19 (4th ed.) .............................................19

11 Williston on Contracts § 30:4 (4th ed.) ...............................................10

17A C.J.S. *Contracts* § 467 .................................................................23-24

23 Williston on Contracts § 63:3 (4th ed.) ...............................................20

58 Cal. Jur. 3d *Specific Performance* § 22 ...............................................24

*Determining the Sources and Content of Federal Common Law—In General*,

    19 Fed. Prac. & Proc. Juris. § 4518 (3d ed.) .......................................12

*Lifetime Health Advisories and Health Effects Support Documents for*

    *Perfluorooctanoic Acid and Perfluorooctane Sulfonate*, 81 Fed. Reg.

    33,250-01 (May 25, 2016).................................................................14

Restatement (First) of Contracts § 375, cmt. a (Am. Law Inst. 1932)...................23

Restatement (First) of Contracts § 397 (Am. Law Inst. 1932).........................11, 21

*Term*, Black's Law Dictionary (12th ed. 2024).......................................20

Webster's Third New International Dictionary 491 (2002) ....................................13

CITY OF SAN DIEGO POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

4927-0123-1392

**CITY OF SAN DIEGO POINTS & AUTHORITIES IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.     <u>INTRODUCTION</u>

This memorandum of points and authorities supports the motion for partial summary judgment of the City of San Diego (the "City") against the United States of America (the "United States" or the "Navy"). The City respectfully requests the Court dismiss the counterclaim-in-reply of the United States, (ECF No. 73 at 13-21), with prejudice because the undisputed facts demonstrate that the United States is not entitled to specific performance of the Memorandum of Agreement ("MOA").

For nearly a century, the United States contaminated Parcels IIIB and VII of the former Naval Training Center San Diego ("NTC") through its activities there and on surrounding properties. This activity introduced chemicals and pollutants creating substantial dangers to human health and the environment. The United States now tries to walk away—and force the City to pick up the tab on its way out. The obligations the United States agreed to in the MOA do not permit this.

The United States may be seeking the statutory remedy of cost recovery for its deficient clean up, but this is a contract case first and foremost. It is the MOA that imposes an obligation on the United States to clean up Parcels IIIB and VII, not statute. And it is the MOA that the United States seeks to enforce against the City through specific performance.

But the complete failure of the United States to satisfy its obligations under the MOA to "take all remedial action necessary to protect human health and the environment," among other breaches, constitute prior material breaches and a failure to satisfy conditions precedent. This forecloses the United States from specific performance and excuses the City's performance as a matter of law. In short, the United States cannot force the City to accept Parcels IIIB and VII after it failed to do what it promised.

## II.    **BACKGROUND**

### A.    **The City conveys property to the Navy for the NTC**

Beginning around 1916, the City conveyed various parcels of tidelands to the United States at no cost for purposes of constructing and operating what came to be known as the NTC. (SOF ¶ 1). The United States owned and operated the NTC from the time it was commissioned in 1923 until 2000 or 2001. (SOF ¶ 2).

From the 1930s into the early 1940s, the United States created a waterway bisecting the NTC called the Boat Channel. (SOF ¶ 3). The Boat Channel extends approximately 5,000 feet north-northeast from San Diego Bay near Harbor Island at the south end to the Marine Corps Recruit Depot at the north end. (SOF ¶ 3).

Most of the Boat Channel—56.5 acres—is comprised of two parcels now designated as Parcel IIIB and Parcel VII. (SOF ¶ 52). The Navy's activity at the NTC over nearly a century introduced numerous harmful contaminants into the Boat Channel. (SOF ¶ 4).

### B.    **Knowing the Boat Channel is contaminated, the Navy starts planning to give it back to the City**

In 1993, the NTC was recommended for closure under the Defense Base Closure and Realignment Act of 1990. (SOF ¶ 6). Under that Act, the City was designated as the Local Redevelopment Agency for NTC. (SOF ¶ 7). The United States, the City, and other stakeholders then engaged in a multi-year planning process under the guidance of the 26-member NTC Reuse Planning Committee to convert the land to public use once the NTC closed. (SOF ¶ 8).

In anticipation of transferring Parcels IIIB and VII to the City, the Navy performed sampling of the submerged sediments in the Boat Channel in 1998. (SOF ¶ 24). The Navy designated these submerged sediments as "IR Site 12." (SOF ¶ 25). The 50.1-acre IR Site 12 is not coextensive with Parcels IIIB and VII, excluding 6.4 acres of Parcels IIIB and VII from the Navy's sampling. (SOF ¶ 26). The unsampled 6.4 acres of the Boat Channel within Parcels IIIB and VII—but outside of IR

1    Site 12—include the riprap banks both above and below the waterline and the seawall
2    portions of the Boat Channel. (SOF ¶ 26).

3        The Navy's sampling confirmed that IR Site 12 contained several known
4    contaminants introduced by its activity at the NTC. (SOF ¶ 4). Despite this, the Navy
5    claimed no remediation was required; the California Environmental Protection
6    Agency and later the San Diego Regional Water Quality Control Board ("Water
7    Board") disagreed. (SOF ¶ 27).

8        The Navy was designated under the Defense Base Closure and Realignment
9    Act as the lead federal agency responsible for managing the investigation and
10   remediation of the Boat Channel mandated by the EPA and the Water Board. (SOF
11   ¶ 28). The Water Board was designated as the lead state agency overseeing the
12   Navy's efforts. (SOF ¶ 28).

13   **C.    The NTC closes and the Boat Channel is slated for redevelopment**

14       The NTC was ultimately closed around 1997, and the property was offered for
15   redevelopment. (SOF ¶ 6). In 1998, the public planning process culminated in the
16   San Diego City Council adopting the August 1998 NTC San Diego Reuse Plan. (SOF
17   ¶ 9). The Navy likewise approved the Reuse Plan in a March 1999 Record of
18   Decision. (SOF ¶ 10).

