Barry P. Steinberg (admitted *Pro Hac Vice*)
barry.steinberg@kutakrock.com
**KUTAK ROCK LLP**
1133 Connecticut Avenue, NW
Suite 1200
Washington, DC  20036
Telephone: (202) 828-2400
Facsimile: (202) 828-2488

Dwyer Arce (admitted *Pro Hac Vice*)
dwyer.arce@kutakrock.com
**KUTAK ROCK LLP**
1650 Farnam Street
The Omaha Building
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148

Thomas F. Vandenburg (SBN 163446)
tvandenburg@wshblaw.com
Alice Charkhchyan (SBN 332670)
acharkhchyan@wshblaw.com
**WOOD, SMITH, HENNING & BERMAN LLP**
505 North Brand Boulevard, Suite 1100
Glendale, CA 91203
Telephone: (818) 551-6000
Facsimile: (818) 551-6050

Attorneys for Defendant/Cross Defendant/
Counter Claimant/Cross Claimant
City of San Diego

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-CV-00541-LL-BJC |
| Plaintiff, | **DECLARATION OF THOMAS VANDENBURG IN SUPPORT OF THE CITY OF SAN DIEGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| CITY OF SAN DIEGO, | |
| Defendant. | The Hon. Linda Lopez |
| *AND RELATED CROSS CLAIMS AND COUNTER CLAIMS* | Trial Date: None Set |

3:23-CV-00541-LL-BJC

I, Thomas F. Vandenburg, declare as follows:

1.    I am an attorney at law duly admitted to practice before the courts of the State of California. I am a Partner with Wood, Smith, Henning, & Berman, LLP. I represent the City of San Diego (hereinafter, "City").

2.    I make this declaration in support of the following memorandum filed concurrently herewith – CITY OF SAN DIEGO POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTERCLAIM-IN-REPLY OF UNITED STATES.

3.    I am over the age of 18 and have personal knowledge of the facts set forth herein and can competently testify as such if called upon to do so.

4.    All of the documents attached hereto are already in the possession or otherwise known to the United States of America for the purpose of the matter.

5.    Attached hereto as Exhibit A is a true and correct copy of an excerpt from the NTC Title Settlement and Exchange Agreement recorded February 28, 2002.

6.    Attached hereto as Exhibit B is a true and correct copy of an excerpt from the Expert Report of J. Michael Trapp, PhD, dated December 23, 2024.

7.    Attached hereto as Exhibit C is a true and correct copy of an excerpt from the Record of Decision for the Disposal and Reuse of Naval Training Center San Diego, California, executed March 10, 1999.

8.    Attached hereto as Exhibit D is a true and correct copy of an excerpt from the Naval Training Center San Diego Reuse Plan, dated August 31, 1998, and adopted October 20, 1998.

9.    Attached hereto as Exhibit E is a true and correct copy of the City Council Resolution No. 290900 adopted 10/20/1998.

10.    Attached hereto as Exhibit F is a true and correct copy of the NTC San Diego Summary of Terms, dated March 6, 2000.

11.     Attached hereto as Exhibit G is a true and correct copy of an excerpt from the Feasibility Study Report IR Site 12, dated September 2016.

12.     Attached hereto as Exhibit H is a true and correct copy of an excerpt from the Final Base Realignment and Closure Business Plan for NTC, dated March 1, 2000.

13.     Attached hereto as Exhibit I is a true and correct copy of a letter from the California Environmental Protection Agency dated August 17, 2001.

14.     Attached hereto as Exhibit J is a true and correct copy of the letter from the San Diego Regional Water Quality Control Board ("Water Board"), dated April 6, 2022.

15.     Attached hereto as Exhibit K is a true and correct copy of the letter from the Water Board, dated March 13, 2013.

16.     Attached hereto as Exhibit L is a true and correct copy of the Feasibility Study Transmission letter, dated September 16, 2016.

17.     Attached hereto as Exhibit M is a true and correct copy of a letter from the City to the Navy, dated July 30, 2018.

18.     Attached hereto as Exhibit N is a true and correct copy of the letter from the Deputy City Attorney to the Navy, dated April 2017.

19.     Attached hereto as Exhibit O is a true and correct copy of the letter from the Water Board to the Navy, dated September 21, 2020.

20.     Attached hereto as Exhibit P is a true and correct copy of the letter from the Navy to the Water Board, dated August 24, 2020.

21.     Attached hereto as Exhibit Q is a true and correct copy of the letter from the City to the Navy, dated September 21, 2020.

22.     Attached hereto as Exhibit R is a true and correct copy of the letter from the Water Board to the Navy, dated December 16, 2020.

23.     Attached hereto as Exhibit T is a true and correct copy of the letter from

the City to the Water Board, dated February 26, 2021.

24.     Attached hereto as Exhibit U is a true and correct copy of an excerpt from the Final Finding of Suitability to Transfer for Parcels III-B and VII, dated March 2021.

25.     Attached hereto as Exhibit V is a true and correct copy of an excerpt from the letter from the City to the Navy, dated April 7, 2021.

26.     Attached hereto as Exhibit W is a true and correct copy of copy of an excerpt from Revision 1 of the Final Finding of Suitability to Transfer for Parcels III-B and VII, dated March 2021.

27.     Attached hereto as Exhibit X is a true and correct copy of the First Amended Petition by City of San Diego for Review of the San Diego Regional Water Quality Control Board's Response to the Department of the Navy's Finding of Suitability to Transfer (Revision 1), dated May 28, 2021.

28.     Attached hereto as Exhibit Y is a true and correct copy of the USA Response to Request for Admission, served June 21, 2024.

29.     Attached hereto as Exhibit Z is a true and correct copy of an excerpt from the Expert Report of Stephen A. Johnson, P.E.

30.     Attached hereto as Exhibit AA is a true and correct copy of an excerpt from the Expert Rebuttal Report of Stephen A. Johnson, P.E.

31.     Attached hereto as Exhibit DD is a true and correct copy of an excerpt from the deposition of Mr. Sean McClain on September 4, 2024.

32.     Attached hereto as Exhibit EE is a true and correct copy of an excerpt from the deposition of Mr. Stephen A. Johnson, P.E., on February 19, 2025.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

3:23-CV-00541-LL-BJC

Date: August 15, 2025                    By: _/s/ Thomas F. Vandenburg_
                                             Thomas F. Vandenburg

- 5 -

DECLARATION OF THOMAS VANDENBURG IN SUPPORT OF THE CITY OF SAN DIEGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

CONFIDENTIAL

THE ORIGINAL OF THIS DOCUMENT
WAS RECORDED ON FEB 28, 2002
DOCUMENT NUMBER 2002-0170369
GREGORY J. SMITH, COUNTY RECORDER
SAN DIEGO COUNTY RECORDER'S OFFICE
TIME: 3:45 PM

Recorded at the Request of and

When Recorded Mail to:

Blake D. Stevenson, Esq.
Senior Staff Counsel
California State Lands Commission
100 Howe Avenue, Suite 100-South
Sacramento, California 95825-8202

STATE OF CALIFORNIA
OFFICIAL BUSINESS:
Document entitled to free
Recordation Pursuant to
Government Code Section 27383
NO TAX DUE

_____

[Space Above for Recorder's Use]

## NAVAL TRAINING CENTER SAN DIEGO
### TITLE SETTLEMENT AND EXCHANGE AGREEMENT

### TABLE OF CONTENTS

Recitals ........................................................................................................................2
Agreement.....................................................................................................................7
   1.  City Conveyances to State. .......................................................................7
   2.  State Acceptance of Conveyances from City......................................................7
   3.  State Conveyances to City. .......................................................................7
   4.  City Acceptance of Patents from State.................................................................8
   5.  Warranties and Indemnities..............................................................................8
   6.  Covenant of Non-Conforming Use. ..................................................................8
   7.  Covenant of Future Conveyance.........................................................................8
   8.  State Minerals Reservation. ...............................................................................8
   9.  State Lands Commission Findings......................................................................9
  10. Acceptance of Conveyances and Consent to Recording. ...................................10
  11. Effect of a Judicial Finding of Invalidity...........................................................10
  12. Further Assurances. .........................................................................................10
  13. Execution Before a Notary Public. ....................................................................11
  14. Counterparts. ..................................................................................................11
  15. Agreement for Compromise and Settlement. ....................................................11
  16. No Admission or Effect if Agreement Not Made Effective.................................11
  17. No Effect on Other Lands.................................................................................11
  18. Agreement Binding on Successors....................................................................11
  19. No Third Party Beneficiaries.............................................................................11
  20. Modification. ...................................................................................................11

1.

**EXHIBIT A**

10/9/2001

USN_0310848

D.     In 1911, the State granted to the City the tide and submerged lands within San Diego Bay lying between the historic mean high tide line and the pierhead line, in trust for purposes of commerce, navigation, and fisheries and subject to the terms and conditions specified in Chapter 700, Statutes of 1911, as amended (referred to in this Agreement as the "Granting Act").

E.     Beginning in 1916, the City made several transfers of portions of the granted lands to the United States for purposes of constructing and operating what came to be known as the Naval Training Center, San Diego. **Exhibit C** ("Approximate Location of Original Conveyances to the United States") attached hereto generally depicts the perimeter boundaries of the NTC Property for reference purposes only and is comprised of four deeds according to the several conveyances to the United States and filled lands waterward of the 1912 pierhead line that all presently constitute the NTC Property. In 1916, the City conveyed 56 acres of land to the United States lying waterward of the historic mean high tide line and extending to the bulkhead line. In 1919, an additional 76 acres of tidelands lying waterward of the historic mean high tide line and extending to the bulkhead line were conveyed to the United States. Then, in 1933, the City conveyed to the United States 95 acres lying waterward of the bulkhead line and extending to the pierhead line. Most of the transferred tide and submerged lands were subsequently filled and reclaimed by the United States in furtherance of its plan for development of the Naval Training Center. The United States filled an additional 135 acres of submerged lands lying waterward of the pierhead line in developing NTC San Diego.

F.     The State contends that all or substantially all of the NTC Property lying waterward of the historic mean high tide line remains subject to the public trust.

G.     The City contends that all of the areas comprised within that portion of the NTC San Diego comprised by the conveyances made in Deed Nos. 2 and 3, as shown on **Exhibit C**, are free of the public trust and that the lands lying within Deed No. 4, and the filled lands lying waterward of Deed No. 4, all within NTC Property, are subject to the public trust.

H.     The property conveyed by Deed No. 1, as shown on **Exhibit C**, is shown for reference purposes only, and is intended to depict in a general way the land within the NTC Property which has always been upland and has never been subject to an asserted public trust interest of the State.

I.     In 1993, the Defense Base Closure and Realignment Commission recommended closure of the Naval Training Center, San Diego under the Defense Base Closure and Realignment Act of 1990. The Center closed operationally in April of 1997. The United States, pursuant to federal law, has transferred certain portions of the NTC Property, and additional transfers will occur under no-cost Economic Development Conveyances ("EDC") and Public Benefit Conveyances ("PBC") to the City and to the San Diego Unified Port District, all as depicted in **Exhibit D** ("Economic and Public Benefit Conveyance Parcels"). In accordance with the terms of state law and upon transfer of the City NTC Property to the City, any former and existing tide and submerged lands on the City NTC Property for which the public trust has not been extinguished are subject to the

3.

USN_0310850



**AtkinsRéalis**

**J. Michael Trapp, PhD**

Prepared for the City of San Diego

December 23, 2024

# Expert Report: Review of NTC Boat Channel Sediment Contamination Remediation



EXHIBIT

**B**

# 3.    Stated Opinions

## 3.1    Opinion 1: The US Navy conducted an inadequate site characterization.

My first opinion is that the US Navy did not conduct an adequate site characterization suitable to the known historical conditions within the watershed and the Boat Channel. This inadequacy falls into the following categories: 1: The list of contaminants of concern was incomplete. 2: The full area of the parcels III-B and VII were not assessed. 3: The density of samples collected was not sufficient.

### 3.1.1    Inadequate Evaluation of Contaminants of Concern

Analytes collected and quantified for the RI and remedial action are incomplete, and insufficient evidence is provided to adequately evaluate sediment sample concentrations for contaminants of concern (COC). These COCs are identified as contaminants in other areas of the San Diego Bay for which Investigative or Cleanup and Abatement Orders (CAOs) have been issued (e.g., Former Campbell Shipyards, Laurel Hawthorne Embayment, Tenth Avenue Marine Terminal, Continental Maritime of San Diego, Harbor Island, Tow Basin[2]). There were no, or limited, PCB, per- and PFAS, and pesticides (other than DDTs and chlordanes) analytes collected during the site characterization.

The US Navy used an incomplete list of contaminants of concern in the site characterization including:

**Polychlorinated Biphenyls**
PCBs have been demonstrated to cause a variety of adverse health effects. They have been shown to cause cancer in animals as well as a number of serious non-cancer health effects in animals, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects. Studies in humans support evidence for potential carcinogenic and non-carcinogenic effects of PCBs. The different health effects of PCBs may be interrelated. Alterations in one system may have significant implications for the other systems of the body. PCBs can accumulate in the environment and are also taken up into the bodies of small organisms and fish. As a result, people who ingest fish may be exposed to PCBs that have bioaccumulated in the fish they are ingesting.

The California Environmental Protection Agency Office of Environmental Health Hazard Assessment (OEHHA) has developed Bay-wide fish consumption advisories due to PCBs and mercury for 16 fish species (https://oehha.ca.gov/advisories/san-diego-bay). This posting is based on the levels of mercury and PCBs found in fish caught from the San Diego Bay and the significant risk that PCBs represent to human health. As such, all recent environmental investigations have included the full complement of 209 congeners (individual PCB compounds). The results of these investigations have identified PCBs as a primary COC driving the remediation at sites throughout the San Diego Bay including the Shipyard Sediment Site (CAO R9-2012-0024), The Tow Basin Facility (CAO R9-2022-0007), as well as sites under current investigative orders for potential cleanup for which PCBs have been identified as the COC, such as Commercial Basin (America's Cup Harbor), B Street and Broadway Piers, Tenth Avenue Marine Terminal, and Continental Maritime San Diego.

---

[2] https://geotracker.waterboards.ca.gov/



**Expert Report: Review of NTC Boat Channel
Sediment Contamination Remediation**

In addition to the Boat Channel sediments, the riprap areas that were not evaluated are likely to harbor PCBs from the potential input or discharge of PCBs to the channel from the operations themselves at the NTC (1986 IAS). Further, much of this "riprap" is actually the debris from demolished buildings from the NTC which was pushed onto the side slopes to stabilize the slopes. Examination of these materials reveals they also contain linoleum flooring and other materials still attached to former floors and walls which were known to contain PCBs as ingredients in the adhesives used in their installation.

A future Investigative Order (IO) is being considered per comments from RWQCB staff and has been confirmed as a possible action the RWQCB would take in discussions between the RWQCB staff and City senior leadership upon the City acceptance of the NTC Boat Channel. Based on recent orders in nearby areas of San Diego Bay, an IO issued for the Boat Channel would require analyzing for the presence of all 209 congeners. This is the current standard and has been required in other contaminated sediment IOs across San Diego Bay, as different PCBs have different toxicity mechanisms and result in different public health and environmental impacts. Thus, the analysis of all 209 congeners is critical for more realistic ecological risk and human health risk assessments via food chain exposure as well as for potential source identification. Collection of all 209 congeners is required for sediment quality investigations per the Water Quality Control Plan for Enclosed Bays and Estuaries – Part 1 Sediment Quality (Water Board, 2018), and the importance of collecting data for all 209 congeners has been stated in recent meetings (December 2024) between the RWQCB and parties involved in IOs throughout the San Diego Bay.

In 1994, an EBS identified specific potential contamination sources at NTC as POIs. There were 93 POIs identified originally. The Boat Channel Sediments was labelled POI 41, which was later designated as IR Site 12. POI 28 is a "former PCB spill area", where transformers were drained to a storm drain when they were taken out of service (1986 IAS). A 1990 Site Investigation for the MCRD Disposal Area (landfill) details that transformers and their contents were disposed of at the site, with the fluids drained directly into the fill area, and also collected in waste oil tanks to oil the surface of the landfill for dust control. The IAS identified this surface drainage or runoff as a potential contaminant pathway from this site to the Boat Channel.



**Figure 6: Map of Points of Interest**

The 1996 Sediment Characterization Report (Bechtel, 1996b) included sampling for only 18 PCB congeners (out of the full suite of 209) for sediment and tissue analysis, per the NS&T (NOAA National Status and Trends program). In the 1998 Remedial Investigation data collection (Bechtel 2003), 2 additional congeners were sampled (congeners 77 and 126), bringing the total to 20, but less than 10% of the 209 possible congeners. Thus, only a very limited subset of PCB congeners was used for sediment and tissue analyses. This limited number of congeners does not account for the components of the nine most common PCB Aroclor mixtures (1221, 1232, 1242, 1016, 1248, 1254, 1260, 1262, and 1268) and thus the highest inputs and sources of risk.

**Per- and Polyfluoroalkyl Substances**

PFOS and PFOA are known to cause adverse human health effects, including high cholesterol and harmful reproductive and developmental effects, as well as cancer in animals and, possibly, humans (USEPA 2017). Firefighting training was a significant aspect of training at the NTC and MCRD for several decades. It was known that fires set for training purposes were extinguished using water and firefighting suppression foams, which contain PFOS and PFOA, and which were directly discharged into the Boat Channel (USEPA 2014). According to Navy documents (DON, 2016), the primary release of PFC/PFAS was through the use of aqueous film-forming foam (AFFF) for fire and emergency responses and during test and training activities. Additionally, these AFFF foams were required by FAA part 139 regulations at the San Diego International Airport immediately adjacent to the Boat Channel and would have been released into the environment through annual required staff training operations, annual required equipment calibrations, accidental releases, and firefighting activities.



PFOS and PFOA are used to give grease, oil, and water resistance to textiles and paper, and are also used in photolithography and floor polishes, activities known to have been performed on the NTC and other US government properties draining to the Boat Channel. PFAS have been used in AFFFs for fighting liquid fuel fires since the 1970s. At the time of the 1996 and 1998 investigations, PFOA and PFOS were not identified as potential threats to humans or the environment; no method of analytical measurement was approved by the EPA until 2009 (EPA Method 537, Version 1.1). Therefore, no testing would have been conducted on soil, water, or groundwater samples at the NTC during the initial study or the supplemental investigations.

However, in 2014, the EPA produced an Emerging Contaminants Fact Sheet – PFOS and PFOA, stating, "This fact sheet is intended for use by site managers who may address PFOS and PFOA at cleanup sites or in drinking water supplies and for those in a position to consider whether these chemicals should be added to the analytical suite for site investigations."

On June 20, 2016, the Department of the Navy identified the Former Naval Training Center Fire Fighter Training Area as a site with potential PFC/PFAS contamination (among Defense Environmental Restoration Program (DERP) BRAC or active sites). This was in response to the Pentagon's request that all military branches identify which of their 664 fire and crash training sites has potential for this contamination[3]. This 2016 memorandum also requests the installations to validate the listed sites, and identify additional PFC/PFAS areas of concern based on staff review of historical records (e.g., crash sites, fire responses, operations, training, etc.), databases, personnel interviews, etc. In 2016, BRAC was directed by the Department of Defense (DOD) to conduct sampling or Initial Assessments at installations to evaluate the presence or absence of PFAS, including NTC. However, in 2020, NTC was 'excluded from further investigation by BRAC PMO based on results from records review." This records review stated that "PFAS investigation will not be performed . . . because the Fire Fighting Training School was constructed in 1991 as a controlled and indoor training facility…" and "hazardous materials identified at the school during Navy ownership did not include PFAS". However, a 2019 Final Environmental Condition of Property (ECP) Report, MCRD Cogeneration Plant (NAVFAC 2109), states, "the fire rescue training facility has three historically utilized and currently empty AFFF containing ASTs on the adjacent property about 50 feet south of the Subject Property (the cogeneration plant) since at least before the City took over the property in the 1990s." Despite these contradictory reports on the presence of AFFF at MCRD or NTC, BRAC issued the memorandum saying there was no potential for this contamination at NTC. We believe this to be false based on the contradictory documentation.

Based on this new information, and the fact that the NTC had been identified as one of the many potentially contaminated sites, the Navy should have sampled for PFOS and PFOA in the Boat Channel at that time (2016), which was still prior to the selection of the remedial action for the Boat Channel. However, no such sampling was undertaken. Therefore, the Boat Channel sediments were not assessed for the extremely likely presence of these contaminants as a result of known use during NTC's tenure in firefighting training, plating, and other activities. It is extremely likely that their presence would be detected as a result of these past activities. As described by the EPA, "PFOS and PFOA are extremely persistent in the environment and resistant to typical environmental degradation processes. As a result, they are widely distributed across the higher trophic levels and are found in soil, air and groundwater at sites across the United States. The toxicity, mobility and bioaccumulation potential of PFOS and PFOA pose potential adverse effects for the environment and human health." And therefore, the cleanup remedy was insufficient because their presence – likely present throughout the entire Boat Channel – would have likely led to a much more extensive removal of sediments.

---

[3] Strategic Environmental Research and Development Program (SERDP) 2016



**Pesticides**

Dichlorodiphenyltrichloroethane (DDT): While the previous NTC sediment investigation (1996) tested for the full six DDT isomers, the Navy RI only tested three of the six DDT isomers. All DDT isomers would be analyzed under current standards and in alignment with other San Diego Bay sediment IOs, in accordance with the Bays and Estuaries Plan (State Board 2018). DDTs and chlordanes, as well as nearly two dozen additional pesticides, were documented for use in pest control activities at the NTC and MRCD (1986 IAS). Section 4.3 of the IAS states that pesticide-laden rinsate was discharged to storm drains until the mid-1970s, while waste pesticides were buried at the refuse disposal area. Also documented in the IAS, "Because of the structure of the northern portion of the Boat Channel, there is less tidal flushing that would happen elsewhere in the Bay. Consequently, contaminants could tend to concentrate if leached to this portion of the Bay." (1986 IAS)

Total DDTs were calculated as the sum of three isomers (4,4'-DDD, 4,4'-DDE, and 4,4'-DDT) in the RI, Pre-design Investigation (PDI), and Post-dredge Confirmation (PDC). However total DDTs are typically calculated as the sum of six isomers: 2,4'-DDD, 2,4'-DDE, 2,4'-DDT, 4,4'-DDD, 4,4'-DDE, and 4,4'-DDT. Use of all six isomers is consistent with other Sediment Chemistry Assessments in the San Diego Bay (e.g., Laurel Hawthorne, Tenth Avenue Marine Terminal). Therefore, total DDTs in the RI and the Remedial Action Completion Report (RACR) include only half of the isomers, whereas, if all isomers were reported, the value of total DDTs would likely increase. These results are therefore not directly comparable to other research conducted in the Bay, and minimal details are provided in this and other documents to understand if the intent of the cleanup goal was for all six isomers.

The Navy initially proposed a total DDT cleanup goal of 274 ug/kg in the draft FS. This was later reduced to 84 µg/kg per the Water Board correspondence of January 15, 2015, which suggested that the 274 µg/kg dataset included an outlier. Based on a review of the analytical data from the 1998 collection (Bechtel 2003) and the PDI data, many of the reported results for the isomers are 'flagged', and only half the limit of detection (LOD) value was used in the summation of total DDTs. If all six DDT isomers were analyzed, the results would likely be higher. Due to this uncertainty, the assessment of the post-dredge sediment condition is incomplete.

Although the RACR presents total chlordane "calculated as the sum of alpha-chlordane and gamma-chlordane" (Table 3.1 of the RACR), no alpha-chlordane and gamma-chlordane results are provided in the analytical reports (Appendix C - Laboratory analytical report for the PDI samples). Instead, Appendix C includes *technical* chlordane results only for the PDI results. However, the Data Validation Summary Report dated October 23, 2017, states that alpha- and gamma-chlordane tests were run on the samples collected October 1 and 2 (the PDI samples). However, they are not presented in any of the analytical reports; only *technical* chlordane is presented. When this "oversight" was recognized (December 2017), the subsequent analyses did report alpha- and gamma-chlordane. However, these reported values are not directly comparable to total chlordane. Therefore, the results presented in Table 3.1 for the October PDI sampling are unable to be verified, which demonstrates that the data has not been critically reviewed. While this error was recognized prior to the PDC sampling, analytical results between the two are not directly comparable.

**PCDD/Fs**

Waste combustion is considered to be the most significant source of polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans to the environment (Huntley et al. 1997; USEPA 2008). As stated in the 1986 IAS, "The school command operated a firefighting training school at NTC from about 1944 to the early 1960's when Buildings 401, 496, 553, 554, and 555 were built. Both waste fuels and at least some school or shop wastes were burned, but quantities are unavailable. The fire rings were on pavement. The firefighting training school was bordered on the south by the open storm drainage channel along the south edge of the base and on the east by San Diego Bay. Therefore, any surface runoff would have flowed directly into the Bay. Training operations were conducted almost daily." Based on the firefighter training school information described above, it is almost certain that PCDD/Fs were generated during firefighter training exercises and consequently washed into the Boat



Channel. PCDD/Fs are highly toxic, carcinogenic, persistent, and bioaccumulative in fish. This information was widely known prior to the completion of the RI in 2003 and should have been evaluated during the RI characterization of Boat Channel sediments and fish with both human health and ecological risks evaluated for PCDD/F exposures. However, no such evaluation was undertaken.

### 3.1.2     Inadequate Assessment of the Full Parcel

The US Navy's investigation of the NTC Boat Channel parcel was inadequate to properly assess and evaluate all environmental risks and areas of the Boat Channel. No sediment sampling in the areas of slopes, shorelines, and shallower areas was conducted, rendering it impossible to assess the environmental impacts of potential contamination in these areas, which are the closest to the outfalls considered by the Navy to be important conduits of contributing pollutants.



**Figure 7: Shoreline Condition in 2018 Showing Concrete Rubble Riprap, Voids, and Erosional Scarping Near an Outfall**

**Stormwater Outfalls**

The Navy identified 34 storm drain outfalls within Stratum 1 and Stratum 2 and had repeatedly claimed that these were a primary source of the contamination found in the Boat Channel sediments, (NAVFAC 2016).

A number of illicit connections to the storm drains were found by the Rick Planning Group in 1998 (Rick Engineering 1998), specifically to storm drains leading to outfalls 14 and 31 adjacent to the firefighting facility/Camp Nimitz. During the 1998 Navy RI, ten samples from two shoreline areas were collected, sediment chemistry data from which demonstrated minimal exposure. We understand that these samples were located

**BILLING CODE 3810-FF**

**DEPARTMENT OF DEFENSE**

**DEPARTMENT OF THE NAVY**

**RECORD OF DECISION FOR THE DISPOSAL AND REUSE OF NAVAL TRAINING CENTER SAN DIEGO, CALIFORNIA**

**SUMMARY:** The Department of the Navy (Navy), pursuant to Section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), and the regulations of the Council on Environmental Quality that implement NEPA procedures, 40 C.F.R. Parts 1500-1508, hereby announces its decision to dispose of Naval Training Center (NTC) San Diego in San Diego, California.

Navy and the City of San Diego jointly analyzed the impacts of the disposal and reuse of Naval Training Center San Diego in an Environmental Impact Statement/Environmental Impact Report (EIS/EIR) prescribed by NEPA and the California Environmental Quality Act (CEQA), Cal. Pub. Res. Code, §§ 21000-21177. The EIS/EIR analyzed five reuse alternatives and identified the Naval Training Center San Diego Draft Reuse Plan dated June 1997 (Reuse Plan) as the Preferred Alternative. The City of San Diego is the Local Redevelopment Authority (LRA) for Naval Training Center San Diego. Department of Defense Rule on Revitalizing Base Closure



EXHIBIT

C

negotiation or by competitive bid, are left to the Federal agency's discretion.  Selecting a method of disposal implicates a broad range of factors and rests solely within the Secretary of the Navy's discretion.


**CONCLUSION:**  The LRA's proposed reuse of Naval Training Center San Diego, reflected in the Reuse Plan, is consistent with the prescriptions of the FPMR and Section 174.4 of the DoD Rule. The LRA has determined in its Reuse Plan that the property should be used for several purposes including residential, educational, commercial, public and recreational uses.  These uses include housing, educational facilities, two hotels, retail stores, an environmental monitoring laboratory and administrative facility, a public safety institute, a nesting site for the California least tern, expansion of the adjacent Lindbergh Field, and athletic fields and open spaces.  The property's location, physical characteristics and existing infrastructure as well as the current uses of adjacent property make it appropriate for the proposed uses.

The Preferred Alternative responds to local economic conditions, promotes rapid economic recovery from the impact of the closure of Naval Training Center San Diego, and is consistent with President Clinton's Five-Part Plan for Revitalizing Base Closure Communities, which emphasizes local economic redevelopment of the closing military facility and creation of

USN_017478

new jobs as the means to revitalize these communities.    32 C.F.R.
Parts 174 and 175, 59 Fed. Reg. 16123 (1994).

Although the "No Action" Alternative has less potential for
causing adverse environmental impacts, this Alternative would not
take advantage of the property's location, physical
characteristics and infrastructure or the current uses of
adjacent property.    Additionally, it would not foster local
economic redevelopment of the Naval Training Center property.

The acquiring entities, under the direction of Federal,
State, and local agencies with regulatory authority over
protected resources, will be responsible for adopting practicable
means to avoid or minimize environmental harm that may result
from implementing the Reuse Plan.

Accordingly, Navy will dispose of Naval Training Center
San Diego in a manner that is consistent with the City of
San Diego's Reuse Plan for the property.


March 10, 1999

WILLIAM J. CASSIDY, JR.
Deputy Assistant Secretary of the Navy
(Conversion And Redevelopment)


33

USN_017478C



October 1998

# Naval Training Center San Diego REUSE PLAN

A Plan, Rationale, and Implementation Program
for Reuse and Redevelopment of NTC



EXHIBIT

**D**

NPS_0000768

# NAVAL TRAINING CENTER SAN DIEGO

# REUSE PLAN

*Prepared for*

**CITY OF SAN DIEGO
SAN DIEGO CITY COUNCIL, ACTING AS
THE LOCAL REDEVELOPMENT AUTHORITY**

**August 31, 1998**

**Adopted by the City Council
October 20, 1998**

*Prepared by*

**Rick Engineering Company**

**with
Rick Planning Group
M. W. Steele Group
Keyser Marston Associates
MacLeod Consulting Services**

This study was prepared under contract with the City of San Diego with financial
support from the Office of Economic Adjustment, Department of Defense. The
content reflects the views of the City of San Diego and does not necessarily reflect
the views of the Office of Economic Adjustment.

