BRETT SHUMATE
Assistant Attorney General
Civil Division

ALASTAIR M. GESMUNDO (CABN 316573)
SAMUEL F. HOBBS (AL Bar No. 9776O19E)
Commercial Litigation Branch
P.O. Box 875, Ben Franklin Station
Washington, DC 20044
Phone: (202) 616-8077

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division

STEFAN J. BACHMAN (SC Bar No. 102182)
BRIAN SCHAAP (DC Bar No. 1780655)
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 616-6536

MICHAEL AUGUSTINI (DC Bar No. 452526)
Environmental Defense Section
450 Golden Gate Avenue, Suite 07-6714
San Francisco, CA 94102
Phone: (202) 532-3210

*Attorneys for Plaintiff and Counterclaim Defendant United States of America*
*(Attorneys for Defendant and Counterclaim Plaintiff City of San Diego on next page)*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-cv-00541-LL-VET |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE BREACH OF CONTRACT COUNTERCLAIM-IN-REPLY** |
| v. | |
| CITY OF SAN DIEGO, et. al. | |
| Defendants. | |

1

2

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

STANDARDS OF REVIEW ................................................................................ 5

ARGUMENT ....................................................................................................... 7

   I.   THE MOA IS A VALID CONTRACT. .................................................... 8

   II.  THE NAVY PERFORMED ITS CONTRACTUAL OBLIGATIONS ............................. 8

      A.  The MOA Incorporates the Navy's Remedial Obligation Under CERCLA. ................. 8

         1.  Under CERCLA, to determine whether a remedy protects human health and the environment, courts look to whether the remedy complies with the NCP. .............. 11

         2.  Regulatory approval can establish compliance with the NCP. ............................... 12

         3.  The Water Board scrutinized and approved each step of the Navy's remediation. ... 14

      B.  The City Cannot Show that the Navy's Selection of the Remedy was Arbitrary and Capricious. ................................................................................. 15

         1.  The Navy reasonably determined that there was no risk to human health or the environment in Parcel III-B that required remediation. ............................. 15

         2.  The Navy reasonably determined there was no risk to human health or the environment on the shoreline that required remediation. ........................... 16

         3.  The Navy's use of sampling was reasonable. .......................................... 18

         4.  The Sediment Quality Objectives do not apply to the Navy's remedial action........ 21

         5.  The Navy was not obligated to remediate PFAS, and the City waived the issue. ..... 21

      C.  The Navy Obtained Site Closure from the Appropriate Regulatory Authority. ........... 23

      D.  Excluding the Disputed Covenant from the Deed was Proper under the MOA and Relevant Law. ...................................................................... 26

   III. THE CITY BREACHED ITS OBLIGATION UNDER THE MOA TO ACCEPT TRANSFER OF THE BOAT CHANNEL PARCELS.................................... 28

   IV. THE CITY'S BREACH HARMS THE NAVY. ..................................... 29

   V.  THE NAVY IS ENTITLED TO SPECIFIC PERFORMANCE. ..................... 29

CONCLUSION ................................................................................................ 30

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Bally's Park Place, Inc. v. N.L.R.B.*,
  646 F.3d 929 (D.C. Cir. 2011) .................................................. 19

5

*Bowden v. United States*,
  106 F.3d 433 (D.C. Cir. 1997) .................................................. 23

6

*Boyle v. United Tech. Corp.*,
  487 U.S. 500 (1988) ................................................................ 7

7

*Carson Harbor Village v. Cnty. of Los Angeles*,
  433 F.3d 1260 (9th Cir. 2006) ................................................. 11

8

9

*City of Bangor v. Citizen Commc'n Co.*,
  532 F.3d 70 (1st Cir. 2008) ...................................................... 12

10

*Ctr. for Biological Diversity v. Haaland*,
  87 F.4th 980 (9th Cir. 2023) ..................................................... 5

11

*Emhart Indus., Inc. v. New England Container Co.*,
  274 F. Supp. 3d 30 (D.R.I. 2017) ................................. 6, 15, 22

12

13

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................ 5

14

*Friends of Santa Fe Cnty. v. LAC Minerals*,
  892 F. Supp. 1333 (D.N.M. 1995) ............................................ 12

15

*Henderson v. Fisher*,
  236 Cal. App. 2d 468 (Cal. Ct. App. 1965) ............................. 29

16

*Housatonic River Initiative v. U.S. EPA*,
  75 F.4th 248 (1st Cir. 2023) ..................................................... 6

17

18

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) .................................................... 7

19

*Javins v. First Nat. Realty Corp.*,
  428 F.2d 1071, (D.C. Cir. 1970) .............................................. 23

20

*Masias v. EPA*,
  906 F.3d 1069 (D.C. Cir. 2018) ............................................... 6

21

22

*Nankuli Paving & Rock Co. v. Shell Oil Co.*,
  664 F.2d 772 (9th Cir. 1981) .................................................... 24

23

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
  442 F.3d 101 (2nd Cir. 2006) .................................................. 23

24

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
  596 F.3d 112 (2nd Cir. 2010) .................................................. 12

25

*NutraSweet Co. v. X-L Eng'g Co.*,
  227 F.3d 776 (7th Cir. 2000) ................................................... 12

26

*Occidental Eng'g Co. v. INS*,
  753 F.2d 766 (9th Cir. 1985) .................................................... 5

27

*Oliva v. United States*,
  961 F.3d 1359 (Fed. Cir. 2020) ................................................ 7

28

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
  501 F.3d 1009, (9th Cir. 2007) ................................................................ 6
*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ................................................................. 6
*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) .............................................................. 5, 6
*Spencer Enter. Inc. v. United States*,
  345 F.3d 683 (9th Cir. 2003) ............................................................... 19
*State of Ohio v. U.S. E.P.A.*,
  997 F.2d 1520 (D.C. Cir. 1993) ...................................................... 11, 24
*Sw. Organizing Project v. U.S. Dept. of the Air Force*,
  526 F. Supp. 3d 1017 (D.N.M. 2021) .................................................. 12
*Wash. State Dep't of Transp. v. Wash. Nat. Gas Co.*,
  59 F.3d 793 (9th Cir. 1995) ........................................................... 11, 12

**Statutes**

42 U.S.C. § 9604 ...................................................................................... 21
42 U.S.C. § 9607 ...................................................................................... 12
42 U.S.C. § 9613 ............................................................................. 4, 5, 13
42 U.S.C. § 9620 .......................................................................... 1, 8, 9, 26
42 U.S.C. § 9621 ................................................................................ passim
Defense Base Closure and Realignment Act of 1990
  Pub. L. No. 101-510 § 2901(b) ............................................................ 29

**Regulations**

40 C.F.R. § 300.430 ................................................................................. 10
40 C.F.R. § 300.515 ................................................................................. 13
40 C.F.R. § 300.700 ........................................................................... 11, 13
55 Fed. Reg. 8666 (Mar. 8, 1990) .................................................. 11, 13, 24
89 Fed. Reg. 39124 (July 8, 2024) ....................................................... 21, 22

**Rules**

D.D.C. LCvR 7(h) ...................................................................................... 5

**INTRODUCTION**

Twenty-five years ago, the United States entered into a Memorandum of Agreement ("MOA") to transfer part of the former Naval Training Center ("NTC") to the City of San Diego. For free, the United States agreed to convey nearly 400 acres to the City, part of which the City has successfully developed into the thriving mixed-use community known as Liberty Station. But, now that the City has received and developed the most valuable property under the MOA, the City refuses to accept the remaining property encompassing the Boat Channel that bisects the NTC: Parcels III-B and VII (the "Boat Channel parcels").

The City baselessly claims that the Navy failed to adequately remediate the Boat Channel parcels. Not so. Consistent with its preexisting obligation under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), the Navy promised in the MOA to take all necessary remedial action before transferring the Boat Channel parcels. The Navy kept its promise. For over twenty years, the Navy painstakingly conducted an investigation, evaluated alternative remedies, and then selected, designed, and implemented a remedy. The Navy considered comments from the public, including from the City, at each step of the process. And the Navy obtained regulatory approval from the lead state agency, the San Diego Regional Water Board ("Water Board"), who concurred that the remedy protected human health and the environment and closed the site.

To avoid its obligation to accept transfer, the City has asserted a grab-bag of objections to the Navy's remediation. As the court has already held, review of the adequacy of the Navy's remediation is limited to the administrative record. ECF No. 184 at 12. Thus, the City must show, based on the administrative record, that the Navy's selection of the remedy was arbitrary and capricious. *See* 42 U.S.C. § 9613(j). The City cannot make this showing for any of its objections. The record demonstrates that the Navy's remediation was reasonable, and that the City's objections are without merit. The City has no excuse for its refusal to accept transfer of the Boat Channel parcels, and the Navy is entitled to summary judgment and specific performance of the City's contractual obligation.

