Barry P. Steinberg (admitted *Pro Hac Vice*)
barry.steinberg@kutakrock.com
**KUTAK ROCK LLP**
1133 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
Telephone: (202) 828-2400
Facsimile: (202) 828-2488

Dwyer Arce (admitted *Pro Hac Vice*)
dwyer.arce@kutakrock.com
**KUTAK ROCK LLP**
1650 Farnam Street
The Omaha Building
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148

Thomas F. Vandenburg (State Bar No. 163446)
tvandenburg@wshblaw.com
Alice Charkhchyan (State Bar No. 332670)
acharkhchyan@wshblaw.com
**WOOD, SMITH, HENNING & BERMAN LLP**
505 North Brand Boulevard, Suite 1100
Glendale, CA 91203
Telephone: (818) 551-6000
Facsimile: (818) 551-6050

Attorneys for Defendant/Counter-Claimant
CITY OF SAN DIEGO

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO,<br><br>Defendant.<br><br>*AND RELATED CROSS CLAIMS AND COUNTER CLAIMS* | Civil No. 3:23-CV-00541-LL-VET<br><br>**CITY OF SAN DIEGO POINTS & AUTHORITIES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT OF UNITED STATES**<br><br>**[ECF NO. 188]**<br><br>The Hon. Linda Lopez<br><br>Trial Date: None Set |

/ / /

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................... 1

II. BACKGROUND ........................................................................................ 3

    A. The City Conveys Property To The Navy For The NTC .................... 3

    B. Knowing The Boat Channel Is Contaminated, The Navy Starts
    Planning To Give It Back To The City .............................................. 4

    C. NTC Closes And The Boat Channel Is Slated For
    Redevelopment ................................................................................... 5

    D. The Navy Insists The City Execute An MOA .................................. 5

    E. The Navy Ignores The City's Ongoing Concerns On IR Site 12 ......... 6

    F. The State Board Fails To Act On The City's Challenge To The
    Navy's Deficient Cleanup .................................................................. 7

    G. The United States Refuses To Take Further Action, Yet Claims
    It Satisfied The MOA ........................................................................ 9

III. STANDARD OF REVIEW ........................................................................ 9

    A. The Standard For Specific Performance Is Not Met ......................... 9

    B. The Limitations Of Administrative Review Do Not Apply To
    Review Of A Contract Remedy ....................................................... 10

    C. The United States Waived Any Ground For Summary Judgment ..... 13

IV. ARGUMENT ........................................................................................... 14

    A. The MOA Does Not Incorporate CERCLA ................................... 14

    B. The MOA Required More Than Merely CERCLA Compliance ....... 17

        1. The MOA's Plain Language Governs ..................................... 17

        2. Nothing Prevented The United States From Agreeing To
        Do More Than CERCLA Required ......................................... 18

    C. The United States Breached The MOA And Failed To Perform ....... 20

1          1.    The United States Failed To Remove Known Carcinogens
2                It Knew To Be Present................................................................20
3          2.    The United States Refused To Investigate The Entirety Of
4                Parcels IIIB And VII.............................................................22
5          3.    The United States Failed To Obtain Site Closure For
6                Parcels IIIB And VII.............................................................23
7          4.    The Cleanup Was Not Based On The Projected Uses Of
8                Parcels IIIB And VII Under The Reuse Plan ...........................24
9      D.    The City Did Not Waive MOA Enforcement.....................................26
10     E.    The United States' Breach Excuses The City's Performance ............27
11     F.    The Cleanup Was Not Consistent With The NCP, Constituting
12           Breach Regardless Of Whether The MOA Only Restates
13           CERCLA .........................................................................................30
14         1.    The United States Failed To Consider The Actual Or
15               Potential Exposure Required By The NCP ..............................30
16         2.    The United States Failed To Evaluate The High Levels Of
17               Hazardous Substances Or Pollutants In The Boat Channel .....30
18         3.    The United States Failed To Eliminate The Threat To
19               Public Health Or Welfare Or The Environment........................31
20         4.    The United States' Investigation Did Not Comply With
21               NCP.......................................................................................31
22         5.    The United States Restricted The Sampling Plan In A
23               Manner Inconsistent With The NCP ........................................32
24         6.    These Failures Constitute Arbitrary And Capricious
25               Action...................................................................................33
26   V.    CONCLUSION ..........................................................................................35

- ii -

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*American Petroleum Institute v. E.P.A.*,
    661 F.2d 340 (5th Cir. 1981).................................................................34

*American Sav. v. Bell*,
    562 F. Supp. 4 (D.D.C. 1981)............................................................12

*American Well Works Co. v. Layne & Bowler Co.*,
    241 U.S. 257 (1916) .............................................................................11

*ARCO Env't Remediation, L.L.C. v. Dep't of Health & Env't Quality of Montana*,
    213 F.3d 1108 (9th Cir. 2000)........................................................2, 11

*Atlantic Richfield Co. v. Christian*,
    590 U.S. 1 (2020) ...........................................................................10-11

*Matter of Bell Petroleum Servs., Inc.*,
    3 F.3d 889 (5th Cir. 1993) ...................................................................34

*Berger v. City of N. Miami, Fla.*,
    820 F. Supp. 989 (E.D. Va. 1993).......................................................12

*Bowman Transp. Inc. v. Arkansas-Best Freight System*,
    371 U.S. 156 (1962) .............................................................................34

*Burlington N. & Santa Fe Ry. Co. v. United States*,
    556 U.S. 599 (2009) .............................................................................16

*City of Tacoma, Dep't of Pub. Utils. v. United States*,
    31 F.3d 1130 (Fed. Cir. 1994).............................................................17

*Cnty. of Suffolk, N.Y. v. United States*,
    19 Cl. Ct. 295 (1990)...........................................................................12

*Defs. of Wildlife v. Salazar*,

    877 F. Supp. 2d 1271 (M.D. Fla. 2012) ............................................................ 12

*Digital Techs., Inc. v. United States*,

    89 Fed. Cl. 711 (2009) ....................................................................................... 15

*DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. Connect Ins.*

    *Agency, Inc.*,

    2016 WL 631574 (W.D. Wash. 2016) .............................................................. 13

*Emhart Indus., Inc. v. New England Container Co., Inc.*,

    274 F. Supp. 3d 30 (D.R.I. 2017) ...................................................................... 34

*Env't Def. Fund v. Env't Prot. Agency*,

    598 F.2d 62 (D.C. Cir. 1978) ............................................................................ 21

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,

    640 F.3d 1034 (9th Cir. 2011) ....................................................................27-28

*FCC v. Fox Television Stations, Inc.*,

    556 U.S. 502 (2009) .......................................................................................... 34

*Gen. Elec. Co. v. Joiner*,

    522 U.S. 136 (1997) .......................................................................................... 21

*Gilbert v. Dep't of Just.*,

    334 F.3d 1065 (Fed. Cir. 2003) ...................................................................28-29

*Giordano v. Solvay Specialty Polymers USA, LLC*,

    522 F. Supp. 3d 26 (D.N.J. 2021) ..................................................................... 20

*Hernandez v. Wonderful Co. LLC*,

    2024 WL 4882180 (S.D.N.Y. 2024) ................................................................ 20

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,

    957 F.3d 1038 (9th Cir. 2020) .......................................................................... 27

*James River Ins. Co. v. Medolac Lab'ys*,

    290 F. Supp. 3d 956 (C.D. Cal. 2018) .............................................................. 28

*Las Vegas Sands, LLC v. Nehme*,

    632 F.3d 526 (9th Cir. 2011) ........................................................................27-28

*Lehman Bros Inc. v. City of Lodi*,

    333 F. Supp. 2d 895 (E.D. Cal. 2004) ..........................................................2, 11

*Loper Bright Enterprises v. Raimondo*,

    603 U.S. 369 (2024) ..............................................................................................35

*Lurline Gardens Ltd. Hous. P'ship v. United States*,

    37 Fed. Cl. 415 (1997) ..........................................................................................16

*Metcalf Const. Co. v. United States*,

    53 Fed. Cl. 617 (2002) ..........................................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983) ................................................................................................33

*Nat'l Foam, Inc. v. Zurich Am. Ins. Co.*,

    2025 WL 699361 (N.D. Cal. 2025) ......................................................................21

*New Castle Cnty. v. Hartford Acc. & Indem. Co.*,

    970 F.2d 1267 (3d Cir. 1992) ..............................................................................17

*Northrop Grumman Info. Tech., Inc. v. United States*,

    535 F.3d 1339 (Fed. Cir. 2008) ..........................................................................15

*Oh v. Resol. Tr. Corp.*,

    26 F.3d 131, 1994 WL 249988 (9th Cir. 1994) ..................................................27

*Saedi v. Coterie Baby, Inc.*,

    2024 WL 4388401 (S.D.N.Y. 2024) ..............................................................20, 29

*San Carlos Irrigation and Drainage Dist. v. United States*,

    877 F.2d 957 (Fed. Cir. 1989) ............................................................................27

*Shaw v. Connecticut Gen. Life Ins. Co.*,

    353 F.3d 1276 (11th Cir. 2003) ..........................................................................12

*Silver State Land LLC v. United States*,

    148 Fed. Cl. 217 (2020) ........................................................................................15

*Smithson v. United States,*

    847 F.2d 791 (Fed. Cir. 1988) ............................................................................ 15

*State of Minn. v. Kalman W. Abrams Metals, Inc.,*

    155 F.3d 1019 (8th Cir. 1998) ............................................................................ 34

*United States v. Bedford Assocs.,*

    618 F.2d 904 (2d Cir. 1980) ................................................................................. 9

*United States v. Iron Mountain Mines,*

    724 F. Supp. 2d 1086 (E.D. Cal. 2010) .............................................................. 34

*Washington State Dep't of Transp. v. Washington Nat. Gas Co., Pacificorp,*

    59 F.3d 793 (9th Cir. 1995) ................................................................................ 34

*Williams v. Emps. Mut. Cas. Co.,*

    845 F.3d 891 (8th Cir. 2017) .............................................................................. 21

**STATE CASES**

*300 DeHaro St. Invs. v. Dep't of Hous. & Cmty. Dev.,*

    161 Cal. App. 4th 1240, 75 Cal. Rptr. 3d 98 (2008) .......................................... 16

*Erickson v. Pharmacia LLC,*

    __ P.3d __, 2025 WL 3030107, at *2 (Wash. 2025) .......................................... 21

*Orange Cnty. Water Dist. v. Alcoa Glob. Fasteners, Inc.,*

    12 Cal. App. 5th 252, 219 Cal. Rptr. 3d 474 (2017), *as modified on*

    *denial of reh'g* (June 22, 2017) ........................................................................ 19

