UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO, et al.,<br><br>Defendants.<br><br>_____<br><br>AND RELATED CROSS-ACTION. | Case No.:  23cv0541-LL-VET<br><br>**ORDER:**<br><br>**(1) GRANTING UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE BREACH OF CONTRACT COUNTERCLAIM-IN-REPLY** [ECF No. 188]**;**<br><br>**(2) DENYING THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE BREACH OF CONTRACT COUNTERCLAIM-IN-REPLY** [ECF No. 186] |

Before the Court are Plaintiff United States of America's ("United States") and Defendant City of San Diego's ("City") motions for partial summary judgment on the United States' counterclaim-in-reply for breach of contract ("Motions"). ECF Nos. 186, 188. The matter is fully briefed, and the Court deems it suitable for determination on the papers and without an oral argument pursuant to Civil Local Rule 7.1. For the reasons below, the Court **GRANTS** the United States' Motion and **DENIES** the City's Motion.

## I.    BACKGROUND

### A. Undisputed Statement of Facts

The Department of the Navy ("Navy") operated the former Naval Training Center ("NTC") in San Diego, California as a training facility from June 1923 until April 1997. ECF No. 1 at 4; United States' Undisputed Statement of Facts ("US SOF") ¶ 70, ECF No. 206-2 at 23. In 1993, the Defense Base Closure and Realignment Commission recommended the closure of the NTC. City's Undisputed Statement of Facts ("City SOF") ¶ 6, ECF No. 207-1 at 3–4; ECF No. 188-1 at 6. The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") requires the military to either identify the property as uncontaminated after investigating whether there has been a release or threatened release of a hazardous substance (42 U.S.C. § 9620(h)(4)(A)), or to covenant that "all remedial action necessary to protect human health and the environment" has been taken before transferring the base property (42 U.S.C. § 9620(h)(3)(A)(ii)(I)). ECF No. 188-1 at 6.

In 1986, the Navy completed an Initial Assessment, which recommended the investigation of several locations at the NTC for possible contamination. US SOF ¶ 3. In 1996, the Navy conducted a Sediment Characterization Study, which found "adverse biological responses" in the sediment in the boat channel and recommended further investigation. *Id*. ¶ 3. In 1998, the Navy developed the Remedial Investigation Work Plan ("RI Work Plan") to devise a "sampling approach for the remedial investigation of the Boat Channel sediments." *Id*. ¶ 4. Around this time, the California Environmental Protection Agency designated the San Diego Regional Water Quality Control Board ("Water Board") as the lead state agency for the remediation of the former NTC. *Id*. ¶ 5; City SOF ¶ 28.

On May 30, 2000, the City and the United States entered into a Memorandum of Agreement ("MOA") for the conveyance of seven parcels of the former NTC property to the City, including two parcels at issue known as Parcels IIIB and VII (also referred to as "Boat Channel Parcels"). City SOF ¶ 19. The MOA acknowledged that Parcels IIIB, VII, VIII, and X were "known" or "believed" to be contaminated. US SOF ¶ 13; City SOF ¶ 22.

23cv0541-LL-VET



ECF No. 189-1 at 14.

Pursuant to the MOA, the Navy agreed to "take all remedial action necessary to protect human health and the environment." US SOF ¶¶ 14, 39. The MOA also required the Navy to obtain site closure from appropriate regulatory authorities based on the projected use of the parcel, as described in the NTC San Diego Reuse Plan dated August 1998. *Id*. ¶ 14.

In March 2001, the City accepted the deeds to Parcel VIII after the Navy completed its remediation and the Water Board issued a no-further-comment letter on the Finding of Suitability to Transfer ("FOST"). *Id*. ¶¶ 16, 84. By 2002, the Navy had successfully transferred all parcels to the City under the MOA except for the Parcels IIIB and VII. *Id*.

In October 2003, the Navy completed the Remedial Investigation Report ("RI Report"), evaluating "the potential risks to beach and water recreational users, consistent with the proposed reuse for the Boat Channel, and to both recreational and subsistence anglers." *Id*. ¶ 18; ECF No. 189-2 at 9. According to the RI Report, "[s]amples of Boat

3

23cv0541-LL-VET

Channel surface sediment, subsurface sediment cores, surface water, and beach sediment were collected." ECF No. 189-2 at 6. For example, the Navy took samples from ten stations on the shoreline and discovered that contamination was highest in the deeper parts of the Boat Channel, lower in the shallower parts of the Boat Channel, and lowest along the shoreline. US SOF ¶¶ 59–60. The RI Report also concluded that "[t]he southern section [of the Boat Channel] is recommended for no further action." ECF No. 189-2 at 9.

In May 2016, the Environmental Protection Agency ("EPA") issued a Lifetime Health Advisory explaining the risk from exposure to PFAS in drinking water. US SOF ¶ 76. However, the Boat Channel is not a source of drinking water. *Id*. ¶ 77. Moreover, PFAS "have not been used or stored within the FOST property." *Id*. ¶ 78.

