ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
STEFAN J. BACHMAN (SC Bar No. 102182)
BRIAN SCHAAP (DC Bar No. 1780655)
Environmental Enforcement Section
MICHAEL C. AUGUSTINI (DC Bar No. 452526)
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 616-6536

*Attorneys for Plaintiff and Counterclaim Defendant United States of America*

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO, et. al.<br><br>    Defendants.<br><br>*AND RELATED CROSS AND COUNTER CLAIMS* | Case No. 3:23-cv-00541-LL-VET<br><br>**PLAINTIFF UNITED STATES OF AMERICA'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>PTC Date: July 14, 2026<br>Courtroom 14B<br>Hon. Linda Lopez |

Plaintiff United States of America respectfully submits the following memorandum of contentions of fact and law pursuant to Local Rule 16.1(f)(2) and the Court's pretrial scheduling order (Dkt. 230). The United States intends to prove at trial that the City of San Diego owes at least 33% and up to 40% of the Navy's total site cleanup costs of $16,118,872.24 (plus interest). These include the $15,944,926.65 in costs already ruled as recoverable by the Court, Dkt. 223, plus an additional $173,945.59 that the United States did not seek in its motion for partial

summary judgment (Dkt. 154), but that the United States will prove are recoverable at trial.  In addition, the City should pay 100% of Department of Justice ("DOJ") enforcement costs.  These include the $1,186,089.73 in DOJ costs already ruled by the Court to be recoverable, Dkt. 223, plus an additional $33,838.04 that the United States did not seek in its motion for partial summary judgment (Dkt. 154), but that the United States will prove are recoverable at trial.  After combining the City's shares of the Navy costs plus the DOJ's enforcement costs, the Court should add interest and enter a final judgment in favor of the United States.  This should include a declaratory judgment for any additional Navy costs incurred after July 31, 2023 and any additional DOJ costs incurred after October 31, 2024.

## **INTRODUCTION**

In March 2023, the United States initiated this action to establish the City of San Diego's liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, for response costs incurred in connection with the Boat Channel Sediments Site at the former Naval Training Center in San Diego, California.  After discovery was completed, the Parties filed several summary judgment motions and the Court's rulings significantly narrowed the issues remaining for trial.

First, in August 2025, the Court found no triable issue on the City's CERCLA liability under 42 U.S.C. § 9607(a)(4)(A) for releasing the contaminants of concern found in the Boat Channel's sediment.  Dkt. 190.  The Court's decision granting the United States' motion discussed the undisputed evidence showing that the City's storm sewer system and airport had released copper, lead, zinc, chlordane, and DDT into the Boat Channel.  *See id.* at 6 (noting, for example, that car tires, brakes, and gasoline sometimes left behind copper, lead, and zinc on public streets, which stormwater runoff picked up and carried downstream into the storm sewer system).  Thus, the United States has established that the City's facilities released hazardous substances into the Boat Channel, and this is no longer an issue for trial.  *Id.*

Second, in March 2026, the Court granted partial summary judgment in favor of the United States on the claim for CERCLA costs, concluding that the City raised no triable issue regarding the accuracy of the United States' cost accounting or the Navy's compliance with the National Contingency Plan ("NCP"). *See* Dkt. 223 at 8-10 ("the Court finds that the City did not meet its burden of proving inconsistency with the NCP by failing to make any argument that the Navy's selection of the response action was arbitrary and capricious, or otherwise not in accordance with law."). This ruling established the City's CERCLA liability for the $17,131,016.38 in costs addressed in the motion, which consisted of $15,944,926.65 in Navy response costs incurred through July 31, 2023, and $1,186,089.73 in Department of Justice enforcement costs incurred through October 31, 2024. *Id.* at 1, 5-6, 8. As explained further below, the United States is seeking to recover at trial the Navy's remaining CERCLA costs incurred through July 31, 2023 in the amount of $173,945.59, and DOJ's remaining enforcement costs incurred through October 31, 2024 in the amount of $33,838.04. The United States is also seeking a declaratory judgment on the City's liability for any future response costs, which would include any response costs incurred by the Navy after July 31, 2023, and any enforcement costs incurred by DOJ after October 31, 2024.

