Thomas F. Vandenburg (State Bar No. 163446)
tvandenburg@wshblaw.com
Alice Charkhchyan (State Bar No. 332670)
acharkhchyan@wshblaw.com
**WOOD, SMITH, HENNING & BERMAN LLP**
505 North Brand Boulevard, Suite 1100
Glendale, CA 91203
Telephone: (818) 551-6000
Facsimile: (818) 551-6050

Attorneys for Defendant/Counter-Claimant CITY OF SAN DIEGO

[*Additional Attorneys on Next Page*]

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>CITY OF SAN DIEGO,<br><br>                    Defendant.<br><br>*AND RELATED CROSS CLAIMS AND COUNTER CLAIMS* | **Civil No. 3:23-CV-00541-LL-VET**<br><br>**CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>The Hon. Linda Lopez<br><br>Trial Date: None Set |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

Barry P. Steinberg (admitted *Pro Hac Vice*)
barry.steinberg@kutakrock.com
**KUTAK ROCK LLP**
1133 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
Telephone: (202) 828-2400
Facsimile: (202) 828-2488

Dwyer Arce (admitted *Pro Hac Vice*)
dwyer.arce@kutakrock.com
**KUTAK ROCK LLP**
1650 Farnam Street
The Omaha Building
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148

Attorneys for Defendant/Counter-Claimant CITY OF SAN DIEGO

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

2

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

# **<u>TABLE OF CONTENTS</u>**

I.    Claim and Defenses: ...............................................................................................1

    A.  SUMMARY OF CLAIMS.................................................................................1

    B.  ELEMENTS REQUIRED TO ESTABLISH CLAIMS ...................................2

    C.  Key Facts Defendant Will Present in Support of its Claims...........................6

    D.  DESCRIPTION OF THE KEY EVIDENCE CITY WILL OFFER IN OPPOSITION TO PLAINTIFF'S CLAIMS .................................................27

    E.  AFFIRMATIVE DEFENSES AND ELEMENTS REQUIRED TO ESTABLISH ..................................................................................................27

    F.  BRIEF DESCRIPTION OF KEY EVIDENCE RELIED ON IN SUPPORT OF AFFIRMATIVE DEFENSES .................................................28

    G.  ANTICIPATED EVIDENTIARY ISSUES.....................................................28

II.   WITNESSES ......................................................................................................28

III.  ANTICIPATE ISSUES OF LAW .....................................................................32

IV.  BIFURCATION ................................................................................................33

V.    JURY TRIAL .....................................................................................................33

VI.  ATTORNEYS' FEES ........................................................................................33

VII. Abandonment of Issues .....................................................................................33

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## TABLE OF AUTHORITIES

Cases

3550 Stevens Creek Assocs. v. Barclays Bank of California, 915 F.2d 1355 (9th Cir. 1990)..................................................................................................................2

ASARCO LLC v. Atl. Richfield Co., LLC, 975 F.3d 859 (9th Cir. 2020) ...............4

Ball v. FleetBoston Financial Corp. 164 Cal. App. 4th 794, 800 (2008) ..................5

Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1187 (9th Cir. 2000)...................6, 32

Burlington N. and Santa Fe Ry. Co. v. U.S., 129 S. Ct. 1870 (2009) .....................27

Cadillac Fairview/California v. Dow Chemical Co., 840 F.2d 691(9th Cir.1988) 3, 5

Carson Harbor Vill. v. City of Los Angeles, 433 F.3d 1260, 1265 (9th Cir. 2006)...2

Chaly-Garcia v. United States, 508 F.3d 1201 (9th Cir. 2007) .......................................4

Columbia Falls Aluminum Co., LLC v. Atl. Richfield Co., No. 21-36042, 2023 WL 1281669, at *2 (9th Cir. Jan. 31, 2023)...............................................................4

FMC Corp. v. Vendo Co., 196 F. Supp. 2d 1023 (E.D. Cal. 2002) .........................3

Fraser v. Goodale, 342 F.3d 1032 (9th Cir. 2003)...............................................34

GenCorp, Inc. v. Olin Corp., 390 F.3d 433, 451 (6th Cir. 2004) .............................6

IceMOS Tech. Corp. v. Omron Corp., 2020 WL 289505, at *3 (D. Ariz. 2020) ...33

Levin Metals Corp. v. Parr– Richmond Terminal Co., 860 F.2d 344 (9th Cir.1988) 5

Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837 (4th Cir. 1992)..........3

Ochs v. PacifiCare of California, 115 Cal. App. 4th 782 (2004) ..............................5

Oliva v. United States, 961 F.3d 1359 (Fed. Circ. 2020).......................................5

Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1301 (9th Cir. 1997) ..................................................................................................................3

PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610 (7th Cir. 1998)..........................6

Scully v. US WATS, Inc., 238 F.3d 497 (3d Cir. 2001)............................................4

Sullins v. Exxon/Mobil Corp., 729 F. Supp. 2d 1129 (N.D. Cal. 2010). .................5

US v. Kramer 757 F. Supp 397 (D.N.J. 1991) ……………………………………… 4

United States v. Davis, 261 F.3d 1, 46 (1st Cir. 2001)............................................6

United States v. Seckinger, 397 U.S. 203, 209 n.12 (1970)......................................4

United States v. Sepulveda-Barraza, 645 F.3d 1066 (9th Cir. 2011) .....................33

Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp., 8 Cal.4th 100, (1994) ..................................................................................................................5

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

ii

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Statutes

42 U.S.C.  § 9613 ................................................................................... 1, 2, 3, 5, 6

42 U.S.C. §§ 9607 ................................................................................... 1, 2, 3, 5

42 U.S.C. §§ 9621 ...................................................................................8

CERCLA § 107 (a) ................................................................................... 1, 2, 6

CERCLA § 113(f)(1) ................................................................................... 1, 3, 5, 6

Fed. R. Evid. 103(b) ...................................................................................33

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to the Court's scheduling order and Local Rule 16-1, CITY OF SAN DIEGO (hereinafter, "Defendant" or the "City") respectfully submits its Memorandum of Contentions of Fact and Law.  The City expressly reserves its right to provide supplemental or different Memorandum of Contentions of Fact and Law at a later time subject to being granted leave of Court to do so.

**I.    <u>Claim and Defenses:</u>**

As preliminary context for this section, the below summary of claims are included for purposes of submitting a complete Memorandum of Contentions of Fact and Law pursuant to Local Rule 16-1.  However, the City maintains that the only issue for adjudication at trial is the allocation of the UNITED STATES OF AMERICA'S (hereinafter, "Plaintiff" or the "Navy") claimed response costs as applicable to the City.

**A.  SUMMARY OF CLAIMS**

**1.  Plaintiff's First Amended Complaint [ECF. 25]**

Claim 1:     Cost Recovery Under CERCLA § 107(a), 42 U.S.C. § 9607

Claim 2:     Declaratory Judgment under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2)

**1.  Defendant's Counterclaims [ECF. 31]**

Claim 1:     Contribution Under CERCLA § 113(f)(1)

Claim 2:     Breach of Contract

Claim 3:     Equitable Indemnity Under Common Law

Claim 4:     Declaratory Judgment under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2)

/ / /

/ / /

/ / /

/ / /

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

## B.   ELEMENTS REQUIRED TO ESTABLISH CLAIMS

### 1.   Cost Recovery Under CERCLA § 107(a), 42 U.S.C. § 9607 [asserted by Plaintiff[1] ]

In a cost recovery action under 42 U.S.C., § 9607(a)(4), CERCLA provides for recovery of "necessary costs of response incurred by any other person consistent with the national contingency plan" (hereinafter, the "NCP").  Plaintiff bears the burden of proving its response costs are consistent with the NCP.  (*U.S. v. Northeastern Pharmaceutical & Co., Inc.*, 810 F.2d 726 (8th Cir. 1986)).  A "person" entitled to sue is "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C., § 9601(21).   To prevail, Plaintiff must establish the following elements:

(1)  the site in question is a facility;

(2)  a release or threatened release of hazardous substance has occurred or is occurring at the site*;*

(3)  the release or threatened release has caused the government to incur response costs; and

(4)  the defendant is in one of the four classes of persons subject to liability, i.e., a potentially responsible party ("PRP") as described in 42 U.S.C., § 9607(A).42 U.S.C., § 9607(a)(4).  (See *Carson Harbor Vill. v. City of Los Angeles,* 433 F.3d 1260, 1265 (9th Cir. 2006*); 3550 Stevens Creek Assocs. v. Barclays Bank of California*, 915 F.2d 1355, 1358 (9th Cir. 1990)).