19       The Reuse Plan contemplated the conveyance of about 430 acres of the NTC
20   to the City. (SOF ¶ 9). It included a comprehensive financial analysis of the NTC
21   redevelopment project and determined that the buildings, infrastructure, and utilities
22   at the NTC were blighted due to disrepair. (SOF ¶ 11). Total improvement costs were
23   estimated at just under $38 million, with backbone infrastructure costs alone
24   estimated at over $26 million (in 1998 dollars). (SOF ¶ 12). This cost analysis, as
25   approved by the Navy, does not include any costs related to the remediation of the
26   Boat Channel or any other NTC property, or provide for the City to assume liability
27   for any future remediation. (SOF ¶ 13).

28

**D.** **The Navy insists the City execute an MOA obligating the United States to "take all remedial action necessary to protect human health and the environment"**

In late 1999 to early 2000, the Navy represented to the City that an MOA was required for the City to take ownership of the NTC—and that time was of the essence. (SOF ¶ 14). The Navy presented the City with a draft MOA and the parties executed a two-page "Summary of Terms" in April 2000. (SOF ¶ 15).

This Term Sheet expressly states the commitment of the United States to "retain[] full responsibility for environmental remediation at NTC consistent with uses described in the LRA's Reuse Plan of August 1998." (SOF ¶ 16). Consistent with this obligation, the Term Sheet also provides that the "remaining parcels (21 acres) will be conveyed after the Government has completed all remedial action necessary to protect human health and the environment and obtained site closure from appropriate regulatory authorities based on the projected use of these parcels as described in the NTC San Diego Reuse Plan dated August 1998." (SOF ¶ 17). The Term Sheet contains no reference to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). (SOF ¶ 18).

On May 30, 2000, the City and the United States executed the MOA for the conveyance of seven NTC parcels to the City, including Parcels IIIB and VII. (SOF ¶ 19). Consistent with the Navy's sampling, the MOA expressly acknowledged that Parcels IIIB and VII were contaminated. (SOF ¶¶ 21-22). In the MOA, the United States expressly assumed full responsibility for remediating Parcels IIIB and VII. (SOF ¶¶ 21-22). With respect to Parcel IIIB, MOA § 2(c) provided:

> The anticipated date of conveyance for Parcel IIIB is March, 2002. Parcel IIIB is believed to contain sediments impacted with various contaminants. Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel

1   IIIB, as described in the NTC San Diego Reuse Plan dated August

2   1998.

3   (SOF ¶ 21). For Parcel VII, MOA § 4(b) provided:

4   Parcel VII . . . The projected date for assignment to the sponsoring

5   agency is March 2000. Parcel VII is believed to contain sediments

6   impacted by various contaminants. Navy shall take all remedial action

7   necessary to protect human health and the environment and will obtain

8   site closure from appropriate regulatory authorities based on the

9   projected use of Parcel VII, as described in the NTC San Diego Reuse

10  Plan dated August 1998.

11  (SOF ¶ 22).

12      **E.    The Navy ignores the City's ongoing concerns as it spends decades**

13          **in remediation efforts based on the 1998 sampling of IR Site 12**

14  In November 2003, the Navy submitted a remedial investigation report to the

15  Water Board based on its 1998 sampling of IR Site 12. (SOF ¶ 29). After substantial

16  delay due to the Navy's inaction, the Water Board granted the Navy an exemption

17  from California's sediment quality objectives in September 2012 because "the

18  Remedial Investigation was submitted to the San Diego Water Board prior to

19  February 19, 2008." (SOF ¶ 30). The sediment quality objectives represent the "level

20  of a constituent in sediment which is established with an adequate margin of safety"

21  under state law, *see* Cal. Water Code § 13391.5(d), and impose greater remediation

22  obligations than CERCLA.

23  In 2016—13 years later—the Navy finally submitted its Feasibility Study on

24  IR Site 12 to the Water Board, still based only on the 1998 sampling. (SOF ¶ 31).

25  The stated purpose of the study was to identify, screen, and evaluate alternatives for

26  remediation of the chemically impacted submerged sediments at IR Site 12, which

27  includes only part of Parcels IIIB and VII. (SOF ¶ 32).

28  While the Navy spent 20 years plodding through this investigation and

- 5 -

remediation process, the City detailed its concerns at each opportunity. (SOF ¶¶ 33-35). As far back as 1995, the City informed the Navy that its sampling plan would not "provide a true description of the presence and general spatial distribution of chemical constituents in the Boat Channel," due to the number of samples, location of samples, and testing regime, among other factors. (SOF ¶ 33). The City asked that the Navy "[p]lease ensure that the vertical and horizontal extent of contamination is delineated." (SOF ¶ 33).

As the Navy moved forward heedlessly, the City repeatedly sounded the alarm, flagging the Navy's:

    (i)    failure to address only IR Site 12 instead of the entirety of the Boat Channel, including the banks, riprap, shoreline, and shallow areas;

    (ii)    reliance on outdated 1998 sampling data;

    (iii)    failure to account for all historical pollutant sources;

    (iv)    failure to test for all likely pollutants;

    (v)    failure to provide for cleanup to current regulatory standards;

    (vi)    failure to perform any remediation on Parcel IIIB;

    (vii)    failure to protect remediated areas against recontamination; and

    (viii)    limited post-dredge confirmation sampling.

(SOF ¶ 34).

The City unequivocally informed the Navy that the City would not accept the Boat Channel parcels unless these issues were addressed. (SOF ¶ 35). Given the City's ongoing concerns throughout this process, the Navy had ample opportunity to change course. It did not and failed to address any of the City's concerns. (SOF ¶ 35). Instead, it plowed ahead with a flawed, outdated, and deficient cleanup of IR Site 12 to pre-2009 regulatory standards in complete disregard of the City's concerns. (SOF ¶ 35).