S61C/0-COVER.WP/31AUG98

NPS_0000769

## 1.0   INTRODUCTION

### 1.1 REUSE PLANNING AT NTC

**A. Base Closure Timing**

In July 1993, the Base Realignment and Closure Commission voted to close the Naval Training Center (NTC), a Naval training site 2.5 miles northwest of downtown San Diego. The closure decision became law in September 1993.

Shortly thereafter, under the terms of the Base Closure and Realignment Act of 1990 (PL 101-510, 104 Stat. 1808), the U.S. Navy announced its intention to close the base by September 1999. Since then, plans for closure accelerated. Operational closure of NTC - i.e., the time when all active military use of the base concludes - actually occurred on April 30, 1997. The Record of Decision (ROD), which is only issued after all required planning and environmental work leading to base closure has been completed, is expected in November/December 1998. Actual transfer of the property from the Navy to other ownerships is anticipated in July 1999.

**B. Planning and Disposition Authority**

The property disposal agency for NTC is the Southwest Division Naval Facilities Engineering Command.

Reuse planning for NTC began in 1993 when San Diego Mayor Susan Golding convened a 26-member NTC Reuse Planning Committee to guide the reuse planning effort. The NTC Reuse Planning Committee provided a focal point for identifying issues, establishing goals, and, ultimately recommending a reuse plan to the San Diego City Council.

This NTC Reuse Plan represents recommendations of the San Diego City Council for Naval Training Center reuse. In its capacity as both the legislative body of the City of San Diego and as the Local Redevelopment Authority (LRA) under the provisions of the Base Realignment and Closure legislation, the City Council forwards these recommendations to the U.S. Secretary of the Navy for action.

**C. City/Navy Agreements**

A series of agreements have been reached between the City and the Navy in furtherance of the reuse planning program.

NPS_0000789

work with the City and the local community to ensure the design of the housing
blends well with the neighborhood.

### 4. Historic District

A Memorandum of Agreement (MOA) was negotiated among the State Historic
Preservation Officer, the U. S. Navy, the City of San Diego, and the National
Advisory Council on Historic Preservation. The Agreement concerns use of
land and structures within the Historic District before and after conveyance. A
copy of the MOA is included in Appendix E.

### 5. School Site

A Memorandum of Understanding (MOU) was negotiated between the U.S.
Navy and the City of San Diego for an elementary school site to be located
within the 59-acre military housing site on NTC. Under the terms of the
Agreement, the Navy will make available to the San Diego Unified School
District a seven-acre cleared parcel on which a school could be constructed.

### D. Reuse Planning Process

The NTC Reuse Plan was developed under the direction of the NTC Reuse
Planning Committee. In July 1994, the Reuse Planning Committee authorized
the selection of a consultant team led by Rick Engineering Company to
undertake preparation of the plan.  The Reuse Planning Committee also
created subcommittees to deal with specific aspects of the reuse effort. These
were: the Environmental Subcommittee, the Homeless Subcommittee, the
Park and Recreation Subcommittee, the Education Subcommittee, the
Economic Development Subcommittee, and the Interim Use Review
Subcommittee.

After preliminary fact finding by the consultant team and a series of invitation
only and public workshops, two primary alternatives and five secondary
alternatives were created. Following this, a request by the Navy to eliminate
some acreage from the City's reuse plan to allow development of military
housing resulted in the removal of land from the City's planning area.

Using the modified planning area, the concept alternatives were extensively
evaluated regarding both market response and economic/financial feasibility.
The evaluation identified a significant funding gap which existed between
estimated development costs and revenues.

Following a presentation of the evaluation to the Reuse Planning Committee,
a request was made of the consultants to develop additional alternatives
emphasizing different patterns of recreational use and residential development.

NPS_0000792

Those alternatives, variations of them, and financial assessments of the options, were prepared for and presented to the Committee at several of its meetings.

In November 1995, a referendum was passed by the voters of the City of San Diego which removed NTC from the General Plan designation of "Future Urbanizing Area," thereby eliminating a potentially-significant constraint to NTC reuse.

Although the Reuse Committee agreed decisively on land uses for the bulk of NTC, only narrowly-won accords were the rule in votes taken regarding land use on Camp Nimitz, the 103-acre parcel physically separated from the principal portion of NTC by a boat channel.

The Reuse Planning Committee made its final recommendations in May 1996, following which a presentation was made to the San Diego Planning Commission. In June and July 1996, the San Diego City Council held two meetings to consider the principal land use recommendations of the Reuse Plan, and then met in September 1996 to finalize draft recommendations to be forwarded to the Secretary of the Navy.

Between September 1996 and July 1998, a series of agreements have been concluded which advance the reuse planning process:

### 1. Agreement Regarding the Homeless

An agreement between the City of San Diego and homeless providers results in a City contribution of $7.5 million to be expended on projects proposed by members of the NTC Homeless Subcommittee. The agreement was approved by the Department of Housing and Urban Development (HUD) in June 1997.

### 2. Agreement Regarding the Historic District

An agreement among the Department of the Navy, the California Historic Preservation Officer, and the Advisory Council on Historic Preservation, which received the concurrence of the City of San Diego and the Save Our Heritage Organization, stipulated changes permitted to the ground surface, landscaping, or structures within the Historic District that might occur prior to conveyance. It also stipulated the City regulatory process to be followed after conveyance.

### 3. Agreement Regarding a School Site

An agreement was reached between the Department of the Navy and the City of San Diego in which the Navy makes available a seven-acre cleared parcel for use as an elementary school site. The parcel is to be made available to the

---

NPS_0000793

communities and limit negative impacts to adjacent neighborhoods.

### 3. Environmental Stewardship

a.  Build upon the unique water orientation of NTC by creating a gateway to the San Diego Bay.

b.  Preserve and enhance the environmental habitat at the base.

c.  Conserve the heritage of our historic buildings through adaptive reuse.

d.  Insure compatibility with the Point Loma and Midway communities and limit negative impacts to adjacent neighborhoods.

### 4. Process

a.  Attain consensus through planning and community participation

b.  Look at NTC in the context of the broader geographic area and the vision for San Diego

## 1.3  BASE HISTORY

When first commissioned on June 1, 1923, the U.S. Naval Training Station, San Diego, consisted of highland donated by the San Diego Chamber of Commerce and tideland given by the City of San Diego.

A 1939 construction program increased the capacity of the station fourfold and in April 1944, the Secretary of the Navy changed the status of the Training Station to the U.S. Naval Training Center, San Diego.

In 1952, projects were approved to convert some recruit barracks into classrooms and to extend training facilities by constructing Camp Nimitz - a permanent recruit camp on the undeveloped Naval Training Center land lying to the south and east of the estuary.

Over the next 20 years, a series of military construction programs resulted in construction of a mess hall, barracks, TV classrooms, and administrative facilities. In the 1990's, construction included a state-of-the-art fire fighting facility, a small arms range, a support center, a medical/dental complex, and a new bridge connecting the main side of the base to Camp Nimitz.

---

NPS_0000795

- An ownership pattern typical of military installations, e.g., one ownership that requires a detailed engineering survey and subdivision mapping process.

- Buildings of substandard design, defective physical construction, and less-than-standard materials that were justified on an emergency basis under wartime conditions. Many of these buildings were constructed at the Naval Training Center during World War II. Although a number of these structures have been partially rehabilitated, most still show evidence of their original substandard design and construction.

- The military program of toxic clean-up presents unique circumstances that may affect value. The presence of asbestos, whether or not encapsulated and whether or not the source of a genuine hazard, may be perceived as a stigma and, as a result, have a real effect on value.

- Aging and substandard self-contained water, sewer, electrical, telephone, steam distribution, and storm drainage systems. Although some of these systems are in relatively good condition, most require extensive upgrading or replacement in order to adequately support economic civilian reuse and adaptation and connection to the systems of local civilian providers.

- Specialized military buildings that are difficult if not impossible to convert to civilian use. Buildings of this type at the base include the specialized training facilities such as the Fire Fighting School, Damage Control Instructor Building, Air Conditioning School and Welding School.

- Widely separated buildings that were located to minimize damage from fire and blast under wartime conditions.

- Utilities that in some instances are located where they interfere with civilian development of sites.

In summary, the NTC Project Area is characterized by a range of physical blighting conditions, access conditions, and circumstances peculiar to its history as a former military installation that affect value and economic viability. Many of these conditions can be corrected, or at least substantially improved; some of these conditions, such as aircraft noise, tideland restrictions, least tern preserve, and historical building designation, must be viewed as permanent.

NPS_0000876

## 2. Infrastructure Deficiencies

Substandard, deficient and deteriorated public improvements or infrastructure have been documented as a major physical blight condition, and one of critical impact on values and investment potential. In the California of the 1990's, the cost to correct infrastructure deficiencies is generally born by private sector development. Where the cost to correct infrastructure deficiencies is not feasible to the private sector, then either the development/investment does not occur, or the public sector intervenes to facilitate feasibility.

Improvements required to correct deficiencies within the Project Area to make existing facilities operational, meet public safety requirements, and service new development has been the subject of a series of studies. Engineering design criteria and system demand, analysis of existing and recommended facilities, phasing and costs, are summarized below. These analyses address primarily "backbone infrastructure" or facilities serving the total Project Area or its major subareas.

The analyses of infrastructure and other improvement needs during the first 15 years of NTC reuse is detailed in Section 5, and summarized as follows:

Backbone Infrastructure

On-Site Roadways and Utility Modifications

| | |
|---|---|
| Master Developer Project Cost | $ 8,760,000 |
| Indirects | 4,380,000 |
| Owner/Operator Costs | 6,300,000 |
| Indirects | 3,150,000 |
| Total Backbone Costs | $22,600,000 |

Other Project Wide Improvements

In addition to backbone infrastructure, a number of other improvement costs are of project-wide benefit. These are:

• Off-site regional infrastructure costs, including street widening of Rosecrans and intersection upgrading as traffic mitigation measures, estimated at $5,000,000.

• Enhanced park improvements over and above turfing of the Waterfront/Recreation public park area, estimated at

---

NAVAL TRAINING CENTER REUSE PLAN    **4/ ECONOMIC & FINANCIAL - 20**
S61C/4-ECONFI.2WP/31AUG96

NPS_0000877

$5,100,000.

- Installation of a looped gas line in Decatur and Truxtun Roads, between Farragut and Gate 1, estimated at $500,000.

- Undergrounding of the above-ground high pressure steam line along the boat channel frontage of the two hotel sites, estimated at $900,000.

- Provision of off-street parking to serve the educational and office areas in and around the Educational Subarea, estimated at $3,600,000.

The total improvement costs to be funded by the Master Developer and Owner/Operator will be $37,700,000 in the first 15 years of development.

The following analysis of economic blighting conditions contains estimates of property values, rent levels and other economic indicators. These values are estimates assuming sufficient infrastructure has been constructed to service the properties; the values are without consideration of the cost to produce the infrastructure and other improvements.

| | | |
|---|---|---|
| 1. | Total Cost, Backbone Infrastructure + Other Improvements | $37.7+ million |
| 2. | Total Development Program | |
| | ● New Construction - commercial buildings | 480,000 SF |
| | ● Small-lot Single Family Homes (96 x 2,160 SF) | 207,360 SF |
| | Townhomes (127 x 1,215 SF) | 154,305 SF |
| | Townhomes (127 x 1,944 SF) | 246,888 SF |
| | ● Rehabilitated Buildings | 1,666,699 SF |
| | ● Hotel Rooms (1,000 x 600 SF) | 600,000 SF |
| | Total Building SF | 3,355,252 SF |
| 3. | By Building SF, Cost of Backbone Infrastructure and Other Project-wide Improvements | $11 |

The central question in the analysis of values and investment capacity for a property like NTC - where there is no established land cost - is the ability of the private sector to relieve the blight and correct the infrastructure

---

NAVAL TRAINING CENTER REUSE PLAN          **4/ ECONOMIC & FINANCIAL - 21**
S61C/4-ECONFI.2WP/31AUG98

NPS_0000878

### 2. Property Values and Rents

Abnormally low lease rates or low property or building values, relative to similar buildings in other local and regional locations, are an indication of a weak or imbalanced market where supply does not match demand. In the case of the Project Area, there are a number of factors depressing property values, as discussed in earlier sections and reemphasized below:

- Not an established commercial or business location due to the Project Area's historic use as a military base.

- Environmental considerations, such as the noise generated by the airport traffic and the stigma associated with a hazardous waste site, will also have a deleterious effect on property values and rents. If there is a lengthy clean-up period, it will effect the marketability and absorption of the properties.

- Regulatory constraints, as the Project Area is subject to (1) the Tidelands Trust requirements for public access protection, (2) the land use restrictions of the California Coastal Act, and (3) the runway protection zones and the CNEL noise impact areas created by the airport. In addition, the northernmost part of Camp Nimitz is a least tern nesting preserve. Many of the buildings within the Area are also on the National Historic Register, which subject them to the rehabilitation provisions of the National Historic Preservation Act.

- The presence of hazardous materials, such as lead paint on the walls, asbestos in floor coverings, and acoustical plaster ceilings in some of the buildings. The existence of these materials will have a significant effect on values and rents for properties on the base. Although remedial plans are being developed for the hazardous substances identified on site (except for lead paint) and friable asbestos has been or will be encapsulated by the Navy, the existence of these materials still negatively affect the value of NTC properties.

A significant fee burden is likely to be imposed on developments within the Project Area because of substantial infrastructure and other site improvements costs. This burden may be in the form of development fees, special taxes, Mello Roos or other assessments. In aggregate, they are likely to be as high as or higher than those at competitive locations which would depress the value of the property in the Project Area.

Thus, without substantial effort to remedy blight conditions in the Project Area, existing and future development in NTC will be unable to achieve values comparable to similar development elsewhere in the market area.

---

NPS_0000880

### 3. Conclusion

This analysis indicates that, given the above factors, the potential values and rents at NTC are likely to be constrained relative to properties in competitive locations. With the exception of hotel uses, the depressed property values of the land uses are not projected to be able to support the extensive amount of infrastructure and site improvements required with any land value remaining. In some instances, negative land values exist. Thus, hotel uses can contribute to a portion of the infrastructure costs, but the net costs of the total development still exceed the projected value supportable for the uses.

## C. Impaired Investment

The ability to invest in new construction or in rehabilitation is a measure of economic health within the Project Area. New development and rehabilitation are deemed feasible if an investor can recapture a reasonable return on investment. When new development and rehabilitation are not feasible, vacant land is not developed and properties are not rehabilitated. Frequently, properties are left unmaintained or poorly maintained and needed capital improvements are deferred. Under these circumstances, the properties become blighted.

In the NTC situation, impaired investment is evaluated in terms of the ability to rehabilitate existing structures or develop new ones, achieve a reasonable return on investment, and recapture any land or building value and/or a share of the infrastructure cost burden. The infrastructure cost burden is the backbone infrastructure and other improvements plus other local, "in-tract," or parcel specific infrastructure. Since there are no established land or building values, the analysis uses a residual approach to determine the amount available for land, buildings to be rehabilitated, and infrastructure.

The residual approach commences with an estimated property value generated by the net operating income that the property can support, i.e., rent less operating expenses, capitalized at the appropriate industry rate for the property. The value is then compared to the costs of new development, rehabilitation, and demolition/clearing. The residual value represents funds available for land, the existing building, and a contribution to infrastructure. The residual value can then be measured against a share of the infrastructure burden to determine if the private sector can finance the infrastructure or whether public intervention will be necessary if rehabilitation or new construction is to occur.

Prototypical industry costs are used for illustrative purposes in this analysis to demonstrate the impact of new development and rehabilitation costs on the economic value of the investment. The level of rehabilitation effort

---

NPS_0000881

## 4.6 FINANCIAL ANALYSIS

This financial analysis is a static view of the estimated project values and costs of the Reuse Plan. In reality however, total build-out may take over 25 years. The costs shown have been estimated in 1998 dollars.

### A. Summary of the Project

Table 23 summarizes all the estimated value and costs from the Reuse Plan. The development value estimated for the life of the project is $43.7 million. After taking into account total tax revenues, the total estimated project value is $115.7 million. However, the estimated project costs are $57.4 million, producing a *negative* development value of $13.7 million and a positive project value of $58.3 million.

It was assumed that the office, research and development (R&D), residential, the four single family residences used as officers quarters, historic core live/work, historic core office, and historic core retail/commercial could all be sold in the first ten years of the project. The development of the two hotels is also estimated to occur within the first ten years. The significant amounts of commercial and educational space needing rehabilitation are expected to take twenty-five years to complete.

### B. Project Description

As described in Table 24, NTC is broken into five Subareas, excluding the Navy Housing portion, to total 430 acres. The Reuse Plan assumes that the 35 acres of the Residential Subarea, the new office/R&D parcels totaling 21 acres, the former officers quarters totaling 17,300 SF, and 382,000 SF of live/work, office, and commercial/retail space within the historic core will all be sold to developers/users. The balance of the base will be either ground leased for new construction or the buildings will be retained and leased out to users.

The Reuse Plan calls for a variety of new construction. The largest single development in terms of acreage is expected to be the 350 housing units in the 35-acre Residential Subarea. The largest project from a development value standpoint will be the two hotels, totaling 1,000 rooms, proposed for opposite sides of the boat channel, along Harbor Drive. The hotel on Camp Nimitz is proposed to have up to 650 rooms in a mid-rise configuration and cater to the business traveler. The Waterfront Hotel and Tennis Center is proposed to have up to 350 rooms and 16 tennis courts and a number of restaurants in a low-rise configuration and cater to the vacationing tourist. Office development is proposed on 12.6 acres, with 240,000 SF of office space. A proposed additional 140,000 SF of R&D space will be on 8.1 acres.

NPS_0000893

5.    Work with Navy regarding the transfer of power, gas, steam, communication and CATV to private operators.

6.    Develop EDC application.

**B. City Budget Impacts Prior to and After Title Transfer**

An estimate of impacts to the City budget is shown in Table 41, Estimated Facility Maintenance Budget. The table includes:

1.    Estimated increases in the maintenance and operations budget for City departments responsible for streets, storm drain, street lighting, park improvements, water, and sewer systems for future budgets;

2.    Estimated increases in the maintenance and operations budget for those City departments involved in the care of buildings and grounds for future budgets;

3.    Estimated increases in the operating budgets for those City departments which provide support for the redevelopment and marketing of NTC for future budgets.

Details regarding potential increases to the San Diego City maintenance and operations budget will be documented by City staff in future City budgets.

NPS_0000967

NPS_0000968

| Table 41: NTC ESTIMATED FACILITY MAINTENANCE BUDGET IMPACT IN 1997 DOLLARS | | | | |
|---|---|---|---|---|
| Facility | Quantity and Condition | Exceptions | Est. Ann. Budget in 1000 $ | Project Portion in 1000 $ |
| Streets (1) | 6.2 miles of local streets, substandard pavement fair to poor condition | Pavement thickness, curbs, and sidewalks need repair, improvements do not comply with ADA requirements. | 50 | none |
| Storm Drain (2) | 5 miles of 10 to 60 inch diameter storm drains; some lines are plugged or damaged; system in average to poor condition | Outlets need repair, some lines need cleaning and repair, NPDES Permits may be required. | 323 | none |
| Street Lighting (3) | 2.5 miles of conduit; 19 circuits; 150-low pressure sodium fixtures. System constructed in 1980, fair to good condition. | Lighting level above City standard for safety, lighting district to fund excess costs | 12 | 7 60% of Lighting cost |
| Park Improvements (4) | | | | |
| Swimming Pools | One in operation, good condition, the second in need of repair and out of service. | Consistent with General Plan standards; Capital commitment required for second pool to operate | 434 | none |
| Recreation Bldgs | Three gyms in fair condition. | Within General Plan standards and will reduce existing community deficiency | 283 | none |
| Ballfields | 3 lighted baseball fields, two are substandard and one is full size. | Within General Plan standards and will reduce existing community deficiency | 60 | none |
| Tennis Courts | 10 lighted courts in fair condition | Exceeds number of courts city will maintain; Require operator agreement to cover O&M | 32 | 32 |
| Multi-Use Fields | One soccer field possibly substandard in poor condition | Within General Plan standards and will reduce existing community deficiency | 8 | none |
| Racquetball/ Squash Courts | 8 courts in fair to poor condition | Exceeds city standards; would require an operator to fund O&M | 27 | 27 |
| Water System (5) | About 5.0 miles of 8 to 20 inch water lines consisting of various type pipes in fair to good condition. Metering only on boundary no internal meters or back flow prevention | Meters will need to be provided by the project. | 50 | none |
| Sewer System (6) | About 5 miles of sewer lines of which 2 miles are City trunks and 3 miles are Navy, collectors in fair to good condition. | No exceptions. | 30 | none |
| Total Estimated Budget Impact | | | 1309 | 66 |

26

SntC\SMP 2WP3\AUG98

NPS_0000969

## Table 41: NTC ESTIMATED FACILITY MAINTENANCE BUDGET IMPACT IN 1997 DOLLARS

| Facility | Quantity and Condition | Exceptions | Est. Ann. Budget in 1000 $ | Project Portion in 1000 $ |
|---|---|---|---|---|
| **Buildings and Grounds (7)** | In excess of 200 buildings between 5 and 75 years in age fair to good condition. About 120 will be demolished in 5 years and remaining will be rehabilitated over next 25+ years. Grounds surrounding the buildings of approximately 25 acres to be maintained. | Building maintenance required until demolition or rehabilitation is completed. Costs may be recovered from the project. | 400 | 400 Full cost of maintenance |
| **Building Utility Services** | | | | |
| Water and Sewer (8) | Water and sewer service will continue until the buildings are demolished or rehabilitated and individual meters installed and property billing is transferred | Water and sewer charges will be charged to CRA until the buildings are transferred. | 120 | 120 |
| Power (9) | About 5 miles of underground conduit installed by Navy (1980s) to Navy specs, not in accordance with CPUC, SDGE may purchase system. | All power charges billed to CRA until meters are installed. | 120 | 120 Power Consumption |
| Communication (10) | Conduit in joint trench with power and in good condition. Will need new switch when Navy disconnects. | Service charges to users. | 0 | 0 Switch cost |
| Steam (11) | About 3 miles of steam and return lines in poor condition will need to be continued north of Farragut until they can be phased out and replaced by Gas. | Contract purchase of steam and O&M of steam lines will be required by CRA. | 150 | 150 Steam and O&M |
| Gas (12) | Minimum gas service exists on NTC and must be replaced by a new system. Usage of exist system will be limited during initial period. | Charges direct to users. | 18 | 18 |
| **Total Estimated Budget Impact** | | | 808 | 808 |

27

SaIC\SMP2WP3\AUG98

NPS_0000970

| Operation | | Activity | Est. Ann. Budget In 1000 $ | Project Portion in 1000 $ |
|---|---|---|---|---|
| Administration (13) | | Direct and coordinate maintenance, security, redevelopment, marketing and negotiations of sale and lease of the property | 600 | 600 |
| Process entitlements, tentative and final maps (14) | | Rezoning and Tentative maps need to be processed and final maps prepared. | 500 | 500 |
| Security (15) | | Provide 2 roving patrols and 3 gate controls until an appropriate level of development and occupation is obtained | 400 | 400 |
| Total Estimated Budget Impact | | | 1500 | 1500 |
| | | | | |
| Budget Impact | Sheet 1 | Normal maintenance and usually a City responsibility | 1309 | 66 |
| Budget Impact | Sheet 2 | Unique maintenance requirements for NTC | 808 | 808 |
| Budget Impact | Sheet 3 | Unique requirements for NTC as a redevelopment project | 1500 | 1500 |
| Total Budget Impact | | | 3617 | 2374 |

| Contract services | | Estimated Costs |
|---|---|---|
| Building Maintenance | Sheet 1 | 400 |
| Water Sewer Billings | Sheet 2 | 120 |
| Electric Billings | Sheet 2 | 120 |
| Steam O&M, Purchase. | Sheet 2 | 150 |
| Gas Billing | Sheet 2 | 18 |
| Security | Sheet 3 | 400 |
| Entitlement (Portion) | Sheet 3 | 500 |
| Total | | 1708 |

28

S6IC5-MP2WP3IAIXO98

NPS_0000971

## NOTES ON MAINTENANCE AND OPERATIONS BUDGETS, as described in Table 41

### City Facilities Maintenance

(1)  Costs for street maintenance for the approximate 6.2 miles of streets is based on $8200 per mile per year and includes periodic street resurfacing and sidewalk maintenance, weekly sweeping, street signing, pavement marking and curb painting. Source J. Levy, Street Division PW Department.

(2)  Costs for storm drain maintenance of the approximate 5 miles of drain line was based on $63,400 per mile per year and includes cleaning and repair. In addition a cost of $42 per inlet per year was added for the approximate 150 inlets and provides annual cleaning. Source J. Levy, Street Division PW Department.

(3)  Costs for the approximate 150 street lights was based on a cost of $81 per fixture per year and includes electrical energy and maintenance of underground circuits and fixtures. Source J. Levy, Street Division PW Department.

(4)  Costs for park facility maintenance and operations were based on similar facilities operated within the existing inventory. In addition initial expenses of S37,000 was prorated to each facility over the first two fiscal years. Source June Dudas, P&R Management Division, C&N Services Department.

(5)  Costs for water system maintenance of the five miles of 8 to 20 inch water mains were based on City wide average costs for regular or routine maintenance of similar sized mains. Source Alex Ruiz, Water Distribution PW Department.

(6)  Costs for sewer system maintenance of the five miles of trunk and collector lines were based on City wide average costs for similar sized mains. Source Wastewater Collection Division PW Department.

### Building and Grounds Maintenance

(7)  Buildings and grounds maintenance costs provide external maintenance only and reflects 2 person hours per building per month. This would allow inspection of each building for vandalism and internal condition and minimal painting (cosmetic) clean up. The approximate 200 buildings would require 2.4 person years annually. This would

29

S44C/s34P 2WP33AJG98

require an annual budget of about $200,000 at $80,000 per person including overhead. Grounds maintenance would involve about $8,000 per acre per year for the 25 acres of landscaping surrounding the various buildings. Source Meyer, Fac, Mgmt. Division PW Department

**Building Utility Service**

(8)  Costs for water and sewer service to the buildings will continue to be a cost to the City until the buildings are demolished or rehabilitated and separately metered and transferred to the new user or occupant. The costs are estimated based on recent usage will be for irrigation of the grounds during the early phases of redevelopment. Source navy utility cost records.

(9)  Power: Should the Navy contract with SDG&E for the purchase of the power distribution system the charges to the City would follow the usual billing procedure and reflect the standard rates. For purposes of this estimate the recent usage by the Navy was adjusted downward to reflect the full closure of the base. Source Navy utility cost records.

(10) Communication: The Navy may, as in the case of the power system, sell the communication system. If so the users including the City would pay the standard rates for usage. However, if the system were transferred to the City then operation and maintenance would need to be contracted for and be funded by the City. In addition the cost of a new switch (connection) with the external system will need to be funded and installed. Further information is required to determine costs to the City.

(11) Steam System: A contract would be necessary for O&M of the system should it be determined that the system continue on a temporary basis until a full gas system could be installed (five years or so) and the buildings converted to gas heating. Preliminary indication by the steam supplier (Sithe Energies) suggest that the O&M costs could be as high as $100,000 per year. To this cost would be added the cost of steam which the Navy would charge estimate at $50,000. Source: Sithe Energies and Navy utility cost records.

(12) Gas System: Minimum number of gas lines and connections exist on NTC. Projections based on recent Navy usage have been used to predict possible costs following transfer of the property. Source Navy utility cost records.

**Operations**

(13) Administration: Includes the staffing cost related to coordination of maintenance, contracts for security, utility

S6\O7-SMP-2WP3\ALOR#

NPS_0000972

services and the redevelopment and marketing of the property.

(14)  Process and entitlement: Includes the costs related to the rezoning, tentative and final map processing required to prepare the property for sale or lease.

(15)  Security: Contract for two (2) roving patrol and three (3) gate controls during first 5 to 10 years or until an adequate level of development has been achieved. Full operation of this security 24 hours per day is estimated at $400,000 per year. These cost are based on recent proposals for Nimitz. Source Real Estate Assets, PW Department.

31

NPS_0000973

## APPENDIX A -
## REUSE PLANNING COMMITTEE MEMBERSHIP

Susan Golding, Mayor of San Diego. *Chairperson of the Committee.*

Brian Bilbray, Congressman, 49th Congressional District.

Byron Wear, San Diego City Council, District Two.

Captain Stephen L. Drake, Commander, Naval Training Center, San Diego.

Harry Albers, Vice President for University Relations and Development, San Diego State University.

Neal Arthur, President, MacArthur Development; Chair, San Diego Housing Commission.

Phil Brown, President, Brown Thumb Construction Company.

Patricia Butler, President, The Butler Group, Inc.

Paul Desrochers, Executive Director, Community Development Commission, City of National City. *Co-Chair, Economic Development Subcommittee.*

Jan Driscoll, Esq., Environmental Attorney.

Sister RayMonda DuVall, Executive Director, Catholic Charities, Diocese of San Diego. *Chair, Homeless Subcommittee.*

Charles Edwards, Former President and Chief Executive Officer, Institutions of Medicine and Science and Scripps Health.

Ed Furtek, Director, Federal Research Policy, University of California, San Diego. *Chair, Education Subcommittee.*

Augustine Gallego, Chancellor, San Diego Community College District.

---

NPS_0000976

Alberto Garcia, President, Alberto R. Garcia and Associates.

Barry Hite, San Diego Blood Bank; San Diego Chapter Sierra Club,
Executive Committee.

Art Lujan, Executive Director, Building Trades Council.

Sally Ortega Madaffer, Editor and Publisher, Mission Times Courier;
San Diego Park and Recreation Board. *Chair, Park and Recreation
Subcommittee.*

Ted Owen, San Diego Business Journal. *Chair, Economic
Development Subcommittee.*

Karen McElliott, San Diego Jack Murphy Stadium Authority Board of
Governors. *Chair, Interim Use Subcommittee.*

Gil Ontai, Principal-in-Charge, Gil Ontai, Architect and Associates.

Steven Oxberry, President, Steven W. Oxberry and Associates.

Wayne Raffesberger, Attorney.

Patricia Rickon, International Development Consultant.

Max Schmidt, Centre City Development Corporation. *Chair,
Environmental Subcommittee.*

Raymond Simas, President, Peninsula Chamber of Commerce.