1

**BACKGROUND**

2      In 1993, the Defense Base Closure and Realignment Commission recommended the

3  former NTC for closure. Before transferring base property, CERCLA requires the military

4  either to identify the property as uncontaminated after investigating whether there has been

5  a release or threatened release of a hazardous substance, § 9620(h)(4)(A), or to covenant

6  that "all remedial action necessary to protect human health and the environment" has been

7  taken, 42 U.S.C. § 9620(h)(3)(A)(ii)(I). Under CERCLA, the Navy is the lead federal

8  agency for the remediation of the former NTC. SOF ¶ 1. Consistent with its obligations

9  under CERCLA, the Navy began investigating the former NTC for possible contamination

10  that might require remediation.

11      The Navy completed an Initial Assessment in 1986, which recommended the

12  investigation of several locations at the NTC for possible contamination. SOF ¶ 2. The

13  Navy then completed a Sediment Characterization Study in 1996, which indicated "adverse

14  biological responses" in the Boat Channel sediment and recommended further

15  investigation. SOF ¶ 3. Pursuant to this recommendation, the Navy developed the

16  Remedial Investigation Work Plan ("RI Work Plan") in 1998 to devise a "sampling

17  approach for the remedial investigation of the Boat Channel sediments." SOF ¶ 4. Also in

18  1998, the California Environmental Protection Agency designated the Water Board as the

19  lead state agency for the remediation of the former NTC. SOF ¶ 5.

20      After the Navy had already begun the remediation process, the United States and

21  the City entered into the MOA around May 30, 2000. SOF ¶ 6. Under the MOA, the United

22  States agreed to convey seven parcels of the former NTC to the City at no cost. SOF ¶ 7.

23      Four parcels, including Parcel III-B, would be transferred to the City as an economic

24  development conveyance. SOF ¶ 8. For these parcels, "the Navy agree[d] to convey" and

25  "the City agree[d] to accept . . . all of the Navy's right, title and interest in" these parcels.

26  SOF ¶ 9. The City promised to use the proceeds from any sale or lease of these parcels

27  within seven years of the transfer date for economic redevelopment. SOF ¶ 10. The other

28  three parcels, including Parcel VII, would be transferred to the City as a public benefit

1    conveyance. SOF ¶ 11. For these parcels, the Navy agreed to "assign the parcels . . . to the

2    sponsoring agencies for conveyance," and the City agreed to "take all necessary actions to

3    accept the deeds as they are proffered by the sponsoring agencies." SOF ¶ 12.

4          The MOA acknowledged that certain parcels, specifically the Boat Channel parcels

5    as well as Parcel VIII and Parcel X, were "known" or "believed" to be contaminated. SOF

6    ¶ 13. Consistent with the Navy's preexisting obligations under CERCLA, the Navy agreed

7    to "take all remedial action necessary to protect human health and the environment and [to]

8    obtain site closure from appropriate regulatory authorities based on the projected use of

9    [the parcel], as described in the NTC San Diego Reuse Plan dated August 1998." SOF ¶ 14.

10   The Navy had already begun the remediation process under CERCLA for each of these

11   parcels before entering into the MOA. SOF ¶ 15.

12         By 2002, the Navy successfully transferred all parcels under the MOA to the City

13   except for the Boat Channel parcels. The City accepted the deeds to Parcel VIII and Parcel

14   X after the Navy completed its remediation and the Water Board issued a no-further-

15   comment letter on a FOST. SOF ¶ 16. The City redeveloped the transferred parcels into a

16   thriving mixed-use commercial hub known as Liberty Station. SOF ¶ 17.

17         But the remediation of the Boat Channel parcels took much longer. In 2003, the

18   Navy completed the Remedial Investigation Report ("RI Report") evaluating whether the

19   Boat Channel parcels posed an unacceptable risk to human health and the environment.

20   SOF ¶ 18. The RI evaluated the entire Boat Channel parcels, including the submerged

21   sediments, the surface water, and the shoreline. SOF ¶ 19. The RI Report concluded that

22   there was no risk to human health or to wildlife that required remediating in any part of the

23   Boat Channel parcels, but the report concluded that there was a risk to benthic invertebrates

24   in in certain areas of the submerged sediments in Parcel VII. SOF ¶ 20.

25         In 2016, the Navy completed the Feasibility Study Report ("FS Report"), which

26   considered eight alternatives to remediate the areas of the submerged sediments in Parcel

27   VII that posed a risk to benthic invertebrates. SOF ¶ 21. The FS Report's preferred

28   alternative was removing the contaminated sediments and disposing of them in a landfill.

                            -3-              Case No. 3:23-cv-00541-LL-VET

1   SOF ¶ 22. After exhaustive review, the Water Board accepted the report's findings and
2   stated that it had no further comment on the FS Report. SOF ¶ 23.

3       In March 2017, the Navy issued the Record of Decision and Remedial Action Plan
4   ("ROD"), in which the Navy selected the remedy: dredging the contaminated sediments
5   and removing them to an off-site landfill. SOF ¶ 24. The ROD reaffirmed the conclusions
6   from the RI Report and FS Report that there was no risk to human health in Parcel III-B or
7   Parcel VII that required remediating; nor was there any risk to the environment in Parcel
8   III-B that required remediating; and that the only risk that required remedial action was to
9   benthic invertebrates in the submerged sediments in certain areas of Parcel VII. SOF ¶ 25.
10  The ROD determined that the selected remedy would protect human health and the
11  environment, as well as satisfying the other criterion under CERCLA. SOF ¶ 26. The Water
12  Board signed the ROD and concurred in the selected remedy. SOF ¶ 27.

13      After preparing a Remedial Design / Remedial Action Work Plan ("RD/RAWP"),
14  the Navy proceeded to implement the remedy, which the Navy completed in early 2018.
15  SOF ¶ 28. In March 2019, the Navy published the Remedial Action Completion Report
16  ("RACR"), which documented that the remedy had been successfully implemented. SOF
17  ¶ 29. The Water Board reviewed the RACR and stated that it had no further comments.
18  SOF ¶ 30. The Water Board agreed that the remedy was complete, "is protective of the
19  environment, complies with federal and state statutes and appropriate requirements, and is
20  cost effective." SOF ¶ 31.

21      Finally, in April 2021, the Navy submitted a Finding of Suitability to Transfer
22  ("FOST") for Parcels III-B and VII, which found that the parcels were environmentally
23  suitable for transfer. SOF ¶ 32. After reviewing the FOST, the Water Board stated that it
24  "finds the Final FOST acceptable with regard to the completion of the sediment
25  remediation in the Boat Channel (IR Site 12) and has no further comments." SOF ¶ 33.
26  Around that time, the Water Board changed the status of the IR Site 12 remediation to
27  "closed" on its website called Geotracker. SOF ¶ 34.

28      Having completed the remediation and obtained site closure from the Water Board,

-4-        Case No. 3:23-cv-00541-LL-VET

the Navy attempted to transfer the Boat Channel parcels to the City. On May 16, 2022, the Navy sent the deed for Parcel III-B to the City and assigned Parcel VII to the National Park Service for conveyance. SOF ¶ 35. The City responded three days later that it would not accept transfer of either parcel and asked the National Park Service to "hold in abeyance" the transfer of Parcel III-B. SOF ¶ 36. Following attempts to resolve the dispute, the Navy sent a Notice of Default to the City on November 3, 2022. SOF ¶ 37. The City failed to cure its breach within 30 days as provided in the MOA. SOF ¶ 37. Consequently, the City is in material breach of the MOA.

## STANDARDS OF REVIEW

<u>Standard and scope of review for issues concerning the adequacy of the remediation:</u> The heart of this dispute is the City's position that it is not obligated to accept transfer of the Boat Channel parcels because the Navy's remediation was inadequate. As this court has already held, for any issues concerning the adequacy of a CERCLA cleanup, the limits on judicial review under § 9613(j) apply. ECF No. 184 ("Section 113(j) applies to any challenge to a CERCLA cleanup."); *see also* ECF No. 156 (United States' motion to limit review to the administrative record). Section 9613(j) provides that when considering any challenge to the adequacy of a CERCLA cleanup, judicial review is limited to the administrative record and subject to the arbitrary and capricious standard. *See* § 9613(j)(1) ("[J]udicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record."); § 9613(j)(2) ("[T]he court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law."). When reviewing whether agency action is arbitrary and capricious based on an administrative record, the court does not decide whether there is a genuine dispute of material fact. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985) (noting that in administrative law cases, "[the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did,"

rather than to "resolve any facts"); *see also* D.D.C. LCvR 7(h) (comment) ("This provision recognizes that in cases where review is based on an administrative record the Court is not called upon to determine whether there is a genuine issue of material fact, but rather to test the agency action against the administrative record."). Instead, the court must uphold the adequacy of the Navy's remediation unless the City can show, based on the administrative record, that the Navy's remediation was arbitrary and capricious.