*Smith v. State Farm Mut. Auto. Ins. Co.,*

    399 P.3d 771 (Colo. App. 2017) ......................................................................... 16

*Valentine v. PPG Indus., Inc.,*

    821 N.E.2d 580 (Ohio Ct. App. 2004) ............................................................... 21

**FEDERAL STATUTES**

42 U.S.C. § 103 ......................................................................................................... 10

42 U.S.C. § 9601(14) ................................................................. 19

42 U.S.C. § 9601(33) ................................................................. 30

42 U.S.C. § 9613(b) ................................................................. 10

42 U.S.C. § 9613(j)(1) (CERCLA § 113(j)(1)) ................................ 10-11

CERCLA § 113 ................................................................. 10-11

CERCLA § 113(b) ................................................................. 10-11

Comprehensive Environmental Response, Compensation, and

Liability Act .................................................. 1-2, 6, 10-14, 16-19, 27, 30, 33-34

Defense Base Closure and Realignment Act of 1990 ................................ 4

Restatement (First) of Contracts § 375 cmt. *a* (Am. Law Inst. 1932) ................ 9-10

Restatement (First) of Contracts § 397 (Am. Law Inst. 1932) ........................ 27-28

Safe Drinking Water Act ................................................................. 30

## STATE STATUTES

Cal. Civ. Code § 3392 (1994) ........................................................ 27

Cal. Water Code § 13391.5(d) ......................................................... 6

California Environmental Quality Act (CEQA) ...................................... 25

California Public Resources Code Sections 21000-21189 ........................... 25

## OTHER AUTHORITIES

11 Williston on Contracts § 30:19 (4th ed.) ...................................... 15

23 Williston on Contracts § 63:3 (4th ed.) ....................................... 28

40 C.F.R. § 300.415(b)(2)(i) ......................................................... 30

40 C.F.R. § 300.415(b)(2)(iv) ........................................................ 30

40 C.F.R. § 300.415(b)(3) ............................................................ 31

40 C.F.R. § 300.415(b)(4) ............................................................ 31

40 C.F.R. § 300.430 ................................................................. 18

40 C.F.R. § 300.430(b) ............................................................... 33

40 C.F.R. § 300.430(d)(1) ........................................................... 33

48 Fed. Reg. 40667 ..................................................................... 10

Cal. Code Regs., tit. 14, div. 6, chap. 3, §§ 15000-15387 ...................................... 25

*Determining the Sources and Content of Federal Common Law—In*

*General*, 19 Fed. Prac. & Proc. Juris. § 4518 (Wright & Miller 3d ed.) ........... 14

*Effects of in Utero PCB Exposure*, 8 Medico-Legal Watch 8 (1999) ..................... 21

*EPA Selects Plan To Cleanup Superfund Site In North Providence*, 24 No. 5

Real Est./Envt.Liability News 10 ......................................................... 21

*Term*, Black's Law Dictionary (12th ed. 2024) ........................................ 28

**CITY OF SAN DIEGO POINTS & AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.    INTRODUCTION

The United States' motion presents a single, narrow, issue: Whether it has met its burden on summary judgment to show it is entitled to specific performance under the Memorandum of Agreement ("MOA") as a matter of law. It has not.

Specific performance is not a remedy created or contemplated by CERCLA. Nothing in CERCLA permits the United States to force another party to accept ownership of any real property after a CERCLA cleanup. This is true regardless of whether the cleanup complied with CERCLA, or whether the costs incurred are consistent with the National Contingency Plan ("NCP"). And it remains true regardless of the Finding of Suitability to Transfer ("FOST") which *permits* the United States to transfer ownership of the property. It does not *obligate* any party to accept it. Only a contract can do that.

The contract here required the United States to "take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel IIIB [and Parcel VII], as described in the NTC San Diego Reuse Plan dated August 1998." (SOF ¶ 14). CERCLA does not require the United States to perform a cleanup "based on the projected use" under the "Reuse Plan." The MOA does. CERCLA does not require the United States to "obtain site closure." The MOA does. Nor does CERCLA require the City to accept the property. The MOA does—but only if the United States can first demonstrate that it met its own contractual obligations. (SOF ¶¶ 93). This is why the United States' attempt to flatten this case into the single issue of CERCLA compliance fails on its own terms. The MOA required more from both sides. And a party seeking a contract remedy must first prove its own contract compliance. The United States cannot make that showing.

Further cementing this distinction between CERCLA compliance and MOA compliance is the fact that, in opposing specific performance, the City does not "seek[] to dictate specific remedial actions; to postpone the cleanup; to impose additional reporting requirements on the cleanup; or to terminate the RI/FS and alter the method and order of cleanup." *Lehman Bros Inc. v. City of Lodi*, 333 F. Supp. 2d 895, 901 (E.D. Cal. 2004) (quoting *ARCO Env't Remediation, L.L.C. v. Dep't of Health & Env't Quality of Montana*, 213 F.3d 1108, 1115 (9th Cir. 2000)) (cleaned up). Put another way, the City does not ask this Court to do anything affecting the CERCLA cleanup. Were this Court to deny the United States' motion, and ultimately deny specific performance entirely (as it should), the United States would not be required to do anything—not on Parcel IIIB, Parcel VII, or anywhere else in the Boat Channel. It would mean only that the United States cannot force the City to accept ownership of those parcels.

The United States even acknowledges this distinction in its own motion. It argues on the one hand that "any challenge to the adequacy of a CERCLA cleanup ... is limited to the administrative record and subject to the arbitrary and capricious standard." (ECF No. 188-1 at 5). Yet it acknowledges that "for other issues"—such as interpreting and enforcing the language of the MOA—"the usual summary judgment standard and scope of review applies" and "[t]he limitation to the administrative record does not." (ECF No. 188-1 at 7).

Contrary to the parties' bargain, the United States is now asking the City to take ownership of parcels that are not ready for recreational use under the Reuse Plan. Instead, the United States asks this Court to force the City to accept property riddled with carcinogens that the United States put there, knew were there, and still refused to address.

In short, the United States cannot hide behind CERCLA's limited review standards while seeking broader relief than CERCLA allows. This inequitable and internally inconsistent argument should be rejected.

## II.    BACKGROUND

### A.    The City Conveys Property To The Navy For The NTC

Beginning around 1916, the City conveyed various parcels of tidelands to the United States at no cost for purposes of constructing and operating what came to be known as the NTC. (SOF ¶ 1). The United States owned and operated the NTC from the time it was commissioned in 1923 until 2000 or 2001. (SOF ¶ 2).

From the 1930s into the early 1940s, the United States created a waterway bisecting the NTC called the Boat Channel. (SOF ¶ 3). The Boat Channel extends approximately 5,000 feet north-northeast from San Diego Bay near Harbor Island at the south end to the Marine Corps Recruit Depot at the north end. (SOF ¶ 3). Most of the Boat Channel—56.5 acres—is comprised of two parcels now designated as Parcel IIIB and Parcel VII. (SOF ¶ 52).

The Navy's activity at the NTC over nearly a century introduced numerous harmful contaminants into the Boat Channel. (SOF ¶ 4). This was first documented by the Navy itself in its environmental survey of the Boat Channel in 1986, resulting in the Initial Assessment Study ("IAS"). (SOF ¶ 2). The IAS studied five waste disposal sites in the NTC, concluding that "all five disposal sites may pose a potential threat to human health or to the environment, and warrant further investigation via confirmation studies." (City SOF ¶ 1). The IAS also noted that "[t]he topography of NTC ... is such that all surface drainage and runoff proceed ... towards the nearby boat channel (2,000 feet or less)." (City SOF ¶ 2). And "human exposure to contaminants could occur through recreational contact" with contaminated sites. (City SOF ¶ 3).

These contaminants that drained into the Boat Channel include:

- **Polychlorinated Biphenyls (PCBs):** "PCBs have been demonstrated to cause a variety of adverse health effects," including "cancer in animals" and "effects on the immune system, reproductive system, nervous system, endocrine system and other health effects." (SOF ¶ 2). The Navy

was aware of PCB contamination at NTC "[a]s early as June 1981." (City SOF ¶ 4).

- **Per- and Polyfluoroalkyl Substances (PFAS):** "PFOS and PFOA are known to cause adverse human health effects, including high cholesterol and harmful reproductive and developmental effects, as well as cancer in animals and, possibly, humans." (SOF ¶ 77). "[T]he primary release of []PFAS was through the use of aqueous film-forming foam ... for fire and emergency responses and during test and training activities" conducted at NTC starting in the 1970s. (SOF ¶ 77).