In September 2016, the Navy completed the Feasibility Study Report ("FS Report"), which identified eight alternatives to remediate the areas of the "chemically impacted sediments." *Id*. ¶ 21; ECF No. 189-4 at 6–10. The Water Board accepted the FS Report's findings and stated that it had no further comment. *Id*. ¶ 23.

In March 2017, the Navy issued the final Record of Decision and Remedial Action Plan ("ROD"), in which the Navy selected the remedy: dredging the contaminated sediments ("Area of Ecological Concern" or "AEOC" as shown in Figure 2 below) and removing them to an off-site landfill. *Id*. ¶¶ 24, 79; ECF No. 189-5 at 9. Because the AEOC was located only in Parcel VII, the Navy concluded that no remedial action was necessary in Parcel IIIB. US SOF ¶ 53.

23cv0541-LL-VET



ROD, ECF No. 189-5 at 32.

According to the ROD, "[t]he remedy was selected in accordance with [CERCLA], and to the extent practicable, the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) . . ." ECF No. 189-5 at 8. The Water Board approved the Navy's selected remedy and signed the ROD on August 10, 2017. US SOF ¶¶ 27, 73, 80. On November 17, 2017, it issued a no-further-comment letter for the ROD. *Id*. ¶ 46. The Navy implemented the remedy, and the remediation was completed in February 2018. *Id*. ¶¶ 28, 79. In March 2019, the Navy published the Remedial Action Completion Report ("RACR") and confirmed that the remedy had been successfully implemented. *Id*. ¶ 29. The Water Board reviewed the RACR and stated that it had no further comments on April 16, 2019. *Id*. ¶¶ 30, 81.

Throughout the investigation and remediation process, the Water Board submitted hundreds of detailed and substantive comments on the Navy's reports, and the Navy responded to each of them. *Id*. ¶ 47. The Water Board also participated in countless calls and meetings to monitor the remediation. *Id*. ¶ 48.

In April 2021, the Navy issued a revised Final Finding of Suitability to Transfer ("final FOST") for Parcels IIIB and VII, which found that the parcels were environmentally suitable for transfer. US SOF ¶ 32; City SOF ¶¶ 46, 47. The Water Board reviewed the final FOST and stated that it "finds the Final FOST acceptable with regard to the completion of the sediment remediation in the Boat Channel (IR Site 12) and has no further comments" on April 29, 2021. US SOF ¶ 33. The Water Board also changed the status of the IR Site 12 remediation to "closed" on its website called Geotracker. *Id*. ¶ 34. On May 16, 2022, the Navy sent the deed for Parcel IIIB to the City and assigned Parcel VII to the National Park Service for conveyance. *Id*. ¶ 35. The City responded that it would not accept the transfer of either parcel and asked the National Park Service to "hold its process in abeyance." *Id*. ¶ 36. On November 3, 2022, the Navy sent a Notice of Default to the City. *Id*. ¶ 37. The United States alleges that the City failed to cure the breach within 30 days pursuant to the MOA. *Id*. The City claims that it was not in breach. *Id*.

On March 27, 2023, the United States filed the instant lawsuit.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it "might affect the outcome of the suit under the governing law," and a dispute over a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Id*. at 252.

The moving party bears the initial burden of identifying those parts of the pleadings

23cv0541-LL-VET

and record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant carries this burden of production, then the non-movant must designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324. Courts must view the facts and draw all reasonable inferences "in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (brackets omitted).

However, "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Nor is it our task "to scour the record in search of a genuine issue of triable fact;" we may "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

## III.   DISCUSSION

"Contracts with the United States are governed by federal law." *Chaly-Garcia v. United States*, 508 F.3d 1201, 1203 (9th Cir. 2007) (citing *United States v. Seckinger*, 397 U.S. 203, 209 n.12 (1970). To recover for breach of contract under federal common law, a party must demonstrate "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) breach of that duty, and (4) damages caused by the breach." *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Circ. 2020) (quoting *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)).

### A. The Navy and the City Entered into a Valid Contract

Both the United States and the City agree that the United States and the City entered into the MOA on May 30, 2000 and that the MOA is a valid and binding contract. US SOF ¶ 38. Thus, there is no genuine dispute as to the validity of the MOA.

### B. The City's Motion

The City asks the Court to dismiss the United States' counterclaim-in-reply with prejudice because the Navy failed to perform its contractual obligation under the MOA as a matter of law. Specifically, the City claims that the Navy failed to investigate and remove

23cv0541-LL-VET

"the 'various contaminants' known to exist in Parcels IIIB and VII." ECF No. 186-1 at 20.

### 1. Navy's Obligation under the MOA

This Court must first decide what performance constitutes an "obligation or duty arising out of the contract" under the MOA. The MOA states that the "Navy shall take all remedial action necessary to protect human health and the environment and will obtain site closure from appropriate regulatory authorities based on the projected use of [Parcels IIIB and VII], as described in the NTC San Diego Reuse Plan dated August 1998." ECF No. 189-1 at 4, 5. As relevant here, the MOA also states that the Parcels IIIB and VII are "believed to contain sediments impacted by various contaminants." *Id*.