Third, in March 2026, the Court addressed the United States' counterclaim-in-reply for breach of contract in another summary judgment order. Dkt. 224. The Court held that the City was liable to the United States for breach of contract because the City refused to accept ownership of the Boat Channel parcels, as agreed in the Memorandum of Agreement ("MOA") the City entered with the Navy as part of the base closure process. *See id.* at 22 ("The MOA requires the City to accept the transfer of the Boat Channel Parcels after the Navy completes its remediation and obtained site closure."). The Court found that specific performance was the appropriate remedy for the City's breach of contract. *Id.* at 23. Thus, there are no issues remaining to be tried on the United States' contract claim against the City.

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

*See* Dkt. 220 at n.2 at 3-4 (noting that the City waived and has no breach of contract cause of action against the United States).

As a result of the Court's dispositive rulings, the United States' CERCLA claim requires the resolution of two remaining issue at trial: (1) adjudicating the City's liability for the United States' response costs that were not specifically covered by the Court's summary judgment ruling; and (2) determining the City's equitable allocation of the CERCLA response costs under 42 U.S.C. § 9613(f)(1). Once the City's equitable share is determined, appropriate interest should be added to the United States' award. *See* Dkt. 223 at 9 (previous summary judgment ruling stating that the City does not dispute that prejudgment interest applies on the United States' costs). The final judgment also should include a declaratory judgment of CERCLA liability against the City for the United States' future response costs relating to the Boat Channel, as provided in 42 U.S.C. § 9613(g)(2). When the Court found the City liable for the contaminated sediments in the Boat Channel, the decision noted that the entry of a declaratory judgment of liability would follow once the City was found responsible for any of the United States' response costs, and that occurred with the ruling in March 2026. *See* Dkt. 190 at 9-10; Dkt. 223. Thus, the United States has satisfied all the conditions needed for the entry of a declaratory judgment of CERCLA liability against the City. *See Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 483 (9th Cir. 2024) (a declaratory judgment is "mandatory" when a party prevails on a CERCLA cost claim).

## I. CONTENTIONS OF FACT

### A.   Background

1.   The United States Navy owned and operated a Naval Training Center ("NTC") in San Diego from about 1923 until 1997.

2.   The NTC included military housing, mess halls, classrooms, a golf course, parade grounds, and a channel of water known as "the Boat Channel."

3.   The Boat Channel resulted from fill activities located within the historic

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

delta of San Diego River and the tidelands of San Diego Bay. The northern portion of the Boat Channel had been shaped to its present-day form by 1927, and the present-day boundaries of the Boat Channel had been created by 1941.

4. The Boat Channel is about 5,000 feet long and about 500 feet wide, except at its northern end, where it is about 800 feet wide. Depths range from 18 to 25 feet in the northern end of the Boat Channel to approximately 15 feet in the southern portion of the basin leading to San Diego Bay. The Harbor Island West Marina is located at the mouth of the Boat Channel in the Bay.

5. The Boat Channel is bordered by the San Diego International Airport, Marine Corps Recruit Depot San Diego, and as a result of the City's redevelopment of the former NTC area, a mixed-use commercial center called Liberty Station.

6. The Boat Channel waterway is open at its confluence with San Diego Bay and is accessible from the Bay and the shoreline. The Boat Channel has regularly been used by the public for recreational boating, kayaking, water skiing, and other water sports.

B.     The Boat Channel Watershed

7. The Boat Channel basin is an integral part of the watershed that drains into it and there are no natural surface water inputs (i.e., streams or rivers). The freshwater entering the Boat Channel comes from storm drain lines or other stormwater conveyances ("storm drains") and runoff from nearby properties.