Under 42 U.S.C., § 9713(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action … under 9607(a) of this title….  In resolving contribution claims,

---

[1] The City initially asserted a Cost Recovery claim under CERCLA § 107(a), 42 U.S.C. § 9607 against the Navy in its Counterclaim which has since been adjudicated on in favor of the Navy.  As such, this claim will not be pursued by the City at trial.

the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." (See *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir. 1992)).

In a cost recovery action by one PRP against another, 42 U.S.C. §§ 9607(a) and 9613(f) apply in tandem. "Section 107(a) creates the right of contribution, the 'contours and mechanics' of which are specified in section 113(f)." (*FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1032 (E.D. Cal. 2002) (cite omitted)). The Ninth Circuit explained:

> Together, §§ 107 and 113 provide and regulate a PRP's right to claim contribution from other PRPs.... The contours and mechanics of this right are now governed by § 113. Put another way, while § 107 created the right of contribution, the "machinery" of § 113 governs and regulates such actions, providing the details and explicit recognition that were missing from the text of § 107....§§ 107 and 113 work together - the first section creating the claim for contribution between PRPs, and the second qualifying the nature of that claim. (*Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1301-1302 (9th Cir. 1997) (cites omitted)).

**2.  Contribution Under CERCLA § 113(f)(1)** [asserted by Defendant]

Defendant is seeking contribution from Plaintiff under 42 U.S.C., CERCLA § 9713(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable under § 9607(a) of this title, during or following any civil action … under 9607(a) of this title.… In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." (See *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir. 1992); (42 U.S.C., § 9613(f)(1)). The phrase "equitable factors" grants the Court wide discretion to issue an allocation. (*Cadillac Fairview/California, Inc. v. Dow Chemical Co.* (9th Cir. 2002).

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

"[T]he law does not command mathematical preciseness from the evidence in finding damages.  Instead, all that is required is that sufficient facts … be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture." (*Scully v. US WATS, Inc*., 238 F.3d 497, 515 (3d Cir. 2001) (internal quotation marks and citation omitted) (see e.g., *Columbia Falls Aluminum Co., LLC v. Atl. Richfield Co*., No. 21-36042, 2023 WL 1281669, at *2 (9th Cir. Jan. 31, 2023).

Courts have applied what is called the "Gore Factors" which include the following: "(i) the ability of the parties to demonstrate that their contribution to a discharge release or disposal of a hazardous waste can be distinguished"; "(ii) the amount of the hazardous waste involved"; "(iii) the degree of toxicity of the hazardous waste involved"; "(iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste"; "(v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such waste"; and "(vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or environment." (See *ASARCO LLC v. Atl. Richfield Co., LLC*, 975 F.3d 859 (9th Cir. 2020).  "Nor was it improper for the court to determine that it could not and need not allocate response costs to a mathematical certainty, and that it could apply general principles of fairness and equity in deciding whether to err on the side of over- or under-compensation.  The district court was not required to adopt the particular set of factors, or the weighting among them, for which Atlantic Richfield advocated." (*Id*. at 869); (see also, *US v. Kramer* 757 F. Supp 397 (D.N.J. 1991) 410-412).

### 3. **Breach of Contract** [asserted by Defendant]

"Contracts with the United States are governed by federal law." (*Chaly-Garcia v. United States*, 508 F.3d 1201, 1203 (9th Cir. 2007) (citing *United States v. Seckinger*, 397 U.S. 203, 209 n.12 (1970)). To recover for breach of contract under federal common law, a party must demonstrate "(1) a valid contract between the parties, (2) an obligation or duty arising out of the

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

contract, (3) breach of that duty, and (4) damages caused by the breach." (*Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Circ. 2020) (quoting *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)).

### 4. Equitable Indemnity [asserted by Defendant]

A claim for equitable indemnity accrues when the indemnitee suffers a loss through payment of an adverse judgment or settlement. *Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp.*, 8 Cal.4th 100, 110 (1994). The allegation of a judgment or settlement is essential to the claim of indemnity; mere existence of a loss does not suffice. *Sullins v. Exxon/Mobil Corp.*, 729 F. Supp. 2d 1129, 1140 (N.D. Cal. 2010).

Contribution and indemnity are derivative of substantive claims, so liability is established or rejected based on the substance of the claims. *See, e.g., Ochs v. PacifiCare of California*, 115 Cal. App. 4th 782, 794 (2004); *Ball v. FleetBoston Financial Corp.* 164 Cal. App. 4th 794, 800 (2008).

### 5. Declaratory Judgment under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2) [asserted by Plaintiff and Defendant]

In an action for cost recovery under 42 U.S.C., § 9607, plaintiff may seek "a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C., § 9613(g)(2). The essential facts establishing a CERCLA plaintiff's right to declaratory relief are the alleged disposal of hazardous substances at the site in question, and whether the plaintiff has incurred costs for cleaning up a hazardous waste site. *Cadillac Fairview/California v. Dow Chemical Co.*, 840 F.2d 691, 696 (9th Cir.1988); *Levin Metals Corp. v. Parr– Richmond Terminal Co.*, 860 F.2d 344, 345 (9th Cir.1988).

Both Plaintiff and Defendant are seeking declaratory judgment pursuant to CERCLA § 113(g)(2) which is a claim seeking a declaration from the Court setting forth Defendant's and Plaintiff's respective liability for past, present and future response, removal and remediation costs, and other penalties and/or damages imposed on the same in connection

with the NTC Boat Channel.  It is well-settled in this and other circuits that a claim for declaratory relief is available and authorized under CERCLA in § 113(f) contribution actions.  See *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191-92 (9th Cir. 2000) (rejecting the argument that the district court was not empowered to issue declaratory relief under § 113(g)(2) in a § 113(f) contribution action, and holding that declaratory relief is authorized in CERCLA contribution cases); see also, e.g., *United States v. Davis*, 261 F.3d 1, 46 (1st Cir. 2001) (holding "that § 9613(g)(2), the declaratory judgment provision of CERCLA, applies to § 9613(f) contribution actions for both past and future response costs"); *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 451 (6th Cir. 2004) (holding that "declaratory judgments concerning future response costs in § 107 and § 113(f) suits must be treated alike," so long as a case or controversy exists).

Upon satisfying the four (4) elements of a cost recovery action under CERCLA § 107 (a), CERCLA permits the City to seek a declaratory judgment for future liability.  According to section 113(g)(2), "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  § 9613(g)(2).  Allowing declaratory relief "economizes on judicial time" (*PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998) and encourages prompt remedial action, placing "the costs on those responsible."  Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1191 (9th Cir. 2000).  While courts do note that there "is an issue of prematurity" when it comes to the "allocation of the clean-up costs that [a plaintiff] has not yet incurred," this prematurity does not foreclose consideration of declaratory relief.  *PMC, Inc.*, 151 F.3d at 616.

### C.    Key Facts Defendant Will Present in Support of its Claims

- The MOA is a contract.
- The NCP is a guidance document, not an enforceable regulation.
- The term "all appropriate action to protect human health and the environment" is not defined in CERCLA or the NCP.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

- An undefined term in a statute is subject to the plain meaning of the words.

- The City raised numerous concerns about the adequacy of the Navy's environmental investigation of the Boat Channel as early as 2017.

- The Navy's sampling plan of the Boat Channel is not statistically valid.

- The Navy's post-remediation sampling was limited to the contaminants that were identified for removal.

- The Navy's sampling plan was completed in 1998.

- The Navy's post-remediation sampling was performed in March 2019.

- PFOS and PFOA were identified as emerging contaminants in 2012.

- PFOS and PFOA are pollutants and contaminants as defined in CERCLA.

- PFOS and PFOA are CERCLA hazardous substances.

- Aqueous Fire Fighting Foam (AFFF) contain PFOS and PFOA.