4927-0123-1392

**F.    The State Board fails to act on the City's challenge to the Navy's deficient cleanup and the Water Board's inconsistent actions**

The Navy completed its limited cleanup of IR Site 12 in 2018 and submitted a Remedial Action Completion Report ("RACR") to the Water Board. (SOF ¶ 36). In response, the Water Board issued an April 16, 2019 "No Further Comment" letter for IR Site 12. (SOF ¶ 37). This letter communicated only that the Water Board had "no further comments on the Final RACR." (SOF ¶ 37). The letter also expressed the Water Board's intent to pursue further cleanup of the Boat Channel, explicitly stating that it "appreciates the opportunity to assist in addressing environmental issues at the former Naval Training Center and looks forward to continuing to assist with these efforts." (SOF ¶ 37). The "No Further Comment" letter was not a "No Further Action" letter, which is typically submitted by water boards for site closure. (SOF ¶ 67).

After receiving the "No Further Comment" letter, the Navy submitted its Draft Finding of Suitability to Transfer ("Draft FOST") for Parcels IIIB and VII to the Water Board on August 24, 2020. (SOF ¶ 38). The FOST is a prerequisite to the ability of the United States to transfer Parcels IIIB and VII to the City. (SOF ¶ 39).

On September 21, 2020, the City objected to the Draft FOST based on the Navy's investigatory and remedial failures at the Boat Channel and highlighted the fact that the Water Board had never issued a "No Further Action" letter for the Boat Channel or IR Site 12. (SOF ¶ 40). On December 16, 2020—despite the Navy's failure to undertake any additional investigation or remedial activities at the Boat Channel—the Water Board did issue a "No Further Action" letter for IR Site 12. (SOF ¶ 41). The City then challenged the "No Further Action" letter through a petition to the State Water Resources Control Board ("State Board") and sent a letter to the Water Board requesting clarification. (SOF ¶ 42). The City received no substantive response from the Water Board or the State Board. (SOF ¶ 42). The Navy then issued its Final Finding of Suitability to Transfer for Parcels III-B and VII

CITY OF SAN DIEGO POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
4927-0123-1392

("Final FOST") in March 2021, which included a statement relying on the "No Further Action" letter from the Water Board. (SOF ¶ 43).

On March 24, 2021, the Water Board issued a letter to the Navy entitled "Recission [sic] of No Further Action Letter for Installation Restoration Site 12, Boat Channel Sediments, Former Naval Training Center, San Diego, California." (SOF ¶ 44). In this letter, the Water Board "rescind[ed] the No Further Action (NFA) Letter dated December 16, 2020" for IR Site 12. (SOF ¶ 44). Based on this, the City sent an April 7, 2021 letter to the Navy objecting to the Final FOST because, among other grounds, the Water Board had rescinded the "No Further Action" letter. (SOF ¶ 45). Thus, "neither the Water Board nor any other regulatory agency has confirmed that the [Navy's] remedial efforts are protective of human health and site closure has not been issued based on the projected uses of the Boat Channel or for the entirety of Parcels III-B and VII, as required by the MOA." (SOF ¶ 45).

On April 13, 2021, the Navy issued a revised Final FOST citing only the Water Board's earlier "No Further Comment" letter, but again concluding that Parcels IIIB and VII were suitable for transfer. (SOF ¶¶ 46-47). On April 29, 2021, the Water Board issued a letter to the Navy finding the revised Final FOST acceptable as to IR Site 12 and stating it "has no further comments." (SOF ¶ 48).

The revised Final FOST failed to address any of the City's prior objections or the fact that the Water Board had rescinded the "No Further Action" letter. (SOF ¶ 49). The revised Final FOST also contained no justification for the exclusion of the 6.4 acres of Parcels IIIB and VII outside of IR Site 12, including the riprap banks and seawall portions, from the investigation and remediation. (SOF ¶ 49). Accordingly, on May 28, 2021, the City filed an amended petition with the State Board challenging the obvious deficiencies in the Navy's investigation and remediation, together with the Water Board's inconsistent and equivocal findings, because they created significant ambiguity over the environmental status of Parcels IIIB and VII, and left the City exposed to further investigation and remediation orders related to the Navy's

- 8 -

contamination of Parcels IIIB and VII in the event they were transferred to the City. (SOF ¶ 50). There was no substantive response from the State Board. (SOF ¶ 51).

**G.    The United States refuses to conduct any further investigation or cleanup, yet claims it has met the requirements of the MOA**

The United States has consistently refused to perform any further investigation and potential remediation of Parcels IIIB and VII. (SOF ¶¶ 33-51). Worse still, the United States has consistently refused to permit the City to perform its own investigation, at its own expense, to determine the current environmental condition of Parcels IIIB and VII. (ECF No. 117-1).

Continuing its decades-long disregard of the City's concerns, the United States now claims it has fulfilled its promise under the MOA to remediate Parcels IIIB and VII and so the City must accept them. (ECF No. 73 ¶ 43). And despite this inequitable behavior, the United States seeks to foist the property on the City through the equitable remedy of specific performance. (ECF No. 73 ¶ 53).

This history demonstrates that the breach-of-contract claim pressed by the United States in its counterclaim-in-reply is meritless. The United States is not entitled to force the City taxpayers to foot the bill after contaminating the property, promising to remediate it, and then refusing to do so.

**III.    STANDARD OF REVIEW**

**A.    Standards Governing Summary Judgment**

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Conservation Cong. v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014). "If ... a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).