# Appendix H

# Urban Design Guidelines

S81C/0-COVER.WP/31AUG98

NPS_0001090

## OPEN SPACE PLAN

*A unique opportunity at NTC is the ability to set aside large areas of land for unrestricted use by the public as open space. When complete, this open space will be a predominant asset of NTC. Landscape, hardscape and water make up this open space system, with precise character and use being defined according to location in the plan. Whether open space is near the water, contained within building courtyards, forming the central gathering space or at an edge determines the detail and specifics of implementation.*

### Recreation

Much of the open space at NTC will be dedicated to passive uses such as picnics, strolling, reading and other traditional park activities. Active uses such as golf, tennis, ball sports and other impromptu activities will also included as part of the open space system. Even some commercial activities such as a driving range, portable food stands and similar uses will be permitted within urban design guidelines.

The urban park system acts as a focus of the Historic Core and Education Subarea and extends into the Residential and Navy Housing Areas. This unique park creates a central green space for walking and gathering, removed from the general public spaces, integrating the various uses and providing a strong organizing element .

### The Water

*The channel is a significant open space element that creates a memorable experience and image for NTC. As the future gateway to the Bay to Bay link, NTC will as often be perceived from the water as it is enjoyed from land. With this in mind, it is important to develop the edges of the channel into an environmental statement that befits the site and sets the tone for the remainder of the Bay to Bay link.*

Much of the shoreline of the channel is proposed to be reconstructed into viable wildlife habitat. This will be mixed with a more urbanized edge resulting in a dynamic body of water that will be enjoyed by naturalists and casual observers as well. The Urban Waterfront Plaza provides an urbanized gathering space at NTC that supports the civic nature of the plan. A central water element and abundant hard-scape will define this space as the civic focus of NTC. It is envisioned that this space will become the major urban plaza for the Point Loma area, providing the opportunity for pubic gatherings and activities for the surrounding communities.

### The Edges

The edges that meet the surrounding community at NTC will be characterized by open space and landscaping of various dimensions. These edges help to convey the character of NTC and to provide a sensitive buffer to the surrounding neighbors. It is consistent with the character of San Diego to set such a public place within landscape.

NPS_0001101



## OPEN SPACE PLAN

### Rip-Rap Water's Edge

*The channel is one of the outstanding amenities of NTC. Access to the water in a graceful way will add measurably to the enjoyment of the base for all visitors.*

Three design alternates are proposed for the waters edge. The first will retain the existing rip-rap edge at the boat channel and continue the grass park-land up to this edge. A meandering 10' wide brushed concrete walkway will be constructed under the west side of the existing palm tree row providing access to open play and picnic areas at the edge of the channel. This walkway will include a decorative motif that relates to the heritage of the bay and the naval base.

Pathway type lighting will be used, avoiding light spill onto the water. Soft up-lighting of the palm trees is acceptable provided it is discreet and does not spill beyond the tree canopy.



---

NPS_0001110

# OPEN SPACE PLAN

**Soft Water's Edge**



*San Diego is noted for its water access and beaches.  Reaching the water in a way similar to a beach recalls the relationship with the water prevalent in the region.*

The second proposed alternate for the water's edge would remove the existing rip-rap edge at the boat channel allowing the grass park-land to slope down and meet the water.  A meandering walkway of the same design described in the first alternative will provide access to open play and picnic areas at the waters edge.



NPS_0001111

ITEM-337:

**SUBJECT:** <u>Two</u> actions related to San Diego Naval Training Center (NTC) Reuse Plan.

(See City Manager Report.  District-2.)

**CITY MANAGER'S RECOMMENDATION:**

Adopt the following resolutions:

Subitem-A:    (R-99-436 REV.) ADOPTED AS RESOLUTION R-290900

Approving and adopting the Naval Training Center San Diego Reuse Plan;

Authorizing the City Manager to submit the approved Reuse Plan to the Department of Housing and Urban Development and the Department of Defense for continued processing in conformance with federal base closure procedures;

Authorizing the City Manager to complete the preparation of a Business Plan and an Economic Development Conveyance Application in accordance with the Reuse Plan.

Subitem-B:    (R-99-437 REV.)   ADOPTED AS AMENDED AS RESOLUTION R-290901

Certifying that Environmental Impact Report EIR-96-0255 in connection with the San Diego Naval Training Center Reuse Plan, has been completed in compliance with the California Environmental Quality Act of 1970, as amended, and State guidelines; that the report reflects the independent judgement of the City of San Diego as Lead Agency; that the information contained in the



EXHIBIT
E

CITY 00011145

report, together with any comments received during the public review process, has been reviewed and considered by Council; adopting the findings made with respect to the project; adopting a Mitigation and Reporting Program, and a Statement of Overriding Considerations.

FILE LOCATION:        SUBITEMS A & B:  LAND-Naval Training
                      Center (NTC)  (67)

COUNCIL ACTION:       (Tape location: C413-E632.)

Hearing began at 12:11 p.m. and halted at 1:42 p.m.

Testimony in opposition by Art Salzberg, John McNab, Mischa Perria, A.P. Weber, and Ron Boshun.

Testimony in favor by Sister Ray Monda Duvall, Daniel Wolf, John Ihrig, Perry Dealy, William Tuchscher, Wayne Raffesberger, Kirk O'Brien, Irene Lawrence, Melanie Nickel, Damon Schamu, and Mel Roop.

MOTION BY WEAR TO APPROVE THE REUSE PLAN, CERTIFY THE EIS/EIR AND ADOPT THE MITIGATION MONITORING AND REPORTING PROGRAM, FINDINGS AND STATEMENT OF OVERRIDING CONSIDERATIONS, AND AUTHORIZE THE CITY MANAGER TO PREPARE, IN ACCORDANCE WITH THE REUSE PLAN, THE BUSINESS PLAN AND ECONOMIC DEVELOPMENT CONVEYANCE APPLICATION AND FURTHER, THAT THE CITY ESTABLISH A LOCAL CITIZEN BASED IMPLEMENTATION ADVISORY COMMITTEE TO REVIEW, AND MAKE RECOMMENDATIONS TO THE CITY MANAGER AND/OR CITY COUNCIL REGARDING, IMPLEMENTATION OF THE NTC MASTER PLAN.  THE COMMITTEE SHOULD BE UPDATED REGARDING NEGOTIATIONS WITH ANY POTENTIAL MASTER DEVELOPERS AND PROVIDE A PUBLIC FORUM REGARDING ALL ASPECTS OF IMPLEMENTATION.

TO ACCEPT AS PART OF THE MOTION AT THE REQUEST OF SAN DIEGO CITY SCHOOLS REGARDING THE ENVIRONMENTAL IMPACT REPORT TO REMOVE THE WORDS "IN CONJUNCTION WITH OTHER MIDDLE SCHOOLS" IN FINDING G, THE SECTION TITLED IMPACT, COMMUNITY SERVICES

CITY 00011146

AND FACILITIES FOR FURTHER CLARIFICATION.  TO ADD THE WORDS
"AT NO COST" AFTER THE WORDS "MAKE AVAILABLE" IN THE SECOND
SENTENCE OF THE FINDINGS ON PAGE 16 SO THAT IT READS AS
FOLLOWS:  IN ADDITION, ON JUNE 30, 1998 THE NAVY ENTERED
INTO AN AGREEMENT WITH THE CITY OF SAN DIEGO WHEREBY THE
NAVY WOULD MAKE AVAILABLE AT NO COST TO THE SAN DIEGO
UNIFIED SCHOOL DISTRICT A SEVEN ACRE ELEMENTARY SCHOOL SITE.

TO ALSO ACCEPT COUNCIL MEMBER KEHOE'S REQUEST TO:

> 1) SPECIFICALLY CALL OUT ART IN THE MIXED USE SECTION,
> 3/LAND USE-2, OF THE NTC REUSE PLAN, TO READ AS
> FOLLOWS:  MIXED USE IS PROPOSED IN THE NORTHERN HALF OF
> THE SITE IN AN AREA DESIGNATED AN HISTORIC DISTRICT BY
> THE FEDERAL GOVERNMENT.  GIVEN THE AGE OF STRUCTURES
> WITHIN THE DISTRICT AND THE HIGH AIRCRAFT NOISE LEVEL,
> BUILDING REHABILITATION COSTS MAY EXCEED $125 SF TO
> FULLY MITIGATE NOISE IMPACTS.  "MIXED USE" THEREFORE
> ALLOWS MAXIMUM OPPORTUNITY TO FIND USES THAT CAN ADAPT
> TO THE SETTING AND CIRCUMSTANCE.  COMMERCIAL AND CIVIC
> USES, AND ESTABLISHMENT OF A REGIONAL ART AND CULTURE
> CENTER ARE CONSIDERED TO BE AMONG THE MOST PROMISING,
> BUT MANY OTHER USES ARE CONSIDERED APPROPRIATE, E.G.,
> OFFICES, RETAIL, MUSEUMS, ART STUDIOS, LIVE/WORK
> SPACES, AND RESTAURANTS AND;
>
> 2) SPECIFY ART UNDER USES IN THE HISTORIC CORE/PRIORITY
> USES SECTION, EXECUTIVE SUMMARY-V,  AND 3/LAND USE-8 OF
> THE NTC REUSE PLAN, TO READ AS FOLLOWS: OFFICE AND
> ADMINISTRATION, COMMERCIAL, FOR-PROFIT AND NON-PROFIT
> INSTITUTIONAL, LOW/NO ENVIRONMENTAL IMPACT RESEARCH AND
> DEVELOPMENT, MUSEUM, ARTS, AND CULTURAL ACTIVITIES,
> PUBLIC USE AREAS.

Second by Mathis.  Passed by the following vote:  Mathis-
yea, Wear-yea, Kehoe-yea, Stevens-yea, Warden-yea,
Stallings-yea, McCarty-yea, Vargas-yea, Mayor Golding-yea.

CITY 00011147

# NTC SAN DIEGO SUMMARY OF TERMS

### *6 March, 2000*

**Transferor:**  United States of America (Government)

**Transferee:**  City of San Diego, California, the local redevelopment authority (LRA)

**Property Description:**  Approximately 279 acres of the former Naval Training Center (NTC) San Diego, California as set forth in the LRA's economic development conveyance (EDC) application of September 23, 1999. This includes real property, improvements, and personal property, collectively referred to as the "Property." The majority of the Property is currently leased to the LRA.

The 279 acres will be conveyed in four separate parcels. The largest parcel, 258 acres, will be conveyed first. Three remaining parcels (21 acres) will be conveyed after the Government has completed all remedial action necessary to protect human health and the environment and obtained site closure from appropriate regulatory authorities based on the projected use of these parcels as described in the NTC San Diego Reuse Plan dated August 1998.

**Legal Authority:**  EDC pursuant to Section 2905 (b)(4) of the Defense Base Closure and Realignment Act of 1990, as amended by Section 2821 of the National Defense Authorization Act for Fiscal Year 2000.

**No-Cost EDC:**  This will be a no-cost EDC provided that all proceeds received by the LRA from any sale or lease of any portion or all of the property during the first seven (7) years after the date of transfer to the LRA is used to support economic redevelopment of the installation. An annual financial statement certified by an independent certified public accountant must be submitted to the Government that describes the use of all proceeds.

**Recoupment Provision:**  If, after review of the yearly financial statements, it is determined that proceeds were not used to support economic redevelopment of the installation, the Government may require the LRA to repay to the Government 100% of proceeds that have not been appropriately reinvested. If recoupment is desired, the Government shall notify the LRA in writing that it intends to recoup proceeds in a specific amount, describing why it believes that those proceeds have not been reinvested as required. Within 30 days of receipt of such notification, the LRA shall submit its response to the Government. Within 30 days of receipt of LRA's response or within 30 days of the date the LRA's response was due under this paragraph, the Government shall issue its decision on the matter which shall be final and binding on the LRA. The amount of the recoupment described in the decision shall be paid by the LRA.

**Environmental Remediation:**  The Government retains full responsibility for environmental remediation at NTC consistent with the uses described in the LRA's Reuse Plan of August 1998.

Page 1 of 2



EXHIBIT

F

USN_0409117

**Memorandum of Agreement:**    The LRA and Government will negotiate a Memorandum of Agreement (MOA) setting forth the terms and conditions for the conveyance of the Property. The MOA shall include, among other things, a schedule for conveyance of parcels, conveyance mechanisms, recoupment provisions, and representations of the LRA and Government.

**Key Dates:**    1. The Government and the LRA will use their best efforts to negotiate and execute the MOA on or before May 16, 2000.

2. The Government will use its best efforts to execute the Finding of Suitability to Transfer (FOST) for the first parcel (258 acres) on or before May 3, 2000, and will complete the FOSTs for the remaining parcels (21 acres) pursuant to the dates agreed to in the MOA.


APPROVED:                                APPROVED:

CITY OF SAN DIEGO, CALIFORNIA            UNITED STATES OF AMERICA


Date: _April 3, 00_                       Date: _3 APRIL 00_


Page 2 of 2

USN_0409118



**DEPARTMENT OF THE NAVY**
BASE REALIGNMENT AND CLOSURE
PROGRAM MANAGEMENT OFFICE WEST
33000 NIXIE WAY, BLDG 50
SAN DIEGO, CA 92147

5090
Ser BPMOW.rlc/0317
September 16, 2016

C. Sherrie Komeylyan
Water Quality Control Board
Northern Groundwater Cleanup Unit
2375 Northside Drive, Suite 100
San Diego, Ca 92108

SUBJECT:    TRANSMITTAL OF THE FINAL FEASIBILTY STUDY REPORT,
            INSTALLATION RESTORATION SITE 12, BOAT CHANNEL SEDIMENTS,
            FORMER NAVAL TRAINING CENTER, SAN DIEGO, CALIFORNIA

Enclosure 1 is submitted for your records. The next step in the CERCLA process is the
Proposed Plan. The Navy will be sending you a copy of the Proposed Plan on September 22,
2016. There is a 30-day comment period ending on Monday, October 24, 2016. During the
comment period, the Navy will hold a public meeting on October 6, 2016. The meeting will start
at 6:00 pm and is located at the Liberty Station Conference Center, Room 205A, 2600 Laning
Road, San Diego, CA 92106.

The Regional Water Quality Control Board will be present and immediately following the
Proposed Plan meeting will discuss the Proposed Plan in terms of the California Environmental
Quality Act (CEQA). They will be available to discuss issues associated with the Proposed Plan.
I encourage everyone to attend this meeting.

Thank you for your support of this program. For further information, please contact Louie
Cardinale, Remedial Project Manager, at (619) 524-4564 or myself, at (619) 524-6073.

Sincerely,

KEITH FORMAN
BRAC Environmental Coordinator
By direction of the Director

Enclosure:  1.  Final Feasibility Study Report, Installation Restoration Site 12, Boat Channel
                Sediments, Former Naval Training Center, San Diego, California

Copy to:  (next pages)

**EXHIBIT
G**

USN_0139024

# Final

## Feasibility Study Report
## IR Site 12, Boat Channel Sediments
### Former Naval Training Center
### San Diego, California

### September 2016

Contract Number: N62473-13-D-4803
Task Order Number:  0005
Document Control Number: TRVT-4803-0005-0008 (Draft DCN: TRVT-0406-0000-0008)

Prepared for:

**Naval Facilities Engineering Command Southwest**
**1220 Pacific Highway**
**San Diego, CA 92132-5190**

## REVIEW AND APPROVAL

| TREVET Project Manager | Peter M. Stang, PG 5219 | 9/15/2016 Date |
|---|---|---|

| Brown and Caldwell Project Manager | Thomas R. McDonnell | 9/15/2016 Date |

## Remedial Investigation Summary

A RI of the surface and subsurface sediments of the Boat Channel was conducted (Bechtel Environmental, Inc. [BEI] 2003) to characterize the nature and extent of chemicals in the sediment and assess whether the Boat Channel Sediments posed a potential risk to human health and/or the environment. The human-health risk assessment evaluated the potential risks to child and adult beach and water recreational users, consistent with the proposed reuse for the Boat Channel, and to both recreational and subsistence anglers (fishers). Ecological risk was assessed for benthic invertebrates and aquatic wildlife (i.e., marine mammals and birds).

During the RI sampling program in 1998, surface and subsurface sediment samples were collected at 26 Boat Channel stations and five project reference stations. Tests conducted on the sediment samples included chemistry, toxicity, benthic community, and bioaccumulation. Sediment pore water chemical composition and surface water chemistry were both analyzed for six Boat Channel stations and three reference stations. Beach sediment chemistry concentrations were analyzed for 10 Boat Channel stations. Three species of fish were collected from the Boat Channel for tissue analyses.

The RI Report (BEI 2003) and subsequent evaluations identified an "Area of Ecological Concern" (AOEC) consisting of five stations (S1S1, S1S4, S1S5, S1S6, and S2S4) where the data used in assessing ecological risk for benthic invertebrates—chemistry, toxicity, and benthic community structure— indicated potential risk to the benthic invertebrate community. The primary chemicals of ecological concern (COECs) identified for the Boat Channel Sediments were copper, lead, zinc, total chlordane, and total dichlorodiphenyltrichloroethane (DDT). All the Boat Channel sampling stations had hazard quotients that were less than 1 or similar to reference conditions for aquatic bird and mammal receptors indicating that unacceptable risk for these receptors is unlikely. Therefore, no stations were identified as an AOEC because of their potential risk to wildlife.

The human-health risk from consumption of fish captured in the Boat Channel was found to be consistent with health risks posed by consumption of fish caught in the greater San Diego Bay region. Non-cancer risk estimates associated with exposure to beach sediment and surface water by both the child and adult receptor are less than 1, indicating that systemic toxicity from exposure to beach sediment is unlikely under a recreational scenario.

In addition, although benthic community risk was not identified for the sediment represented by Stations S2S9 and S2S10, the DON has elected to include these stations in the AOEC due to concentrations of total DDT in the subsurface sediment.

## Sediment Cleanup Goals and Area of Ecological Concern

For this FS, sediment cleanup goals, using alternative cleanup levels, were developed for the COECs to estimate a site-specific, risk-based concentration that would not be expected to cause toxic effects of an altered benthic invertebrate community.

Areal boundaries for each sampling station in the AOEC were assessed using the Theissen polygon method and further refined using site-specific bathymetric patterns. The AOEC areal

USN_0139045

## Section 2    Site Information

This section discusses the Boat Channel background including the site location and history, the physical setting, the methods and findings of the Boat Channel RI Report, and the sediment AOEC and COECs.

## 2.1    Background

This subsection describes the Boat Channel location and history and summarizes the Boat Channel RI Report (BEI 2003), subsequent revisions as documented in responses to agency comments (DON 2006b), and supplemental data evaluation performed by the DON and Water Board.

### 2.1.1    Location

The former NTC was located in San Diego County, California, approximately 2.5 miles northwest of downtown San Diego and occupied approximately 541 acres adjacent to San Diego Bay (Figure 2-1). The Boat Channel divides the former NTC property into two sections, with San Diego Bay bordering the property on the south. The RI Report assessed the Boat Channel from the northern end south to the North Harbor Drive bridge.

### 2.1.2    Description

The Boat Channel originated between the 1930s and the early 1940s, when hydraulic fill dredged from San Diego Bay was used to fill in the tidelands and riverbed between the present location of the San Diego River to the north and the property line between the former NTC and the current Marine Corps Recruit Depot (MCRD) (Naval Energy and Environmental Support Activity [NEESA] 1986). The Boat Channel was jointly used by former NTC and MCRD.

The Boat Channel extends north-northeast from San Diego Bay near West Basin at Harbor Island (Figure 2-1). The overall length of the Boat Channel is approximately 5,000 feet; the width of the channel is approximately 500 feet, except at the northern end where it is approximately 800 feet. The water depth in the center of the Boat Channel is approximately 15 feet below mean lower low water (MLLW) except in the basin at the northern end (Figure 2-2). The water depths in the basin range from 18 to 25 feet below MLLW (National Oceanic and Atmospheric Administration [NOAA] 2008).

Thirty-three storm drains discharge into the Boat Channel from drainage areas that include former NTC, MCRD, San Diego International Airport (Lindbergh Field), and properties within the San Diego Unified Port District and the city of San Diego (BEI 2003).

The Boat Channel Sediments were identified as Point of Interest 41 in the former NTC Base Realignment and Closure Cleanup Plan (DON 1995) because of possible impact by discharges from the stormwater outfalls along the channel. In late 1995, the Boat Channel Sediments were designated as IR Site 12 as part of the Navy IR Program (DON 1996).

## 2.1.9 Community Relations

As part of the IR Program, a Community Relations Plan (CRP) for former NTC was prepared in 1992 and updated in 1995 (Bechtel National, Inc. [BNI] 1995). The CRP describes the public participation program designed to assure involvement by the local community. Information repositories were established and maintained for community access to environmental restoration documents, and nine fact sheets have been prepared and distributed to the public.

The former NTC Restoration Advisory Board (RAB) was established in January 1994. Since then, the RAB has held 56 scheduled meetings and has participated in site tours. In addition, subcommittee meetings have been held, as needed, to discuss specific documents or technical issues of concern to RAB members. Environmental restoration documents have been provided to the RAB for review and comment. Currently the former NTC RAB meets on an "as needed" basis. The last RAB meeting was held in March 2004. With the submission of this document, the Navy intends to reengage with the RAB and local community to continue community relations efforts and schedule the next RAB meeting.

## 2.1.10 Regulatory Status

Although the Boat Channel is not listed on the U.S. EPA National Priorities List (NPL), the DON's current policy is that response actions at both NPL and non-NPL sites be accomplished in accordance with CERCLA, DERP, and the NCP. The DON is the lead federal agency for the implementation of these actions. The Water Board was delegated authority as lead state agency in January 1998 by the California Environmental Protection Agency, Department of Toxic Substances Control (DTSC).

## 2.1.11 Methodologies and Findings of the Remedial Investigation

This section summarizes the methodologies and findings of the RI conducted at the Boat Channel. Details of this investigation are contained in the final RI Report (BEI 2003). BEI conducted the RI under the IR Program developed by the DON and followed the guidance promulgated by CERCLA of 1980, as amended by SARA of 1986.

This section also summarizes the subsequent data evaluation performed in coordination with the Water Board and other regulatory agencies (NOAA and California Department of Fish and Game [now Wildlife]).

### 2.1.11.1 Objectives and Scope of the Remedial Investigation

The objectives of the RI Report (BEI 2003) included characterizing the nature and extent of chemicals in the Boat Channel Sediments and assessing whether these sediments pose a potential risk to human health and/or the environment. In 1998, during the RI sediment sampling program, surface and subsurface sediment chemistry samples were collected at 26 Boat Channel stations and five project reference stations. Toxicity tests were conducted on surface sediment samples using amphipods (measuring survival) and sea urchins (measuring fertilization and larval development). The structure and composition

USN_0139073

### 2.1.11.3 Site Characterization Methods

Site characterization methods conducted during the RI Report (BEI 2003) were designed to acquire data and information for use in conducting ecological and human-health risk assessments of the Boat Channel Sediments.

In support of this task, five project reference stations in northern San Diego Bay, outside the Boat Channel, were selected during the project planning stage with the participation and acceptance of the agencies/trustees. The project reference stations were intended to represent sediments exposed to day-to-day activities of northern San Diego Bay and were therefore located in areas not used by former NTC. The sediments of the project reference stations were characterized in a manner similar to the Boat Channel Sediments so that the Boat Channel data could be compared with the project reference station data.

The Boat Channel was divided into two spatial strata (areas) for sediment sampling: Stratum 1 (10 sampling stations) located in the northern end of the channel, and Stratum 2 (16 stations) located in the central and southern portions of the channel. The project reference area (five stations), located in San Diego Bay south of the Boat Channel, was identified as Stratum 3. These sediment sampling locations are shown in Figure 2-4.

In 1998, surface sediment samples were collected from the upper six inches of the sediment bed using a Gray-O'Hara Box Core at the 26 Boat Channel stations and the five reference stations (Figure 2-4) and assessed for physical, chemical, toxicity, and benthic community properties. Subsurface sediment core samples (to depths of 7 feet below the mud line) were collected using vibracore equipment for use in describing the vertical distribution of sediment physical and chemical properties. Surface water samples and beach sediment samples were collected with hand-held equipment. Pelagic and bottom-dwelling fish species were collected from the Boat Channel using an otter trawl from a boat and a beach seine net from the shoreline.

The surface, subsurface, and beach sediment samples were analyzed for grain size, total sulfides, total organic carbon, metals, organotins, polychlorinated biphenyls (PCBs), chlorinated pesticides including dichlorodiphenyltrichloroethane (DDT) and chlordane, and semivolatile organic compounds (SVOCs) including polycyclic aromatic hydrocarbons (PAHs). Surface water, fish tissue, and pore water samples were analyzed for metals, organotins, PCBs, pesticides, and SVOCs.

Concentrations were calculated for total high molecular weight PAHs (HPAH) as the sum of benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(g,h,i)perylene, benzo(a)pyrene, chrysene, dibenzo(a,h)anthracene, fluoranthene, indeno(1,2,3-cd)pyrene, and pyrene; total low molecular weight PAHs (LPAH) as the sum of acenaphthene, acenaphthylene, anthracene, fluorene, naphthalene, and phenanthrene; total PAH as the sum of total HPAH and total LPAH; total PCB as the sum of selected PCBs; total DDT as the sum of DDT and the related compounds dichlorodiphenyldichloroethane (DDD) and dichlorodiphenyldichloroethylene (DDE); and total chlordane as the sum of alpha- and gamma-chlordane.

USN_0139075

area to each sampling station without bias (Figure 2-11). However, the boundaries identified in this manner assume that the sediment bottom is a constant plane without bathymetric contours and that there are no impediments to the spatial distribution of contaminants.

### 2.2.2.2  Refined Estimate of Area for the Boat Channel AOEC

The areal boundaries for each station defined by the Thiessen polygon method (Figure 2-11) were refined using site-specific bathymetric patterns (Figure 2-10). Contaminants are frequently associated with the fine-grained sediment, which tends to settle to the deeper, calmer portions of a water body. Five of the seven AOEC stations (S1S1, S1S4, S1S5, S1S6, and S2S4) are located in the basin in the northern end of the Boat Channel. The docks at MCRD are located in the area of the AOEC. The bottom of the basin ranges from depths of 18 to 25 feet below MLLW. Enhanced sedimentation in the basin is indicated by the higher concentrations of total organic carbon and levels of fine-grained sediment. Two of the AOEC stations (S2S9 and S2S10) are located in the middle of the main channel at shallower depths (10 to 15 feet below MLLW) and are expected to accumulate sediment at a rate slower than the deeper basin. Sediment slopes along the perimeter of the Boat Channel range up to 30 percent (Figure 2-12). Stations located in an area with a steep depth gradient were assumed to accumulate much less sediment than areas with a more flat aspect.

The AOEC areal boundary was refined by modifying the perimeter indicated by the Thiessen polygons based on the bathymetric contours. The revised AOEC boundary for six of the seven Thiessen polygons generally follow the bathymetric contour of 12 feet below MLLW with adjustments to circumvent sediment slopes that are greater than 10 percent (Figures 2-13 and 2-14). Since the S1S5 polygon is in shallow water (less than 12 feet below MLLW) the boundary refinement process was applied in the following manner.  The revised AOEC boundary for S1S5 follows the bathymetric contour of 6 feet below MLLW, which circumvents sediment slopes greater than 10 percent. The area represented by the AOEC is approximately 9.10 acres.

Slopes and shallower areas are not included in the AOEC because: a) reported sediment concentrations from samples collected at the basin or channel bottom are not considered representative of the slopes and shallower areas; b) sediment remediation technologies are less efficient on sloped sediment surfaces; and c) eelgrass beds that are more likely to occur along the perimeter of the Boat Channel are less likely to be impacted.

### 2.2.3  Vertical Extent of the Boat Channel AOEC

The RI Report (BEI 2003) showed that sediment characteristics of the Boat Channel AOEC change with depth below the mud line. The data indicated that the surface sediment in the northern portion of the AOEC, extending from the mud line to approximately one foot below the mud line, is characterized as soft organic silt containing high concentrations of total organic carbon, high moisture content, and a high percentage of fine-grained sediment. Subsurface sediment below approximately one foot has reduced levels of total organic carbon, moisture content, and fines (Figures 2-15,

USN_0139087

# Section 3    Remedial Action Objective and Remediation Goals

This section presents and discusses the RAO and the remediation goals developed for the Boat Channel AOEC pursuant to the requirements of the NCP, using available site-specific information. A clearly defined RAO and medium-specific remediation goals are necessary to identify and effectively evaluate remedial action alternatives during the FS process and, ultimately, to select a final remedy that is protective of human health and the environment.

Subsequent to development of the RAO, a preliminary assessment of potential site-specific federal and state ARARs was conducted. Following this task, the remediation goals for the sediments of the Boat Channel AOEC were developed that would satisfy the RAO and ARARs.

Remediation goals can include acceptable levels of chemical concentrations and acceptable exposure levels for protecting environmental receptors, provided such data and information can be identified in the ARARs, or by other means if ARARs do not provide such information. Remediation goals provide objectives that can be used for identification and evaluation of remedial action alternatives.

Final remediation goals are not determined for a site until selection of the final remedy is made in the Record of Decision (ROD). Nevertheless, RAOs and associated remediation goals are typically developed during the RI/FS process to provide a basis for the screening of remedial technologies and process options and for the detailed evaluation of remedial alternatives.

## 3.1    Chemicals of Ecological Concern

The final RI Report (BEI 2003) and subsequent data evaluation performed in coordination with the Water Board identified copper, lead, zinc, total chlordane and total DDT as the COECs for the Boat Channel AOEC sediments.

## 3.2    Boat Channel Environmental Medium of Interest

The Boat Channel Sediments were observed to be a habitat for a wide range of marine organisms. These organisms typically use the surficial portions of the sediment but also live within the sediment to depths of 1.3 feet or more. In view of these observations, the medium of interest for the Boat Channel Sediments AOEC was identified in the RI as the surficial benthic sediments (i.e., the surface sediments from 0 to 6 inches below the mud line where the maximum COEC concentrations were reported compared to the subsurface samples). Pore water within the sediment was considered to be another important medium at the Boat Channel AOEC. However, because the quality of the sediment pore water would be closely related to the bulk sediment quality, addressing the sediment quality was considered sufficient for the purpose of this FS Report.

The water column is not a medium of interest for this FS Report because IR Site 12 only consists of the Boat Channel Sediments. The Boat Channel COECs are expected to remain associated with the sediments due to their physical and chemical properties.