"The arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). Agency action is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 987 (9th Cir. 2023). Under this standard, the reviewing court should "sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made." *Locke*, 776 F.3d at 994. The court should not "substitute its judgment for that of the agency." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). "[D]eference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise." *Locke*, 776 F.3d at 994.

The court's review should focus "on the administrative record in existence at the time of the decision," rather than a "record that is made initially in the reviewing court." *Locke*, 776 F.3d at 992 (citation omitted). By considering "evidence that was not before the agency, it inevitably leads the court to substitute its judgment for that of the agency." *Id.* (citation omitted). For these reasons, it is improper to consider the opinion of post-hoc expert witnesses to reevaluate the scientific merits of the agency's decision. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603–04 (9th Cir. 2014).

1      Furthermore, under CERCLA, arguments about the adequacy of the remedy must
2  be raised during the comment period. *Emhart Indus., Inc. v. New England Container Co.*,
3  274 F. Supp. 3d 30, 48 (D.R.I. 2017) ("This statutory and regulatory scheme, when viewed
4  as a whole, requires parties to make all of their known and available arguments regarding
5  the merits of a remedy to EPA during the notice and comment period in the first instance.
6  Only then, after EPA has had the opportunity to provide its response in the administrative
7  record, may a federal court review EPA's decision."); *see also Housatonic River Initiative
8  v. U.S. EPA*, 75 F.4th 248, 280 (1st Cir. 2023) (noting that objections may be waived if no
9  commenter raised them to the agency); *Masias v. EPA*, 906 F.3d 1069, 1080 (D.C. Cir.
10 2018) ("Although [the petitioner] need not have personally raised his current objection
11 during the comment period ... he must point [the court] to a commenter who did.");
12 *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, (9th Cir. 2007) ("As
13 a general rule, we will not review challenges to agency actions raised for the first time on
14 appeal."). If an objection to the remedy was not raised during the comment period, the
15 objection is waived.

16      <u>Standard of review for other issues:</u> For issues besides the adequacy of the
17 remediation—such as whether the MOA is a valid contract, or whether the MOA obligates
18 the Navy to include the disputed covenant in the deed—the usual summary judgment
19 standard and scope of review applies. "The court shall grant summary judgment if the
20 movant shows that there is no genuine dispute as to any material fact and the movant is
21 entitled to judgment as a matter of law." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387
22 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(a)). The limitation to the administrative record
23 does not apply to these other issues.

**ARGUMENT**

24
25      The federal common law of contracts governs contracts with the federal
26 government. *Boyle v. United Tech. Corp.*, 487 U.S. 500, 504 (1988). Under federal
27 common law, the elements for breach of contract are "(1) a valid contract between the
28 parties, (2) an obligation or duty arising out of the contract, (3) breach of that duty, and (4)

-7-              Case No. 3:23-cv-00541-LL-VET

1  damages caused by the breach." *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir.

2  2020). Each element is addressed in turn.

3  I.   THE MOA IS A VALID CONTRACT.

4       The MOA is a valid and binding contract. The United States and the City mutually

5  agreed to the terms of the MOA for valid consideration and manifested their assent by

6  executing the agreement on May 30, 2000. SOF ¶ 38. The parties do not dispute that the

7  MOA is a valid contract. The City asserted a breach of contract claim against the United

8  States based on the MOA, necessarily maintaining that the MOA is a valid contract. *See*

9  ECF No. 8 at 18; ECF No. 31 at 21.

10  II.  THE NAVY PERFORMED ITS CONTRACTUAL OBLIGATIONS.

11      Under the second element, the City maintains that it did not have an obligation to

12  take the Boat Channel parcels because the Navy failed to perform its prerequisite

13  obligations. First, this brief establishes the meaning of the Navy's remedial obligation

14  under the MOA and demonstrates that the Navy met that standard. This brief then refutes

15  the City's various objections and demonstrates that the City cannot show the remediation

16  was arbitrary and capricious.

17      A.   The MOA Incorporates the Navy's Remedial Obligation Under CERCLA.

18      Word-for-word, the MOA incorporates the Navy's pre-existing obligation under

19  CERCLA to remediate the Boat Channel parcels. Under CERCLA, the Navy had a pre-

20  existing obligation to take all remedial action necessary to protect human health and the

21  environment before transferring the Boat Channel parcels. *See* § 9621(b)(1) (requiring the

22  selection of "a remedial action that is protective of human health and the environment").

23  The MOA merely recognized the Navy's pre-existing obligation. Nothing in the MOA

24  suggests the Navy agreed to do more than it was already required to do under CERCLA.

25  Thus, to determine the scope of the Navy's remedial obligation, the parties' intention under

26  the MOA was to look to the law under CERCLA.

27      The MOA uses the ***exact same*** language as CERCLA to define the remediation

28  cleanup standard. The MOA requires the Navy to "take all remedial action necessary to

-8-           Case No. 3:23-cv-00541-LL-VET

protect human health and the environment." SOF ¶ 39. Likewise, CERCLA provides that, before transferring federal property, the United States shall covenant that "all remedial action necessary to protect human health and the environment" has been completed. § 9620(h)(3)(A)(ii)(I).[1] The MOA's cleanup standard comes verbatim from CERCLA. The City cannot explain how repeating the exact same pre-existing standard—without saying anything else—somehow creates a different and heightened obligation.

The City knew that the Navy was already obligated under CERCLA to complete the remediation and that CERCLA governed the remediation. In the same sentence that regurgitates the Navy's remediation obligation under CERCLA, the MOA refers to the 1998 San Diego Reuse Plan. In the Reuse Plan—which predates the MOA by two years—the City acknowledges that "the Navy is responsible for all aspects of boat channel cleanup prior to conveyance" pursuant to CERCLA: "Following the requirements of the federal [CERCLA], the Navy must proceed with a Remedial Investigation, Feasibility Study, Proposed Plan, Record of Decision, and Remedial Action." SOF ¶ 40. The Reuse Plan shows the parties' mutual understanding that the Navy's remedial obligation was to follow the CERCLA process and standard.

The MOA also recognizes in paragraph 5 that the Navy must prepare a FOST, which is a CERCLA-derived procedure for documenting compliance with cleanup requirements, *see* 42 U.S.C. § 9620(h)(3). Attached to the MOA is the FOST the Navy completed for Parcels II, III-A, and IX. SOF ¶ 41. The example FOST explains that its purpose is to document that the property "is environmentally suitable to transfer by deed under Section 120(h) of" CERCLA, and that "all remedial actions necessary to protect human health and the environment . . . have been taken." SOF ¶ 41.

Additionally, in paragraph 3, the MOA states that each conveyance shall be by deed "in substantially the form" as attached to the contract as Exhibit B. SOF ¶ 42. The sample

---

[1] As explained in Section II.D. *supra*, the Navy is not required to provide this covenant in this instance because the City is a potentially responsible party.

deed warrants that "all remedial action necessary to protect human health and the environment with respect to any hazardous substances remaining on the Property has been taken," and expressly notes that the terms "remedial action" and "hazardous substances," among others, shall "have the meanings given such terms under CERCLA. SOF ¶ 42. In all, the MOA explicitly cites or refers to CERCLA at least 27 times. SOF ¶ 43. The City's suggestion that the Navy's remedial obligation under the MOA is distinct from the CERCLA standard is preposterous.

The parties' course of performance further established that CERCLA provided the process and standard for the Navy's remedial obligations. The MOA contains the exact same remedial obligation for Parcel VIII. SOF ¶ 44. The Navy followed the same remediation process and applied the same remediation standard for Parcel VIII, and the City accepted the parcel without objection. SOF ¶ 16. In the FOST for Parcel VIII, the Navy unambiguously explained that it followed the CERCLA process and standard to remediate the property: "The IR Program is the Navy's version of the [CERCLA] process. Per the requirements of CERCLA and its amendments, all federally owned facilities are required to remediate a site to the same degree as if it were privately owned. . . . All remedial action to protect human health and the environment ha[s] been taken at IR Site 15 [Parcel VIII], in accordance with CERCLA § 120(h)(3)." SOF ¶ 45. Although the City accepted that this process and standard was enough to satisfy the MOA for Parcel VIII, the City now seeks to apply a different process and standard to the Boat Channel parcels.