- **Polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans (PCDD/Fs):** PCDD/Fs are created from waste combustion, which was known to have occurred at the NTC from the 1940s to 1960s. (City SOF ¶ 5). "PCDD/Fs are highly toxic, carcinogenic, persistent, and bioaccumulative in fish. This information was widely known prior to the completion of the RI in 2003." (City SOF ¶ 5).

## B.    Knowing The Boat Channel Is Contaminated, The Navy Starts Planning To Give It Back To The City

In 1993, the NTC was recommended for closure under the Defense Base Closure and Realignment Act of 1990. (SOF ¶ 6). In anticipation of transferring Parcels IIIB and VII to the City, the Navy performed sampling of the submerged sediments in the Boat Channel in 1998. (SOF ¶ 19). The Navy designated these submerged sediments as "IR Site 12." (SOF ¶ 19).

The 50.1-acre IR Site 12 is not coextensive with Parcels IIIB and VII, and excludes approximately 6 acres of Parcels IIIB and VII from the Navy's sampling. (SOF ¶ 19). The unsampled 6.4 acres of the Boat Channel within Parcels IIIB and VII—but outside of IR Site 12—include the riprap banks both above and below the waterline and the seawall portions of the Boat Channel. (SOF ¶ 19).

The Navy's sampling confirmed that IR Site 12 contained several known contaminants introduced by its activity at the NTC—including PCBs. (SOF ¶ 4). Despite this, the Navy claimed no remediation was required; the California Environmental Protection Agency and later the San Diego Regional Water Quality Control Board ("Water Board") disagreed. (SOF ¶ 27).

## C.    NTC Closes And The Boat Channel Is Slated For Redevelopment

The NTC was ultimately closed around 1997, and the property was offered for redevelopment. (SOF ¶ 6). In 1998, the San Diego City Council adopted the August 1998 NTC San Diego Reuse Plan. (SOF ¶ 9). The Navy likewise approved the Reuse Plan in a March 1999 Record of Decision. (SOF ¶ 10).

The Reuse Plan contemplated the conveyance of about 430 acres of the NTC to the City. (SOF ¶ 9). It included a comprehensive financial analysis of the NTC redevelopment project and determined that the buildings, infrastructure, and utilities at the NTC were blighted due to disrepair. (SOF ¶ 11). Total improvement costs were estimated at just under $38 million. (SOF ¶ 12). This cost analysis, as approved by the Navy, does not include any costs related to the remediation of the Boat Channel or any other NTC property, or provide for the City to assume liability for any future remediation. (SOF ¶ 13).

## D.    The Navy Insists The City Execute An MOA

In late 1999 to early 2000, the Navy represented to the City that an MOA was required for the City to take ownership of the NTC, including Parcels IIIB and VII. (SOF ¶ 14). The Navy presented the City with a draft MOA and the parties executed a two-page "Summary of Terms" in April 2000. (SOF ¶ 15).

This Term Sheet states the commitment of the United States to "retain[] full responsibility for environmental remediation at NTC consistent with uses described in the LRA's Reuse Plan of August 1998." (SOF ¶ 16). Consistent with this obligation, the Term Sheet also provides that the "remaining parcels (21 acres) will be conveyed after the Government has completed all remedial action necessary to

protect human health and the environment and obtained site closure from appropriate regulatory authorities based on the projected use of these parcels as described in the NTC San Diego Reuse Plan dated August 1998." (SOF ¶ 17). The Term Sheet contains no reference to CERCLA. (SOF ¶ 18).

On May 30, 2000, the City and the United States executed the MOA. (SOF ¶ 19). Consistent with the Navy's sampling, the MOA expressly acknowledged that Parcels IIIB and VII were contaminated. (SOF ¶¶ 21-22). In the MOA, the United States expressly assumed full responsibility for remediating Parcels IIIB and VII. (SOF ¶¶ 21-22).

**E.    The Navy Ignores The City's Ongoing Concerns On IR Site 12**

In November 2003, the Navy submitted a remedial investigation report to the Water Board based on its 1998 sampling of IR Site 12. (SOF ¶ 29). After substantial delay due to the Navy's inaction, the Water Board granted the Navy an exemption from California's sediment quality objectives ("SQOs") in September 2012 because "the Remedial Investigation was submitted to the San Diego Water Board prior to February 19, 2008." (SOF ¶ 30). The SQOs represent the "level of a constituent in sediment which is established with an adequate margin of safety" under state law, *see* Cal. Water Code § 13391.5(d), and impose greater remediation obligations than CERCLA. The Water Board made clear "the SQOs will apply to: (1) any new spill, release, or unpermitted discharge that occurred after the Remedial Investigation or cleanup activities, or (2) any prior spill, release, or unpermitted discharge that was not covered in the Remedial Investigation." (SOF ¶ 90).

In 2016—13 years later—the Navy finally submitted its Feasibility Study on IR Site 12 to the Water Board, still based only on the 1998 sampling. (SOF ¶ 31). The stated purpose of the study was to identify, screen, and evaluate alternatives for remediation of the chemically impacted submerged sediments at IR Site 12, which includes only part of Parcels IIIB and VII. (SOF ¶ 32).

While the Navy spent 20 years plodding through this investigation and

remediation process, the City detailed its concerns at each opportunity. (SOF ¶¶ 33-35). As far back as 1995, the City informed the Navy that its sampling plan would not "provide a true description of the presence and general spatial distribution of chemical constituents in the Boat Channel," due to the number of samples, location of samples, and testing regime, among other factors. (SOF ¶ 33). The City asked that the Navy "[p]lease ensure that the vertical and horizontal extent of contamination is delineated." (SOF ¶ 33).

As the Navy moved forward heedlessly, the City repeatedly sounded the alarm, flagging the Navy's numerous failures, including the failure to address the banks, riprap, shoreline, and shallow areas, reliance on outdated data, and failure to test for all likely contaminants. (SOF ¶ 34). The City unequivocally informed the Navy that the City would not accept the Boat Channel parcels unless these issues were addressed. (SOF ¶ 35).

F.    **The State Board Fails To Act On The City's Challenge To The Navy's Deficient Cleanup**

The Navy completed its limited cleanup of IR Site 12 in 2018 and submitted a Remedial Action Completion Report ("RACR") to the Water Board. (SOF ¶ 36). In response, the Water Board issued an April 16, 2019 "No Further Comment" letter for IR Site 12. (SOF ¶ 37). The "No Further Comment" letter was not a "No Further Action" letter, which is typically submitted by water boards for site closure. (SOF ¶ 67). This letter communicated only that the Water Board had "no further comments on the Final RACR." (SOF ¶ 37).

After receiving the "No Further Comment" letter, the Navy submitted its Draft FOST for Parcels IIIB and VII to the Water Board on August 24, 2020. (SOF ¶ 38). The FOST is a prerequisite to the ability of the United States to transfer Parcels IIIB and VII to the City. (SOF ¶ 39).

On September 21, 2020, the City objected to the Draft FOST based on the Navy's investigatory and remedial failures at the Boat Channel and highlighted the

fact that the Water Board had never issued a "No Further Action" letter for the Boat Channel or IR Site 12. (SOF ¶ 40). On December 16, 2020—despite the Navy's failure to undertake any additional investigation or remedial activities at the Boat Channel—the Water Board did issue a "No Further Action" letter for IR Site 12. (SOF ¶ 41). The City then challenged the "No Further Action" letter through a petition to the State Water Resources Control Board ("State Board") but received no substantive response. (SOF ¶ 42). The Navy then issued its Final FOST for Parcels III-B and VII in March 2021, which relied on the "No Further Action" letter from the Water Board. (SOF ¶ 43).

On March 24, 2021, the Water Board "rescind[ed] the No Further Action (NFA) Letter dated December 16, 2020" for IR Site 12. (SOF ¶ 44). Based on this, the City sent an April 7, 2021 letter to the Navy objecting to the Final FOST because "neither the Water Board nor any other regulatory agency has confirmed that the [Navy's] remedial efforts are protective of human health and site closure has not been issued based on the projected uses of the Boat Channel or for the entirety of Parcels III-B and VII, as required by the MOA." (SOF ¶ 45).

On April 13, 2021, the Navy issued a revised Final FOST citing only the Water Board's earlier "No Further Comment" letter, but again concluding that Parcels IIIB and VII were suitable for transfer. (SOF ¶¶ 46-47). On April 29, 2021, the Water Board issued a letter to the Navy finding the revised Final FOST acceptable as to IR Site 12 and stating it "has no further comments." (SOF ¶ 48).

The revised Final FOST failed to address any of the City's prior objections or the rescission of the "No Further Action" letter. (SOF ¶ 49). The revised Final FOST also contained no justification for the exclusion of the 6.4 acres of Parcels IIIB and VII outside of IR Site 12, including the riprap banks and seawall portions, from the investigation and remediation. (SOF ¶ 49). Accordingly, on May 28, 2021, the City filed an amended petition with the State Board challenging these deficiencies because they would expose the City to further investigation and remediation if the parcels

were transferred to the City. (SOF ¶ 50). There was no substantive response from the State Board. (SOF ¶ 51).

### G.   The United States Refuses To Take Further Action, Yet Claims It Satisfied The MOA

The United States has consistently refused to perform any further investigation and potential remediation of Parcels IIIB and VII. (SOF ¶¶ 33-51). Worse still, the United States has consistently refused to permit the City to perform its own investigation, at its own expense, to determine the current environmental condition of Parcels IIIB and VII. (ECF No. 117-1).