According to the City, the United States was required to take *all* remedial action necessary to protect human health and the environment by removing the "various contaminants" known to exist in Parcels IIIB and VII. ECF No. 186-1 at 20. The City claims that the term "contaminants" is unambiguous because "contaminant" is defined as "something that contaminates" and "contaminate" is defined as "to render unfit for use by the introduction of unwholesome or undesirable elements." ECF No. 186-1 at 20. Therefore, the City argues that the MOA required remediation of *all* contaminants, such as per- and polyfluoroalkyl substances ("PFAS") and perfluorooctanoic acid ("PFOA"), which the United States did not test for. *Id*.

In contrast, the United States claims that the "MOA uses CERCLA's remedial standard" and that "[n]othing in the MOA suggests the parties intended to establish a different cleanup standard." ECF No. 207 at 17. Thus, the Court must first analyze whether the MOA incorporates CERCLA.

For purposes of reviewing the City's Motion, this Court finds that the MOA incorporates CERCLA's remedial standard for the following reasons.

### i. Contract Interpretation

When interpreting contracts, "[a] written contract must be read as a whole and every part interpreted with reference to the whole." *Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983); *see also* Restatement (Second) of Contracts § 202(2) ("A writing is

23cv0541-LL-VET

interpreted as a whole, and all writings that are part of the same transaction are interpreted together."). "Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." *Id.* "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *Int'l Union of Bricklayers & Allied Craftsman Loc. Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir. 1985). "A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) (citing *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981)).

First, the MOA repeats the remedial standard from CERCLA verbatim:

- CERCLA: ". . .each deed entered into for the transfer of such property by the United States . . . shall contain a covenant warranting that **all remedial action necessary to protect human health and the environment** with respect any such substance remaining on the property has been taken before the date of such transfer . . ." 42 U.S.C. § 9620(h)(3)(A)(ii)(I).

- MOA: "Navy shall take **all remedial action necessary to protect human health and the environment** and will obtain site closure from appropriate regulatory authorities based on the projected use of Parcel [], as described in the NTC San Diego Reuse Plan dated August 1988." ECF No. 189-1 at 4, 5.

Second, CERCLA is referenced at least 21 times in the MOA. ECF No. 189-1 at 19, 22, 51, 62, 69, 70, 94, 98, 102, 107. The City tries to argue that CERCLA does not apply to the MOA because it is not mentioned or cited at all in the *body* of the MOA, which according to the City is the first ten pages of a 220-page document. ECF No. 186-1 at 25. However, "[a] writing is interpreted as a whole, and all writing that are part of the same transaction are interpreted together." Restatement (Second) of Contracts § 202(2). Thus, the exhibits that are attached to the body of the MOA should be read together.

Even if the Court were to review only the body of the MOA, it would still lead to other portions of the MOA that expressly refer to CERCLA. For example, paragraph 3 of the MOA states that "[a]ll conveyances shall be by quitclaim deed [] in substantially the form attached hereto to as Exhibit 'B.'" ECF No. 189-1 at 5. In Exhibit B, paragraph 4(b)

23cv0541-LL-VET

warrants that "all remedial action necessary to protect human health and the environment with respect to any hazardous substances remaining on the Property has been taken," and paragraph 7 expressly notes that the terms "remedial action" and "hazardous substances," among others in paragraph 4, shall "have the meanings given such terms under CERCLA." *Id*. at 19, 22. Thus, Exhibit B not only repeats the same remedial standard under CERCLA, but it also expressly refers to CERCLA.

In addition, the body of the MOA refers to the 1998 San Diego Reuse Plan ("Reuse Plan"), which in turn refers to CERCLA. The MOA states that the "Navy . . . will obtain site closure . . . as described in the NTC San Diego Reuse Plan dated August 1998." ECF No. 189-1 at 4, 5. The 1998 Reuse Plan, which was adopted by the San Diego City Council two years before the execution of the MOA, states that "the Navy is responsible for all aspects of boat channel cleanup prior to conveyance. Following the requirements of the federal Comprehensive Environmental Response Compensation and Liability Act (CERCLA), the Navy must proceed with a Remedial Investigation, Feasibility Study, Proposed Plan, Record of Decision, and Remedial Action." ECF No. 189-28 at 6. Thus, after drawing all reasonable inferences in the light most favorable to the opposing party, this Court finds that the parties likely intended the MOA to incorporate CERCLA's remedial standard.

### ii.    Technical Terms

The use of technical terms in the MOA also supports the argument that the parties intended to apply CERCLA's remedial standard. "[T]echnical terms and words of art are given their technical meaning when used in a transaction within their technical field." Restatement (Second) of Contracts § 202(3)(b); *see also Prestwick Cap. Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 656 (7th Cir. 2013) ("words of art or technical terms are assigned their industrial meanings within the commercial context of the agreement"); *see e.g., Hartford Fire Ins. Co. v. Clark*, 562 F.3d 943, 946 (8th Cir. 2009) (giving the word "overcharges" its technical meaning in the transportation industry in a bill of lading contract); *Petro v. Ohio Cas. Ins. Co.*, 95 F. Supp. 59, 62. (S.D. Cal. 1950)

23cv0541-LL-VET

(finding "the words used were words of art, [and] that the parties were using the words in the sense used by the regulations").