8. The lands within the Boat Channel watershed include residential, recreational, industrial, and commercial land uses. The discharge of stormwater from these lands carries pollutants to the Boat Channel, and those pollutants over time accumulate in the sediment on the bottom of the Boat Channel.

9. The United States and the City have each owned land in the Boat Channel watershed. For instance, the City has owned all streets not on federal land within the Boat Channel watershed since the construction of the streets. In addition, the City owns parking lots and buildings that are sources of contaminants, such as

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

heavy metals, in the area that drains to the Boat Channel.  The Boat Channel watershed also includes parts of the San Diego International Airport, which the City owned and operated from 1928 to 1962.

10.   The City owns and operates the municipal separate storm sewer system ("Storm Sewer System") running throughout the City, including in the area that encompasses the Boat Channel watershed.  This consists of drains, pipes, culverts, ditches, outfalls, and other discharge points.  *See* Dkt. 190 at 5.

11.   The City's Storm Sewer System is designed to gather runoff from hundreds of acres of residential, commercial, industrial, and other areas, and then to discharge that runoff into the Boat Channel.  City witnesses confirmed that the Navy, as an occupant of abutting land, was not authorized to stop discharges from the City's Storm Sewer System from entering the Boat Channel.  Indeed, the City stormwater facilities that conveyed contaminants and impacted the sediment in the Boat Channel were part and parcel of the City's stormwater management practices.

12.   More than thirty stormwater outfalls discharge stormwater into the Boat Channel.  The City owns some of these stormwater outfalls that discharge to the Boat Channel.  Stormwater runoff from the Airport also drains to the Boat Channel.

13.   In addition to stormwater, the City owns and operates a separate system that manages and treats sewage, ultimately at a plant in Point Loma.  Stormwater is not supposed to enter the City's sewage system and vice versa.  However, the City's sewage system sometimes experiences failures, breakages, and overflows of raw sanitary sewage, which have contributed contamination to the Boat Channel.  One large failure a few blocks from the Boat Channel in August 1962 resulted in the City pumping hundreds of thousands of gallons of raw sewage into the Boat Channel basin.  Untreated sewage typically contains many of the same constituents, such as metals, that were detected in the Boat Channel sediment.

14.   The City's CERCLA liability for decades of stormwater runoff and sanitary sewage discharges has been established in this case as a matter of law.  Dkt.

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

190 at 6.  The City released hazardous substances into the environment and this led to the accumulation of metals (copper, lead, and zinc) and pesticides (dichlorodiphenyltrichloroethane or "DDT" and chlordane) in the Boat Channel.  *Id.* These contaminants are common in stormwater runoff.

          C.      The Navy's Investigation and Remediation of the Boat Channel

15.    In accordance with CERCLA, the Navy is authorized to identify, evaluate, and respond to the release or threat of release of hazardous substances, pollutants, or other contaminants into the environment from Navy facilities.

16.    During the 1990s, the Navy conducted a comprehensive environmental investigation into potential sources of contamination associated with the former NTC and Marine Corps Recruit Depot and performed the necessary  removal actions to address the environmental issues that were identified. Upon completion of those CERCLA response activities, the ownership of the former NTC land was transferred to the City and commercially redeveloped as Liberty Station.

17.    In 1995, the Navy identified the Boat Channel sediments as a point of interest due to possible impacts resulting from stormwater discharges from the outfalls along the Boat Channel.  The Navy commenced a remedial investigation in 1998 and developed a remedial action plan for the sediment in the Boat Channel that was determined to require an additional response.  During the CERCLA process, the Boat Channel sediments were referred to as IR Site 12.  The recoverability of the costs associated with these CERCLA activities managed by the Navy were addressed in the United States' prior summary judgment motion.  *See* Dkt. 223.

18.    No unacceptable risks to human health were determined with regard to recreational exposure scenarios (selected based on proposed channel reuse) to water, sediment, and beach sand within the Boat Channel area.  *See*, *e.g.*, Dkt. 224 (discussing background facts relating to the investigation and history).