- AFFF was stored near and upgradient to the Boat Channel.

- The Navy never tested or sampled the water or sediment in the Boat Channel for PFOS or PFOA.

- The Boat Channel includes the unsubmerged shoreline and adjacent banks.

- The shoreline and banks were not adequately sampled or tested for hazardous substances or pollutants and contaminants.

- The shores and banks are neither safe nor suitable for recreation purposes.

- The deed presented to the City for conveyance of the Boat Channel contains no land use restrictions other than the limitation for recreational use.

- Prior to being banned, the Navy procured and used large quantities of DDT in its training exercises at NTC San Diego.

- The United States military routinely dumped toxic and explosive substances in water bodies.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- The Navy's contribution of DDT to the Boat Channel includes not only run-off but the dumping of bulk DDT into the Boat Channel.

- DDT is a persistent chemical.

- CERCLA section 113 (j)(2) does not limit the judge's equitable discretion in allocating contribution shares between PRPs.

- The Navy is a PRP with respect to contamination in the Boat Channel.

- The President has, by Executive Order 12580, delegated his statutory authority for environmental matters, including 42 USC 9621 in the jurisdiction, custody, or control of the Secretary of Defense to the Secretary.

- 42 USC 9621(d) imposes upon the Navy the obligation to address pollutants and contaminants in is exercise of the Authority of the President with respect to environmental contamination in the Boat Channel.

- The NCP includes in it guidance the need to address pollutants and contaminants.

- The Navy never addressed, tested, or sampled for pollutants and contaminants in the Boat Channel.

- The Navy's administrative record does not include reference to pollutants of contaminants.

- The draft deed provided to the City for conveyance of the Boat Channel was a Navy document.

- The statutory conveyance mechanism for the Boat Channel is a Public Benefit Conveyance for recreational purposes.

- The Navy has entered into an agreement with the Department of the Interior whereby DOI will act for the United States for recreation PBCs.

- The City received a formal financial demand notice from the Department of Justice on XXX.

- Stratum 1 is in the northern end of the Boat Channel and was deemed to represent an area of "low influence from tidal flushing and high potential of influence from the outfall discharges."

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- Stratum 2 is between Stratum 1 and the Harbor Drive overpass and was deemed to represent a "'transition' area of moderate tidal flushing but also potentially influenced by outfall discharges from various sources including NTC and groundwater discharge from the NTC landfill."

- Stratum 3 extends from south of the Harbor Drive overpass southward towards San Diego Bay and was deemed to represent "an area of higher tidal flushing and lower potential influence from the outfalls lining the Boat Channel."

- Sediment samples were analyzed for metals, polynuclear aromatic hydrocarbons (PAHs), polychlorinated biphenyls (PCBs), pesticides, and semi-volatile organic compounds (SVOCs), and the results were compared to two guideline values established by the National Oceanic and Atmospheric Administration (NOAA).

- This investigation recommended further investigation of the sediments in Stratum 1 and Stratum 2 due to elevated concentrations of metals and pesticides. Further investigation of Stratum 3 was not recommended.

- A Remedial Investigation (RI) of the Boat Channel sediments was conducted in 1998 with the objective to "acquire sufficient data to assess" whether the sediments pose an unacceptable risk to human health and the environment and determine if remedial actions would be necessary.

- During the RI, sediment samples were collected from all three strata, with samples from Stratum 3 collected as "reference samples" for comparing results from Stratum 1 and Stratum 2 against.

- The RI identified areas within Stratum 1 and Stratum 2 that met the criteria for an area of ecological concern or potential ecological concern due to the concentrations of copper, lead, zinc, and total chlordane in the Boat Channel sediments.

- Total DDT was later added as a contaminant of concern. The Navy and California Regional Water Quality Control Board developed the following risk-based sediment cleanup goals for the Boat Channel sediments.

- The sediment cleanup goal for one or more COC was exceeded at seven sampling stations in the Boat Channel. The locations of these sampling stations and the COC concentrations associated with them is summarized below:

  - Five of the sampling stations are at the northern, dead-end portion of the Boat Channel, with four of them in Stratum 1 (S1S1, S1S4, S1S5, S1S6) and one in Stratum 2 (S2S4). The sediment cleanup goal for one or more

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

COC was exceeded at these five sampling locations in the sediment samples collected from 0 to 0.5 feet below the channel bottom. The COC concentrations were on the same order of magnitude as the sediment clean-up goals.

- The remaining two sampling stations (S2S9 and S2S10) are located roughly in the middle of Stratum 2. DDT was detected at very high concentrations in deeper sediments (i.e. sediments from 0.5 to 3 feet below the channel bottom) at these stations. The sediment cleanup goals for the other COCs were not exceeded in this area.

- In 2017, the Navy selected dredging with off-site disposal as the remedial alternative for the Boat Channel sediments to reduce ecological health risks for current and future receptors.

- Between November 2017 and February 2018, a total of 31,057 cubic yards of sediment was dredged from Stratum 1 and Stratum 2 and disposed at an off-site, regulated landfill.

- In the 1980s, the Navy worked to develop a comprehensive understanding of the Navy's stormwater conveyance systems at NTC and MCRD.

- In 1983, the Navy inspected the storm drain outfalls from the NTC and MCRD to the Boat Channel and mapped the associated storm drain systems as part of a bacteriological source investigation. This study identified 33 stormwater outfalls to the Boat Channel and stated the storm drain systems at the NTC and MCRD were "generally clean of trash, garbage, or debris."

- In 1989, the Navy conducted a study at the NTC to (1) identify issues with the storm drain conveyance system and (2) recommend improvements to the system to eliminate or reduce damage to NTC pavement and structures caused by stormwater runoff.

- The 1989 investigation assessed the conditions of 29 stormwater conveyance systems at NTC and MCRD. The report described the NTC's stormwater drainage system in "poor condition with catch basins and inlets filled with vegetation, silt and garbage as well as being broken." The report also stated "it is apparent that numerous swales, catch basins, and inlets have not been repaired or cleaned recently. Also, all of the outfalls into the Bay Channel, from the west, are crushed, deteriorated, and plugged."

- In the early 2000s, Matrix Environmental Services, LLC (Matrix) investigated and mapped the stormwater conveyance systems in the Boat Channel area on behalf of the City of San Diego Redevelopment Agency. Matrix prepared a draft report in March 2005, which identified 45 stormwater outfalls that discharged into the Boat Channel

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

and mapped the conveyance structures associated with each outfall. The City and US Government have both come to reply upon that map in this matter for defining the following:

- The drainage basin boundaries and acreage for each stormwater outfall that discharges into the Boat Channel:
  o Thirty (30) outfalls drain areas that are smaller than 10-acres in size;
  o Eleven (11) outfalls drain areas that are 10- to 100-acres in size; and
  o The remaining four (4) outfalls drains areas that are 155-acres in size or larger.

- The drainage basin boundaries for <u>all</u> the stormwater outfalls that discharge into the Boat Channel. The upland area encompassed by these boundaries are referred to hereinafter as the Boat Channel Drainage Basin.

- The Matrix report also noted the Boat Channel strata into which each outfall discharged. My evaluations in this report also rely upon the Matrix Map and report for defining the boundaries of the overall Boat Channel Drainage Basin, as well as the boundaries for the drainage basins for each of the three Boat Channel strata. The outfalls, drainage basin boundaries for each of the strata, and the boundary for the overall Boat Channel drainage basin are illustrated on Figure 3, along with the Boat Channel sediment remediation areas.

- A map from 1929 notes two areas dredged to minus 9 ft and minus 15 ft in the area adjacent to the NTC. A map from 1935 illustrates a channel in this area noted with "15 Ft. Deep Jan. 1927." The Boat Channel is approximately 5,000 feet in length, is 500 to 800 feet wide, with depths of 15 to 25 feet below mean lower low water (MLLW). Additional information regarding past dredging of the Boat Channel, other than remedial dredging conducted in 2018, has not been identified in the documents produced.

- The only freshwater input to the Boat Channel is from storm drains and stormwater runoff; there are no significant sources of fresh surface water bodies flowing into the Boat Channel. According to the Navy's contractors, mixing in the Boat Channel occurs primarily by tidal action, but the tidal flushing is minimal.