"Contract interpretation is a question of law generally amenable to summary judgment." *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002). "When the court can determine the meaning of a written contract without any guide other than knowledge of the simple facts on which, from the nature of language in general, its meaning depends, the terms of the contract will be deemed unambiguous." *Ambiguity as a prerequisite to interpretation and construction*, 11 Williston on Contracts § 30:4 (4th ed.). This presents "a question of law." *United States v. Contra Costa Cnty. Water Dist.*, 678 F.2d 90, 91 (9th Cir. 1982). And so "[s]ummary judgment is appropriate ... if the contract is unambiguous." *Id.*; *see also San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959-60 (Fed. Cir. 1989) ("[w]hether a contract creates a duty is a legal question of contract interpretation and thus freely reviewable by this court" on summary judgment).

"[I]t is well settled that the actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls." *Zurich Am. Ins. Co. of Illinois v. VForce Inc.*, No. 2:18-CV-02066-DAD-CKD, 2024 WL 4452721, at *5 (E.D. Cal. Oct. 8, 2024). In making this determination, "a word or a term cannot be considered in isolation; it must be read in the semantic and functional context of the ... clause at issue to determine if two competing, reasonable interpretations exist." *New Castle Cnty. v. Hartford Acc. & Indem. Co.*, 970 F.2d 1267, 1271 (3d Cir. 1992). The parties may not introduce extrinsic evidence "to create an ambiguity where the language is clear." *City of Tacoma, Dep't of Pub. Utils. v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994).

The MOA provisions at issue here are unambiguous, precluding the Court from considering extrinsic evidence and permitting the Court to enforce the MOA's requirements on summary judgment.

## B.    Elements Required to Prevail on Claim of Breach of Contract

For the United States to recover for breach of contract, it "must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising

1 out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."

2 *San Carlos*, 877 F.2d at 959. But "[i]t is well-established at common law that a breach

3 or non-performance of a promise by one party to a bilateral contract, so material as

4 to justify a refusal of the other party to perform a contractual duty, discharges that

5 duty." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 536 (9th Cir. 2011) (quoting

6 Restatement (First) of Contracts § 397 (Am. Law Inst. 1932)) (cleaned up).

7     It is also well established that "if a condition precedent to performance fails,

8 the parties still have a contract, but they lose the right to enforce at least some of its

9 terms." *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1043 (9th Cir.

10 2020) (emphasis omitted). And "a party is not entitled to specific performance if" the

11 party "has not fully and fairly performed all the conditions precedent on his part to

12 the obligation of the other party." *Oh v. Resol. Tr. Corp.*, 26 F.3d 131 (table), 1994

13 WL 249988, at *2 (9th Cir. 1994) (quoting Cal. Civ. Code § 3392 (1994)).

14     Here, the United States has committed multiple material breaches of the

15 unambiguous terms of the MOA. It has also failed to satisfy conditions precedent to

16 the City's obligation to accept the parcels. The United States is not entitled to specific

17 performance on its breach-of-contract claim as a matter of law.

18 **IV.   ARGUMENT**

19     **A.   This motion should be granted regardless of whether federal law or**

20           **California state law applies to the MOA**

21     Where the United States is a party to a contract entered into pursuant to federal

22 law, federal common law typically governs the interpretation of the contract. *Chaly-*

23 *Garcia v. United States*, 508 F.3d 1201, 1203 (9th Cir. 2007) (citing *United States v.*

24 *Seckinger*, 397 U.S. 203, 209 n.12 (1970)); *see also GECCMC 2005-C1 Plummer St.*

25 *Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027, 1032 (9th Cir.

26 2012). This federal common law is derived from general principles of contract

27 interpretation. *Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir. 1983) (citing

28 *Seckinger*, 397 U.S. at 209-11); *see also Grand Famous Shipping Ltd. v. Port of*

*Houston Auth.*, 572 F. Supp. 3d 307, 314 (S.D. Tex. 2021). In defining federal common law, federal courts rely on the "Restatements of the Law" and "widely adopted uniform acts developed by the Commissioners on Uniform State Laws to determine what federal common law requires." *Determining the Sources and Content of Federal Common Law—In General*, 19 Fed. Prac. & Proc. Juris. § 4518 (3d ed.).

Even if California contract law applied to the MOA, the relevant contract principles are the same as those under federal law. And where "the Court would reach the same conclusion whether it applied California law or federal common law, the Court need not decide which of the two bodies of law applies." *Caltex Plastics, Inc. v. Raytheon Co.*, No. CV 14-504 PA (EX), 2014 WL 12687419, at \*4 (C.D. Cal. Apr. 24, 2014). Thus, because the City prevails regardless, the Court does not need to determine which applies.

**B.      The United States failed to perform the unambiguous requirements of the MOA with regard to Parcels IIIB and VII**

**1.      The United States failed to take all actions necessary to protect human health and the environment**

Under the MOA, the United States and the City agreed: "Subject to the terms and conditions hereinafter set forth, the Navy agrees to convey to the City, and the City agrees to accept from the Navy ... all of the Navy's right, title and interest in the Property." (SOF ¶ 19). The United States acknowledged in the MOA that the parcels are "believed to contain sediments impacted by various contaminants." (SOF ¶¶ 19-22). Specifically, "Parcel IIIB is believed to contain sediments impacted with various contaminants. Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel IIIB, as described in the NTC San Diego Reuse Plan dated August 1998." (SOF ¶ 21). Likewise, "Parcel VII is believed to contain sediments impacted by various contaminants. Navy shall take all remedial action necessary to protect human health and the environment and will

1    obtain site closure from appropriate regulatory authorities based on the projected use
2    of Parcel VII, as described in the NTC San Diego Reuse Plan dated August 1988."
3    (SOF ¶ 22).

4        Reading these provisions of the MOA in context, as required in contract
5    interpretation, there is no ambiguity. The United States must "take all remedial action
6    necessary to protect human health and the environment" by removing the "various
7    contaminants" known to exist in Parcels IIIB and VII.