USN_0139090

social, and economic impacts to the surrounding community including property owners other than the discharger. The overall approach used for the evaluation began with the understanding that to objectively balance benefits and costs of remediation, both had to be expressed numerically and in a manner that allowed for incremental analysis. Benefits were defined as the incremental exposure reduction achieved by remediating the maximum remaining concentrations of primary COCs and expressed numerically as a percentage. This is appropriate since, in general, exposure to potential receptors is directly proportional to chemical concentrations (i.e., a 10 percent reduction in concentration results in a 10 percent reduction in exposure). Costs were defined as the incremental expenditures required to remediate the maximum remaining concentrations of primary COCs and expressed as dollars (in millions). To evaluate the benefits and costs of incremental remediation simultaneously, the incremental exposure reduction percentage was divided by the incremental expenditure in millions of dollars. The resulting metric was incremental exposure reduction per million dollars. This metric could then be charted to determine if the incremental cost of further reductions in primary COCs was consistent throughout the effort of cleaning up the Boat Channel to background concentrations.

The evaluation concluded that cleaning up to background sediment chemistry levels may be technologically feasible; however, the incremental benefit of cleanup diminishes significantly with additional cost beyond a certain point, and asymptotically approaches zero as remediation approaches background concentrations. After remediation of three polygons, there is a break point where the incremental cost of further reductions in primary COCs outweighed the incremental benefits. Based on these considerations, cleaning up to background sediment chemistry levels may be technologically feasible, but is not economically feasible.

### 3.5.1.2 Alternative Cleanup Levels and Development of Sediment Cleanup Goals

Alternative cleanup levels were evaluated since cleanup to background levels is economically infeasible (Appendix H). The TEF analysis indicates that cleanup to background levels is economically infeasible after the remedial action at the initial polygons. The benefit diminishes rapidly as additional remedial action continues. After a cleanup to background levels at three polygons, the benefit of remedial action begins to approach zero.

The DON determined that the risk-based sediment cleanup goals described in Section 2 of this FS report are the alternative cleanup levels and are the lowest achievable levels that are technologically and economically feasible. The sediment cleanup goals were determined to be protective of benthic invertebrates. Wildlife such as birds and mammals and humans recreating and fishing at the Boat Channel were not associated with adverse risk; however, implementation of the sediment cleanup goals will reduce the potential exposures of these receptors. Therefore, the sediment cleanup goals will provide a benefit for all of the receptors evaluated for the Boat Channel Sediments: benthic invertebrates, bird and mammal wildlife, and human recreators and fishers. Further, the selected

USN_0139093

USN_0139186



FEET MLLW

A'

MHW

MLLW

MUD LINE

MHW - MEAN HIGH WATER LINE
MLLW - MEAN LOWER LOW WATER LINE
MUD LINE - BOTTOM SURFACE OF BOAT CHANNEL
DEPTH IS RELATIVE TO MEAN LOWER LOW WATER

A

FEET MLLW

DEPTH CONTOURS ARE FEET BELOW MEAN LOWER LOW WATER

N

CROSS-SECTION FOR BOAT CHANNEL CENTERLINE
FEASIBILITY STUDY REPORT

IR  SITE 12,  BOAT  CHANNEL  SEDIMENTS
FORMER  NAVAL  TRAINING  CENTER
SAN  DIEGO,  CALIFORNIA

PROJECT
LOCATION

FIGURE
2-2

SCALE IN FEET

0     200     400

PROJECT NUMBER
144552

DATE
FEB 2016

NAVFAC

DATA SOURCES:
THE BATHYMETRIC DATA IS A COMPILATION OF ELECTRONIC DATA FILES OBTAINED
FROM NOAA, OFFICE OF COAST SURVEY; NAUTICAL CHART 18773 NOAA SURVEYS
FROM 1990-2001, REMEDIAL INVESTIGATION SOIL BORING DATA AND DIGITAL
INTERPOLATION OF THE DATA

N00247.000613
NTC SAN DIEGO
SSIC #5090.3

# FINAL
# BASE REALIGNMENT AND CLOSURE
# BUSINESS PLAN
# FORMER NAVAL TRAINING CENTER
# SAN DIEGO, CALIFORNIA

## MARCH 2000



EXHIBIT

H

Date: 03/01/00

# TABLE OF CONTENTS

| Section | Page |
|---|---|
| Introduction | 1 |
| Status of Disposal and Reuse Process | 1 |
|    Major Reuse Issues | 1 |
|    Relationship to Environmental Programs | 2 |
| Status of Environmental Regulatory Programs | 2 |
| Key Environmental Sites | 3 |
|    Site 1 | 3 |
|    Site 3 | 5 |
|    Site 12 | 5 |
|    Site 14 | ~~6~~ 7 |
|    Site 15 | 7 |
|    Building 361 UST | 8 |
| Successful Acceleration Initiatives by the BCT | 8 |
| Major Execution Issues/Funding Commitment | 9 |
| Environmental Program Schedule/Critical Milestones | ~~9~~ 10 |
| Environmental Condition of Property | 10 |

## TABLES

1  Disposal Parcel Data Summary

2  Site Summary

3  Disposal Schedule/Finding Commitments

## FIGURES

1  Former NTC Disposal and Reuse Parcels

2  Former NTC ~~Projects Presently Underway~~ Environmental Condition of Property

3  Former NTC ~~Environmental Condition of Property~~ Suitability of Property For Transfer by Deed

---

Date: 03/01/00

Base Realignment and Closure Business Plan

Channel. The Sediment Characterization Study concluded that metals, PCBs, hydrocarbons, and pesticides were present in Boat Channel sediments. The highest concentrations were found at the northern end of the Boat Channel where the water is deepest and tidal circulation is lowest.

The draft RI defined the nature and extent of contamination in the Boat Channel Sediments and determined whether the sediments in the Boat Channel present an unacceptable risk to human health and/or the environment. RI fieldwork was completed in October 1998. A draft RI report was issued in December 1999 and is currently being reviewed by regulatory agencies and the public.

The draft RI identified 25 stations where all the lines of evidence used in assessing ecological risk—chemistry, toxicity, and benthic community structure as supported by bioaccumulation—did not significantly differ from reference values, as represented from the bay reference stations. Therefore, it was concluded that these stations do not pose an unacceptable risk to the environment. However, one station (S1S4) was identified within the Boat Channel where the lines of evidence used in assessing ecological risk significantly differed from reference values, as represented from the bay reference stations.

The following factors were taken into consideration in selecting the risk management decisions used to determine the proper response required for protection of aquatic ecosystems present in the Boat Channel and San Diego Bay:

- the estimated maximum size of the area of ecological concern is roughly 4 percent of the entire Boat Channel. By this estimate, close to 96 percent of the Boat Channel does not pose an unacceptable level of risk to ecological receptors,

- based on the physical characteristics of the Boat Channel and the observed distribution of sediment chemistry, it appears that the Boat Channel acts to accumulate fine sediments and contaminants in its northern end and may continue to accumulate these fine sediments and contaminants,

- the primary contaminants of ecological concern identified for the Boat Channel sediments are prevalent throughout San Diego Bay,

- the potential ongoing sources of contaminants of ecological concern include storm drains that are not under the control of the DON and are regulated by the Clean Water Act, and

- dense beds of eel grass, a highly valued ecological component, are prevalent along the shoreline of much of the Boat Channel and any action taken could harm this resource and sensitive biological community associated with it.

The draft RI concluded that recreational use of the Boat Channel does not pose unacceptable risk to human health. The human-health risk from consumption of fish captured in the Boat Channel was found to be consistent with health risks posed by consumption of fish caught in the greater San Diego Bay region. The current San Diego County Department of Health Services fish consumption warning for San Diego Bay is

Date: 03/01/00

Base Realignment and Closure Business Plan

consistent with the findings of this RI, and should remain in place for the Boat Channel. Based on the results of the RI and the above risk management considerations, the DON has determined and proposed that no action is the appropriate response for Site 12. However, this document is undergoing regulatory and public review. Comments from these parties will be incorporated into the final RI.

## Site 14

Site 14 (former Point of Interest 29), the former Small Arms Range No. 2 (Building 192), was constructed in 1942. The building contained shooting bays for small arms target practice. The facility operated as a small arms range from 1942 until 1993. In 1994, the building was demolished and the sand trap material, where the bullets were deflected by steel plates, was apparently graded onto the site. An EE/CA was issued in 1998. The purpose of the EE/CA was to identify and analyze removal action alternatives that would reduce lead contamination to an acceptable level, thereby reducing the potential for human and ecological exposure to lead-contaminated soils at Site 14. The EE/CA preferred alternative was excavation and off-site disposal of contaminated soil. An Action Memorandum, signed by the Navy in May 1999, recommended removal of the contaminated soil to an off-site Class I hazardous waste landfill. The removal action was performed in 1999. The site currently is scheduled for closure pending receipt of closure letters from the regulatory agencies.

## Site 15

Site 15 (former Point of Interest 8), consisting of Building 443, was constructed in 1956. The building was used by the Navy as a dry cleaning training facility. The dry cleaning equipment in the building consisted of a closed-loop system that included a washer, dryer, and dry cleaning machine. Pressing machines were also located in the building. The dry cleaning solvents used in the building reportedly consisted of Stoddard solvents and perchloroethene (PCE). The dry cleaning training operations were discontinued in Building 443 in September 1994.

The 1986 IAS identified Building 443 as having used hazardous materials and having generated hazardous waste. A basewide Environmental Baseline Survey (EBS) was conducted by BNI in 1994. The EBS recommended further investigation to assess the presence of PCE in the vicinity of Building 443. A Comprehensive Site Assessment (SA) was completed by BNI in 1996. The SA underwent regulatory review and the regulatory agencies requested that further sampling be conducted. As a result, a second Expanded Site Assessment (ESA) was conducted by BNI in 1996/1997. The ESA report revealed that low-level soil and groundwater contamination were present. Further action was recommended to delineate the vertical and horizontal extent of the contamination in groundwater.

A final expanded Site Inspection (SI) report for Site 15 was issued by SOTA in October 1999. The results of the initial sampling activities were presented to regulatory agencies

N00247_000846
NTC SAN DIEGO, CA
SSIC 5000-33a

**COMMENTS ON 1) DRAFT REMEDIAL INVESTIGATION REPORT, SITE 12, DATED 21 DECEMBER 1999; 2) RESPONSE TO COMMENTS FROM MULTIPLE AGENCIES ON DRAFT REMEDIAL INVESTIGATION, SITE 12, DATED 21 DECEMBER 1993; AND 3) TECHNICAL MEMORANDUM SEDIMENT AREA OF ECOLOGICAL CONCERN, SITE 12, DATED 16 MARCH 2001**

08/17/2001
CRWQCB - SAN DIEGO, CA



Approved for public release: distribution unlimited.



**San Diego Region**

Internet Address: http://www.swrcb.ca.gov/rwqcb9/
9771 Clairemont Mesa Boulevard, Suite A, San Diego, California 92124-1324
Phone (858) 467-2952 • FAX (858) 571-6972

Winston H. Hickox
secretary for
Environmental
Protection

Gray Davis
Governor

August 17, 2001


Mr. Jose Payne
BRAC Environmental Coordinator
Southwest Division Naval Facilities Engineering Com
Base Realignment and Closure (BRAC) Operations
1230 Columbia Street, Suite 1100
San Diego, CA 92101


Dear Mr. Payne:

RE:    **DRAFT REMEDIAL INVESTIGATION REPORT FOR SITE 12, THE BOAT
       CHANNEL, FORMER NAVAL TRAINING CENTER, SAN DIEGO,
       CALIFORNIA**

       **RESPONSES TO REGULATOR COMMENTS ON THE DRAFT REMEDIAL
       INVESTIGATION REPORT FOR SITE 12, THE BOAT CHANNEL, FORMER
       NAVAL TRAINING CENTER, SAN DIEGO, CALIFORNIA**

       **TECHNICAL MEMORANDUM SEDIMENT AOEC SITE 12, THE BOAT
       CHANNEL, FORMER NAVAL TRAINING CENTER (NTC), SAN DIEGO,
       CALIFORNIA**


The San Diego Regional Water Quality Control Board (RWQCB) has received the above
referenced documents dated December 1999, December 2000 and March 2001, respectively.
Acting as the lead state regulatory agency under CERCLA program, the RWQCB has
coordinated with other federal, state and local agencies in reviewing documents and providing
comments, met with the Navy and the City of San Diego to discuss corrective action and
property transfer issues. The following federal, state and local agencies have provided written or
oral comments on the Draft RI Report: U.S. EPA, U.S. Fish and Wildlife Service, Cal/EPA
OEHHA, California Department of Fish and Game, City of San Diego. Due to the complex
nature of the site, great effort was needed to coordinate with multiple parties, to comply with
RWQCB's bay-wide sediment cleanup guidelines, and to evaluate appropriate remedial
strategies. The RWQCB would like to provide the following general comments to summarize
and conclude the review of these documents:

1. The Remedial Investigation results clearly demonstrate elevated chemical concentrations (i.e.
   lead, copper, zinc and chlordane) in the sediment, reduced survival rate in test animals and

*California Environmental Protection Agency*

*The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption. For a list of
simple ways you can reduce demand and cut your energy costs, see our Web-site at http://www.swrcb.ca.gov.*

*Recycled Paper*



USN_0504468

reduced abundance and diversity of the resident benthic invertebrate community in certain areas in the Boat Channel. Beneficial uses of the San Diego Bay, as established in the RWQCB's Basin Plan, has been impacted. Cleanup action is warranted.

2. Past activities at NTC include light industry, service stations, hobby shops, shooting range, landscaping, storm drain system, etc. Contamination from pollutants associated with these activities was found both on land and in the sediments within the NTC property boundary. Evidence suggests that NTC has contributed to sediment contamination in the Boat Channel.

3. The Draft RI report has inappropriately applied the 4xERM sediment chemistry criterion in interpreting investigation results. The 4xERM threshold was used by the State Board's Bay Protection Program to identify and prioritize toxic hot spots. By no means should it be used in sediment cleanup determinations (see No. 4 below and RWQCB's guidelines on sediment cleanup level determination). The Draft RI report should be revised to correct this inappropriate use; any interpretations and conclusions so derived should be re-evaluated.

4. In compliance with State Board's Resolution No. 92-49, *Policies and Procedures for Investigation and Cleanup and Abatement of Discharges under Water Code Section 13304*, the San Diego RWQCB has established Guidelines for Assessment and Remediation of Contaminated Sediments in San Diego Bay. The Guidelines set certain criteria and methods for data acquisition and analyses, require site specific information and multiple lines of evidence in determining cleanup levels that are protective to beneficial uses. The Guidelines provide a phased approach for investigation and cleanup, and consistency for all contaminated sites in the San Diego Bay. The Guidelines should be used at Site 12 for site assessment and evaluation, as well as cleanup determination.

5. The Navy should conduct a thorough investigation of the existing storm drain system at the NTC property. These activities include video inspection for damages and illicit connections, sediment deposits, etc. Sediment within the storm drain system should be sampled and tested for contaminants of concerns. This is necessary to determine if ongoing discharges are occurring at NTC. If warranted, corrective action should be taken to remove illicit connections, repair damages, and remove polluted sediments to assure that any discharges through the storm drain will comply with applicable state and federal water quality requirements.

6. Since multiple parties are potentially involved in contributing to the pollutants found in the Boat Channel, it is difficult to distinguish who is responsible for the deposition of waste. Therefore, the Navy may not be the sole responsible party for the cleanup of the Boat Channel. One method to address the issue of multiple parties is to address the Boat Channel separate from the rest of NTC property. NTC may propose a ROD that addresses the storm drains on the NTC property. This ROD must clarify that it is limited in scope, that waste/ hazardous substances at NTC have been released/discharged to the Boat Channel, and that

*California Environmental Protection Agency*

♻ *Recycled Paper*

USN_0504469

Mr. J. Payne                              - 3 -                              August 17, 2001
IR Site 12 (Boat Channel), NTC

those releases/discharges will be addressed outside this ROD. Due to the complex nature of the Boat Channel, including that there are multiple sources of pollutants, all involved parties should be named responsible parties and participate in further investigation and cleanup activities. The limited ROD will not close Site 12, but should allow the Navy and other responsible parties to work together and remediate as necessary. A No Further Action ROD can be signed only after the site is closed.

Should you have any question regarding this letter, please contact Mr. Charles Cheng at (858) 627-3930.

Sincerely,

DAVID T. BARKER
Supervising WRC Engineer
Water Resource Protection Branch

dtb:jpa:cqc

ntc\site12ri_rpt.doc

*California Environmental Protection Agency*

♻ *Recycled Paper*

AUG 20 2001 11:14                                        RSA 5710332        PAGE.03

USN_0504470

Mr. J. Pagos                                                                            August 17, 2001
IR Site 12 (Boat Channel), NTC                -4-

cc:

Ms. Frances McChesney, Office of the Chief Counsel, 1001 I Street, Sacramento, CA 95814

Mr. John Richards, Office of the Chief Counsel, 1001 I Street, Sacramento, CA 95814

Mr. Martin Hausladen, US EPA, Region IX, (H-9-2), Hazardous Waste Management Division,
75 Hawthorne Street, San Francisco, CA 94105-3901

Dr. Clarence Callahan, US EPA, Region IX, (SFD-8-B), Technical Support Team, 75 Hawthorne
Street, San Francisco, CA 94105-3901

Dr. Sophia Serda, US EPA, Region IX, (SFD-8-B), Technical Support Team, 75 Hawthorne
Street, San Francisco, CA 94105-3901

Dr. Karen Randles, Office of Environmental Health Hazard Assessment (OEHHA), 1001 I
Street, Sacramento, CA 95814

Ms. Judy Gibson, U.S. Fish and Wildlife Service, 2730 Loker Avenue West, Carlsbad, CA
92008

Mr. Bill Paznokas, California Department of Fish and Game, 4949 Viewridge Avenue, San
Diego, CA 92123

Mr. Scott Flint, California Department of Fish and Game, Office of Spill Prevention and
Response, P.O. Box 944209, Sacramento, CA 94244-2090

Ms. Marcella Escobar-Eck, City of San Diego, NTC Reuse Project Director, 202 C Street,
MS3A, San Diego, CA 92101

Ms. Cheryl Lester, City of San Diego, Environmental Services Department, Environmental
Programs Division, 9601 Ridgehaven Court, Suite 320, San Diego, CA 92123-1636

Mr. Ted Olsen, City of San Diego, Environmental Services Department, Environmental
Programs Division, 9601 Ridgehaven Court, Suite 320, San Diego, CA 92123-1636

Mr. Rick Adcock, San Diego Unified Port District, P.O. Box 120488, San Diego, CA 921 12

*California Environmental Protection Agency*

♻ *Recycled Paper*

USN_0504471





# San Diego Regional Water Quality Control Board

April 6, 2022

Ashley Kerins
Associate Counsel
Base Realignment and Closure Program Management Office
Department of the Navy
33000 Nixie Way, Building 50
San Diego, CA 92147
ashley.b.kerins.civ@us.navy.mil
(sent via email only)

**In reply refer to / attn:
DOD100366600:KSchwall**



**Subject:    Response to the Department of the Navy request to clarify
information on the completed cleanup activities at Installation
Restoration Site 12, former Naval Training Center, San Diego,
California**

Dear Ashley Kerins,

The California Regional Water Quality Control Board, San Diego Region (San Diego
Water Board) reviewed the Department of the Navy's (Navy) request to clarify
information on the completed cleanup activities at Installation Restoration (IR) Site 12
(IR Site 12 or the Boat Channel), former Naval Training Center (NTC), San Diego.[1]
Specifically, the Navy requested the San Diego Water Board provide clarification on two
issues: (1) whether the sediment quality objectives (SQOs) in the *Water Quality Control
Plan for Enclosed Bays and Estuaries: Part 1 Sediment Quality* (Enclosed Bays and
Estuaries Plan) are applicable to IR Site 12 because a site assessment was completed
and submitted prior to February 19, 2008, and (2) whether title or ownership of the Boat
Channel is relevant to SQOs exemption. This correspondence clarifies the applicability
of the SQOs to the cleanup activities at IR Site 12.

The San Diego Water Board understands that the exemption from SQOs for cleanup
activities applies to IR Site 12 and only for the prior contamination that was analyzed in
the Navy's Remedial Investigation Report.[2] Additional details are provided below.

---

[1] Email from Ashely Kerins, Navy, to Vincent Vu, State Water Board, February 10, 2022.
[2] Navy Final Remedial Investigation Report for IR Site 12, The Boat Channel, Former Naval Training
Center, San Diego, California, October 30, 2003.

CELESTE CANTÚ, CHAIR │ DAVID GIBSON, EXECUTIVE OFFICER

2375 Northside Drive, Suite 100, San Diego, CA 92108-2700 │ www.waterboards.ca.gov/sandiego

USN_0310146

A. Kerins                                    - 2 -                              April 6, 2022

## BACKGROUND

The NTC is in the City and County of San Diego and is located approximately 2.5 miles
northwest of downtown San Diego, occupies approximately 540 acres, and is near the
northernmost point of San Diego Bay. The Boat Channel divides the former NTC
property into two sections. In 1993, the NTC was recommended for closure by the
Defense Base Realignment and Closure Commission, and the facility was closed on
April 30, 1997. Wastewater potentially discharged to the Boat Channel via surface water
runoff and storm drain outfalls included paint thinner/solvent waste, plating wastewater,
waste lube oil, steam cleaner effluent, waste pesticides, and photo processing
wastewater.[3]

The Navy's final Record of Decision (ROD) identified the selected remedy for IR Site 12,
which included the dredging of contaminated sediments from seven areas of ecological
concern and disposing the dredged contaminated sediments at an off-site regulated
solid waste landfill. The San Diego Water Board signed the final ROD for IR Site 12 in
March 2017 and approved the Navy's Final Remedial Action Completion Report on April
16, 2019, stating that the selected remedy for IR Site 12 "is protective of the
environment, complies with federal and state statutes and appropriate requirements,
and is cost-effective."

## REGULATORY FRAMEWORK

The State Water Resources Control Board (SWRCB) adopted SQOs, as part of the
Enclosed Bays and Estuaries Plan, on September 16, 2008. As adopted in 2008, the
Enclosed Bays and Estuaries Plan included the following use and applicability criteria
for the SQOs: "The supersession provision in 1. above does not apply to existing
sediment cleanup activities where a site assessment was completed and submitted to
the Regional Water Board by February 19, 2008." (Enclosed Bays and Estuaries Plan
(2008), Ch. II.B.2.)[4]

## APPLICABILITY OF SQOS TO IR SITE 12

The San Diego Water Board received the Navy's Final Remedial Investigation Report
(Remedial Investigation) for IR Site 12, the Boat Channel, Former Naval Training
Center, San Diego, California on November 14, 2003. For purposes of interpreting the
SQOs exemption in the Enclosed Bays and Estuaries plan, the San Diego Water Board
accepted the Navy's Remedial Investigation as the equivalent of a site assessment.

---

[3] Final Remedial Action Completion Report, Installation Restoration Site 12, Boat Channel Sediments,
Former Naval Training Center, San Diego, California, March 2019.
[4] The Enclosed Bays and Estuaries Plan was amended in 2018 with an equivalent provision: "The
supersession provisions in paragraphs 1) and 2) above do not apply to existing sediment cleanup
activities where a site assessment was completed and submitted to the Regional Water Quality Control
Board (Regional Water Board) by February 19, 2008." (Enclosed Bays and Estuaries Plan (2018), Ch.
III.A.1.b.3.)

A. Kerins                                        - 3 -                              April 6, 2022

Since the Remedial Investigation was submitted to the San Diego Water Board prior to
February 19, 2008, cleanup activities for IR Site 12 were exempt from the SQOs.

Subsequent communications between the Navy and San Diego Water Board support a
similar conclusion was previously reached by the parties. The Navy's *Draft Feasibility
Study Report, Appendix B, for IR Site 12, Boat Channel Sediments, Former Naval
Training Center, San Diego California* (Draft Feasibility Study)[5] provided a discussion of
applicable or relevant and appropriate requirements (ARARs) to IR Site 12. Regarding
the SQOs, Appendix B stated: "As agreed with the [San Diego Water Board], the Navy's
Remedial Investigation report for [IR] Site 12 dated October 2003 serves as a site
assessment supporting the finding that the [Naval Training Center] Site 12 is
'grandfathered' from the applicability of the Water Quality Control Plan for Enclosed
Bays and Estuaries – Part 1 Sediment Quality and these requirements do not apply."
(Draft Feasibility Report, Appendix B, p. B-15.) Further, the Navy's responses to the
San Diego Water Board's comments on the Draft Feasibility Study contained additional
discussion of the SQOs: "The Boat Channel sediments site is exempt from the SQO
requirements due to Section II.B.2 of the SQO document which states that SQO's do
not 'apply to existing sediment cleanup activities where a site assessment was
completed and submitted to the Regional Water Board by February 19, 2008'. Also,
please refer to the minutes of the September 25, 2012, meeting between the San Diego
Water Board and Navy that documents the SWRCB counsel concurrence with the Navy
that SQO's are not ARARs." (Letter from Janet Lear, Department of the Navy, to John
Anderson and Chehreh Komeylyan, San Diego Water Board (Aug. 22, 2013), with
enclosure, Responses to Comments dated January 9, 2013, and March 22, 2013, on
the Draft Feasibility Study Report, IR Site 12, Boat Channel Sediments, Former Naval
Training Center, San Diego, California, p. 41.)

**AFFECT OF TITLE AND OWNERSHIP FOR SQOS EXEMPTION**

The Enclosed Bays and Estuaries Plan provides an exemption from the SQOs for
"sediment cleanup activities where a site assessment was completed and submitted to
the San Diego Water Board by February 19, 2008." Title or ownership of the site is not
relevant, nor necessary, to assess whether a site assessment was completed and
submitted to the San Diego Water board by February 19, 2008. Therefore, the San
Diego Water Board would not look at title or ownership of the site to determine whether
sediment cleanup activities are exempt from the SQOs.

The San Diego Water Board appreciates the Navy's efforts to cleanup the Boat
Channel. As stated above, that cleanup was exempt from the SQOs for the discharges
analyzed in the Remedial Investigation. At this time, the San Diego Water Board does
not anticipate requiring additional cleanup of the Boat Channel. However, the SQOs will
apply to: (1) any new spill, release, or unpermitted discharge that occurred after the
Remedial Investigation or cleanup activities, or (2) any prior spill, release, or
unpermitted discharge that was not covered in the Remedial Investigation.

---

[5] Draft Feasibility Study Report, IR Site 12, Boat Channel Sediments, Former Naval Training Center, San
Diego, California, May 2012.

USN_0310148

A. Kerins                            - 4 -                        April 6, 2022

In the subject line of any response, please include the reference code -
**DOD100366600:KSchwall**. For questions or comments, please contact Ms. Kristin
Schwall at (619) 521-3368, or Kristin.Schwall@waterboards.ca.gov.

Respectfully,

David W.
Gibson

Digitally signed by David W.
Gibson
Date: 2022.04.06 16:33:44
-07'00'

David W. Gibson
Executive Officer
San Diego Water Board

DWG:sm:kks:vu

cc (sent via email):

> R. Louie Cardinale, BRAC Program Management Office West,
> rene.cardinale@navy.mil
>
> Tahirih Linz, BRAC Environmental Coordinator, Treasure Island, Navy BRAC
> PMO, tahirih.p.linz.civ@us.navy.mil
>
> Vincent Vu, Attorney, State Water Resources Control Board,
> vincent.vu@waterboards.ca.gov
>
> Sean McClain, Senior Engineering Geologist, California Regional Water Quality
> Control Board, San Diego Region, sean.mcclain@waterboards.ca.gov
>
> Kristin Schwall, Water Resource Control Engineer, California Regional Water
> Quality Control Board, San Diego Region, kristin.schwall@waterboards.ca.gov

| Tech Staff Info & Use | |
|---|---|
| GeoTracker ID | DOD100366600 |
| Cost Recovery ID | 16591 |
| FI$CAL ID | H47000 |

USN_0310149

**California Regional Water Quality Control Board, San Diego Region**

March 22, 2013

In reply refer to:
DOD100366600:CKomeylyan

Ms. Janet Lear, BRAC Environmental Coordinator
Program Management Office West
1455 Frazee Road, Suite 900
San Diego, CA 92108-4310

**Subject: Response to Comments on the Draft Feasibility Study Report for IR Site
12, Boat Channel Sediments, Former Naval Training Center, San Diego,
(dated January 9, 2013) (5090 Ser BPMOW.sdb/0008)**

Ms. Lear:

The San Diego Regional Water Quality Control Board (San Diego Water Board) has
reviewed the Responses to Comments on the Draft Feasibility Study Report and has the
following comments:

1. The Department of Navy (DON) and San Diego Water Board agreed upon the
   methodology for Station Assessment; however no agreement or concurrence was
   reached regarding whether the polygons associated with the "Possibly Impacted"
   stations should be part of the remedial footprint. The San Diego Water Board email
   dated February 27, 2012 to the DON indicated that the DON's proposed methodology
   for "reclassifying" the possibly impacted stations had been reviewed and that there
   were some concerns with the proposed approach. This email also indicated that Mr.
   Steve Bay an expert in this matter with Southern California Coastal Waters Research
   Project (SCCWRP) was reviewing the document and would be providing technical
   comments. The San Diego Water Board's concerns and issues associated with
   DON's proposal were sent to the DON in correspondence dated May 15, 2012.
   These concerns have yet to be addressed or resolved. Prior to the San Diego Water
   Board's acceptance of the Feasibility Study Report all comments and concerns should
   be resolved to ensure that the remedial footprint for the site addresses all areas
   where sediment quality does not support existing or potential beneficial uses of the
   sediments within the former NTC Boat Channel.

2. The San Diego Water Board agrees that the *Water Quality Control Plan for Enclosed
   Bays and Estuaries – Part 1 Sediment Quality* (Bays and Estuaries Plan) is not
   applicable to the Boat Channel sediments as an ARAR as mentioned during the
   September 25, 2012 meeting. Nonetheless, methods for triad data collection,
   evaluation, and integration have progressed since 2003 when the Boat Channel triad
   data were discussed in the Remedial Investigation Report. Using some of the up-to-





USN_0138859

date concepts and methodologies in the Bays and Estuaries Plan to integrate and interpret the stale triad data for the Boat Channel Site is not the same as treating the Plan as an ARAR. Had the Bays and Estuaries Plan been considered an ARAR for this site, site assessment would have had to be conducted as described in the plan and further stressor identification studies of the sediments would have been required.