Even now, after years of litigation, the City has never explained its alternative interpretation of the Navy's remedial obligation. If not determined by reference to the well-established body of law under CERCLA, how are the parties and the court supposed to determine when all necessary remedial action has been taken? The City's view, essentially requiring the Navy to remediate the property to whatever standard meets the City's satisfaction, would render the provision void for vagueness or otherwise unenforceable. Restatement (Second) of Contracts § 33 (Contract terms must be "reasonably certain" and "provide a basis for determining the existence of a breach and for giving an appropriate

remedy."). Moreover, the Navy could not agree to an obligation that requires more than the statutory standard. CERCLA requires selecting a remedy "in accordance with . . . the national contingency plan." § 9621(a). An important criterion of the NCP is selecting cost-effective remedies. 40 C.F.R. § 300.430(f)(1)(i)(B); *see also* 42 U.S.C. § 9621(b)(1). An obligation that required the Navy to remediate more than is considered necessary under CERCLA would not be cost effective and would thus not be in accord with the NCP. The Navy could not and would not have agreed to a standard that creates this problem.

To accept the City's position, the court would have to find that even though both parties knew the Navy had a pre-existing obligation under CERCLA to remediate the Boat Channel parcels, and even though the parties used the exact same language from CERCLA in the MOA to describe the remediation obligation, and even though the parties elsewhere in the MOA expressly cited the specific CERCLA provision containing this language and obligation, that somehow the parties intended for this language to mean something different in the MOA, without saying anything anywhere about what that alternative meaning is. The City's position isn't credible.

      1. <u>Under CERCLA, to determine whether a remedy protects human health and the environment, courts look to whether the remedy complies with the NCP.</u>

CERCLA requires selecting a remedy that "is protective of human health and the environment." § 9621(b). To implement CERCLA's command, the EPA promulgated the NCP to establish the process and standards for ensuring the protection of human health and the environment. *See* 55 Fed. Reg. 8666, 8700 (Mar. 8, 1990) (The NCP's process "ensures the selection of remedial actions that fulfill statutory requirements to protect human health and the environment."). "The NCP is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *Wash. State Dep't of Transp. v. Wash. Nat. Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995).

Consistent with the statute, the NCP requires that a remedy protect human health and the environment as an irreducible threshold criterion. *State of Ohio v. U.S. E.P.A.*, 997 F.2d 1520, 1531 (D.C. Cir. 1993); *see also* 42 U.S.C. § 9621(d)(1) (requiring the selection

1   of remedies "at a minimum which assures protection of human health and the

2   environment"); 55 Fed. Reg. 8666, 8726 (explaining that remedies "must be demonstrated

3   to be protective"). Accordingly, if a party substantially complies with the NCP, the remedy

4   protects human health and the environment.

5           The standard for determining compliance with the NCP is well-established. As an

6   initial matter, CERCLA requires only "substantial compliance" with the NCP. 40 C.F.R.

7   § 300.700(c)(3)(i); *Carson Harbor Village v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265

8   (9th Cir. 2006). When the United States conducts a remediation, "consistency with the NCP

9   is presumed." *Wash. State Dep't of Transp.*, 59 F.3d at 799–800. To overcome this

10  presumption, the other party must show that the government's remedial action was

11  arbitrary and capricious. *Id.* at 802. The statute provides the arbitrary and capricious

12  standard, § 9613(j)(2), which "is justified because determining the appropriate removal and

13  remedial action involves specialized knowledge and expertise, and therefore the choice of

14  a particular cleanup method is a matter within the discretion of the government." *Wash.*

15  *State Dep't of Transp.*, 59 F.3d at 802 (cleaned up).

16          2.  Regulatory approval can establish compliance with the NCP.

17          The state regulator's approval and monitoring of the remediation can establish

18  compliance with the NCP. The First, Second, and Seventh Circuits have each held that a

19  private party may establish compliance with the NCP by showing that the state regulator

20  approved the remediation. *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d

21  112, 137 (2nd Cir. 2010) ("[P]rivate parties . . . must establish compliance. One way of

22  establishing compliance with the national plan is to conduct a response under the

23  monitoring, and with the ultimate approval, of the state's environmental agency."); *City of*

24  *Bangor v. Citizen Commc'n Co.*, 532 F.3d 70, 91 (1st Cir. 2008) ("Often that showing is

25  met if the remediation work is carried out under the approval and monitoring of the

26  appropriate state environmental agency."); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d

27  776, 791 (7th Cir. 2000) ("The Illinois EPA approved NutraSweet's clean-up plan, and the

28  agency monitored the progress of the remediation. . . . In light of this evidence, we are

1    satisfied that NutraSweet met this requirement for a CERCLA recovery."). If private

2    parties who do not enjoy the presumption of consistency can establish compliance with the

3    NCP by citing state regulatory approval, it follows that state regulatory approval can

4    establish compliance with the NCP for federal agencies, who already start with a

5    presumption of consistency. Otherwise, the United States would be subject to a higher

6    standard of proof, when the statute, regulations, and case law are clear that the United

7    States is meant to be subject to a lower standard of proof. *See Wash. State Dep't of Transp.*,

8    59 F.3d at 799 (citing 42 U.S.C. § 9607(a)(4)).

9         Giving special weight and deference to regulatory approval is appropriate and

10   consistent with the statutory scheme.[2] When a federal agency is the lead agency, the federal

11   agency is required to give the state regulator an opportunity to comment, but the federal

12   agency does not have to obtain the state's approval. *See* 42 U.S.C. § 9621(f)(1)(E)

13   (requiring that states have the opportunity to review and comment on remedial actions); 40

14   C.F.R. § 300.515(e)(2)(ii) ("State concurrence on a ROD is not a prerequisite to EPA's

15   selecting a remedy."). If the federal agency goes further and obtains the state regulator's

16   approval, it strengthens the presumption of consistency with the NCP, given that both sets

17   of regulators are certifying that the remedy satisfies the applicable requirements.

18        The regulations establish a similar presumption of consistency with the NCP in

19   other contexts. Specifically, if a party conducts a remediation pursuant to an abatement

20   order under § 106 or pursuant to a consent decree under § 122, the remediation "will be

21   considered consistent with the NCP." 40 C.F.R. § 300.700(c)(3)(ii). The preamble to the

22   NCP explains that this conclusion is warranted and appropriate for § 106 orders and § 122

23   decrees because the regulators responsible for enforcing CERCLA and the NCP have

24

25   _____

26   [2] *Cf. Sw. Organizing Project v. U.S. Dept. of the Air Force*, 526 F. Supp. 3d 1017, 1066–
     72 (D.N.M. 2021) (abstaining jurisdiction to decide how much remediation is necessary

27   and "defer[ring] to the NM Environment Department, the authorized state regulatory
     agency under the" Resource Conservation and Recovery Act); *Friends of Santa Fe Cnty.*

28   *v. LAC Minerals*, 892 F. Supp. 1333, 1349–50 (D.N.M. 1995) (same).

1   selected and approved the remedy. 55 Fed. Reg. 8666, 8797 ("As to section 106/122 orders
2   or decrees, those documents implement remedies that have been selected in accordance
3   with CERCLA and the NCP, and they contain the cleanup standards necessary for
4   consistency with the NCP. EPA believes that defendants will have acted 'consistent with
5   the NCP' when they comply with a section 106 order or a section 122 consent decree.").
6   So too, here. If the lead federal agency and the lead state agency have each determined that
7   the selected remedy complies with the NCP and protects human health and the
8   environment, that should be conclusive on the issue.

9       3.   The Water Board scrutinized and approved each step of the Navy's
10           remediation.

11          Crucially, the Water Board concurred in the selection of the remedy in the ROD.
12   SOF ¶ 27. The selection of the remedy is the key decision point and final agency action
13   under CERCLA and the NCP. *See* 42 U.S.C. § 9621(a)–(d) (providing rules for the
14   selection of a remedy); § 9613(k) (directing the creation of "an administrative record upon
15   which the President base the selection of a response action"). After reviewing the
16   465-page ROD, the Water Board expressly and unreservedly "concur[red] with the selected
17   remedy." SOF ¶ 27. This concurrence establishes that the Navy's selection of the remedy
18   was consistent with the NCP and was not arbitrary and capricious.