Continuing its decades-long disregard of the City's concerns, the United States now claims it has fulfilled its promise under the MOA to remediate Parcels IIIB and VII and so the City must accept them. (ECF No. 73 ¶ 43). And despite this inequitable behavior, the United States seeks to foist the property on the City through the equitable remedy of specific performance. (ECF No. 73 ¶ 53).

This history demonstrates that the breach-of-contract claim pressed by the United States in its counterclaim-in-reply is meritless. The United States is not entitled to force the City taxpayers to foot the bill after contaminating the property, promising to remediate it, and then refusing to do so.

## III.   STANDARD OF REVIEW[1]

### A.   The Standard For Specific Performance Is Not Met

"[A] claim for specific performance of a contract may not be allowed if the claimant [itself] refuses to comply with [its] obligations under the contract." *United States v. Bedford Assocs.*, 618 F.2d 904, 919 (2d Cir. 1980). A "decree for specific performance will not be granted in cases where the plaintiff has repudiated his duty without making timely retraction ... or has otherwise already committed such a substantial breach as to discharge the duty of the defendant.'" *Id.* (quoting

---

[1] The standards governing summary judgment are well-known to the Court and the parties. (*See* ECF No. 186-1 at 9).

1   Restatement (First) of Contracts § 375 cmt. *a* (Am. Law Inst. 1932)).

2       For this reason, "the district court has the power ultimately to deny the
3   government's claim for specific performance if the government refuses to perform
4   its contractual obligations, thereby failing to establish its substantive right to
5   recover." *Id.*

6   **B.    The Limitations Of Administrative Review Do Not Apply To**
7           **Review Of A Contract Remedy**

8       Even though specific performance is a contract remedy—not a CERCLA
9   remedy—the United States nonetheless argues that "the City must show, based on
10  the administrative record, that the Navy's selection of the remedy was arbitrary and
11  capricious." (ECF No. 188-1 at 1). The United States bases this argument on
12  CERCLA § 113, which provides that "[i]n any judicial action under this chapter,
13  judicial review of any issues concerning the adequacy of any response action taken
14  or ordered by the President shall be limited to the administrative record." 42 U.S.C.
15  § 9613(j)(1) (CERCLA § 113(j)(1)).

16      This argument should be rejected. In *Atlantic Richfield Co. v. Christian*, 590
17  U.S. 1 (2020), the Supreme Court addressed similar jurisdictional provisions in
18  § 113(b). The provision at issue there provided that federal courts have jurisdiction
19  "over all controversies arising under this chapter," i.e., the chapter codifying
20  CERCLA, 103 of title 42 of the United States Code. 42 U.S.C. § 9613(b). As the
21  Supreme Court explained, after Congress enacted CERCLA in 1980, "Atlantic
22  Richfield faced strict and retroactive liability for the many tons of arsenic and lead ...
23  spewed across the area over the previous century." *Id.* at 9. As a result, "EPA
24  designated ... more than 300 square miles ... as one of the inaugural Superfund sites."
25  *Id.* (citing 48 Fed. Reg. 40667).

26      Over the next 35 years, "EPA has managed an extensive cleanup at the site,
27  working with Atlantic Richfield to remediate more than 800 residential and
28  commercial properties." *Id.* While this effort was ongoing, "a group of 98 owners of

1  property within the Superfund site filed this lawsuit against Atlantic Richfield in
2  Montana state court, asserting trespass, nuisance, and strict liability claims under
3  state common law." *Id.* at 10. They sought "restoration damages" that would include
4  implementing "a restoration plan that goes beyond EPA's own cleanup plan." *Id.*

5        The Supreme Court held that § 113(b) did not prevent a state court from
6  exercising jurisdiction over state-law claims related to these cleanup efforts. *Id.* at 9.
7  In doing so, the Supreme Court focused on the plain meaning of "arising under this
8  chapter" as used in § 113(b), explaining that "a suit *arises under* the law that creates
9  the cause of action." *Id.* at 13 (quoting *American Well Works Co. v. Layne & Bowler
10  Co.*, 241 U.S. 257, 260 (1916)) (emphasis added) (cleaned up). Under this language,
11  the restrictions of § 113 did not apply because "[t]he landowners' common law
12  claims for nuisance, trespass, and strict liability ... *arise under* Montana law and not
13  under [CERCLA]." *Id.* at 13-14 (emphasis added). For this reason, "the Montana
14  courts retain jurisdiction over this lawsuit, notwithstanding the channeling of
15  Superfund claims to federal courts in § 113(b)." *Id.*

16        Like in *Christian*, this case involves claims for relief under two distinct bodies
17  of law: CERCLA and the federal common law of contracts. The United States asks
18  this Court to hold that the restrictions on "judicial action under this chapter"—the
19  same chapter at issue in *Christian*—apply to its breach-of-contract claim because this
20  case also includes CERCLA claims. But, like the landowners in *Christian*, the United
21  States' breach-of-contract claim does not seek relief under "this chapter." 42 U.S.C.
22  § 9613(j)(1). Nothing in "this chapter" grants the United States the right to force an
23  unwilling party to take ownership of the property.

24        This point is even clearer here than in *Christian*. Unlike the landowners there,
25  the City does not seek to impose its own "restoration plan." Nor does it "seek[] to
26  dictate specific remedial actions; to postpone the cleanup; to impose additional
27  reporting requirements on the cleanup; or to terminate the RI/FS and alter the method
28  and order of cleanup." *Lehman Bros Inc.*, 333 F. Supp. 2d at 901 (quoting *ARCO*

*Env't Remediation, L.L.C.*, 213 F.3d at 1115) (cleaned up). It merely opposes the United States' attempt to force the City to accept the property. Denying the United States' motion, and granting the City's competing motion, would not require the United States to engage in any further cleanup—or to do anything at all. It would simply prevent the United States from forcing the City to accept the property.

This distinction between administrative review and contract enforcement is further confirmed by courts in other administrative-review cases. "While a court employs the deferential APA standard of review to an administrative record ... compliance with a contractual obligation is usually reviewed de novo on the litigation record. ... [T]he Court has consistently found that the breach of contract claim is not confined to the administrative record." *Defs. of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1298 n.33 (M.D. Fla. 2012). And "[a]s a rule, de novo review permits the parties to put before the district court evidence beyond" what appears in the administrative record. *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1284 n.6 (11th Cir. 2003); *see also Cnty. of Suffolk, N.Y. v. United States*, 19 Cl. Ct. 295, 300 (1990) ("Since defendant has not cited any provision in the contracts or controlling regulations that limits the scope of this court's review of such a breach claim, the scope of this court's review here will be the same as it would be for any other federal contract."); *American Sav. v. Bell*, 562 F. Supp. 4, 8 (D.D.C. 1981) (noting "no support for the proposition that this Court should be equally bound in a situation where the agency is sued on a contract claim." (capitalization altered)).[2]

The United States even admits that "[t]he limitation to the administrative record does not apply" with respect to "issues ... such as whether the MOA is a valid contract, or whether the MOA obligates the Navy to include the disputed covenant in the deed—the usual summary judgment standard and scope of review applies." (ECF

---

[2] For this reason, the outcome of the City's motion to supplement the administrative record is irrelevant to whether the Court will consider evidence on specific performance outside the administrative record. *See Berger v. City of N. Miami, Fla.*, 820 F. Supp. 989, 993 (E.D. Va. 1993) ("Because the CERCLA issues differ from the state contract claim issues, so too will the evidence required to prove the claims differ.").

No. 188-1 at 7). The United States apparently thinks "the usual summary judgment standard and scope of review" applies to everything in the MOA except for its own performance obligations. The Court should reject this double standard and apply "the usual summary judgment standard and scope of review" to all aspects of the MOA, not just those that impose obligations on the City.[3]

### C.   The United States Waived Any Ground For Summary Judgment

Notably absent from the United States' arguments in support of summary judgment is any argument—or even a passing comment—suggesting that the MOA is unambiguous. Instead, the United States tells the Court it is entitled to summary judgment because, apparently, an extrinsic source—the entirety of CERCLA—dictates the meaning of the relevant contract language.

This argument is circular and self-defeating. As explained below, the Court cannot interpret the MOA with reference to an extrinsic source, including statutory text not expressly incorporated, unless the contract is ambiguous. And if the contract is ambiguous, the Court cannot grant summary judgment. This self-constructed catch-22 defeats the United States' motion in its entirety.

Importantly, any argument the United States could have presented in support of its motion asserting that the MOA is unambiguous is now waived. As this Court recently explained in this case, "[i]t is well established that a 'party waives or abandons an argument at the summary judgment stage by failing to provide more than a passing remark in support of its position.'" (ECF No. 190 at 9) (quoting *DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. Connect Ins. Agency, Inc.*, 2016 WL 631574, at *25 (W.D. Wash. 2016)). The United States does not even provide such a "passing remark."

Through its circular arguments, the United States has waived the most fundamental showing required to obtain summary judgment on a breach-of-contract

---

[3] For this same reason, the United States' argument that the City waived any issues related to the cleanup by allegedly "fail[ing] to raise an issue before selection of the remedy" also misses the mark. (ECF No. 188-1 at 22).

claim. By waiving any argument that the MOA is unambiguous, the United States' motion stumbles right out of the gate. The Court need go no further to deny the motion.