Here, the parties do not dispute that they entered into the MOA for the United States to transfer federal property to the City. ECF Nos. 186-1 at 11; 207 at 9. The MOA requires the Navy to take "remedial action" before the transfer of such property, but the MOA does not define key words like "remedial action," "hazardous substance," or any other terms in the MOA for that matter. The City asks the Court to use the "plain meaning" of these highly technical terms. ECF No. 186-1 at 25. However, CERCLA defines these key words, including "remedial action," "hazardous substance," "contaminant," and "environment." 42 U.S.C. §§ 9601(8) (defining "environment"), 9601(14) (defining "hazardous substance"), 9601(24) (defining "remedial action"), 9601(33) (defining "contaminant"). Given that the MOA was created with the hazardous waste removal in the backdrop, the Court finds that the parties likely intended to apply the technical terms and meanings under CERCLA.

### iii.   Course of Performance

The parties' course of performance also supports the claim that CERCLA dictates the Navy's obligation under the MOA. "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *N. Cnty. Commc'ns Corp. of Arizona v. Qwest Corp.*, 824 F.3d 830, 840 (9th Cir. 2016) (quoting Restatement (Second) of Contracts § 202(4) (1979)).

Here, the Navy had followed CERCLA's remediation process for Parcel VIII, and the City accepted Parcel VIII without any objection. *See* ECF Nos. 189-13 (deed for Parcel VIII); 189-15 (FOST for Parcel VIII). In fact, the Navy stated in Parcel VIII's FOST that it followed CERCLA's process and standards to remediate the property: "All remedial actions to protect human health and the environment have been taken at IR Site 15 [Parcel VIII], in accordance with CERCLA § 120(h)(3)." ECF 189-15 at 11. Given that the City

11

previously acknowledged that CERCLA's standards satisfied the MOA's remedial obligation for Parcel VIII, the City cannot plausibly seek to apply a different standard to the Boat Channel Parcels. And the City fails to present any basis to do so.

Moreover, the City had never objected before when the Navy stated that it was conducting the cleanup pursuant to CERCLA throughout the remediation process. *See* RI Report, ECF No. 189-3 at 7, 25 ("The Navy is investigating the Boat Channel under its authorities established by . . . CERCLA . . . Consistent with CERCLA and its implementing regulations (the NCP), the Navy will comply with any promulgated standard, requirement, criteria or limitation under a State environmental or facility siting law that is more stringent than corresponding Federal standards."); FS Report, ECF No. 155, USN_87684 ("This report presents the results of a CERCLA Feasibility Study."); FS Report, ECF No. 155, USN_87685 (noting the Feasibility Study "is a continuation of the CERCLA process for the Boat Channel Sediments and follows the RI."); FS Report, ECF No. 155, USN_87686 ("The evaluations [of remedial alternatives] are made relative to the criteria required by the NCP under CERCLA."); FS Report, ECF No. 155, USN_87693 (noting the RI "followed the guidance promulgated by CERCLA"); ROD, ECF No. 189-5 at 8 ("The remedy was selected in accordance with [CERCLA]."); ROD, ECF No. 189-5 at 28 ("[T]he Navy, in partnership with the [Water Board], considered all pertinent factors in accordance with CERCLA and NCP remedy selection criteria."). In fact, the City itself cited CERCLA when submitting comments on the Navy's reports during the remediation. FS Report, ECF No. 155, USN_88575 ("Per CERCLA Section 107(a) and DOD guidance for site restoration, this RI/FS should include the documentation of the search completed for all potential dischargers of pollutants that would have ultimately entered the Boat Channel."); ROD, ECF No. 155, USN_98606 ("As such over the course of the review of the CERCLA process documents, the City has put forward concerns over several items related to the feasibility and remediation plan.").

In another instance, the City even acknowledged that the MOA's remedial obligation refers to CERCLA. While submitting comments on the FOST, the City stated in a letter:

23cv0541-LL-VET

"Consistent with the MOA, both of these types of conveyances contain specific requirements for the protection of human health and the environment, further outlined by CERCLA § 120 (42 U.S.C. § 9620, *et seq.*)." ECF No. 207-7 at 3. Therefore, the parties' course of performance demonstrates that the parties consistently applied CERCLA standard for the Navy's remedial obligation under the MOA.

In sum, this Court finds that the parties likely intended the Navy's remedial obligation under the MOA to mirror its obligation under CERCLA. The Court will now analyze whether the Navy performed its obligation.