19.    However, some of the sediment in two areas of the Boat Channel – referred to as Stratum 1 and Stratum 2 in the CERCLA remediation process – were

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

found to pose a potential environmental risk for benthic invertebrates living on the bottom. To eliminate the potential ecological risk, the Navy developed a remedial action plan with input, oversight, and approval from the California Regional Water Quality Control Board ("Water Board"). As reflected in the administrative record, the selected response was to remove any sediment containing concentrations of copper, lead, zinc, chlordane, and DDT that was above the action level.

20. After carrying out the investigation process outlined in CERCLA, in 2017-2018 the Navy dredged the contaminated Boat Channel sediments and disposed of approximately 30,000 cubic yards of material at an off-site landfill. This completed the CERCLA response action for the Boat Channel to the satisfaction of the lead regulatory agency, the Water Board.

### D. CERCLA Costs

21. The Court has found the City liable under CERCLA for $17,131,016.38 in costs, consisting of $15,944,926.65 in Navy response costs incurred through July 31, 2023 and $1,186,089.73 in Department of Justice enforcement costs incurred through October 31, 2024. Dkt. 223 at 1, 5-6, 8.

22. At trial the United States will present evidence that the Navy incurred additional response costs prior to July 31, 2023 in the amount of $173,945.59. These are Navy costs that the United States did not seek in its prior motion for partial summary judgment, Dkt. 223 at 6-8.

23. In accordance with the court-approved consent decree entered in June 2024, the United States recovered $2,412,029.89 in a settlement with the San Diego Unified Port District ("Port District") and San Diego Regional Airport Authority ("Airport Authority"). Dkt. 69. Along with the issue of interest, the United States proposes to address the treatment of this partial reimbursement of costs in post-trial briefing after the Court allocates the response costs at issue between the parties to arrive at the final amount to be included in the judgment.

24. The United States will also present evidence at trial that DOJ incurred

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

additional enforcement costs prior to October 31, 2024 in the amount of $33,838.04. These are DOJ costs that the United States did not seek in its prior motion for partial summary judgment, Dkt. 223 at 6-8.

25.    The City cannot meet its burden of proving inconsistency with the NCP for these additional Navy and DOJ costs.

26.    The United States has also incurred—and continues to incur—new DOJ enforcement costs post-dating October 31, 2024.  These costs are recoverable under CERCLA, and the City should be held liable for these costs through a declaratory judgment issued by the Court under 42 U.S.C. § 9613(g)(2).

## II.    CONTENTS OF LAW

### A. City's Liability for Remaining CERCLA Response Costs

27.    Section 107(a)(4)(A) of CERCLA allows the United States to recover "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(A); *see also Carson Harbor Vill. v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006); *Wash. State Dep't of Transp. v. Wash. Nat. Gas Co., Pacificorp*, 59 F.3d 793, 799 (9th Cir.1995) (discussing the NCP).

28.    "[W]hen the United States government . . . is seeking recovery of response costs, consistency with the NCP is presumed." *Wash. State*, 59 F.3d at 799-800 (citing *United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir. 1992)). Therefore, the objecting party has the burden of proving inconsistency with the NCP. *Wash. State*, 59 F.3d at 800.  To prove that the United States' response costs were inconsistent with the NCP, the City must show that the government's selection of the response action was "arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. § 9613(j)(2); *Wash. State*, 59 F.3d at 802; *see* Dkt. 223 at 8-10 (discussing the applicable legal standards).

29.    The City has failed to establish that the Navy's remaining CERCLA

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

response costs incurred prior to July 31, 2023, and DOJ's remaining enforcement costs incurred prior to October 31, 2024, were inconsistent with the NCP. These costs were not arbitrary and capricious and were in accordance with law. Therefore, as with the approximately $17 million in expenses resolved on summary judgment, the City is liable to United States for the additional Navy response costs of $173,945.59 and the additional DOJ enforcement costs of $33,838.04 to be established at trial. *See* Dkt. 223 at 4-8. These amounts should be added to the $17,131,016.38 in CERCLA costs that the Court found recoverable at the summary judgment stage.