- Quantification of the sediment transport and sedimentation rates within the Boat Channel have not been identified in the discovery documents.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ◆ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- The Remedial Action Completion Plan for the Boat Channel stated the sedimentation rate within the Boat Channel is likely lower than the sedimentation rate within San Diego Bay, which was estimated at 0.13 to 0.61 inches per year.

- The Navy's RI Report for the Boat Channel states "no assessment was made of specific sediment transport processes into the Boat Channel, which would include contributions from stormwater runoff as well as deposition of sediments from San Diego Bay."

- Prior to the 1920s, the land within the Boat Channel Drainage Basin was largely undeveloped open space and tidelands. Significant development began in the 1920s with the construction of the Naval Training Center (NTC), the Marine Corps Recruit Depot (MCRD), and nearby residential properties. Later developments included the expansion of the San Diego Airport into the Boat Channel Drainage Basin; construction of additional residential, religious, educational, and commercial facilities; and development of a small area for light industrial purposes.

- The development history of the Boat Channel Drainage Basin is described below in five time periods, each of which is defined by either a significant change in land use/development and/or ownership.

- Significant development began in the early 1920s with the construction of the NTC, the MCRD, and residential properties northwest of the NTC. This period is also defined by the filling of tidelands to further develop the NTC and MCRD and the construction of the U.S. Government-owned Boat Channel.

- The NTC, MCRD, and residential area underwent extensive development during this time period, as summarized below.

- In the 1920s and early 1930s, the area of the present-day Boat Channel was tidal lands and open water of the San Diego Bay. In 1922, a channel was reportedly dredged in the tidelands between the MCRD and NTC to allow shallow draft vessels to reach both facilities. During the late 1930s to approximately 1941, dredged material from San Diego Bay was used to fill in the tidelands at the NTC and MCRD to allow for additional development and expansion of these facilities. The present-day Boat Channel was constructed during these activities. The photograph below from 1941 shows the NTC and MCRD tidelands being filled and the development of the Boat Channel.

- The Marine Corps Recruit Depot (MCRD) was the first significant development within the present-day Boat Channel Drainage Basin. It has been operational for over

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

100 years and its primary mission has always been to provide basic training for new Marine Corps recruits. It is the only Marine basic recruit training facility on the West Coast.

- Construction of the MCRD began in 1919 and it was commissioned in 1921. By 1926, the critical facilities had been constructed, and included an administration building, a large power plant, an ice plant, a laundry, carpentry and machine shops, a quartermaster store, seven barracks buildings, and five sets of officers' quarters. The addition of a cantonment (i.e. temporary quarters for personnel) was the only facility needed at the time should a sudden large increase in personnel be needed due to an emergency or war. A list of Marine Corps contracts indicates the water supply and sewer systems were constructed in August 1920, the steam and electric distribution systems were completed in February 1921 and repaired in May 1927, and concrete roads were installed in November 1921. The parade ground was paved in 1930. An emergency expansion of the MCRD began in September 1939, which resulted in the construction of 27 "storehouses", additional barracks and dining facilities, new roads, a railroad, and "hundreds" of 16-men huts. The MCRD reportedly consisted of 676 acres of land in the early 1930s. Approximately 367 acres of the MCRD consists of land in the reclaimed tidal area.

- The Naval Training Center (NTC) was the second significant development within the Boat Channel Drainage Basin. It was operational for nearly 75 years and its mission was to provide basic and specialized training for Navy and Naval Reserve personnel.

- The Navy was gifted an area of tidelands along the Point Loma Bay Shore in 1919 for a naval training center.

- The original grant included 135 acres of land donated by the San Diego Chamber of Commerce and 142 acres of tidelands given by the City of San Diego.

- Construction of the NTC began in 1921 and it was commissioned in 1923.

- Construction of the NTC occurred in phases, primarily in response to national defense priorities.

- The NTC originally consisted of 25 permanent buildings in the 1920s and expanded to 34 permanent buildings and 15 temporary buildings by 1939.

/ / /

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

- The NTC property expanded in 1933 with an additional 95 acres of land gifted by the City of San Diego as well as the filling of approximately 130 additional acres of tidelands.

- The northwestern area of the Boat Channel Drainage Basin was developed in the 1920s and 1930s with residential properties and school sites. Construction of single-family homes first occurred in the northern area (near the intersection of Lytton and Rosecrans Streets) and expanded over time in a southerly direction along Rosecrans Street.

- A small number of commercial properties and a golf driving range were also developed along Lytton Avenue, immediately north of the NTC, sometime before 1940.

- The San Diego Municipal Airport-Lindbergh Field opened in August 1928,[64] east of the MCRD and outside the boundaries of the Boat Channel Drainage Basin.

- The airport was originally designed and constructed for joint use by both the U.S. Marine Corps and the City of San Diego.

- The federal government constructed a seawall and filled in the tidelands with dredged materials from San Diego Bay for the portion of the airfield to be operated by the U.S. Marine Corps.

- The first dredging was completed in December 1929.[65] Additional dredging projects were sponsored by the City Harbor Department, U.S. Navy, the Army Corps of Engineers, and the Works Progress Administration which provided tidal mud from San Diego Bay to expand the airfield to approximately 455 acres by 1941.

- Ryan Air had a small facility in the area immediately north of the MCRD during this time period.

- Ryan air operated a small flight school, offered scenic flights, and conducted some aircraft manufacturing operations at this facility.

- The earliest maps reviewed that depict stormwater conveyance systems within the Boat Channel Drainage Basin are from 1915 to the early 1920s. These maps depict a simplistic system, consisting of a few pipes and a box culvert, that served a limited area of the NTC and MCRD, and even smaller area of the residential area northwest of the NTC. These conveyances discharged to San Diego Bay through a handful of outfalls, only one of which (the box culvert) is in the present-day Boat Channel.

- The other stormwater conveyances present during this period discharged to the tidelands that were later filled during the expansions of the NTC and MCRD.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- As the Navy made plans to fill in tidelands at the NTC and MCRD and construct the Boat Channel, it also planned expansions and extensions of the stormwater conveyance systems.

- A 1938 Navy drawing depicts proposed changes to stormwater conveyance systems at the NTC and MCRD that appear related to extending the conveyances to the area of the present-day Boat Channel.

- Stormwater conveyance infrastructure in the areas outside the NTC and MCRD was very limited in the 1920s and 1930s. Stormwater flow was largely directed by street curbs and gutters, with only a few storm drain lines/conveyances present.

- The filling in of tidelands at the NTC and MCRD and construction of the Boat Channel are believed to have been completed by 1942.

- From 1942 to 1952, the NTC and MCRD were at peak capacity with national defense priorities of World War II and the Korean War.

- The NTC reportedly reached its war-time peak in 1942, with 33,000 men housed in temporary-type wood frame and stucco structures, and again in 1950.

- During this time period, the U.S. Government developed the Fleet Anti-Submarine Warfare Training Center (FASWTC) in the southern fringes of the Boat Channel Drainage Basin, immediately south of the NTC.

- In 1942, the U.S. Government took control of the San Diego Municipal Airport/Lindberg Field and its operations to support war-time efforts.

- The U.S. Government made two expansions to the airport during its ownership. It constructed the airport's first main runway in 1942, and relocated the main runway in 1944 with the construction of a new, longer runway.

- The U.S. Government relinquished control of the airport back to the City of San Diego in approximately 1947.

- Aviation manufacturing was a significant industry in the San Diego region during World War II and the Korean War, including at and adjacent to the airport. Consolidated Aircraft Corporation, Convair, and Ryan Aeronautical Company constructed thousands of aircraft in the area to support the war-time efforts. Nearly all these aviation-related manufacturing activities occurred outside the boundary of the Boat Channel Drainage Basin and are therefore not discussed in greater detail. However, a small area of land within the northern portion of the Boat Channel Drainage Basin was

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

used by Consolidated Vultee Aircraft Corporation and Convair Aircraft Manufacturing during the 1950s. These operations likely began in the Boat Channel Drainage Basin before the 1950s, but historical aerial photographs and Sanborn Fire Insurance Maps were not available for this area until 1949 and 1950, respectively. A review of the 1949 aerial photograph indicates this area was largely used for outdoor storage, and likely associated with the large warehouse structures present nearby, but just outside the boundaries of the Boat Channel Drainage Basin. Ryan Air's facility that was present immediately north the MCRD in the previous time period is no longer present during this time period.