8        The contractual term "contaminants" is also unambiguous. A "contaminant" is
9    "defined as 'something that contaminates.'" *Church Mut. Ins. Co. v. Clay Ctr.*
10   *Christian Church*, 746 F.3d 375, 381 (8th Cir. 2014) (quoting <u>Webster's Third New</u>
11   <u>International Dictionary</u> 491 (2002)). "In turn, 'contaminate' is defined as 'to render
12   unfit for use by the introduction of unwholesome or undesirable elements.'" *Id.*
13   (quoting <u>Webster's Third New International Dictionary</u> 491 (2002)).

14       Among the numerous chemicals the Navy discharged into the Boat Channel
15   are per- and polyfluoroalkyl substances ("PFAS"), including the specific PFAS
16   compounds perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid
17   ("PFOA"), for which the United States did no testing. (SOF ¶ 4). They also included
18   total petroleum hydrocarbons, dichlorodiphenyltrichloroethane ("DDT") isomers
19   and PCB congeners, and polychlorinated dibenzo-p-dioxins polychlorinated
20   dibenzofurans ("PCDD/Fs"). (SOF ¶ 4).

21       There is no ambiguity in the fact that each of these chemicals is a
22   "contaminant" as that word is used in the MOA—or anywhere else. The most
23   concerning of these is PFAS. "PFAS are a group of over 10,000 synthetic chemicals.
24   They are often referred to as 'forever chemicals' because they do not naturally break
25   down in the environment, or 'biodegrade.' Humans can be exposed to PFAS through
26   ingestion, inhalation, and skin absorption." *Saedi v. Coterie Baby, Inc.*, No.
27   24CV3893 (DLC), 2024 WL 4388401, at *1 (S.D.N.Y. Oct. 3, 2024). "PFAS are
28   synthetic chemicals harmful to humans and the environment. PFAS are also

1    sometimes referred to as 'forever chemicals' because they bioaccumulate, or build

2    up in the body over time, and are harmful even in small doses." *Hernandez v.*

3    *Wonderful Co. LLC*, No. 23-CV-1242 (ER), 2024 WL 4882180, at *2 (S.D.N.Y.

4    Nov. 25, 2024). "[T]he introduction of so-called forever chemicals into drinking

5    water and the environment is known as pollution." *Nat'l Foam, Inc. v. Zurich Am.*

6    *Ins. Co.*, No. 23-CV-03873-LB, 2025 WL 699361, at *7 (N.D. Cal. Feb. 26, 2025)

7    "Quantifying the potential health risks of ingestion, the EPA issued a lifetime health

8    advisory for PFAS in 2016 at seventy parts per trillion." *Schaap v. United States*, No.

9    24-1300C, 2025 WL 929227, at *1 (Fed. Cl. Mar. 26, 2025) (citing *Lifetime Health*

10   *Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and*

11   *Perfluorooctane Sulfonate*, 81 Fed. Reg. 33,250-01 (May 25, 2016)).

12       "Humans can be exposed to PFAS through ingestion, inhalation, and skin

13   absorption" which "has been linked to health consequences, including cancer, thyroid

14   disorders, and harm to reproductive and immune systems." *Saedi*, 2024 WL 4388401,

15   at *1. Indeed, "studies show that exposure to PFAS may cause testicular cancer,

16   kidney cancer, liver cancer, autoimmune disorders, endocrine disorders,

17   developmental defects to fetuses during pregnancy, developmental defects to

18   breastfed babies, reduced vaccine response, increased cholesterol, and increased liver

19   enzymes" in humans. *Giordano v. Solvay Specialty Polymers USA, LLC*, 522

20   F. Supp. 3d 26, 29-30 (D.N.J. 2021); *accord Williams v. Emps. Mut. Cas. Co.*, 845

21   F.3d 891, 905 (8th Cir. 2017) ("[A]lthough there are some circumstances in which it

22   would be ambiguous whether a given substance is a contaminant, the word

23   unambiguously applies to asbestos that was excavated and pulverized into thick

24   clouds of dust that filled a building.").

25       "Forever chemicals" like PFAS present substantial risks to human health,

26   particularly given the NTC Reuse Plan adopted by the City, and approved by the

27   United States, contemplates recreational uses of the parcels by the public. (SOF ¶ 23).

28   The MOA unambiguously required the United States to take all actions to remove

4927-0123-1392

1    these contaminants from the Boat Channel. (SOF ¶¶ 21-22). It is indisputable that the

2    United States failed to do so. (SOF ¶ 44). Significantly, the City's intended use of the

3    property is expressly identified as the basis for what remediation is "necessary": that

4    "based on the projected use of Parcel IIIB, as described in the NTC San Diego Reuse

5    Plan dated August 1998." (SOF ¶ 21). The Navy's limitation of the investigation to

6    a subset of the Boat Channel allowed it to ignore the environmental health and safety

7    implications of the 6.4 acres outside of IR Site 12. No investigation by the Navy and

8    no determination by the Water Board addressed the entire Boat Channel.

9               **2.      The United States refused to investigate the entirety of**

10                        **Parcels IIIB and VII**

11         Despite the requirements of the MOA, there is no dispute that the United States

12   only investigated and remediated an area it designated as "IR Site 12." (SOF ¶ 25).

13   IR Site 12 is not coextensive with Parcels IIIB and VII. (SOF ¶ 72). The United

14   States completely ignored the 6.4 acres of Parcels IIIB and VII outside of IR Site 12.

15   (SOF ¶ 73).