3. As previously stated during the September 25, 2012 meeting, the San Diego Water Board is in agreement with the process used in identification of the "Possibly Impacted" stations. The "Possibly Impacted" station designation represents the lower end of the observed impact continuum at the site (as apparent in the chemistry and toxicity test results). In determining whether a "Possibly Impacted" station should be included in the remedial footprint, the DON must have substantial evidence to show that the observed effects are caused by factors other than exposure to toxic pollutants. The available data for these stations, including chemical gradients and proximity to sources, does not provide any evidence that the observed impact is caused by anything other than exposure to toxic pollutants associated with historical discharges. As such, all of the "Possibly Impacted" stations should be included in the remedial footprint. However, as discussed in Comment 7 below, that does not necessarily mean that the same remedial actions should apply to all polygons within the footprint.

4. In order to try and link elevated chemistry levels in sediment to source areas, the San Diego Water Board conducted a chemistry signal or chemical gradient analysis. The San Diego Water Board conducted this analysis and provided the contour maps to the DON (attachment 1). As stated during the December 11, 2012 meeting, the location of former storm drain outfalls, potential source areas, and the elevated chemical concentrations supported an interpretation of point source pollution, and absent any other data to indicate otherwise, the "Possibly Impacted " stations should be included in the remedial footprint.

5. As stated in *Part 1, Path Forward for Assessment of Aquatic Life Beneficial Uses, Former Naval Training Center Boat Channel,* the "Possibly Impacted" stations shall be further evaluated by the DON to determine whether or not these stations meet the protective condition. Results of the three lines of evidence for these stations have indicated observed impacts at these sites. These stations would meet the protective condition if the presence of stressors other than sediment contamination exists; however, proof of the existence of stressors other than sediment contamination has not been demonstrated.

6. The agreed upon sediment assessment approach utilizes all available data and analysis from the three lines of evidence to determine whether impacts to sediments exist within the former NTC Boat Channel, unless the existence of confounding factors are present that would indicate the results from the analysis are not reliable. *Part 1, Path Forward for Assessment of Aquatic Life Beneficial Uses, Former Naval Training Center Boat Channel* describes the importance and reasons for evaluating all of the lines of evidence and not giving more weight to one line of evidence over another. The agreed upon multiple line of evidence approach described in this

TOMÀS MORALES, CHAIR | DAVID GIBSON, EXECUTIVE OFFICER

9174 Sky Park Court, Suite 100, San Diego, CA 92123-4353 | (858) 467-2952 | www.waterboards.ca.gov/sandiego
♻ Recycled Paper

USN_0138860

Ms. Janet Lear                                     - 3 -                              March 22, 2013

document is based on the limitations of the methods for measuring chemistry, toxicity, and benthic impacts in environmental samples. None of these measures alone are reliable as an indicator of sediment quality and all three measures are needed for the most reliable sediment quality assessment.

7. As previously stated in the San Diego Water Board's comments dated July 20, 2012, none of the arguments presented by the DON demonstrate that 1) toxic pollutants are not causing the responses observed at the "Possibly Impacted" stations, or 2) other factor (besides chemical contaminants) are responsible for the observed impacts. During the September 25, 2012 meeting, the DON mentioned managing risks at the "Possibly Impacted" stations as an approach to addressing potential impacts at these sites. The San Diego Water Board is interested in hearing the DON's proposals for risk management in the polygons associated with the possibly impacted stations. Please provide any proposed alternative methods for managing the risks associated with these sites to the San Diego Water Board for review and concurrence. Absent any other proposal to address these possible impacts, the San Diego Water Board maintains that the stations classified as "Possibly Impacted" should remain within the remedial footprint. Being in the remedial footprint, however, does not mean that any particular remedy must be used. Applying different remedies to the likely impacted areas and possibly impacted areas might be reasonable, and should be discussed.

8. The DON in a letter dated January 22, 2013 acknowledged receipt of additional comments on the subject Feasibility Study Report for this site and requested written confirmation that the San Diego Water Board has reviewed a complete copy of the report and has no further comments. Comments on the complete Feasibility Study report have been submitted to the DON via letters dated July 20, 2012 and January 9, 2013 (attachment 2 and 3 respectively). These letters constitute the San Diego Water Board's comments on the Feasibility Study report. The Technological and Economic Feasibility Evaluation provided in the draft Feasibility Study Report has been reviewed and the only outstanding comment was also provided in the letter dated January 9, 2013 to the DON.

The San Diego Water Board would be happy to meet with you regarding resolution of these comments. In the subject line of any response, please include the reference number: **DOD100366600:CKomeylyan**. For questions, comments, or to set up a meeting/conference call to discuss this matter, please contact Ms. Sherrie Komeylyan by phone at (858) 467-2734, or by email CKomeylyan@waterboards.ca.gov.

Respectfully,

John P. Anderson, PG
Southern San Diego County Ground Water Unit

JPA:apt:jc:jpa:ck

TOMÁS MORALES, CHAIR | DAVID GIBSON, EXECUTIVE OFFICER

9174 Sky Park Court, Suite 100, San Diego, CA 92123-4353 | (858) 467-2952 | www.waterboards.ca.gov/sandiego
♻ Recycled Paper

USN_0138861

Ms. Janet Lear                                    - 4 -                              March 22, 2013


Attachments:    1. Chemistry Gradient Analysis provided to the DON via email
                   dated October 19, 2012 to Ms. Wochnick.

                2. Comments on the Feasibility Study Report for IR Site 12, the
                   Former Naval Training Center Boat Channel provided to DON
                   via correspondence dated July 20, 2012.

                3. Additional comments on Feasibility Study Report for IR Site 12,
                   the Former Naval Training Center Boat Channel provided to
                   DON via correspondence dated January 9, 2013.

cc by email:    Mr. Anthony Megliola, NAVFAQHQ, BRAC PMO,
                Anthony.Megliola@navy.mil;
                Ms. Heather Wochnick, NAVFAQHQ, BRAC PMO,
                Heather.Wochinick@navy.mil
                Mr. Curtis M. Moss, NAVFAQHQ, BRAC PMO, Curis.M.Moss@navy.mil
                Mr. Tom McDonnell, NAVFAQHQ, BRAC PMO,
                TMcDonnell@BrwnCald.com
                Ms. Janet Lear, NAVFAQHQ, BRAC PMO, Janet.Lear@navy.mil
                Mr. Andrew Tauriainen, State Water Resources Control Board, Office of
                Enforcement, ATauriainen@waterboards.ca.gov
                Councilmember  Kevin L. Faulconer, Council District 2,
                KevinFaulconer@sandiego.gov

| Tech Staff Info & Use | |
| --- | --- |
| Geotracker ID | DOD100366600 |

TOMÁS MORALES, CHAIR | DAVID GIBSON, EXECUTIVE OFFICER

9174 Sky Park Court, Suite 100, San Diego, CA 92123-4353 | (858) 467-2952 | www.waterboards.ca.gov/sandiego
Recycled Paper

USN_0138862



**DEPARTMENT OF THE NAVY**
BASE REALIGNMENT AND CLOSURE
PROGRAM MANAGEMENT OFFICE WEST
33000 NIXIE WAY, BLDG 50
SAN DIEGO, CA 92147

5090
Ser BPMOW.rlc/0317
September 16, 2016

C. Sherrie Komeylyan
Water Quality Control Board
Northern Groundwater Cleanup Unit
2375 Northside Drive, Suite 100
San Diego, Ca 92108

SUBJECT:    TRANSMITTAL OF THE FINAL FEASIBILTY STUDY REPORT,
            INSTALLATION RESTORATION SITE 12, BOAT CHANNEL SEDIMENTS,
            FORMER NAVAL TRAINING CENTER, SAN DIEGO, CALIFORNIA

    Enclosure 1 is submitted for your records. The next step in the CERCLA process is the
Proposed Plan. The Navy will be sending you a copy of the Proposed Plan on September 22,
2016. There is a 30-day comment period ending on Monday, October 24, 2016. During the
comment period, the Navy will hold a public meeting on October 6, 2016. The meeting will start
at 6:00 pm and is located at the Liberty Station Conference Center, Room 205A, 2600 Laning
Road, San Diego, CA 92106.

    The Regional Water Quality Control Board will be present and immediately following the
Proposed Plan meeting will discuss the Proposed Plan in terms of the California Environmental
Quality Act (CEQA). They will be available to discuss issues associated with the Proposed Plan.
I encourage everyone to attend this meeting.

    Thank you for your support of this program. For further information, please contact Louie
Cardinale, Remedial Project Manager, at (619) 524-4564 or myself, at (619) 524-6073.

Sincerely,

KEITH FORMAN
BRAC Environmental Coordinator
By direction of the Director

Enclosure:  1. Final Feasibility Study Report, Installation Restoration Site 12, Boat Channel
               Sediments, Former Naval Training Center, San Diego, California

Copy to:  (next pages)

**EXHIBIT**

**L**



**The City of**
**SAN DIEGO**

# Attachment 10

**Office of the Director**
Transportation & Storm Water Department

July 30, 2018


VIA EMAIL TO: rebecca.cardoso@navy.mil


Ms. Rebecca Cardoso
BRAC Environmental Coordinator
Department of the Navy
Base Realignment and Closure
Program Management Office West
33000 Nixie Way, Bldg. 50 Suite 207
San Diego, CA  92147

Subject:  Consultation Regarding Department of the Navy Consideration of San Diego Naval
          Training Center Restoration Advisory Board (RAB) Adjournment

Dear Ms. Cardoso:

The City of San Diego (City) appreciates the opportunity to provide comments regarding the
Department of the Navy's consideration of Naval Training Center (NTC) Restoration Advisory
Board (RAB) adjournment.  The City believes adjournment of the RAB is inappropriate at this
time because at least three important considerations are not satisfied. Specifically, the
environmental restoration of the NTC Boat Channel is incomplete, all environmental
remedies are not in place, and the Boat Channel has not been transferred out of DOD control.
See 32 CFR §202.10(a)(1)(ii), (iii), and (vi).  Thus, the City recommends that dissolution of
the RAB be postponed until the project has addressed all existing contamination in the
entirety of the NTC Boat Channel in accordance with current regulatory standards and
requirements in order to protect the public and the environment.

The City has repeatedly raised numerous concerns about the Boat Channel restoration project
which have remained unaddressed. The City's concerns were documented most recently in
various letters which we attach to and incorporate here. (See Attachments 1 – 9).  The City's
primary concerns include the following: (i) the project's failure to address all existing
contamination in the entirety of the Boat Channel including the slopes, shorelines and
shallower areas; (ii) the project's inadequate site characterization, given its reliance on 20-
year old data which is likely not representative of current site conditions and on outdated
scientific methodologies; (iii) the project's failure to provide clean-up to current regulatory
standards; (iv) the project's failure to account for all legacy contamination, such as the
landfill formerly located on NTC/Camp Nimitz; and (v) the project's failure to adequately
protect environmental resources which could have led to further contamination. Thus, in the
City's view, restoration is not complete, environmental remedies are not in place, and the

202 'C' Street, Suite 9A
San Diego, CA  92101
pgomez@sandiego.gov



**EXHIBIT**
**M**

T (619) 236-6959
www.sandiego.gov

USN_0140738

Ms. Rebecca Cardoso
July 30, 2018
Page 2 of 3

In closing, it is premature to adjourn the RAB. The City of San Diego requests that the RAB continue to carry out duties to advise the Navy regarding this project until all environmental concerns are addressed.

The City appreciates the Navy's consideration of the above comments. If you have questions, please contact Ruth Kolb at (858) 541-4328 or rkolb@sandiego.gov.

Sincerely,

Kris McFadden
Director
Transportation & Storm Water Department

DK\rk

Attachments:  1.  City of San Diego Comment Letter – Draft Final Feasibility Study Report, IR Site 12, Boat Channel Sediments, Former NTC, San Diego, CA, 3-18-2016
2.  City of San Diego Comment Table – Draft Final Feasibility Study Report, IR Site 12, Boat Channel Sediments, Former NTC, San Diego, CA, 3-18-2016
3.  City of San Diego Comment Letter - Draft Final Feasibility Study Report, IR Site 12, Boat Channel Sediments, Former NTC, San Diego, CA, 6-10-2016
4.  City of San Diego Comment Letter - Draft Record of Decision- Final Remedial Action Plan, IR Site 12, Boat Channel Sediments, Former NTC, San Diego, CA, 1-12-2017
5.  City of San Diego Comment Table - Draft Record of Decision – Remedial Action Plan, IR Site 12, Boat Channel Sediments, Former NTC Boat Channel, San Diego, CA, 1-12-2017
6.  City of San Diego Comment Letter – Draft Mitigated Negative Declaration for ROD-RAP, IR Site 12, NTC Boat Channel Sediments Remediation Project, 6-8-2017
7.  City of San Diego Comment Table - Draft Mitigated Negative Declaration, IR Site 12, Former NTC, San Diego, CA, 6-8-2017
8.  City of San Diego Comment Letter -Draft Remedial Design and Remedial Action Work Plan, IR Site 12, Boat Channel Sediments, Former NTC, San Diego, CA, 8-25-2017
9.  City of San Diego Comment Table - Revised Remedial Design and Remedial Action Work Plan, IR Site 12, Boat Channel Sediments, Formal NTC, San Diego, CA, 8-25-2017

Page 3
Ms. Rebecca Cardoso
July 30, 2018

      cc:  Johnnie Perkins, Jr., Deputy Chief Operating Officer, Infrastructure/Public Works
David Graham, Deputy Chief Operating Officer, Neighborhood Services
Erik Caldwell, Director, Economic Development Department
Kris McFadden, Director, Transportation & Storm Water Department
Lee Friedman, Infrastructure Policy Manager, Office of the Mayor
Leslie FitzGerald, Chief Deputy City Attorney, City Attorney's Office
Grace Lowenberg, Deputy City Attorney, City Attorney's Office
Davin Widgerow, Deputy City Attorney, City Attorney's Office
Alejandra Gavaldon, Strategic Program Manager, Transportation & Storm
Water Department
Ruth Kolb, Program Manager, Transportation & Storm Water Department
Stephen Marsh, Denton US LLP, 4655 Executive Drive, Suite 700, San Diego CA
92121

USN_0140740

OFFICE OF

MARY T. NUESCA
ASSISTANT CITY ATTORNEY

AMANDA L. GUY
DEPUTY CITY ATTORNEY

# THE CITY ATTORNEY
## CITY OF SAN DIEGO

MARA W. ELLIOTT
City Attorney

CIVIL ADVISORY DIVISION
1200 THIRD AVENUE, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-4100
TELEPHONE (619) 533-5800
FAX (619) 533-5856

April 28, 2017

## CONFIDENTIAL SETTLEMENT COMMUNICATIONS

### Fed. Rules of Evid. Rule 408 and Cal. Evid. Code § 1152

**SENT VIA EMAIL AND U.S. MAIL:**
Roberto Ramos-Antonmattei
Senior Trial Attorney
Department of the Navy
Office of the General Counsel
Naval Litigation Office
720 Kennon St. SE, Bldg. 36, Rm. 233
Washington Navy Yard, DC 20374-5013

**SENT VIA EMAIL AND U.S. MAIL:**
Michael Tencate
Navy BRAC PMO West
33000 Nixie Way, Bldg. 50
San Diego CA 92147

> *Re:    Environmental Response at Former Naval Training Center*
> *San Diego Boat Channel, San Diego, California*

Dear Messrs. Ramos-Antonmattei and Tencate:

On February 14, 2017, the Department of the Navy (DON), the City of San Diego (City), the San Diego Unified Port District, and the San Diego County Regional Airport Authority met to discuss the DON's remediation of the former Naval Training Center San Diego (NTC) Boat Channel site and potential settlement of associated environmental response costs. At that meeting, the DON requested responses from the City on the following: (i) any defenses to liability the City may assert; (ii) the City's response regarding the availability of certain City property located adjacent to the boat channel for the DON's use during implementation of the selected remedy for the site; (iii) any other offers of in-kind contribution for the DON's consideration; (iv) the City's response to the DON's proposed allocation of responsibility (60% Department of Defense (DOD) and 40% non-DOD); and (v) the City's objectives for mediation if the parties pursue that option.

By letter dated March 30, 2017, the City responded to items (ii) and (iii). This letter is the City's preliminary response to the remaining items. In addition, it sets forth the City's initial assessment of the applicability of the Memorandum of Agreement between the City and the DON, for the conveyance of the former Naval Training Center property (MOA), to issues raised by the DON's demand for contribution, as described in the DON's letter of December 27, 2016, and its proposed remediation. At the outset, we note that our analysis and evaluation of this matter is ongoing. Thus, we invite the DON's responses to the positions reflected in this letter.

Document Number: 1494399



EXHIBIT
**N**

Roberto Ramos-Antonmattei
Michael Tencate                          -6-                          April 28, 2017

justification.[12] Moreover, while it appears that the Water Board will approve the DON's Record
of Decision (ROD) for the NTC Boat Channel remediation, it will only do so under a reservation
of rights to pursue a more aggressive cleanup for the site.[13]

In sum, the DON developed a remedial plan based on what is now outdated science,
using stale and insufficient data, that is not representative of current conditions in the Boat
Channel, and which fails to clean up all relevant areas to current regulatory standards. The DON
will only receive a qualified approval for its proposed cleanup because the Water Board has
reserved its rights to impose stricter cleanup standards. The Water Board has not concurred that
the cleanup will meet current standards, only that they are no longer interested in prolonging the
dispute with the DON. This leaves the City exposed to further cleanup orders the moment the
parcels are conveyed. This falls far short of the "site closure" that the DON promised the City in
the MOA.

Under the circumstances, the City does not intend to accept the Boat Channel parcels
unless and until the site has been properly characterized, the parcels have been remediated to
current regulatory standards under California law, and the DON has received site closure from
the Water Board, without a reservation of rights, in accordance with the MOA.

3.      **The DON has failed to allege facts supporting its claim that the City is a Potentially
        Responsible Party under CERCLA.**

The DON has not alleged a specific basis for characterizing the City as a Potentially
Responsible Party (PRP) under CERCLA; however, the DON appears to view the City as a
CERCLA operator or arranger due to its municipal separate storm sewer system (MS4).[14] The
following is the City's initial response to alleged CERCLA liability in connection to its MS4.

First, the DON has not demonstrated that the City had, or has, the requisite management,
direction or control of any disposal of hazardous wastes through its MS4 system to the Boat
Channel site that would result in operator liability. "[A]n operator must manage, direct or
conduct operations specifically related to pollution, that is, operations having to do with the
leakage or disposal of hazardous waste, or decisions about compliance with environmental
regulations." *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998). Operator liability "only
attaches if the defendant had authority to control the cause of the contamination at the time the
hazardous substances were released into the environment." *Kaiser Aluminum & Chemical Corp.
v. Catellus Dev. Corp.*, 976 F.2d 1338 (9th Cir. 1992); *see Carson Harbor Village, Ltd. v.
Unocal Corp.*, 287 F. Supp. 2d 1118 (C.D. Cal. 2003), aff'd, 433 F.3d 1260 (9th Cir. 2006)

---

[12] *See* Water Board letter to DON relating to the Draft Feasibility Study, dated Nov. 27, 2013.
[13] The Water Board reserved its rights to pursue a more aggressive cleanup in its June 24, 2016 letter to the DON,
stating: "

> It is also important to note that the site is not on the National Priorities List
> (NPL). Therefore the site is subject to CERCLA section 120(a)(4), which states:
> "State laws concerning removal and remedial actions, including State laws
> regarding enforcement, shall apply to removal and remedial action at [non NPL
> federal facilities]". The San Diego Water Board reserves the right to apply
> CERCLA section 120(a)(4) to the site as appropriate.

[14] *See* Final Draft ROD, p. 2-7.

USN_0119555

Roberto Ramos-Antonmattei
Michael Tencate                          -9-                          April 28, 2017

Additionally, the City refutes the Port's and Airport's assertion that the City has
conceded to an apportionment share of 20-24%.[20] The City has not conceded to a particular
allocation liability for remediation costs associated with the Boat Channel site. Please note that
the City's draft 2005 "Matrix Report" was never finalized and that it does not represent the
City's position regarding its allocation liability.[21]

**6.      Proposed Mediation Objectives.**

The City is open to pursuing mediation in this matter and would look to that process to
accomplish the following: (i) facilitate communication between the parties and an exchange of
information; (ii) assist in narrowing the issues in dispute; and (iii) generate options for the
parties' consideration in an effort to reach a mutually acceptable resolution.

As mentioned at the outset, this letter represents the City's initial assessment of this
matter. Further research and analysis are ongoing. Thus, we welcome any information or
documentation the DON is willing to share for our consideration as we continue our evaluation
of this matter.

Finally, this letter does not constitute a waiver or relinquishment of any rights or
remedies. The City reserves its rights in full to raise any and all claims and/or defenses, and to
seek any and all available remedies, at law or in equity, at any time and from time-to-time.

Please contact Amanda Guy at (619) 533-5878 or aguy@sandiego.gov if you have any
questions or concerns regarding this matter.

Sincerely yours,

MARA W. ELLIOTT, City Attorney

By _____
Amanda L. Guy
Deputy City Attorney

ALG:js:ccm
cc: Mr. John Carter, Esq., San Diego Unified Port District (sent via email)
     Mr. Lee Kaminetz, Esq., San Diego County Regional Airport Authority (sent via email)
     Ms. Danielle Sakai, Esq., Best Best & Krieger, LLP (sent via email)
     Ms. Paz Gomez, Deputy Chief Operating Officer, Infrastructure/Public Works (sent via email)
     Mr. Kris McFadden, Director, Transportation & Storm Water Department (sent via email)
     Mr. Drew Kleis, Deputy Director, Transportation & Storm Water Department (sent via email)
#1494399

---

[20] Danielle Sakai letter to DON, dated Mar. 28, 2017, at p. 3.
[21] Moreover, the Matrix Report found that the City's contribution to contamination at the NTC Boat Channel site,
due to City events or City owned or managed property, could be as low as 5 percent of the contaminants observed in
Stratum 1 and Stratum 2.

USN_0119558





## San Diego Regional Water Quality Control Board

September 2, 2020

Tahirih Linz
BRAC Environmental Coordinator
Naval Facilities Engineering Command
Base Realignment and Closure
Program Management Office West
33000 Nixie Way, Building 50 Suite 207
San Diego, Ca 92147
Sent via e-mail to: Tahirih.Linz@navy.mil

**In reply refer to / attn:**
**DOD100366600:KSchwall**

**Subject:  Response to the Draft Finding of Suitability to Transfer for Parcels III-B and VII, Former Naval Training Center, San Diego, San Diego County, California, August 2020**

Ms. Linz:

The California Regional Water Quality Control Board, San Diego Region (San Diego Water Board) reviewed the *Draft Finding of Suitability to Transfer for Parcels III-B and VII, Former Naval Training Center, San Diego, San Diego County, California, August 2020* (Draft FOST). The purpose of this Draft FOST is to document the environmental suitability of the Boat Channel located on the former Naval Training Center (NTC), San Diego, for transfer consistent with the Comprehensive Environmental Response, Compensation, and Liability Act. The Boat Channel includes two parcels, Parcels III-B (approximately 13 acres) and VII (approximately 44 acres). The sediments of the Boat Channel were designated as Installation Restoration Site 12 in 1995. The selected remedial action removed contaminated sediment within the Boat Channel. The remedial action was completed in February 2018.

The San Diego Water Board finds the Draft FOST acceptable and has no further comments.

The San Diego Water Board appreciates the opportunity to assist in addressing environmentally impaired sites at NTC and looks forward to assisting with these efforts. In the subject line of any response, please include the reference number DOD100366600:KSchwall.

EXHIBIT

O
_____

HENRY ABARBANEL, PH.D., CHAIR  |  DAVID GIBSON, EXECUTIVE OFFICER

Ms. Linz                          - 2 -                          September 2, 2020

For questions or comments, please contact Ms. Kristin Schwall at (619) 521-3368, or by email at Kristin.Schwall@waterboards.ca.gov.

Respectfully,

Kristin K. Schwall, P.E.
Project Manager
Water Resources Control Engineer



Sean McClain, P.G.
Program Manager
Senior Engineering Geologist

cc (via email):  Mr. R. Louie Cardinale, BRAC Program Management Office West, rene.cardinale@navy.mil

| Tech Staff Info & Use | |
| --- | --- |
| GeoTracker ID | DOD100366600 |
| PCA Code | 16591 |
| FI$CAL ID | H47000 |



**DEPARTMENT OF THE NAVY**
**NAVAL FACILITIES ENGINEERING COMMAND**
**BASE REALIGNMENT AND CLOSURE**
**PROGRAM MANAGEMENT OFFICE WEST**
**33000 NIXIE WAY, BLDG 50 Suite 207**
**SAN DIEGO, CA 92147**

5000-33B
Ser BPMOW.rlc/253
August 24, 2020

Kristin Schwall
Kristin.Schwall@waterboards.ca.gov
Water Quality Control Board
Northern Groundwater Cleanup Unit
2375 Northside Drive, Suite 100
San Diego, CA  92108

SUBJECT:    DRAFT FINDING OF SUITABILITY TO TRANSFER FOR PARCELS III-B
AND VII, FORMER NAVAL TRAINING CENTER, SAN DIEGO, SAN
DIEGO COUNTY, CALIFORNIA

I am pleased to submit for your review the *Draft Finding of Suitability to Transfer for
Parcels III-B and VII, Former Naval Training Center, San Diego, San Diego County, California,
August 2020.* All recipients receive electronically via email. Please provide your written
comments no later than September 21, 2020.

Thank you for your continued support of this program.  If you have any questions, please
contact Mr. Louie Cardinale, the Project Manager, at (619) 524-4564, or me at (619) 524-6073.

Sincerely,

LINZ.TAHIRIH.PAR Digitally signed by
LINZ.TAHIRIH.PARVINE.15171952
VINE.1517195258 58
Date: 2020.08.24 14:14:57 -07'00'

TAHIRIH LINZ
BRAC Environmental Coordinator
By direction of the Director

Enclosures:  1.  Draft Finding of Suitability to Transfer for Parcels III-B and VII, Former Naval
Training Center, San Diego, San Diego County, California

Copy to:
Ms. Kelly Dorsey                              Mr. Roger Mitchell
Kelly.Dorsey@waterboards.ca.gov               Roger.Mitchell@waterboards.ca.gov
California Water Quality Control Board         California Water Quality Control Board
2375 Northside Drive, Suite 100               2375 Northside Drive, Suite 100
San Diego, CA  92108                          San Diego, CA  92108

Copy to:  (cont'd next page)



**EXHIBIT**

**P**

5000-33B
Ser BPMOW.rlc/253
August 24, 2020

Copy to:
Lt. Karl Coulson
karl.coulson@usmc.mil
Marine Corps Recruiting Depot
4600 Belleau Avenue, Building 224
San Diego, CA  92140

Ms. Ruth Kolb
RKolb@sandiego.gov
Program Manager
Transportation and Storm Water
9370 Chesapeake Drive, Suite 100
San Diego, CA  92123

Mr. Drew Kleis
akleis@sandiego.gov
Deputy Director
City of San Diego
1200 Third Avenue, 11th Floor
San Diego, CA  92101

Mr. Frederick Ortlieb
fortlieb@sandiego.gov
Deputy City Attorney
City of San Diego
1200 Third Avenue 11th Floor
San Diego, CA  92101

Danielle Sakai, Esq
danielle.sakai@bbklaw.com
Best Best & Krieger, LLP
3390 University Ave, 5th Floor
Riverside, CA 92501

Mr. John Carter
jcarter@portofsandiego.org
San Diego Unified Port District
Office of the General Counsel
3165 Pacific Highway
San Diego, CA  92101

Mr. Lee Kaminetz
lkaminetz@san.org
General Counsel
San Diego County Regional
Airport Authority
P.O. Box 82776
San Diego, CA  92138

Thomas F. Vandenburg, Esq.
tvandenburg@wshblaw.com
Wood, Smith, Henning & Berman LLP
505 North Brand Boulevard Suite 1100
Glendale, CA 91203

Kris McFadden, Director
kmcfadden@sandiego.gov
City of San Diego Transportation &
Stormwater Department
202 C Street, 9th Floor
San Diego, CA 92010

Leslie FitzGerald, Esq
lfitzgerald@sandiego.gov
Senior Chief Deputy City Attorney
San Diego City Attorney's Office
1200 Third Avenue, Suite 1100
San Diego, CA 92101

Christina Bibler, Director
cbibler@sandiego.gov
City of San Diego Economic
Development Department
1200 Third Ave, 14th Floor
San Diego, CA 92101

David Siegenthaler
david_siegenthaler@nps.gov
National Park Service
333 Bush Street, Suite 500
San Francisco, CA  94104-2828

2

USN_0172573

5000-33B
Ser BPMOW.rlc/253
August 24, 2020

Blind copy to:
L. Cardinale (3 Hard copies with CDs)
Diane Silver, EV33.DS, NBSD Bldg. 3159 (1 copy Compliance,
 3 copies Administrative Record)
X Drive file
Serial file

Writer:  L. Cardinale
Typist:  J. Gonzalez

USN_0172574



10960 Wilshire Boulevard • 18th Floor • Los Angeles, CA • 90024-3804
**tel** 310-481-7600 • **fax** 310-481-7650 • wshblaw.com

Thomas F. Vandenburg
**direct dial** (310) 481-7607
**email** tvandenburg@wshblaw.com
**refer to** 10874-0001

September 21, 2020

***VIA E-MAIL AND CERTIFIED MAIL RETURN RECEIPT REQUESTED***

Tahirih Linz
BRAC Environmental Coordinator
Department of the Navy
Naval Facilities Engineering Command
BRAC Program Management Office West
33000 Nixie Way, Bldg 50, Suite 207
San Diego, CA 92147
E-Mail: tahirih.linz@navy.mil

> Re:   ***Department of the Navy's Draft Finding of Suitability to
> Transfer re NTC Boat Channel***
> Our Client:      City of San Diego

Dear Ms. Linz:

Please allow this correspondence to serve as a cover letter for the City of San Diego's (City) comments in response to the Department of the Navy's (DON) draft Finding of Suitability to Transfer (FOST) the Naval Training Center (NTC) Boat Channel, located in San Diego, California. The following summary of arguments, as well as the attached technical evaluation and expert declaration, conclusively illustrate that the NTC Boat Channel is <u>not</u> suitable for transfer.