19          The Water Board's involvement in and scrutiny of the remediation was extensive.
20   The Water Board issued a no-further-comment letter for each of the FS Report, the
21   RD/RAWP, the RACR, and the FOST. SOF ¶¶ 23, 30, 33, 46. Nor was the Water Board a
22   rubber stamp. The Water Board submitted hundreds of detailed and substantive comments
23   on the Navy's reports, spanning ***311 pages*** of detailed back-and-forth between the Water
24   Board's comments and the Navy's responses. SOF ¶ 47. The Water Board also participated
25   in countless calls and meetings to monitor the remediation. SOF ¶ 48. The Water Board
26   closely scrutinized the remediation, and its concurrence establishes that the remediation
27   was consistent with the NCP and protected human health and the environment.

28

-14-        Case No. 3:23-cv-00541-LL-VET

B.  <u>The City Cannot Show that the Navy's Selection of the Remedy was Arbitrary
    and Capricious.</u>

The City cannot show that the Navy's selection of the remedy was arbitrary and
capricious. The City has asserted various reasons why the selected remedy was allegedly
inadequate. None withstands scrutiny.

1.  <u>The Navy reasonably determined that there was no risk to human health or
    the environment in Parcel III-B that required remediation.</u>

The City has argued that the Navy failed to perform under the MOA because it did
not remediate Parcel III-B. The Navy didn't remediate Parcel III-B because the
investigation showed that Parcel III-B didn't require remediation. The Navy conducted a
remedial investigation of the entire Boat Channel, including Parcel III-B, to determine
which areas required remediating. SOF ¶ 49, RI Report ("The scope of the project
encompassed . . . 31 stations spanning the length of the Boat Channel and into San Diego
Bay. . . . The project scope was developed with the approval of technical specialists within
the federal and state regulatory agencies."); SOF ¶ 49, ROD (map showing sample
locations in the Boat Channel, including in Parcel III-B). The RI Report recommended "no
further action" in the "southern section" of the Boat Channel, which contained all of Parcel
III-B. SOF ¶ 50. In the FS Report, the Navy expanded the area of ecological concern to be
addressed in the remediation. SOF ¶ 51. But at no point did any part of the area of
ecological concern include any of Parcel III-B. SOF ¶ 52. Accordingly, the Navy
determined that no remedial action was necessary in Parcel III-B, and the Water Board
concurred. SOF ¶ 53.

The Navy's detailed reasoning for why remediation was not necessary in Parcel III-
B, which the Water Board accepted, is not arbitrary and capricious. RI Report
USN_527214–527227 (findings about which areas require remediation); FS Report
USN_87695–87708 (same); ROD USN_98196–98203 (same). The City never questioned
the finding that Parcel III-B did not require remediation during the comment period, and
the issue is thus waived. *See Emhart Indus., Inc.*, 274 F. Supp. 3d at 48.

-15-          Case No. 3:23-cv-00541-LL-VET

The MOA also does not require unnecessary remediation. In fact, the MOA contemplates that Parcel III-B might not require remediation. The MOA says that "Parcel IIIB *is believed* to contain sediments impacted with various contaminants." SOF ¶ 54, MOA ¶ 2(c) (emphasis added). In contrast, for Parcel VIII, the MOA says that "Parcel VIII *is known* to be impacted with elevated levels of tetrachloroehene (PCE) in soil and groundwater." SOF ¶ 55, MOA ¶ 2(b) (emphasis added). The MOA used this disparate language precisely because previous assessments had confirmed that Parcel VIII was contaminated but indicated only that Parcel III-B might be contaminated. The Navy's decision not to remediate Parcel III-B after further investigating and sampling the parcel is well-reasoned and perfectly consistent with the MOA's terms.

> 2. The Navy reasonably determined there was no risk to human health or the environment on the shoreline that required remediation.

The City claims the Navy failed to consider and include the shoreline in the scope of the remediation. Not so. The Navy explicitly included the shoreline, beaches, and riprap in the scope of its investigation, and reasonably determined that these areas did not require remediation.

In the RI Work Plan, the Navy explicitly considered the shoreline when deciding where to take samples and where there might be exposure to potential contamination:

> [H]uman access to the shoreline of the Boat Channel is somewhat limited because the northern portion is surrounded by steep embankments, with no intertidal areas that are easily or safely accessed. A great portion of the remainder of the channel is lined with riprap that is submerged at high tide. Currently, human use mainly consists of boat-related activities (e.g., pleasure craft), although there may be recreational use by swimmers. With the closure of NTC and implementation of the Draft Reuse Plan, there may be increased access to the shoreline and incidental use of the pedestrian trail paralleling the channel by walkers and joggers.

SOF ¶ 56. The Navy decided to focus the shoreline sampling to the "beach areas," reasoning that "these areas would be the locations most likely frequented by recreational

-16-        Case No. 3:23-cv-00541-LL-VET

users of the Boat Channel. Therefore, the most direct medium exposure by the recreational user is the surface sand at the limited zones of access to the channel." SOF ¶ 57. Exposure to any potential contamination in the sediment underneath the riprap was limited because the riprap covered the sediment. SOF ¶ 58, RI Work Plan (noting that "access to the shoreline is limited" where it is "lined with riprap"); SOF ¶ 58, RI Report ("The banks of the Boat Channel are lined with riprap along much of its length[.]"). The City's claim that the Navy did not consider the shoreline as part of the remediation is simply not true. The Navy took samples from ten stations on the shoreline. SOF ¶ 59. The Navy made a reasoned decision to target the beaches for sampling, rather than the riprap, because the beaches were a far more likely pathway to exposure.

The sampling results confirmed that the shoreline did not require remediation. The sampling results showed that contamination was greatest in the deeper parts of the Boat Channel, less in the shallower parts of the Boat Channel, and least along the shoreline. SOF ¶ 60, FS Report ("Sediment contaminant concentrations are higher at deeper locations than shallower locations. . . . In addition, the Beach Sediment samples . . . had much lower concentrations of contaminants than did the deep sediment stations."); SOF ¶ 60, RI Report USN_527214 ("Concentrations of chemicals measured in the surface sediment tend to increase in a south-to-north gradient–i.e., lowest at and near the reference stations and highest in the deeper, more quiescent stations in the northern section of the channel."). The data showed no risk to human health or the environment on the beaches, and demonstrated that the contamination tended to sink to the deeper parts of the Boat Channel. Based on these results, the Navy's decision not to remediate the shoreline was reasonable and fully supported by the evidence.

The Navy explained these points in response to the City's comments on the ROD. When the City claimed the Navy did not investigate and consider remediating the parts of the shoreline with riprap, the Navy explained: "The areas along the shoreline and slopes containing riprap have been investigated, and were not identified as areas of concern." SOF ¶ 61. The Navy also noted that the "Remedial Investigation collected beach sediment in

close proximity to the riprap and found very low concentrations of contaminants." SOF ¶ 62. The City continued to raise its objection, but the City never addressed the sample data showing that the contamination was concentrated in the deeper parts of the Boat Channel, not the shoreline. *See also* SOF ¶ 63 (explaining why the sloped areas did not require remediation). Additionally, the Water Board reviewed the City's comments and approved the Navy's reports over the City's objections, agreeing with the Navy that the City's comments did not warrant reconsidering the reports' conclusions. SOF ¶ 64 (agreeing that the Water Board "concluded that notwithstanding the City's comments, the proposed remediation satisfied the applicable regulations and protected human health and the environment").

### 3.  The Navy's use of sampling was reasonable.

The City argues that the Navy's remediation was inadequate because it relied on samples collected in 1998 during the remedial investigation. As an initial matter, the City's argument is incorrect. The Navy did not rely solely on the samples collected in 1998; the Navy collected additional sediment samples in 2017 and again in 2018. The Navy collected pre-remediation sediment samples during the remedial design phase in 2017. SOF ¶ 65, RACR ("P[re-Design Investigation] sediment sampling activities were conducted on October 2 and 3, 2017."). The Navy also collected post-remediation sediment samples in 2018 to confirm that the remedy successfully removed the contamination. SOF ¶ 66, RACR (describing the post-dredge confirmation sampling and finding that "[c]onfirmation sample results indicated that no [chemicals of ecological concern] were reported exceeding cleanup goals in any of the sediment samples"). Neither the pre- nor post-remediation samples indicated that conditions had changed such that the selected remedy was no longer adequate and needed to be modified or reconsidered.

The Navy reasonably determined that further sampling was not necessary for at least three reasons. First, new contamination was unlikely. The contamination in the sediments was mostly from historical sources and practices. SOF ¶ 67, ROD ("The subject remedial action focuses on the combined contamination to the Boat Channel from historic releases.