## IV.    ARGUMENT[4]

### A.    The MOA Does Not Incorporate CERCLA

The United States argues that the MOA merely "incorporates the Navy's pre-existing obligation under CERCLA to remediate the Boat Channel parcels." (ECF No. 188-1 at 9). In support, it argues that "[t]he MOA uses the **exact same** language as CERCLA to define the remediation cleanup standard." (ECF No. 188-1 at 9) (emphasis in original). By using language that also happens to appear once in a single, fifth-level sub-sub-sub-sub-subsection of CERCLA, the MOA apparently silently incorporated the entirety of CERCLA by implication. (ECF No. 188-1 at 10 (citing 42 U.S.C. § 9620(h)(3)(A)(ii)(I))).

But for all its bluster that the City's contrary position is "preposterous," the United States cites nothing supporting the incredible proposition that the most complicated statutory and regulatory scheme in American law can be silently incorporated wholesale into a 10-page contract just by using similar language. This comes nowhere close to incorporating some unknown tens—perhaps hundreds—of thousands of pages of the U.S. Code, the Code of Federal Regulations, and the Federal Register into the MOA.

There is ultimately no room for debate on this point; the United States is flat wrong. Courts applying federal common law brook no dissent: "[T]he language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and *must clearly*

---

[4] The United States argues that federal common law alone applies to the MOA. (ECF No. 188-1 at 7). Federal courts often use state law to fill gaps in federal common law. *See Determining the Sources and Content of Federal Common Law—In General*, 19 Fed. Prac. & Proc. Juris. § 4518 (Wright & Miller 3d ed.) ("The power to choose [a federal common-law rule] may also be exercised by adopting state law as the governing rule."). But California and federal law are in accord on the issues presented here, rendering a choice-of-law analysis unnecessary. (ECF No. 186-1 at 11-12).

*communicate that the purpose of the reference is to incorporate the referenced material into the contract.*" *Silver State Land LLC v. United States*, 148 Fed. Cl. 217, 240 (2020) (quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008)) (emphasis in original). This stands in contrast to language meant "merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history," which does not accomplish the task. *Id.*

For this reason, courts are "reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." *Id.* "For a contract to incorporate a document or statutory provision, 'the incorporating contract must use language that is *express and clear*, *so as to leave no ambiguity* about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract.'" *Id.* (emphasis in original). "[G]eneral references to statutes or regulations will not suffice." *Digital Techs., Inc. v. United States*, 89 Fed. Cl. 711, 724 (2009).

This rule "protects the government" as much as it does other contracting parties. This is because the "wholesale incorporation of regulations into a contract would allow a contracting party to choose among a multitude of regulations as to which he could claim a contract breach—and thus a wholly new ground of obligation would be summarily created by mere implication." *Silver State Land LLC*, 148 Fed. Cl. at 240 (quoting *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988)) (cleaned up).

Significantly, a party cannot engraft a statutory definition into a contract when the contract itself does not do so. "The principle that parties are presumed to contract with reference to existing law is generally applied in connection with contract 'construction' (determining the legal effect of a contract) rather than contract 'interpretation' (determining the meaning of words used in a contract)."

*Incorporation of rules of law into contracts*, 11 Williston on Contracts § 30:19 (4th ed.). "When statutory language is included in a contract, it assumes a new legal identity: that of contractual language." *300 DeHaro St. Invs. v. Dep't of Hous. & Cmty. Dev.*, 161 Cal. App. 4th 1240, 1256, 75 Cal. Rptr. 3d 98, 111 (2008). Even "[a] recital that an agreement is governed by or executed pursuant to a set of regulations"—which is also absent from the MOA—"does not incorporate those regulations into the agreement." *Lurline Gardens Ltd. Hous. P'ship v. United States*, 37 Fed. Cl. 415, 420 n.7 (1997). And "while courts may consider a statute in construing the legal effect of a contract, they are not required to look to statutes to interpret the meaning of a contract's words, absent the parties' intent to incorporate a statutory definition." *Smith v. State Farm Mut. Auto. Ins. Co.*, 399 P.3d 771, 776 (Colo. App. 2017). The MOA expresses no "intent to incorporate a statutory definition" into any provision of the MOA. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 610-11 (2009) ("Because CERCLA does not specifically define [a statutory term] ... we give the phrase its ordinary meaning." (citations omitted)).

Importantly, the MOA is an integrated contract that "shall not be modified unless in writing and signed by both Parties." (ECF 186-2 ¶ 60). And "[a]ll prior discussions and understandings on this matter are superseded [sic] by said documents." (ECF 186-2 ¶ 60).

The United States asks the Court to amend the MOA to state that the "Navy shall take all remedial action required by CERCLA." The United States could have written the MOA that way—the United States drafted the MOA in its entirety, after all—yet it failed to do so. The Court should reject the attempt by the United States to excuse its performance under the terms of an agreement it unilaterally wrote and imposed on the City. *See Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 629 (2002) (the law "puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy").

### B.    The MOA Required More Than Merely CERCLA Compliance

#### 1.    The MOA's Plain Language Governs

The United States claims that the MOA is "void for vagueness" if not interpreted "by reference to the well-established body of law under CERCLA." (ECF No. 188-1 at 10). Nonsense. Courts are called upon to interpret contracts every single day. The Court must "determine when all necessary remedial action has been taken," and when all of the United States' obligations are satisfied, the same way it does for any other contract—based on its plain language.

The United States' argument that the City's reading of the MOA—that is, the correct reading—would render it "void for vagueness" finds no support in the law. If a contract is not sufficiently clear as to the respective parties' obligations— ambiguous, in other words—the Court considers evidence outside the four corners of the contract to resolve the ambiguity. It does not declare it void and unenforceable and send the parties home. But this requires the Court to consider and weigh evidence, something it cannot do at summary judgment. So if the United States is right that the MOA is "vague" the motion must be denied. Once again, the United States has offered an internally inconsistent and self-defeating argument.

In making this determination, "a word or a term cannot be considered in isolation; it must be read in the semantic and functional context of the ... clause at issue to determine if two competing, reasonable interpretations exist." *New Castle Cnty. v. Hartford Acc. & Indem. Co.*, 970 F.2d 1267, 1271 (3d Cir. 1992). The parties may not introduce extrinsic evidence "to create an ambiguity where the language is clear." *City of Tacoma, Dep't of Pub. Utils. v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994).

The plain and unambiguous language of the MOA forecloses the United States' constrained interpretation. Under the MOA, the United States and the City agreed: "Subject to the terms and conditions hereinafter set forth, the Navy agrees to convey to the City, and the City agrees to accept from the Navy ... all of the Navy's

- 17 -

right, title and interest in the Property." (SOF ¶ 19). The United States acknowledged in the MOA that the parcels are "believed to contain sediments impacted by various contaminants." (SOF ¶¶ 19-22). Specifically, "Parcel IIIB is believed to contain sediments impacted with various contaminants. Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel IIIB, as described in the NTC San Diego Reuse Plan dated August 1998." (SOF ¶ 21). Likewise, "Parcel VII is believed to contain sediments impacted by various contaminants. Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel VII, as described in the NTC San Diego Reuse Plan dated August 1988." (SOF ¶ 22).

Reading these provisions of the MOA in context, as required in contract interpretation, there is no ambiguity. The United States must "take all remedial action necessary to protect human health and the environment" by removing the "various contaminants" known to exist in Parcels IIIB and VII so that the parcels are suitable for their "projected use" under the reuse plan. These "projected use[s]" include recreational uses by San Diego residents in the Boat Channel, on the shore, and in the water, exposing those visitors to any contaminants that have not been cleaned up. (SOF ¶ 58).

## 2. Nothing Prevented The United States From Agreeing To Do More Than CERCLA Required

The United States argues that it could not agree—and the MOA cannot require it—to do more than the bare minimum required by CERCLA. It insists that "[a]n obligation that required the Navy to remediate more than is considered necessary under CERCLA would not be cost effective and would thus not be in accord with the NCP." (ECF No. 188-1 at 11).

The United States cites only to 40 C.F.R. § 300.430 in support of this. But that

- 18 -

regulation makes cost-effectiveness just one factor among many. "The NCP ... expressly requires that a proposed remedial action be 'cost-effective,' *provided that it adequately protects human health and the environment.*" *Orange Cnty. Water Dist. v. Alcoa Glob. Fasteners, Inc.*, 12 Cal. App. 5th 252, 335, 219 Cal. Rptr. 3d 474, 545 (2017), *as modified on denial of reh'g* (June 22, 2017) (emphasis added). So the United States cannot avoid its obligations under the MOA to "protect human health and the environment" by claiming it is not "cost effective."

The United States also offers no factual support for its claim. It does not cite a statement of fact or any evidence regarding the cost of an MOA-compliant cleanup. By failing to properly support this statement, the United States has waived it.

More importantly, the United States could not support this statement even if it tried. The United States never tested or investigated other contaminants in the parcels, such as PFAS or the most common PCBs, and excluded approximately 6 acres of the parcels entirely from its investigation and cleanup. (SOF ¶ 18). While a cleanup addressing only part of the contaminated property is certainly more "cost effective" than a proper cleanup of the entire parcels, the MOA required more.

And because the United States never investigated PFAS, or other "contaminants" that might be present, the true cost of remediation was never considered or evaluated in the administrative record, or anywhere else. This failure precludes the United States from insisting, with no support at all, that such a remediation would not have been "cost effective." The United States cannot hide behind its own refusal to perform under the MOA to support its attempt to force the City to accept the parcels.

This is demonstrated by the fact that the United States agreed in the MOA to other cleanup obligations that are not required by CERCLA. For example, the United States agreed to clean up petroleum products from Parcel X. (City SOF ¶ 4). But CERCLA expressly excludes petroleum from the definition of a hazardous substance. 42 U.S.C. § 9601(14).