### 2. The Navy's Performance

The City has asserted various reasons why the Navy failed to perform its obligation under the MOA.

i.    City's Claim 1: The Navy failed to remove all contaminants

The City claims that the Navy failed to test the contaminants that it "discharged into the Boat Channel," specifically the PFAS. ECF Nos. 186-1 at 20. However, there was no basis for the Navy to remediate PFAS in the Boat Channel because the EPA did not designate PFAS as a hazardous substance until July 2024 – *after* the Navy selected the remedy in 2017 and completed the remedial action in 2018. ECF No. 207 at 18, 29. Thus, the designation of PFAS as a hazardous substance in July 2024 was too late to change the Navy's remedial obligation.

While an agency can initiate a response action before a pollutant or contaminant is designated as a hazardous substance, it can do so only if it establishes that a release presents "an imminent an substantial danger." 42 U.S.C. § 9604(a)(1); *see* 89 Fed. Reg. 39137 ("With respect to hazardous substances, the Agency can conduct response actions if there is a release or threatened release; however, for pollutants or contaminants, EPA can only respond if it establishes that the release may present an imminent and substantial danger.") However, the City does not identify any evidence in the record showing that PFAS had been released and posed an imminent and substantial danger. In fact, the City could not have done so because even when the EPA issued a Lifetime Health Advisory explaining

13

23cv0541-LL-VET

the risk from exposure to PFAS in drinking water in May 2016, neither the Boat Channel nor the groundwater at the former NTC was a source of drinking water. ECF 189-8 at 16–17; US SOF ¶ 77.

Moreover, the issue is waived. Under CERCLA, if a party fails to raise an issue before the selection of the remedy, the issue is waived. *Emhart Indus., Inc. v. New England Container Co., Inc.*, 274 F. Supp. 3d 30, 48 (D.R.I. 2017) (holding that CERCLA "requires parties to make all of their known and available arguments regarding the merits of a remedy to EPA during the notice and comment period in the first instance."). Therefore, the City has not demonstrated that the Navy's decision not to include PFAS in its remediation was a breach of its obligation under the MOU.

         ii.     City's Claim 2: The Navy refused to investigate the entirety of Boat Channel Parcels (Parcels IIIB and VII)

The City claims that the United States only investigated and remediated an area that the Navy designated as IR Site 12[1] and "completely ignored the 6.4 acres of Parcels IIIB and VII outside of IR Site 12." ECF No. 186-1 at 22.

First, the Navy had previously rebutted these points in response to the City's comments on the ROD. When the City claimed the Navy did not investigate and consider remediating the parts of the shoreline with riprap, the Navy explained: "The areas along the shoreline and slopes containing riprap have been investigated[] and were not identified as areas of concern." ECF 189-5 at 40. Moreover, the Water Board reviewed the City's comments and overrode the City's objections by concurring in the selected remedy. *See* ECF 189-35 at 32.

Second, the record shows that the Navy went above and beyond in its investigation. For instance, the map below shows that the Navy took the beach sediment samples from ten stations on the shoreline that were outside of IR Site 12. ECF No. 189-5 at 33. The map also shows that the Navy took sediment samples in the San Diego Bay that is outside of

---

[1] IR Site 12 is the "submerged sediments in the Boat Channel." ECF No. 186-1 at 9.

both IR Site 12 and the Boat Channel Parcels. *Id.*; *see also* ECF 189-1 at 28 (map of the Boat Channel parcels).



ECF No. 189-5 at 33

Third, the shoreline did not require remediation because the sampling results demonstrated that there was no risk to human health or the environment on the beaches. For example, the sampling results disclosed that contamination was greatest in the deeper parts of the Boat Channel, less in the shallower parts of the Boat Channel, and least along the shoreline. ECF No. 189-4 at 27 ("Sediment contaminant concentrations are higher at deeper locations than shallower locations. . . . In addition, the Beach Sediment samples . . . had much lower concentrations of contaminants than did the deep sediment stations."); ECF No. 189-2 at 14 ("Concentrations of chemicals measured in the surface sediment tend to increase in a south-to-north gradient—i.e., lowest at and near the reference stations and

23cv0541-LL-VET

highest in the deeper, more quiescent stations in the northern section of the channel.").

As for Parcel IIIB, the Navy determined that no remedial action was necessary in Parcel IIIB after conducting an investigation of the entire Boat Channel, and the Water Board concurred. *See* ECF Nos. 189-2 at 27 ("The southern section is recommended for no further action."); 189-5 at 32 (a map of the areas of ecological concern in the Boat Channel shows that Parcel IIIB is not affected). Therefore, the City cannot establish that the United States failed to investigate or was required to remediate the entirety of the Boat Channel parcels under the MOA.

### iii.     City's Claim 3: The Navy failed to obtain site closures for Parcels IIIB and VII

Next, the City argues that the Water Board's no-further-comment letter was not sufficient and that a no-further-action letter was required for the site closure. *See* ECF No. 186-1 at 23. Further, the City claims that even if the no-further-comment letter was sufficient, that letter addressed only the IR Site 12, not the entirety of Parcels IIIB and VII, and therefore it did not satisfy the requirement under the MOA to obtain site closures for Parcels IIIB and VII. *Id*.