### B. Equitable Allocation of Costs

30. The United States has established the City's joint and several liability for its CERCLA costs relating to the Boat Channel, but that is not the end of the matter because the City has alleged a contribution counterclaim under 42 U.S.C. § 9613(f)(1) to account for the United States' liability for some of the contaminated sediment in the Boat Channel. Resolving the City's counterclaim therefore requires an equitable apportionment of costs among the two remaining potentially responsible parties ("PRPs") at trial. *See United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 140 (2007). The City is required to pay its fair share of the United States' costs to investigate and remediate the Boat Channel and bears the burden to prove how much of the costs should be borne by the United States. *See NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 690 (7th Cir. 2014); *see generally Whittaker Corp. v. United States*, 825 F.3d 1002, 1008 (9th Cir. 2016) (noting that CERCLA contribution is contingent on proving an inequitable distribution of liability).

31. CERCLA affords district courts broad discretion to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1); *TDY Holdings, LLC v. United States*, 372 F.Supp.3d 1091, 1095 (S.D. Cal. 2019), *aff'd*, 825 F. App'x 525, 526 (9th Cir. 2020); *see also Litgo N.J. Inc. v. Comm'r Dep't of Env'tl Prot.*, 725 F.3d 369, 387 (3d Cir.

2013) (noting that district courts have "tremendous discretion" when exercising equitable authority to allocate CERCLA costs).

32.    Courts may consider several of the so-called "Gore" factors when allocating CERCLA response costs. *See Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000); *ASARCO LLC v. Atl. Richfield Co.*, 975 F.3d 859, 869-70 (9th Cir. 2020). These factors include consideration of each PRP's contribution to the contamination; the degree of involvement in the generation or disposal of the hazardous waste; the care exercised by each PRP; each PRP's cooperation or non-cooperation with federal, state or local agencies when conducting the response action; and the financial benefits that result from remediating the site, including financial gains from redevelopment. *ASARCO*, 975 F.3d at 869-71; *TDY*, 372 F.Supp.3d at 1095; *Litgo*, 725 F.3d at 385-86.

33.    The relative mass of contaminants contributed by each PRP is often used as a fair measure for allocation when determining equitable responsibility for response costs. *See Boeing*, 207 F.3d at 1188 (upholding a district court's allocation based on the "relative mass" each party added to the groundwater plume); *U.S. v. Davis*, 31 F. Supp. 2d 45, 64 (D.R.I. 1998) ("the fairest, and most practical, measure of relative responsibility is the quantity or volume of hazardous waste attributable to each party"). However, a court need not quantify each party's contribution to the contamination with mathematical certainty. *ASARCO*, 975 F.3d at 869; *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 571-72, 578 (6th Cir. 1991) (emphasizing that the allocation of CERCLA response costs does not require meticulous factual determinations as to the causal contribution of each party).

34.    This CERCLA case involves nonpoint source pollution. The Parties largely agree that stormwater runoff is the primary reason that the metals and pesticides of concern accumulated in the Boat Channel's sediments. The City also does not seriously dispute the United States' assessment of the volume of stormwater that comes from land the City owns or controls within the Boat Channel watershed.

The City came to a similar conclusion regarding stormwater volume years ago when evaluating its potential liability for the contaminated sediment in the Boat Channel.

35. In any event, the United States will present an equitable allocation that comprehensively analyzes the volume of stormwater contributed by properties in the Boat Channel's watershed and assesses the relative mass of contaminants contributed by both the City and the United States via stormwater.

36. Based on general principles of fairness, the Court should conclude that the relative volume of stormwater and the mass of the contaminants in the stormwater that the Parties contributed to the Boat Channel are fair metrics to establish a baseline for the allocation of the Navy's investigation and remediation costs to the City in this case.