- Light industrial activities, mostly related to auto repair/maintenance/towing, were also developed during this time period along Lytton Avenue, Barnett Avenue, and Pacific Highway.

- Additional residential properties were constructed during this time period in the Boat Channel Drainage Basin. The residential area northwest of the NTC is almost completely developed by 1949. The U.S. Government also developed and owned two residential communities north of the MCRD during this time period.

- In 1941, the Navy acquired approximately 44 acres of land in the northern area of the Boat Channel Drainage Basin, in the area of Ryan Air's former facility, and developed it into multi-family Navy housing in 1942. This residential development is sometimes referred to as the Gateway Housing Development/Liberty Village and is located at present-day address 2741 Mendonca Drive, San Diego. It appears that this housing development is still owned by the U.S. Government.

- In 1946, the Navy acquired approximately 27 acres of land adjacent to the Gateway Housing Development/Liberty Village and developed it into additional multi-family Navy housing. This residential development was referred to as Independence Housing and is located at present-day address 2535 Midway Drive, San Diego.

- Additional commercial development occurred along Lytton Avenue, Rosecrans Street, and Midway Drive.

- No maps of the NTC's stormwater conveyance systems from 1942 to 1952 have been identified in the discovery documents produced to Roux. Maps of the NTC from 1953 depict a vast, complex storm drainage system with 23 storm drain outfalls to the Boat Channel. Based on the rapid expansion of facilities at the NTC during this war-time period, to construction of the Boat Channel, and the 1938 map that illustrates proposed changes to the NTC's stormwater conveyance systems, it is reasonable to conclude that NTC conveyance system illustrated in the 1953 map was most likely installed during the 1942 to 1952 time period.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

- A comprehensive map of the MCRD's stormwater conveyance system from 1942 to 1952 also has not been identified in the discovery documents provided to Roux. Four maps from 1942 and 1943 have been identified but only one of them is legible and maps a very small area. This map identifies a "New 24-inch Conc. Drain" to the Boat Channel, just south of Building 213. A map of the MCRD from 1951 depicts a new storm drain conveyance line that drains a large area of the MCRD and discharges to the northern portion of the Boat Channel.

- Two significant expansions of storm drain conveyances occurred outside the NTC and MCRD boundaries in the early 1940s:

  - The Navy installed stormwater conveyances in the Gateway Housing Development/Liberty Village area. These conveyances appear to connect to the box culvert that was installed in the early 1920s, which discharges to Stratum 1.

- Stormwater conveyances were installed in the commercial area north of the MCRD, in Midway Drive, Frontier Drive (now Sports Arena Boulevard), Enterprise Street, Barnett Avenue, and Pacific Highway. Maps of these conveyances have not been identified in the discovery documents. However, information embedded in the City of San Diego's Geographic Information System (SanGIS) indicates these conveyances were installed in 1942. According to the Matrix Map, these stormwater conveyances are connected to an MCRD conveyance that discharges to Stratum1.

- Development within the Boat Channel Drainage Basin was largely completed by 1953 and minimal changes in development and land use occurred from 1953 to 1965. Noteworthy changes during this time period are mostly limited to changes of land ownership and the construction of a few additional commercial properties.

- During the 1950s, the Navy constructed Camp Nimitz in an undeveloped portion of the NTC on the east side of the Boat Channel to house additional new recruits. The first phase of development was completed in 1955.

- The U.S. Air Force purchased the property at present-day address 2555 Sports Arena Boulevard in 1956. The U.S. Air Force used this property as a parking lot and outdoor storage.

- Ownership of the airport changed in December 1962, when the San Diego Unified Port District (SDUPD) took over ownership and operation from the City of San Diego.

- SDUPD owned/operated the airport until 2001.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- In 1965, the Navy transferred the Gateway Housing property at 2535 Midway Avenue as excess property to the U.S. Postal Service (USPS).
- Some additional commercial development occurred along Barnett Avenue and Midway Avenue and the southern extent of Rosecrans Street during this time period.

- During 1965, the MCRD utilized a portion of its undeveloped property for a landfill.

- As mentioned previously, a vast, complex storm drain conveyance system had been constructed at the NTC by 1953, with 23 storm drain outfalls discharging to the Boat Channel.

- A comprehensive map of the MCRD's stormwater conveyance system for this time period has not been identified in the discovery documents provided to Roux. However, one map from 1953 indicates that stormwater conveyances had been installed within the MCRD Parade Ground and the developed area east of the Parade Ground by December 1953.

- According to the Matrix Map, these MCRD conveyances discharge to Stratum 1.

- The storm drain conveyance system in the residential area northwest of the NTC was expanded during this time period with the installation of storm drainpipes along Rosecrans Street and Nimitz Boulevard. Maps of these conveyances have not been identified in the discovery documents. However, information embedded in the City of San Diego's SanGIS indicates these conveyances were largely installed between 1953 and 1963.

- According to the Matrix Map, these conveyances discharge to Stratum 3.

- During the period from 1966 to 1975, the operations at the San Diego International Airport expanded in the Boat Channel Drainage Basin.

- Present-day Terminal 1 was constructed and put into operation on March 5, 1967.

- The main runway was extended to its present-day length of 9,400 feet in 1972, and a 26-acre parking apron for servicing new, larger commercial aircraft was built in 1975.

- The United States Postal Service (USPS) constructed a Processing and Distribution Center (P&DC) with a Vehicle Maintenance Facility (VMF) in the 1970s on the property it acquired from the Navy at 2535 Midway Drive.

- By 1970, the former Navy housing structures on this property had been removed and the construction of the P&DC is underway.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC
CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- The P&DC was constructed by 1972 and its operations included sorting and distributing mail.

- The VMH became operational in the "early 1970s." Its operations involved maintaining, cleaning, and fueling USPS vehicles.

- In 1971, the City of San Diego installed a new stormwater conveyance in Barnett Avenue. This conveyance discharges to Stratum 1 through a dedicated outfall.

- Maps from 1972 of the MCRD depict a vast, complex stormwater conveyance system that discharges to the Boat Channel through five outfalls.  Many of the conveyances illustrated in these maps were also depicted in maps from previous time periods.

- No significant changes to the NTC's stormwater conveyance system or other areas of the Boat Channel Drainage Basin were noted in the reviewed discovery documents.

- Few changes to land use and ownership occurred in the Boat Channel Drainage Basin during 1976 to 1998.  The noteworthy changes that occurred were that the San Diego International Airport continued to be further developed and expanded within the Boat Channel Drainage Basin. Construction of present-day Terminal 2 began in June 1977 and was completed in July 1979 and that the Navy took over ownership and operation of the U.S. Air Force's property at 2555 Sports Arena Boulevard in 1994 for use as a parking lot and warehouse facility.

- In approximately 1989, the USPS constructed and began operating a Carrier Station Annex (CAX) adjacent to its P&DC and VMF at 2535 Midway Drive.

- Maps showing the comprehensive stormwater conveyance systems at NTC and MCRD for this time period generally reflect the same configurations as previous time periods. No significant additions or changes to the stormwater conveyance systems in other areas of the Boat Channel Drainage Basin were noted in the reviewed discovery documents.

- As described above, the COCs that the Navy and San Diego Regional Water Quality Control Board identified for cleanup in the Boat Channel sediments were copper, lead, zinc, chlordane, and DDT.  The potential sources for these contaminants include both point sources and non-point sources.

/ / /

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC
CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

- A point source is contamination that is from a single identifiable source location, versus a non-point source is where contamination is from diffuse area often with multiple contributing sources.

- Copper, zinc, and lead were detected at concentrations in Stratum 1 sediments exceeding the Boat Channel sediment cleanup goals: Zinc was detected at four stations (S1S1, S1S4, and S1S6) at concentrations (335 – 530 mg/kg) exceeding the zinc cleanup goal (329 mg/kg); Lead was detected at two stations (S1S4 and S1S6) at concentrations (190-391 mg/kg) exceeding the lead cleanup goal (183 mg/kg); Copper was detected in only one station (S1S4) at a concentration (281 mg/kg) exceeding the copper cleanup goal (166 mg/kg).