16         The United States deliberately did not perform any sampling between low-tide

17   water line and the top of the Boat Channel banks, nor at the seawalls, nor beneath the

18   submerged riprap, nor around the storm drain outfalls located in the banks. (SOF

19   ¶ 49). This unaddressed area—where the likelihood of human contact and animal

20   contact with contaminated sediments is greatest—is littered throughout with riprap

21   in the form of large chunks of construction and demolition debris such as concrete,

22   rebar, flooring, and asphalt from old NTC structures likely to harbor legacy

23   contaminants. (SOF ¶ 56). In fact, the United States was so concerned about that area

24   that it prohibited the City from performing any work within 15 feet of the top of the

25   banks specifically to prevent "the sloughing of soil or other materials from the

26   bank ... into the Boat Channel." (SOF ¶ 57).

27         Because it is undisputed that the United States took no action at all to

28   investigate and remediate the 6.4 acres of Parcels IIIB and VII outside of IR Site 12,

4927-0123-1392

1  the United States indisputably failed to satisfy the MOA's condition precedent that it
2  "take **all** remedial action necessary to protect human health and the environment" in
3  Parcels IIIB and VII—it clearly has not.

4          **3.**      **The United States Failed to Obtain Site Closure for**
5                                    **Parcels IIIB and VII**

6          The MOA also requires the United States to "obtain site closure from
7  appropriate regulatory authorities"—the Water Board—with respect to both
8  Parcels IIIB and VII. (SOF ¶¶ 21-22).

9          In response to the Navy's self-declared completion of its remediation of IR
10  Site 12, the Water Board issued only a "No Further Comment" letter. (SOF ¶ 37).
11  This correspondence was not a "No Further Action" letter typically issued by local
12  water boards for site closure. Instead, the Water Board merely stated that it "has no
13  further comments on the Final RACR." (SOF ¶ 37). According to the Water Board,
14  that means only that the Water Board did not have any more comments on a report
15  that was submitted. (SOF ¶ 37). In contrast, a "No Further Action" letter means "the
16  cleanup has been completed, the Water Board is done with the site, no further action
17  is needed, and the site is be closed." (SOF ¶ 67). Those are two very different
18  determinations.

19          Even if the United States was correct in its claim that the "No Further
20  Comment" letter is sufficient, that letter addressed only IR Site 12, not the entirety
21  of Parcels IIIB and VII. (SOF ¶¶ 52-56). The United States has not obtained any
22  Water Board determination for the remaining areas of Parcels IIIB and VII. (SOF ¶¶
23  52-56). So, at most, the Navy received site closure for IR Site 12, not the full
24  Parcels IIIB and VII. That determination does not satisfy the MOA requirement to
25  obtain site closure for Parcels IIIB and VII. (SOF ¶¶ 21-22).

26
27
28

**4.    The Actions of the United States Were Not Based on the Projected Uses of Parcels IIIB and VII as Described in the NTC San Diego Reuse Plan Dated August 1998**

The MOA requires the remediation and regulatory sign-off to be "based on the projected use of Parcel [IIIB and VII], as described in the NTC San Diego Reuse Plan dated August 1998." (SOF ¶¶ 21-22). That requirement was not met.

The NTC Reuse Plan adopted by the City and approved by the United States is a comprehensive land use planning document developed over a multi-year planning process. (SOF ¶ 68). It includes an Open Space Plan, which proposed three alternatives for the Boat Channel redevelopment. It notes: "The channel is one of the outstanding amenities of NTC. Access to the water in a graceful way will add measurably to the enjoyment of the base for all visitors." (SOF ¶ 69). The Reuse Plan further states: "The second proposed alternate for the water's edge would remove the existing riprap edge at the boat channel allowing the grass park-land to slope down and meet the water." (SOF ¶ 70).

Thus, a projected use for Parcels IIIB and VII expressly included the removal of the existing riprap on the banks and the exposure of the sediments below the riprap to allow "reaching the water in a way similar to a beach." (SOF ¶ 71). This projected use would obviously involve human contact, as well as animal contact, with the sediment. Yet no investigation was conducted of the sediment underlying the riprap all along the banks of Parcels IIIB and VII. (SOF ¶ 26). Thus, regardless of the standard applicable to the Navy's cleanup and regardless of the characterization of the Water Board's determination, the Navy's remediation did not satisfy the requirement that it be "based on the projected use of Parcel [IIIB and VII]." (SOF ¶¶ 21-22).

The issue is satisfaction of the mutually agreed contract language as a condition precedent to the conveyance. The City satisfied its conditions precedent. The United States did not.

**C.    The Attempt by the United States to Claim the MOA Only Requires it to Comply with CERCLA Has No Support in the MOA**

The United States claims its obligation to the City to remediate Parcels IIIB and VII is merely a promise to follow a process outlined in CERCLA. The plain and unambiguous language of the MOA forecloses this constrained interpretation.

On its face, MOA §§ 2(c) and 4(b) express a promise to take specific actions and to achieve a specific result. The United States seeks to import CERCLA into the MOA to restrict the substance of its promise. But the MOA contains no such restriction, nor does CERCLA control the contractual obligations of the United States under the MOA.

If the United States meant to limit its contractual obligations only to the requirements of CERCLA, it was required to say so. At the very least, the MOA would reference, cite, or quote CERCLA. But it does not mention CERCLA at all. The body of the MOA, including the signature page, is 10 pages long. The rest is a series of exhibits. Nowhere in those 10 pages is "CERCLA" or "Superfund," or "42 U.S.C." mentioned. The phrase "all remedial action necessary to protect human health and the environment" is not in quotations, capitalized, italicized, or bolded. (SOF ¶¶ 21-22). Neither this phrase, nor its constituent terms, are defined in the MOA. (SOF ¶ 59). There is nothing to indicate this phrase has any meaning other than the plain meaning of the words used. Both California and federal common law confirm that this forecloses the argument of the United States.