The DON and the City entered into a Memorandum of Agreement on May 30, 2000 (MOA) for the conveyance of the former NTC property to the City, including the Boat Channel parcels, also known as Parcels IIIB and VII (FOST Property). The parties expressly acknowledged that the Boat Channel was contaminated, and the MOA explicitly governs the DON's investigation and remediation of the Boat Channel, as well as its subsequent transfer to the City. The MOA dictates that the "Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel



WOOD • SMITH • HENNING • BERMAN

Tahirih Linz
Our File No.: 10874-0001
September 21, 2020
Page 2

[IIIB and VII], as described in the NTC San Diego Reuse Plan dated August 1998."
(MOA §§ 2(c), 4(b)).[1]

Parcel IIIB is intended to be an economic benefit conveyance under the Defense Base
Closure and Realignment Act (DBCRA) § 2905(b)(4), and Parcel VII is intended to be a
public benefit conveyance. (MOA Recitals C, D). Consistent with the MOA, both of
these types of conveyances contain specific requirements for the protection of human
health and the environment, further outlined by CERCLA § 120 (42 U.S.C. § 9620, *et
seq*.). These requirements have not been met. They include, but are not limited to,
notice of the type and quantity of hazardous substances *currently* located on and within
the property, and that all remedial action necessary to protect human health and the
environment with respect to any such substance remaining on the property has been
taken before the date of the intended transfer.[2]

The DON's assessment of protection of human health and beneficial uses of the Boat
Channel as set forth in the draft FOST is insufficient to address the current conditions of
the FOST Property and its intended uses. As you can see from the attached
*Independent Evaluation of Pollution Contribution to the Naval Training Center Boat
Channel*, prepared by Michael Baker International (Independent Evaluation), the
deficiencies in the DON's purported assessment can be broken down into five main
areas.

First, the draft FOST illustrates that the DON has inadequately conducted the site
characterization investigation of the Boat Channel, as evidenced by its reliance on 22-
year old data to characterize its remediation efforts. Due to the age of these data, it is
clear that the DON has relied on site characterization information that is not
representative of current site conditions, as vast changes in the concentrations and
locations of pollutants of concern in the channel may have occurred through any
number of processes over the past two decades. Furthermore, these potential changes
would likely necessitate adjustments to the investigation and remediation activities
required to ensure the safety of human health and the environment. Without more
current data, it is impossible for the DON, or any other regulatory agency or party, to
confirm that no additional actions would be required to remove remaining contamination
at the Boat Channel.

---

[1] Memorandum of Agreement (MOA) between City and DON, May 30, 2000.

[2] 42 U.S.C. § 9620(h)(3).

USN_0179260

Tahirih Linz
Our File No.: 10874-0001
September 21, 2020
Page 3

Second, the DON has failed to address all of the existing contamination throughout the
entirety of the Boat Channel including, but not limited to, the slopes, improperly
disposed of potentially contaminated construction waste on the slopes, shorelines, and
shallower areas of the Boat Channel. As set forth in the *Independent Evaluation*, the
Boat Channel encompasses approximately 19 acres of land, parcels known as IIIB and
VII, which extend up to the top of the bank of the boat channel; however, "IR Site 12,"
includes only the submerged Boat Channel sediments.[3]  Additionally, no remediation of
Parcel IIIB has yet been performed as required by the MOA.  Also, the DON's remedial
investigation (RI) and post-dredge confirmation (PDC) were based on very limited data
collected. Only a single RI sample was taken from each area of ecological concern,
which is insufficient to provide an accurate and representative characterization of these
areas.  Moreover, no PDC sample was taken in areas where target dredging depths
were not met; therefore, it is unknown whether the dredging achieved remediation of the
contaminated sediment and protection of the environment. Further, no sediment
sampling in the areas of slopes (particularly those areas covered by construction
waste), and shorelines was conducted, rendering it impossible to assess the
environmental impacts of potential contamination in these areas, which are the closest
to the outfalls considered by the DON to be important conduits of contributing pollutants.

Third, the DON has failed to account for all legacy contamination including, but not
limited to, the landfill formerly located on the Naval Training Center/Camp Nimitz site
which lies adjacent to the Boat Channel. Reports commissioned by the DON show a
shallow aquifer under the old landfill (both a burn ash and solid waste site) where
groundwater in likely contact with the waste generally flows toward the Boat Channel[4].
However, this potentially significant source of contamination to the Boat Channel does
not appear to have been investigated. The failure to account for historical contamination
also includes legacy sewage discharges, post-1998 contamination, and historical Navy
activities that contributed to pollutant discharges.  The project's remedial action should

---

[3] This directly contradicts the assurances to the City in an email from DON
attorney Jack Wells to the City stating that the DON "views all of the boat channel to the
top of the bank as being part of the 'boat channel.' " (See email from Jack Wells to
Deputy City Attorney Rick Duvernay dated March 16, 2000.)

[4] 1999 Final Technical Memorandum, Base-wide Groundwater Evaluation for
Former Naval Training Center, San Diego, California by Bechtel National, Inc. *See also
Naval Training Center Boat Channel Technical Report*, prepared by Michael Baker
International, July 20, 2020.

Tahirih Linz
Our File No.: 10874-0001
September 21, 2020
Page 4

have accounted for contamination currently in existence at the site and should not have
been limited to pre-1998 releases and conditions.

Fourth, the analytes measured in samples collected for the RI and remedial action
completion report (RACR) are incomplete, and insufficient information is provided to
adequately evaluate sediment quality for contaminants of concern and sample
concentrations. Due to the DON's inadequate characterization, the Boat Channel most
likely has not been remediated to current regulatory standards and stated goals for the
projected uses of the Boat Channel.   It should also be noted that the Water Board, in its
June 24, 2016 response to the DON's Record of Decision, stated that the Boat Channel
is subject to CERCLA § 120(a)(4) requirements, and the Water Board thus reserved the
right to apply more stringent cleanup requirements to the property.

Fifth, the DON's remedial action was based on regulations that pre-dated the adoption
in 2008 of the 2009 Sediment Quality Objectives (SQO). The SQO requirements of the
Water Quality Control Plan for Enclosed Bays and Estuaries - Part 1 Sediment Quality
(State Water Board 2009) were not included because the Navy's 2018 remedial action
was based on an RI report completed 15 years prior in 2003.  As such, the Alternative
Cleanup Levels (ACLs) targeted by the DON's remedial action did not meet current
sediment remediation standards under California law, i.e., the 2009 SQOs.  While the
DON concluded that the 2009 SQOs were not Applicable or Relevant and Appropriate
Requirements (ARARs) under CERCLA, the DON failed to provide any explanation or
analysis as to why the 2009 SQOs are not relevant and appropriate.[5]  Contrary to the
DON's assertion, the 2009 SQOs are a relevant and appropriate requirement, and the
DON failed to formally waive those requirements in accordance with CERCLA.[6]
Moreover, the MOA requires cleanup to current regulatory standards, which the DON's
current level of remediation has failed to accomplish.

Additionally, on June 5, 2018, the State Water Resources Control Board adopted
Resolution No. 2018-0028, amending the Water Quality Control Plan for Enclosed Bays,
and Estuaries of California—Sediment Quality Provisions that were approved by the US
Environmental Protection Agency on March 11, 2019.  In accordance with the NTC San
Diego Reuse Plan dated August 1998, the Boat Channel is projected to provide habitat
for aquatic dependent wildlife as well as recreational use through angling, immersion

---

[5] *See* Final Feasibility Study (FS), p. 2-12; App. B, p. 15-16.

[6] See Final FS App. I, Responses to City of San Diego Comments, p. 25-27, #10;
see also 40 C.F.R. § 300.430(f)(5)(ii)(C).

**WOOD • SMITH • HENNING • BERMAN**

USN_0179262

Tahirih Linz
Our File No.: 10874-0001
September 21, 2020
Page 5

swimming, and wading at a planned beach.[7]  However, the DON has failed to develop
and achieve remedial action objectives that are both protective of these beneficial uses
and meet current regulatory requirements, including the SQOs.

In addition to the technical arguments above, the finding in the draft FOST that "All
Remedial Action Has Been Taken" is inaccurate and not supported by the facts. First,
the primary information upon which the draft FOST is based applies *only* to a *portion* of
the FOST Property, and not to the entire property. The FOST Property is defined as
Parcels III-B and VII, but only the sediments are included in IR Site 12, and only the
sediments were the focus of the DON's efforts. As explicitly stated in the draft FOST,
the IR Site 12 excludes the rip-rap banks, seawall portions, and slopes up to the top of
the bank of the Boat Channel. It is entirely possible that remedial response actions will
be necessary now or in the future on the FOST Property outside of IR Site 12. Thus, it is
inaccurate to state that all remedial action has been taken at the FOST Property.

Second, the remedy, which solely consisted of dredging, does not include measures to
control the potential migration of historical contaminants onto the FOST Property from
adjacent areas and storm drains. The draft FOST claims that "stormwater
discharges...[were] identified as [a] primary source[] of contaminants to the Boat
Channel;" yet the response action did nothing to investigate and/or remediate historic
contamination on the banks, in the riprap/construction debris, and along the shoreline
areas where the storm drains and surface waters have historically discharged into the
Boat Channel.  As a result, on-going sources of contamination likely remain at the
FOST Property which could re-contaminate the Boat Channel sediments. Therefore, all
remedial action has not been taken.

Third, the Water Board has never provided a "No Further Action" letter for the Boat
Channel (Parcels III-B and VII) that would serve to confirm that no additional
investigation or remediation is required. On the contrary, consistent with its prior
communications to the DON, the Water Board expressly indicated its expectation to be
involved in further remedial efforts.[8]  Moreover, neither the Water Board nor any other
regulatory agency has confirmed that the DON's remedial efforts are protective of
human health or issued a site closure based on the projected uses of the Boat Channel,

_____

[7] *Naval Training Center Boat Channel Technical Report*, prepared by Michael
Baker International, July 20, 2020.

[8] Water Board letter to DON dated 9/2/2020 re: Response to draft FOST; Water
Board letter to DON dated 4/16/2019 re: Final RACR; Water Board letter to DON dated
June 24, 2016 re: Record of Decision.

Tahirih Linz
Our File No.: 10874-0001
September 21, 2020
Page 6

as required by the MOA. Thus, it is incorrect to state that the Boat Channel is currently suitable for transfer.

In sum, the FOST Property is not suitable for transfer because the remedial action was based on outdated science, using stale and insufficient data, that was not representative of existing site conditions. The remedial action did not account for all legacy contamination, failed to assess and clean-up the entire FOST Property using current regulatory standards, and fails to mitigate the potential for re-contamination. The post-remediation confirmation sampling was inadequate. Finally, the DON did not receive a "No Further Action" letter from any regulatory agency for its remediation, but only an equivocal sign-off from the Water Board, which reserved its rights to pursue further site cleanup, leaving any transferee of the FOST Property exposed to further cleanup orders. Accordingly, the City submits this correspondence, as well as the enclosed declaration, comments, reports, and supporting documentation, to illustrate that the DON's draft FOST is insufficient to permit transfer of the Boat Channel to the City in its current condition.

Very truly yours,

WOOD, SMITH. HENNING & BERMAN LLP

By: _____

      THOMAS F. VANDENBURG
      STRATTON P. CONSTANTINIDES

TFV:spc
15607682.1:10874-0001

Memorandum of Agreement between USA and COSD dated May 30, 2000
MBI Independent Evaluation of Pollution Contribution to the NTC Boat Channel
Declaration of Steven Johnson

*Copied Via E-Mail*
Kristin Schwall, Water Quality Control Board <kristin.schwall@waterboards.ca.gov>
David Siegenthaler, National Park Service <david_siegenthaler@np.gov>
Kelly Dorsey, Water Quality Control Board <kelly.dorsey@waterboards.ca.gov>
Roger Mitchell, Water Quality Control Board <rodger.mitchell@waterboards.ca.gov>

USN_0179264

Tahirih Linz
Our File No.: 10874-0001
September 21, 2020
Page 7


Lt. Karl Coulson, Marine Corps Recruiting Depot <karl.coulson@usmc.mil>
Lee Kaminetz, San Diego County Regional Airport Authority <lkaminetz@san.org>
Ruth Kolb, City of San Diego <rkolb@sandiego.gov>
Drew Kleis, City of San Diego <akleis@sandiego.gov>
Kris McFadden, City of San Diego <kmcfadden@sandiego.gov>
Frederick Ortlieb, City of San Diego <fortlieb@sandiego.gov>
Leslie FitzGerald, City of San Diego <lfitzgerald@sandiego.gov>
Grace Lowenberg, City of San Diego <gclowenberg@sandiego.gov>
Danielle Sakai, Best Best & Krieger, LLP <danielle.sakai@bbklaw.com>
Christina Bibler, City of San Diego <cbibler@sandiego.gov>
Sumer Hasenin, City of San Diego <syhasenin@sandiego.gov>
John Carter, San Diego Unified Port District <jcarter@portofsandiego.org>
David Gibson, Water Quality Control Board <david.gibson@waterboards.ca.gov>
Ally Berenter, City of San Diego, Officer of the Mayor <aberenter@sandiego.gov>
Johnnie Perkins, Jr., City of San Diego <jlperkins@sandiego.gov>

*Copied Via Certified Mail, Return Receipt Requested*

Kristin Schwall                         David Siegenthaler
Water Quality Control Board             National Park Service
Northern Groundwater Cleanup Unit       333 Bush Street, Suite 500
2375 Northside Drive, Suite 100         San Francisco, CA 94104-2828
San Diego, CA 92108

**WOOD • SMITH • HENNING • BERMAN**

USN_0179265





## San Diego Regional Water Quality Control Board

December 16 2020

Ms. Tahirih Linz
BRAC Environmental Coordinator
Naval Facilities Engineering Command
Base Realignment and Closure
Program Management Office West
33000 Nixie Way, Building 50 Suite 207
San Diego, CA 92147
Sent via e-mail to: Tahirih.Linz@navy.mil

**In reply refer to / attn:**
**DOD100366600:KSchwall**



### Subject:   No Further Action for Installation Restoration Site 12, Boat Channel
Sediments, Former Naval Training Center, San Diego, California

Ms. Linz:

This letter confirms the completion of corrective action at Installation Restoration Site 12
(IR Site 12), Boat Channel Sediments, Former Naval Training Center, San Diego,
California. The California Regional Water Quality Control Board, San Diego Region
(San Diego Water Board) reviewed the information in the above-referenced file and
finds the cleanup of contaminated sediments at IR Site 12 is protective of human health
and the environment, and complies with appropriate federal and state statutes and
requirements. Therefore, the San Diego Water Board concludes that no further action
related to the cleanup of contaminated sediments at IR Site 12 is required.

**Remedial Action Background.** The Department of the Navy (Navy) developed the final
Record of Decision (ROD) for IR Site 12 based on the draft ROD[1] and comments
received from the San Diego Water Board, California Department of Fish and Wildlife,
and the City of San Diego. The Navy's final ROD identifies the selected remedy for IR
Site 12, which includes dredging contaminated sediments from seven areas of
ecological concern and disposing the dredged contaminated sediments at an off-site
regulated solid waste landfill. The San Diego Water Board signed the final ROD for IR
Site 12 in March 2017,[2] and prepared and approved a Mitigated Negative Declaration

---

[1] *Draft Record of Decision/Final Remedial Action Plan for Installation Restoration Site 12, Boat Channel
Sediments, Former Naval Training Center, San Diego, California, December 2016.* Available at:
https://documents.geotracker.waterboards.ca.gov/regulators/deliverable_documents/1289278924/Draft%
20NTC%20ROD%2012%201%202016_CD.1.pdf
[2] *Final Record of Decision/Final Remedial Action Plan for Installation Restoration Site 12, Boat Channel
Sediments Former Naval Training Center San Diego, California March 2017.* Available at:

HENRY ABARBANEL, Ph.D., CHAIR   |   DAVID GIBSON, EXECUTIVE OFFICER

Case 3:23-cv-00541-LL-VET Document 186-3 Filed 08/15/25 PageID.5354 Page 95 of 150

Ms. Linz                              - 2 -                        December 16, 2020

and Mitigation Monitoring Plan in accordance with the California Environmental Quality Act.

The Navy completed remedial actions at IR Site 12 in February 2018, and submitted the draft Remedial Action Completion Report (RACR) to the Restoration Advisory Board (RAB), the public, and the San Diego Water Board for review and comment.[3] The Navy also provided stakeholders with an opportunity to discuss the completion of the remedial action and achievement of cleanup goals during the RAB meeting on August 22, 2018. The San Diego Water Board and the City of San Diego provided the Navy with comments on the draft RACR. The Navy developed responses to these comments and included them in the final RACR.[4] The San Diego Water Board approved the Navy's final RACR on April 16, 2019,[5] stating that the selected remedy for IR Site 12 "is protective of the environment, complies with federal and state statutes and appropriate requirements, and is cost-effective".

In the subject line of any response, please include the reference code - **DOD100366600:KSchwall**. For questions or comments, please contact Ms. Kristin Schwall at (619) 521-3368, or Kristin.Schwall@waterboards.ca.gov.

Respectfully,

David W. Gibson

Digitally signed by David W. Gibson
Date: 2020.12.16 16:44:44 -08'00'

DAVID W. GIBSON
Executive Officer

DWG:rm:sm:ks

cc (via e-mail):     Mr. R. Louie Cardinale, BRAC Program Management Office West, rene.cardinale@navy.mil

| Tech Staff Info & Use | |
|---|---|
| GeoTracker ID | DOD100366600 |
| PCA Code | 16591 |
| FI$CAL ID | H47000 |

---

https://documents.geotracker.waterboards.ca.gov/regulators/deliverable_documents/7077137827/Boat%20Channel%20Final%20ROD%20Signed%2008082017.pdf

[3] *Draft Remedial Action Completion Report, Installation Restoration Site 12, Boat Channel Sediments, Former Naval Training Center San Diego, California, July 2018*. Available at: https://documents.geotracker.waterboards.ca.gov/regulators/deliverable_documents/2039364039/Site12_DraftRACR_July2018_part1.pdf

[4] *Final Remedial Action Completion Report, Installation Restoration Site 12, Boat Channel Sediments, Former Naval Training Center, San Diego, California, March 2019*. Available at: https://documents.geotracker.waterboards.ca.gov/regulators/deliverable_documents/7124928355/Final%20RACR%20Site%2012%20NTC%20SD%20(Vol%20I%20-%20Text%20Figs%20Apps%20A-%20K).pdf

[5] San Diego Water Board approval letter for the Final RACR. Available at: https://documents.geotracker.waterboards.ca.gov/regulators/deliverable_documents/5363826930/201904 16%20WB%20NFC%20Final%20RACR%20NTC%20Site%2012%20Boat%20Channel.pdf

CSD_00004240



10960 Wilshire Boulevard • 18th Floor • Los Angeles, CA • 90024-3804
**tel** 310-481-7600 • **fax** 310-481-7650 • wshblaw.com

Thomas F. Vandenburg
**direct dial** (310) 481-7607
**email** tvandenburg@wshblaw.com
**refer to** 10874-0001

February 26, 2021

***VIA ELECTRONIC MAIL ONLY***

David Gibson
Kristin Schwall
San Diego Regional Water Quality Control Board
Northern Groundwater Cleanup Unit
2375 Northside Drive, Suite 100
San Diego, CA 92108
E-Mail: david.gibson@waterboards.ca.gov
E-Mail: kristin.schwall@waterboards.ca.gov



Re:   ***San Diego Regional Water Quality Control Board's***
***No Further Action Letter, dated December 16, 2020***
**Reference ID No. DOD100366600**
Our Client:      City of San Diego

Dear Mr. Gibson and Ms. Schwall:

Please allow this correspondence to serve as the City of San Diego's (City) comments, objections, and request for clarification and additional information regarding the December 16, 2020 correspondence titled "No Further Action for Installation Restoration Site 12, Boat Channel Sediments, Former Naval Training Center, San Diego, California" (NFA Letter) transmitted by the San Diego Regional Water Quality Control Board (Regional Board) to the BRAC Environmental Coordinator, Naval Facilities Engineering Command, Department of the Navy (DON). The NFA Letter concluded that "no further action related to the cleanup of contaminated sediments at IR Site 12 is required."

**Scope of No Further Action Letter**

As you are aware, Installation Restoration (IR) Site 12 is a portion of the waterway/sediments commonly known as the Boat Channel at the former Naval Training Center (NTC) property. The DON is attempting to transfer portions of the Boat Channel – including Parcels III-B and VII to the top of their banks and IR Site 12 – to the City. It is the City's understanding, however, that the NFA Letter only applies to IR Site 12, and does not include the banks, slopes, shorelines, and shallow areas of the NTC

WOOD • SMITH • HENNING • BERMAN

CITY 00003742

David Gibson
Kristin Schwall
Our File No.: 10874-0001
February 26, 2021
Page 2

Boat Channel (collectively referred to as the "banks") which are also included in Parcels
III-B and VII.

To date, the DON has not completed an investigation or remediation of the banks
adjacent to IR Site 12, despite the DON's previous statements that stormwater
discharges were a primary source of contamination to the Boat Channel.[1] Indeed, the
DON's remedial action has consisted solely of dredging submerged sediments and has
not included measures to remediate and/or control the potential migration of historical
contaminants (including contamination from riprap/construction debris) from the banks
onto IR Site 12, nor did it account for all legacy contamination, including potential
contamination from the landfill formerly located on the NTC/Camp Nimitz site. As a
result: (i) the banks remain a potential source of contamination, and (ii) it is highly likely
that IR Site 12 could become re-contaminated through runoff and stormwater
discharges from the banks and/or other legacy contamination, exposing the City to
potential cleanup and investigative orders if the Boat Channel parcels are transferred to
the City in their current state.[2]

## April 16, 2019 Letter from the Regional Board

On April 16, 2019, the Regional Board issued a letter regarding the DON's Final
Remedial Action Completion Report (Final RACR) titled, "Remedial Action Completion
Report, Installation Restoration Site 12, Boat Channel Sediments, Former Naval
Training Center, San Diego, California" (April 2019 Final RACR Letter) wherein the
Regional Board concluded it had "no further comments" on the Final RACR, but did not
issue a "no further action" determination.

The DON subsequently submitted its draft Findings of Suitability to Transfer (FOST) the
NTC Boat Channel, wherein it relied on the April 2019 Final RACR Letter in support of
its position that the property is suitable for transfer. The City, however, cited to the

---

[1] Final Feasibility Study (FS) p.2-20; Final FS App. I, Responses to City of San Diego Comments, p. 24-
25, #9 and p. 28, #12. Final Record of Decision/Remedial Action Plan pp. 2-7 – 2-8.

[2] The DON's remedial action was also based on (i) 20-year old data which was likely not representative
of current conditions and (ii) regulations that pre-dated the adoption of the 2009 Sediment Quality
Objections and therefore did not meet current sediment remediation standards under California law.

WOOD • SMITH • HENNING • BERMAN

CITY 00003743

David Gibson
Kristin Schwall
Our File No.: 10874-0001
February 26, 2021
Page 3

Regional Board's failure to issue a "no further action" letter as evidence, among other
things, that the property was not suitable to transfer.

While the City is not aware of *any* additional investigation or remediation by the DON at
the NTC Boat Channel since the Regional Board's prior issuance of the April 2019 Final
RACR Letter, the Regional Board unexpectedly issued the NFA Order on December 16,
2020, finding no further action necessary for IR Site 12. As such, the City is seeking
additional information and clarification regarding why the Regional Board issued the
NFA Letter twenty (20) months after the April 2019 Final RACR Letter, without any
additional investigation or remediation conducted at the NTC Boat Channel.

**Petition for Review**

Based on the foregoing, as well as additional arguments set forth in the City's FOST
Comment Letter, the City submitted a Petition for Review to the State of California,
State Water Resources Control Board (State Board) on January 15, 2021 to challenge
and object to the Regional Board's issuance of the NFA Letter. As noted in the City's
FOST Comment Letter (September 21, 2020) and Petition for Review re the Regional
Board's NFA Letter (January 15, 2021), the City maintains that the DON has failed to
adequately investigate and remediate the NTC Boat Channel (1) to ensure the
protection of human health and the environment, and (2) to levels suitable for
transferring the property to the City. It is the City's position that the State Board should
grant this Petition and direct the Regional Board to require the DON to address the
issues raised by the City on numerous occasions.

**Public Records Request and Request for Additional Information**

In addition to the attached Public Records Act request for information and documents
related to the above-stated items, the City respectfully requests that the Regional Board
provide clarification regarding:

- The scope of the December 16, 2020 NFA Letter, including whether the NFA Letter
  applies to Parcels III-B and VII in their entirety, including to the top of the banks,
  slopes, shorelines, and shallower areas of the NTC Boat Channel.

CITY 00003744



**Naval Facilities Engineering Systems Command Southwest
Base Realignment and Closure Program Management Office
West
San Diego, California**

**FINAL
FINDING OF SUITABILITY TO TRANSFER FOR
PARCELS III-B AND VII**

FORMER NAVAL TRAINING CENTER, SAN DIEGO
SAN DIEGO COUNTY, CALIFORNIA

**MARCH 2021**

**Approved for public release: distribution is unlimited.**



EXHIBIT

U



**Naval Facilities Engineering Systems Command Southwest**
**Base Realignment and Closure Program Management Office West**
**San Diego, California**

**FINAL**
**FINDING OF SUITABILITY TO TRANSFER FOR PARCELS III-B AND VII**

FORMER NAVAL TRAINING CENTER, SAN DIEGO
SAN DIEGO COUNTY, CALIFORNIA

**MARCH 2021**

DCN: TRBW-0202-4895-0007

**Prepared for:**



**Department of the Navy**
**Naval Facilities Engineering Systems Command Southwest**
**BRAC PMO West**
**33000 Nixie Way, Building 50**
**San Diego, CA 92147**

**Prepared by:**

 **9775 Businesspark Avenue, Suite 200**
**San Diego, California 92131**

Contract Number: N62473-18-D-0202; Delivery Order Number: N6247319F4895

USN_0514557

In 2016, the Navy released a Proposed Plan (PP) presenting the remedial action
alternatives under consideration for IR Site 12, with a public comment period, and held
a public meeting attended by community members, Restoration Advisory Board
members, representatives of the Navy and the San Diego Regional Water Quality
Control Board (Water Board).

The Final Record of Decision/Final Remedial Action Plan (ROD/RAP) documenting the
selected remedy for IR Site 12, Boat Channel sediments, was signed by the Navy on
March 28, 2017, after the Water Board concurred with the Final ROD/RAP on March 27,
2017.  The Final ROD/RAP documents the public comment period and public meeting
held for the PP and included responses to comments on the PP from the public in the
Responsiveness Summary (Attachment E to the Final ROD/RAP).  The City of San
Diego, the California Department of Fish and Wildlife, and the Water Board commented
on the draft ROD/RAP as documented in Attachment G of the Final ROD/RAP.  As
required by the California Environmental Quality Act, the Water Board prepared and
approved a Mitigated Negative Declaration and Mitigation Monitoring Plan.

The selected remedy was to dredge contaminated sediment within the AOEC to a depth
of 1 to 2 feet (approximately 23,200 cubic yards) and dispose of the dredge material off
site at a permitted and regulated solid waste landfill (Navy 2017).

The remedial action for IR Site 12 was completed in February 2018.  The Final RACR
for IR Site 12 documents that completion with a total of 31,057 cubic yards of sediment
being removed from the Boat Channel and transported for off-site disposal at a
permitted and regulated solid waste landfill (Parsons 2019).  The Water Board
concurred with the RACR stating that the Navy's selected remedy "is protective of the
environment, complies with federal and state statutes and appropriate requirements,
and is cost-effective" (Water Board 2019). The Water Board confirmed the completion of
the cleanup in a December 2020 letter concluding that "no further action related to the
cleanup of contaminated sediments at IR Site 12 is required" (Water Board 2020).

## 3.2    Resource Conservation and Recovery Act

Former NTC San Diego was not a Resource Conservation and Recovery Act (RCRA)-
permitted hazardous waste facility, and no RCRA Part A or B permits were issued for
this facility.  The Navy has no corrective action obligations at former NTC San Diego
with respect to such permits.

## 3.3    Petroleum Products and Derivatives

The Water Board administers the Underground Storage Tank (UST) corrective action
program at former NTC San Diego pursuant to RCRA Subtitle I and §§ 25280-25299.8

USN_0514567



10960 Wilshire Boulevard • 18th Floor • Los Angeles, CA • 90024-3804
**tel** 310-481-7600 • **fax** 310-481-7650 • wshblaw.com

Thomas F. Vandenburg
**direct dial** (310) 481-7607
**email** tvandenburg@wshblaw.com
**refer to** 10874-0001

April 7, 2021

***VIA ELECTRONIC MAIL ONLY***

Tahirih Linz
BRAC Environmental Coordinator
Department of the Navy
Naval Facilities Engineering Command
BRAC Program Management Office West
33000 Nixie Way, Bldg 50, Suite 207
San Diego, CA 92147
E-Mail: tahirih.linz@navy.mil

        Re:    ***Department of the Navy's Finding of Suitability to Transfer re***
               ***NTC Boat Channel – Rescission of No Further Action Letter***
               Our Client:     City of San Diego

Dear Ms. Linz:

Please allow this correspondence to serve as the City of San Diego's (City) comments in response to the Department of the Navy's (DON) March 2021 Finding of Suitability to Transfer (FOST) the Naval Training Center (NTC) Boat Channel, located in San Diego, California. The City incorporates herein all the facts, objections, and arguments set forth in its prior comments and correspondence, including the City's September 21, 2020 Draft FOST Comment Letter and associated technical memoranda, which conclusively (and again) illustrate that NTC Parcels III-B and VIII (Boat Channel) are <u>not</u> suitable for transfer.

Among many other objections to the draft FOST, the City pointed out that the Water Board had never provided a "No Further Action" letter for the FOST Property (which consists of Boat Channel Parcels III-B and VII) that would serve to confirm that no additional investigation or remediation is required. In fact, the Water Board had expressly indicated its expectation to be involved in further remedial efforts.

Subsequent to the City's Draft FOST Comment Letter, and apparently in response to that specific objection, correspondence between the DON and the Water Board illustrates that the DON contacted the Water Board and requested a "No Further Action"

WOOD • SMITH • HENNING • BERMAN



Tahirih Linz
Our File No.: 10874-0001
April 7, 2021
Page 2

Letter for IR Site 12 (which only includes the sediments within Boat Channel Parcels III-B and VII and does not cover the riprap, banks, slopes, shorelines or shallower areas of the Boat Channel). The letter was negotiated between the DON and the Water Board, and was subsequently issued on December 16, 2020 ("NFA Letter"). Based thereon, the DON revised its Draft FOST to include the following representation:

> "The Water Board confirmed the completion of the cleanup in a December 2020 letter concluding that "no further action related to the cleanup of contaminated sediments at IR Site 12 is required" (Water Board 2020)."