These pre-1997 releases likely have been the result of processes and practices no longer performed or allowed."). Long before 1998, parties had adopted much cleaner practices and releases of the chemicals of concern found in the Boat Channel were far less likely. SOF ¶ 68, ROD ("Stormwater Pollution Prevention practices have evolved since the decades past when these contaminants found their way to Boat Channel. Current controls and practices have diminished the levels of lead, zinc, copper, chlordane and DDT to the Boat Channel. For example[,] the use of chlordane and DDT is extremely restricted. Industries must comply with much stricter standards than in the 1950s, 1960s and 1970s."). The City itself acknowledged that new contamination was unlikely. SOF ¶ 69, FS Report ("[I]t is unlikely that large amounts of newly contaminated sediments would have been deposited due to improved pollution prevention practices[.]").  Moreover, because the Navy ceased operations at the former NTC in 1997, the Navy could not have caused any additional contamination after the 1998 sampling, further decreasing the likelihood of additional contamination. SOF ¶ 70, ROD ("NTC ceased operations in April 1997. All other IR sites and Navy-related sources have been cleaned up and sites closed. IR Site 12 (Boat Channel Sediments) is the only remaining IR site.").[3]

      Second, even if there had been additional contamination, it likely would have been captured by the selected remedy. The Navy's investigation of the Boat Channel found that

---

[3] In response to comments on the reports, the Navy sometimes suggested that it was not responsible for remediating any contamination that occurred after the Navy ceased operations at the former NTC in 1997. Properly understood, and as the Navy repeatedly explained, the Navy determined in consultation with the Water Board that additional contamination in the Boat Channel was unlikely, so the remediation was thus focused on cleaning up historical contamination. This reason is sufficient to sustain the Navy's decision, and any overstatement that the Navy isn't responsible for post-1997 contamination is harmless. *See Bally's Park Place, Inc. v. N.L.R.B.*, 646 F.3d 929, 939 (D.C. Cir. 2011) ("When an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and the agency would clearly have acted on that ground even if the other were unavailable."); *see also Spencer Enter. Inc. v. United States*, 345 F.3d 683, 693 (9th Cir. 2003) ("[A]ny one of these grounds would be sufficient to reject the petition.").

contaminants tended to settle in the deeper parts of the Boat Channel. SOF ¶ 71. The Navy's selected remedy thus focused appropriately on these areas, and the Navy proceeded to dredge and remove the sediment from the deeper parts of the Boat Channel. Any new contamination likely would have settled in the same area, and it would have been removed with the old contamination.

Third, the Navy determined it was unlikely that existing contamination had migrated to different locations because the Boat Channel was a low-energy environment. SOF ¶ 72, ROD ("Since the Boat Channel is a low energy environment, contaminants would not be expected to be transported significant distances once deposited, tending to settle in the lower areas of the Boat Channel."); *id.* ("[A] drogue study performed in 1982 documented the low current environment in the northern area and throughout the Boat Channel. The study also concluded that contaminant transport associated with sediment particles was likely not significant in transporting contaminants either in or out of the Boat Channel."); SOF ¶ 72, FS Report ("The bathymetric contours are unlikely to have changed greatly over time due to the absence of significant sedimentation that could increase the bottom surface or tidal current that could scour the bottom surface."). Thus, it was reasonable not to take new samples in different locations.

The Water Board approved the Navy's selected remedy and did not believe that further sampling was necessary. SOF ¶ 73, FS Report ("The Water Board was a key participant during the entire RI and FS process, and has concurred that the data and conclusions are valid and appropriate for making the cleanup decision for the Boat Channel."); SOF ¶ 73, ROD ("The 1998 data set represents the most accurate assessment of sediment conditions in the Boat Channel associated with the termination of Navy operations at the former NTC in April 1997. . . . The State of California Water Board was an active participant in the development of both CERCLA documents, the selection of [chemicals of ecological concern], and the development and regulatory concurrence with the Sediment Cleanup Goals for IR Site 12."). The Navy's sampling for the Boat Channel remediation was reasonable.

1             4.   <u>The Sediment Quality Objectives do not apply to the Navy's remedial action.</u>

2        The City argues that the Navy's remediation was inadequate because it did not

3 consider the 2008 and 2011 Sediment Quality Objectives ("SQOs"). The City ignores that,

4 by their own terms, the 2008 and 2011 SQOs did not apply to the Navy's remedial action.

5 Enclosed Bays and Estuaries Plan (2008), Ch. II.B.2 ("The supersession provision in 1.

6 above ***does not apply to existing sediment cleanup activities*** where a site assessment was

7 completed and submitted to the Regional Water Board by February 19, 2008.") (emphasis

8 added); Enclosed Bays and Estuaries Plan (2011), Ch. II.B.3 ("The supersession provisions

9 in paragraphs 1) and 2) above ***do not apply to existing sediment activities*** where a site

10 assessment was completed and submitted to the [Water Board] by February 19, 2008.")

11 (emphasis added). Because the Navy completed and submitted the RI Report in 2003,

12 which is the equivalent of a site assessment, the Water Board agreed that the 2008 and

13 2011 SQOs did not apply to the Navy's remediation of the Boat Channel. SOF ¶ 74. The

14 City does not cite any authority to the contrary.

15        Accordingly, the ROD reports, with the Water Board's concurrence, that the SQOs

16 are not applicable or relevant and appropriate requirements for the Boat Channel

17 remediation. SOF ¶ 75, ROD ("The SQO program provisions are not CERCLA ARARs

18 because the Former NTC IR Site 12 was 'grandfathered' from their applicability, and they

19 are not 'relevant and appropriate' to the site."). Nevertheless, the Navy "used some of the

20 SQO data evaluation methods as a voluntary accommodation of the Water Board," even

21 though the Navy "is not legally bound to comply with them." *Id*. Thus, the Navy may well

22 have satisfied the SQOs despite not being required to do so.

23            5.   <u>The Navy was not obligated to remediate PFAS, and the City waived the</u>

24                 <u>issue.</u>

25        The City's latest argument to escape its obligations under the MOA is to fault the

26 Navy for failing to include PFAS in the scope of the remediation. The problem? PFAS was

27 not declared a hazardous substance until ***July 8, 2024***. Designation of Perfluorooctanoic

28 Acid (PFOA) and Perfluorooctanesulfnoic Acid (PFOS) as CERCLA Hazardous

1  Substances, 89 Fed. Reg. 39124 (July 8, 2024). The Navy issued its ROD in 2017, and the
2  Navy completed the remedial action in 2018. The City does not explain how or why the
3  Navy should have included PFAS before it was designated a hazardous substance.

4      There was no basis to include PFAS in the Navy's remediation. Before being
5  designated as a hazardous substance, an agency can initiate a response action only if it
6  establishes that a release presents "an imminent and substantial danger." 42 U.S.C. §
7  9604(a)(1); *see* 89 Fed. Reg. 39137 ("With respect to hazardous substances, the Agency
8  can conduct response actions if there is a release or threatened release; however, for
9  pollutants or contaminants, EPA can only respond if it establishes that the release may
10  present an imminent and substantial danger."). At no time during the remediation of the
11  Boat Channel was there any evidence of an imminent and substantial danger from PFAS.

12      In May 2016, the EPA issued a Lifetime Health Advisory explaining the risk from
13  exposure to PFAS in drinking water. SOF ¶ 76. As noted in the FOST, neither the Boat
14  Channel nor the groundwater at the former NTC is a source of drinking water. SOF ¶ 77,
15  FOST ("No beneficial uses have been established for groundwater in the Point Loma
16  Hydrologic area, and groundwater in the Coronado Hydrologic unit has been exempted
17  from the designation of beneficial use as a municipal groundwater supply.") The report
18  also noted that PFAS "have not been used or stored within the FOST property." SOF ¶ 78,
19  FOST.  Given that the primary exposure pathway to PFAS is drinking water, PFAS could
20  not have presented an imminent and substantial danger in the Boat Channel since it is not
21  a source of drinking water.

22      Regardless, the issue is waived. Under CERCLA, if a party fails to raise an issue
23  before the selection of the remedy, the issue is waived. *Emhart Indus., Inc.*, 274 F. Supp.
24  3d at 48 (holding after reviewing CERCLA's statutory scheme that waiver applies to
25  CERCLA). Here, neither the City nor any other party suggested that the Navy should
26
27
28

1   include PFAS in the remediation prior to the selection of the remedy.[4] SOF ¶ 79. Because

2   the EPA issued the Lifetime Health Advisory about PFAS in May 2016, nearly a year

3   before the Navy selected the remedy, the City cannot claim that it did not have any

4   opportunity to raise the issue in time.