In short, the United States cannot claim that it is entitled to recover the contractual remedy of specific performance while at the same time claiming that it does not need to perform the conditions precedent to the City's performance.

**C.    The United States Breached The MOA And Failed To Perform**

**1.    The United States Failed To Remove Known Carcinogens It Knew To Be Present**

Among the numerous chemicals the Navy discharged into the Boat Channel are PFAS, for which the United States did no testing. (SOF ¶ 4). They also include total petroleum hydrocarbons, DDT, PCB congeners, and PCDD/Fs, which the United States either failed to test for at all, or only tested for some forms of those contaminants and not others. (SOF ¶ 4).

There is no ambiguity in the fact that each of these chemicals is a "contaminant" under the plain meaning of that word. The most concerning of these is PFAS and PCB, both "forever chemicals" and known carcinogens.

"PFAS are a group of over 10,000 synthetic chemicals. They are often referred to as 'forever chemicals' because they do not naturally break down in the environment, or 'biodegrade.' Humans can be exposed to PFAS through ingestion, inhalation, and skin absorption." *Saedi v. Coterie Baby, Inc.*, 2024 WL 4388401, at *1 (S.D.N.Y. 2024); *see also Hernandez v. Wonderful Co. LLC*, 2024 WL 4882180, at *2 (S.D.N.Y. 2024) (same). Human exposure "has been linked to health consequences, including cancer, thyroid disorders, and harm to reproductive and immune systems." *Id.* Indeed, "studies show that exposure to PFAS may cause testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, developmental defects to fetuses during pregnancy, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes" in humans. *Giordano v. Solvay Specialty Polymers USA, LLC*, 522 F. Supp. 3d 26, 29-30 (D.N.J. 2021).

Likewise, "PCB's are widely considered to be hazardous to human health.

1   Congress, with limited exceptions, banned the production and sale of PCB's in

2   1978." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997); *see also Env't Def. Fund*

3   *v. Env't Prot. Agency*, 598 F.2d 62, 65 (D.C. Cir. 1978) ("PCBs are a group of related

4   chlorinated hydrocarbon chemicals useful in several industrial processes and toxic to

5   a wide variety of organisms, including man."). "The International Agency for

6   Research on Cancer .... [and] [t]he American Conference of Governmental Industrial

7   Hygienists rates chemicals as ... human carcinogen[s]" including PCBs. *Valentine v.*

8   *PPG Indus., Inc.*, 821 N.E.2d 580, 606 (Ohio Ct. App. 2004). "Human exposure to

9   these toxins is mainly from meat, dairy products, and fish." *Effects of in Utero PCB*

10  *Exposure*, 8 Medico-Legal Watch 8 (1999). This was recognized as far back as 1979,

11  with "the [EPA] officially bann[ing] the manufacture, processing, and sale of PCBs

12  in the United States after identifying their severe toxic effects on humans and

13  wildlife." *Erickson v. Pharmacia LLC*, __ P.3d __, 2025 WL 3030107, at *2 (Wash.

14  2025). PCBs have also been the target of other CERCLA cleanup efforts. *See EPA*

15  *Selects Plan To Cleanup Superfund Site In North Providence*, 24 No. 5 Real

16  Est./Envt. Liability News 10 ("The goal of the [PCB] cleanup is to allow fish

17  consumption from the river, reduce the risk the contamination poses to wildlife, and

18  to comply with federal drinking water standards.").

19       "[T]he introduction of so-called forever chemicals into drinking water and the

20  environment is known as pollution." *Nat'l Foam, Inc. v. Zurich Am. Ins. Co.*, 2025

21  WL 699361, at *7 (N.D. Cal. 2025); *see Williams v. Emps. Mut. Cas. Co.*, 845 F.3d

22  891, 905 (8th Cir. 2017) ("[A]lthough there are some circumstances in which it

23  would be ambiguous whether a given substance is a contaminant, the word

24  unambiguously applies to asbestos that was excavated and pulverized into thick

25  clouds of dust that filled a building.").

26       "Forever chemicals" like PFAS and PCB present substantial risks to human

27  health, particularly given the Reuse Plan contemplates recreational uses of the parcels

28  by the public. (SOF ¶ 23). The MOA unambiguously required the United States to

take all actions to remove these contaminants from the Boat Channel. (SOF ¶¶ 21-22). It is indisputable that the United States failed to do so. (SOF ¶ 44). Significantly, the City's intended use of the property is expressly identified as the basis for what remediation is "necessary." (SOF ¶ 21). The Navy's limitation of the investigation to a subset of the Boat Channel allowed it to ignore the environmental health and safety implications of the 6.4 acres outside of IR Site 12. No investigation by the Navy and no determination by the Water Board addressed the entire Boat Channel.

The United States argues that "[t]he City does not explain how or why the Navy should have included PFAS before it was designated a hazardous substance." (ECF No. 188-1 at 22). It claims "[t]here was no basis to include PFAS in the Navy's remediation." (ECF No. 188-1 at 22). But there is no question that the United States knew its activities in the Boat Channel had resulted in the discharge of PFAS and PCB at the time it executed the MOA. (SOF ¶ 2, 79). Indeed, the United States does not dispute that PFAS or PCB is present in the Boat Channel. (City SOF ¶ 7). While it does claim that "[t]he [FOST] report also noted that PFAS 'have not been used or stored within the FOST property,'" (ECF No. 188-1 at 22), "[t]he rip-rap banks, or seawall portions of the FOST Property are not part of IR Site 12." (ECF No. 189-9 at PageID.5905 (Hobbs Decl. Ex. 8 at 11)). In other words, the precise areas of Parcels IIIB and VII that are the subject of dispute were never tested for PFAS or PCB and never remediated for that contaminant.

## 2. The United States Refused To Investigate The Entirety Of Parcels IIIB And VII

Despite the requirements of the MOA, there is no dispute that the United States only investigated and remediated an area it designated as "IR Site 12." (SOF ¶ 25). IR Site 12 is not coextensive with Parcels IIIB and VII. (SOF ¶ 72). The United States completely ignored the 6.4 acres of Parcels IIIB and VII outside of IR Site 12. (SOF ¶ 73).

The United States deliberately did not perform any sampling between low-tide

water line and the top of the Boat Channel banks, nor at the seawalls, nor beneath the submerged riprap, nor around the storm drain outfalls located in the banks. (SOF ¶ 49). This unaddressed area—where the likelihood of human contact and animal contact with contaminated sediments is greatest—is littered throughout with riprap in the form of large chunks of construction and demolition debris such as concrete, rebar, flooring, and asphalt from old NTC structures likely to harbor legacy contaminants. (SOF ¶ 56). In fact, the United States was so concerned about that area that it prohibited the City from performing any work within 15 feet of the top of the banks specifically to prevent "the sloughing of soil or other materials from the bank ... into the Boat Channel." (SOF ¶ 57).

Because it is undisputed that the United States took no action at all to investigate and remediate the 6.4 acres of Parcels IIIB and VII outside of IR Site 12, the United States indisputably failed to satisfy the MOA's condition precedent that it "take **all** remedial action necessary to protect human health and the environment" in Parcels IIIB and VII—it clearly has not.

### 3. The United States Failed To Obtain Site Closure For Parcels IIIB And VII

The MOA also requires the United States to "obtain site closure from appropriate regulatory authorities"—the Water Board—with respect to both Parcels IIIB and VII. (SOF ¶¶ 21-22).

In response to the Navy's self-declared completion of its remediation of IR Site 12, the Water Board issued only a "No Further Comment" letter in which the Water Board merely stated that it "has no further comments on the Final RACR." (SOF ¶ 37). According to the Water Board, that means only that the Water Board did not have any more comments on a report that was submitted. (SOF ¶ 37). In contrast, a "No Further Action" letter means "the cleanup has been completed, the Water Board is done with the site, no further action is needed, and the site is be closed." (SOF ¶ 67). Those are two very different determinations.

1    Even if the United States was correct in its claim that the "No Further

2  Comment" letter is sufficient, that letter addressed only IR Site 12, not the entirety

3  of Parcels IIIB and VII. (SOF ¶¶ 52-56). The United States has not obtained any

4  Water Board determination for the remaining areas of Parcels IIIB and VII. (SOF ¶¶

5  52-56). So, at most, the Navy received site closure for IR Site 12, not the full

6  Parcels IIIB and VII. That determination does not satisfy the MOA requirement to

7  obtain site closure for Parcels IIIB and VII. (SOF ¶¶ 21-22).

8    The United States claims that the "No Further Comment" letter constitutes

9  regulatory closure for the NTC Boat Channel, but it does not. Instead, the "No Further

10  Comment" letter provides a very simple, direct statement that specifically references

11  only one submittal by the Navy: "The San Diego Water Board has no further

12  comments on the Final RACR." (SOF ¶ 30).

13    The United States also argues that the act of a nameless Water Board Staff

14  Member to change a Water Board webpage reference to "closed" constitutes

15  regulatory closure of the site. But the United States provides no competent or

16  admissible evidence, nor does it cite to any controlling statute, regulation, or even

17  nonbinding regulatory guidance which affords any legal significance to such a

18  ministerial act. Indeed, the only evidence on this issue—the testimony of the Water

19  Board's Executive Officer—indicates uncertainty as to whether this change to

20  "closed" on the Geotracker website had any legal effect. (SOF ¶ 34).