After remediating the parcels, the Navy was required to "obtain site closure from appropriate regulatory authorities." ECF 189-1 at 4–5. On April 16, 2019, the Water Board issued a no-further-comment letter regarding IR Site 12 after reviewing the RACR. *See* ECF 189-23. Around that time, the Water Board changed the status of the site to "closed" on its Geotracker website. *See* ECF 189-25 at 3. Subsequently, the Water Board agreed that the Boat Channel Parcels (Parcels IIIB and VII) were suitable for transfer on April 29, 2021. *See* ECF 189-26 at 2. Thus, the Navy obtained site closure for Parcels IIIB and VII from the Water Board as required by the MOA.

The City does not cite any evidence or authority to support its claim that a no-further-

23cv0541-LL-VET

action letter is required for the site closure.[2] The City conveniently omits the fact that it had previously accepted the Water Board's no-further-comment letter for Parcel VIII for its site closure without any objection. *See* ECF 189-17 (Water Board's no-further-comment letter on Parcel VIII); *see also Nankuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 779 (9th Cir. 1981) ("A course of performance of the contract . . . demonstrates how the parties understand the terms of their agreement.").

The City's other argument that the Water Board's closure of the site applies only to IR Site 12, rather than the entire Boat Channel Parcels, does not hold water. As explained in Section III.B.2.ii., *supra*, the Navy took samples from areas outside of IR Site 12 and determined that Parcel IIIB did not require remediation. Nonetheless, the Water Board's April 2021 no-further-comment letter on the final FOST explicitly states that Parcel IIIB and Parcel VII are suitable for transfer. *See* ECF 189-26 at 2. Therefore, the record shows that the Navy obtained site closures for Parcels IIIB and VII as required by the MOA.

iv.    <u>City's Claim 4: The Navy's actions were not based on the projected use of Parcels IIIB and VII as described in the NTC San Diego Reuse Plan dated August 1998</u>

The MOA requires the remediation and regulatory sign-off to be "based on the projected use of Parcel [IIIB and VII], as described in the NTC San Diego Reuse Plan dated August 1998." ECF No. 189-1 at 4, 5. The City argues that the 1998 Reuse Plan proposed three alternatives for the Boat Channel redevelopment that "expressly included the removal of the existing riprap on the banks and the exposure of the sediments below the riprap to allow 'reaching the water in a way similar to a beach.'" ECF No. 186-1 at 24. The City

---

[2] Upon the City's request, the Water Board briefly issued a no-further-action letter for the Boat Channel Parcels. *See* ECF No. 189-24. The Water Board rescinded the letter after realizing that a no-further-action letter was not necessary. ECF No. 189-25. The Water Board confirmed in deposition testimony that rescinding the no-further-action letter was merely correcting a mistake and did not affect its closure of the site or approval of the remedy. ECF No. 189-36 at 7–8.

23cv0541-LL-VET

argues that no investigation was conducted of the sediment underlying the riprap all along the banks of Parcels IIIB and VII even though the projected use would involve human and animal contact with the sediment. *Id*.

However, the record shows that the Navy did consider the projected uses from the Reuse Plan. *See* RI Work Plan, ECF No. 189-10 at 5 ("With the closure of NTC and implementation of the Draft Reuse Plan, there may be increased access to the shoreline and incidental use of the pedestrian trail paralleling the channel by walkers and joggers."); ROD, ECF No. 189-5 at 9 ("The RI included a human-health risk assessment evaluating the potential risks to child and adult beach and water recreational users, consistent with the proposed reuse for the Boat Channel, and to both recreational and subsistence anglers (fishers)."

Moreover, the Navy took beach samples close to the riprap and found that there was no risk to human health or the environment in those areas. *See* FS Report, ECF No. 189-4 at 4 ("Noncancer risk estimates associated with exposure to beach sediment and surface water by both the child and adult receptor are less than 1, indicating that systemic toxicity from exposure to beach sediment is unlikely under a recreational scenario."); ROD, ECF No. 189-5 at 9 ("No unacceptable human health risk associated with recreational exposure to water, sediment and beach sand at the Boat Channel was identified."). Thus, the City has not demonstrated that the Navy's actions were not based on the projected use of the Boat Channel Parcels as required by the MOA.

In sum, the City cannot show as a matter of law that the Navy breached their obligation under the MOA. Accordingly, the City's Motion is **DENIED**.

**C. United States's Motion**

**1. Navy's Obligation**

The parties repeat the same arguments they made in the City's Motion and related filings regarding the Navy's obligation and performance. *See generally* ECF Nos. 188-1, 206, 210. As discussed in detail in Section III.B.1, *supra*, the MOA's remediation standard repeats the CERCLA standard "word for word," CERCLA is expressly referenced at least

21 times in the MOA, CERCLA provides definitions for highly technical terms such as "remedial action" in a highly technical field of hazardous waste removal, and the parties' course of performance demonstrates that the City previously accepted other parcels that applied CERCLA's remedial standard. *See* ECF No. 188-1 at 12–14. In contrast, the City has not provided any evidence to show that the Navy's remedial obligation under the MOA required more than the remedial obligation under CERCLA. *See generally* ECF No. 206. Even after drawing all reasonable inferences in the light most favorable to the City as the party opposing the United States' summary judgment motion, this Court agrees with the United States that "[n]othing in the MOA suggests that the Navy agreed to do more than it was already required to do under CERCLA" for remediation. ECF No. 188-1 at 12.