37. There is no dispute that the City routinely used pesticides, including DDT and chlordane, for insect control within the Boat Channel watershed and throughout the City. In addition to applying pesticides to the ground surface, the City sprayed pesticides directly into the manhole covers in the City's streets. Thus, the City's stormwater and sewer system were pathways for the contaminants at issue. The City's practices added to the contaminant load observed in the Boat Channel.

38. The Court also should consider the evidence that the City's sewer network experienced failures within the Boat Channel watershed. In one widely reported incident in 1962, this led to the City pumping hundreds of thousands of gallons of untreated sewage into the Boat Channel itself. These untreated wastes likely contained metals and other contaminants found in sewage. Although the impacts from these discharges cannot be precisely quantified because the City apparently took no measurements or samples when its sewer lines failed, the anecdotal evidence regarding these failures in the City's sewer system further supports the allocation of response costs to the City at no less than the baseline established by the contaminant mass in its stormwater, if not higher.

39. Similarly, the City's ownership and operation of the Airport for more

-12-

than 30 years warrant consideration in the equitable allocation of the costs at issue. Overland runoff from the Airport contained hazardous substances that ended up in the Boat Channel and activities associated with the Airport likely added some additional contribution of metals to Boat Channel sediments via aerial deposition. The current owner of the Airport, the San Diego Regional Airport Authority, did compensate the United States for a share of the Boat Channel response costs to account for its period of ownership, Dkt. 69, but the City has paid nothing for its role at the Airport.

40. In addition, the Court should consider the City's lack of cooperation in refusing to offer, let alone agreeing to pay, a fair share of the Navy's investigation and cleanup costs without requiring litigation. It is undisputed that the City did not fund any of the Navy's response actions prior to the filing of this lawsuit. And when faced with the United States' CERCLA claim in this case, the City knew it was potentially liable for millions of dollars but did not acknowledge its responsibility or offer to share any of the Navy's CERCLA cleanup expenses. In its answer, the City denied almost all the United States' allegations in the complaint, including that the City was the owner of its municipal stormwater system. The City proceeded to deny basic facts regarding its CERCLA liability throughout the lawsuit even though there was never a serious question that stormwater from the City's facilities contributed to the accumulation of hazardous substances in the Boat Channel. Ultimately, the Court was required to entertain a series of dispositive motions that were barely contested and the Court correctly ruled that the City had raised no genuine issue of fact regarding its CERCLA liability for the Boat Channel.

41. In the circumstances presented here, the City's refusal to take responsibility for its role in adding to the Boat Channel contamination justifies increasing the City's share of the response costs under CERCLA's equitable principles. The City accepted the valuable property surrounding the Boat Channel from the Navy and has enjoyed the benefits, as demonstrated by the successful

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

Liberty Station development.  But the City's unjustified denials of liability drove up litigation expenses, required more government and court resources to be dedicated to adjudicating the City's CERCLA liability, and delayed the transfer of ownership of the Boat Channel property—in breach of its contract with the Navy.

42.    As for the Navy's response costs relating to the Boat Channel, the Court should find that the City should pay at least 33% in accordance with its stormwater contribution to the contamination and up to 40% to the United States based on the other relevant equitable factors, plus interest.

43.    As for the DOJ enforcement costs, the Court has held they are recoverable as CERCLA response costs and the United States contends that the City is solely responsible for them.  The City declined to pay its fair share of response costs to the Navy for the remediation of the Boat Channel and forced the United States to pursue litigation to secure an enforceable judgment.  As the Court found, the City offered no valid defenses to the United States' compelling proof of CERCLA liability and the recoverability of over $17 million in response costs relating to the Boat Channel.  Because the City denied liability for the CERCLA costs at issue, thereby necessitating years of litigation, fairness dictates that the City pay 100% of the United States' enforcement expenses.