- Activities at multiple NTC buildings, all located within the Stratum 1 drainage basin, are identified as likely to have contributed metals contamination to Boat Channel sediments via stormwater discharges.

- The NTC Marina Building (Building 358) is a potential source of lead and copper pollution to the Boat Channel. Built in 1942 (and rebuilt in 1960), the Marina Building was a boat house for decades before transitioning to an Outboard Motor repair facility that was used to repair and paint outboard motors, sailboats, and motorboats in the 1970s and 1980s. In addition to metals from repair work, copper and lead-based paint would have been used and stored at the building for decades.

- NTC Building 185 was a metal machine shop, constructed in 1942.

- Numerous NTC locations (Buildings 31, 34, 42, 142, 174, 187, 188, 189, 213, 361) were associated with gasoline and paint storage, automotive repair, vehicle storage, painting, welding, battery charging and vehicle refueling, all of which could be point sources for the three metals.

- The NTC's former shooting range (former Building 192) operated from 1942 to 1994 and had a sand / dirt floor until 1974.

- During remediation analysis in the 1990s, lead was detected in the soil at concentrations up to 11,900 mg/kg.

- Numerous storm drain catch basins, which all discharge to Stratum 1, are mapped in the immediate vicinity of the NTC buildings listed above. Additionally, a Navy contractor has stated the following regarding Navy operations at the NTC: *"Industrial waste generation operations at NTC San Diego have historically centered around public works and the school commands."* *"The current waste management practices, including disposing of paints in dumpsters and pouring solvents down drains or on the pavement to evaporate, have always been followed."* *"There has been very little on-site hazardous waste disposal. This is partly because of the small quantities generated and partly because so much of the base is paved or generally open. There have never been many of the conveniently secluded, nonpaved areas which tend to invite improper disposal. Consequently, most wastes have gone down drains or off site* (emphasis added)."

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- Activities at multiple MCRD buildings, all located within the Stratum 1 drainage basin 9 (except as noted), are also identified as likely to have contributed metals contamination to Boat Channel sediments via stormwater discharges.
- The MCRD's gasoline stations, gas pumps, and fuel storage facilities (Buildings 355, 375, 500, 507) could have been sources of historical lead.
- The activities conducted at the MCRD's Motor Transport facilities (Buildings 107, 112, 115, and 152).
- Similar to the NTC's Boat House (Building 358), the MCRD also had a Boat House (Building 365).
- The Amphibian Tank Shelter (former Building 213) and Tank Bath were located directly adjacent to Stratum 1 in the 1940s. In addition to the potential metal runoff from the tank storage and wash, it is expected the amphibian tanks were also used within the Boat Channel, given the presence of a ramp situated between the Boat Channel and the Amphibian Tank Shelter.

- MCRD Auto Hobby Shop (Building 213) is located within the Stratum 2 drainage basin.

- The NTC and MCRD's boat docks/marinas, which have been present <u>within</u> Stratum 1 as early as the 1920s, could also be a point source for copper contamination to Stratum 1 sediments.

- Elevated levels of copper in sediments have been noted throughout San Diego Bay, but particularly near small harbors and shipping channels. NTC Pier 445 was constructed in 1923 with 14 boat slips and is observable in Stratum 1 in the 1929 aerial photograph. This dock is identified as "Utility Dock 445" in a 1963 NTC map.

- A 1942 map of MCRD includes a pier and "float" from MCRD Building 131; these features were expanded by 1963 to include a second pier.

- The location of these MCRD features are also within Stratum 1. A third dock in Stratum 1, from NTC, is observed in the 1949 aerial photograph this dock is identified as "Training Dock 446" in the 1963 NTC map and was expanded in 1974 to include 40 slips.

- Copper contamination is known to be associated with copper-based antifouling paints used historically and recently in marine applications.

- Additionally, the treated wood piers themselves are also a potential source for copper contamination because material used to treat the wood contains chromated copper arsenate (CCA).

- Researchers have found piers can contribute tens of mg/kg of copper to the sediments.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- Most of the copper leached from the CCA-treated piers remains relatively close to the pier location and on the surface of the sediments. During a 1984 underwater facilities evaluation, the Navy noted that the wooden portion of the bulkheads of Piers 445 and 446 were deteriorated from dry rot, as were three wooden guide piles for Pier 445.

- The inactive NTC landfill has maximum soil concentrations of copper (426 mg/kg), lead (1040 mg/kg), and zinc (2390 mg/kg) at levels within the landfill that could be responsible for the Boat Channel contamination if it washed into the Boat Channel, but given the current landfill cover, any current or historical pathway into Stratum 1 is uncertain given its drainage area.

- If landfill leachate were to reach the Boat Channel via groundwater flow, that is one potential pathway for landfill metals to reach the Boat Channel and its sediments, but the inactive landfill is not located adjacent to the area of elevated sediment impacts in Stratum 1.

- Typical road runoff, from both streets and parking lots, often is a contributor to metal contamination in waterways.

- Lead was a common gasoline additive starting in the 1920s and continuing into the early 1990s before it was completely phased out. Lead does not degrade in the environment, so lead from road runoff can remain a problem until it is diluted out or buried by new sediments.

- Even years after its ban as a gasoline additive, lead in soil near highways in San Diego was found to be 331 mg/kg.

- Copper and zinc are also known to accumulate on roads due to abrasion of brake lining and tires, as well as leaks of oil that are deposited on the road surface.

- In addition to road runoff, all three of the metals can also be found in general urban runoff. The concentrations of zinc and lead detected in Boat Channel sediments are consistent with concentrations found in general urban runoff.

- Researchers looking at runoff in the Los Angeles area, which has a similar climate to San Diego, have found that copper and zinc tend to have similar patterns of concentrations from runoff. Both have the highest concentrations in runoff from industrial sites, about double the next highest which is from agriculture.

- For both, recreational uses (golf courses, playgrounds, playing fields, developed parks) produce half the concentration of agriculture.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- Residential and commercial uses contribute the least amount of heavy metals in urban runoff. The big difference between copper and zinc is that copper also is found in runoff from transportation land use (airports, bus terminals, freeways, etc.) that is equal to runoff from recreation land uses.

- The same study found that lead had the highest concentration in runoff from agriculture and high density residential, with slightly lower concentrations in runoff from recreation land uses. This 2008 study did not find high levels of lead in runoff from transportation land uses, which included all paved vehicle surfaces.

- Roof runoff could also contribute copper, zinc, and lead at concentrations relevant to contributing to the sediment contamination.

- Metal concentrations in roof runoff depends on the roofing material. There are pictures at the MCRD from the 1950's of Quonset huts which are constructed of galvanized steel.

- More than 400 Quonset huts at the MCRD can be viewed in a 1953 aerial photograph.

- The pictures also show other buildings with Spanish tiles or flat concrete roofs.

- Zinc is particularly high with galvanized steel roofs, but copper, zinc, and lead have all be detected in roof runoff from these three styles of roofs as well as common residential roofs such as treated wood shingles and asphalt shingles.

- Boat traffic within the Boat Channel could also be considered as a non-point source separate from the marinas which are point sources.

- Individual boats have the potential to contribute all of the metals from their paint, lead in spilled/discharged gasoline, or zinc from electrolysis blocks used to prevent corrosion in boat hulls.

- DDT and chlordane were detected at concentrations in sediments in Stratum 1 and Stratum 2 that exceed the Boat Channel sediment cleanup goals:  DDT and Chlordane were detected five stations (S1S1, S1S4, S1S5, S1S6, S2S4) in the northern end of the Boat Channel at concentrations (88 – 293 ug/kg total DDT and 18 – 26 ug/kg total chlordane) exceeding the total DDT cleanup goal (84 ug/kg) and total chlordane cleanup goal (16 ug/kg); DDT was detected in two stations (S2S9 and S2S10) at concentrations (7,040.1 ug/kg and 17,490.1 ug/kg) exceeding the total DDT cleanup goal (84 ug/kg).