"The principle that parties are presumed to contract with reference to existing law is generally applied in connection with contract 'construction' (determining the legal effect of a contract) rather than contract 'interpretation' (determining the meaning of words used in a contract)." *Incorporation of rules of law into contracts*, 11 Williston on Contracts § 30:19 (4th ed.). "When statutory language is included in a contract, it assumes a new legal identity: that of contractual language." *300 DeHaro St. Invs. v. Dep't of Hous. & Cmty. Dev.*, 161 Cal. App. 4th 1240, 1256, 75 Cal. Rptr.

3d 98, 111 (2008). However, even "[a] recital that an agreement is governed by or executed pursuant to a set of regulations"—which is also absent from the MOA— "does not incorporate those regulations into the agreement." *Lurline Gardens Ltd. Hous. P'ship v. United States*, 37 Fed. Cl. 415, 420 n.7 (1997). And "while courts may consider a statute in construing the legal effect of a contract, they are not required to look to statutes to interpret the meaning of a contract's words, absent the parties' intent to incorporate a statutory definition." *Smith v. State Farm Mut. Auto. Ins. Co.*, 399 P.3d 771, 776 (Colo. App. 2017). The MOA expresses no "intent to incorporate a statutory definition" into any provision of the MOA. *Accord Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 610-11 (2009) ("Because CERCLA does not specifically define [a statutory term] ... we give the phrase its ordinary meaning." (citations omitted)).

Importantly, the MOA is an integrated contract which specifically states: "This Agreement shall not be modified unless in writing and signed by both Parties. No oral statements or representations made by, or on behalf of either Party shall be a part of this Agreement. This Agreement, together with all exhibits hereto, constitute the entire agreement between the Parties. All prior discussions and understandings on this matter are superseded [sic] by said documents." (SOF ¶ 60).

The MOA unambiguously requires the United States to do more than merely comply with CERCLA. It is indisputable that removing the PFAS is a remedial action necessary to protect human health and the environment, which the United States failed to take. It is indisputable that the Water Board did not issue a "No Further Action" letter for Parcels IIIB or VII to close the site of either parcel. It is indisputable that the actions of the United States were not consistent with the projected removal of the existing riprap and exposure of the underlying sediments under the Reuse Plan to allow human access to the water. The Navy never investigated this area, despite its contractual obligation to address the entire Boat Channel, not just IR Site 12.

**D.      The failure of the United States to perform under the MOA is a breach of its material terms, excusing the City's performance**

"[A] term may be 'material' in one of two ways: It may be a necessary term, without which there can be no contract; or, it may be an important term that affects the value of the bargain." *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037 (9th Cir. 2011). The breach of a material term "is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract." *Degree of breach; "material breach" or "total breach"*, 23 Williston on Contracts § 63:3 (4th ed.); *see also Gilbert v. Dep't of Just.*, 334 F.3d 1065, 1071 (Fed. Cir. 2003) ("[A] breach is material when it relates to a matter of vital importance, or goes to the essence of the contract.").

"Other courts have defined a breach of contract as 'material' if the promisee receives something substantially less or different from that for which the promisee bargained." *Degree of breach; "material breach" or "total breach"*, 23 Williston on Contracts § 63:3 (4th ed.); *see also Term*, Black's Law Dictionary (12th ed. 2024) (defining an essential term of a contract as "a contractual provision that specifies an essential purpose of the contract, so that a breach of the provision through inadequate performance makes the performance not only defective but essentially different from what had been promised").

"It is well-established at common law that a breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." *Las Vegas Sands*, 632 F.3d at 536 (quoting Restatement (First) of Contracts § 397 (Am. Law Inst. 1932)) (cleaned up). In other words, "one party's material breach of a contract excuses the other party's duty to perform." *James River Ins. Co. v. Medolac Lab'ys*, 290 F. Supp. 3d 956, 970 (C.D. Cal. 2018).

The material nature of the cleanup requirement is evident in the MOA. It expressly recognizes that four of the seven NTC parcels were contaminated, and the

1    City bargained for identical cleanup and regulatory sign-off requirements for each
2    parcel prior to transfer. (SOF ¶¶ 21-22). There is no question that the MOA's
3    requirement that the United States "take all remedial action necessary to protect
4    human health and the environment" is "an important term that affects the value of
5    the bargain." *Facebook*, 640 F.3d at 1037. The same goes for the promises of the
6    United States to "obtain site closure from appropriate regulatory authorities" "based
7    on the projected use of" the parcels "as described in the NTC San Diego Reuse Plan
8    dated August 1998." (SOF ¶¶ 21-22).

9        The undisputed facts show that the United States failed to perform these
10    obligations. Forcing the City to accept the parcels anyway will leave it on the City to
11    spend millions of dollars to perform the costly investigation and remediation that the
12    United States should have performed under the MOA. This is because the Water
13    Board will not grant the City an exemption from the sediment quality objectives like
14    it did for the Navy—the City cannot submit a remedial investigation "prior to
15    February 19, 2008." (SOF ¶ 30).

16        This is completely contrary to the benefit the City bargained for in the MOA.
17    No costs were expected to be incurred by the City for the investigation or remediation
18    of any contaminated parcels. (SOF ¶ 13). The obligation of the United States to incur
19    these costs is plainly a material term of the MOA—the City would have never agreed
20    to accept the parcels without the promise of the United States to perform this cleanup.
21    Nor would the City have ever agreed to accept the parcels for recreational use under
22    the Reuse Plan if it knew that doing so would expose its residents to the risk of
23    "cancer, thyroid disorders, and harm to reproductive and immune systems" created
24    by the PFAS contamination. *Saedi*, 2024 WL 4388401, at *1. By turning a blind eye
25    to this contamination, the United States asks the City to put the health and safety of
26    every visitor to the Boat Channel in danger. There are no circumstances in which the
27    City—or any responsible public official—would agree to this.