Furthermore, in response to the City's September 21, 2020 Draft FOST Comment Letter, the DON stated as follows:

> "Subsequent to the release of the Draft FOST, the Water Board issued a No Further Action letter (Attachment 2) to the Navy which addresses the City's objection that absent the letter, the FOST cannot conclude that "all remedial action necessary to protect human health and the environment with respect to any such [hazardous] substance remaining on the property has been taken".
>
> […]
>
> The NFA letter satisfies that MOA provision in concluding that no further action related to the cleanup of "IR Site 12" is required."[1]

However, the Water Board subsequently issued a letter entitled *Recission [sic] of No Further Action Letter for Installation Restoration Site 12, Boat Channel Sediments, Former Naval Training Center, San Diego, California* ("NFA Rescission Letter") on March 24, 2021. The NFA Rescission Letter effectively "rescinded" the Water Board's December 16, 2020 NFA Letter, thereby eliminating the DON's ability to rely on the NFA Letter to support its claim that all required remediation has occurred related to IR Site 12, particularly with regard to ensuring that remedial efforts were protective of human health. In addition, the April 16, 2019 No Further Comment letter only applies to IR Site

---

[1] It should be noted that the NFA Letter only applied to IR Site 12, and not to Parcels III-B and VII in their entirety, and therefore, it did not provide the complete site closure necessary to effectuate transfer under the MOA. Regardless, rescission of the NFA Letter further demonstrates that transfer is not appropriate as it shows that even IR Site 12 has not been adequately remediated.

WOOD • SMITH • HENNING • BERMAN

CITY 00003528

Tahirih Linz
Our File No.: 10874-0001
April 7, 2021
Page 3

12, which covers only a portion of Parcels III-B and VII.  No site closure has been
issued for the entirety of Parcels III-B and VII as required by the MOA.

Based on the foregoing, the City again reiterates that the Water Board has not provided
any confirmation with respect to the Boat Channel that no additional investigation or
remediation is required.  On the contrary, consistent with its prior communications to the
DON, the Water Board has expressly indicated its expectation to be involved in further
remedial efforts as reflected by the Water Board's previous equivocal sign-off which
reserved its rights to pursue further site cleanup, leaving any transferee of the FOST
Property exposed to further cleanup orders.  Specifically, the Water Board's April 16,
2019 correspondence regarding the DON's March 2019 Final Remedial Action
Completion Report states that the Water Board "looks forward to continuing to assist
with these efforts" concerning investigation and remediation of environmental
contamination in the Boat Channel.  Therefore, as discussed above, **neither the Water
Board nor any other regulatory agency has confirmed that the DON's remedial
efforts are protective of human health and site closure has not been issued based
on the projected uses of the Boat Channel or for the entirety of Parcels III-B and
VII, as required by the MOA**.  Thus, the Boat Channel is not suitable for transfer.

Accordingly, the City reiterates all of its objections set forth in the City's September 21,
2020 Draft FOST Comment Letter and submits this correspondence to further illustrate
that the DON's FOST is insufficient to permit transfer of the Boat Channel to the City in
its current condition.

Very truly yours,

WOOD, SMITH. HENNING & BERMAN LLP

By: _____
        THOMAS F. VANDENBURG
        STRATTON P. CONSTANTINIDES

TFV:spc
20722950.1:10874-0001

*Copied Via E-Mail*
David Gibson, Water Quality Control Board <david.gibson@waterboards.ca.gov>
Kristin Schwall, Water Quality Control Board <kristin.schwall@waterboards.ca.gov>

CITY 00003529

Tahirih Linz
Our File No.: 10874-0001
April 7, 2021
Page 4


David Siegenthaler, National Park Service <david_siegenthaler@nps.gov>
Kelly Dorsey, Water Quality Control Board <kelly.dorsey@waterboards.ca.gov>
Roger Mitchell, Water Quality Control Board <roger.mitchell@waterboards.ca.gov>
Lt. Karl Coulson, Marine Corps Recruiting Depot <karl.coulson@usmc.mil>
Lee Kaminetz, San Diego County Regional Airport Authority <lkaminetz@san.org>
Ruth Kolb, City of San Diego <rkolb@sandiego.gov>
Drew Kleis, City of San Diego <akleis@sandiego.gov>
Kris McFadden, City of San Diego <kmcfadden@sandiego.gov>
Grace Lowenberg, City of San Diego <gclowenberg@sandiego.gov>
Danielle Sakai, Best Best & Krieger, LLP <danielle.sakai@bbklaw.com>
Christina Bibler, City of San Diego <cbibler@sandiego.gov>
John Carter, San Diego Unified Port District <jcarter@portofsandiego.org>
Ally Berenter, City of San Diego, Officer of the Mayor <aberenter@sandiego.gov>
Alia Khouri, City of San Diego <EKhouri@sandiego.gov>
Nicole Denow, City of San Diego <ndenow@sandiego.gov>

WOOD • SMITH • HENNING • BERMAN

CITY 00003530



**Naval Facilities Engineering Systems Command Southwest
Base Realignment and Closure Program Management Office
West
San Diego, California**

**REVISION 1 FINAL
FINDING OF SUITABILITY TO TRANSFER FOR
PARCELS III-B AND VII**

FORMER NAVAL TRAINING CENTER, SAN DIEGO
SAN DIEGO COUNTY, CALIFORNIA

**APRIL 2021**

**Approved for public release: distribution is unlimited.**



USN_0173527



**Naval Facilities Engineering Systems Command Southwest
Base Realignment and Closure Program Management Office
West
San Diego, California**

**REVISION 1 FINAL
FINDING OF SUITABILITY TO TRANSFER FOR
PARCELS III-B AND VII**

FORMER NAVAL TRAINING CENTER, SAN DIEGO
SAN DIEGO COUNTY, CALIFORNIA

**APRIL 2021**

DCN: TRBW-0202-4895-0007.R1

**Prepared for:**



**Department of the Navy
Naval Facilities Engineering Systems Command Southwest
BRAC PMO West
33000 Nixie Way, Building 50
San Diego, CA 92147**

**Prepared by:**

 **9775 Businesspark Avenue, Suite 200
San Diego, California 92131**

Contract Number: N62473-18-D-0202; Delivery Order Number: N6247319F4895

## Section 1    **Purpose**

The purpose of this Finding of Suitability to Transfer (FOST) is to summarize how the requirements and notifications for hazardous substances, petroleum products, and other regulated materials have been satisfied on property described in Section 2.0 located on the former Naval Training Center (NTC), San Diego located in San Diego, California.

This FOST has been prepared in accordance with the Department of Defense (DoD) Base Redevelopment and Realignment Manual (DoD 2006) and the Department of the Navy (Navy) Base Realignment and Closure Program Management Office (BRAC PMO) Policy for Processing Findings of Suitability to Transfer or Lease (Navy 2008).

USN_0173533

Finding of Suitability to Transfer for Parcels III-B and VII
Former Naval Training Center San Diego, California                    Purpose

*This page intentionally left blank.*

USN_0173534

Finding of Suitability to Transfer for Parcels III-B and VII
Former Naval Training Center San Diego, California                    Property Description

## Section 2    Property Description

The former NTC San Diego is located within the City and County of San Diego, is
approximately 2.5 miles northwest of downtown San Diego, and occupies approximately
540 acres near the northernmost point of San Diego Bay (Figure 1).  The subject
property of this FOST includes two parcels, Parcels III-B (approximately 13 acres) and
VII (approximately 44 acres).  The two parcels total approximately 57 acres and are
collectively referred to as the FOST Property (Figure 2).

The FOST Property is within the Boat Channel that starts in the Marine Corps Recruit
Depot (MCRD) and transects the former NTC San Diego.  The portion of the Boat
Channel that is within the MCRD boundary is not part of the FOST Property (Figure 2).

The sediments of the Boat Channel have been designated as Installation Restoration
(IR) Site 12 and the portions of IR Site 12 that are on former NTC San Diego property
are included in the FOST Property (Figure 2).  The rip-rap banks, or seawall portions of
the FOST Property are not part of IR Site 12.

During the reuse planning process, the former NTC San Diego property was divided into
10 reuse parcels.  All parcels have been transferred to date except for the two parcels
that comprise the FOST Property.

USN_0173535

Finding of Suitability to Transfer for Parcels III-B and VII
Former Naval Training Center San Diego, California                    Property Description

*This page intentionally left blank.*

USN_0173536

## Section 3    Summary of Environmental Conditions

This section summarizes the environmental conditions and actions taken to satisfy requirements related to hazardous substances, petroleum products, and other regulated materials on the FOST Property.

### 3.1    Comprehensive Environmental Response, Compensation, and Liability Act

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 United States Code (U.S.C.) Section (§) 9601 *et seq*., also known as Superfund, addresses environmental releases or threatened releases of hazardous substances to the air, surface water, groundwater, sediment, or soil.  The National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 Code of Federal Regulations (CFR) Part 300, is the regulation that implements CERCLA.  In 1986, Congress amended CERCLA by enacting the Superfund Amendments and Reauthorization Act (SARA), which mandated that DoD follow the same cleanup regulations that apply to private entities.  SARA also established the Defense Environmental Restoration Program (DERP).  The DoD conducts environmental restoration through the DERP.  The Navy Installation Restoration Program was designed to identify and clean up contamination from hazardous substances, pollutants, and contaminants resulting from past Navy activities to protect human health and the environment at present and former Navy installations.

The Navy has the authority to select and undertake CERCLA response actions, including remedial actions, at IR Site 12.  In 1995, the Boat Channel sediments were identified as IR Site 12.  IR Site 12 is the only IR Site located within the FOST Property.

As detailed below, a remedial investigation, a feasibility study, selection and implementation of a final remedial action, and a remedial action completion report (RACR) for IR Site 12, have been completed in accordance with CERCLA, the NCP, and the DERP.  An Administrative Record for IR Site 12 response actions is maintained by the Navy.

The Final Remedial Investigation (RI) Report for IR Site 12, (BEI 2003), identified an "Area of Ecological Concern" (AOEC) where the data used in assessing ecological risk for benthic invertebrates — chemistry, toxicity, and benthic community structure — indicated potential risk to the benthic invertebrate community.  The chemicals of ecological concern (COECs) identified for the Boat Channel sediment AOEC were copper, lead, zinc, total chlordane, and total dichlorodiphenyltrichloroethane also known as DDT.

USN_0173537

In 2016, the Navy released a Proposed Plan (PP) presenting the remedial action
alternatives under consideration for IR Site 12, with a public comment period, and held
a public meeting attended by community members, Restoration Advisory Board
members, representatives of the Navy and the San Diego Regional Water Quality
Control Board (Water Board).

The Final Record of Decision/Final Remedial Action Plan (ROD/RAP) documenting the
selected remedy for IR Site 12, Boat Channel sediments, was signed by the Navy on
March 28, 2017, after the Water Board concurred with the Final ROD/RAP on March 27,
2017.  The Final ROD/RAP documents the public comment period and public meeting
held for the PP and included responses to comments on the PP from the public in the
Responsiveness Summary (Attachment E to the Final ROD/RAP).  The City of San
Diego, the California Department of Fish and Wildlife, and the Water Board commented
on the draft ROD/RAP as documented in Attachment G of the Final ROD/RAP.  As
required by the California Environmental Quality Act, the Water Board prepared and
approved a Mitigated Negative Declaration and Mitigation Monitoring Plan.

The selected remedy was to dredge contaminated sediment within the AOEC to a depth
of 1 to 2 feet (approximately 23,200 cubic yards) and dispose of the dredge material off
site at a permitted and regulated solid waste landfill (Navy 2017).

The remedial action for IR Site 12 was completed in February 2018.  The Final RACR
for IR Site 12 documents that completion with a total of 31,057 cubic yards of sediment
being removed from the Boat Channel and transported for off-site disposal at a
permitted and regulated solid waste landfill (Parsons 2019).  The Water Board
concurred with the RACR in a No Further Comment (NFC) letter dated April 16, 2019
stating that the Navy's selected remedy "is protective of the environment, complies with
federal and state statutes and appropriate requirements, and is cost-effective" (Water
Board 2019). The Water Board confirmed the completion of the cleanup with the NFC
letter on the RACR and with the closed status of IR Site 12 noted in Geotracker, the
Water Board's database (Water Board 2021).

## 3.2    Resource Conservation and Recovery Act

Former NTC San Diego was not a Resource Conservation and Recovery Act (RCRA)-
permitted hazardous waste facility, and no RCRA Part A or B permits were issued for
this facility.  The Navy has no corrective action obligations at former NTC San Diego
with respect to such permits.

USN_0173538

## 3.3    Petroleum Products and Derivatives

The Water Board administers the Underground Storage Tank (UST) corrective action program at former NTC San Diego pursuant to RCRA Subtitle I and §§ 25280-25299.8 of the California Health and Safety Code.  The authority of the Water Board to require corrective action at UST sites is set forth in Title 23 California Code of Regulations Division 3, Chapter 16.  The Navy implements petroleum corrective action activities at former NTC San Diego in coordination with the Water Board.  No USTs were located within the FOST Property.

## 3.4    Munitions Response Program

Under the Munitions Response Program (MRP), the Navy conducted a search to address munitions and explosives of concern (MEC) and munition constituents from past on-site activities.  The 1994 Community Environmental Response Facilitation Act Environmental Baseline Survey included an inspection, a comprehensive document review, and personnel interviews to establish the history of MEC use, storage, and disposal at former NTC San Diego (Bechtel 1994).  There are no MRP sites within the FOST Property.

## 3.5    Asbestos-Containing Material

DoD policy is to manage asbestos-containing material (ACM) in a manner protective of human health and the environment, and to comply with all applicable federal, state, and local laws and regulations governing ACM hazards in or on buildings, structures, facilities, and utilities on the property (DoD 1994).  Unless a competent authority concludes that ACM on the property poses a threat to human health at the time of transfer, all property containing ACM is conveyed, leased, or otherwise disposed of "as-is" through the BRAC process.  If known friable ACM exists in a building, occupation of the building will be prohibited until the friable ACM has been abated or the building is demolished by a transferee.

There are no buildings within the FOST Property.

## 3.6    Lead-Based Paint

Lead-based paint (LBP) hazards are defined in the Federal Residential Lead-Based Paint Hazard Reduction Act of 1992 (Title X of Public Law 102550), as codified in 42 U.S.C. § 4822 as "any condition that causes exposure to lead that would result in adverse health effects."  The act provides for regulation of the lead hazard from LBP. Hazards include lead-contaminated dust and soil for target housing only.  The act defines target housing as any housing constructed before 1978, except any housing for

USN_0173539

the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in housing for the elderly or persons with disabilities) or any zero-bedroom dwelling. Under the act, the Navy is required to disclose the presence of known LBP and/or LBP hazards prior to the sale or transfer of property to a non-federal entity.

There are no buildings, therefore no LBP is presumed to be within the FOST Property.

## 3.7    Polychlorinated Biphenyls

DoD policy guidance for polychlorinated biphenyls (PCBs) is based on the Toxic Substances Control Act regulations found in Title 40 of the CFR Part 761. Beginning in the 1980s, the Navy began a program to remove or replace all transformers containing PCBs. A PCB abatement program was initiated at former NTC San Diego in 1988 and the last PCB-containing transformer was retrofilled in April 1996.

A review of documents and reports concludes that no PCB transformers or related releases were located within the FOST Property.

## 3.8    Pesticides

The FOST Property may contain residue from pesticides that have been applied in the management of the former NTC San Diego and surrounding properties. Pesticides identified as IR Site 12 sediment COECs were remediated under CERCLA and are discussed in Section 3.1. The Navy knows of no use of any registered pesticide in a manner inconsistent with its labeling and believes that all applications were made in accordance with the Federal Insecticide, Fungicide, and Rodenticide Act, Title 7 U.S.C. § 136, *et seq.*, its implementing regulations, and according to the labeling provided with these substances. It is the Navy's position that it has no obligation under the covenants provided pursuant to § 120(h)(3)(A)(ii) of CERCLA, Title 42 U.S.C. § 9620(h)(3)(A)(ii), for the remediation of legally applied pesticides.

## 3.9    Emerging Contaminants

Perfluorinated compounds (PFCs) or per- and polyfluoroalkyl substances (PFAS), including perfluorooctanoic acid (PFOA) and perfluorooctane sulfonic acid (PFOS), are currently classified as unregulated or "emerging" contaminants. In May 2016, the U.S. Environmental Protection Agency (U.S. EPA) issued a Lifetime Health Advisory to provide Americans, including the most sensitive populations, with a margin of protection from a lifetime of exposure to PFOA and PFOS in drinking water (U.S. EPA 2016). U.S. EPA established the health advisory level at 70 parts per trillion (ppt) for the combined concentrations of PFOA and PFOS in drinking water.

USN_0173540

Finding of Suitability to Transfer for Parcels III-B and VII
Former Naval Training Center San Diego, California          Summary of Environmental Conditions

No beneficial uses have been established for groundwater in the Point Loma Hydrologic area, and groundwater in the Coronado Hydrologic unit has been exempted from the designation of beneficial use as a municipal groundwater supply (BEI 2003).  PFAS have not been used or stored within the FOST Property.

## 3.10    Adjacent Property

This section provides an analysis of potential environmental impacts caused by adjacent property conditions related to hazardous substances, petroleum products, and other regulated materials.

The FOST Property is located adjacent to or near closed former NTC San Diego IR sites (IR Sites 4, 10, and 14) (Figure 2).  These closed sites will not affect the FOST Property as the lateral and vertical extent of contamination has been fully characterized, and response actions are complete.

The MCRD is located adjacent to the FOST Property and operates a boat dock to store recreational boats in the northeast portion of the Boat Channel basin.  The sediments of the MCRD portion of the boat channel were included in the completed IR Site 12 response action and therefore will not impact the FOST Property.  MCRD also has two closed UST sites adjacent to or near the FOST Property (Cogeneration Plant and Combustion Turbine).  These closed sites will not affect the FOST Property as the lateral and vertical extent of contamination has been fully characterized, and response actions are complete.

Stormwater discharge and atmospheric deposition from surrounding areas, including the former NTC San Diego, MCRD, San Diego International Airport, and properties within the Port District and the City of San Diego, have been identified as primary sources of the contaminants in IR Site 12, the Boat Channel sediments.  The sediments were remediated during the completed IR Site 12 response action and therefore will not impact the FOST Property.

USN_0173541

Finding of Suitability to Transfer for Parcels III-B and VII
Former Naval Training Center San Diego, California          Summary of Environmental Conditions

*This page intentionally left blank.*

USN_0173542

Case 3:23-cv-00541-LL-VET    Document 186-3    Filed 08/15/25    PageID.5377    Page
118 of 150

Finding of Suitability to Transfer for Parcels III-B and VII                Summary of Deed Covenants,
Former Naval Training Center San Diego, California                Restrictions, and Notifications

# Section 4    Summary of Deed Covenants, Restrictions, and Notifications

This section summarizes the deed covenants, restrictions, and notifications, if any, associated with the FOST Property related to CERCLA, petroleum products and derivatives, ACM, LBP, and pesticides.

## 4.1    Comprehensive Environmental Response, Compensation, and Liability Act

### 4.1.1    CERCLA § 120(h)(3)(A)(i)(I) Notice

Pursuant to CERCLA § 120(h)(3)(A)(i)(I), (II) and (III), any deed(s) transferring the FOST Property will contain a notice providing available information regarding the type, quantity, and location of hazardous substances, and the time when these substances were stored, released, or disposed of, as defined in CERCLA § 120(h), and a description of the remedial action taken, if any, on the FOST Property.  A "Hazardous Substances Notification," provides this notice (Attachment A).

### 4.1.2    CERCLA § 120(h)(3)(A)(ii)(I) Covenant

#### 4.1.2.1    All Remedial Action Has Been Taken

Pursuant to CERCLA § 120(h)(3)(A)(ii)(I), any deed(s) transferring the FOST Property will contain a covenant warranting that all remedial action necessary to protect human health and the environment with respect to any hazardous substance, as defined in CERCLA § 120(h), remaining on the FOST Property has been taken.

#### 4.1.2.2    Additional Remediation Obligation

Pursuant to CERCLA § 120(h)(3)(A)(ii)(II), any deed(s) transferring the FOST Property is required to contain a covenant warranting that any additional remedial action found to be necessary in the FOST Property after the date of such transfer shall be conducted by the United States.

However, under CERCLA § 120(h)(3)(B), the requirement to include the CERCLA § 120(h)(3)(A)(ii) covenant in the deed does not apply in any case in which the entity to which the property is transferred is a potentially responsible party (PRP) with respect to the property transferred by the United States.

### 4.1.3    CERCLA § 120(h)(3)(A)(iii) Access Clause

Pursuant to CERCLA § 120(h)(3)(A)(iii), any deed(s) transferring the FOST Property will contain a clause retaining and reserving a perpetual and assignable easement and right

USN_0173543

Finding of Suitability to Transfer for Parcels III-B and VII        Summary of Deed Covenants,
Former Naval Training Center San Diego, California        Restrictions, and Notifications

of access on, over, and through the FOST Property, to enter upon the FOST Property in
any case when remedial action or corrective action is found to be necessary on the part
of the United States after the date of such transfer, without regard to whether such
remedial action or corrective action is on the FOST Property or on adjoining or nearby
lands.

## 4.2     Asbestos-Containing Material

Any deed(s) transferring the FOST Property will contain a notification to the transferee
that hazardous materials in the form of asbestos or ACM have been found and are
otherwise presumed to exist in utilities (above and underground) and structures
(including but not limited to currently inaccessible demolition debris that may contain
ACM wrapping such as fuel, hot-water or other pipelines) on the FOST Property.

## 4.3     Pesticides

Any deed(s) transferring the FOST Property will contain a notification to the transferee
that the property may contain pesticide residue from pesticides that have been applied
in the management of former NTC San Diego and that there has been no known use of
any registered pesticide in a manner inconsistent with its labeling.

USN_0173544

## Section 5    Finding of Suitability to Transfer Statement

Based on the information contained in this FOST and the notifications, restrictions, and covenants that will be contained in the deed(s), the FOST Property is suitable for transfer.


Signature: _____    Date: _____

                Lawrence Lansdale
                Environmental Director
                Base Realignment and Closure Program Management Office
                Naval Facilities Engineering Command
                By direction

USN_0173545

1 Thomas F. Vandenburg (State Bar No. 163446)
  tvandenburg@wshblaw.com
2 Stratton P. Constantinides (State Bar No. 305103)
  sconstantinides@wshblaw.com
3 **WOOD, SMITH, HENNING & BERMAN LLP**
  10960 Wilshire Boulevard, 18th Floor
4 Los Angeles, California 90024-3804
  Phone: 310-481-7600 ♦ Fax: 310-481-7650
5
6 Attorneys for Petitioner, City of San Diego



7

8 **STATE OF CALIFORNIA**

9 **STATE WATER RESOURCES CONTROL BOARD**

10

11 In the Matter of the Petition of,          Reference ID No. DOD100366600

12 CITY OF SAN DIEGO                          **FIRST AMENDED PETITION BY CITY OF SAN DIEGO FOR REVIEW OF THE SAN DIEGO REGIONAL WATER QUALITY CONTROL BOARD'S RESPONSE TO THE DEPARTMENT OF THE NAVY'S FINDING OF SUITABILITY TO TRANSFER (REVISION 1), DATED APRIL 29, 2021; REQUEST FOR HEARING**

13               Petitioner.

14

15

16

17

18 **I.     INTRODUCTION AND SUMMARY**

19       Pursuant to California Water Code ("Water Code") § 13320 and Title 23 of the California

20 Code of Regulations §§ 2050, *et seq.*, Petitioner CITY OF SAN DIEGO ("City" or "Petitioner")

21 hereby submits this Amended Petition to the State Water Resources Control Board ("State Board")

22 to review and clarify the San Diego Regional Water Quality Control Board's ("Regional Board")

23 April 29, 2021 letter entitled "Response to the Revision 1 Final Finding of Suitability to Transfer

24 for Parcels III-B and VII Former Naval Training Center, San Diego, California", as transmitted to

25 the BRAC Environmental Coordinator, Naval Facilities Engineering Command, Base

26 Realignment and Closure Program Management Office West, Department of the Navy ("FOST

27 / / /

28 / / /

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

USN_0168718

C.     **FOST Response Letter, Dated April 29, 2021.**

Subsequent to the NFA Rescission Letter, the DON issued its *Revision 1, Final Finding of Suitability to Transfer for Parcels III-B and VII* on April 15, 2021 ("Revised FOST"), which removed its prior reference to the rescinded NFA Order.  The Revised FOST failed to address any of the City's prior objections or that the NFA Order had been rescinded.  In response to the Revised FOST, the Regional Board issued the FOST Response Letter that is the subject of this Amended Petition.  However, the FOST Response Letter, similar to the Regional Board's prior correspondence, failed to address the safety of human health and the environment with respect to the Boat Channel (or IR Site 12).  Moreover, the FOST Response Letter failed to address the questions and requests for clarification submitted by the City in its prior correspondence outlined above.

It is clear that the actions of the Regional Board have created a level of confusion detrimental to the City as it relates to the Boat Channel.  The Regional Board's transmission, and subsequent rescission, of its NFA Order and associated claim that this rescission is essentially inconsequential to the Regional Board's inherent authority to require additional investigative and remedial work at IR Site 12 (and the remainder of the Boat Channel) has muddied the Regional Board's position on potential environmental contamination in the Boat Channel.  This confusion was only further exacerbated by the Regional Board's response to the DON's Revised FOST, which limited its approval of the FOST to IR Site 12 even though  the DON's Revised FOST encompasses, and contemplates transfer of, the *entire* Boat Channel.  Accordingly, it is undeniable that these gross inconsistencies, and the resulting ambiguity as to whether additional investigative and remedial work will be required at the Boat Channel, have prejudiced the City as the intended transferee of the Boat Channel Parcels III-B and VII.

Based on the foregoing, as well as the facts and arguments set forth herein, the City is seeking review on the grounds that the obvious failures in the DON's investigatory and remedial activities at the Boat Channel, including IR Site 12, together with the confusion caused by the Regional Board's issuance of inconsistent and equivocal findings related to the DON's investigation and remediation of the Boat Channel, have created significant uncertainty over

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

21203925.1:10874-0001                              -4-
FIRST AMENDED PETITION FOR REVIEW OF THE REGIONAL BOARD'S RESPONSE TO THE
DEPARTMENT OF THE NAVY'S FINDING OF SUITABILITY TO TRANSFER (REVISION 1)

USN_0168721

1  whether the City will be subject to future investigatory and cleanup orders for pre-existing

2  contamination of Boat Channel Parcels III-B and VII.  Thus, the City is seeking clarification of the

3  Regional Board's FOST Response Letter and its position on the environmental status of Parcels

4  III-B and VII.

5  **II.**     **CONTACT INFORMATION OF PETITIONER**

6          The contact information for Petitioner City of San Diego is as follows:

7          Nicole Denow
           Deputy City Attorney
8          Office of the City Attorney
           City of San Diego
9          Tel: (619) 533-6173
           E-Mail:  ndenow@sandiego.gov

10         The attorneys for Petitioner City of San Diego are as follows:

11
           Thomas F. Vandenburg, Esq.
12         Stratton P. Constantinides, Esq.
           Wood, Smith, Henning & Berman LLP
13         10960 Wilshire Boulevard, 18th Floor
           Los Angeles, California 90024-3804
14         Tel: (310) 481-7600
           E-Mail: tvandenburg@wshblaw.com
15         E-Mail: sconstantinides@wshblaw.com

16  **III.**    **THE ACTION BEING PETITIONED**

17          For the reasons set forth herein, and specifically in Section VIII below, the City is seeking

18  review of the FOST Response Letter, a copy of which is attached hereto and marked as **Exhibit**

19  **"A"**.  Specifically, the City is seeking review on the grounds that the obvious failures in the

20  DON's investigatory and remedial activities at the Boat Channel, including IR Site 12, together

21  with the Regional Board's inconsistent and equivocal findings related to the DON's investigation

22  and remediation of the Boat Channel have created significant uncertainty over whether the City

23  will be subject to future investigatory and cleanup orders for pre-existing contamination of Boat

24  Channel Parcels III-B and VII.  Thus, the City is seeking clarification of the Regional Board's

25  FOST Response Letter and its position on the environmental status of Parcels III-B and VII.

26  **IV.**    **THE DATE THAT THE REGIONAL BOARD ACTED**

27          The Regional Board issued its FOST Response Letter on April 29, 2021, and the State

28  Board is being requested to issue the relief requested herein on the date that this Amended Petition

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ◆ FAX 310-481-7650

FIRST AMENDED PETITION FOR REVIEW OF THE REGIONAL BOARD'S RESPONSE TO THE
DEPARTMENT OF THE NAVY'S FINDING OF SUITABILITY TO TRANSFER (REVISION 1)

USN_0168722

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
United States Department of Justice

KIRK T. MANHARDT, Director
MARCUS S. SACKS, Senior Litigation Counsel
ALASTAIR M. GESMUNDO (CA Bar No. 316573)
SAMUEL HOBBS (AL Bar No. 9776O19E)
Commercial Litigation Branch
Corporate Financial Litigation Section
Box 875, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-4664

STEFAN BACHMAN (SC Bar No. 102182)
DEVON LEA FLANAGAN (DC Bar No. 1022195)
BRIAN SCHAAP (DC Bar No. 1780655)
STEVE O'ROURKE (MA Bar No. 565493)
Environmental Enforcement Section

MARK RIGAU (CA Bar No. 223610)
Environmental Defense Section

*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:23-CV-00541-LL-DTF |
| Plaintiff, | |
| v. | **PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT CITY OF SAN DEIGO'S FIRST SET OF REQUESTS FOR ADMISSION** |
| **CITY OF SAN DIEGO; SAN DIEGO UNIFIED PORT DISTRICT; and SAN DIEGO AIRPORT AUTHORITY** | |
| Defendants. | |

In accord with Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff and

Counter-Defendant, the United States of America (the "United States") responds as follows to

1



**RESPONSE:**  The United States also objects to the Request because it seeks a single admission in response to a two-prong compound request. Subject to and fully reserving the foregoing General and Specific Objections, the United States admits that it agreed to "take all remedial action necessary to protect human health and the environment and [to] obtain site closure from appropriate regulatory authorities" for Parcel III-B and Parcel VII before transferring those parcels to the City, but the United States denies that it agreed to remediate Parcel III-B and Parcel VII.