5           Likewise, the designation of PFAS as a hazardous substance in July 2024 was too

6   late to change the Navy's remedial obligation. Under the MOA, the City was obligated to

7   accept title to the Boat Channel parcels after the Navy completed its performance. The

8   Navy attempted to transfer the Boat Channel parcels to the City in 2022, but the City

9   refused to accept transfer. At that point, the City was in material breach of the MOA. MOA

10  ¶ 9 ("Failure of the City to accept delivery of a Deed . . . shall be deemed to be a breach of

11  this Agreement."). A party's material breach of a contract "excuse[s] the nonbreaching

12  party from further performance." *New Windsor Volunteer Ambulance Corps, Inc. v.*

13  *Meyers*, 442 F.3d 101, 117 (2nd Cir. 2006); *see also* Restatement (Second) of Contracts

14  § 237.[5] The City's failure to accept transfer cannot possibly result in adding to the Navy's

15  contractual obligations. A party does not benefit from its breach. *See, e.g.*, *Javins v. First*

16  *Nat. Realty Corp.*, 428 F.2d 1071, (D.C. Cir. 1970) (recognizing "the contract principle

17  that no one may benefit from his own wrong"). The City was obligated to accept transfer

18  in 2022. At that time, the Navy was not obligated to remediate PFAS.

19          C.   The Navy Obtained Site Closure from the Appropriate Regulatory Authority.

20          The MOA requires the Navy to "obtain site closure from appropriate regulatory

21  authorities." MOA ¶¶ 2(c), 4(b). As the lead agency for the state, the Water Board is the

---

[4] The City first raised PFAS in comments submitted on the RACR in October 2018, long
after the Navy issued the final ROD in March 2017 and completed the remedial action
around March 2018. SOF ¶ 98. At that time, it was far too late for the Navy to include
PFAS in the remediation. Of course, as explained above, the Navy would have had no basis
to include PFAS in the remediation even if the City had raised the issue timely.

[5] When applying the federal common law for contracts, courts typically look to the
Restatement whose "principles represent the prevailing view among the states." *Bowden v.*
*United States*, 106 F.3d 433, 439 (D.C. Cir. 1997).

1    appropriate regulatory authority. *See* ROD USN_98183. The Water Board has confirmed

2    that it closed the site, and the City's arguments to the contrary are frivolous.

3         The Water Board determined that the remediation was complete and closed the site.

4    In the ROD, the Water Board agreed that the selected remedy protected human health and

5    the environment. SOF ¶ 80, ROD ("The selected chemical remedy will protect human

6    health and the environment."). After reviewing the RACR, the Water Board agreed that the

7    remedy had been implemented successfully. SOF ¶ 81 ("The Final RACR documents the

8    completion of a remedial action to address chemically impacted sediments at [IR] Site 12.

9    . . . The remedy is protective of the environment, complies with federal and state statutes

10   and appropriate requirements, and is cost-effective. The San Diego Water Board has no

11   further comments on the Final RACR.").[6] Finally, the Water Board agreed that Parcels III-

12   B and VIII were suitable for transfer. SOF ¶ 82 ("The San Diego Water Board finds the

13   Final FOST acceptable with regard to the completion of the sediment remediation in the

14   Boat Channel (IR Site 12) and has no further comments."). Around that time, the Water

15   Board changed the status of the site to "closed" on its Geotracker website. SOF ¶ 34. The

16   Water Board's declaration that it closed the site should end the matter.

---

20   [6] The City attempts to seize on the Water Board's statement that the "remedy is protective
21   of the environment," without mentioning human health, as evidence that the Water Board
     never determined the remedy protected human health. This is a red herring. The RI Report
22   and the FS Report concluded there was no risk to human health. SOF ¶ 83, ROD ("No
     unacceptable human health risk associated with recreational exposure to water, sediment
23   and beach sand at the Boat Channel was identified."). Accordingly, the remedy focused on
     the environmental risks that had been identified. At any rate, the protection of human health
24   is an irreducible threshold criterion for any CERCLA remedy. *State of Ohio*, 997 F.2d at
25   1531; *see also* § 9621(d)(1) (requiring the selection of remedies "at a minimum which
     assures protection of human health and the environment"); 55 Fed. Reg. 8726 (explaining
26   that remedies "must be demonstrated to be protective"). The Water Board cannot concur
     that a remedial action is complete without determining that it protects human health. If a
27   remedy did not protect human health, it would not "compl[y] with federal and state statutes
     and appropriate requirements," as the Water Board certified. SOF ¶ 31.

1   Nevertheless, the City contends the site is not closed until the Water Board issues a

2   no-further-action letter, arguing that the Water Board's no-further-comment letters are not

3   enough. The City does not cite any authority for its position. Even more revealing, the City

4   accepted without objection the Water Board's no-further-comment letter on Parcel VIII as

5   the equivalent of site closure. SOF ¶ 84; *see also Nankuli Paving & Rock Co. v. Shell Oil*

6   *Co.*, 664 F.2d 772, 779 (9th Cir. 1981) ("A course of performance of the contract . . .

7   demonstrates how the parties understand the terms of their agreement."). Now that the City

8   has received the benefit of its bargain, the City wants different rules to apply to Parcels III-

9   B and VII, but the MOA's requirement is the same. *Compare* MOA ¶ 2(b) *with* ¶ 2(c).

10   At the City's urging, the Water Board briefly issued a no-further-action letter for

11   the Boat Channel parcels. SOF ¶ 85. The Water Board subsequently realized that a no-

12   further-action letter was not necessary and rescinded the letter. SOF ¶ 86. The Water Board

13   explained that it did not rescind the no-further-action letter because of any issue with the

14   remediation:

15   Because the San Diego Water Board previously responded that it had no further

16   comment on the Final RACR and subsequently noted in Geotracker the closed status

17   of the case, an NFA letter was not necessary to effect closure of IR Site 12, nor was

18   its issuance required by applicable federal or state law. For these reasons, the San

19   Diego Water Board hereby rescinds the NFA letter. Rescission of the NFA Letter

20   neither limits nor expands the San Diego Water Board's regulatory authority

21   regarding IR Site 12.

22   SOF ¶ 87. The Water Board confirmed in deposition testimony that rescinding the no-

23   further-action letter was merely correcting a mistake and did not affect its closure of the

24   site or approval of the remedy. SOF ¶ 88.

25   Next, the City argues that the Water Board's site closure does not apply to the entire

26   Boat Channel. This argument rehashes the City's position that Parcel III-B and the

27   shoreline were not included in the scope of the remediation. The argument is without merit.

28   *See* Sections II.B.1 and II.B.2 *supra*. The Navy investigated Parcel III-B and the shoreline

-25-          Case No. 3:23-cv-00541-LL-VET

1  and determined—with the Water Board's concurrence—that these areas did not require

2  remediation. *See id.* In any event, the Water Board's no-further-comment letter on the

3  FOST explicitly states that it applies to Parcel III-B and Parcel VII. SOF ¶ 89.

4      Finally, the City suggests the site closure is illegitimate because the Water Board

5  has said that the exemption from the SQOs applies only to contamination that was analyzed

6  within the scope of the RI Report. SOF ¶ 90 ("[T]he exemption from SQOs for cleanup

7  activities applies to IR Site 12 and only for the prior contamination that was analyzed in

8  the Navy's Remedial Investigation Report."). The exemption only ever applied to the scope

9  of the Navy's remedial investigation. *See* Section II.B.4 *supra*. Thus, after taking title, the

10  City will enjoy the same exemption that the Navy received—no more, and no less. SOF

11  ¶ 90 (explaining that title and ownership are not relevant to the scope of the exemption).

12  The Navy would not be exempt from the SQOs for any future contamination, or for any

13  past contamination that was not analyzed in the remedial investigation. It is not clear on

14  what basis the City believes that it should be. For the other parcels that were transferred

15  pursuant to the MOA, the same rules apply: the City would be exempt from the SQOs for

16  contamination that was analyzed in those investigations, but the new standards would

17  otherwise apply. This does not render the closure of Parcels VIII or X invalid, nor does it

18  render the closure of Parcels III-B or VII invalid.

19      D.  Excluding the Disputed Covenant from the Deed was Proper under the MOA

20          and Relevant Law.

21      The City contends that the Navy breached the MOA by failing to include a covenant

22  in the deed warranting that all necessary remedial action has been taken. But consistent

23  with CERCLA and binding Department of Defense policy, the MOA says the Navy will

24  not provide this covenant to parties who are potentially responsible for the remediation.