21    **4.    The Cleanup Was Not Based On The Projected Uses Of**

22    **Parcels IIIB And VII Under The Reuse Plan**

23    The MOA requires the remediation and regulatory sign-off to be "based on the

24  projected use of Parcel [IIIB and VII], as described in the NTC San Diego Reuse Plan

25  dated August 1998." (SOF ¶¶ 21-22). That requirement was not met.

26    The Reuse Plan adopted by the City and approved by the United States is a

27  comprehensive land use planning document developed over a multi-year planning

28  process. (SOF ¶ 68). It includes an Open Space Plan, which proposed three

alternatives for the Boat Channel redevelopment. It notes: "The channel is one of the outstanding amenities of NTC. Access to the water in a graceful way will add measurably to the enjoyment of the base for all visitors." (SOF ¶ 69). The Reuse Plan further states: "The second proposed alternate for the water's edge would remove the existing riprap edge at the boat channel allowing the grass park-land to slope down and meet the water." (SOF ¶ 70).

Thus, a projected use for Parcels IIIB and VII expressly included the removal of the existing riprap on the banks and the exposure of the sediments below the riprap to allow "reaching the water in a way similar to a beach." (SOF ¶ 71). This projected use would obviously involve human contact, as well as animal contact, with the sediment. Yet no investigation was conducted of the sediment underlying the riprap all along the banks of Parcels IIIB and VII. (SOF ¶ 26). Thus, regardless of the standard applicable to the Navy's cleanup and regardless of the characterization of the Water Board's determination, the Navy's remediation did not satisfy the requirement that it be "based on the projected use of Parcel [IIIB and VII]." (SOF ¶¶ 21-22).

Indeed, the City will likely be affirmatively prevented from developing the property under the Reuse Plan even if it tried to do so. This redevelopment is governed in part by the California Environmental Quality Act ("CEQA"), codified in California Public Resources Code Sections 21000-21189 and the CEQA Guidelines (California Code of Regulations, Title 14, Division 6, Chapter 3, Sections 15000-15387). CEQA requires the evaluation and disclosure of potential environmental impacts of the redevelopment to the public and other public agencies, including the Regional Water Quality Control Board, the Port of San Diego, the California Coastal Commission, and the EPA. Any of these agencies can take action to prevent the redevelopment of the parcels completely due to environmental impact concerns, such as the fact that the Navy's remediation of the parcels did not include the area beneath the rip-rap and did not address PFAS, PCB, and other known

1  carcinogens.

2       The Navy is required to obtain approval from all appropriate regulatory

3  authorities that its remediation was sufficient to protect human health and the

4  environment based on the City's projected redevelopment of the parcels. Nowhere in

5  the record has the Navy obtained a determination by the Water Board that all remedial

6  action necessary was taken so as to permit the City to proceed with redevelopment

7  pursuant to the Reuse Plan.

8       The issue is satisfaction of the mutually agreed contract language as a

9  condition precedent to the conveyance. The City satisfied its conditions precedent.

10  The United States did not.

11       ### D.   The City Did Not Waive MOA Enforcement

12       The United States argues that the City waived its argument about the failure of

13  the United States to clean up the PFAS contamination because "[t]he City first raised

14  PFAS in comments submitted on the RACR in October 2018, long after the Navy

15  issued the final ROD in March 2017 and completed the remedial action around March

16  2018." (ECF No. 188-1 at 23 n.4). The United States also claims that "[b]ecause the

17  EPA issued the Lifetime Health Advisory about PFAS in May 2016, nearly a year

18  before the Navy selected the remedy, the City cannot claim that it did not have any

19  opportunity to raise the issue in time." (ECF No. 188-1 at 23).

20       The United States does not mention PCB, the carcinogenic contaminant found

21  to be present on the parcels in the 1986 Initial Assessment that the United States

22  failed to properly investigate or remediate. In any event, the United States again

23  ignores the plain language of the MOA. It clearly provides that "[t]he failure of either

24  Party to insist, in any one or more instances, upon strict performance of any of the

25  terms of this Agreement shall not be construed as a waiver or relinquishment of such

26  Party's right to future performance of this Agreement, but the obligations of the other

27  Party with respect to such future performance shall continue in full force and effect."

28  (SOF ¶ 84).

1    The United States also ignores the fact that CERCLA is retroactive. The 2024
2    PFAS designation is retroactive and the United States still owns the property. Had
3    the United States not taken 20 years to perform its cleanup and tender the parcels,
4    and tendered the parcels before the 2016 advisory, perhaps the City could have
5    accepted the parcels. But PFAS was designated while the United States still owned
6    the property, obligating the United States to address the PFAS contamination under
7    the MOA and CERCLA.

8    ### E.    The United States' Breach Excuses The City's Performance

9    For the United States to recover for breach of contract, it "must allege and
10   establish: (1) a valid contract between the parties, (2) an obligation or duty arising
11   out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."
12   *San Carlos Irrigation and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed.
13   Cir. 1989). But "[i]t is well-established at common law that a breach or non-
14   performance of a promise by one party to a bilateral contract, so material as to justify
15   a refusal of the other party to perform a contractual duty, discharges that duty."
16   *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 536 (9th Cir. 2011) (quoting
17   Restatement (First) of Contracts § 397 (Am. Law Inst. 1932)) (cleaned up).

18   It is also well established that "if a condition precedent to performance fails,
19   the parties still have a contract, but they lose the right to enforce at least some of its
20   terms." *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1043 (9th Cir.
21   2020) (emphasis omitted). And "a party is not entitled to specific performance if" the
22   party "has not fully and fairly performed all the conditions precedent on his part to
23   the obligation of the other party." *Oh v. Resol. Tr. Corp.*, 26 F.3d 131 (table), 1994
24   WL 249988, at *2 (9th Cir. 1994) (quoting Cal. Civ. Code § 3392 (1994)).

25   "[A] term may be 'material' in one of two ways: It may be a necessary term,
26   without which there can be no contract; or, it may be an important term that affects
27   the value of the bargain." *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034,
28   1037 (9th Cir. 2011). The breach of a material term "is a failure to do something that

is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract." *Degree of breach; "material breach" or "total breach"*, 23 Williston on Contracts § 63:3 (4th ed.); *see also Gilbert v. Dep't of Just.*, 334 F.3d 1065, 1071 (Fed. Cir. 2003) ("[A] breach is material when it relates to a matter of vital importance, or goes to the essence of the contract.").

"Other courts have defined a breach of contract as 'material' if the promisee receives something substantially less or different from that for which the promisee bargained." *Degree of breach; "material breach" or "total breach"*, 23 Williston on Contracts § 63:3 (4th ed.); *see also Term*, <u>Black's Law Dictionary</u> (12th ed. 2024) (defining an essential term of a contract as "a contractual provision that specifies an essential purpose of the contract, so that a breach of the provision through inadequate performance makes the performance not only defective but essentially different from what had been promised").

"It is well-established at common law that a breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." *Las Vegas Sands*, 632 F.3d at 536 (quoting Restatement (First) of Contracts § 397 (Am. Law Inst. 1932)) (cleaned up). In other words, "one party's material breach of a contract excuses the other party's duty to perform." *James River Ins. Co. v. Medolac Lab'ys*, 290 F. Supp. 3d 956, 970 (C.D. Cal. 2018).

The material nature of the cleanup requirement is evident in the MOA. It expressly recognizes that four of the seven NTC parcels were contaminated, and the City bargained for identical cleanup and regulatory sign-off requirements for each parcel prior to transfer. (SOF ¶¶ 21-22). There is no question that the MOA's requirement that the United States "take all remedial action necessary to protect human health and the environment" is "an important term that affects the value of the bargain." *Facebook*, 640 F.3d at 1037. The same goes for the promises of the United States to "obtain site closure from appropriate regulatory authorities" "based

- 28 -

on the projected use of" the parcels "as described in the NTC San Diego Reuse Plan dated August 1998." (SOF ¶¶ 21-22).

The undisputed facts show that the United States failed to perform these obligations. Forcing the City to accept the parcels anyway will leave it on the City to spend millions of dollars to perform the costly investigation and remediation that the United States should have performed under the MOA. This is because the Water Board will not grant the City an exemption from the sediment quality objectives like it did for the Navy—the City cannot submit a remedial investigation "prior to February 19, 2008." (SOF ¶ 30).

This is completely contrary to the benefit the City bargained for in the MOA. No costs were expected to be incurred by the City for the investigation or remediation of any contaminated parcels. (SOF ¶ 13). The obligation of the United States to incur these costs is plainly a material term of the MOA—the City would have never agreed to accept the parcels without the promise of the United States to perform this cleanup. Nor would the City have ever agreed to accept the parcels for recreational use under the Reuse Plan if it knew that doing so would expose its residents to the risk of "cancer, thyroid disorders, and harm to reproductive and immune systems" created by the PFAS contamination. *Saedi*, 2024 WL 4388401, at *1. By turning a blind eye to this contamination, the United States asks the City to put the health and safety of every visitor to the Boat Channel in danger. There are no circumstances in which the City—or any responsible public official—would agree to this.

The requirements that the United States "take all remedial action necessary to protect human health and the environment" and "obtain site closure from appropriate regulatory authorities" "based on the projected use of" the parcels "as described in the NTC San Diego Reuse Plan dated August 1998" are material terms of the MOA as a matter of law. The failure of the United States to perform this obligation precludes the United States from enforcing the MOA against the City. The City is excused from accepting these contaminated parcels as a matter of law. *See Gilbert*,

1  334 F.3d at 1072 ("Where ... the facts are undisputed, the determination of whether
2  there has been material non-compliance with the terms of a contract, and hence
3  breach, necessarily reduces to a question of law.").