### 2. Navy's Performance

Under the MOA, the Navy was required to "take all remedial action necessary to protect human health and the environment and [] obtain site closure from appropriate regulatory authorities based on the projected use of [Parcels IIIB and VII], as described in the NTC San Diego Reuse Plan dated August 1998." ECF No. 189-1 at 4, 5.

### a. Remedial Action Necessary to Protect Human Health and the Environment

The EPA promulgated the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") to implement CERCLA's goal of selecting a remedy that "is protective of human health and the environment" 42 U.S.C. §§ 9605; 9621. The NCP "provide[s] the organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants." 40 C.F.R. § 300.1. It outlines "specific steps parties must take in choosing a remedial action plan and cleaning up hazardous waste." *Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006); *see also Washington State Dep't of Transp. v. Washington Natural Gas Co., Pacificorp*, 59 F.3d 793, 799 (9th Cir.1995) (stating that the NCP "identifies methods for investigating the environmental and health problems resulting from a release or threatened release and criteria for determining the appropriate extent of

23cv0541-LL-VET

response activities" (citation omitted)).

First, the NCP requires a remedial investigation to characterize the site and assess the risks to human health and the environment. *See* 40 C.F.R. § 300.430(d). Second, the NCP requires a feasibility study that identifies the applicable and relevant and appropriate requirements ("ARARs"), establishes the acceptable exposure levels, and evaluates the remedial alternatives based on specified criteria. *See* 40 C.F.R. § 300.430(e). Next, the NCP directs the lead agency to select a preferred remedy based on those specified criteria, present it to the public for comment, review the public comments and consult with the state or support agency, and then document the final remedy selection in a record of decision. *See* 40 C.F.R. § 300.430(f). The NCP also provides instructions for designing and implementing the selected remedy. *See* 40 C.F.R. § 300.435.

Here, the record shows that the Navy followed every step outlined in the NCP:

- Completed a Sediment Characterization Study in 1996 (ECF No. 189-9);

- Developed a Remedial Investigation Work Plan in 1998 to devise a sampling approach for the remedial investigation of the Boat Channel sediments (ECF No. 189-10);

- Completed the Remedial Investigation Report in 2003, which explained that the Navy took samples from different stations on the shoreline including beach sediment in close proximity to the riprap (ECF No. 189-2);

- Completed the Feasibility Study Report in 2016 that recommended eight alternatives for remediation (ECF No. 189-4);

- Issued the final Record of Decision and Remedial Action Plan in 2017, which explained the selected remedy of dredging the contaminated sediments and removing them to an off-site landfill (ECF No. 189-5);

- Implemented the remedy and completed the Remedial Action Completion Report (ECF No. 189-6);

- Exchanged comments and responses with the Water Board (ECF Nos. 155 at USN_88277–88412, 88450–88490, 88528–88572, 88591–88602; 189-3; 189-5 at 41–47, 54–55; 189-7 at 4–7, 9–10; 189-22);

- Exchanged comments and responses with the City of San Diego (ECF Nos. 155 at USN 88573–88587, 88603–88605; 189-5 at 39–40; 189-7 at 13–15);

- Exchanged comments and responses with other organizations, such as San Diego

Unified Port District and San Diego County Regional Airport Authority (ECF No. 189-5 at 34–38); State of California's Department of Fish and Wildlife (ECF No. 189-5 at 48–53, 56–60); Human and Ecological Risk Office (ECF No. 155 at USN 88413–88426, 88491–88504); Southern California Coastal Waters Research Project (ECF No. 155 at USN 88427–88449, 88505–88527); and U.S. Fish and Wildlife Service (ECF No. 155 at USN 88588)

- Participated in countless calls and meetings with the Water Board (ECF No. 189-18 at 2–7); and

- Received no-further-comment letters from the Water Board for every phase (ECF Nos. 189-7 at 11–12; 189-19; 189-23; 189-26; 189-21).

In turn, the City responded with the same arguments from its Motion, which this Court discussed at length in Section III.B. The Court will not rehash them here. Thus, the Court finds that the Navy performed its remedial obligation under both CERCLA and the MOA.

### b.  Site Closure from Appropriate Regulatory Authorities

The MOA requires the Navy to "obtain site closure from appropriate regulatory authorities." ECF No. 189-1 ¶¶ 2(c), 4(b). Here, the State of California's lead agency, the San Diego Regional Water Quality Control Board ("Water Board") reviewed the Finding of Suitability to Transfer ("FOST") and issued "no-further-comment," finding that "the Final [FOST] acceptable with regard to the completion of the sediment remediation in the Boat Channel (IR Site 12)." ECF No. 189-26 at 2. The Water Board changed the status of the IR Site 12 remediation to "closed" on its website called Geotracker. ECF Nos. 189-25 at 3. Thus, the Navy obtained site closure from the appropriate regulatory authority as required by the MOA.