## C. <u>Prejudgment Interest</u>

44.    As the Court has already ruled, the United States is entitled to prejudgment interest on its recovery of CERCLA costs.  *See* Dkt. 223 at 9 (observing that the City does not dispute that prejudgment interest applies on the United States' costs); 42 U.S.C. § 9607(a)(4) ("The amounts recoverable in an action under this section shall include interest on the amounts recoverable" by the United States under Section 107(a)(4)(A)).  As specified in CERCLA Section 107(a)(4), the rate of interest on the outstanding unpaid balance owed to the United States "shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund."  42 U.S.C. § 9607(a)(4).

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

45.     If the Parties cannot agree to an interest calculation, the United States proposes submitting post-trial briefing to the Court that calculates the total amount of interest owed by the City based on the allocated share of the United States' response costs for which the City is found liable at trial.

### D. Declaratory Judgment for Future CERCLA Response Costs

46.     The United States is also seeking a declaratory judgment on the City's liability for any future response costs (i.e., any Navy costs incurred after July 31, 2023, and any DOJ costs incurred after October 31, 2024). The Court stated in its ruling granting the United States' motion for partial summary judgment on the City's CERCLA liability that the Court would wait to grant the declaratory judgment until the United States had proven it has incurred recoverable response costs. *See* Dkt. 190 at 9-10 (noting that CERCLA would authorize the entry of a declaratory judgment once the City was found responsible for any of the response costs).

47.     Because the Court has since found that the United States has incurred $17,131,016.38 in recoverable response costs, Dkt. 223, the United States is now entitled to a declaratory judgment on the City's liability for future response costs. *See* Dkt. 190 at 9-10; *see also* 42 U.S.C. § 9613(g)(2)(B) ("In any such action described in this subsection, the court *shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.") (emphasis added); *Santa Clarita* 99 F.4th at 483 (noting that CERCLA makes this "mandatory").

48.     That judgment would declare the City liable for any future costs incurred by the United States (i.e., Navy costs incurred after July 31, 2023, or DOJ costs incurred after October 31, 2024), so long as those costs are properly documented and not inconsistent with the NCP.  Any future Navy costs could arguably be offset in part by a finding in favor of the City on its counterclaim for contribution under § 113(f)(1), Dkt. 190 at 9, but the City should be declared liable for the full amount of any future DOJ enforcement costs.

-15-

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

49.     The United States proposes submitting a post-trial motion to the Court that describes all DOJ enforcement costs incurred after October 31, 2024 and seeks an order for the City to pay these costs.

## III.    WITNESSES

The United States currently expects to call the following witnesses in its case in chief at trial:

### 1.    Mr. Rene "Louie" Cardinale

From 2016 to 2025, Louie Cardinale served as the Navy's Remedial Project Manager and Contracting Officer's Representative assigned to the former Naval Training Center Boat Channel property.  He may be called to provide information regarding the remedial action and the Navy's response costs.

### 2.    Dr. Andrew Earles

Dr. Earles is an Executive Vice President at Wright Water Engineers, Inc. in Denver, Colorado, and a licensed professional engineer and board-certified water resources engineer.  He received a PhD in civil and environmental engineering from the University of Virginia and a bachelor's degree in civil engineering from Stanford University.  He has been an advisor to the International Stormwater Best Management Practices Database since 1999 and has worked on implementing urban drainage and stormwater management criteria for multiple entities.  Dr. Earles is expected to provide expert testimony about contaminants in the City of San Diego's stormwater runoff and the fate and transport of chlordane, DDT, lead, copper, and zinc in the drainage area to the Boat Channel.

### 3.    Dr. Charles McLane

Dr. McLane received a PhD in environmental sciences from the University of Virginia, a master's degree in geology from Colorado State University, and a bachelor's degree in geology from Susquehanna University.  He has more than 30 years of experience consulting for clients in a variety of CERCLA matters, including addressing issues of site characterization, groundwater modeling, fate

and transport of chemicals in the subsurface, and discharge of contaminants to surface water and sediments.  Dr. McLane is expected to provide expert testimony on the equitable allocation of CERCLA costs between the City of San Diego and the United States.