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- Use and production of DDT exploded in the 1940s during World War II. National production of DDT dramatically increased from 1,000 lbs per month in 1943 to 3 million lbs per month in 1945, with the majority being used by the military. The military routinely sprayed interior walls with DDT to control mosquitos, as well as supplied soldiers with small cans of DDT powder. Its usage peaked in 1959 in the United States and gradually decreased through the 1960s until it was banned in 1972 by the EPA.

- Chlordane usage began in the late 1940's as a broad-spectrum pesticide, though it was heavily used for control of termites in homes. Chlordane has been banned on turfgrass in the United States since 1978.

- This was followed by a ban in 1983 for all uses except termite control, then finally a complete ban in 1988 for all uses.

- Chlordane usage in California was already mostly for structural protection even before the 1983 ban on other uses.

- San Diego falls in a zone of high termite density, thus high potential for chlordane usage on houses.

- There are no DDT/chlordane manufacturing facilities in the NTC, MCRD, or the watershed that could explain direct pesticide discharges into the Boat Channel, but there are some potential point sources where pesticides were handled and stored, and numerous potential non-point sources where pesticides were reasonably expected to have been applied.

- Golf courses are known contributors of pesticide contamination to waterways, and there is a golf course on the NTC grounds, within the Stratum 1 drainage basin. "DDT was used extensively" as pest control for the golf course from 1959-1970, with the rinsate of empty DDT containers "poured on the ground near Building 516".

- There are also multiple recreation fields and green spaces on the NTC and MCRD that would likely have been sprayed with the two pesticides. "*Waste pesticides (principally surplus DDT) were taken to the MRCD refuse disposal area and buried* (emphasis added)."

- Chlordane has been found in the sediments in various locations throughout San Diego Bay with researchers pointing toward golf courses as a potential source. In addition to DDT, the golf course on the grounds of the NTC is reasonably expected to be a source for chlordane to the impacted sediments.

/ / /

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC
CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- In addition, the military also has a history of using chlordane for termite control in their housing units until 1988. There is no specific documentation detailing chlordane use in housing at either the NTC or the MRDC, but it would be consistent both with chlordane usage in the San Diego area and with the military as a whole.

- Pesticides, including DDT and chlordane, were stored on-site at the NTC and MCRD. These pesticides were stored at the NTC at the Golf Course Maintenance Storage Areas (Buildings 364, 516, and 519) 194,195,196 and potentially in NTC Buildings 34, 174, 179, 180 or 464. Pesticide storage at the MCRD was potentially in Buildings 129, 299, and 358.

- While potential leaks or spills can occur during storage and handling, previous reports have pointed toward the practice of rinsing empty pesticide containers then disposing the rinsate down the storm drains leading to the Boat Channel.

- The inactive NTC landfill has maximum soil concentrations of DDT (180 µg/kg) and chlordane (250 µg/kg) at levels within the landfill that could be responsible for contributions to the Boat Channel contamination if it washed into the Boat Channel, but given the current landfill cover, the current or historical pathway into Stratum 1 is uncertain given its drainage area.

- If landfill leachate were to reach the Boat Channel via groundwater flow, that is one potential pathway for landfill metals to reach the Boat Channel and its sediments, but the inactive landfill is not located adjacent to the area of elevated sediment impacts in Stratum 1.

- Before their bans, both DDT and chlordane were used extensively throughout the US, and both are known to have been used on the MCRD.

- There is substantial green space on the MCRD site directly adjacent to Stratum 1 of the Boat Channel that would have likely seen pesticide use, not to mention the other open/drill space throughout the MCRD.

- There are also some residential areas that would drain into Stratum 1 of the Boat Channel. Given how slowly both pesticides degrade, it is conceivable that general runoff from lawns and municipal spraying could contribute to the sediment contamination. Both of these pesticides have been banned for decades but continue to be detected in urban runoff and stream sediments.

/ / /

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

- Current presence in streams for both DDT and chlordane seem to be more correlated to watersheds with earlier transition to urban land uses rather than those that remained as agriculture.

- Owners of real property are liable for hazardous substance remediation on a strict liability basis. This provision of law is retroactive, and the date of causation is irrelevant.

- Plaintiff entered into a settlement agreement with the San Diego Unified Port District and the San Diego County Regional Airport Authority in this case and negotiated with the same a Consent Decree which was approved by the Court. (See ECF. No. 69).

- In 2000, it was anticipated that the Navy would clean up and transfer the Boat Channel parcels to the City by 2002 (BRAC Business Plan, March 2000; MOA) but this timeline was delayed as a result of the Navy and the RWQCB taking 5 years to prepare the Remedial Investigation (RI – 1998-2003), and a FS taking nearly 13 years. The final scope of the investigation and cleanup was not completed for nearly 20 years after the data was collected.

- Despite the 8/12/2008 correspondence from the RWQCB advising the Navy of the need to collect more data per these new Sediment Quality Objectives, as a result of submitting its site investigation prior to 2008, the Navy was grandfathered into regulatory standards that existed in 2003, rather than being held to a more rigorous standards established by the Water Board in 2009 and 2018.

- In 2016, the Navy prepared a Feasibility Study and subsequent remediation alternatives identified seven of 26 sampling stations of submerged sediments as impacted based upon data collected in 1998.

- The Remedial Investigation report and subsequent evaluations identified an Area of Ecological Concern consisting of five locations where the ecological risk assessment for benthic invertebrates indicated potential risk and in order to turn the individual sampling stations into defined areas for remediation, the Thiessen Polygon method was employed.

- The Thiessen Polygon method assigns an area to each sampling station without bias; however, the boundaries identified in this manner assume that the sediment bottom is a constant plan without bathymetric contours and that there are no impediments to the spatial distribution of contaminants.

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

26

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

- Despite the City's repeated concerns regarding the quality of the investigation being documented by the Navy, the RQWCB allowed the Navy to rely on an incomplete and outdated investigation, and ultimately, authorized a limited cleanup of submerged sediments in the Boat Channel.

## D. DESCRIPTION OF THE KEY EVIDENCE CITY WILL OFFER IN OPPOSITION TO PLAINTIFF'S CLAIMS

The City anticipates offering the below key evidence in opposition to Plaintiff's claims.

- Expert opinions and testimony of Adam H. Love
- Comment letters submitted by the City to the Regional Water Board from 2015 regarding City's concerns about the Navy's investigation and remediation of the NTC Boat Channel.
- Testimony of Drew Kleis
- Documents relied upon / referenced to by Adam H. Love in his expert report and rebuttal expert report
- Defendant's Exhibit List attached hereto as **Exhibit A**.

## E. AFFIRMATIVE DEFENSES AND ELEMENTS REQUIRED TO ESTABLISH

Divisibility:  Responsibility for response costs for the contamination may be reduced, considering a variety of factors including, but not limited to, the following: (a) whether other properties in the area contributed to the contamination; (b) whether Plaintiff used and caused contamination at certain portions of the Property; (c) the duration of the parties' respective ownership and/or operations; (d) the "hazardous substances" used at the Property and their relation to the contamination; and (e) the volume of "hazardous substances" used at the Property and their relation to the contamination. *Burlington N. and Santa Fe Ry. Co.* v. *U.S.,* 129 S. Ct. 1870 (2009).

/ / /

CIVIL NO. 3:23-CV-00541-LL-BJC
CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## F.   BRIEF DESCRIPTION OF KEY EVIDENCE RELIED ON IN SUPPORT OF AFFIRMATIVE DEFENSES

The City anticipates that the key evidence for all claims is essentially the same:

- Expert opinions and testimony of Adam H. Love
- Comment letters submitted by the City to the Regional Water Board from 2015 regarding City's concerns about the Navy's investigation and remediation of the NTC Boat Channel.
- Testimony of Drew Kleis
- Documents relied upon / referenced to by Adam H. Love in his expert report and rebuttal expert report
- Defendant's Exhibit List attached hereto as **Exhibit A**.

## G.   ANTICIPATED EVIDENTIARY ISSUES

None.