28        The requirements that the United States "take all remedial action necessary to

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

4927-0123-1392

1    protect human health and the environment" and "obtain site closure from appropriate

2    regulatory authorities" "based on the projected use of" the parcels "as described in

3    the NTC San Diego Reuse Plan dated August 1998" are material terms of the MOA

4    as a matter of law. The failure of the United States to perform this obligation

5    precludes the United States from enforcing the MOA against the City. The City is

6    excused from accepting these contaminated parcels as a matter of law. *See Gilbert*,

7    334 F.3d at 1072 ("Where ... the facts are undisputed, the determination of whether

8    there has been material non-compliance with the terms of a contract, and hence

9    breach, necessarily reduces to a question of law.").

10       **E.    This breach and failure to satisfy conditions precedent to the City's**

11          **duty to accept Parcels IIIB and VII precludes specific performance**

12       "To establish a right to specific performance, the plaintiff must establish:

13   (1) the contract terms are sufficiently definite; (2) consideration is adequate; (3) there

14   is substantial similarity of the requested performance to the contractual terms;

15   (4) there is mutuality of remedies; and (5) plaintiff's legal remedy is inadequate."

16   *Rampp v. Ocwen Fin. Corp.*, No. 11-CV-3017-BTM-NLS, 2014 WL 4912930, at *5

17   (S.D. Cal. Sept. 29, 2014).

18       "Under California law, a party is not entitled to specific performance if [it] [ ]

19   has not fully and fairly performed all the conditions precedent on his part to the

20   obligation of the other party." *Oh*, 1994 WL 249988, at *2 (quoting Cal. Civ. Code

21   § 3392 (1994)); *see also PlattPacific, Inc. v. Andelson*, 6 Cal. 4th 307, 313 (1993)

22   ("Under the law of contracts, parties may expressly agree that a right or duty is

23   conditional upon the occurrence or nonoccurrence of an act or event.").

24       Federal common law agrees: "a claim for specific performance of a contract

25   may not be allowed if the claimant [itself] refuses to comply with [its] obligations

26   under the contract." *United States v. Bedford Assocs.*, 618 F.2d 904, 919

27   (2d Cir. 1980). "The Restatement of Contracts ... comments that '(a) decree for

28   specific performance will not be granted in cases where the plaintiff has repudiated

- 22 -

1   his duty without making timely retraction ... or has otherwise already committed such

2   a substantial breach as to discharge the duty of the defendant.'" *Id.* (quoting

3   Restatement (First) of Contracts § 375 cmt. a (Am. Law Inst. 1932)). For this reason,

4   "the district court has the power ultimately to deny the government's claim for

5   specific performance if the government refuses to perform its contractual obligations,

6   thereby failing to establish its substantive right to recover." *Id.*

7       "There are two species of conditions precedent: conditions precedent to

8   *formation* and conditions precedent to *performance*." *Int'l Bhd. of Teamsters*, 957

9   F.3d at 1043 (emphasis in original); *see also* 17A C.J.S. *Contracts* § 467 ("A

10  condition precedent thus may be either a condition to the formation of a contract or

11  to an obligation to perform an existing agreement."). "[C]onditions precedent to

12  performance under an existing contract arise from the terms of a valid contract and

13  define an event that must occur before a right or obligation matures under the

14  contract." 17A C.J.S. *Contracts* § 467 "[I]f a condition precedent to *performance*

15  fails, the parties still have a contract, but they lose the right to enforce at least some

16  of its terms." *Int'l Bhd. of Teamsters*, 957 F.3d at 1043 (emphasis in original); *see*

17  *also* Cal. Civ. Code § 1436 ("A condition precedent is one which is to be performed

18  before some right dependent thereon accrues, or some act dependent thereon is

19  performed.").

20      "The existence of a condition precedent normally depends upon the intent of

21  the parties as determined from the words they have employed in the contract."

22  *Karpinski v. Smitty's Bar, Inc.*, 246 Cal. App. 4th 456, 464 (2016). "[T]he law has

23  come to recognize and enforce the use of linguistic conventions to create conditions

24  precedent." *Israel v. Chabra*, 537 F.3d 86, 93 (2d Cir. 2008). "Parties often use

25  language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and

26  'subject to' to make an event a condition." *Ginett v. Computer Task Grp., Inc.*, 962

27  F.2d 1085, 1100 (2d Cir. 1992). And where a party's "duty to perform under the

28  contract is conditioned on the happening of some event, the [other party] must prove

- 23 -

1  the event transpired." *Consolidated World Investments, Inc. v. Lido Preferred Ltd.*, 9
2  Cal. App. 4th 373, 380 (1992).

3       As a result, by providing that the City's obligation to "accept from the Navy"
4  Parcels IIIB and VII is "**Subject to** the terms and conditions hereinafter set forth,"
5  the MOA creates a condition precedent to performance requiring the United States to
6  perform its obligations under the MOA before the City is required to accept the
7  parcels. The United States has failed to do so, excusing the City from performance.
8  *See* 58 Cal. Jur. 3d *Specific Performance* § 22 ("Specific performance cannot be
9  enforced in favor of a party who has not fully and fairly performed all the conditions
10 precedent on his or her part to the obligation of the other party.").

11 **V.   CONCLUSION**

12      For the reasons set forth above, this Court should enter an order granting the
13 City's motion for partial summary judgment dismissing the counterclaim-in-reply of
14 the United States with prejudice.

17  DATED: August 15, 2025                 Respectfully submitted,

18                                          **KUTAK ROCK LLP**

20                                          By: *s/ Barry P. Steinberg*
                                            Barry P. Steinberg
21                                          barry.steinberg@kutakrock.com

22                                          Attorney for Defendant/Cross
                                            Defendant/Counter Claimant/Cross
23                                          Claimant
                                            City of San Diego