**REQUEST FOR ADMISSION NO. 13:**   Admit that **PARCEL III-B** and **PARCEL VII** extend to the top of the banks of those parcels as shown in Record of Survey Map 16556, Sheet 2 of 3, Official Records of San Diego County.

**RESPONSE:**   The United States objects to the Request to the extent it seeks an admission regarding the genuineness of the Record of Survey Map referenced therein that is not attached to these Requests, as required by Fed. R. Civ. P. 36(a)(2).  The United States also objects to the Request because, without attaching the referenced document, the Request lacks foundation.  The United States also objects to the Request because it seeks a single admission in response to a two-prong compound request.

Subject to and fully reserving the foregoing General and Specific Objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 14:**  Admit that **IR SITE 12** does not include the **RIP-RAP** banks, or seawall portions of **PARCEL III-B** or **PARCEL VII**.

**RESPONSE:**  The United States objects to this Request as vague and ambiguous because of its use of terms based on an ambiguous definition, including "RIP-RAP" which the City defines overbroadly as "the chunks of concrete, rebar, and other construction and demolition debris on the banks of the **BOAT CHANNEL**."  The United States also objects to

9

the undefined terms "banks" and "seawall portions" as vague and unclear. The United States also

objects to the Request because it seeks a single admission in response to a two-prong compound

request.

Subject to and fully reserving the foregoing General and Specific Objections, the United

States admits this Request.

**REQUEST FOR ADMISSION NO. 15:**  Admit that **YOU** did not perform any
remediation of **PARCEL III-B**.

**RESPONSE:**  Subject to and fully reserving the foregoing General Objections, the

United States admits this Request.

**REQUEST FOR ADMISSION NO. 16:**   Admit that **YOU** did not investigate the
sediments on the banks of the **BOAT CHANNEL** immediately below and adjacent to the
outfalls discharging to the **BOAT CHANNEL** for possible contamination.

**RESPONSE:**  The United States objects to the Request as vague and ambiguous because

it does not identify the precise locations or measurements for what it is referring to when it says,

"immediately below and adjacent to the outfalls discharging."  The United States objects to the

undefined term "banks" as vague and unclear. The United States also objects to the Request

because it seeks facts irrelevant to the claims and defenses in this case.

Subject to and fully reserving the foregoing General and Specific Objections, the United

States denies this Request.

**REQUEST FOR ADMISSION NO. 17:**  Admit that **YOU** did not investigate the
sediments on the banks of the **BOAT CHANNEL** beneath the **RIP-RAP** for possible
contamination.

**RESPONSE:**  The United States objects to this Request as vague and ambiguous

because of its use of terms based on an ambiguous definition, including "**RIP-RAP**" which the

City defines overbroadly as "the chunks of concrete, rebar, and other construction and

demolition debris on the banks of the **BOAT CHANNEL**."  The United States objects to the

Dated: July 22, 2024

Respectfully,

/s/ *Samuel Hobbs*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
United States Department of Justice

KIRK T. MANHARDT, Director
MARCUS S. SACKS, Senior Litigation Counsel
ALASTAIR M. GESMUNDO (CA Bar No. 316573)
SAMUEL HOBBS (AL Bar No. 9776O19E)
Commercial Litigation Branch
Corporate Financial Litigation Section
Box 875, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-4664

STEFAN BACHMAN (SC Bar No. 102182)
DEVON LEA FLANAGAN (DC Bar No. 1022195)
BRIAN SCHAAP (DC Bar No. 1780655)
STEVE O'ROURKE (MA Bar No. 565493)
Environmental Enforcement Section

MARK RIGAU (CA Bar No. 223610)
Environmental Defense Section

*Attorneys for United States of America*

United States District Court

for the Southern District of California

Case No. 3:23-CV-00541-LL-BJC

UNITED STATES OF AMERICA,

Plaintiff,

v.

CITY OF SAN DIEGO; SAN DIEGO UNIFIED PORT DISTRICT; and SAN DIEGO
AIRPORT AUTHORITY,

Defendants.

---

Expert Report of

Stephen A. Johnson, P.E.

December 22, 2024

Stephen A. Johnson, P.E.

**EXHIBIT**

**Z**

*Expert Report of Stephen A. Johnson, P.E.*                    *December 22, 2024*

same Record of Survey Map.[6]  That map defines Parcel Numbers 4, 11, and 15 as extending to "top of bank of boat channel."[7]  Therefore, Parcels III-B and VII do not terminate at the water's edge, but rather extend to all land up to the top of the Boat Channel.[8]

The Final FOST explains that "[t]he sediments of the Boat Channel have been designated as Installation Restoration (IR) Site 12[.]"[9]  The document does not define the lateral extent of the Boat Channel Sediments.  However, there are two clear limitations of the scope of the term Boat Channel Sediments.

First, the Final FOST does not define IR Site 12 as encompassing all of Parcels III-B and VII.  Therefore, by definition, even if the Navy's investigation and remediation addressed all of IR Site 12 those actions would not have addressed all of Parcels III-B and VII.

Second, the Final FOST expressly states that "[t]he rip-rap banks, or seawall portions of the FOST Property are not part of IR Site 12."[10]  The rip-rap banks cover a large portion of area between the water's edge and the top of the channel banks.  In some areas, the rip-rap banks extend below the water line.

Other than these two limitations, the Final FOST does not define the lateral limit of IR Site 12 between the water's edge; however, the Remedial Investigation does.

<u>The Remedial Investigation identifies the lateral limit of IR Site 12 as the low-tide water line</u>

The Navy performed a Remedial Investigation ("RI") of the Boat Channel Sediments.[11]  In the Project Objective and Scope section of the RI Report ("RIR"), the Navy stated that:

> The objective of the RI was to acquire sufficient data to assess whether the Boat Channel sediments pose an unacceptable risk to human health and/or the environment, and whether remedial or cleanup strategies are deemed necessary.  Previous investigations indicated that waste-generation activities and surface water runoff that discharged through the storm drain system surrounding the Boat Channel may have led to contamination in the Boat Channel sediments.

> The scope of the project encompassed the generation of analytical data on sediment chemistry and toxicity at 31 stations spanning the length of the Boat Channel and into San Diego Bay.  The scope did not include source identification.  The study evaluated the chemistry of sediment,

---

[6] Memorandum of Agreement By and Between the United States of America and the City of San Diego For Economic Development Conveyance and Public Benefit Conveyances at the Former Naval Training Center, San Diego, Exhibit A.  Filed May 30, 2000.

[7] Record of Survey No. 16556.  Filed April 25, 2000.  (Referencing Record of Survey Map No. 15840.  Filed June 12, 1998).

[8] Final FOST, 2-1.

[9] Final FOST, 2-1.

[10] Final FOST, 2-1.

[11] Bechtel Environmental, Final Remedial Investigation Report for IR Site 12, The Boat Channel, Former Naval Training Center, San Diego, California (October 30, 2003) ("Final RIR").

*Expert Report of Stephen A. Johnson, P.E.*                                          *December 22, 2024*

sediment porewater, surface water, and sediment toxicity in context with sediment data from other locations within the northern portion of San Diego Bay.[12]

The sediments sampled at those 31 stations were located below the water surface.[13]  The only other sediment that was sampled during the RI was "beach sediment."[14]  The beach sediment was sampled in three limited areas (10 individual sample locations) at an elevation of 0.0 feet above the mean lower low water level ("low-tide water line").[15, 16]  Therefore, based on the area over which the Navy investigated (Boat Channel Sediments – the draft and Final FOST's definition of IR Site 12), IR Site 12 is defined by submerged sediments and sediments located at the low-tide water line, excluding the submerged rip-rap banks and seawall areas.

The Navy did not perform any sampling between the low-tide water line and the top of the Boat Channel banks, at the seawall areas, or at the submerged portion of the rip-rap banks.  Therefore, I refer to this area collectively as the "Unaddressed Area."

This omission is significant.  Dr. Michael Trapp has studied the Navy's work at IR Site 12 extensively.  I understand that he will provide an expert report explaining that he has concluded that:

- The area between the low-tide water line and the top of the Boat Channel banks is likely to be contaminated and should be investigated to determine the need for remediation.

- If the needed characterization is not performed, legacy contamination may remain at the site and represent potential environmental impacts to water quality, recreational uses, and biological resources.

<u>No remediation of the Unaddressed Area</u>

Given the absence of any investigation conducted in the Unaddressed Area, the RIR did not present any discussion or characterization of the nature and extent of any contamination in this area.  As a result, the Navy's Feasibility Study ("FS") did not evaluate alternative methods to remedy any contamination in the Unaddressed Area.[17]  Likewise, the Record of Decision/Remedial Action Plan ("Final ROD/RAP") selecting the remedy for the Boat Channel Sediments did not include any measures to clean up any contamination in the Unaddressed Area.[18]  Finally, the Remedial Action Completion Report ("RACR")

---

[12] Final RIR, ES-1.

[13] Final RIR, ES-2.

[14] Ibid.

[15] Final RIR, 7-2; NAVFAC, Final Record of Decision/Final Remedial Action Plan for Installation Restoration Site 12, Boat Channel Sediments, Former Naval Training Center, San Diego, California (March 2017) ("Final ROD/RAP"), Attachment G, G-3.

[16] The RIR explains that the purpose of collecting the samples at this low-tide water line location was to estimate the risk associated with contacting beach sediments exposed during low tide.  Final RIR, 7-2

[17] NAVFAC, Final Feasibility Study Report, IR Site 12, Boat Channel Sediments, Former Naval Training Center, San Diego, California (September 2016) ("Final FS").

[18] Final ROD/RAP.

United States District Court

for the Southern District of California

Case No. 3:23-CV-00541-LL-BJC


UNITED STATES OF AMERICA,

Plaintiff,

v.

CITY OF SAN DIEGO; SAN DIEGO UNIFIED PORT DISTRICT; and SAN DIEGO
AIRPORT AUTHORITY,

Defendants.

---

Expert Rebuttal Report of

Stephen A. Johnson, P.E.

January 21, 2025

Stephen A. Johnson, P.E.



Report.[5]  Those documents were either provided by counsel or obtained by Gnarus personnel.  I discussed with counsel the nature and scope of the assignment, the background of this litigation, and various questions that arose during the analysis.  I also informed Counsel of the information that would assist my analysis and requested specific documents, as needed.  Finally, I discussed various matters with City officials and City consultants.

Documents Used

In addition to the documents referenced above, I also rely on the knowledge I have accumulated over the course of my career from statutes, regulations, government policies, government guidance, other regulatory documents, professional publications, documents related to contaminated sites, and various other types of information.  I did not attempt to list in the documents referenced above all such information that I have used as background knowledge in my work in this matter.

Limitations

This report is based on information reviewed to date.  I reserve the right to revise and/or amend this report as additional information becomes available to me, including, but not limited to, other experts' opinions, rebuttal opinions, deposition testimony, and additional documents.

**5.0     BASIS AND REASONS FOR OPINION:  Ms. Koch's two opinions are inaccurate, as she offers those opinions with respect to "the Site," which, by definition, includes the Unaddressed Area where no investigation or remediation was performed.**

**5.1     Factual Foundation**

Ms. Koch states that all of the Navy's actions relevant to her report, all of her analyses, and all of her opinions relate to "the Site."  Her report defines "the Site" as "the San Diego Boat Channel."[6]  Ms. Koch does not provide any citation that defines the "San Diego Boat Channel" or otherwise explains the geographic extent of it.

However, the MOA and Final FOST, the controlling documents for the proposed transfer of the Former Naval Training Center ("NTC") property to the City and the investigation and remediation of that property, use the term "boat channel" and/or "Boat Channel" (collectively "Boat Channel") to refer to Parcels III-B and VII of the NTC.[7]  As explained in my initial expert report, those two parcels do not end

---

[5] I also have reviewed case filings issued after the filing of my initial expert report, including the motion for partial summary judgment and responses (including my declaration).

[6] Koch Report, 2.

[7] MOA, 2-3, Exhibit A p. 2 of 2, Exhibit D; Record of Survey No. 16556 (filed April 25, 2000), referencing Record of Survey Map No. 15840 (filed June 12, 1998); Final FOST, 2-1.

*Expert Rebuttal Report of Stephen A. Johnson, P.E.*                    *January 21, 2025*

at the water line but rather extend to the "top of bank of boat channel."[8]  The MOA provides a cross section of the channel and surrounding land that illustrates the lateral extent of the Boat Channel.[9]



Pursuant to the MOA, to render the property suitable for transfer to the City, the Navy must "take all remedial action necessary to protect human health and the environment and [] obtain site closure from appropriate regulatory authorities based on the projected use of" Parcels III-B and VII (i.e., the Boat Channel).[10]

### 5.2    Ms. Koch's Opinion 1 is incorrect

Ms. Koch first offers the opinion that the process the Navy undertook to investigate, select, and implement the remedy for "the Site" was not inconsistent with the NCP.  This is incorrect.  As previously discussed, Ms. Koch's definition of "the Site" is the Boat Channel (i.e., Parcels III-B and VII), and the Navy failed to perform the NCP process elements described in her report for a portion of the Boat Channel, specifically the Unaddressed Area.  Those process elements include a remedial investigation ("RI"), feasibility study ("FS"), remedy selection ("ROD/RAP"), remedial design ("RD"), and remedial action ("RA"), among others.[11]

As I explain in my initial expert report, the Navy's response actions were limited to the Boat Channel <u>sediments</u>, which the Final FOST, among other documents, defines as IR Site 12.[12]  I further explain that (a) IR Site 12 expressly excludes certain areas of the Boat Channel, namely the rip-rap banks and seawall areas, (b) the Navy's RI did not involve collection of any samples at an elevation higher than the mean lower low water level ("low-tide waterline"), and (c) as a result, the Navy's RI, FS, ROD/RAP, RD, and RA were not based on any work being performed in the areas between the low-tide waterline and the top of

---

[8] MOA, Exhibit A and Exhibit D; Record of Survey No. 16556 (filed April 25, 2000), referencing Record of Survey Map No. 15840 (filed June 12, 1998).

[9] MOA, Exhibit D.

[10] MOA, 2-3.

[11] Koch Report, 5, 7-12.

[12] Final FOST, 2-1.

the Boat Channel banks (the Unaddressed Area). The size of the Unaddressed Area is approximately 5.5 acres.[13]

The significance of the Navy's failure to perform response actions in the Unaddressed Area is not theoretical. In fact, it highlights a provision the Navy and City incorporated in the MOA that protects against the risk that contaminants in soil and other materials along the Boat Channel banks and adjacent to the Boat Channel could migrate into the Boat Channel. The MOA states:

> The City agrees that until such time as site closure is obtained by the Navy, the City shall take all steps necessary to ensure that no activity is conducted within 15 feet of the top of the bank of the Boat Channel with may result in the sloughing of soil or other materials from the bank or the Esplanade into the Boat Channel shown on Exhibit "D."[14]

As result, by defining "the Site" to mean all property within the Boat Channel (Parcels III-B and VII), Ms. Koch is incorrect when she opines that the process the Navy undertook to investigate, select, and implement the remedy at "the Site" was not inconsistent with the NCP.[15]

### 5.3    Ms. Koch's Opinion 2 is incorrect

The second opinion Ms. Koch offers is that the Navy and Regional Board determined that "the Site" remedy was protective of human health and the environment. This opinion is also incorrect.

Ms. Koch relies on several documents to support her position. One of these is the ROD/RAP, in which the remedy was formally selected. However, as discussed in my initial report, because the scope of the Navy's response action was IR Site 12, and because the work leading to the development and selection of the remedy was also limited to IR Site 12, the remedy the Navy selected was similarly limited to IR Site 12. The Regional Board's concurrence with the ROD/RAP could only apply to IR Site 12, because that is the only area that was addressed by the ROD/RAP.

Another document Ms. Koch relies on to support her opinion is the Remedial Action Completion Report ("RACR") authored by the Navy.[16] This document describes the Navy's work to implement the remedy, pursuant to the ROD/RAP. Because the ROD/RAP only addressed IR Site 12, the RACR also only covered completion of the remedy performed at IR Site 12.

Because the Navy limited its remedy (as defined in the ROD/RAP and RACR) to IR Site 12, the Navy and Regional Board's determinations of protectiveness were similarly limited to IR Site 12. As result, by defining "the Site" to mean all property within the Boat Channel (Parcels III-B and VII), Ms. Koch is

---

[13] Information provided AtkinsRealis.

[14] MOA, 2-3.

[15] In the background section of her report, Ms. Koch states that "the Site" was designated as IR Site 12. That statement is incorrect. She defines "the Site" as the Boat Channel, and IR Site 12 excludes the Unaddressed Area of the Boat Channel. Koch Report, 5.

[16] NAVFAC, Final Remedial Action Completion Report, Installation Restoration Stie 12, Boat Channel Sediments, Former Naval Training Center, San Diego, California (March 2019).

```
 1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF CALIFORNIA
 2
                       Case No. 3:23-cv-00541-LL-DTF
 3
 4       UNITED STATES OF AMERICA,
 5                        Plaintiff,
 6       vs.
 7       CITY OF SAN DIEGO, etc., et al,
 8                        Defendants.
         _____/
 9
         AND RELATED CROSS-CLAIMS and
10       COUNTER CLAIMS
         _____/
11
12
13                        REMOTE DEPOSITION OF
14                           SEAN MCCLAIN
15
16                     Wednesday, September 4, 2024
17                     10:00 a.m. - 12:38 p.m. (PDT)
18
19
20       Stenographically Reported By:
21
22       Kimberly Fontalvo, Realtime Reporter
23       Realtime Systems Administrator
24       National Court Reporters Association
25       Colorado Court Reporters Association
```

EXHIBIT DD

                                            Page 1

```
 1      APPEARANCES:
 2

        On behalf of Plaintiff:
 3
             U.S. DEPARTMENT OF JUSTICE
 4           P.O. Box 7611
             Washington, D.C.  20044
 5           BY:  ALASTAIR GESMUNDO, ESQ.
             alastair.gesmundo@usdoj.gov
 6

 7

 8      On behalf of Defendant/Cross Defendant/Counter
        Claimant/Cross Claimant, City of San Diego:
 9
             KUTAK ROCK
10           1133 Connecticut Avenue
             Washington, D.C.  20036
11           BY:  BARRY P. STEINBERG, ESQ.
             barry.steinberg@kutakrock.com
12           BY:  LAUREN IRISH, ESQ.
             lauren.irish@kutakrock.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                              Page  2

```
 1                    I N D E X
 2

 3

 4     Examination                                 Page
 5     SEAN MCCLAIN
       Direct             By Mr. Steinberg            4
 6     Cross              By Mr. Gesmundo            54
       Redirect           By Mr. Steinberg           75
 7
       Certificate of Oath                          90
 8     Certificate of Reporter                      91
       Read and Sign Letter to Witness             93
 9     Errata Sheet (forwarded upon execution)     95
10                       EXHIBITS
11
12     No.                                         Page
13     Exhibit 5      Previously Marked             7
14     Exhibit 56     Previously Marked            11
15     Exhibit 55     Previously Marked            17
16     Exhibit 6      Previously Marked            32
17     Exhibit 7      Previously Marked            34
18     Exhibit A      GeoTracker document          38
19     Exhibit 12     Previously Marked            41
20     Exhibit B      Letter dated February 18,    49
                      2021
21
       Exhibit C      Letter dated March 24,       58
22                    2021
23     Exhibit D      Letter dated September 2,    61
                      2020
24
       Exhibit E      Water Board's Public         66
25                    Notice of Record of
                      Decision
```

Page  3

```
 1                THE COURT REPORTER:  Please raise your

 2          right hand.

 3                Do you swear that the testimony you are

 4          about to give will be the truth, the whole

 5          truth, and nothing but the truth?

 6                THE WITNESS:  I do.

 7      BY MR. STEINBERG:

 8          Q.    Okay.  Thank you.

 9                A couple of just preliminary things.

10      Hopefully someone will remind me if I go too long

11      without a break.  And I realize that although we've

12      all had lunch here, you-all have not out there, so

13      we will take a lunch break at some point in time,

14      and preferably it will be before 6:00 p.m.

15                At any rate, the proceedings today are

16      essentially as if you were in court.  You're under

17      oath.  The testimony that you are giving can be used

18      when we get to a judicial setting.  And, you know,

19      you may be called to testify, you may not.  That

20      will be determined later.

21                But the point is that this is as if --

22      it's a little more informal, but nonetheless,

23      treated as if you were in court in your answers.

24                I will ask you a number of questions.  You

25      are not represented by counsel here today, but it's
```

Page  4

1    Ms. Linz.

2         A.   Correct.

3         Q.   Who signed it?  Was it Gibson?  Yeah.

4              Okay.  And if you will go down, you will

5    see there's a discussion there.  Keep going.  Go

6    back up some.

7              All right.  You will see at the beginning,

8    it talks about the completion of corrective action.

9    In the last two lines of that first paragraph, it

10   says the "Water Board concludes that no further

11   action related to the cleanup of contaminated

12   sediments at IR Site 12 is required."

13             Are you familiar with that letter?  Have

14   you heard that comment before?

15        A.   I have.  Yes.

16        Q.   And what is the significance of the

17   statement "no further action"?

18        A.   So typically "no further action" means the

19   cleanup has been completed and no further action is

20   needed.  The site will be closed.

21        Q.   And you are aware -- was that

22   determination important to the Navy?

23             MR. GESMUNDO:  Objection.  Calls for a

24        legal opinion.  Lacks foundation.

25        A.   I don't know.

                                        Page 33

1    no-further-action letter.

2              And I stated the reasons why.  This was a

3    CERCLA site.  It's not an underground storage tank

4    case or a site cleanup case.  No-further-action

5    letters are the standard for those kind of cases

6    that the Water Board oversees and regulates.

7              This is an IR site, and no-further-action

8    letters are not necessary because it's following the

9    CERCLA process, and we concur with those documents

10   as it's moving through the CERCLA process.

11        Q.   Understood.

12             So because this is IR site, as you said,

13   does the distinction between a no further comment or

14   a no-further-action letter matter?

15        A.   A "no further comment" would mean we don't

16   have any comments on the report that was submitted.

17             "No further action" would mean we're going

18   to close the case.  There is no further action that

19   is needed on a case.  So that's typically the last

20   letter that we send and we close out the site.

21        Q.   Understood.  And I think I'm just trying

22   to draw a distinction between what you were

23   describing earlier as why the Water Board didn't

24   need to provide a no-further-action letter in this

25   case, because it's an IR site, correct?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1           A.    Correct.

2           Q.    So I'm wondering if the same logic applies

3      for the "no further comment," that there would be no

4      further comment because it's an IR site.

5           A.    "No further comment" is typically

6      referring to reports that have been submitted and

7      we've reviewed them and we don't have any comments.

8      We say, you know, we concur with this report and we

9      have no further comments.

10           It kind of finalizes -- it lets the Navy

11      know that -- move to the next step.  We're done with

12      this report, pretty much.

13           Q.    Okay.  Thank you.

14           MR. GESMUNDO:  So I will stop sharing this

15      document for now.  Thank you.

16           And for the record, I believe this was

17      already -- this document was also used in a

18      prior Water Board deposition.

19           The next document I'm going to share is a

20      September 2, 2020 letter.

21           (Thereupon, marked as Exhibit D.)

22      BY MR. GESMUNDO:

23           Q.    Mr. McClain, can you see this letter?

24           A.    I do.

25           Q.    It bears the Water Board letterhead dated

Page 61

1    San Diego Water Board.  He has authority to sign

2    no-further-action letters, records of decisions, and

3    those final decision documents or letters on cases.

4         MR. GESMUNDO:  I think those are all the

5         questions I have for you.  I appreciate your

6         time.

7         Counsel, do you have any other questions?

8         MR. STEINBERG:  Yes, I do.  Thank you.

9                   REDIRECT EXAMINATION

10    BY MR. STEINBERG:

11    Q.   One question came up just now in that last

12   exchange.  Mr. Gesmundo asked you if the

13   Water Board's actions are approvals.  An approval is

14   different than "no further comment."  Am I missing

15   something there?

16    A.   No.  Concurrence, approval is, you know,

17   is green with whatever is being proposed in that

18   document.  If we say "no further comments," it just

19   means we have -- we concur with this document and we

20   have no further comments on it.  They are different.

21    Q.   A "no further comment" is a concurrence?

22    A.   No.

23    Q.   A "no further comment" is an approval?

24    A.   No.  It means we --

25    Q.   "No further comment" is no further

Page 75

1      BY MR. STEINBERG:

2          Q.    Does the same standard apply for "no

3      further comment"?

4          A.    No.

5          Q.    Why?

6          A.    "No further comment," to me, is different

7      than a "no further action."  Like I said, we provide

8      comments on work plans and reports.  These are our

9      suggestions or our attempt to have a site follow the

10     regulatory process and standards, and we provide

11     those comments.

12              "No further action" means we're done, the

13     site is closed, and there is no further action

14     that's necessary.  So "no further comment" and "no

15     further action" are different.

16         Q.    If the Navy said, "There's PFAS out there

17     and we're not going to clean it up, we're not going

18     to do anything about it, because the City also

19     contributed to that same PFAS issue," and you looked

20     at that issue today, would you have an enforcement

21     action --

22              MR. GESMUNDO:  Objection.  Calls for

23         speculation.

24     BY MR. STEINBERG:

25         Q.    -- as a CERCLA hazardous substance?

                                            Page 82

1                    CERTIFICATE OF OATH

2

3

4

5

6

7        STATE OF COLORADO

8

9                    I, the undersigned authority, certify

10

11        that SEAN MCCLAIN, remotely appeared before me

12

13        and was duly sworn on the 4th day of September,

14

15        2024.

16

17                    Signed this 13th day of September, 2024.

18

19

20

21

22

23

24                    KIMBERLY FONTALVO, RPR, CLR

25                    Notary Public, State of Colorado

                                                Page 90

1                    CERTIFICATE OF REPORTER

2

3       STATE OF COLORADO

4

5                I, KIMBERLY FONTALVO, Registered

6       Professional Reporter, do hereby certify that I

7       was authorized to and did stenographically report

8       the foregoing remote deposition of SEAN MCCLAIN;

9       that a review of the transcript was requested;

10      and that the transcript is a true record of my

11      stenographic notes.

12               I FURTHER CERTIFY that I am not a

13      relative, employee, attorney, or counsel of any

14      of the parties, nor am I a relative or employee

15      of any of the parties' attorneys or counsel

16

17      connected with the action, nor am I financially

18

19      interested in the action.

20

21               Dated this 13th day of September, 2024.

22

23                         _____

24

25                         KIMBERLY FONTALVO, RPR, CLR

                                              Page 91

```
 1            IN THE UNITED STATES DISTRICT COURT FOR

 2              THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5            Plaintiff,              )
                                      )
 6            vs.                     )Case No.
                                      )3:23-cv-0541-LL-VET
 7   CITY OF SAN DIEGO, et al.,       )
                                      )
 8              Defendants.           )
     _____)

 9

10

11

12

13

14

15

16                   DEPOSITION OF

17              STEPHEN A. JOHNSON, P.E.

18            Wednesday, February 19, 2025

19                   Volume I

20

21

22   Reported by:

     CARLA SOARES

23   CSR No. 5908

24   Job No. 7147478

25   Pages 1 - 184
```

EXHIBIT EE

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT FOR
 2             THE SOUTHERN DISTRICT OF CALIFORNIA
 3
 4    UNITED STATES OF AMERICA,      )
                                     )
 5            Plaintiff,             )
                                     )
 6               vs.                 )Case No.
                                     )3:23-cv-0541-LL-VET
 7    CITY OF SAN DIEGO, et al.,     )
                                     )
 8               Defendants.         )
      _____)
 9
10
11
12
13
14
15
16            DEPOSITION OF STEPHEN A. JOHNSON, P.E.,
17    Volume I, taken on behalf of Plaintiff, beginning at
18    9:30 a.m., and ending at 3:58 p.m., on Wednesday,
19    February 19, 2025, before CARLA SOARES, Certified
20    Shorthand Reporter No. 5908.
21
22
23
24
25
```

Page  2

```
 1    APPEARANCES:

 2

 3    For the Plaintiff:

 4         UNITED STATES DEPARTMENT  of JUSTICE
           ENVIRONMENTAL ENFORCEMENT SECTION

 5         BY:  NICHOLAS McDANIEL, Attorney at Law
           P.O. Box 7611

 6         Washington, DC 20044
           202.616.6536

 7         nicholas.a.mcdaniel@usdoj.gov

 8

 9    For the Defendants:

10         WOOD SMITH HENNING & BERMAN
           BY:  THOMAS F. VANDENBURG, Attorney at Law

11         505 North Brand Boulevard, Suite 1100
           Glendale, California 91203

12         818.551.6013
           tvandenburg@wshblaw.com

13

14
      ALSO PRESENT:  Yunia Lobega, Paralegal

15                   U.S. Department of Justice

16                   Brian Henthorn (via Zoom)

17                   Mark Pigau (via Zoom)

18                   Stefan Bachman (via Zoom)

19

20                   --o0o--

21

22

23

24

25

                                           Page  3
```

1    what other discussion did you have with Michael

2    Salisbury about those issues?

3         A    As I say, it was to -- the purpose of the call

4    was to -- to discuss their -- I wanted to understand how

5    they arrived at the area of 5.5 acres for the

6    unaddressed area.  That was the purpose of the call, was

7    to go through that.

8              In the course of that call, I concluded that

9    it may be more accurate to say that it is 6.4 acres as

10   the size of the unaddressed area.  That doesn't affect

11   my opinion in any way.

12             But there are some differences in

13   documentation for Parcels III-B and VII that affect the

14   calculation of the size.  And it appears to me

15   that 6.4 acres is, for purposes of this case, the more

16   accurate size for the unaddressed area.

17        Q    And what differences in documentation are you

18   referring to?

19        A    The -- when Michael Salisbury did his

20   calculation, he did it using GIS software.  And that

21   relies on files, GIS files, sometimes called shapefiles,

22   to -- used to plot and calculate areas with.

23             And he used GIS files that appear to have --

24   the source for which appears to be the county assessor,

25   recorder, and county clerk, collectively or

                                            Page 57

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were administered an oath; that a record of

7     the proceedings was made by me using machine shorthand

8     which was thereafter transcribed under my direction;

9     that the foregoing transcript is a true record of the

10    testimony given.

11          Further, that if the foregoing pertains to the

12    original transcript of a deposition in a Federal Case,

13    before completion of the proceedings, review of the

14    transcript [x] was [ ] was not requested.

15          I further certify I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney or any party to this action.

18          IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated: 2/27/25

22

23

                    *Carla Soares*

24              CARLA SOARES

               CSR No. 5908

25

                                          Page 181