25      The MOA says the deed might not include the disputed covenant. The MOA states

26  that the deed transferring the parcels shall be "in substantially the form attached hereto as

27  Exhibit 'B' provided, however, that ***changes may be required in connection with***

28  ***execution of the [FOST] discussed in paragraph 5***." MOA ¶ 3 (emphasis added). In

Exhibit B, the sample deed includes the covenant at issue from CERCLA § 9620(h)(3)(A)(ii). But attached to the sample deed is a sample FOST, which expressly notes: "this covenant will not apply to any response action required on the property as a result of an act or omission of the grantee which results in a new release or threat of release of hazardous substances." MOA p. 68. This tracks the relevant law under CERCLA, which states in § 9620(h)(3)(B) that the disputed covenant "shall not apply in any case in which the person or entity to whom the real property is transferred is a potentially responsible party with respect to such property."

The exact eventuality contemplated in the MOA is what occurred here. The ROD identified the City as a potentially responsible party for the contamination in the Boat Channel parcels. SOF ¶ 91, ROD; *see also* ECF No. 118. The FOST likewise noted that the covenant "does not apply in any case in which the entity to which the property is transferred is a potentially responsible party (PRP) with respect to the property transferred by the United States." SOF ¶ 92, FOST. Accordingly, consistent with the terms of the MOA, the Navy did not include the disputed covenant in the deed.

Moreover, Department of Defense policy forbids the Navy from providing the disputed covenant to a potentially responsible party: "[T]his 120(h) clause shall not be provided in any case in which the person or entity to whom the real property is transferred is a potentially responsible party with respect to such property." DOD Instruction 4165.72 ¶ 5.5.2.4.1.4. This instruction is binding on the Navy. DOD Instruction 4165.72 ¶ 2.1 (specifying that it applies to all military departments). Thus, the Navy cannot provide the covenant the City seeks, nor is the Navy obligated to do so under the MOA.[7] Nor would it

---

[7] Excluding potentially responsible parties from receiving the disputed covenant makes good sense. Otherwise, if the Navy provided the covenant to a grantee who is responsible for contaminating the property, the grantee could use the covenant to force the Navy to take the lead in a future remediation of that contamination, even though the grantee at that point is the owner of the property and is responsible for the contamination. That's not sensible. Regardless of the covenant, if a future remediation is required for some contamination traceable to the Navy and the City, the cost would be apportioned between

1  be fair for the City to receive a covenant releasing it from liability for contamination that

2  it shares responsibility for creating in the first place.

3      III. THE CITY BREACHED ITS OBLIGATION UNDER THE MOA TO ACCEPT

4               TRANSFER OF THE BOAT CHANNEL PARCELS.

5         There is no genuine dispute that the MOA obligated the City to accept transfer of

6  the Boat Channel parcels after the Navy completed its remediation and obtained site

7  closure. *See* MOA ¶ 1 (For Parcel III-B, "the Navy agrees to convey to the City, and the

8  City agrees to accept from the Navy . . . all of the Navy's right, title, and interest in the

9  Property."); MOA ¶ 4 (For Parcel VII, the "City shall take all necessary actions to accept

10 the deeds as they are proffered by the sponsoring agencies."). On May 16, 2022, after the

11 Navy performed its obligations under the MOA, *see* Section II *supra*, the Navy sent the

12 deed for Parcel III-B to the City and assigned Parcel VII to the National Park Service for

13 its conveyance to the City. SOF ¶ 93. The City responded that it "objects, for a number of

14 reasons, to the transfer of either of those parcels in their present condition," and specifically

15 asked the National Park Service to "hold its process in abeyance." SOF ¶ 36.

16        Under the MOA, "[f]ailure of the City to accept delivery of a Deed . . . after written

17 notice and thirty days to cure, shall be deemed to be a breach of this Agreement." SOF

18 ¶ 94, MOA ¶ 9. Consistent with this provision, the Navy sent a notice of default to the City

19 on November 3, 2022. SOF ¶ 94. The City failed to cure its breach and accept delivery of

20 the parcels within thirty days of the notice of default. Consequently, the City breached the

21 MOA.[8]

22

23 _____

24 the Navy and the City as they are in any other CERCLA remediation. The only issue
   affected by the covenant is who leads any such hypothetical future remediation.

25 [8] The City has made a frivolous argument that it didn't breach because the Navy didn't

26 send a ***signed*** deed for Parcel III-B to the City. The Navy sent an executable deed to the
   City for signature, SOF ¶ 95; the MOA does not require the Navy to sign first. At any rate,

27 the City responded that it would not accept transfer. SOF ¶ 36. Similarly, the City argues
   that the National Park Service never sent a deed for Parcel VII. SOF ¶ 96. The City omits

28 that it instructed the National Park Service not to send the deed. The Navy assigned Parcel

IV. THE CITY'S BREACH HARMS THE NAVY.

There is no genuine dispute that the City's failure to accept transfer of the Boat Channel parcels harms the Navy. The Navy budgets approximately $15,000 each year for the cost of maintaining buoys and navigational lighting in the Boat Channel. Megliola Decl. ¶ 9. The public also accesses parts of the Boat Channel parcels for recreational purposes, exposing the Navy to ongoing liability. *Id.* at ¶ 8. The City's breach also denies the Navy the benefit of its bargain. A primary purpose of the MOA—indeed, part of the statutory mission of the Base Realignment and Closure program—is to offload surplus military property. *See* Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510 § 2901(b). The City took the valuable parts of the former NTC but has refused to honor its contractual obligation to take the Boat Channel parcels. The Boat Channel parcels are submerged and surrounded by upland property owned by the City, the San Diego Airport Authority, and the Marine Corps Recruit Depot. *See* MOA p. 13. There is no ingress or egress to the Boat Channel parcels without securing an easement from the surrounding upland property owners. *See id*. By taking only the valuable parts of the former NTC, the City received the benefit of its bargain under the MOA and stranded the Boat Channel parcels, making them more difficult to offload.

V. THE NAVY IS ENTITLED TO SPECIFIC PERFORMANCE.

The Navy is entitled to specific performance to remedy the City's breach. Specific performance is an equitable remedy that is appropriate when damages are inadequate. Restatement (Second) of Contracts §§ 357, 359. Specific performance is routinely awarded for the breach of real estate contracts. Williston on Contracts § 67:65 ("Ordinarily the

---

VII to the National Park Service for conveyance to the City, and sent the executed assignment documents to the National Park Service and the City. SOF ¶¶ 97, 36. The City responded that it objected to the transfer of the Boat Channel parcels and asked the National Park Service to "holds its process in abeyance." SOF ¶ 36. The Navy offered to cure these alleged deficiencies with conveyance, SOF ¶ 97, but the City ignored the offer. The City's repudiation of its contractual obligations is unambiguous.

-29-                    Case No. 3:23-cv-00541-LL-VET

specific performance of a contract to convey land is as much a matter of course as an action of damages for its breach."); *see also Henderson v. Fisher*, 236 Cal. App. 2d 468, 473 (Cal. Ct. App. 1965) ("[I]t is the general rule that in the case of a contract for the transfer of an interest in land it is presumed that damages would not adequately compensate for the breach."). Specific performance is especially appropriate here, because the Navy agreed to transfer the Boat Channel parcels at no cost and the City has made it exceedingly difficult to find a substitute transferee by taking the valuable parts of the former NTC and stranding the Boat Channel parcels.

## CONCLUSION

The court should grant summary judgment to the United States on its breach of contract claim and order the City to accept transfer of the Boat Channel parcels.

1

Dated: August 18, 2025          /s/ *Samuel Hobbs*
                                BRETT A. SHUMATE
2                               Assistant Attorney General
                                Civil Division
3

4                               KIRK MANHARDT
                                MARCUS SACKS
5                               ALASTAIR M. GESMUNDO (CABN 316573)
                                SAMUEL F. HOBBS (AL Bar No. 9776O19E)
6                               Commercial Litigation Branch
                                Corporate Financial Litigation Section
7                               P.O. Box 875, Ben Franklin Station
                                Washington, DC 20044
8                               Phone: (202) 616-8077
                                Email: samuel.hobbs@usdoj.gov
9

10                              ADAM R.F. GUSTAFSON
                                Acting Assistant Attorney General
11                              Environment and Natural Resources Division

12

13                              STEFAN J. BACHMAN (SC Bar No. 102182)
                                BRIAN SCHAAP (DC Bar No. 1780655)
14                              Environmental Enforcement Section
                                P.O. Box 7611
15                              Washington, DC 20044
                                Phone: (202) 616-6536
16

17                              MICHAEL AUGUSTINI (DC Bar No. 452526)
                                Environmental Defense Section
18                              450 Golden Gate Avenue, Suite 07-6714
                                San Francisco, CA 94102
19                              Phone: (202) 532-3210

20

21                              *Attorneys for Plaintiff and Counterclaim-Defendant United States of America*

22

23

24

25

26

27

28

                                        -i-          Case No. 3:23-cv-00541-LL-VET