4  **F.    The Cleanup Was Not Consistent With The NCP, Constituting**
5  **Breach Regardless Of Whether The MOA Only Restates CERCLA[5]**

6  **1.    The United States Failed To Consider The Actual Or**
7  **Potential Exposure Required By The NCP**

8  The NCP requires that the United States consider the "[a]ctual or potential
9  exposure to nearby human populations, animals, or the food chain from hazardous
10 substances or pollutants or contaminants." 40 C.F.R. § 300.415(b)(2)(i). The
11 inclusion of pollutants and contaminants in the NCP is not new or novel.
12 Perfluorinated compounds (PFAS) have long been known to satisfy the CERCLA
13 definition of pollutants and contaminants. *See* 42 U.S.C. § 9601(33). They were
14 identified as emerging contaminants pursuant to the Safe Drinking Water Act as early
15 as November 2017, before being designated as CERCLA hazardous substances, yet
16 the United States failed or refused to investigate their presence notwithstanding their
17 known nearby presence and the potential for migration to the Boat Channel. (The
18 City's SOF ¶ 79).

19 **2.    The United States Failed To Evaluate The High Levels Of**
20 **Hazardous Substances Or Pollutants In The Boat Channel**

21 The United States is also required to evaluate "[h]igh levels of hazardous
22 substances or pollutants or contaminants in soils largely at or near the surface, that
23 may migrate." 40 C.F.R. § 300.415(b)(2)(iv). The failure or refusal of the United
24 States to evaluate contaminants and hazardous substances in the area of the rip rap, a
25 known and expected recreational area, demonstrates a deliberate attempt to ignore an

26

27 [5] Consistency with the NCP is entirely irrelevant to whether the United States performed under the plain language of
   the MOA. But the City includes this response nonetheless to prevent any argument that it has waived its claims that
28 the cleanup did not comply with the NCP.

- 30 -

obvious environmental risk associated with the presence of hazardous substances that would have migrated under that debris. The United States also failed to investigate areas immediately around the storm water outfalls which the United States claims are the primary contributors of contamination to the Boat Channel. The migration from surface water runoff and outfalls is an identified source of contamination. (SOF ¶ 77).

### 3.    The United States Failed To Eliminate The Threat To Public Health Or Welfare Or The Environment

"If the lead agency determines that a removal action is appropriate, actions shall, as appropriate, begin as soon as possible to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat to public health or welfare of the United States or the environment." 40 C.F.R. § 300.415(b)(3). The United States made no effort to comply with this provision of the NCP. This is evident in any of the documentation produced by the United States. As one example, a frustrated Water Board documented a 5-year period where there was essentially no action from submittal of the Remedial Investigation in 2003 through at least 2008. The lengthy period between sampling in 1998 and completion of remediation in 2018 should have resulted in measures to ensure that further migration to the Boat Channel was abated. However, none were implemented. (ECF No. 137 ¶ 5).

### 4.    The United States' Investigation Did Not Comply With NCP

The investigation of the United States failed to adhere to the requirements of 40 C.F.R. § 300.415(b)(4), which prescribes sufficient data collection quality and quantity. The sampling and analysis of the Boat Channel was constrained geographically and temporally. The effort to limit the depth of analysis in IR Site 12, the lack of statistical validity for the sampling plan, the failure to sample the soils adjacent to IR Site 12, the limited number of samples for the spatial area at issue, and the failure to sample soils across which migrating contaminants were known or suspected to migrate represent a failure of significant proportions with respect to this provision of the NCP. The non-static nature of the Boat Channel sediment and the

runoff from soils exacerbates the risk of continuing contamination long after the IR Site 12 removal action. The failure of the United States to perform post-remediation sampling after these issues were identified defies explanation. The refusal to allow the City to perform this post-remediation sampling at its own expense can best be explained as an attempt to preclude discovery of the failure of the United States. (City SOF ¶ 8).

The United States also failed to investigate and remediate the entirety of the Boat Channel. (SOF ¶ 18). Instead, the United States investigated and remediated only IR Site 12. The United States took no action to address approximately 6 acres of the Boat Channel outside of IR Site 12. (SOF ¶ 18). The United States took no action with respect to the areas between the low-tide waterline and the top of the Boat Channel banks. (SOF ¶ 18). This failure was inconsistent with the NCP because it ignored the potential for any past and continuing contribution of potential contaminants in this surrounding area to the IR Site 12 sediments. (ECF 134 ¶ 13). Because of this, the remedial action of the United States did not extend to the unaddressed area, the unaddressed area also falls outside the scope of the letters issued by the California Regional Water Quality Control Board, San Diego Region. (ECF 134 ¶ 20). This constitutes a failure by the United States to fulfill its obligation to "take all remedial action necessary to protect human health and the environment and ... obtain site closure from appropriate regulatory authorities based on the projected use" of the Boat Channel. (ECF 134 ¶ 21).

### 5.    The United States Restricted The Sampling Plan In A Manner Inconsistent With The NCP

The NCP also requires that "[i]n implementing this section, the lead agency should consider the program goal, program management principles, and expectations contained in this rule. The investigative and analytical studies should be tailored to site circumstances so that the scope and detail of the analysis is appropriate to the complexity of site problems being addressed." 40 C.F.R. § 300.430(b). The

constraints imposed in the sampling plan included a failure to investigate to a sufficient depth to determine the effects on deep benthic organisms, essential components of the food chain. Their presence is not limited to the sediment surface and near surface, yet the action of the United States did not proceed to the depth of their presence. Essentially the United States plan ignored representative sampling in all three dimensions. (ECF No. 137 ¶ 8).

Under the NCP, "[t]he purpose of the remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives. To characterize the site, the lead agency shall, as appropriate, conduct field investigations, including treatability studies, and conduct a baseline risk assessment." 40 C.F.R. § 300.430(d)(1).

The United States acted inconsistently with this requirement. Both the City and the Water Board repeatedly raised concerns to the United States relating to site characterization, the representativeness of the sampling plan, the staleness of the data relied upon in the execution of its removal action, the limitation of chemicals of concern by eliminating a broader area of investigation, and the failure to perform any sampling of soils or water for PFAS before or after their designation as CERCLA hazardous substances. In addition, the City raised the issue of the failure by the United States to adhere to the SQOs.

### 6.    These Failures Constitute Arbitrary And Capricious Action

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* "In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-*

*Best Freight System*, 371 U.S. 156, 168 (1962)). "Judicial review 'must be based on something more than trust and faith in [the government's] experience.'" *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 905 (5th Cir. 1993) (quoting *American Petroleum Institute v. E.P.A.*, 661 F.2d 340, 349 (5th Cir. 1981)). Despite the ostensibly "narrow" scope of review, "[t]his inquiry must be searching and careful." *United States v. Iron Mountain Mines*, 724 F. Supp. 2d 1086, 1090 (E.D. Cal. 2010).

The actions of the United States here fail this standard. As the Ninth Circuit has previously held, the NCP "require[s] a remedial investigation 'to determine the nature and extent of the threat presented by the release.'" *Washington State Dep't of Transp. v. Washington Nat. Gas Co., Pacificorp*, 59 F.3d 793, 803 (9th Cir. 1995). "This includes sampling, monitoring, as necessary, and includes the gathering of sufficient information to determine the necessity for and proposed extent of remedial action." *Id.* Where the "remedial investigation utterly failed to determine the nature or the extent of the threat posed" by hazardous substances, the government's "actions were inconsistent with the NCP" and no cost recovery was warranted. *Id.*

In a similar case, the court held that a government cleanup was arbitrary and capricious where the government "failed to undertake a feasibility study" and "relied on EPA's May 1986 Site Assessment" despite warnings that the results of the site assessment were questionable. *State of Minn. v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1024 (8th Cir. 1998); *see also Emhart Indus., Inc. v. New England Container Co., Inc.*, 274 F. Supp. 3d 30, 49 (D.R.I. 2017) ("decisions made within [CERCLA and the NCP] will qualify as 'arbitrary and capricious' if [the government] fails to 'examine the relevant data and articulate a satisfactory explanation for its action.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009))).

Notably, in making this determination the Court may not provide any deference to the legal conclusions or positions advanced by the United States. Instead, "[c]ourts must exercise their independent judgment in deciding whether an

1  agency has acted within its statutory authority." *Loper Bright Enterprises v.*

2  *Raimondo*, 603 U.S. 369, 412 (2024). The determination of the law, and the

3  underlying facts of the actions of the United States, is the exclusive province of the

4  Court. The facts as demonstrated by the City's evidence, at the very least, create

5  genuine issues of material fact regarding inconsistency with the NCP. As in the cases

6  cited above, the United States has "utterly failed to determine the nature or the extent

7  of the threat posed," and failed to "gather[] sufficient information to determine the

8  necessity for and proposed extent of remedial action," among the numerous other

9  deficiencies outlined above.

10  ## V.    CONCLUSION

11        For the reasons set forth above, this Court should enter an order denying the

12  motion for partial summary judgment of the United States. The Court should instead

13  grant the City's motion and dismiss the counterclaim-in-reply of the United States

14  with prejudice. In the alternative, the Court should deny both motions and determine

15  whether the United States is entitled to specific performance based on the evidence

16  adduced at trial.

17

18   DATED: November 26, 2025          Respectfully submitted,

19                                     **KUTAK ROCK LLP**

20

21                                     By: *s/ Barry P. Steinberg*
                                          Barry P. Steinberg
22                                        barry.steinberg@kutakrock.com

23                                     Attorney for Defendant
                                       City of San Diego

24

25

26

27

28