The City argues that the "no-further-comment" is insufficient and that the Navy needed to obtain a "no-further-action" letter. ECF No. 206 at 32. However, the Water Board clarified that "no-further-action" is not necessary. ECF No. 189-25 at 3 ("an NFA letter was not necessary to effect closure of IR Site 12"). Therefore, this Court finds that the Navy obtained site closures for the Parcels IIIB and VII from an appropriate regulatory authority as required by the MOA.

23cv0541-LL-VET

In sum, this Court finds that there is no genuine dispute that the Navy performed its obligation under the MOA.

### 3.  The City's Breach

The United States claims that the City breached the MOA by failing to accept the transfer of the Boat Channel Parcels from the Navy. ECF No. 188-1 at 32. The MOA requires the City to accept the transfer of the Boat Channel Parcels after the Navy completes its remediation and obtained site closure. *See* MOA ¶ 1, ECF No. 189-1, (For Parcel III-B, "the Navy agrees to convey to the City, and the City agrees to accept from the Navy . . . all of the Navy's right, title, and interest in the Property."); MOA ¶ 4 (For Parcel VII, the "City shall take all necessary actions to accept the deeds as they are proffered by the sponsoring agencies."). Under the MOA, "[f]ailure of the City to accept delivery of a Deed . . . after written notice and thirty days to cure, shall be deemed to be a breach of this Agreement." MOA ¶ 9, ECF No. 189-1.

Here, the Navy emailed the City a letter on May 16, 2022, stating that the Navy had completed all remedial action and obtained site closure from the Water Board as required by the MOA. ECF Nos. 189-29; 189-30 at 2. On May 19, 2022, the City responded, objecting to the transfer of the Boat Channel Parcels. ECF No. 189-31 at 2. On November 3, 2022, the Navy sent a written notice of default to the City. ECF No. 189-32 at 2–5. The City failed to cure its breach within 30 days as provided in the MOA. US SOF ¶ 37; ECF No. 73 ¶ 35. Therefore, the City was in breach of the MOA.

The City's only defense is that the Navy's breach excused the City's performance." ECF No. 206-1 at 27. However, given that this Court has already found that the Navy performed its obligation under the MOA, it also finds that the City breached the MOA.

### 4.  The City's Breach Harmed the Navy

The United States claims that there is no genuine dispute that the City's failure to accept transfer of the Boat Channel Parcels harmed the Navy. ECF No. 188-1 at 33. Specifically, the harms include "maintenance costs from continued ownership and responsibility for the Boat Channel Parcels, including approximately $15,000 each year

that [the Navy's Base Realignment and Closure's ("BRAC")] Caretake Site Office budgets annually for speed control buoys and repairs." Megliola Decl. ¶ 9, ECF No. 188-3. "The harms also include ongoing liability of the Navy resulting from public access to and use of the Boat Channel Parcels and for potential injury to the members of the public. *Id*. at ¶ 8. Lastly, the City's failure obstructs the Navy's BRAC statutory mission to "dispose of Navy BRAC properties and provide savings to the Navy and the federal taxpayer." *Id*. ¶ 7. The City does not respond at all to the United States' allegation. *See generally* ECF No. 206. Therefore, this Court finds that the City's failure harmed and continues to harm the Navy.

### 5. Specific Performance

Specific performance is routinely awarded for the breach of real estate contracts. Williston on Contracts § 67:65 ("Ordinarily the specific performance of a contract to convey land is as much a matter of course as an action of damages for its breach."); *see also Henderson v. Fisher*, 236 Cal. App. 2d 468, 473 (Cal. Ct. App. 1965) ("[I]t is the general rule that in the case of a contract for the transfer of an interest in land it is presumed that damages would not adequately compensate for the breach.").

The Court agrees with the United States that specific performance is appropriate here because the City received the benefit of the bargain under the MOA but has refused to honor its part of the bargain. *See* ECF No. 188-1 at 33. The City took the valuable parts of the former NTC and made it exceedingly difficult for the Navy to find a substitute transferee for the Boat Channel Parcels as there is no ingress or egress to the Boat Channel Parcels without securing an easement from the surrounding upland property owners. *See id*. The City's only argument against specific performance is that the Navy did not fully perform its obligation under the MOA. *See* ECF No. 206 at 36. Given that this Court has already found that the Navy performed its obligation under the MOA, this Court finds that specific performance is appropriate here.

///

///

///

23cv0541-LL-VET

## IV.   CONCLUSION

Accordingly, the United States is entitled to partial summary judgment as to its counterclaim-in-reply as a matter of law. Therefore, the Court **GRANTS** the United States' Motion and **DENIES** the City's Motion.

**IT IS SO ORDERED.**

Dated:  March 30, 2026

Honorable Linda Lopez
United States District Judge

23cv0541-LL-VET