       4.   <u>Mr. Wayne Lorenz</u>

Mr. Lorenz received master's and bachelor's degrees in civil and environmental engineering from the University of Colorado.  He has more than 49 years of engineering experience and has served as the responsible engineer for the planning and design of various wastewater pipelines, pumping stations, and treatment plants.  Mr. Lorenz is expected to provide expert testimony about sources of chlordane, DDT, lead, copper, and zinc in wastewater and the City of San Diego's conveyance of contaminated wastewater to the Boat Channel.

       5.   <u>Dr. Jason Gart</u>

Dr. Gart is a vice president and senior associate at History Associates Incorporated in Rockville, Maryland.  He received a PhD in history and a master's degree in public history from Arizona State University.  Dr. Gart is expected to provide expert testimony about historical use and disposal of chlordane, DDT, lead, copper, and zinc in the City of San Diego and in the drainage area to the Boat Channel.  He is also expected to provide expert testimony about historical operations at the San Diego International Airport, including activities that involved the use of lead, copper, and zinc at the Airport.

       6.   <u>Mr. Wiley Wright, CPA</u>

Mr. Wright is a certified public accountant with more than 40 years of experience in public accounting and experience analyzing the accounting and supporting documentation for more than 150 CERCLA claims.  He has testified at trials and depositions in numerous CERCLA matters.  Mr. Wright is expected to provide expert testimony about the accounting of the U.S. Navy's costs incurred remediating the Boat Channel.

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

7.  <u>Mr. William Kime, CPA</u>

Mr. Kime is a certified public accountant with more than 38 years of experience in public accounting and 35 years of experience accumulating and summarizing costs incurred by the Department of Justice's Environment and Natural Resources Division.  He is expected to provide expert testimony about the accounting of the Department of Justice's enforcement costs in this matter.

The United States may call the following witnesses if the need arises:

1.  Ms. Janet Lear

2.  Mr. David Clark

3.  Ms. Diane Silva

4.  Ms. Kathryn Cranford
    NAVFAC SW Planning, Design and Construction Contracting Core - Marine Corps (PDCMAR)
    750 Pacific Highway
    San Diego, CA 92132

5.  Ms. Kristin Schwall
    Regional Water Quality Control Board
    2375 Northside Drive, Suite 100
    San Diego, CA 92108
    (619) 516-1990

6.  Ms. Chehreh Komeylyan
    Regional Water Quality Control Board
    2375 Northside Drive, Suite 100
    San Diego, CA 92108
    (619) 521-3366

7.  Mr. Andre Sonksen

8.  Mr. Drew Kleis

9.  Mr. Anthony Megliola

10.  Ms. Amy Jo Hill

11.  Ms. Kim Cannon

12.  Ms. Rachel E. Yencha

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo

13. Mr. Jesse Gregorio

## IV.  ABANDONED ISSUES

The United States has not abandoned any of its claims or defenses.

## V.  EXHIBITS

The United States' list of trial exhibits is attached as Exhibit 1.

Respectfully Submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

Dated: June 9, 2026

/s/ *Michael C. Augustini*
STEFAN J. BACHMAN (SC Bar No. 102182)
BRIAN SCHAAP (DC Bar No. 1780655)
Environmental Enforcement Section
MICHAEL C. AUGUSTINI (DC Bar No. 452526)
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 616-6536
Stefan.Bachman@usdoj.gov
Brian.Schaap@usdoj.gov
Michael.Augustini@usdoj.gov

BRETT A. SHUMATE
Assistant Attorney General, Civil Division
MARCUS SACKS
ALASTAIR M. GESMUNDO (CABN 316573)
SAMUEL F. HOBBS (AL Bar No. 9776O19E)
Commercial Litigation Branch
Corporate Financial Litigation Section
P.O. Box 875, Ben Franklin Station
Washington, DC 20044
Phone: (202) 616-8077

***Attorneys for Plaintiff and Counterclaim-Defendant United States of America***

Case No. 3:23-cv-00541-LL-VET
U.S. Contentions Memo