## II.   WITNESSES

The City identifies the following witnesses it expects to present at trial:

1.    <u>Adam H. Love, Ph.D.</u>

Dr. Love is a Vice President and Principal Scientist at Roux Associates, Inc. in Oakland, California. He received Boat Channel, historical stormwater volumes conveyance systems, contribution a PhD in civil and environmental engineering and a Master of Science degree in material science and mineral engineering both from the University of California at Berkeley. He received his bachelor's degree in geosciences from Franklin & Marshall College. He has over 20 years of experience in environmental forensics, site characterization, remediation, exposure assessment, human health risk, and contamination transport analyses. Dr. Love is expected to provide expert testimony about observed contaminant impacts to the of relevant contaminants in stormwater, and the allocation of contaminant contribution to the environmental responses costs for the Boat Channel.

2.    <u>J. Michael Trapp, Ph.D.</u>

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

Dr. Trapp is the National Water Resources Market Lead for AtkinsRéalis. He received a PhD in marine and atmospheric chemistry from Rosensteil School of Marine and Atmospheric Science at the University of Miami. He received a Master of Science degree in chemistry from the University of Miami and a bachelor's degree in biology and chemistry from Florida Southern College. Dr. Trapp is expected to provide expert testimony about how the U.S. Navy conducted an inadequate site characterization, the U.S. Navy's remediation did not meet current regulatory sediment framework, and that the U.S. Navy's dredge operations did not properly remediate the areas identified as impacted in the Remedial Action Plan.

3.    Andrew Kleis
Assistant Director, Water Delivery Branch
City of San Diego Public Utilities Department
525 B St.
San Diego, CA 92101

4.    Charles Modica
Independent Budget Analyst, City of San Diego
202 C St.
San Diego, CA 92101

5.    Benjamin Battaglia
Director of Finance and City Comptroller, City of San Diego
202 C St.
San Diego, CA 92101

The City identifies the following witnesses it may present at trial if the need arises:

1.    David Gibson
Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, CA 92108

2.    Chehreh Komeylyan
Water Resource Control Engineer
San Diego Regional Water Quality Control Board

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

2375 Northside Drive, Suite 100
San Diego, CA 92108

3.  Sean McClain
    Senior Engineering Geologist
    Program Manager for Site Restoration, Military Facilities Unit
    San Diego Regional Water Quality Control Board
    2375 Northside Drive, Suite 100
    San Diego, CA 92108

4.  Kristin Schwall
    Water Resource Control Engineer, retired
    San Diego Regional Water Quality Control Board
    2375 Northside Drive, Suite 100
    San Diego, CA 92108

5.  Rene Luis Cardinale
    U.S. Department of Navy
    Remedial Project Manager
    Naval Facilities Engineering Systems Command Southwest
    750 Pacific Highway
    San Diego, CA 92132

6.  Lonie Cyr
    U.S. Department of Navy
    Cadastral Department
    Naval Facilities Engineering Systems Command Southwest
    750 Pacific Highway
    San Diego, CA 92132

7.  Amy Jo Hill
    U.S. Department of Navy
    Real Estate Contracting Officer
    Navy Facilities Engineering Systems Command
    750 Pacific Highway
    San Diego, CA 92132

8.  Janet Lear
    U.S. Department of Navy
    Navy Deputy Base Closure Manager

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ◆ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC

CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ◆ FAX 310-481-7650

BRAC PMO West
1455 Frazee Road, Suite 900
San Diego, CA 92108

9.   Thomas Macchiarella
U.S. Department of Navy
BRAC Base Closure Manager
Base Realignment and Closure Program Management Office, West
33000 Nixie Way, Building 50
San Diego, CA 92147

10.   Anthony Megliola
U.S. Department of Navy
BRAC Base Closure Manager
Base Realignment and Closure Program Management Office, West
33000 Nixie Way, Building 50
San Diego, CA 92147

11.   Doug Campbell
Deputy Director, Pure Water Operations
City of San Diego Public Utilities Department
525 B St.
San Diego, CA 92101

12.   Victoria Kalkirtz-Moore
Stormwater Compliance Manager
City of San Diego Public Utilities Department
525 B St.
San Diego, CA 92101

13.   Ruth Kolb
Biologist – Storm Water Specialist, City of San Diego, retired
City of San Diego Public Utilities Department
525 B St.
San Diego, CA 92101

14.   Amanda M. Parra
Assistant Deputy Director, Stormwater Department, Operations Division
City of San Diego Public Utilities Department

CIVIL NO. 3:23-CV-00541-LL-BJC
CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

525 B St.
San Diego, CA 92101

15. Andre Sonksen
Stormwater Compliance Manager
City of San Diego Public Utilities Department
525 B St.
San Diego, CA 92101

16. Peter Vroom, Ph.D.
Deputy Director
City of San Diego Public Utilities Department
525 B St.
San Diego, CA 92101

17. Marc Webb
Deputy Director, Records Management and Research
Office of the City Clerk for the City of San Diego
202 C St., Second Floor
San Diego, CA 92101

## III.    ANTICIPATE ISSUES OF LAW

Because both parties are alleged as PRPs, the Court must "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000).

Also, the City will present matters appealing to the court's equitable jurisdiction in allocating response costs. These matters pertain to the future liability of the City with respect to perfluorinated compounds; requirements pursuant to the State of California's Sediment Quality Objectives; the discovery of hazardous substances in addition to or in excess of existing contaminant levels; discovery of hazardous substances at or under the rip rap debris on the bank of the Boat Channel; and the cost of removal of the rip rap to render the property suitable for its intended recreational purposes. These matters are not intended to constitute a challenge to the adequacy of the Navy's response action.

/ / /

CIVIL NO. 3:23-CV-00541-LL-BJC

## IV.  BIFURCATION

Defendant does not request bifurcation of the issues at trial.

## V.  JURY TRIAL

The claims should be tried to the Court.

## VI.  ATTORNEYS' FEES

None of the claims against Defendant allow for recovery of attorneys' fees.

## VII.  Abandonment of Issues

Defendant abandons the following affirmative defenses:

(a)  Statute of Limitations

(b)  Act of God or War

(c)  Act or Omission of Third Party

(d)  Superseding or Intervening Independent Cause

(e)  Cause-in-Fact

(f)  Proximate Cause of Harm

(g)  Releases Authorized or Permitted Pursuant to Federal or State Law

The City's pretrial submissions do not include evidence and argument that the Court has definitively ruled on the record will be excluded at trial and for all purposes in this litigation. (*See, e.g.*, ECF Nos. 219, 220, 221, 222, 224). The City does not make an offer of proof of this excluded evidence because "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence ... a party need not renew an objection or offer of proof to preserve a claim of error for appeal." *United States v. Sepulveda-Barraza*, 645 F.3d 1066, 1070 (9th Cir. 2011); *see* Fed. R. Evid. 103(b). The City also does not include evidence and argument offered on the cross-motions for summary judgment on the United States' counterclaim-in-reply for specific performance. (ECF Nos. 186, 188). No offer of proof is required to preserve review of the Court's order granting summary judgment to the United States. (ECF No. 224); *see IceMOS Tech. Corp. v. Omron Corp.*, 2020 WL 289505, at *3 (D. Ariz. 2020) ("An order granting partial summary judgment is not an

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

evidentiary ruling."); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("In reviewing a summary judgment, we are limited to the evidence available to the court at the time the motion was made."). The City does not abandon or otherwise waive these issues for review on appeal from a final judgment or an order certifying an immediate appeal. (*See* ECF No. 226).

Respectfully submitted,

DATED: June 9, 2026            **WOOD, SMITH, HENNING & BERMAN LLP**

By: ___/s/ Alice Charkhchyan___
            THOMAS F. VANDENBURG
            ALICE CHARKHCHYAN
Attorneys for Defendant/Cross
Defendant/Counter Claimant/Cross Claimant,
CITY OF SAN DIEGO

DATED: June 9, 2026            **KUTAK ROCK LLP**

By: ___/s/ Barry P. Steinberg___
            Barry P. Steinberg
            Dwyer Arce
Attorneys for Defendant/Cross
Defendant/Counter Claimant/Cross Claimant,
CITY OF SAN DIEGO

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
10960 WILSHIRE BOULEVARD, 18TH FLOOR
LOS ANGELES, CALIFORNIA 90024-3804
TELEPHONE 310-481-7600 ♦ FAX 310-481-7650

CIVIL NO. 3:23-CV-00541-LL-BJC
CITY OF SAN DIEGO'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW